**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| Donald J. Trump, Candidate for President of the United States of America, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. ) _____ ) |
| The Wisconsin Elections Commission, and its members, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Dean Knudson, Robert F. Spindell, Jr., in their official capacities, Scott McDonell in his official capacity as the Dane County Clerk, George L. Christenson in his official capacity as the Milwaukee County Clerk, Julietta Henry in her official capacity as the Milwaukee Election Director, Claire Woodall-Vogg in her official capacity as the Executive Director of the Milwaukee Election Commission, Mayor Tom Barrett, Jim Owczarski, Mayor Satya Rhodes-Conway, Maribeth Witzel-Behl, Mayor Cory Mason, Tara Coolidge, Mayor John Antaramian, Matt Krauter, Mayor Eric Genrich, Kris Teske, in their official Capacities; Douglas J. La Follette, Wisconsin Secretary of State, in his official capacity, and Tony Evers, Governor of Wisconsin, in his Official capacity. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT FOR EXPEDITED DECLARTORY AND INJUNCTIVE RELIEF PURSUANT TO ARTICLE II OF THE UNITED STATES CONSTITUTION**

The plaintiff, Donald J. Trump, Candidate for President of the United States, by

counsel, alleges:

## THE PARTIES

1.      Plaintiff, Donald J. Trump, is a resident of the State of Florida, is the forty-fifth President of the United States of America, and was a candidate for President of the United States in the November 3, 2020, election held in the State of Wisconsin for the selection of electors for the offices of President and Vice President of the United States.

2.      Ann S. Jacobs, is sued in her official capacity as a member of the Wisconsin Elections Commission ("WEC" or the "Commission").

3.      Mark L. Thomsen is sued in his official capacity as a member of the WEC.

4.      Marge Bostelmann is sued in her official capacity as a member of the WEC.

5.      Dean Knudson is sued in his official capacity as a member of the WEC.

6.      Robert F. Spindell, Jr., is sued in his official capacity as a member of the WEC.

7.      Scott McDonell is sued in his official capacity as the Dane County Clerk.

8.      George L. Christenson is sued in his official capacity as the Milwaukee County Clerk.

9.      Julietta Henry is sued in her official capacity as the Milwaukee Election Director.

10.      Claire Woodall-Vogg is sued in her official capacity as the Executive Director of the Milwaukee Election Commission.

11.      Mayor Tom Barrett is sued in his official capacity as the Mayor of the City of Milwaukee.

12.     Jim Owczarski is sued in his official capacity as City Clerk of the City of Milwaukee.

13.     Mayor Satya Rhodes-Conway is sued in her official capacity as Mayor of the City of Madison.

14.     Maribeth Witzel-Behl is sued in her official capacity as City Clerk of the City of Madison.

15.     Mayor Cory Mason is sued in his official capacity as Mayor of the City of Racine.

16.     Tara Coolidge is sued in her official capacity as City Clerk of the City of Racine.

17.     Mayor John Antaramian is sued in his official capacity as Mayor of the City of Kenosha.

18.     Matt Krauter is sued in his official capacity as City Clerk of the City of Kenosha.

19.     Mayor Eric Genrich is sued in his official capacity as Mayor of the City of Green Bay.

20.     Kris Teske is sued in her official capacity as City Clerk of the City of Green Bay.

21.     Douglas J. La Follette, is sued in his official capacity as the Wisconsin Secretary of State, and by virtue of his responsibility under the Wisconsin Constitution and Wis. Stat. § 6.30 to affix the seal of the State and register commissions.

22.    Tony Evers, is sued in his official capacity as the Governor of Wisconsin, and by virtue of his roles as the Chief Executive of the State of Wisconsin and under 3 U.S.C. § 6 in the certification activities for Presidential electors.

## JURISDICTION AND VENUE

23.    This action arises under 42 U.S.C. § 1983 and Art. I, § 4, cl. 2, Art. II, § 1, cl. 4 and the First and Fourteenth Amendments of the United States Constitution.

24.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), 2201, and 2202.

25.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred or will occur in this District.

## BRIEF SUMMARY OF *ULTRA VIRES* ACTS BY WISCONSIN OFFICIALS THAT UNDERMINED THE PRESIDENTIAL ELECTION IN WISCONSIN

26.    A striking characteristic of the November 3, 2020, election in Wisconsin is that it involved a number of *ultra vires* acts by Wisconsin public officials charged with administering the election that were inconsistent with state law and the directions of the Wisconsin Legislature as set forth in the Wisconsin Election Code.

27.    "[A] significant departure from the [State's] legislative scheme for appointing Presidential electors" or for electing members of the federal Congress "presents a federal constitutional question" this Court must answer. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *see also Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat 304 (1816) (concluding Virginia court misinterpreted state law in order to reach a federal question). The constitutional delegation of power to the state legislature

means that "the text of [state] election law itself, and not just its interpretation by the courts of the States, takes on independent significance." *Bush v. Gore*, 531 U.S. at 112–13 (Rehnquist, C.J., concurring).

28. At the heart of each violation of the Wisconsin Election Code described in this Complaint was the purposeful disregard of thoughtful legislative safeguards meant to prevent absentee ballot fraud and to promote uniform treatment of absentee ballots throughout the State, including by:

a. **Ignoring or compromising state law limits on the availability of mail-in balloting for those reasonably able to cast a ballot in-person** – The intentional acts of election officials which compromised legislative limits on the availability of mail-in ballots, undermined the authority of the state legislature and undercut the Wisconsin Election Code requirements related to photo identification for in-person and absentee electors, reducing the security and integrity of the election by making it easier to engage in mail-in ballot fraud.

b. **Proliferating unmanned mail-in ballot drop boxes** – which contradict state law absentee balloting requirements making it easier to engage in ballot harvesting and other forms of mail-in ballot fraud and resulting in the standardless operation of a new form of balloting in the State not permitted under the Wisconsin Election Code.

c. **Processing and counting vast numbers of mail-in ballots outside the visibility of poll watchers** – despite Wisconsin law which provides that the voting, processing and tabulation of ballots are to be

observable by members of the public and poll watchers, and undermining this crucial safeguard against fraud which when properly applied promotes public confidence in elections.

d. **Reducing or eliminating mandatory voter information certifications for mail-in ballots** – The intentional acts of election officials which diminished or eliminated state laws requiring that voters provide information on the mail-in ballot envelope, such as the voter's name, address, and signature and the name, address and signature of a witness, undermined the authority of the state legislature, reduced the security and integrity of the election by making it easier to engage in mail-in ballot fraud and created another standardless rule in conflict with the clear terms of the Wisconsin Election Code, preventing uniform treatment of absentee ballots throughout the State.

e. **Permitting "ballot tampering"** – a practice forbidden by state law wherein election workers alter the certification of the voter or witness on mail-in ballots which, contrary to the Wisconsin Election Code, was expressly authorized by the Wisconsin Elections Commission, resulting in disparate and unequal application of the voting laws throughout Wisconsin and opening the door to standardless and subjective determinations of election workers which undermined uniform treatment of absentee ballots throughout the State.

29.     These practices usurped the Wisconsin Legislature's exclusive authority to direct the election for Presidential electors in Wisconsin and also violated equal protection and due process standards, significantly undercutting the predictable and uniform application of the law, while serially undermining the Wisconsin Election Code.

30.     It is the policy of the State of Wisconsin that "voting by absentee ballot is ['in contrast' to the constitutional right of in-person voting] a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse." Wis. Stat. § 6.84(1).

31.     As explained herein, the Plaintiff seeks a very precise remedy to uphold the exclusive authority of the Wisconsin Legislature granted in Article II of the United States Constitution regarding the conduct and manner in Wisconsin for appointing Electors to vote for the President of the United States. Plaintiff seeks a declaration and preliminary and permanent injunction that the Defendants and their practices described in this Complaint infringed and invaded upon the Wisconsin Legislature's prerogative and directions under Article II of the U.S. Constitution regarding the conduct of the 2020 Presidential election in Wisconsin and will, if continued, do so in future elections.[1] After issuance of the requested declaratory and injunctive relief, Plaintiff asks this Court to immediately remand this matter to the Wisconsin Legislature to review the nature and scope of the infringement declared and determine the appropriate remedy for the constitutional violation(s) established, including any impact upon the allocation of Presidential electors for the State of Wisconsin.

---

[1] Plaintiff incorporates his motion for expedited declaratory, preliminary and permanent injunctive relief filed contemporaneously with this Complaint.

## PROCEDURAL CONTEXT

32.     The Electoral College is scheduled to meet on December 14, 2020.[2]

33.     The matters addressed in this Complaint must be considered expeditiously and <u>Plaintiff is contemporaneously with the filing of this Complaint filing a separate motion requesting that this matter be set for a hearing within forty-eight (48) hours on Plaintiff's motion for expedited declaratory, preliminary and permanent injunctive relief or within such other shortened time period which the Court determines reasonable under the circumstances and which will permit all parties an opportunity for appeals at all levels of the federal judicial system to be completed by December 11, 2020</u>.[3]

34.     Given the unique nature of the issues raised herein, Plaintiff's Complaint sets forth the basic legal authorities and principles upon which Plaintiff relies. Therefore, pursuant to Civil L.R. 7(a)(2) Plaintiff is filing a certificate stating that no additional memorandum or other supporting papers will be filed supporting his initial motion for expedited declaratory, preliminary and permanent injunctive relief outside of this Complaint and the exhibits filed in support of this Complaint.

35.     Plaintiff's requests for relief are based on public documents and facts not significantly in dispute and, in any case, should be capable of presentation within a one-day hearing.

36.     Plaintiff's requests for relief are based upon the following allegations.

---

[2] 3 U.S.C. § 7.
[3] This request is underlined to draw it to the attention of the Court, court staff and Defendants' counsel.

# BACKGROUND

## The Electors Clause of the U.S. Constitution

37.     Article II of the United States Constitution requires that each State "shall appoint" its Presidential electors "in such Manner as the *Legislature thereof* may direct." U.S. CONST. art. II, § 1, cl. 4 (emphasis added).[4]

38.     Thus, "in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000).

39.     "[T]he state legislature's power to select the manner for appointing electors is plenary." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

40.     Therefore, a state supreme court cannot invoke a state constitution to circumscribe that legislative power. *Palm Beach Cty. Canvassing Bd.*, 531 U.S. at 77.

41.     For the same reasons, neither can an executive branch official, such as a Governor of a State, a mayor of a municipality or an election officer in the State, a municipal clerk, or any administrative body or member of such a body, lawfully circumscribe, alter, limit, amend or fail to enforce or refuse to enforce a law enacted by the State Legislature which is, or was intended by the Legislature to be, applicable to the Presidential election in the State.

---

[4] *See also* id. art. I, § 4, cl. 2 (providing that, in each State, the "Legislature thereof" shall establish "[t]he Times, Places and Manner of holding Elections for Senators and Representatives").

Case 2:20-cv-01785   Filed 12/02/20   Page 9 of 72   Document 1

## The Election Clauses and Separation of Powers Provisions of the U.S. Constitution Safeguard Liberty and Fair and Free Elections

42. Whether the State of Wisconsin and its public officials respected the limits of the United States Constitution's Electors Clause is a matter of fundamental national importance not limited to the interests of Wisconsin voters or merely those individuals who voted in the 2020 Presidential Election in Wisconsin.

43. The U.S. Supreme Court has long recognized that "in the context of a Presidential election," "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983).

44. "For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id*.

45. Consistent with other separation-of-powers provisions in the Constitution, the explicit allocation of authority to state legislatures to regulate federal elections, seen in both the Electors Clause and in the authority of state legislatures stated in Art. I, § 4, cl. 2 to establish the time, place and manner of holding elections for Senators and U.S. Representatives (collectively, the "Election Clauses") are a structural check on governmental power which preserve liberty, freedom, and fair elections for all Americans.[5]

---

[5] Counsel for Plaintiff wishes to credit the compelling arguments raised in the *Brief of the State of Missouri and Nine Other States as Amici Curiae in Support of Petitioners* (*i.e.*, the states of Missouri, Alabama, Arkansas, Florida, Kentucky, Louisiana, Mississippi, South Carolina, South Dakota and Texas) in the case of *Republican Party of Pennsylvania v. Boockvar*, Nos. 20-542, 20-574, On Petition for Writs of Certiorari to the Pennsylvania Supreme Court (filed Nov. 9, 2020). The arguments of the Attorneys General on behalf of their States have been liberally borrowed from herein without further attribution, particularly in relation to separation of powers

46.     Encroachment on this authority by another state actor from the other branches of government undercuts the specific design for separation of powers in the federal constitution and diminishes one of the most cherished liberties for all Americans, the right to vote for President of the United States.

47.     It is nearly uniformly recognized that the separation-of-powers provisions in the Constitution, which allocate authority to specific governmental actors to the exclusion of others, are designed to preserve liberty.

48.     "The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

49.     "Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours." *Id*. "The purpose of the separation and equilibration of powers in general . . . was not merely to assure effective government but to preserve individual freedom." *Id*. at 727.

50.     Given the overriding importance of both separation of powers and free and fair elections to our republican form of government, upholding the Electors Clause against infringement is a Constitutional issue of the highest magnitude.

51.     American liberty is safeguarded by the time-tested structure of our government and the wise provisions for its order found in the United States Constitution.

---

principles under the Electors Clause and the States' concerns regarding maintaining uniform standards against absentee ballot fraud.

52.     The idea that the Constitution's division of powers protects liberty applies both to the checks and balances between the branches of government *and* to the checks and balances between the federal government and the States.

53.     As James Madison said, in *Federalist 45*: "The State governments may be regarded as constituent and essential parts of the federal government; whilst the latter is nowise essential to the operation or organization of the former. Without the intervention of the State legislatures, the President of the United States cannot be elected at all. They must in all cases have a great share in his appointment, and will, perhaps, in most cases, of themselves determine it."[6]

54.     "The federal system rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220–21 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). "[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond*, 564 U.S. at 221 (2011) (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)). "Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions." *Id*.

55.     The Supreme Court recognizes that "federalism enhances the opportunity of all citizens to participate in representative government." *FERC v. Mississippi*, 456 U.S. 742, 789 (1982) (O'Connor, J., concurring in part and dissenting in part). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of

---

[6] *The Federalist Papers*, Federalist No. 45, *available at*: https://avalon.law.yale.edu/18th_century/fed45.asp.

Case 2:20-cv-01785   Filed 12/02/20   Page 12 of 72   Document 1

power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

56.     The Election Clauses' grant of authority to state *Legislatures* implements both horizontal and vertical separation of powers. The Clauses allocate to each State— not to federal actors—the authority to dictate the manner of selecting Presidential electors.

57.     And within each State, the Election Clauses explicitly allocate that authority to a single branch of state government: to the "Legislature thereof."

58.     It is not accidental that the Constitution allocates the authority to direct how Presidential Electors will be chosen to state Legislatures alone, rather than executive officers, judicial officers or administrative officials.

59.     The Constitutional Convention's delegates frequently recognized that the Legislature is the branch most responsive to the People and most democratically accountable. *See*, *e.g.*, Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U.PA. J. CONST. L. 1, 31 (2010) (collecting ratification documents expressing that state legislatures were most likely to be in sympathy with the interests of the people); Federal Farmer, No. 12 (1788), *reprinted in* 2 THE FOUNDERS' CONSTITUTION (Philip B. Kurland & Ralph Lerner eds., 1987) (arguing that electoral regulations "ought to be left to the state legislatures, they coming far nearest to the people themselves"); THE FEDERALIST NO. 57, at 350 (C. Rossiter, ed. 2003) (Madison, J.) (stating that the "House of Representatives is so constituted as to support in its members an habitual recollection of their dependence on the people"); *id*. (stating that the "vigilant

Case 2:20-cv-01785   Filed 12/02/20   Page 13 of 72   Document 1

and manly spirit that actuates the people of America" is greatest restraint on the House of Representatives).

60. The historical record is clear that the Founders entrusted the solemn responsibility to determine the manner of election of the President to state legislatures because they recognized that state legislatures – more than any other locus of government power – are the people's representatives and bastions of democratic accountability. A system of federalism, separation of powers, and constitutional government is enshrined in Article II.

61. By identifying the "Legislature thereof" in each State as the regulator of elections for federal officers, the Election Clauses prohibit the arrogation of power over Presidential elections by non-legislative officials and are a safeguard against corruption.

62. The Framers recognized that unelected bureaucrats in charge of elections for President of the United States pose a far greater risk to liberty than the People's elected representatives in each State having exclusive and unfettered jurisdiction over the rules for federal elections and the manner of appointing Presidential electors.

63. Therefore, it is essential that actions which usurp the power invested in the Wisconsin Legislature by the Elections Clauses not stand in the 2020 Presidential Election, and all future elections.

## **Whether Election Administrators Adhered to the Direction of the Wisconsin Legislature in the Conduct of the Presidential Election Presents a Justiciable Issue**

64. It is, of course, imminently likely that the Wisconsin Legislature is aware of some, if not all, of the issues and concerns pertaining to administration of the 2020 Presidential election in the State of Wisconsin.

65. For instance, it has been publicly reported that after the November 3 election the Speaker of the Wisconsin Legislature directed the Committee on Campaigns and Elections to conduct an election integrity investigation using subpoena powers to call witnesses.[7]

66. This Court may take judicial notice of several election-related lawsuits filed in State and Federal courts pertaining to the election.

67. Plaintiff recognizes that in relation to the Electors Clause of Article II of the U.S. Constitution it is ultimately the exclusive province of the Wisconsin Legislature to determine the remedy for violations of Article II of the U.S. Constitution in Wisconsin.

68. However, as the Supreme Court has recognized since at least 1803, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. 137, 177, 2 L. Ed. 60 (1803).

69. It is therefore proper in our federal system to bring questions concerning violations of laws to the courts.

70. Questions about the laws surrounding the election and whether those laws were followed by state officials are justiciable even though in the unique context of the Electors Clause it is the State Legislature alone that has the *final* say on those questions and on the appointment of that State's electors.

71. Courts are called upon to "respect . . . the constitutionally prescribed role of state *legislatures*" while enforcing against other state actors, whether they be courts, executives or election officials, the "responsibility to enforce the explicit requirements of Article II." *Bush v. Gore*, 531 U.S. at 115 (Rehnquist, C.J., concurring).

---

[7] "Assembly Speaker Calls For Investigation of Wisconsin Election," *Wisconsin Public Radio*, November 6, 2020, *available at*: https://www.wpr.org/assembly-speaker-calls-investigation-wisconsin-election. Submitted as Exhibit **1** to Plaintiff's Complaint.

72. Therefore, it is the duty of the courts, when presented with potential violations of the Electors Clause of Article II of the U.S. Constitution, to receive evidence and adjudicate whether a violation has been established.

## WISCONSIN LEGISLATURE'S EXPRESS POLICICIES AND DIRECTIONS REGARDING ELECTIONS

73. The Wisconsin Legislature's directions regarding the conduct of Presidential elections in Wisconsin can be found in the Wisconsin Election Code. Wis. Stat. §§ 5-12 *et seq*.

### Wisconsin Law Requires Photo Identification for In-Person Voters and Most Absentee Voters

74. For instance, the Wisconsin Legislature added a requirement to the Wisconsin Election Code in 2014 that requires an "elector"[8] to present one of ten acceptable forms of photo identification to vote. Wis. Stat. § 5.02 (6m) (a) – (g).

75. Wisconsin's voter photo identification law was upheld by the Wisconsin Supreme Court which noted that, "[s]ince 1859, [it] ha[s] held that 'it is clearly within [the legislature's] province to require any person offering to vote[] to furnish such proof as it deems requisite[] that he is a qualif[i]ed elector." *League of Women Voters of Wisconsin Education Network, Inc. v. Walker*, 851 N.W.2d 302, 305 (Wis. 2014), (quoting *Cothren v. Lean*, 9 Wis. 254, 258 (1859)).

76. Wisconsin's photo identification law applies to all in-person voters[9] and, with only very narrow and limited exceptions, to the *first time* a Wisconsin voter casts an absentee ballot.[10]

---

[8] The term "elector" in the Wisconsin Election Code typically refers to a voter. The terms "voter" and "elector" are generally used interchangeably herein, except when referring to Presidential Electors.

77.     However, once a voter has voted absentee the first time and provided a copy of their identification with their absentee ballot, thereafter when voting absentee the voter need not provide identification, unless their name or address changes. Wis. Stat. § 6.87(4)(b)3.[11]

78.     There are limited exceptions to the photo identification requirement for absentee voters (*i.e.*, the requirement the absentee voter provide a copy of their photo ID the first time they vote absentee) for overseas and military voters and a limited class of essentially disabled absentee voters.

79.     These limited exceptions to the photo identification requirement for absentee voting apply only to: residents of qualified retirement and care facilities,[12] military and overseas voters,[13] and absentee voters who automatically receive absentee ballots as a voter "indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period [and who has] sign[ed] a statement to that effect." Wis. Stat. § 6.86(2)(a).

---

[9] *See* Wis. Stat. § 5.02(6m), 5.02(16c) (pertaining to "identification" and providing that in most instants photo identification is required); § 6.79(2)-(3) (pertaining to providing proof of identification at the polling place).

[10] Wis. Stat. § 6.87(1) ("Unless application is made in person under s. 6.86(1)(ar), the absent elector is exempted from providing proof of identification under sub. (4)(b)2. or 3., or the applicant is a military or overseas elector, the absent elector shall enclose a copy of his or her proof of identification or any authorized substitute document with his or her application. The municipal clerk shall verify that the name on the proof of identification conforms to the name on the application. The clerk shall not issue an absentee ballot to an elector who is required to enclose a copy of proof of identification or an authorized substitute document with his or her application unless the copy is enclosed and the proof is verified by the clerk.").

[11] Wis. Stat. Ann. § 6.87(4)(b)3 provides: "If the absentee elector has received an absentee ballot from the municipal clerk by mail for a previous election, has provided proof of identification with that ballot, and has not changed his or her name or address since providing that proof of identification, the elector is not required to provide proof of identification."

[12] Wis. Stat. § 6.875.

[13] Wis. Stat. § 6.865.

80.     Regarding absentee voters who do not have to provide photo identification because they are indefinitely confined by age, illness or infirmity or disabled for an indefinite period, the voter is entitled to vote absentee if "in lieu of providing proof of identification, [the voter] submit[s] with his or her absentee ballot a statement signed by the same individual who witnesses voting of the ballot which contains the name of the elector and verifies that the name and address are correct." Wis. Stat. § 6.87(4)(b)2.

81.     The transparent purpose of these precisely written exceptions to Wisconsin's photo identification requirement for first time absentee voters is to confine those who need not provide photo identification when voting absentee to only military and overseas voters and those who are institutionalized or of significantly restricted mobility (i.e., "indefinitely confined" or "disabled for an indefinite period") due to one or more of four (4) limiting physical conditions: age, physical illness, infirmity or disability.

82.     Wisconsin law also provides that once an absentee voter provides proof of identification with their initial absentee ballot(s), in subsequent elections in which that person votes absentee they no longer have to provide proof of identification if their name and/or address have not changed. Wis. Stat. § 6.87(4)(b)3.

**Wisconsin Public Officials Misapplied Wisconsin's "Indefinitely Confined" or Indefinite Period of Disability Exceptions, Undermining Wisconsin Election Law and Permitting Likely Tens of Thousands of Voters to Improperly Vote Absentee Without Complying with Wisconsin's Photo Identification Law**

83.     As explained below, in 2020 a number of public officials in Wisconsin's largest municipalities contended that the COVID-19 pandemic rendered voters "indefinitely confined because of age, physical illness or infirmity or . . . disabled for an

18

indefinite period"[14] and permitted tens of thousands of voters to vote absentee without a condition of age, illness or infirmity that rendered them indefinitely confined or indefinitely disabled.

84. For instance, on March 29, 2020, the Wisconsin Elections Commission issued written guidance distributed to all election officials in the State and posted on the Commission website that "[d]uring the current public health crisis, *many voters* of a certain age or in at-risk populations *may meet that standard of indefinitely confined until the crisis abates*."[15]

85. This guidance contradicts Wis. Stat. § 6.86(2)(a) which requires an actual and verifiable physical or temporal condition being presently experienced by the voter (*i.e.*, age, physical illness or infirmity or disability) to justify an application for an absentee ballot based on indefinite confinement or indefinite disability and not a inchoate fear or apprehension experienced by the voter.

86. Contrary to the express terms of the Wisconsin Election Code, the Commission's guidance sought to alter the Election Code and plainly conveyed to election officials and the public that the COVID-19 pandemic *alone* could satisfy the requirement for the voter to request an absentee ballot.

87. Moreover, as explained above, not only did the Commission's guidance open the floodgates to absentee balloting by every voter in the State of Wisconsin, it opened the door to the wide scale circumvention of Wisconsin's photo identification law

---

[14] Wis. Stat. § 6.86(2)(a).
[15] Guidance for Indefinitely Confined Electors, Covid-19, Wisconsin Elections Commission, March 29, 2020, (emphasis added) *available at*: https://elections.wi.gov/node/6788. Submitted as Exhibit **2** to Plaintiff's Complaint.

which was enacted by the Legislature specifically to help ensure election integrity in the State.

88.     The motives of the Commission in issuing this erroneous guidance are not at issue here, what matters is that the Commission lacked the authority to issue a guidance which *de facto* changed Wisconsin election law and circumvented the Legislature's absentee ballot and photo identification requirements for tens of thousands of voters. *See*, *e.g.*, *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) ("However well-intentioned and appropriate from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code, at least as it pertains to selection of presidential electors.").

89.     The Commission's March 29, 2020, guidance was inaccurate and misleading in other particulars. For instance, it conveyed: "Statutes do not establish the option to require proof or documentation from indefinitely confined voters. *Clerks* may tactfully verify with voters that the voter understood the indefinitely confined status designation when they submitted their request but they *may not request or require proof*."[16] This instruction doubly undermined the Election Code. First, it emphasized to voters that no election official would ever check or challenge their assertion of "indefinitely confined" status, thereby, affirming in writing there would be no ramifications for non-compliance with the law. Second, the instruction tied the hands of election officials throughout the State who were told they could not even "request" a voter confirm the basis for a claim the voter was entitled to receive an absentee ballot. Throughout the Election Code it is clear that the Wisconsin Legislature intends election

---

[16] *Id.*

officials to question and where necessary even challenge the assertions of a voter.[17] To the contrary, the Commission's guidance told Wisconsin's election officials not to enforce the law and effectively gutted Wisconsin's photo identification law and statutory absentee ballot limitations, rendering them substantially less effective in the 2020 Presidential election and for potentially many elections to come.

90.    The consequences of the Commission's erroneous guidance which improperly changed the application of Wisconsin law were at least two-fold:

(1) Contrary to Wisconsin law and the policy of the Wisconsin Legislature, it is estimated that over 150,000 individuals were permitted to vote on November 3, 2020, without producing any photo ID whatsoever (by relying upon the "indefinitely defined" or indefinite period of disability exceptions they could vote simply by submitting a statement from an individual who witnessed them voting); and

---

[17] *See*, *e.g.*, Wis. Stat. §§ 6.325 (elector may be disqualified if an election official "demonstrates beyond a reasonable doubt that the person does not qualify"; election officials "may require naturalized applicants to show their naturalization certificates"); 6.48 ("Any registered elector of a municipality may challenge the registration of any other registered elector"); 6.79 (if an elector claims to be unable to sign the poll list the election officials at the polls may elect not to waive the signature requirement and challenge the elector's ballot, in which case for the elector's vote to be counted the elector must "provide evidence of his or her physical disability to the board of canvassers"); 6.87(1) (requiring a clerk to verify an absentee voter's proof of identification and specifying that the clerk "shall not issue an absentee ballot to an elector who is required to enclose a copy of proof of identification" and has not done so); 6.87(6) (providing that any absentee ballot "not mailed or delivered as provided in this subsection may not be counted"); 6.92 ("each inspector shall challenge for cause any person offering to vote whom the inspector knows or suspects is not a qualified elector or who does not adhere to any voting requirement under this chapter" and providing that the inspector may put any elector under oath or affirmation to examine them with questions about the "qualifications" of an elector); 6.925 (allow for electors to challenge other electors for cause); 6.93 (allowing the votes of absent electors to be challenged for cause); 6.94 (providing that if a challenged elector does not answer questions put to the elector "the inspectors shall reject the elector's vote"); 7.15(e) (setting for the duty of municipal clerks to "inspect systematically and thoroughly the conduct of elections in the municipality so that elections are honestly, efficiently and uniformly conducted").

(2) If this erroneous interpretation of law is not corrected, these individuals will

henceforth in future elections be able to vote absentee without showing either

ID or even providing a statement from a witness who observed them voting

and can vouch for their identification.

91.     Other election officials, including those in Wisconsin's two most

numerous counties, Dane and Milwaukee counties, provided erroneous guidance to the

public.

92.     For instance, on or about, March 25, 2020, the Clerk of Dane County,

Scott McDonell, publicly advised Dane County voters and others throughout the State to

declare themselves "indefinitely confined" under Wis. Stat. § 6.86(2) in order to avoid

having to provide proof that they are eligible voters.

93.     Defendant McDonell issued the following statement on his Facebook

page:

> I have informed Dane County Municipal Clerks that during this
> emergency and based on the Governors Stay at Home order <u>I am declaring
> all Dane County voters may indicate as needed that they are indefinitely
> confined due to illness.</u> This declaration will make it easier for Dane
> County voters to participate in this election by mail in these difficult
> times. <u>I urge all voters who request a ballot and have trouble presenting [a]
> valid ID to indicate that they are indefinitely confined.</u>
>
> People are reluctant to check the box that says they are indefinitely
> confined but this is a pandemic…. The process works like this:
>
> • A voter visits myvote.wi.gov to request a ballot.
>
> • A voter can select a box that reads "I certify that I am indefinitely
> confined due to age illness, infirmity or disability and request ballots be
> sent to me for every election until I am no longer confined or fail to return
> a ballot.["]
>
> • The voter is then able to skip the step of uploading an ID in order to
> receive a ballot for the April 7 election. Voters are confined due to the

COVID-19 illness. When the Stay at Home order by the Governor is lifted, the voter can change their designation back by contacting their clerk or updating their information in myvote.wi.gov. Voters who are able to provide a copy of their ID should do so and not indicate that they are indefinitely confined.[18]

94.     The foregoing instruction by the Dane County Clerk went even beyond the encouragement of the Wisconsin Elections Commission to side-step the law and actively encouraged voters to purposefully request an absentee ballot and declare themselves indefinitely confined in order to avoid the photo identification requirements of Wisconsin law.

95.     The Dane County Clerk would later be reprimanded by the Wisconsin Supreme Court for his encouragement to voters to avoid the law. But the damage was irretrievable, particularly because the Wisconsin Elections Commission never retracted its erroneous guidance that advised voters in the November 3, 2020, election that no one would even question their use of the "indefinitely confined" exception to avoid the photo identification and absentee ballot laws.

96.     On March 25, 2020, the Dane County Clerk emailed the same announcement and instructions to all clerks responsible for administering elections in the municipalities within Dane County.[19]

97.     A similar notice was given by the Milwaukee County Clerk.[20]

---

[18] *See* Exhibit **3** to Plaintiff's Complaint (Screenshot of re-posted Facebook Post of Scott McDonell) (emphasis added).
[19] "Absentee voters in Milwaukee, Dane counties can say they're 'indefinitely confined' and skip photo ID, clerks say," *Milwaukee Journal Sentinel*, March 25, 2020, *available at*: https://www.jsonline.com/story/news/local/milwaukee/2020/03/25/absentee-voters-milwaukee-dane-counties-can-skip-photo-id-coronavirus-indefinitely-confined/5085017002/. Submitted as Plaintiff's Exhibit **4**.
[20] *Id.*

98.     After the Primary Election members of the Wisconsin Legislature made clear that the COVID-19 pandemic did not change mandatory provisions of Wisconsin election law which still could and should be applied uniformly during the pandemic.

99.     For instance, Wisconsin Senators Roger Roth and Jim Steineke wrote, "[w]hile we of course need to make adjustments to our everyday lives to help flatten the curve for COVID-19 and keep our health care workers, elderly, and most vulnerable safe, making sweeping changes to our most basic right, voting, should be the last thing we consider, especially given the flexibility of Wisconsin's current system."[21]

100.    But the Wisconsin Elections Commission never withdrew its erroneous guidance which facilitated avoiding the requirements of Wisconsin law.

101.    Whatever excuses may be given for the conduct of election officials before the primary election, by the time of the November 3, 2020 General Election there could be no reasonable or lawful contention that the COVID-19 pandemic provided an excuse to avoid Wisconsin's election laws. *Carson*, 978 F.3d at 1060.

102.    By failing to abide by its statutory obligation to engage in the proper application of Wisconsin's absentee ballot provisions and Wisconsin's voter identification law, the Wisconsin Elections Commission and Defendant County and Municipal Clerks and other public officials, ensured an unequal and inconsistent application of the law and permitted thousands of ballots to be accepted based on the improper and inaccurate claim that the COVID-19 pandemic continued to justify a wide scale failure to apply Wisconsin voting laws.

---

[21] "Rep. Jim Steineke and Sen. Roger Roth: All-mail ballot proposal: return to sender," *The Cap Times*, April 20, 2020, *available at*: https://madison.com/ct/opinion/column/rep-jim-steineke-and-sen-roger-roth-all-mail-ballot-proposal-return-to-sender/article_68db7ebd-a638-53e9-ba06-f499342f0b98.html. Submitted as Plaintiff's Exhibit **5**.

103.     These actions by the Commission, other Defendants and election officials throughout Wisconsin were directly contrary to Wisconsin law for all the reasons discussed above.

104.     The conduct of these state and local officials directly affected the 2020 Presidential Election in Wisconsin which was decided by some 20,000 votes, making it impossible to know with certainty who won the Presidential Election as tens of thousands of ballots were counted without full compliance and contrary to the manner the Wisconsin Legislature directed in the Wisconsin Election Code.

105.     Regarding the Presidential Election in Wisconsin, it is clear that due to the conduct of the Defendants unlawful ballots under Wisconsin Law and the Electors Clause of the U.S. Constitution were cast and counted, throughout the State.

106.     In 2019, roughly 72,000 Wisconsin voters were identified as indefinitely confined. However, at least in part because of the Wisconsin Elections Commission's inaccurate guidance and other such actions, by November 2020 that number had risen to 243,900 voters, effectively overturning Wisconsin's voter identification law as to some 170,000 or more individuals, and dramatically increasing the number of mail-in ballots in the State contrary to the policy and direction of the Wisconsin Legislature.[22]

107.     The interpretative usurpation and erroneous official guidance from the Wisconsin Elections Commission, which altered the application of the Election Code and effectively annulled certain provisions of the Election Code, circumvented the Wisconsin

---

[22] *See*, *e.g.*, "Republicans say thousands in Wisconsin may have circumvented voter ID requirement," Washington Examiner, Nov. 10, 2020, *available at*: https://www.washingtonexaminer.com/news/republicans-say-thousands-in-wisconsin-may-have-circumvented-voter-id-requirement. Submitted as Plaintiff's Exhibit **6**.

Legislature's express direction that voting by absentee ballot is a "privilege,"[23] not a right, and that absentee balloting must be "carefully regulated to prevent the potential for fraud or abuse."[24]

108.    These outright usurpations of the Wisconsin Legislature's authority by Wisconsin officials, including the Wisconsin Elections Commission, municipal and county clerks and others who provided inaccurate guidance to voters, encouraging voters to violate the law and then accepting those violations as though they were lawful, fostered predictable administrative issues, including by circumventing Wisconsin's photo identification law and expanding the number of absentee ballots, which made Wisconsin's election less secure, more difficult to administer, and more subject to error.

## The Wisconsin Legislature Expressly Disfavors Mail-In Voting and Has Sought to Limit the Practice in Wisconsin

109.    Wisconsin is a "no excuse" absentee voting state, meaning that a registered Wisconsin voter "who for any reason is unable or unwilling to appear at the polling place in his or her ward or election district" is entitled to request an absentee ballot. Wis. Stat. § 6.85(1).

110.    However, the fact that absentee balloting is available to all only means that the State has chosen not to superintend or monitor a voter's personal choice to vote absentee or not, it does not mean that the State encourages absentee voting.

111.    Rather, the Wisconsin Legislature has directed that absentee balloting is to be "carefully regulated" and has in place a clear system of rules regarding absentee voting that must be enforced by the State's election officials.

---

[23] Wis. Stat. § 6.84(1).
[24] *Id.*

112. The Wisconsin Election Code states a fact-based, healthy concern that mail-in balloting heightens the risk of fraud in elections conducted in Wisconsin.

113. The Wisconsin Legislature makes it the express policy of the State of Wisconsin that "voting is a constitutional right, the vigorous exercise of which should be strongly encouraged. *In contrast, voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place.* The legislature finds that *the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse*; to prevent overzealous solicitation of absentee electors who may prefer not to participate in an election; to prevent undue influence on an absent voter to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses." Wis. Stat. § 6.84(1) (emphasis added).

114. The Wisconsin Legislature's express written policy limiting mail-in balloting and emphasizing the Legislature's concern about mail-in ballot fraud is supported by substantial, well-known, and publically available, data and information, including the regular statements of the United States Supreme Court and many other courts around the country, which consistently and regularly warn of the dangers of mail-in ballot fraud.

## The Wisconsin Legislature's Concerns with Mail-In Ballot Fraud Are Reasonable and Well Founded

115. In *Crawford v. Marion County Election Board*, the U.S. Supreme Court recognized that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk of voter fraud real but that it could affect the outcome of a close

Case 2:20-cv-01785   Filed 12/02/20   Page 27 of 72   Document 1

election." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 195-96 (2008) (opinion of Stevens, J.) (emphasis added).

116.    This is why the bi-partisan Carter-Baker Commission on Federal Election Reform co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker concluded that "[a]bsentee ballots remain the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005).[25]

117.    According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several ways." *Id*. These abuses include interception of blank ballots, "pressure" and "intimidation" of elderly and vulnerable voters, "vote buying schemes" that are "far more difficult to detect when citizens vote by mail," and ballot tampering by third-party operatives after a ballot is marked. *Id*. The Commission noted that "absentee balloting in other states has been a major source of fraud." *Id*. at 35. And the Commission recommended that "States … need to do more to prevent … absentee ballot fraud." *Id*. at v.

118.    Likewise, the most recent edition of the U.S. Department of Justice's Manual on *Federal Prosecution of Election Offenses*, published by its Public Integrity Section, highlights the same concerns with a higher degree for fraud to be perpetrated through mail-in ballots. *See* U.S. Dep't of Justice, Federal Prosecution of Election Offenses (8th ed. Dec. 2017), at 28-29 ("*DOJ Manual*").[26]

---

[25] BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM (Carter-Baker Commission), Sept. 2005, *available at*: https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf. Submitted as Plaintiff's Exhibit **7**.
[26] *Federal Prosecution of Election Offenses*, 8th Ed. (2017), available at https://www.justice.gov/criminal/file/1029066/download. Submitted as Plaintiff's Exhibit **8**.

119.    The *DOJ Manual* states: "Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place." *Id*.

120.    The *DOJ Manual* reports that "the more common ways" that election-fraud "crimes are committed include … [o]btaining and marking absentee ballots without the active input of the voters involved." *Id*. at 28.

121.    And the *DOJ Manual* notes that "[a]bsentee ballot frauds" committed both with and without the voter's participation are "common." *Id*. at 29.

122.    The Department of Justice has for many years recognized the susceptibility of absentee balloting to higher levels of fraud and cheating. The 6th edition of the DOJ Manual (1995) contains the same "particularly susceptible" language on p. 23. It also says, "[t]he most frequently encountered election frauds are absentee ballot fraud and ballot box stuffing." p. 82.

123.    The high risks of mail-in ballot fraud are why many other nations disfavor or restrict entirely the use of mail-in ballots.

124.    For instance, a database of election survey responses from the Harvard Dataverse called *Perceptions of Electoral Integrity*, (PEI-7.0)[27] found that out of 166 countries only 40 used mailed ballots in their most recent national election.

125.    Out of the 216 countries and territories analyzed by the *International Institute for Democracy and Electoral Assistance Voting from Abroad Database*, only 88 permitted voters abroad to cast ballots in presidential elections.[28]

---

[27] Perceptions of Electoral Integrity, (PEI-7.0), Harvard Dataverse, Norris, Pippa; Grömping, Max, 2019, a*vailable at*: https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/PDYRWL. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

126.     Merely weeks ago, a Missouri court considered extensive expert testimony reviewing absentee-ballot fraud cases and distilled their common features. *See Findings of Fact, Conclusions of Law, and Final Judgment in Mo. State Conference of the NAACP v. State*, No. 20AC-CC00169-01 (Circuit Court of Cole County, Missouri Sept. 24, 2020), *aff'd*, 607 S.W.3d 728 (Mo. *en banc* Oct. 9, 2020). The court found that cases of absentee-ballot fraud "have several common features that persist across multiple recent cases: (1) close elections; (2) perpetrators who are candidates, campaign workers, or political consultants, not ordinary voters; (3) common techniques of ballot harvesting, (4) common techniques of signature forging, (5) fraud that persisted across multiple elections before it was detected, (6) massive resources required to investigate and prosecute the fraud, and (7) lenient criminal penalties." *Id*. at 17.

127.     The court concluded that "fraud in voting by mail is a recurrent problem, that it is hard to detect and prosecute, that there are strong incentives and weak penalties for doing so, and that it has the capacity to affect the outcome of close elections." *Id*. In this recent case brought by the NAACP, the court recognized that "the threat of mail-in ballot fraud is real." *Id*. at 2.

128.     Some authorities have recognized that mail-in balloting can encourage and perpetuate systemic discrimination against the elderly and the illegal harvesting of coerced ballots from the institutionalized and infirm.

129.     *The New York Times* has reported:

---

[28] Voting from Abroad Database, International Institute for Democracy and Electoral Assistance, *available at*: https://www.idea.int/data-tools/data/voting-abroad. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020); *See*, *e.g.*, *Voting Fraud Is a Real Concern. Just Look Around the World* (summarizing mail-in voting restrictions in European nations). *Available at*: https://www.newsweek.com/voting-fraud-real-concern-just-look-around-world-opinion-1522535. Submitted as Plaintiff's Exhibit **9**.

Election administrators have a shorthand name for a central weakness of voting by mail. They call it granny farming.

"The problem," said Murray A. Greenberg, a former county attorney in Miami, "is really with the collection of absentee ballots at the senior citizen centers." In Florida, people affiliated with political campaigns "help people vote absentee," he said. "And help is in quotation marks."

Voters in nursing homes can be subjected to subtle pressure, outright intimidation or fraud. The secrecy of their voting is easily compromised. And their ballots can be intercepted both coming and going.[29]

130.     Thus, the Wisconsin's Legislature's policy disfavoring mail-in balloting and the Wisconsin Election Code's provisions which seek to erect barriers to mail-in ballot fraud are rational and well within the discretion and authority of the Wisconsin Legislature.

**The Anticipated Competitiveness of the 2020 Presidential Election in Wisconsin Made it A Potential Target for Fraud**

131.     It is material not only that the Defendant governmental officials undermined the Wisconsin Legislature's express directions and written guardrails against mail-in ballot fraud, but that these state actors did so to prepare for *this* Presidential election in Wisconsin.

132.     As discussed in numerous court cases, including those cited above, and in the study done by President Carter and Secretary Baker, and as acknowledged by the U.S. Department of Justice, it is well known that the risk of fraud increases in *close* elections.

133.     The U.S. Department of Justice's Manual on *Federal Prosecution of Election Offenses* emphasizes that election fraud typically occurs when the parties

---

[29] "Error and Fraud at Issue as Absentee Voting Rises," *The New York Times*, Oct. 6, 2012, *available at*: https://www.nytimes.com/2012/10/07/us/politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html. Submitted as Plaintiff's Exhibit **10**.

anticipate a close election, creating a strong motive to try to flip the outcome of the election through fraudulent activity. DOJ Manual, at 2-3, 27. As the Manual states, "the conditions most conducive to election fraud are close factional competition within an electoral jurisdiction for an elected position that matters." *Id*. at 2-3. "Election fraud does not normally occur in jurisdictions where one political faction enjoys widespread support among the electorate, because in such a situation it is usually unnecessary or impractical to resort to election fraud in order to control local public offices." *Id*. at 27. "Instead, election fraud occurs most frequently when there are fairly equal political factions, and when the stakes involved in who controls public offices are weighty." *Id*. "In sum, election fraud is most likely to occur in electoral jurisdictions where there is close factional competition for an elected position that matters." *Id*.

134.    As the U.S. Department of Justice recognizes, the potential for election fraud is highest where there is expected a "close" election "for an elected position that matters" – nothing could better describe the anticipated 2020 Presidential election in Wisconsin.

135.    It was not a secret and was well known and much publicized, for months before that the 2020 Presidential Election in Wisconsin might be pivotal to the national outcome.

136.    The *Real Clear Politics* elections site listed Wisconsin as a "top battleground" state throughout 2020.[30]

137.    President Trump only won Wisconsin's Presidential election in 2016 by just under 23,000 votes.

---

[30] *See, e.g.*, Real Clear Politics Top Battleground States Page, *available at*: https://www.realclearpolitics.com/elections/trump-vs-biden-top-battleground-states/. Submitted as Plaintiff's Exhibit **11**.

138.    Wisconsin's reputation as a "top battleground state" was borne out in the 2020 Presidential election.

139.    Wisconsin engaged in a recount in Dane and Milwaukee Counties, with preliminary vote totals from the November 3, 2020 election showing an approximate 20,000 vote difference statewide between President Trump and former Vice President Joe Biden.

140.    Due to the anticipated close Presidential election in Wisconsin, the state's election officials should have been on high alert against fraud and sought to strictly enforce the Wisconsin Legislature's express policy disfavoring mail-in balloting.

141.    However, in numerous ways Defendants did the opposite.

142.    More than 30% of the ballots counted in the preliminary tabulations related to the 2020 Presidential election were mail-in ballots.

143.    Thus, Defendants' disobedience to the Wisconsin Legislature's directions regarding the conduct of the Presidential election pertaining to handling absentee ballots usurped the Legislature's "plenary" power under Article II of the Constitution and also increased the risk that fraud could infect a substantial number of the ballots counted in this election.

**The Disparate Impact of Mail-In Balloting**

144.    Mail-in balloting is not simply disfavored because of its susceptibility to fraud.

145.    Mail-in balloting is also disfavored because of its disparate impact upon different classes of voters and because of the very different way mail-in voters are treated vis-à-vis in-person voters.

33

146.     As the Wisconsin Legislature has observed, mail-in voters are more susceptible to undue influence and even coercion and intimidation because mail-in balloting is done in private and outside the ability of the strict rules of the polling place to protect the voter.

147.     Therefore, for instance, mail-in balloting is susceptible to systemic discrimination and abuse against the infirm and the elderly.

148.     Mail-in balloting also discriminates against able-bodied voters, those who can vote in-person on Election Day, as Wisconsin's written state policy encourages.

149.     This is so because in practice mail-in voting works against those who cast their ballot in-person in multiple pernicious ways.

150.     For instance, the Wisconsin Legislature exercised its authority and judgment to protect Wisconsin voters against potential voter fraud by enacting voter identification legislation requiring Wisconsin voters to produce photo identification when they cast a ballot at a polling place.

151.     Yet, Wisconsin voters who cast a mail-in ballot do not sign the poll book and do not have their identification checked by poll workers, unless voting by absentee for the first time, and are therefore not subject to continuing application of Wisconsin's photo identification law.

152.     The voting process is different and less secure for mail-in voters in other ways.

153.     Mail-in voting takes place in private and outside the purview of poll workers.

154.    Consequently, mail-in voting also does not present the same opportunity to challenge the claimed identity of the voter that exists when every in-person voter must sign the voting list, to produce photo identification and is subject to challenge by a live poll worker and/or poll watcher. *See* Wis. Stat. § 6.79.

155.    These are certainly some of the reasons that the Wisconsin Legislature has classified mail-in voting as a privilege and not a right.

156.    Mail-in voting treats similarly situated voters differently, placing more obligations upon the in-person voter, while simultaneously creating a risk that in-person voters' votes will be diluted through the increased risk of fraud that mail-in balloting presents.

157.    These elements clarify why many countries outside the United States ban mail-in balloting altogether or limit it far more than occurred in the 2020 Presidential election in Wisconsin.

158.    These factors also clarify why it is crucial that the Wisconsin Legislature's express policy to closely regulate mail-in balloting be upheld and enforced.

159.    Ultimately, when protections against voter fraud are lowered it disillusions the electorate and drives honest citizens out of the process. Nothing could be worse for democracy.

160.    As the U.S. Court of Appeals for the Seventh Circuit observed earlier this year in a case upholding Wisconsin's absentee voting requirements, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *DNC v. Bostelmann*, No. 20-1538, 2020 WL 3619499, at *2 (7th Cir. Apr. 3, 2020) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S. Ct. 5, 7, 166 L. Ed. 2d 1 (2006)).

161.    By failing to implement the directions of the Wisconsin Legislature in the Election Code, as required by the Electors Clause for Presidential Elections, state election officials inexorably set the State upon a path that generated the very distrust and disillusionment in the election process the Seventh Circuit warned about just months ago.

162.    The path forward that upholds the law and seeks to restore faith in the legal process related to Wisconsin elections is for this Court to declare that these failures by Wisconsin's election officials, which conflicted with their duties under the Election Code, abridged the Legislature's authority under the Electors Clause.

## 2020 PRESIDENTIAL ELECTION IN WISCONSIN

163.    In part due to the nearly year old COVID-19 pandemic, but also for many reasons contributed to by Defendants, there was a massive increase in mail-in balloting in the November 3, 2020, election in Wisconsin.

164.    Wisconsin voters have not voted absentee in large numbers before this year.

165.    For instance, some 146,932 mail-in ballots were returned in the 2016 General Election in Wisconsin out of more than 3 million votes cast.[31]

166.    In stark contrast, it is reported that some 1,275,019 mail-in ballots, nearly a 900% increase over 2016, were returned in the November 3, 2020 election.[32]

167.    While it can be contended that the increase in mail-in balloting is attributable to the COVID-19 pandemic, public documents demonstrate this is not the only reason.

---

[31] Source: U.S. Elections Project, *available at*: http://www.electproject.org/early_2016. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).
[32] Source: U.S. Elections Project, *available at*: https://electproject.github.io/Early-Vote-2020G/WI.html. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

**Mayors in Wisconsin's Five Largest Cities Adopted an Unlawful Plan to Expand Absentee Voting Using Prohibited, Un-Manned, Drop Boxes and the Wisconsin Elections Commission Supported the Unlawful Plan**

168.     Following the 2020 primary election, local officials in Wisconsin's five largest cities agreed to promote the expansion of mail-in voting in their cities and to adopt practices promoting and expanding mail-in voting that were banned by the Wisconsin Legislature.

169.     On June 15, 2020, the Mayors of the Cities of Madison, Milwaukee, Racine, Kenosha and Green Bay submitted a grant request to a not-for-profit organization, "Center for Tech & Civic Life," ("CTCL"), that the Mayors called "Wisconsin Safe Voting Plan 2020."[33]

170.     However, despite the name of the plan, it did not apply to the whole of Wisconsin, but only to their five cities.

171.     The five Mayors wrote that, "[a]s mayors in Wisconsin's five biggest cities" they had agreed to "work collaboratively" in relation to the remaining elections in 2020, including the 2020 Presidential election.[34]

172.     The five Mayors sought funding from CTCL to "[e]ncourage and [i]ncrease [a]bsentee [v]oting ([b]y [m]ail and [e]arly [i]n-person," to [u]tilize secure

---

[33] Wisconsin Safe Voting Plan 2020 Submitted to the Center for Tech & Civic Life, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay (hereafter, "The 5 Mayors' Voting Plan") *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf. Submitted as Plaintiff's Exhibit **12**.

[34] 5 Mayors' Voting Plan, p. 1.

drop-boxes to facilitate return of absentee ballots" and to "[e]xpand . . . [c]urbside [v]oting."[35]

173.    The five Mayors' coordinated effort, particularly when the Wisconsin Legislature recognizes absentee voting as subject to an increased risk of fraud and stated it should be "carefully regulated," contradicted a fair and evenhanded approach toward election administration across Wisconsin and conflicted with the duties the Wisconsin Election Code imposes upon election officials.[36]

174.    For instance, the Mayors' plan to use "drop-boxes to facilitate return of absentee ballots" in Wisconsin's largest cities is directly contrary to Wisconsin law providing that absentee ballots may only be "mailed by the elector, or delivered *in person* to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b)1 (emphasis added).

175.    The fact that other methods of delivering absentee ballots, such as through unmanned drop boxes, are *not* permitted is underscored by Wis. Stat. § 6.84(2) which provides "with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. *shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election*." Wis. Stat. § 6.84(2) (emphasis added).

176.    Therefore, absentee ballot drop boxes are clearly illegal under Wisconsin law, and the Mayors' plan to use them, and indeed to proliferate them in their cities—for

---

[35] *Id*. at 4.
[36] The Wisconsin Election Code defines an "Election official" as "an individual who is charged with any duties relating to the conduct of an election," Wis. Stat. § 5.02(4e), which clearly encompasses mayors given that municipalities are charged with administering elections under Wisconsin law.

instance, Green Bay sought funding to install drop boxes at grocery stores and gas stations[37]— was a serious breach of the Wisconsin Election Code.[38]

177.    The use of these un-manned absentee ballot boxes is so seriously in violation of the Wisconsin Election Code that the Wisconsin Legislature has mandated that ballots collected in such a manner, "may not be included in the certified result of any election." Wis. Stat. § 6.84(2).

178.    Therefore, all absentee ballots collected at the illegal, un-manned absentee ballot drop boxes in Wisconsin were cast in direct contravention of the Wisconsin Election Code. As a result, these ballots have no legal weight in determining the outcome of the Presidential Election. The cities and other units of government that counted them simply broke the law and willfully defied the clear direction of the Wisconsin Legislature as to the Presidential election, committing a manifest violation of the Electors Clause.

179.    The Wisconsin Legislature is so concerned about the sites at which absentee ballots may be delivered that it specifically describes in the Election Code "Alternate absentee ballot site[s]" and details the procedure by which the governing body of a municipality may designate a site or sites for the delivery of absentee ballots "other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." Wis. Stat. 6.855(1) (emphasis added).

---

[37] 5 Mayors' Voting Plan, p. 10.
[38] As discussed below, there are several clear policies in the Wisconsin Election Code which are undermined by absentee ballot drop boxes, such as the desire to ensure that absentee voters are free to prepare and cast their ballots in secret, free from coercion and the desire to avoid ballot harvesting, *i.e.*, the practice of representatives of parties or candidates collecting ballots from individuals and delivering them to the polls, which can be coercive and subject balloting to other possibilities for manipulation.

180.    Any alternate absentee ballot site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Wis. Stat. 6.855(3).  Likewise, Wis. Stat. 7.15(2m) provides, "[i]n a municipality in which the governing body has elected to an establish an alternate absentee ballot sit under s. 6.855, the municipal clerk shall operate such site as though it were his or her office for absentee ballot purposes and shall ensure that such site is adequately staffed." Thus, unmanned absentee ballot drop-off sites as proposed by the Mayors, and ultimately used throughout their cities in the 2020 Presidential election, are prohibited by the Wisconsin Legislature.

181.    Despite the clear provisions of the Election Code described above, the Wisconsin Elections Commission endorsed the concept of un-manned absentee ballot drop boxes in official guidance to local Wisconsin election officials on August 19, 2020.[39]

182.    Notably, the guidance posted by the Commission on its website contained no analysis of the legality of such drop boxes under Wisconsin law.[40]

183.    As stated in the Commission's August 19 guidance, that guidance was drawn directly from a document distributed by the Cybersecurity and Infrastructure Security Agency (CISA) Elections Infrastructure Government Coordinating Council and Sector Coordinating Council's Joint COVID Working Group, an agency of the U.S. federal government.

---

[39] Wisconsin Elections Commission Memoranda, To: All Wisconsin Election Officials, Aug. 19, 2020, *available at*: https://elections.wi.gov/sites/elections.wi.gov/files/2020-08/Drop%20Box%20Final.pdf. Submitted as Plaintiff's Exhibit **13**.

[40] *Id*.; *see also* Wisconsin Elections Commission Notice, "Absentee Ballot Drop Box Information," To: Wisconsin County Clerks, Wisconsin Municipal Clerks, City of Milwaukee Election Commission, Milwaukee County Election Commission, Aug. 19, 2020, *available at*: https://elections.wi.gov/node/7036. Submitted as Plaintiff's Exhibit **14**.

40

184.    The CISA guidance document,[41] which was copied and reissued virtually verbatim (except for several telling exclusions discussed below) by the Wisconsin Elections Commission, included the following warning:

> *If you are considering the use of ballot drop boxes, you should review your existing laws and requirements and determine whether emergency changes may be necessary.* A full list of state practices can be found at the National Conference of State Legislators (NCSL) website listed in the Additional Resources section.[42]

185.    However, the foregoing warning was deleted from the guidance issued by the Wisconsin Elections Commission which guidance, as discussed above, patently conflicts with Wisconsin state law.

186.    As a consequence of the Commission's unlawful guidance, unauthorized, illegal, un-manned absentee ballot drop boxes were used in Wisconsin in the 2020 Presidential Election.

187.    Through the Commission's irresponsible August 19, 2020 guidance and related actions which encouraged local election officials in Wisconsin to implement, un-manned absentee ballot drop boxes in violation of Wisconsin law, the Commission created a wholly new process and procedure for casting an absentee ballot in Wisconsin not sanctioned by state law or the Wisconsin Legislature.

188.    On information and belief, it is understood that these failures by the Commission, the Mayors in Wisconsin's five largest cities and election administrators throughout Wisconsin resulted in unlawful, un-manned absentee ballot drop boxes being used in hundreds of locations throughout the State.

---

[41] CISA Ballot Drop Box Paper, *available at*:
https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf. Submitted as Plaintiff's Exhibit **15**.
[42] *Id*. (emphasis added).

189.    In fact, is understood that over five hundred un-manned, illegal, absentee ballot drop boxes were used in the Presidential election in Wisconsin.[43]

190.    Un-manned absentee ballot drop boxes opened the absentee voting process in Wisconsin to the unsavory and, in Wisconsin illegal, practice of ballot harvesting which is otherwise prevented by the requirement in the Election Code that absentee ballots may be voted only by depositing absentee ballots in the mail or by the voter delivering them directly to an authorized election worker at a designated absentee ballot site under Wis. Stat. § 6.855.

191.    Un-manned absentee ballot drop boxes permit a ballot harvester to drop off multiple absentee ballots at a time which cannot be legitimately accomplished when the statutory procedures for voting an absentee ballot in person are followed. *See* Wis. Stat. § 6.87.

192.    Absentee ballot harvesting opens the election process to the potential for fraud and coercion, identified by the Wisconsin Legislature as a prime concern and reason for the strict limitations on absentee voting contained in the Wisconsin Election Code. *See* Wis. Stat. 6.84(1) ("to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate . . . or other similar abuses").

---

[43] "Ballot drop boxes offer 'a safe place' for voting in Wisconsin's election," *Wisconsin Center for Investigative Journalism*, October 29, 2020, ("The drop box in the Green Bay suburb where Vincent deposited her ballot is one of more than 500 in the state, according to the Wisconsin Elections Commission.") *available at*: https://www.channel3000.com/ballot-drop-boxes-offer-a-safe-place-for-voting-in-wisconsins-election/ Submitted as Plaintiff's Exhibit **16**; "Search for a ballot drop box in your community using this tool," *Wisconsin Watch*, October 27, 2020, ("With Election Day just days away, voters are being urged to deposit their absentee ballots in one of the over 500 secure drop boxes across the state."), *available at*: https://www.wisconsinwatch.org/2020/10/wisconsin-absentee-ballot-drop-box-search/. Submitted as Plaintiff's Exhibit **17**.

193.     The Wisconsin Elections Commission's endorsement of standard-less, un-manned absentee ballot drop boxes violated the Wisconsin Election Code and fundamentally altered the 2020 President election in Wisconsin, breaking the detailed statutorily mandated custody, presentment and voting procedures for absentee ballots, *see* Wis. Stat. §§ 6.855, 6.87, 6.875, 6.88, 7.15(2m), thereby voiding the legality of all absentee ballots placed in these un-manned absentee ballot drop boxes. *See* Wis. Stat. §§ ("Notwithstanding s. 5.01(1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)(2). and (4) shall be construed as mandatory. *Ballots cast in contravention of the procedures specified in those provisions may not be counted*. Ballots counted in contravention of the procedures specified in those provisions *may not be included in the certified results of any election*.").

194.     Because absentee ballot drop boxes are barred by the Wisconsin Election Code, there are no chain of custody and public access and observation standards or rules regarding the use of such drop boxes in the Wisconsin Election Code.

195.     The Wisconsin Elections Commission's guidance on un-manned absentee ballot drop boxes contained absolutely no direction, instructions or standards for local election officials regarding the important aspects of ballot chain of custody, and openness to the public that are emphasized throughout the Wisconsin Election Code in relation to all other aspects of the voting and ballot handling processes.[44]

---

[44] *See*, *e.g.*, Wis. Stat. §§ 6.855, 6.86, 6.87, 6.875, 6.88.

196.    Tellingly, the following section from the CISA guidance document was entirely omitted from the Commission's guidance to Wisconsin election officials:

**Election Night and Closing Boxes**

You need to give special consideration to returning temporary ballot drop boxes and locking permanent drop boxes on election night. Organizing teams from other county or city departments is one way to accomplish this. Essentially you need bipartisan teams to be at every ballot drop-off location precisely when polls close. Their responsibilities include:

☐  Identifying the voter or car in line at the time polls close and ensuring they have the opportunity to deposit their ballots.

☐  Retrieving the temporary indoor boxes and returning them to the counting facility.

☐  Locking the drop slot on the 24-hour boxes and transferring ballots to a ballot transfer bag or box and returning them to the counting facility.

☐  Completing "chain of custody" forms.[45]

197.    No uniform standards were issued by the Commission regarding election night procedures, removing absentee ballots from the boxes, transport of the ballots to wards or counting centers, procedures for maintaining the security and chain of custody of the absentee ballots and for ensuring public accountability and observation throughout the process. These are all important aspects of the integrity of an election for which the Wisconsin Legislature has shown a strong concern in the Election Code. *See*, *e.g.*, Wis. Stat. 6.88.

198.    Rather, in the rush to push the use of drop boxes, not only did the Commission not adopt standards for their use, the Commission deleted even the

---

[45] CISA Ballot Drop Box Paper, *available at*: https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf. Submitted as Plaintiff's Exhibit **15**.

barebones notice about the need for standards in the meagre guidelines it issued. Thus, local officials were not even advised to consider adopting standards to guide the use of the ballot drop boxes.

199.    Without such standards and procedures there can be no assurance that the drop boxes and their contents were handled consistently throughout the State, regarding who had access to the ballots from the time they left the voters hands until they were ultimately delivered to election officials or even that ballots throughout the State were properly collected from the hundreds of unauthorized sites around the State. Therefore, even if the use of unmanned drop boxes were permissible under State law, it is clear that there was an abject lack of uniform standards regarding the handling, security and openness of the process to the public in connection with the new use of un-manned, absentee ballot drop boxes, rendering them constitutionally suspect under the Equal Protection and Due Process Clauses of the U.S. Constitution. *See Bush v. Gore*, 531 U.S. at 109 (observing that the election recount process at issue there was "inconsistent with the minimum procedures necessary to protect the fundamental right of each voter") ("there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied"); *Anderson v. Celebrezze*, 460 U. S. 780, 788, (1983) (States should adopt "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself."); *Storer v. Brown*, 415 U. S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.").

200.     Regarding un-manned absentee ballot boxes in Wisconsin in the 2020 President election, and as to the ballots that were housed therein, there can be no assurance that the ballots were secured, maintained, and transported in an equal and fair way because there were simply *no standards* in place in relation to these boxes.

201.     Rather, it is apparent that, although the use of these drop boxes was sanctioned by the Wisconsin Elections Commission, which operated an interactive list of such locations, using absentee ballot drop boxes in these locations was not subject to uniform rules or any acceptable standards, and there were no uniform chain of custody procedures or standards connected to their use. A review of an interactive list of absentee ballot drop boxes provided on the internet by the Wisconsin Elections Commission (the "WEC Drop Box List")[46] bears out the lack of any uniform standards related to the unmanned, absentee ballot drop boxes used in the 2020 Presidential election in Wisconsin:

- For the drop box located in Hayward, Wisconsin, the information provided to the public on the WEC Drop Box List is: "Drop Box - Use Water & Sewer payment drop box located in the back of City Hall by the bulletin board."[47]

- On the WEC List for the City of Menasha, Wisconsin there is a "Library Drop Box" with the instruction: "Designated book drop slot,"[48] apparently

---

[46] The WEC Drop Box List was accessible to the public and linked through internet articles. *See*, *e.g.*, "Search for a ballot drop box in your community using this tool," *Wisconsin Watch*, October 27, 2020, (Links to the WEC Drop Box List and allows public to search list of all drop boxes in state.), *available at*: https://www.wisconsinwatch.org/2020/10/wisconsin-absentee-ballot-drop-box-search/. Submitted as Plaintiff's Exhibit **17**; Screenshots of all of the drop box locations on the WEC Drop Box List are submitted as Plaintiff's Exhibit **18**.
[47] *See* Plaintiff's Exhibit **19**.
[48] *See* Plaintiff's Exhibit **20**.

indicating that absentee ballots may have been intermingled with library books and evidently that access to the ballots was available to library staff.[49]

- In the town of Vermont in Dane County the drop box instruction was: "Please drop ballots through the mail slot in the door."[50]

- For the Village of Deforest in Dane County the drop box instruction was: "Please use the night depository found in the vestibule of Village Hall to drop off your absentee ballot 24/7."[51]

- In the Village of Boyd the public was instructed: "Ballots can be placed in mail slot in front door of Village Hall."[52]

202.    Thus, the Wisconsin Elections Commission and hundreds of election jurisdictions around the State acting under the imprimatur of the Commission, contrary to the express directions of the Wisconsin Legislature in the Wisconsin Election Code, employed a mish-mash of last minute unauthorized absentee ballot drop off locations which lacked uniform standards regarding security and chain of custody of the ballots and opened up the absentee ballot voting process to the very concerns for ballot harvesting identified by the Legislature in Wis. Stat. 6.84(1).

203.    While everyone understands that public officials working in cities and towns across Wisconsin are dedicated and selfless, it should not be a moment of pride that the Wisconsin Elections Commission offered so little guidance that absentee ballots could be intermingled with library books and utility bills without any requirement for

---

[49] There were numerous drop boxes located at libraries and other locations where it appears the same slots or boxes were used to deposit books, utility bill payments and perhaps other papers somewhat less critical than ballots in a presidential election.
[50] *See* Plaintiff's Exhibit **21**.
[51] *See* Plaintiff's Exhibit **22**.
[52] *See* Plaintiff's Exhibit **23**.

chain of custody rules or fixed standards regarding who could access ballots. Nor did the Commission apparently require records to be kept of any of this.

204.    Milwaukee alone used 15 unauthorized, illegal, un-manned absentee ballot drop boxes in connection with the 2020 Presidential Election.[53]

205.    The illegal drop boxes were a last minute, unexpected addition to the election landscape in Wisconsin. For instance, Madison, Wisconsin added 14 un-manned, absentee ballot drop boxes on October 16, 2020, just two and a half weeks before the Presidential Election.[54] One of these drop boxes was placed in a large public park in Madison not adjacent to any building, making it an obvious potential location for dropping off multiple ballots in a ballot harvesting operation.[55]

206.    Pictures of these un-manned drop boxes are accessible in the articles referenced in the footnotes below and clearly demonstrate they do not meet the requirements for an alternate absentee ballot site described in the Wisconsin Election Code.[56]

207.    Yet another failure of the un-manned absentee ballot drop box program was that it ended up extending the election in some locations beyond the 8 p.m. deadline set in the Wisconsin Election Code for the close of the polls and the end of balloting. *See*

---

[53] *See*, *e.g*., "Milwaukee gears up for historic election in which up to 70% of voters may not cast a ballot at polls on Nov. 3," *Milwaukee Journal Sentinel*, September 15, 2020, *available at*: https://www.jsonline.com/story/news/local/milwaukee/2020/09/15/milwaukee-offers-15-absentee-ballot-drop-boxes-november-election/5650834002/, Submitted as Plaintiff's Exhibit **24**; "Milwaukee absentee ballot drop boxes to be replaced this week with permanent versions," *Milwaukee Journal Sentinel*, October 27, 2020, *available at*: https://www.jsonline.com/story/news/politics/elections/2020/10/27/milwaukee-absentee-ballot-drop-boxes-replaced-week/6046375002/, Submitted as Plaintiff's Exhibit **25**.
[54] "City of Madison Unveils Secure Absentee Ballot Drop Boxes," *cityofmadison.com*, October 16, 2020, available at: https://www.cityofmadison.com/news/city-of-madison-unveils-secure-absentee-ballot-drop-boxes. Submitted as Plaintiff's Exhibit **26**.
[55] *Id*; The description for the Elver Park location on the WEC Drop Box List says, "Box is located in island of the circle drive near the park shelter." *See* Exhibit **27**.
[56] *See* photographs in connection with articles identified in footnotes above.

Wis. Stat. §§ 6.78 ("The polls at every election shall be open from 7 a.m. until 8 p.m.").
6.87(6) (regarding absentee ballots, "[t]he ballot shall be returned so it is delivered to the
polling place no later than 8 p.m. on election day."); 7.52 (regarding counties that canvass
absentee ballots at a location other than the polling place, the municipality is only to
"canvass all absentee ballots received by the municipal clerk by 8 p.m. on election day").

208.    Officials in a number of municipalities around Wisconsin announced that
ballots could be deposited in un-manned drop boxes until 8 p.m. on Election Day.[57] This
was incorrect, however, as a matter of law. As the un-manned drop boxes are not a
polling place, a clerk's office, or an alternate absentee ballot site, ballots contained in
drop boxes at 8 p.m. on Election Day could no longer be lawfully counted.

209.    Observance of the deadline for the close of the polls and the end of the
balloting is clear in the Wisconsin Election Code, representing the firm and considered
judgment of the Wisconsin Legislature that there must be an absolute cut-off for the time
*and* place at which ballots must be received by 8 p.m. In locations in which absentee
ballots are counted at the polls there is no grace period for ballots that have been mailed
but not yet delivered to the polls as Wis. Stat. § 6.87(6) makes clear. Likewise, where
absentee ballots are counted centrally only such ballots as have been "received by the
municipal clerk by 8 p.m. on election day"[58] may be counted.

210.    Of course, as the Election Code does not contemplate un-manned absentee
ballot drop boxes, there is no grace period in the Code for ballots placed in a drop box
that were not delivered to the polls, to the municipal clerk's office or to an alternate

---

[57] *See*, Screenshots of drop box locations on the WEC Drop Box List submitted as Plaintiff's
Exhibit **18**.
[58] Wis. Stat. § 7.52(1)(a).

absentee ballot site. *See* Wis. Stat. §§ 6.855, 7.15(2m). Alternate absentee ballot sites must be "staffed" therefore un-manned drop boxes do not qualify. *Id*.

211.    The importance of the timing and delivery provisions related to absentee balloting in the Wisconsin Election Code are clear, and under the Electors Clause they cannot be set aside by any state actor save the Wisconsin Legislature. *See Carson*, 978 F.3d at 1060-61 (finding that the Minnesota Secretary of State's "plan to count mail-in ballots received after the deadline established by the Minnesota Legislature will inflict irreparable harm on the [Presidential] Electors").

212.    As the Eighth Circuit held in *Carson*, an election official's plan to count ballots received after the statutory deadline in a Presidential election violates the Electors Clause.

213.    Likewise, decisions of election officials to count ballots from ballot boxes that were not emptied until 8 p.m. is just one more way that the poorly planned and executed drop box program created substantial and unfortunate conflicts with the Election Code to the detriment of both candidates and voters.

214.    The unlawful unmanned ballot drop boxes used in Madison, Milwaukee, Racine, Kenosha and Green Bay in the 2020 Presidential Election, were an integral part of the five Mayors' plan to "encourage higher percentages of [the Mayors'] electors to vote absentee."[59]

215.    Because of the unlawful drop boxes and the promotion of absentee voting in which Milwaukee planned to engage, that City "anticipate[d] that 80% of residents will vote absentee by mail."[60]

---

[59] 5 Mayors' Voting Plan, p. 7.
[60] *Id*. at 8.

216.    Recognizing "very small numbers of voters had traditionally chosen to cast ballots by mail," the five Mayors sought through their coordinated plan to "promote absentee voting,"[61] including through unlawful, unmanned drop boxes, "in the midst of a global pandemic when many voters are . . . apprehensive about in-person voting."[62]

217.    Yet, the five Mayors' Voting Plan included no data or analysis supporting the claim that in-person voting with social distancing and mask wearing was any less safe than voting via curbside voting or illegal drop boxes.

218.    The Mayors received the entire $6,324,567 request for funding they sought from CTCL[63] and the impact of the funding and their plan to expand absentee voting in their cities is undeniable.

219.    Madison recorded 90% turnout in the November 3, 2020 election;[64] Green Bay's turnout was 90%;[65] Milwaukee's turnout was 83%[66] and Kenosha's turnout was

---

[61] *Id*. at 7.

[62] *Id*.

[63] *See* "The 5 Mayors' Voting Plan") *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf. Submitted as Plaintiff's Exhibit **12**; CTCL Press Release: *CTCL Partners with 5 Wisconsin Cities to Implement Safe Voting Plan*, July 7, 2020, *available at*: https://www.techandciviclife.org/wisconsin-safe-voting-plan/. Submitted as Plaintiff's Exhibit **28**.

[64] Comparing 178,346 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 161,836 votes. Vote totals for the 2020 Election in Madison are *available in*: https://badgerherald.com/news/2020/11/04/voter-turnout-in-madison-dane-county-surpasses-record-2016-numbers/ Submitted as Plaintiff's Exhibit **29**.

[65] Comparing 52,064 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 47,375 votes. Vote totals for the 2020 Election in Green Bay are *available in*: https://www.greenbaypressgazette.com/story/news/politics/elections/2020/11/03/green-bay-election-2020-voters-go-polls-wisconsin/6117086002/. Submitted as Plaintiff's Exhibit **30**.

[66] Comparing 294,459 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 246,934 votes. Vote totals for the 2020 Election in Milwaukee are *available in*: https://county.milwaukee.gov/EN/County-Clerk/Off-Nav/Election-Results/Election-Results-Fall-2020. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

86%,[67] all compared to the number of registered voters they listed in their June 15, 2020, application for grant funding.

220.  These are extraordinary turn out ratios.

221.  However, the extraordinary voter turnout in these cities was achieved via an unlawful absentee-ballot expansion plan that flouted state law limits on absentee voting, reduced barriers to fraud, and introduced manifold opportunities for abuse by rushing in an untested, unauthorized, standardless new absentee balloting process in Wisconsin.

222.  Rather than seek to raise the protections surrounding mail-in ballots to address the increased risk of fraud associated with this type of voting, there was a directed effort by the five largest cities in Wisconsin to reduce the guardrails against mail-in ballot fraud and make the voting system less, rather than more, secure.

223.  CTCL funding like that received by the Mayors of Wisconsin's five largest cities to promote a massive absentee ballot expansion program and opened the doors to ballot harvesting and voter coercion, among other practices about which the Wisconsin Legislature has expressly stated its concerns, was also received by other jurisdictions across America.

224.  Publically available records indicate that at least 250 million dollars was made available for jurisdictions administering elections and channeled through CTCL,[68]

---

[67] Comparing 47,433 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 41,251 votes. Vote totals for the 2020 Election in Kenosha are *available in*: https://www.kenosha.org/departments/city-clerk-treasurer/elections. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

[68] "CTCL Receives $250M Contribution to Support Critical Work of Election Officials," Sept. 1, 2020, a*vailable at*: https://www.techandciviclife.org/open-call/. Submitted as Plaintiff's Exhibit **31**.

which by CTCL's own admission originated from a very limited donor base of one or two wealthy individuals.[69]

225. It appears that in connection with the 2020 election season CTCL has distributed throughout the United States an amount roughly comparable to that appropriated by the U.S. Congress for election administration in the CARES Act in March, 2020, *for the entire United States*.[70] The extraordinary amounts of CTCL's grants to election administrators raise questions regarding the transparency and reporting standards applicable to entities which work directly with powerful politicians and election administrators and are, through their funding, able to influence the elections process.

226. In Wisconsin, the more than $6.3 million received from CTCL by the State's five largest cities for their Mayors' Voting Program nearly equaled the total of $7.2 million in total federal CARES Act funding available to the Wisconsin Elections Commission and dwarfed the $4.1 million in CARES Act funds available to the entire state to help local election officials "prepare for Fall 2020 elections amid the COVID-19 pandemic."[71]

227. However, the CTCL funding does not only evidence a potential municipal vs. rural bias[72] and it is not only concerning because it paid for programs which, at least in part undermined, rather than upheld state election law.

---

[69] *Id.*

[70] *See* CTCL website, noting $400 million contribution to election administration through the CARES Act. *Available at*: https://www.techandciviclife.org/open-call/.

[71] "WEC Prepares for Fall Elections by Approving Block Grants to Municipalities and Mailing to Voters - COVID-19," Wisconsin Elections Commission, May 29, 2020, *available at*: https://elections.wi.gov/node/6917. Submitted as Plaintiff's Exhibit **32**.

[72] The CTCL website lists grants to other entities in Wisconsin but the *amount* of these grants does not appear to be available. *See*

228. There is also an evident partisan political correlation. The funding in the so called "Safe Voting Plan" announced by CTCL on July 7, 2020, went to five municipalities in which Democrat Presidential Candidate Hillary Clinton won more votes than Republican Presidential Candidate Donald Trump in the 2016 Presidential Election.

229. The partisan correlation of funding under the "Safe Voting Plan" in Wisconsin in 2020 is summarized in the following table[73]:

| Jurisdiction/City | Grant Amount | Trump 2016 Votes | Clinton 2016 Votes | Clinton Percentage |
|---|---|---|---|---|
| Madison | $ 1,271788 | 23,053 | 120,078 | 83.89% |
| Milwaukee | $ 2,154,500 | 45,167 | 188,653 | 80.68% |
| Racine | $ 942,100 | 8,934 | 19,029 | 68.05% |
| Kenosha | $ 862,779 | 15,829 | 22,949 | 58.98% |
| Green Bay | $ 1,093,400 | 19,821 | 21,291 | 51.78% |
| Totals | $ 6,324,567 | 112,804 | 372,000 | 76.73% |

230. While correlation does not always equal causation, the facial correlation between partisan political interests and the illegal program of absentee ballot expansion should provoke questions from any fair-minded observer.

231. The fact that CTCL is not a grassroots organization and that hundreds of millions of dollars of its funding comes from one or two individuals adds further concern.

232. When multiple violations of state law regarding the administration of a single Presidential election can be tied to a single out-of-state organization that invested

https://docs.google.com/spreadsheets/d/1E7P3owIO6UlpMY1GaeE8nJVw2x6Ee-iI9d37hEEr5ZA/edit#gid=1993755695. (Not reproduced due to volume of data.) (Accessed Nov. 29, 2020).
[73] The elections data is accessible at: https://elections.wi.gov/elections-voting/results/2016/fall-general.

enormous sums in the administration of that very election: this correlation adds further strength to the conclusion that those election law violations undermined the direction of the Wisconsin Legislature.

233.    In other words, the duty of the Wisconsin Elections Commission was to pay closer attention to the directions of the Wisconsin Legislature than to facilitating the projects funded by CTCL.

234.    However, the record described above demonstrates that when it comes to the massive absentee balloting program expansion in Wisconsin and the proliferation of un-manned absentee ballot drop boxes throughout the State, CTCL's directions (as reflected through the projects it funded) were followed more closely in the Presidential election than the directions of the Wisconsin Legislature.

## The Wisconsin Elections Commission Unlawfully Directed Election Officials to Tamper with Absentee Ballot Witness Certifications

235.    Adding to these concerns, it is now understood that election workers in the five Wisconsin cities, whose employment by the cities was almost certainly funded by the generous, private, targeted July, 2020 CTCL grant, also engaged in the prohibited practice of ballot tampering by manipulating absentee ballot envelope certifications in compliance with yet another *ultra vires* guidance issued by the Wisconsin Elections Commission which, as explained below, violated state law and abrogated the Legislature's authority regarding the conduct of the election.

236.    Election workers at the Central Count location in the City of Milwaukee were observed marking on absentee ballot envelopes and altering absentee ballot

certifications contained on the envelope.[74] For election workers to alter under oath certifications on an absentee ballot envelope obviously makes little sense in terms of process management, chain of custody, or election integrity and there exist no detailed statewide standards that would authorize or guide such conduct by election workers.

237.  The Wisconsin Election Code requires that election inspectors examine absentee ballot envelope certifications to find whether "the certification has been properly executed."[75] "When the inspectors find that a certification is insufficient . . . inspectors shall not count the ballot." Only then is an election official to write on the ballot envelope – "inspectors shall endorse every ballot not counted on the back, 'rejected (giving the reason)'." Wis. Stat. § 6.88(3)(b).

238.  Therefore, the Election Code treats absentee ballot envelope certifications as evidence in a legal process. These certifications are sworn statements made expressly "subject to the penalties of s. 12.60(1)(b), Wis. Stats., for false statements." Wis. Stat. § 6.87.2. The absentee ballot is subject to being counted or not based upon whether the inspectors find the certification sufficient.

239.  As a matter of forensics and evidence handling, election workers being instructed to enter information on an absentee ballot certification makes no sense. This is

---

[74] *See* Affidavit of Bartholomew R. Williams, (prevented from meaningful observation at Milwaukee Absentee Ballot Central Count location; observed that ballot counters were refusing to announce name of the elector and observed election staff looking up names of ballot witness and inserting witness addresses without contacting witness or elector); Submitted as Plaintiff's Exhibit **33**; Affidavit of Anne Marie Klobuchar (when she arrived at the Milwaukee Central Count location they were not permitting Republicans to observe so she registered as an Independent, she observed absentee ballots arriving at Central Count with already opened envelopes, she observed approximately 75 absentee ballots where red marks appeared to indicate dates or other information had been changed, she observed absentee ballots that appeared to be in non-official envelopes but was too far away to be able to see what was being done with the ballots), Submitted as Plaintiff's Exhibit **34**.
[75] Wis. Stat. § 6.88(3)(b).

akin to court staff altering an affidavit or other sworn instrument before it is seen by the judge, and without the judge knowing who made the alterations and why, or when they were made.

240.    Yet, on October 19, 2020, the Wisconsin Elections Commission issued a "Spoiling Absentee Ballot Guidance" advising election officials that an absentee ballot "witness does not need to appear to add a missing address."[76] As Plaintiff's affidavits indicate, this erroneous guidance by the Commission was followed by election workers who completed addresses for witnesses and counted ballots with incomplete witness certifications contrary to state law, *see* Wis. Stat. § 6.84(2) (such ballots "may not be included in the certified result of any election"), resulting in an unknown number of unlawful votes being counted from absentee ballots submitted without photo identification and without compliance with witnessing requirements required in state law.

241.    The clear language of the Election Code forbids these alterations. Wisconsin Statutes § 6.87(6d) states, "[i]f a certificate is missing the address of a witness the ballot may not be counted;" and Wis. Stat. § 6.87 (9) requires any defects in an absentee voter's certification to be cured only by the absent voter and by 8 p.m. on election day.

242.    Again, why the Wisconsin Elections Commission decided to alter the Election Code is not known, nor relevant.[77] What matters is they changed the law without authority to do so.

---

[76] Spoiling Absentee Ballot Guidance, Wisconsin Elections Commission, October 19, 2020, available at: https://elections.wi.gov/node/7190. Submitted as Plaintiff's Exhibit **35**.

[77]  Just a few months earlier on August 18, 2020, the Commission instructed voters that a witness to a voter's absentee ballot "must sign and provide their full address (street number, street name, city) in the Certification of Witness section" of the absentee ballot envelope and, consistent with the law, cautioned voters that, "**[i]f any of the required information above is missing, your**

243.     What can be said, however, is the Commission's directive was unwise. By instructing election workers to write on a ballot envelope certification before it was ruled on by the inspectors the Commission increased the potential for tampering and confusion, while undermining a key evidentiary link in the absentee balloting system.

244.     A barrier crossed by the directive was the sanctity and reliability of the certification itself.  Once a third party is authorized to write on the evidence, concerns begin to arise regarding what else might get written in. If a witness address can be added, why not a signature?

245.     The Commission's guidance upset other important aspects of the security net that the Legislature put in place.

246.     The Legislature has gone to significant length and detail in the Election Code to ensure the absentee elector is at all times in control of the destiny of their ballot.

247.     However, the Commission undermined the Legislature's voter-centric approach in the Commission's October 19, 2020 guidance by ordering that, "[t]he *witness can* appear <u>without the voter</u> to *add their signature or address*."[78]

248.     The Commission's directive also undermined the forensic value of the absentee ballot witnessing process.

249.     For good reason notaries are not permitted to sign jurats days or weeks after the fact. They must affirm a document was signed on the date they act as a witness. The reason the certification form prescribed by the Legislature for an absentee ballot

---

**ballot will not be counted.**" Uniform Instructions for Wisconsin Absentee Voters, Wisconsin Elections Commission, August 18, 2020, *available at*:
https://elections.wi.gov/sites/elections.wi.gov/files/2020-09/Uniform%20Absentee%20Instructions%20-%20Current%20-%20By-Mail%20Voters.pdf.
Submitted as Plaintiff's Exhibit **36**.
[78] Spoiling Absentee Ballot Guidance, Plaintiff's Exh. 35 (emphasis added).

envelope does not reference a date is likely because the statutory process itself does not permit witnesses to come back after the fact and alter or sign their certification.

250. Indeed, if a witness can come back after the fact to sign a certification there is nothing that could prevent a witness from *withdrawing* their certification, thereby invalidating the absentee ballot.

251. It is therefore easy to see how the Commission's improvident guidance is a recipe for chaos.

252. Just as importantly, the Commission's abrogation of plain statutory language takes control away from the voter, allowing others outside the voter's sphere of influence (or even knowledge) to take actions that affect the validity of his or her vote.

253. But the Commission's directive went even further. It required that "clerk[s] should attempt to resolve any missing witness address information prior to Election Day if possible, and this can be done through reliable information (personal knowledge, voter registration information, through a phone call with the voter or witness)." *Id*.

254. This was pure bureaucratic diktat, not supported by any of the statutory citations perfunctorily included at the end of the directive.

255. Through this mandate the Commission turned clerks into the Commission's functionaries, requiring clerks to hound voters and witnesses for missing information on the ballot envelope and empowering clerks to insert this information into the certification without even authorization from the voter, who, after all, is the person who would know if the clerk's supposition about what the clerk considers "personal knowledge" or "reliable information" is accurate.

256. It is impossible to believe that when legislators voted to require "certificate[s]" from an absentee elector and witness via a form similar to that set forth in Wis. Stat. § 6.87(2) that any legislator could have conceived a process where the "witness" (or more accurately someone an election official thinks was the witness) could provide a missing signature days after the fact without even giving notice to the voter.

257. No supposition is required. It is clear the Legislature did not intend such a process because the Election Code provides simply and clearly, "If a certificate is missing the address of a witness, the ballot may not be counted." Wis. Stat. § 6.87(6d).

258. A thorough review of the absentee balloting process in the Wisconsin Election Code also exposes the utter incongruity of the Commission's directive with the statutory language itself.

**The Voter-Centric Approach to Absentee Balloting in the Wisconsin Election Code**

259. The Wisconsin Election Code absentee balloting process is, in fact, *very* different from the absentee balloting process implemented by the Wisconsin Elections Commission through its guidance documents which during 2020 repeatedly amended Wisconsin Election Law and changed the way elections are administered in Wisconsin.

260. While the Wisconsin Elections Commission has recently bought into an absentee ballot free for all, the Wisconsin Election Code charts a more measured course.

261. Starting with recognition of the potential for fraud and abuse in the absentee ballot process (*i.e.*, the need for "voting by absentee ballot [to] be carefully regulated to prevent the potential for fraud or abuse"[79]) the Election Code describes a closely regulated *voter-centric* system where both the voter and the public (*i.e.*, other voters) are protected by giving the voter alone— not absentee ballot witnesses, and

_____

[79] Wis. Stat. § 6.84(1).

certainly not anonymous bureaucratic functionaries—control over whether the voter's absentee ballot is cast. The voter may ask for assistance during the absentee process, but the Election Code empowers the voter alone and places responsibility upon the voter alone to make all crucial choices regarding the voter's absentee ballot and whether it will be cast and counted.

262.     As a consequence, the absentee balloting process set forth in the Wisconsin Election Code, in contrast to the new system the Commission has enacted through fiat, provides for a more measured, structured, reliable, and ultimately safer and more secure approach.

263.     The voter-centric absentee ballot process described in the Election Code starts with the necessity of the voter *alone* requesting an absentee ballot. Wisconsin Statutes § 6.86(1)(ar) states, "[e]xcept as authorized in s. 6.875(6), the municipal clerk shall not issue an absentee ballot unless the clerk receives a written application therefor from a qualified elector of the municipality."

264.     The only arguable exception to a voter-centric approach of the absentee ballot *requesting* process is in Wis. Stat. §6.875(6), relating to "[a]bsentee voting in person inside residential care facilities and qualified retirement homes [which] shall be conducted by municipalities *only* in the manner described in [Wis. Stat. §6.875],"[80] which permits a municipal clerk to set up a visit to the facility for the purpose of giving the residents an opportunity to vote in person by absentee ballot. *See* Wis. Stat. §6.875(6).  This reasonable exception, however, is closely regulated through detailed rules to protect the security of the process, including that "2 special voting deputies" must conduct the visit with explicit advance public notice requirements and the deputies to be

---

[80] Wis. Stat. § 6.875(2)(a) (emphasis added).

appointed by the two largest political parties in the state, among other things. *See* Wis. Stat. 6.875(4)(a), (4)(b), (5), (6)(a). Thus, this narrow exception really proves the rule. The detailed manner in which the Election Code governs absentee voting in retirement facilities serves to underscore the Legislature's underlying intent to create a structured, closely regulated, system of absentee voting.

265.    Unless the voter *requesting* an absentee ballot is exempt from the requirement to provide proof of identification (pursuant to limited exceptions discussed above), "*the absent elector shall enclose* a copy of his or her proof of identification" with the application. Wis. Stat. § 6.87(1) (emphasis added). There is no provision authorizing anyone other than the elector to transmit proof of identification to the clerk's office.

266.    Likewise, the absentee ballot must be transmitted *only* to the absentee voter and (unless they are a military or overseas voter) via only one of two possibilities: (1) by "mail[ing] the absentee ballot to the elector's residence"[81] or (2) by "deliver[ing] it to the elector *personally* at the clerk's office or at an alternate [absentee ballot] site,"[82] (which pursuant to the Election Code is required to be a staffed clerk's office). Again, the transaction involving an absentee ballot is only between the clerk and the absentee voter. There is no option for the clerk to give another person any aspect of control over the delivery of the ballot to the voter. An absentee ballot cannot be handed off by the clerk to the voter's spouse, friend or designee.

267.    Once the absentee voter has received the balloting materials and is ready to *vote* the elector must mark his or her ballot in the presence of a witness. Wis. Stat. § 6.87(4)(b)(1). However, the witness is not permitted to learn how the elector voted. *Id*.

---

[81] Wis. Stat. § 6.87(3)(a).
[82] *Id*. (emphasis added).

While a voter needing assistance can receive it, all aspects of the voting process are supposed to take place at the direction of the voter.

268.    After marking the ballot the voter is to place it in the return envelope and seal the envelope. *Id.* The return envelope has a certificate on it to be completed by both the voter and the witness. Wis. Stat. § 6.87(2). The voter is to sign the certificate and provide an identification number, if any. *Id.* The witness is to print their name and address and sign the certification. *Id.*

269.    In the statutory description of the voting process every piece of paper that is to be enclosed in the return envelope is connected to the phrase "the elector shall enclose," or words to that effect. Wis. Stat. § 6.87(4)(b)(1).

270.    The statute next provides that the return envelope "shall be mailed *by the elector* or *delivered in person* to the municipal clerk issuing the ballot or ballots." *Id.* Again, the Code language specifies a voter-centric system in which the voter is the one who accomplishes delivery of the sealed ballot envelope in one of only two ways: delivery by the elector in person or by mail.

271.    "If a municipal clerk receives an absentee ballot with an improperly completed certificate or with no certificate, the clerk may return the ballot to the elector, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time permits the elector to correct the defect and return the ballot within the period authorized under sub. (6)," i.e., by 8 p.m. on election day. Wis. Stat. § 6.87(9).

272.    "When an absentee ballot arrives at the office of the municipal clerk . . . the clerk shall enclose it, unopened, in a carrier envelope which shall be ***securely sealed***

***and endorsed*** with the name and official title of the clerk, and the words 'This envelope contains the ballot of an absent elector and must be opened in the same room where votes are being cast at the polls during polling hours on election day or, in municipalities where absentee ballots are canvassed under s. 7.52, stats., at a meeting of the municipal board of absentee ballot canvassers under s. 7.52, stats.'" Wis. Stat. § 6.88(1) (emphasis added).

273.    The above provisions directly contradict the Wisconsin Elections Commission's October 19, 2020 directive to clerks and election workers to inject themselves into the actual voting process by seeking to proactively amend the absentee ballot envelope certifications. In contrast, the plain statutory language requires that the clerk treat the envelope certification as forensic evidence and "may" either return a ballot that lacks a completed certification or place the ballot envelope in a "carrier envelope which *shall* be securely sealed and endorsed." Wis. Stat. § 6.88(1).

274.    The clear intent of these Code provisions is that once sealed the carrier envelope is to stay sealed not be repeatedly opened by clerk's office employees in an expensive and time consuming quest to participate in the voting process by seeking out information and marking up the absentee ballot envelope certification.

275.    Ultimately, the carrier envelope is to be "enclose[d] . . . in a package and deliver[ed] to the election inspectors of the proper ward or election district or, in municipalities where absentee ballots are canvassed under s. 7.52, to the municipal board of absentee ballot canvassers when it convenes under s. 7.52(1)." Wis. Stat. § 6.88(2).

276.    Once the carrier envelopes are delivered to a poll to be counted on Election Day it is the responsibility of the inspector at that poll to in public "open the

carrier envelope only, and announce the name of the absent elector." Wis. Stat. § 6.88(3)(a).

277.    "When the inspectors find that the certification has been properly executed" and all other aspects concerning the qualifications of the elector appear to be in order then the absentee ballot envelope can be opened as part of the ballot counting process. *Id*.

278.    The foregoing is the absentee balloting process as described in the Wisconsin Election Code, and it is plainly *not* the process that was implemented by the Wisconsin Elections Commission through its directives issued to municipal clerks in the most recent election.

279.    As a matter of clear statutory direction, Wis. Stat. 6.84(2), demonstrates what a serious matter the unlawful alterations of ballot envelopes that the Commission directed municipal clerks to undertake were. This provision states that ballots tampered with in contravention of 6.87(6d), which prohibit a witness's address from being altered or changed, "may not be included in the certified result of any election." 6.84(2) (emphasis added).

280.    By instructing clerks and other election officials on the unlawful alteration of absentee ballot envelopes, the Wisconsin Elections Commission usurped the authority of the Wisconsin Legislature and administratively amended the Election Code altering the conduct of the election in violation of Article II of the U.S. Constitution.

## **The Conduct of the Mayors in Wisconsin's Five Largest Cities Contributed to a Lack of Public Access to Absentee Ballot Processing and Counting Contrary to Law, Undermining Public Confidence in the Election and Depriving the Public of an Important Aspect of Accountability for Absentee Ballots**

281.    Public access and oversight are an essential safeguard of the absentee balloting process guaranteed by the Wisconsin Election Code.

282.    The five Mayors knew that the intense efforts to generate mail-in ballots in their cities would cause massive logistical issues that would make ballot counting more difficult for citizens to observe and monitor. Thus, they should have worked to protect the public's right to meaningful access as provided for in the Wisconsin Election Code, but did not.

283.    Wisconsin law provides that all aspects of elections in the State are to be open to the public, including absentee ballot counting.

284.    Wis. Stat. 7.41(1) provides:

Any member of the public may be present at any polling place, in the office of any municipal clerk whose office is located in a public building on any day that absentee ballots may be cast in that office, or at an alternate site under s. 6.855 on any day that absentee ballots may be cast at that site for the purpose of observation of an election and the absentee ballot voting process[.]

285.    Wis. Stat. 7.52(1)(a) provides:

Any member of the public has the same right of access to a meeting of the municipal board of absentee ballot canvassers under this subsection that the individual would have under s. 7.41 to observe the proceedings at a polling place.

286.     Yet, as designed, the Mayors' absentee ballot expansion program that was intended to generate absentee ballots from 80% or more of the registered voters in a major city like Milwaukee could never reasonably accommodate public scrutiny.

287.     This fact is evident from the five Mayors' Voting Plan itself which sought funding in the City of Milwaukee for a Central Count location to count absentee ballots where there would be "15 chiefs and 200 election workers." [83]

288.     It would literally require an army to keep tabs on the counting of hundreds of thousands of absentee ballots by more than 200 election workers at the Milwaukee Central Count location. But, it appears no CTCL funding was requested to enhance truly effective public scrutiny and oversight of the absentee ballot canvassing and counting processes.

289.     Moreover, as the affidavits attached to the Complaint indicate, Republicans were limited to only 15 watchers at the Milwaukee Central Count location to try to keep abreast of the activities of more than 200 election workers dealing with mountains of absentee ballots.[84]

290.     The small band of Republican watchers were further hampered by unwritten rules, zealously enforced, that kept Republican watchers so far away from the

---

[83] 5 Mayors' Voting Plan, p. 19.

[84] *See also* "What poll watchers can and can't do at Wisconsin voting sites," *Milwaukee Journal Sentinel*, October 20, 2020, ("Milwaukee election officials currently anticipate about 60 observers will be allowed at central count on Election Day, including 15 from each of the two major political parties."), *available at*: https://www.jsonline.com/story/news/politics/elections/2020/10/20/what-poll-watchers-can-and-cant-do-wisconsin-voting-sites-election-polling-places-election-observers/5941883002/. Submitted as Plaintiff's Exhibit **37**.

absentee ballot canvassing and counting that they could not meaningfully view the process.[85] These restrictions violated Wis. Stats. §§7.41(1) and 7.52(1)(a).

291.    Similarly, observers in other cities which received CTCL funding were prevented from observing absentee ballots being processed.[86]

292.    Likewise, the un-manned absentee ballot box program ushered in by the five Mayors and the Wisconsin Elections Commission provided for none of the public oversight and accountability protections which are applicable to other forms of balloting under the Wisconsin Elections Code (*i.e.*, in-person voting, in-office absentee voting and absentee voting by mail) such as the opportunity for public watchers, notice to the public regarding how the program was administered and uniform chain of custody standards for the ballots.

---

[85] *See* Affidavit of Beth A. Brown, paras. 6-8 (Milwaukee poll watcher who was prevented from observing voting and curb-side voting), Submitted as Plaintiff's Exhibit **38**; Affidavit of Bartholomew R. Williams, (prevented from meaningful observation at Milwaukee Absentee Ballot Central Count location; observed that ballot counters were refusing to announce name of the elector and observed election staff looking up names of ballot witness and inserting witness addresses without contacting witness or elector). Submitted as Plaintiff's Exhibit **33**.

[86] *See* Affidavit of Mary Angelina Horn, (prevented from serving as a poll watcher in Racine, observed questionable conduct such as voters "voting more than once" but no action was taken), Submitted as Plaintiff's Exhibit **39**; Affidavit of Charles A. Armgardt, paras. 5-14, see especially para. 10 (City of Racine watcher: "I was also denied access by election officials to the station within the polling places where mailed or absentee ballots were checked in and counted. At Festival Park Hall, for example, the absentee ballot station was placed in the back of the room, approximately seventy feet from any designated observer area."), Submitted as Plaintiff's Exhibit **40**. ; Affidavit of Steve S. Goetz, para. 6 (poll watcher in Madison, Wisconsin who reported: "I was required to stand in a very small designated area that was at least 10 feet [from] the registration tables, where I could not meaningfully observe the process.") Submitted as Plaintiff's Exhibit **41**; Affidavit of Lana Sloane, para. 6 (was a poll watcher in a precinct in Madison, Wisconsin where watching area was so small that she was told there was only room for one person and that she could only alternate with a Democrat poll observer, accordingly she was unable to watch during 90 minute periods when the Democrat poll watcher was the only observer), Submitted as Plaintiff's Exhibit **42**;
*see also* Affidavit of Kyle Hudson, paras. 3-10 (poll watcher in Sun Prairie was asked to leave and not observe the canvassing of ballots, when he demanded access he was told the only access he would be given was via Zoom call, as the video feed for the canvass continually froze he was unable to observe the canvassing), Submitted as Plaintiff's Exhibit **43**; Affidavit of Jeremy Bowers (Sun Prairie poll watcher who confirms he was excluded from polling place and could only watch via an insufficient Zoom call); Submitted as Plaintiff's Exhibit **44**.

293.    Thus, the five Mayors' Voting Plan foresaw and facilitated a massive volume of mail-in ballots that flooded mammoth, centralized, municipal counting centers where the activities of the workers paid for by CTCL funding could not be observed, and many workers therefore counted ballots effectively unobserved.

294.    This scenario is literally the furthest thing one can imagine from the "Legislative policy" set forth in Wis. Stat. § 6.84 that "voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse."

295.    When viewed in light of the patent violations of Wisconsin election law discussed herein, it is evident that the CTCL funding, the five Mayors' Voting Plan coupled with the unlawful directives of the Wisconsin Elections Commission facilitated a disturbing number of illicit acts and practices by Wisconsin election officials which increased the risk of fraud in the November 3, 2020 election and squarely conflicted with the directions of the Wisconsin Legislature.

296.    For all of the foregoing reasons, the 2020 Presidential election in Wisconsin was manifestly different from prior Wisconsin elections due to factors such as the massive number of mail-in ballots voted, the manner in which those ballots were processed, the lack of fidelity to the requirements of the Election Code, and the standard-less application of processes related to the collecting, handling, canvassing, and counting of absentee ballots and the lack of meaningful public observation of these processes.

297.    Separately and collectively, the Defendants' actions dramatically lowered the guardrails against fraud in the Wisconsin Election Code, creating an invitation for mail-in ballot fraud contrary to the intent of the Wisconsin Legislature and undercutting the consistency of election procedures in the State, making the November 3, 2020

election impossible to administer fairly, and rendering the election irredeemably inconsistent with the directions of the State Legislature regarding the conduct of the election.

298.    As the U.S. Supreme Court and Seventh Circuit Court of Appeals both recently warned, such acts which increased the propensity for fraud in a targeted way in a battleground state in what was a close election, can do nothing other than undermine the public's faith in democracy.

299.    Fortunately, the Electors Clause was intended by the Framers as a bulwark against the actions of local executive branch officials who would attempt to subvert the will of the people, as reflected in their state legislature's directions regarding the manner in which electors for the Nation's Chief Executive are to be chosen.

300.    Given the clear statement in the Wisconsin Election Code that the absentee balloting provisions of the Code are "mandatory"[87] and that absentee ballots cast "in contravention of the procedures specified in those provisions may not be included in the certified result of any election,"[88] the Wisconsin Legislature's directions were neither followed during the absentee balloting process when absentee ballot drop boxes were used contrary to Wisconsin law, nor were the Wisconsin Legislature's clear instructions followed when absentee ballots collected in these boxes were counted in the canvassing and/or recount processes. Plainly, it would violate Wisconsin law to certify any election result in which ballots from these illegal ballot drop boxes were counted.

301.    As Justice Gorsuch said little more than a month ago in a case involving Wisconsin's deadline for counting absentee ballots, "[t]he Constitution provides that state

---

[87] Wis. Stat. § 6.84(2)
[88] *Id.*

legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, No. 20A66, 2020 WL 6275871, at *2 (U.S. Oct. 26, 2020) (concurring in denial of application to vacate stay). While Justice Gorsuch and Justice Kavanaugh, who joined the concurrence, were in that case addressing the Elections Clause, their analysis holds equally under the Electors Clause.

302.     The clear meaning of the Electors Clause compels the determination that the 2020 Presidential Election in Wisconsin was not conducted consistent with the direction of the Wisconsin Legislature thereby violating the U.S. Constitution.

## CONCLUSION

By ignoring the Wisconsin Legislature's express directions regarding the collection, handling, processing, canvassing, and counting of absentee ballots and related activities and/or through improper certification of elections and related activities, all in violation of the Wisconsin Election Code and through violations of the Electors and Elections Clauses and the Equal Protection and Due Process Clauses to the United States Constitution, the Defendants ran an unconstitutional and unlawful Presidential election in Wisconsin.

WHEREFORE, Plaintiff Donald J. Trump prays for judgment:

1. Declaring the Defendants violated the Electors Clause by failing to abide by the directions of the Wisconsin Legislature in connection with the conduct of the 2020 Presidential Election in Wisconsin;

2. Declaring the Defendants violated the Equal Protection and Due Process Clauses in connection with the conduct of the 2020 Presidential Election in Wisconsin;

3. Declaring that the constitutional violations of the Defendants likely tainted more than 50,000 ballots, a number well in excess of the current estimated difference between the vote totals for the Republican and Democrat candidates for President;

4. Remanding this case to the Wisconsin Legislature to consider the Defendants' violations of the Electors, Equal Protection and Due Process Clauses and determine what remedy, if any, the Wisconsin Legislature should impose within its authority pursuant to the Electors Clause;

5. Enjoining any actions inconsistent with the Court's declaration and judgment;

6. Awarding the Plaintiff his costs and attorneys fees under 42 U.S.C. § 1983 and any other applicable authority; and

7. Awarding all other just and proper relief.

Respectfully Submitted,

KROGER, GARDIS & REGAS, LLP

/s/ William Bock, III

William Bock III, Indiana Attorney No. 14777-49
James A. Knauer, Indiana Attorney No. 5436-49
Kevin D. Koons, Indiana Attorney No. 27915-49

ATTORNEYS FOR PLAINTIFF DONALD J. TRUMP

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000