# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DONALD J. TRUMP,

           Plaintiff,

v.                                                Case No. 20-C-1785

THE WISCONSIN ELECTIONS COMMISSION, et al.,

           Defendants.

## BRIEF OF DEFENDANTS BARRETT, WOODALL-VOGG, AND OWCZARSKI IN RESPONSE TO PLAINTIFF'S MOTION FOR EXPEDITED DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

The Motion for Expedited Declaratory and Injunctive Relief and accompanying Complaint filed by Plaintiff Donald J. Trump ("Plaintiff") present an alternate reality in which the November 3, 2020, general election did not occur in the face of a global pandemic, the voters of Wisconsin did not select Plaintiff's opponent, and the will of those voters was not confirmed by a recount that Plaintiff requested. Undaunted by the fact that all of those things have actually occurred, Plaintiff seeks to discard the votes of more than three million Wisconsinites. He does so by citing concerns over absentee voting processes that could have been raised months, if not years, ago, and by alleging voter fraud without evidence.

As Plaintiff conceded at the Status in this matter, and as this court has noted, Plaintiff's motion should have been filed as one for an expedited hearing on the merits of a declaratory judgment action. Plaintiff's claims could have been brought considerably earlier and are thus barred by the equitable doctrine of laches. The vague allegations he makes against the City of

Milwaukee's Mayor, City Clerk, and the Executive Director of the Elections Commission (collectively, the "City of Milwaukee" or "City") are premised on misstatements of fact and mischaracterizations of law and are insufficient to warrant the declaratory relief sought.[1] Indeed, the relief he requests is illegal and unconscionable. His Motion, however styled, should be denied in its entirety and his Complaint should be dismissed.

## ARGUMENT

**I.  The Plaintiff's Claims Are Barred by Laches.**

The equitable doctrine of laches "derive[s] from the maxim that those who sleep on their rights, lose them." *Navarro v. Neal*, 716 F.3d 425, 429 (7th Cir. 2013) (quoting *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002)). For the doctrine to apply, the party asserting it must show (1) lack of diligence by the opposing party and (2) prejudice. *Id*. at 429 (citing *Cannon v. Univ. of Health Scis./The Chicago Med. Sch.*, 710 F.2d 351, 359 (7th Cir.1983). In the context of elections, this means that any claim against a state electoral procedure must be expressed expeditiously. As time passes, the "state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citations omitted).

In a 2013 case the Seventh Circuit approvingly discussed the application of laches to bar claims for injunctive relief in an election case. *Navarro*, 76 F.3d at 429-30.[2] The plaintiffs in *Navarro* had been omitted from a primary ballot after failing to collect the necessary signatures,

---

[1] The City has filed a separate Motion to Dismiss Plaintiff's Complaint for Declaratory and Injunctive Relief pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6); however, it will address the merits of Plaintiff's arguments in support of declaratory/injunctive relief in this brief.

[2] Numerous other courts have done the same. *See, e.g., Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (denying election-related challenges because plaintiff waited two weeks to file an action after becoming aware of certification "irregularities."); *Hawkins v. Wisconsin Elections Comm'n*, 2020 WI 75, ¶¶ 5, 9-10, 393 Wis. 2d 629, 632-35, 948 N.W.2d 877, 878-80 (denying leave to commence election-related original action because, among other things, the plaintiffs' delay in seeking relief would cause "undue damage" to Wisconsin electors).

2

yet waited for approximately ten weeks, and until shortly before the election, to seek injunctive relief. *Id*. at 429. Based on those facts, the court found that the plaintiffs could not "reasonably dispute" the district court's application of laches to bar their claims for injunctive relief. *Id.*

As to the first laches prong, Plaintiff has shown a complete lack of diligence in bringing his claims. The determination as to whether a party demonstrated a lack of diligence in filing suit turns on whether the delay was both unreasonable and inexcusable. *Cannon,* 710 F.2d at 359. As noted below, Plaintiff's adequate and exclusive remedy for attempting to challenge his election defeat lies in Wisconsin's statutory recount procedures[3]. Yet even setting that point aside for argument's sake, the doctrine of laches bars his claims, which could have been brought well before the November 3, 2020, general election. Plaintiff's Complaint focused on the following aspects of Wisconsin's election process: (1) assertion of "indefinitely confined" status by some absentee voters (Compl. ¶¶ 80-108); (2) use of secure drop boxes for collecting absentee ballots (Compl. ¶¶ 168-213); (3) promotion of absentee voting, including acceptance of the CTCL grant by various state and local officials (Compl. ¶¶ 214-34); (4) alleged "tampering" with absentee witness certifications (Compl. ¶¶ 235-258); (5) alleged interference with election observers (Compl. ¶¶ 281-290).

Plaintiff failed to address diligently and appropriately all five of these issues. In each instance, the policies and activities to which he now objects had been widely disseminated for months or even years. The first issue, regarding "indefinitely confined" voters, was the subject of litigation that resulted in a March 31, 2020, order of the Wisconsin Supreme Court clarifying the relevant guidelines. (Woodall-Vogg Decl. ¶ 35, Ex. P). The second issue, concerning the use of secure drop boxes, was clearly addressed (and deemed permissible) in Wisconsin Elections Commission ("WEC") guidance dated August 19 deemed, 2020. (Woodall-Vogg

---

[3] *See* Section II(b) of this brief for an extensive discussion of the recount process as it relates to this matter.

Decl. ¶ 27, Ex. F). The third issue regarding the promotion of absentee voting in the face of the global COVID-19 pandemic began occurring "following the 2020 primary election" and no later than June 15, 2020, as Plaintiff acknowledges in his Complaint. (Compl. ¶¶ 168-69). (Woodall-Vogg Decl. ¶ 12, Ex. D). The fourth issue, the practice of municipal clerks completing witness address information on absentee ballot certification, was based on WEC guidance from October 2016—more than four years prior to the 2020 presidential election at issue in this action. (Woodall-Vogg Decl. ¶ 5, Ex. A). As to the final issue, Plaintiff's allegations of interference with his campaign's election observers, though certainly of more recent vintage than issues one through four, could still have been raised sooner than a month after the election—and, like his other concerns, were mandatorily remedied via Wisconsin's statutory recount process.

Not only was Plaintiff inexcusably tardy in asserting his claims, but the relief he seeks would profoundly prejudice the City of Milwaukee and disenfranchise the entire Wisconsin electorate. Plaintiff demands nothing less of this Court than the complete nullification of the state's election results. His apparent strategy of waiting until voting concluded, demanding a recount (his only actual recourse once the election was finished), and then challenging the election results in federal court to hedge his bets is a shameless affront to the democratic process. Had Plaintiff been genuinely concerned about the fairness of well-established voting processes in Wisconsin, or their application during a pandemic that took hold of Wisconsin in March 2020, he could have challenged those processes promptly to ensure their resolution before a single vote was cast. Doing so also ensured Defendants, including the City, were unable to adopt alternate procedures that would have complied with any court ruling, preserving enfranchisement for as many Wisconsin voters as possible. Instead, he waited until the votes were counted (twice, in Milwaukee and Dane Counties), and only then asked this Court to enable his end run around

every citizen's fundamental right to have her or his vote counted. *See Donald J. Trump for Pres., Inc. v. Boockvar*, No. 20-CV-02078, 2020 WL 6821992, *1 (M.D. Pa. Nov. 21, 2020) ("Plaintiffs ask this Court to disenfranchise almost seven million voters. This Court has been unable to find any case in which a plaintiff sought such a drastic remedy in the contest of an election….")

Under both the Wisconsin and federal doctrines of laches, the fact that Plaintiff waited until *after* the election—when no remedy but the disenfranchisement of otherwise qualified electors remains available—should serve as a bar to his current request. The application of laches becomes particularly appropriate where a litigant is not seeking a "purely prospective remedy," but is instead demanding declaratory and injunctive relief with retroactive effect. *See e.g. Navarro*, 716 F.3d at 429. As Wisconsin Supreme Court Justice Hagedorn wrote in a concurring opinion, denying a similar Petition for Leave to Commence an Original Action in the Wisconsin Supreme Court:

> The Wisconsin Voters Alliance and a group of Wisconsin voters bring a petition for an original action raising a variety of questions about the operation of the November 3, 2020 presidential election. Some of these legal issues may, under other circumstances, be subject to further judicial consideration. But the real stunner here is the sought-after remedy. We are invited to invalidate the entire presidential election in Wisconsin by declaring it "null"—yes, the whole thing. And there's more. We should, we are told, enjoin the Wisconsin Elections Commission from certifying the election so that Wisconsin's presidential electors can be chosen by the legislature instead, and then compel the Governor to certify those electors. At least no one can accuse the petitioners of timidity.
>
> Such a move would appear to be unprecedented in American history. One might expect that this solemn request would be paired with evidence of serious errors tied to a substantial and demonstrated set of illegal votes. Instead, the evidentiary support rests almost entirely on the unsworn expert report of a former campaign employee that offers statistical estimates based on call center samples and social media research.
>
> This petition falls far short of the kind of compelling evidence and legal support we would undoubtedly need to countenance the court-ordered disenfranchisement

of every Wisconsin voter. The petition does not even justify the exercise of our original jurisdiction.

*Wisconsin Voters All. v. Wisconsin Elections Comm'n,* No. 2020AP1930-OA, at 2 (Wis. Sup. Ct. Dec. 4, 2020) (Hagedorn, J., concurring).

The voters of Milwaukee (and Wisconsin at large) should not be forced to bear the burden of Plaintiff's tardiness in challenging policies with which he disagrees. For these and the foregoing reasons, the City of Milwaukee requests that this Court deny Plaintiff's requested relief. Alternatively, for the same reasons, in the unlikely event this Court finds the WEC's guidance to be contrary to state law, this Court should grant only prospective relief so as to preserve the enfranchisement of innocent Wisconsin voters whose ballots were processed along then-existing guidelines.

## II. The Plaintiff's Claims for Injunctive Relief Fail to Meet the Applicable Standards.

To the extent that Plaintiff is pursuing injunctive relief that remedy should not be granted because he has another adequate remedy at law, he is unlikely to succeed on the merits of his claims[4], and the equities do not weigh in his favor. Plaintiff has not met his high burden of establishing that preliminary injunctive relief is warranted.

### a. The Plaintiff Had an Alternative and Exclusive Remedy.

Particularly worthy of note is Plaintiff's inability to meet the first prong of the injunctive relief standard. The adequate—and exclusive—remedy for Plaintiff's complaints about the Wisconsin elections process lies in the recount procedures set forth in Wis. Stat. § 9.01. Wis. Stat. § 9.01(11) expressly and unequivocally states that "[t]his section constitutes the exclusive

---
[4] *See* Section II(b)I of this brief for a full discussion of why Plaintiff's claims fail on the merits.

6

judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process." *See also Carlson v. Oconto Cnty. Bd. of Canvassers*, 2001 WI App 20, ¶ 7, 240 Wis. 2d 438, 623 N.W.2d 195 (deeming Wis. Stat. § 9.01 the "exclusive remedy for any claimed election fraud or irregularity). Any appeal regarding the recount process thus must commence in a circuit court in Wisconsin and then work its way through Wisconsin's higher courts, as appropriate. Wis. Stat. §§ 9.01(6)-(9).

Plaintiff is well aware of Wisconsin's recount statute and the procedures contained therein, and is currently availing himself of them. He requested recounts in Dane and Milwaukee Counties and unsuccessfully pursued an original action in the Wisconsin Supreme Court following the conclusion of those recounts. (Woodall-Vogg Decl. ⁋ 33, Ex. N). Plaintiff's petition was denied because he failed to comply with the procedural requirements of Wis. Stat. § 9.01, and the Court directed him to follow those requirements by filing in circuit court. *Id.* at 2. Justice Hagedorn, concurring, noted that "[a]ll parties seem to agree that Wis. Stat. § 9.01 (2017-18) constitutes the 'exclusive judicial remedy' applicable to this claim." *Id.* (citing Wis. Stat. 9.01(11)). Plaintiff is now appealing the recount in the circuit courts—the appropriate venue indicated by Wis. Stat. § 9.01(6) and the Wisconsin Supreme Court. *Id.*

    b. **The Plaintiff Cannot Succeed on the Merits.**

        i. <u>The City at All Times Followed State Law and WEC Guidance on Indefinitely Confined Electors.</u>

Plaintiff points to no act of the City that was improper in connection with the law regarding, or the WEC guidance pertaining to, indefinitely confined electors; nor can they. At all times, the City followed the WEC's Guidance for Indefinitely Confined Electors dated March

7

29, 2020. That guidance cites to the statute and specifically provides, contrary to Plaintiff's apparent contention, that: "[i]ndefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity, or disability." (Woodall-Vogg Decl. ¶ 12, Ex. C, at 1). Moreover, this language was specifically upheld by the Wisconsin Supreme Court as expressing an accurate statement of the law. (Woodall-Vogg Decl. ¶ 35, Ex. P, at 2). The fact that more people may have identified themselves as indefinitely confined this year, either because they became aware of the option, because COVID-19 made them newly indefinitely confined, or because they were otherwise indefinitely confined persons who became new voters cannot be said to form the basis for a blanket declaration that City officials acted improperly or illegally.

ii. No Law Prohibits the Use of Drop Boxes by Wisconsin Municipalities.

Plaintiff also alleges that the City's use of Center for Tech & Civic Life ("CTCL") funds to provide secure drop boxes was illegal. (Compl. ¶¶ 168-217). In support of this position, Plaintiff points to Wis. Stat. § 6.87(4)(b)(1), which provides that completed absentee ballots "shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots."

Plaintiff's attempt to deem the use of drop boxes illegal is unsupported by law and contrary to widespread safe election practices encouraged by the WEC during the COVID-19 pandemic. (Woodall-Vogg Decl., ¶ 25, Ex. G). It is by no means clear the statutory directive that absentee ballots must be *delivered* by the elector in one of only two ways, ("in person…to the municipal clerk"), forecloses the option for the municipal clerk to *receive* absentee ballots in a drop box. The WEC reached the opposite conclusion. *Id.*

8

### iii. The City's Use of CTCL Funding Was Permissible.

Plaintiff is disingenuous about the nature of the CTCL grant program and the manner in which the City spent the grant funds it received from the CTCL. Most notably, Plaintiff ignores the fact that over 100 Wisconsin municipalities of varying sizes and population densities received CTCL grants in 2020, including traditionally "red" suburban communities like the cities of Brookfield and Waukesha. (Woodall-Vogg Decl. ¶¶ 22-23, Ex. E).

It is unsurprising that plaintiff attempts to cast the five municipal defendant mayors as a cabal in league with one another and with liberal donors to obscure this inconvenient truth: The CTCL grants have been challenged eight times in federal court over the past three months and every single judge to consider those suits has deemed the plaintiffs' claims meritless or has otherwise denied relief. This includes eight federal district judges, three unanimous federal appellate panels, and two Justices of the United States Supreme Court, including one case that went up through Justice Kavanaugh, who was the then-assigned Justice for the Seventh Circuit.[5] In the Eastern District of Wisconsin case, Judge Griesbach denied a temporary restraining order on the ground that plaintiffs were unlikely to succeed on the merits of their claims. He held that "Plaintiffs have presented at most a policy argument for prohibiting municipalities from accepting funds from private parties to help pay the increased costs of conducting safe and efficient elections." *Wisconsin Voters Alliance v. City of Racine*, No. 20-C-

---

[5] *See, Pa. Voters All. v. Center Cnty.*, No. 20-CV-1761, 2020 WL 6158309 (M.D. Pa. October 21, 2020) (Brann, J.), *stay denied*, No. 20-3175 (3d Cir. Oct. 28, 2020), *stay denied,* No. 20A82 (U.S. Nov. 3, 2020) (Alito, J., in chambers); *Election Integrity Fund v. City of Lansing and City of Flint*, No. 20-2048 (6th Cir. Oct. 20, 2020); *Pa. Voters All. v. Center County*, No. 20-3175 (3rd Cir. Oct. 28, 2020); Dkt. 18, *Ga. Voter All. v. Fulton County*, No. 1:20 Civ. 04198 (N.D. Ga. Oct. 28, 2020); Dkt. 5, *S.C. Voter's All., et. al. v. Charleston County et. al.*, No. 2:20 Civ. 3710 (D.S.C. Oct. 26, 2020); Dkt. 76, *Pa. Voters All., et al. v. Centre County, et al.*, No. 4:20 Civ. 01761 (M.D Pa. Oct. 21, 2020); Dkt. 23, *Iowa Voter All., et al., v. Black Hawk County*, No. 20 Civ. 2078, (N.D. Iowa Oct. 20, 2020); Dkt. 19, *Election Integrity Fund, et al. v. City of Lansing and City of Flint*, NO. 1:20 Civ. 950 (W.D. Mich. Oct. 19, 2020); Dkt. 19, *Tex. Voters All., et al. v. Dallas County, et al.*, No. 4:20 Civ. 775, (E.D. Tex. Oct. 20, 2020); Dkt. 25, *Minn. Voters All. v. City of Minneapolis*, No. 20 Civ. 2049 (D. Minn. Oct. 16, 2020).

1487, 2020 WL 6129510, *1 (E.D. Wis. Oct. 14, 2020) (Griesbach, J.). Judge Griesbach continued that even if there was a risk of skewing an election through selective funding, "[t]he record before the Court…does not provide the support needed for the Court to make such a determination, especially in light of the fact that over 100 additional Wisconsin municipalities received grants as well." *Id.* at 2-3. Finally, Judge Griesbach held that "the Court finds nothing in the statutes Plaintiffs cite, either directly or indirectly, that can be fairly construed as prohibiting the defendant Cities from accepting funds from CTCL." *Id.* at 3.

Subsequently, plaintiffs in that case moved for an injunction pending appeal with the United States Court of Appeals for the Seventh Circuit. *Wis. Voters All. v. City of Racine et al.*, No 20-3002 (7th Cir.) Justices Flaum, Easterbrook and Chief Justice Sykes denied the motion the same day. *Wisconsin Voters Alliance v. City of Racine*, No. 20-C-1487, 2020 WL 6129510, *1 (E.D. Wis. Oct. 14, 2020) (Griesbach, J.), *stay denied,* 2020 WL 6591209 (E.D. Wis. Oct. 21, 2020), *stay denied*, No. 20-3002 (7th Cir. Oct. 23, 2020). Plaintiffs then filed a motion for an injunction pending appeal in the United States Supreme Court, where it was denied by Justice Kavanaugh on October 29, 2020. *Wisconsin Voters Alliance v. City of Racine*, No. 20-C-1487, 2020 WL 6129510, *1 (E.D. Wis. Oct. 14, 2020) (Griesbach, J.), *stay denied,* 2020 WL 6591209 (E.D. Wis. Oct. 21, 2020), *stay denied*, No. 20-3002 (7th Cir. Oct. 23, 2020), *stay denied,* No. 20A75 (U.S. Oct. 29, 2020) (Kavanaugh, J., in chambers). The case is currently awaiting full briefing of defendants' motion to dismiss for lack of standing.

What Plaintiff almost entirely ignores in the current case is that elections in 2020 were conducted during a pandemic, which presented unique challenges and increased costs. It is completely reasonable, particularly after Wisconsin navigated the first Presidential preference primary after COVID-19 shutdowns on April 7, 2020, with all of its associated challenges, that

Defendants would seek to obtain funds to facilitate voter access.  The WEC has issued nearly 60 separate COVID-related communications, webinars, memoranda, etc., to assist municipal clerks in protecting voters and complying with state law.  (Woodall-Vogg Decl. ¶ 27, Ex. I; *see also* https://elections.wi.gov/covid-19/election-officials).  Those funds were used consistently with state law, and not for a partisan purpose.  (Woodall-Vogg Decl. ¶¶ 19-20).

This court should see the CTCL grant allegations for precisely what they are—a red herring.  Plaintiff makes no independent claim that the City's acceptance of the grant itself was illegal or otherwise improper.  Instead, Plaintiff uses the grant as an entrée to complain about other matters raised elsewhere in the complaint – drop boxes and absentee voting generally – and now does so with the implication of a partisan motivation that has been rejected by every other court to have examined the matter.  This court should do the same.

> iv. <u>The City of Milwaukee Properly Allowed Absentee Ballot Canvassers to Complete Partial Addresses on Absentee Ballot Return Envelopes.</u>

Plaintiff alleges that the Milwaukee Election Commission ("MEC") staff, including the Executive Director, improperly instructed staff to complete partial witness addresses on absentee ballot return envelopes. (Compl. ¶¶ 235-258).  This process was authorized by the WEC in guidance first published in October, 2016, and was subsequently reaffirmed several weeks prior to the November 3, 2020 presidential election. (*See e.g.* Compl. Ex. 35).  Plaintiff demands that this Court declare both the MEC's actions and the WEC's guidance unlawful.  For the reasons explained in the following paragraphs of this brief, the City of Milwaukee urges this Court to deny Plaintiff's requested relief.

First, it is necessary to dispense with all pretense and bluntly recognize the true end goal of Plaintiff's request.  Plaintiff seeks nothing less than the outright disenfranchisement of

otherwise qualified electors based on what is—at best—a hyper-technicality made possible only by an extremely narrow reading of Wis. Stat § 6.87. Plaintiff does not claim that even a *single* address was inaccurately identified by MEC staff, or that any affected address was itself disqualifying for some independent reason. This not only casts serious doubt about the sincerity of Plaintiff's suggested impetus for this extraordinary action (concern about fraudulently cast ballots), but it also throws into sharp relief the extremity of the position Plaintiff now pushes towards this Court—that Wis. Stat. § 6.87 mandates the disenfranchisement of qualified electors even though enfranchisement could just as readily be achieved through the simple identification of easily accessible and verifiable information. Such an interpretation would needlessly work an injustice on countless Wisconsin electors, and directly contravenes the stated purpose of the Wisconsin elections statutes—which is to maximize the enfranchisement of Wisconsin voters. *See* Wis. Stat. 5.01(1). For this reason alone, Plaintiff's requested relief should be denied.

Second, contrary to Plaintiff's assertions, neither the WEC's guidance nor the MEC's procedures for implementing it are in violation of any state law.[6] While Plaintiff asserts that § 6.87 prohibits clerks from completing missing witness address information, Plaintiff does not identify—nor could he—any language in § 6.87 expressly stating such a prohibition. Instead, Plaintiff essentially argues that because § 6.87 already provides a procedure for correcting "improperly completed certificates," that procedure must be viewed as mandatory, and by consequence, exclusive of all others. (Compl. ¶ 241); Wis. Stat. § 6.87(9). This supposedly exclusive correction procedure is found at § 6.87(9), and allows clerks to return "improperly completed" absentee ballot envelopes to the voter for correction. Ballots with corrected

---

[6] The MEC's procedures for obtaining missing witness address information are summarized in the Declaration of Claire Woodall-Vogg, Executive Director of the MEC, filed herewith. (*See* Woodall-Vogg Decl. ¶¶ 3-10).

12

certificates may be counted so long as they are returned to the clerk by 8:00 p.m. on election day. Wis. Stat. § 6.87(6) and (9).

What Plaintiff conveniently glosses over, however, is that the § 6.87(9) correction procedure is *not* one of the absentee ballot procedures made "mandatory" by Wis. Stat. § 6.84(2). By default, then, Wis. Stat § 6.87(9) is instead governed by the far more expansive legislative intent declared in Wis. Stat. § 5.01(1), which directs that "chs. 5 to 12 **shall be construed to give effect to the will of the electors…notwithstanding informality or failure to fully comply with some of their provisions**." (Emphasis added). In applying § 5.01(1), the Wisconsin Supreme Court has "quite consistently construed the provisions of election statutes as directory rather than mandatory so as to preserve the will of the elector." *Lanser v. Koconis,* 62 Wis. 2d 86, 91, 214 N.W.2d 425, 427 (1974).

In this way, Plaintiff's characterization of § 6.87(9) as a mandatory, exclusive remedy falls apart. By creating § 6.87(9) but excluding that provision from the list of mandatory procedures stated in § 6.84(2), the legislature necessarily authorized the correction of absentee ballot certificates but chose not to rigidly impose a mandatory process through which to accomplish that goal. In other words, there is simply nothing in § 6.87 to suggest that the § 6.87(9) procedure is the sole way to rehabilitate an insufficient absentee ballot certificate. So long as the ballots are corrected by 8:00 p.m. on election day, all mandatory requirements of § 6.87 are satisfied. Because the core assumption upon which Plaintiff's argument relies is legally unsound, his requested relief is improper and should be denied.

> v. <u>Central Count/Observer Practice was Appropriate and Consistent with State Law.</u>

While on the one hand protesting that the City's acceptance of CTCL grant funds was problematic, Plaintiff complains on the other that defendants should have spent the funds differently: On increasing observer access at the central count facility for counting absentee ballots. Several real world considerations must be addressed in connection with this contention.

Plaintiff himself has repeatedly, and very publicly, stated the importance of releasing election results on election day.[7] This placed tremendous pressure on election officials, including those in the City, to count all absentee ballots as quickly as possible. Current state law does not allow for the counting of any absentee ballot until the polls open at 7 a.m. on election day. Wis. Stat. § 6.88(3)(a). Indeed, because of the time it takes to process absentee ballots, even prior to COVID-19 defendants have sought to amend state law to allow them to begin tabulating absentee ballots, without releasing a count, prior to the opening of the polls on election day. (Woodall-Vogg Decl. ¶ 29). Unfortunately, these proposals have never been adopted. This process can cause confusion among the public and the Plaintiff has attempted to spread disinformation about this confusion, repeatedly describing the City of Milwaukee's reporting of absentee ballot results, and Milwaukee County's subsequent canvass of the absentee ballot results, as a nefarious "ballot dump" somehow indicative of fraud."[8]

It is important to keep in mind that there is not unlimited space for observers in this or any year, and that the 2020 general election presented unique challenges to facilitating observer access. There was also, as Plaintiff glaringly refuses to acknowledge, a particular need to practice social distancing in light of COVID-19. Wisconsin statutes provide that the right to observe an election is upheld via establishment of an "observation area," not that observers must

---

[7] *See,* https://www.opb.org/article/2020/11/02/fact-check-trump-falsely-claims-that-votes-shouldn-t-be-counted-after-election-day/ (Woodall-Vogg Decl. ¶ 28, Ex. J).
[8] *See,* https://www.snopes.com/fact-check/wisconsin-vote-dump/ (Woodall-Vogg Decl. ¶ 30, Ex. K).

14

be allowed to roam freely throughout any polling place, or throughout a central count facility. Wis. Stat. §§ 7.41(1) and (2). Additionally, the WEC has provided that:

> Observers are not entitled to view registration forms, proof of residence documents or the observer log on Election Day. Observers may ask the chief inspector or designee to view other documents, such as the poll list, that are available when doing so will not delay or disrupt the process, but this may not be possible when polls are busy, and they may not view confidential information. The chief inspector or designee has sole discretion to determine whether such documents may be viewed or photographed….

(Woodall-Vogg Decl. ¶ 31, Ex. L). This is in contrast to a recount when a greater opportunity to observe materials, sufficient to permit objections, must be allowed. *See,* Wis. Stat. 9.01(1)(b)11; (Woodall-Vogg Decl. ¶ 32, Ex. M).

Simply, there is no way to practically achieve a one-to-one ratio of observer to poll worker that Plaintiff is apparently seeking, nor is such a drastic approach required under Wisconsin law. It is certainly not possible to do so in a pandemic, without risking the health and safety of poll workers and observers. Indeed, this level of access is neither necessary nor plausible in any election, as the Wisconsin legislature has determined that observers are not and cannot be untrained, self-appointed, election auditors. Nor could they be, without delaying the tabulation of absentee ballots for days or weeks.[9] (Woodall-Vogg Decl. ¶¶ 36-37).

## CONCLUSION

This Court should recognize Plaintiff's vague constitutional claims for what they really are: the same unprecedented attempt to disenfranchise Wisconsin voters recently rejected by Wisconsin's highest court. While some of the specific allegations differ between Plaintiff's and his surrogates' state court action and the instant case, both advance generalized and unsubstantiated allegations of voting process irregularities—particularly regarding absentee

---

[9] The recently conducted partial recount requested by Plaintiff with the additionally described observational opportunities took over seven working days in each of Milwaukee and Dane Counties to complete.

ballots—in hopes of reversing Plaintiff's defeat on November 3, 2020. Plaintiff continues to litigate his recount action; now in Milwaukee County Circuit Court. The remedy for any alleged irregularities involving dozens, hundreds, or even thousands of votes simply cannot be to disenfranchise every single voter in the state of Wisconsin, (amounting to millions) and potentially throwing the Presidential election into chaos less than one week before the electoral college meets.

By the standards of recent years, this election was not particularly close. If this and other lawsuits are given traction, no Presidential election will ever pass without the gross tonnage of unmeritorious litigation this one has generated. How much worse, too, for the unfortunate future candidate raising an actually meritorious election fraud claim? The City of Milwaukee therefore requests cancellation of the evidentiary hearing set for Thursday, December 10, 2020, at 9:00 a.m.; dismissal of Plaintiff's Complaint, with prejudice; costs and attorney's fees, and any other relief the court deems just and proper. Alternatively, the City requests that Plaintiff be required to make a more definite statement of his claims prior to any evidentiary hearing in this matter so that the City may attempt to understand the nature of Plaintiff's Constitutional federal claims, to the extent any are stated.

Dated at Milwaukee, Wisconsin, this 8th day of December, 2020.

>TEARMAN SPENCER
>City Attorney, State Bar No. 1030676
>
>s/James M. Carroll
>James M. Carroll (State Bar No. 1068910)
>Scott F. Brown (State Bar No. 1089753)
>Kathryn Z. Block (State Bar No. 1029749)
>Patrick J. McClain (State Bar No. 1100896)
>Elleny B. Christopoulos (State Bar No. 1105495)
>Tyrone M. St. Junior (State Bar No. 1079284)
>Julie P. Wilson (State Bar No. 1034792)
>*Attorneys for Defendants, Tom Barrett, Claire Woodall-Vogg, and Jim Owczarski*
>CITY OF MILWAUKEE
>Milwaukee City Attorney's Office
>200 E. Wells Street, Room 800
>Milwaukee, WI 53202-3515
>Telephone: (414) 286-2601
>Facsimile: (414) 286-8550
>jmcarr@milwaukee.gov

1077-2020-1711:272577