# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DONALD J. TRUMP,

     Plaintiff,

v.                                 Case No. 20-CV-1785-BHL

WISCONSIN ELECTIONS COMMISSION,
*et al.*,

     Defendants.

---

## MEMORANDUM OF LAW OF DEFENDANTS GEORGE L. CHRISTENSON AND JULIETTA HENRY IN SUPPORT OF MOTION TO DISMISS AND IN OPPOSITION TO MOTION FOR EXPEDITED DECLARATORY AND INJUNCTIVE RELIEF

**MILWAUKEE COUNTY OFFICE OF CORPORATION COUNSEL**

Margaret C. Daun
Milwaukee County Corporation Counsel
901 N. 9th Street, Suite 303
Milwaukee, WI 53233
(414) 278-4300 (phone)
margaret.daun@milwaukeecountywi.gov

**HANSEN REYNOLDS LLC**

Andrew A. Jones
Andrew J. Kramer
James F. Cirincione
301 N. Broadway, Suite 400
Milwaukee, WI 53202
(414) 455-7676 (phone)
(414) 273-8476 (fax)
ajones@hansenreynolds.com
akramer@hansenreynolds.com
jcirincione@hansenreynolds.com

John W. McCauley
10 E. Doty Street, Suite 800
Madison, WI 53703
(608) 841-1351 (phone)
jmcauley@hansenreynolds.com

*Attorneys for Defendants*
*George L. Christenson and Julietta Henry*

**TABLE OF CONTENTS** **Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

APPLICABLE LEGAL STANDARDS UNDER RULES 12(B)(1) & (6) ................................ 4

ARGUMENT ........................................................................................................... 5

I.      PRESIDENT TRUMP'S CLAIMS SHOULD BE DISMISSED. .................................... 5

        A.      President Trump Lacks Standing. .......................................................... 5

                1.      Article III Standing. .................................................................. 5

                2.      The President Fails To Allege A Concrete And Particularized Injury In-Fact. ....................................................................................... 5

                3.      The President Also Fails To Allege That The Milwaukee County Defendants Caused His Alleged Injury. ....................................... 8

                4.      The President Fails To Establish That His Injury Is Redressable By The Relief He Seeks. ............................................................... 9

        B.      President Trump's Claims Are Barred As A Matter of Equity ................. 10

        C.      This Court Should Abstain From Addressing President Trump's Claims .......... 12

        D.      President Trump's Constitutional Claims Are Without Merit. ................ 15

                1.      The Elections and Electors Clauses .......................................... 15

                2.      Equal Protection and Due Process ........................................... 17

        E.      The Challenged Aspects Of Election Administration Did Not Violate Wisconsin Law ................................................................................. 19

                1.      Indefinitely Confined Electors. .............................................. 19

                2.      Witness Addresses On Absentee Ballot Envelopes. ................... 22

        F.      The Remedy Requested By President Trump Has Absolutely No Basis In Law. ................................................................................................ 26

II.     PRESIDENT TRUMP IS NOT ENTITLED TO INJUNCTIVE RELIEF. .................... 27

i

A.      President Trump Has No Likelihood Of Success On The Merits......................28

B.      There Is An Adequate Remedy At Law And No Irreparable Harm. .................28

C.      The Balance Of The Equities Weighs Strongly Against Granting The Requested Relief, And The Relief Is Not In The Public Interest.......................28

CONCLUSION.............................................................................................................................30

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                   **Page**

*Adams v. City of Indianapolis,* 742 F.3d 720 (7th Cir. 2014)--------------------------------------5, 17

*Allen v. Wright*, 468 U.S. 737 (1984)-------------------------------------------------------------- 6

*Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440 (7th Cir. 2009) --------------------------- 4

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
576 U.S. 787 (2015)--------------------------------------------------------------------------------16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)------------------------------------------------------------- 4, 5

*Baek v. Clausen*, 886 F.3d 652 (7th Cir. 2018) -------------------------------------------------- 13, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)------------------------------------------------- 4, 5

*Bell v. City of Country Club Hills*, 841 F.3d 713 (7th Cir. 2016) ------------------------------------ 4

*Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998)------------------------------------------------15

*Bodine v. Elkhart Cnty. Election* Bd., 788 F.2d 1270 (7th Cir. 1986) -------------------------------- 8

*Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121 (W.D. Pa. Oct. 28, 2020) ------------- 6

*Bognet v. Sec'y of Commonwealth of Pa.,*
No. 20-3214, 2020 WL 6686120 (3rd Cir. Nov. 13, 2020) --------------------------------------- 6

*Bond v United States*, 564 U.S. 211 (2011) ----------------------------------------------------- 7

*Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942)-------------------------------------------13

*Bush v. Gore,* 531 U.S. 98 (2000)-------------------------------------------------------------------18

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) -------------------------------------------------- 7

*Citizens for John W. Moore Party v. Bd. of Election Com'rs of City of Chicago,*
 781 F.2d 581 (7th Cir. 1986)----------------------------------------------------------------------19

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ----------------13

*Curry v. Baker*, 802 F.2d 1302 (11th Cir. 1986)-------------------------------------------------19

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332 (2006)-------------------------------------------- 6

iii

*Davis v. Hildebrant*, 241 U.S. 565 (1916) ------------------------------------------------------------------16

*Donald J. Trump for President, Inc. v. Boockvar*,
No. 20-CV-2078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020)---------------------------------------18

*Donald J. Trump for President, Inc. v. Secretary Commonwealth of Pennsylvania*,
No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020) ------------------------------------------30

*eBay, Inc. v. Mercexchange, LLC*, 547 U.S. 388 (2006) --------------------------------------------27

*Envision Healthcare, Inc. v. Preferredone Ins. Co.*, 604 F.3d 983 (7th Cir. 2010)----------- 13, 15

*Fournier v. Reardon*, 160 F.3d 754 (1st Cir. 1998) --------------------------------------------------15

*Fulani v. Hogsett*, 917 F.2d 1028 (7th Cir. 1990) ----------------------------------------------------11

*Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980) --------------------------------------- 15, 19

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) --------------------------------------------------------------10

*Hart v. King*, 470 F. Supp. 1195 (D. Haw. 1979) ---------------------------------------------------11

*Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018 (7th Cir. 1979) --------------------------28

*Int'l College of Surgeons v. City of Chicago*, 153 F.3d 356 (7th Cir. 1998)-------------------------13

*Kelly v. Commonwealth of Pennsylvania*,
No. 68-MAP-2020, 2020 WL 7018314 (Pa. Nov. 28, 2020) -------------------------------------11

*King v. Whitmer*, No. 2:20-cv-13134, ECF No. 62 at 19 (E.D. Mich. Dec. 7, 2020)---------------12

*Knox v. Milw. Cty. Bd. of Election Comm'rs*, 581 F. Supp. 399 (E.D. Wis. 1984)------------------11

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ------------------------------------------------------------- 5

*Lance v. Coffman*, 549 U.S. 437 (2007)----------------------------------------------------------------- 7

*Longshore v. U.S.*, 77 F.3d 440 (Fed. Cir. 1996) ---------------------------------------------------26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ------------------------------------------- 5, 9

*Minnesota Voters Alliance v. Ritchie*, 720 F.3d 1029 (8th Cir. 2013)--------------------------------15

*New Ga. Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020)---------------------------------19

*Ollmann v. Kowalewski*, 238 Wis. 574, 300 N.W.2d 183 (1941) --------------------------------29

iv

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ------------------------------------ 19

*Pitts v. Unarco Indus., Inc.,* 712 F.2d 276 (7th Cir. 1983) ------------------------------------ 26

*Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941) ------------------------------------ 12

*Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467 (E.D. Wis. 1986) ------------------------------------ 28

*Reynolds v. Sims*, 377 U.S. 533 (1964) ------------------------------------ 29

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ------------------------------------ 8

*S.W. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003) ------------------ 30

*Shipley v. Chicago Bd. of Election Comm'rs,* 947 F.3d 1056 (7th Cir. 2020) ---------------------- 17

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) ------------------------------------ 4

*Smiley v. Holm,* 285 U.S. 355 (1932) ------------------------------------ 16

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ------------------------------------ 5, 6

*State ex rel. Symmonds v. Barnett*, 182 Wis. 114, 195 N.W. 707 (1923) ---------------------------- 29

*Stein v. Cortes*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) ------------------------------------ 6

*Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010) ------------------------------------ 17

*Toney v. White*, 488 F.2d 310 (5th Cir. 1973) ------------------------------------ 11

*Tucker v. Burford*, 603 F. Supp. 276 (N.D. Miss. 1985) ------------------------------------ 11

*Turnell v. CentiMark Corp.,* 796 F.3d 656 (7th Cir. 2015) ------------------------------------ 27

*U.S. v. Bd. of Sch. Comm'rs of Indianapolis,* 677 F.2d 1185 (7th Cir. 1982) ---------------------- 26

*Warth v. Seldin*, 422 U.S. 490 (1975) ------------------------------------ 5

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ------------------------------------ 8

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ------------------------------------ 13

*Wis. Small Bus. United, Inc. v. Brennan,*
2020 WI 69, 393 Wis. 2d 308, 946 N.W.2d 101 ------------------------------------ 12

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 6 of 39   Document 81

*Wood v. Raffensperger*,
No. 20-cv-04651-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) ---------------------------- 30

<u>STATUTES</u>

U.S. Const., Art. II, § 1, Cl. 2 ------------------------------------------------------------------- 7, 15

U.S. Const., Art. II, § 4, Cl. 1 ------------------------------------------------------------------- 7, 15

3 U.S.C. § 5 --------------------------------------------------------------------------------------- 3

Wis. Stat. § 5.05 --------------------------------------------------------------------------------- 17

Wis. Stat. § 5.05(1) ------------------------------------------------------------------------------ 20

Wis. Stat. § 6.86(1)(a) --------------------------------------------------------------------------- 19

Wis. Stat. § 6.86(2) -------------------------------------------------------------------- 13, 14, 19, 21

Wis. Stat. § 6.86(2)b ----------------------------------------------------------------------------- 21

Wis. Stat. § 6.87 --------------------------------------------------------------------------------- 22

Wis. Stat. § 6.87(1) ------------------------------------------------------------------------------ 23

Wis. Stat. § 6.87(2) -------------------------------------------------------------------------- 23, 24

Wis. Stat. § 6.87(4)(b) --------------------------------------------------------------------------- 19

Wis. Stat. § 6.87(6b) ----------------------------------------------------------------------------- 23

Wis. Stat. § 6.87(6d) ----------------------------------------------------------------------------- 24

Wis. Stat. § 6.87(9) ------------------------------------------------------------------------------ 23

Wis. Stat. § 7.70(3)(a) --------------------------------------------------------------------------- 3

Wis. Stat. § 7.70(5)(b) --------------------------------------------------------------------------- 3

Wis. Stat. § 7.75(1) ------------------------------------------------------------------------------ 3

Wis. Stat. § 9.01(6) ------------------------------------------------------------------------------ 28

Wis. Stat. § 9.01(11) ----------------------------------------------------------------------------- 14

<u>RULES</u>

Fed. R. Civ. P. 12 (b)(1)------------------------------------------------------------------------- 4

Fed. R. Civ. P. 12(b)(6)------------------------------------------------------------------------- 4, 5

Fed. R. Civ. P. 12(i)------------------------------------------------------------------------- 2

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 8 of 39   Document 81

# INTRODUCTION

President Donald J. Trump lost the November 3 election, both nationally and in Wisconsin. Now, a full month after the election, and on the eve of the December 14 meeting of the Electoral College, the President seeks an order declaring that the election in Wisconsin was conducted in an illegal manner, enjoining any actions by state and local elections officials inconsistent with such a declaration, and "remand[ing]" this case to the Wisconsin legislature to "determine what remedy, if any" to impose. Put simply, President Trump asks this Court to nullify the entire presidential election in Wisconsin and to open the door for the Wisconsin legislature to select its own slate of electors to participate in the Electoral College.

President Trump asserts that he "does not seek a remedy disenfranchising any lawful votes." Nothing could be further from the truth. Now that he has lost his bid for reelection, the President asks this Court for help in turning the disinformation he has been publicly fomenting into a tangible payoff: a second-chance "election" in the Wisconsin legislature, one in which over 3.2 million votes cast by Wisconsin citizens are ignored and only the 132 members of the Republican-controlled state legislature decide whether he or President-Elect Joseph R. Biden receives Wisconsin's ten electoral votes. If that isn't disenfranchisement, nothing is.

This lawsuit is profoundly undemocratic, and it is an insult to our most basic norms regarding elections and the orderly transition of power from one president to the next. In strictly legal terms, it simply has no basis in law for multiple reasons. *First*, President Trump lacks standing to pursue his claims under Article II's Elections and Electors Clauses and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as he has failed to allege a concrete and particularized injury-in-fact, and his complaint does not satisfy the remaining elements of standing. *Second*, coming a full month after the election and multiple months and even years after the elections practices in question were instituted, President Trump's complaint is

1

barred by principles of equity, including the doctrine of laches. *Third*, well-established abstention doctrines counsel strongly against this Court exercising jurisdiction over this case given that the President's claims all revolve around the administration of the election under Wisconsin law and because there is a separate lawsuit commenced by the President currently pending in the Wisconsin circuit court that addresses these same state-law issues. *Fourth*, President Trump's claims simply have no merit, whether considered under constitutional principles or as questions of Wisconsin election law (which, in truth, is all they are). *Finally*, the President's demand for immediate declaratory and injunctive relief likewise cannot succeed, as his claims have no likelihood of success, he has an adequate remedy at law and will not suffer irreparable harm in the absence of such relief, and the balance of the equities and the public interest weigh decisively against disenfranchising 3.2 million Wisconsin voters.

It would be a grave mistake, and it would set a precedent that would only encourage other losing candidates to attempt to delegitimize unfavorable election results by using the courts to sow confusion and discord, to grant President Trump what he seeks via this lawsuit. Defendants George L. Christenson and Julietta Henry (the "Milwaukee County defendants") respectfully submit that complaint should be dismissed, and the requested declaratory and injunctive relief should be denied.[1]

## BACKGROUND

On November 3, citizens across the country voiced their will in the presidential election. Based on the results of the initial canvass, former Vice President, now President-Elect Joseph R.

---

[1] The Milwaukee County defendants respectfully submit that this Court should address their motion to dismiss (along with those of the other defendants) *before* turning to the President's motion for expedited relief. *See* Fed. R. Civ. P. 12(i). Addressing the parties' respective motions in this fashion may well obviate the need for any hearing, let alone an evidentiary hearing, on the President's motion.

2

Biden won the presidential election in Wisconsin. Wisconsin Elections Commission ("WEC"), Unofficial Results for November 3, 2020 General Election.[2]

Following the initial canvass, President Trump petitioned the WEC for a recount. Recount Pet. (Nov. 18, 2020).[3] The recount petition sought a recount only in two counties, Milwaukee and Dane. *Id.*, at 5 & Ex. A. Following the completion of the recount, President-Elect Biden's final statewide vote total was 1,630,866, and President Trump's was 1,610,184, a margin of 20,682 votes in favor of President-Elect Biden. WEC, Statement of Canvass (Nov. 30, 2020).[4]

Pursuant to statute, the WEC chairperson canvassed the election returns from all seventy-two Wisconsin counties and certified the final, statewide results on November 30. *Id.*; Wis. Stat. § 7.70(3)(a). In turn, Governor Tony Evers signed a certificate of ascertainment reflecting the final election results on the same date. Office of the Governor, State of Wisconsin, Gov. Evers Certifies 2020 General Election Results (Nov. 30, 2020);[5] Wis. Stat. § 7.70(5)(b). Wisconsin's presidential electors will meet and cast their votes as part of the Electoral College at 12:00 p.m. on December 14. Wis. Stat. § 7.75(1).

On December 1, President Trump petitioned the Wisconsin Supreme Court to accept jurisdiction over an original action challenging the recount and the final certification of the election results. *Donald J. Trump v. Anthony S. Evers, et al.*, 2020-AP-1971-OA.[6] On December 3, the Wisconsin Supreme Court denied the petition. *Id.* That same day, President Trump filed a notice

---

[2] https://elections.wi.gov/node/7234.
[3] https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Trump%20Campaign%20Recount%20Petition.pdf.
[4] https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Jacobs%20-%20Signed%20Canvass%20for%20President%20-%20Vice%20President.pdf.
[5] The federal "safe harbor" deadline for a state to do so is today, December 8. *See* 3 U.S.C. § 5.
[6] https://wscca.wicourts.gov/caseDetails.do?caseNo=2020AP001971&cacheId=20090BD0282BB665D8EE799D11B6C026&recordCount=1&offset=0&linkOnlyToForm=false.

3

of appeal from the recount under Wis. Stat. § 9.01(6) initiating two circuit court actions, one in Dane County and a second in Milwaukee County, which are now consolidated in the Milwaukee County Circuit Court. *Donald J. Trump v. Joseph R. Biden*, Milwaukee County Circuit Court Case No. 20-CV-7092.[7] In his state court case, which is set to be heard and determined either on the afternoon of December 10 or the morning of December 11, President Trump raises at least two of the substantive complaints asserted in this case – those relating to witness address information on absentee ballot envelopes and indefinitely confined voters. *See* Jones Decl., Ex. 1.

## APPLICABLE LEGAL STANDARDS UNDER RULES 12(B)(1) & (6)

Whether a plaintiff has standing under Article III is an issue of subject matter jurisdiction addressed pursuant to Federal Rule 12(b)(1). *Silha v. ACT, Inc.*, 807 F.3d 169, 172-74 (7th Cir. 2015). A facial challenge to standing requires a court to look to the complaint and determine whether the plaintiff has alleged an adequate basis for jurisdiction. *Id.* at 173-74; *Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443 (7th Cir. 2009).

A court must dismiss claims pursuant to Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The applicable standard is one of plausibility: a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In keeping with this standard, a court must also find that the complaint provides enough facts to "raise the claim above a mere 'speculative' level." *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016)

---

[7] https://wcca.wicourts.gov/caseDetail.html?caseNo=2020CV007092&countyNo=40&index=0#records.

(quoting *Twombly*, 550 U.S. at 555). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to survive a Rule 12(b)(6) challenge. *Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal,* 556 U.S. at 678).

## ARGUMENT

## I.     PRESIDENT TRUMP'S CLAIMS SHOULD BE DISMISSED.

President Trump's claims fall short under Rules 12(b)(1) and (6). The President lacks standing to pursue any of his claims. In any event, his claims are equitably barred, this Court should abstain from addressing the claims, and they fail to state a claim for numerous reasons.

### A.     President Trump Lacks Standing.

#### 1.     Article III Standing.

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Under Article III, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The party seeking to invoke federal jurisdiction "bears the burden of proving standing." *Spokeo*, 136 S. Ct. at 1547.

#### 2.     The President Fails To Allege A Concrete And Particularized Injury In-Fact.

The President lacks Article III standing because he has not suffered any "concrete and particularized" injury-in-fact. *Lujan*, 504 U.S. at 560-561. A particularized injury "affect[s] the

plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. To be concrete, "it must actually exist." *Id.* "The opposite of a particularized injury is a generalized grievance, where the impact on plaintiff is plainly undifferentiated and common to all members of the public." *Bognet v. Sec'y of Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *12 (3rd Cir. Nov. 13, 2020). Although the President was a candidate in the election, that does not automatically give him Article III standing. Like anyone else who comes before the court, he must allege that he has suffered an actual injury-in-fact affecting him in a personal and individual way. He fails to do so. Instead, the President's complaint is primarily a vehicle to present this Court with the same speculation about voting irregularities he has been pressing in the media and on Twitter for weeks, while making outlandish claims of *potential* voter fraud to create an illusion of support for his claim that the election results lack integrity.

First, the President has not alleged that any specific invalid votes were cast, and he cannot rely on broad allegations based on conjecture to support his claim that the results of the election in Wisconsin might be inaccurate. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006); *Stein v. Cortes*, 223 F. Supp. 3d 423, 432-433 (E.D. Pa. 2016); *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *3 (W.D. Pa. Oct. 28, 2020). President Trump has not sufficiently alleged an injury-in-fact on the basis that the election results would somehow be different but for allegedly invalid ballots, which the President has only speculated may have been cast.

Second, the President claims an injury under the Elections and Electors Clauses, based on his allegations that the WEC violated Wisconsin election law in implementing procedures to guide the administration of elections in Wisconsin. However, "[f]ederal courts are not venues for plaintiffs to assert a bare right 'to have the Government act in accordance with law.'" *Bognet*, 2020 WL 6686120, at *9-14 (quoting *Allen v. Wright*, 468 U.S. 737, 754 (1984)).

6

The Elections and Electors Clauses vest authority in "the Legislature" of each state to regulate congressional and presidential elections. U.S. Const. art. II, § 4, cl.1, art. II, § 1, cl. 2. The Supreme Court has held that private citizens do not have standing to assert a claim under the Elections Clause absent a "particularized stake in the litigation." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). In *Lance*, the Court explained generally that federal courts should not serve as a forum for "generalized grievances" and specifically articulated the "obvious" problem with the plaintiffs' standing: "The only injury plaintiffs allege is that the law – specifically the Elections Clause – has not been followed." *Id.* This is "precisely the kind of undifferentiated, generalized grievance" that cannot create standing. *Id.*

The *Bognet* case before the Third Circuit concerned the 2020 general election, in which one of the plaintiffs, Bognet, was an unsuccessful congressional candidate. Along with several citizens who voted in the election, Bognet challenged an order issued by the Pennsylvania Supreme Court relating to the deadlines for ballots to be tabulated in the election. *Bognet*, 2020 WL 6686120, at *3-4. The Third Circuit concluded that neither the voters *nor the candidate* had a sufficiently particularized stake in the litigation to support standing, because they did not represent the Pennsylvania General Assembly. *Id.*, 2020 WL 6686120, at *7. Nor could Bognet assert the rights of the Pennsylvania General Assembly based on prudential standing. *Id.* The same is true here. Because the President does not represent the Wisconsin legislature, does not have a close relationship with it, and does not allege that the legislature is hindered from asserting its rights, the President lacks standing under the Electors and Elections Clauses.[8]

_____

[8] The *Bognet* panel correctly rejected *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), in which a split panel of the Eighth Circuit reached a different conclusion. *Bognet*, 2020 WL 6686120, at *8. As *Bognet* explained, the Eighth Circuit's conclusion was based on a misapplication of *Bond v United States*, 564 U.S. 211 (2011), in which the Supreme Court reached the unremarkable conclusion that a plaintiff who had been

Third, the President tries to recycle a theory that has been repeatedly rejected by other federal courts: that votes validly cast in person at polling locations might have been "diluted" by the inclusion of allegedly invalid absentee ballots. Compl., ¶ 156. However, under Supreme Court law, "vote dilution" is a constitutional injury that occurs only when certain electors' votes have greater weight, or count for more, than votes of other electors. *Bodine v. Elkhart Cnty. Election Bd.,* 788 F.2d 1270, 1271 (7th Cir. 1986). Under this theory, a citizen's vote is diluted if legislative districts have significant population differences. *See Wesberry v. Sanders*, 376 U.S. 1, 7 (1964); *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019). Because, under the President's theory, all voters are affected equally by any number of invalid votes, each individual vote still carries the same weight in determining the result of the election, and vote dilution does not occur. *See Bognet*, 2020 WL 6686120, at *12 (explaining that any purported vote dilution resulting from allegedly invalid votes would affect *all* voters (and *all* candidates) equally, not just the plaintiffs and *their* votes). Because the votes cast in person in Wisconsin have not been given lesser weight than all votes cast in the election, the President has alleged only a generalized grievance about how the election was conducted, not a particularized harm to himself.

### 3. The President Also Fails To Allege That The Milwaukee County Defendants Caused His Alleged Injury.

Separate from the President's failure to allege a concrete and particularized injury, he also has not shown that the Milwaukee County defendants caused his alleged generalized injury. The causation element of standing requires an injury "fairly traceable to the challenged action of the

---

indicted under a federal criminal statute had standing to challenge that statute as violative of the Tenth Amendment and police powers reserved to the state. *Bond*, 564 U.S. at 222-25. The *Carson* panel extended *Bond* well beyond its proper application and reached an incorrect conclusion. *See Bognet*, 2020 WL 6686120, at *8 n.6. Regardless, as *Bond* made clear, even an individual challenging state action under the Tenth Amendment must still allege more than a generalized grievance that the government has failed to follow the law, a requirement the President fails to satisfy here. *See Bond*, 564 U.S. at 225.

defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal punctuation omitted). Admitting he has no evidence that invalid ballots were cast, the President resorts to conjecture and claims that the circumstances under which the election was conducted pose a high risk of fraud, likely involving "tens of thousands" of invalid votes.

In a case filed in the Western District of Pennsylvania, the court refused to "endorse standing theories that rest on speculation about the decisions of independent actors.'" *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *2 (W.D. Pa. Oct. 10, 2020). Here, the President likewise has failed to allege a plausible basis to infer that invalid ballots were cast or counted because of any actions (or inactions) by the Milwaukee County defendants with regard to the administration of Wisconsin's voting and canvassing procedures. Although the complaint contains numerous references to alleged irregularities in certain poll locations and to purported violations of the relevant Wisconsin election observation statutes (*e.g.*, Compl., ¶¶ 28, 236, 282-300), the President does not tie any allegation of invalidly-cast votes to Milwaukee County other than lumping the county into his grand allegation that the 2020 Wisconsin election violated the constitution (*id.*, ¶ 301). The President has not identified a single specific vote cast by fraud in this election, and even if invalid votes were cast, those votes resulted from the independent actions of others (*i.e.*, voters), not the Milwaukee County defendants, and they impact the electorate generally, not the President specifically.

### 4. The President Fails To Establish That His Injury Is Redressable By The Relief He Seeks.

Even assuming the President could allege an injury-in-fact caused by defendants (which he cannot), his proposed remedy is wholly unsuitable (and unconstitutional, as discussed below) to redress his injury and would cause a grossly disproportionate harm to the electorate as a whole.

9

The complaint fails to allege any evidence that widespread election irregularities occurred anywhere in Wisconsin that actually led to invalidly cast votes. The President attempts to avoid that fatal deficiency by weakly alleging his own estimate that "tens of thousands" of invalid votes could have been cast in an effort to cause doubt about the election result. Compl., ¶¶ 83, 88, 104. But that allegation cannot support his requested remedy, which is to eliminate *every single vote* cast in Wisconsin and allow the Wisconsin legislature to determine the winner of the presidential election in this state. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

The President's proposed remedy is not tailored to redress his alleged injury. Rather, it appears designed to cause a change in the results of the presidential election by allowing the Wisconsin legislature – with a Republican majority – to decide not which candidate won the election, but which will receive Wisconsin's electoral votes. Ironically, the President's remedy would cause actual vote dilution: the votes of several dozen members of the Wisconsin legislature would discard *en masse* the votes of over 3 million Wisconsin citizens.

## B. President Trump's Claims Are Barred As A Matter of Equity.

President Trump comes to this Court far too late to seek *any* relief whatsoever. Indeed, he seeks relief based on complaints regarding aspects of election administration in Wisconsin that were a matter of public record long before the election. President Trump did not take any steps to challenge these supposed deficiencies before the election but instead waited to seek relief after Wisconsin's electors cast their votes. Because President Trump waited and gambled (wrongly) on the result of the election, equity weighs decisively against granting his requested relief.

As courts across this country have long recognized, there is a duty for "parties having grievances based on discriminatory [election] practices to bring the grievances forward for pre-

10

election adjudication." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). This is because the "failure to require prompt pre-election action in such circumstances as a prerequisite to post-election relief may permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (internal quotation and citation omitted). Courts have thus ordinarily considered post-election relief only when "by the nature of the case [there was] no opportunity to seek pre-election relief." *Hart v. King*, 470 F. Supp. 1195, 1198 (D. Haw. 1979). And this principle has been applied to cases with real (and even admitted) problems with the conduct of an election. *See*, *e.g.*, *Tucker v. Burford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985) (even when defendants conceded malapportioned districts, plaintiffs' "hedging posture" and failure to pursue pre-election relief precluded post-election relief).

The Pennsylvania Supreme Court confronted this very issue just days ago in addressing a lawsuit brought to benefit President Trump and seeking to invalidate millions of mail-in ballots in the presidential election in Pennsylvania based on a challenge to a 2019 state statute establishing universal mail-in voting. *Kelly v. Commonwealth of Pennsylvania*, No. 68-MAP-2020, 2020 WL 7018314 (Pa. Nov. 28, 2020) (per curiam). The Court dismissed the petition for review "based upon Petitioners' failure to file their facial constitutional challenge in a timely manner," finding a violation of the doctrine of laches "given their complete failure to act with due diligence in commencing their facial constitutional challenge" to the state statute. 2020 WL 7018314, at *1 (internal citation omitted). *See also Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (refusing to grant relief in light of plaintiffs' delay); *Knox v. Milw. Cty. Bd. of Election Comm'rs*, 581 F. Supp. 399, 402-07 (E.D. Wis. 1984) (denying request to enjoin election on grounds of laches where complaint was filed seven weeks before election). In a case seeking similar

11

injunctive relief in the Eastern District of Michigan filed after the conclusion of the 2020 election, the court noted that "[t]he rationale for imposing the doctrine of laches is now at its peak." *King v. Whitmer*, No. 2:20-cv-13134, ECF No. 62 at 19 (E.D. Mich. Dec. 7, 2020).

These well-established principles apply with great force here. President Trump sat on his hands and, for whatever reason, did not pursue a legal challenge on these issues before the election. He certainly could have pursued relief before the election; as discussed below (*see* Point I(E)), the issues he raises now were all a matter of public record, and nothing impeded him from seeking redress, either from the WEC or the courts, long before the voters went to the polls. He offers no excuse for having waited until now to sue. Absent any pre-election challenge by President Trump, there can be no claim that state or local election officials were on notice of any problems claimed by the President. And the relief he requests, if granted, would undo the results of the entire election in Wisconsin. The prejudice to the people of Wisconsin would be undeniable. Under these circumstances, the elements of the doctrine of laches are easily satisfied. *See*, *e.g.*, *Wis. Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶ 12, 393 Wis. 2d 308, 946 N.W.2d 101.

### C. This Court Should Abstain From Addressing President Trump's Claims.

President Trump invites this Court to insert itself into issues relating to the orderly administration of Wisconsin's election law under the guise of federal constitutional claims. Such relief, if granted, would be an extraordinary federal judicial intrusion into a state's administration of the presidential election in violation of the principles of abstention.

Under the *Pullman* abstention doctrine, a federal court should not exercise jurisdiction over federal constitutional claims when (1) uncertain issues of state law underlie the claims and (2) there is a reasonable probability that the state-law issues are amenable to interpretation by a state court that would obviate the need for adjudication of the federal claims. *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 501-02 (1941). The *Pullman* doctrine seeks "to promote a

12

harmonious federal system by avoiding a collision between the federal courts and state (including local) legislatures." *Int'l College of Surgeons v. City of Chicago*, 153 F.3d 356, 361 (7th Cir. 1998). Under the related, but distinct, *Colorado River* abstention doctrine, "considerations of wise judicial administration, specifically regard for conservation of judicial resources and comprehensive disposition of litigation, may counsel abstention by federal courts in the face of pending actions in state court concerning the same matter." *Baek v. Clausen*, 886 F.3d 652, 663 (7th Cir. 2018) (internal quotations omitted) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)). And, in cases involving requests for declaratory relief, the so-called *Wilton/Brillhart* abstention doctrine gives district courts "substantial discretion in deciding whether to declare the rights of litigants" and to, "in the sound exercise of their discretion, stay or dismiss an action seeking a declaratory judgment in favor of an ongoing state court case." *Envision Healthcare, Inc. v. Preferredone Ins. Co.*, 604 F.3d 983, 986 (7th Cir. 2010) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) and *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942)).

Here, President Trump asserts that the WEC gave incorrect advice to the public in March about their ability to identify themselves as "indefinitely confined" for absentee voting purposes under Wis. Stat. § 6.86(2) due to the COVID-19 pandemic. Compl., ¶¶ 83-108. President Trump also alleges that the WEC incorrectly advised clerks they could cure missing witness address information on absentee ballot certificate envelopes without the witness appearing in person to do so. *Id.*, ¶¶ 235-58.[9]

---

[9] President Trump's allegations relating to the use of ballot "drop boxes" and the ability of election observers to adequately view the processing or counting of ballots at the City of Milwaukee's central count do not directly relate to the Milwaukee County defendants, so they are not addressed herein. *See* Compl., ¶¶ 168-234, 281-95. However, it is worth noting that *every single ballot* cast in Milwaukee County was

As discussed below (*see* Point I(E)), Wisconsin law is clear on these points, and President Trump's positions have no merit. Regardless, for present purposes, President Trump, *at best*, can only contend that these issues remain open under Wisconsin law. Indeed, the statutory definition of who is "indefinitely confined" under § 6.86(2) is presently the subject of litigation pending before the Wisconsin Supreme Court in *Jefferson, et al. v. Dane County*, Appeal No. 2020-AP-557. And, as noted above, both issues are the subject of President Trump's newly-commenced circuit court appeal from the recounts conducted in Milwaukee and Dane Counties.

Obviously, the resolution of these issues by the Wisconsin courts could obviate the need to adjudicate President Trump's federal constitutional claims. Moreover, the administration of Wisconsin election law is a matter of fundamental importance as a question of state policy. Wisconsin undoubtedly has a paramount interest in the administration of elections in the state and the timely certification of the full results of those elections. To that end, Wisconsin law declares that the *exclusive* remedy for challenging alleged irregularities committed during an election lies with a recount and subsequent action filed in a Wisconsin circuit court (*see* Wis. Stat. § 9.01(11)), the judicial remedy President Trump now separately pursues. Under these circumstances, the risk of a federal court disrupting the orderly administration of Wisconsin election law through an erroneous interpretation of issues of state law strongly counsels in favor of abstention under the principles outlined in *Pullman*. In the alternative, considerations of wise judicial administration require abstention under the *Colorado River* or *Wilton/Burhart* doctrines given President Trump's pending state court action addressing the same underlying issues of Wisconsin election law.[10]

---

reviewed and counted *a second time* during the recount, and the President has raised neither of these supposed concerns in his state court action arising from the recount. *See* Jones Decl., Ex. 1.

[10] Indeed, there is (or at least should be) a substantial interest in avoiding piecemeal litigation, the question of whether the challenged practices violated Wisconsin election law is in fact an issue of Wisconsin law,

14

## D. President Trump's Constitutional Claims Are Without Merit.

There is no federal constitutional right to an election free from error. "[G]arden variety election irregularities" do not infringe on anyone's constitutional right to vote. *Bennett v. Yoshina,* 140 F.3d 1218, 1226 (9th Cir. 1998). "Elections are, regrettably, not always free from error, let alone the risk of error." *Boockvar,* 2020 WL 5997680, at \*48 (internal quotations and citation omitted). Further, the constitution "is not an election fraud statute," *Minnesota Voters Alliance v. Ritchie,* 720 F.3d 1029, 1031 (8th Cir. 2013), and federal courts are not "state election monitors," *Gamza v. Aguirre,* 619 F.2d 449, 454 (5th Cir. 1980), "awaiting the entry of an aggrieved litigant's recitation of alleged state law violations," *Fournier v. Reardon,* 160 F.3d 754, 757 (1st Cir. 1998).

The President nonetheless asserts that defendants violated the Elections and Electors Clauses, as well as the Equal Protection and Due Process Clauses, in the manner in which they administered the election. Each of these claims fails on its merits.

### 1. The Elections and Electors Clauses.

Section 1, Clause 2 of Article II of the U.S. Constitution, concerning "Presidential Electors," provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct" its designated number of electors to select the President. Similarly, Section 4, Clause 1 of Article II authorizes "each State by the Legislature thereof" to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives." President Trump contends here

_____

President Trump can hardly claim the state court action he commenced will be inadequate to protect his rights, and the state court suit will not delay the ultimate resolution of these issues given that it is set to be heard and decided on December 10 or 11. *See Baek,* 886 F.3d at 663-64 (describing the factors to be considered in applying *Colorado River* doctrine); *Envision Healthcare, Inc.,* 604 F.3d at 986 (describing the "classic example of when [*Wilton/Brillhart*] abstention is proper occurs where . . . solely declaratory relief is sought and parallel state proceedings are ongoing").

15

that the Electors Clause confers authority over presidential elections in Wisconsin exclusively on the Wisconsin "Legislature" and concomitantly "prohibit[s] the arrogation of power over Presidential elections by non-legislative officials." Compl., ¶ 61. According to the complaint, the WEC and other defendants "violated the Electors Clause by failing to abide by the directions of the Wisconsin Legislature in connection with the conduct of the 2020 Presidential Election in Wisconsin." *Id.*, at p.71, "Prayer for Relief," ¶ 1.

Even if President Trump had standing under the Elections and Electors Clauses, his claim fails on the merits. "Wherever the term 'legislature' is used in the Constitution, it is necessary to consider the nature of the particular action in view." *Smiley v. Holm,* 285 U.S. 355, 366 (1932). The term "legislature" in the Electors Clause is not limited to a state's legislative body alone but refers instead to valid exercise of the legislative power. For example, in *Davis v. Hildebrant,* the Supreme Court upheld an Ohio constitutional provision conferring legislative power on the people directly to approve or disapprove of laws enacted by the General Assembly through a referendum process. 241 U.S. 565, 566–70 (1916). The Court extended *Davis* a few years later in *Smiley v. Holm*, where it held that nothing in the Elections Clause "precludes a state from providing that legislative action in districting the state for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power." 285 U.S. 355, 372–73 (1932). *Davis* and *Smiley* thus clarify that the reference to the "Legislature" in the Elections Clause includes not only a state's legislative body but also, in appropriate cases, citizens' referendum power and a governor's veto power.

More recently, the Supreme Court expanded that principle further in *Arizona State Legislature v. Arizona Independent Redistricting Commission,* 576 U.S. 787 (2015). There, the Court held that the Elections Clause permits the use of a redistricting commission, rather than

solely the state legislature, to draw congressional districts. *Id.* at 801–09. Following *Davis* and *Smiley*, the Court explained that "our precedent teaches that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto," as well as the independent redistricting commission at issue. *Id.* at 808–09.

Here, too, Wisconsin has chosen to regulate the manner of its elections in part by using a commission separate from the legislative body, the WEC. The statutes give the WEC general authority and responsibility for the administration of elections in this state. Wis. Stat. § 5.05. Nothing in the Electors or Elections Clauses prohibits Wisconsin from conducting its elections in that manner. Nor do those clauses elevate every claimed error by the WEC into a constitutional violation.

### 2. Equal Protection and Due Process.

In summarizing his claims, President Trump asserts that the alleged violations of Wisconsin election law amount to deprivations of his rights under the Equal Protection and Due Process Clauses. Compl., p. 71, "Conclusion." Yet, nowhere in his 72-page, 302-paragraph complaint does the President specifically explain why or how those rights have been violated. This alone is enough to dismiss the claims. *See, e.g.*, *Adams,* 742 F.3d at 728 (bare legal conclusions are insufficient to state a claim); *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (claims alleged "in a wholly conclusory fashion" are "plainly improper" under federal pleading standards).

Regardless, courts have repeatedly rejected Equal Protection and Due Process claims in analogous circumstances. For instance, the Seventh Circuit has held that the unlawful – even deliberately unlawful – administration of state election law does not amount to a denial of federal constitutional protections. *Shipley v. Chicago Bd. of Election Comm'rs,* 947 F.3d 1056, 1062 (7th Cir. 2020). As Seventh Circuit explained: "such allegations may state a claim for violation of the

17

Illinois Election Code. But that is a state law claim for a violation of state law, not a federal claim for a violation of constitutional rights." *Id.*

Further, although President Trump hints that his claims in this respect might be based on the "unequal and inconsistent application of [Wisconsin election law]" (*see*, *e.g.*, Compl., ¶ 102), that, too, is insufficient to state a federal constitutional claim. *See*, *e.g.*, *Boockvar*, 2020 WL 5997680, at *44-45. (recognizing that "many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a single state") (collecting cases); *Donald J. Trump for President, Inc. v. Boockvar*, No. 20-CV-2078, 2020 WL 6821992, at *14 (M.D. Pa. Nov. 21, 2020) (holding that "[t]hat some counties may have chosen to implement [the Secretary of State's] guidance (or not), or to implement it differently, does not constitute an equal-protection violation."). Likewise, insofar as President Trump contends that varying methods among municipal clerks of implementing Wisconsin election law regarding absentee ballots somehow created a greater risk of fraud in certain municipalities, that also is claim that has been soundly rejected by the courts. *See*, *e.g.*, *Boockvar*, 2020 WL 5997680, at *45; *Boockvar*, 2020 WL 6821992, at *14.

*Bush v. Gore,* 531 U.S. 98 (2000), also does not support President Trump's attempt to state a claim. In that case, the Florida Supreme Court ordered a statewide recount with the aim of discerning the "intent of the voter." *Id.* at 105-06. The problem was that the state court's order lacked a "specific standard to ensure … equal application" of that principle. *Id.* at 106. But the Court stressed that it was *not* deciding "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* at 109. That is the very question at issue here – the exercise by state and local authorities of their lawful expertise in conducting an election. *Bush v. Gore* expressly did not address that question.

18

For similar reasons, any claim by President Trump under the Due Process Clause must also fail. *See*, *e.g., New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (declining to extend due process protections to violations of state election procedures); *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986) ("the ordinary dispute over the counting and marking of ballots" does not rise to a constitutional violation); *Gamza*, 619 F.2d 449 at 453 ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute.").[11]

### E. The Challenged Aspects Of Election Administration Did Not Violate Wisconsin Law.

#### 1. Indefinitely Confined Electors.

Under Wis. Stat. § 6.86(2), an elector who is "indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period may by signing a statement to that effect require than an absentee ballot be sent to the elector automatically for every election." *See also* Wis. Stat. § 6.86(1)(a)3. An elector who has applied for and qualifies to receive absentee ballots as an indefinitely confined voter is not required to provide proof of identification only if the elector submits with their ballot "a statement signed by the same individual who witnesses voting of the ballot which contains the name and address of the elector and verifies that the name and address are correct." Wis. Stat. § 6.87(4)(b)2.

---

[11] The President's claims are also barred because he seeks a federal injunction against state officials for alleged violations of Wisconsin law. Although the President contends that defendants' administration of the election violates the federal constitution, his substantive claims are based on alleged violations of state law. The injunctive relief sought by the President would impact the state directly and, consequently, would violate the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984); *Citizens for John W. Moore Party v. Bd. of Election Com'rs of City of Chicago*, 781 F.2d 581, 584-85 (7th Cir. 1986) (Easterbrook, J., dissenting).

19

President Trump argues that some unspecified number of electors improperly claimed indefinite confinement status in 2020 and that, as a result, this Court should void the entire election. Compl., ¶¶ 83-108. President Trump's position is based primarily on guidance publicly issued by the WEC to election officials on March 29, 2020. Specifically, the WEC – the entity charged by statute in Wisconsin law with administering the state's election laws (*see* Wis. Stat. § 5.05(1)) – publicly advised:

> Due to the continuing spread of COVID-19, staff of the Wisconsin Elections Commission (WEC) has received numerous inquiries regarding the application of the indefinitely confined designation for absentee voters under Wisconsin Statutes. At its meeting of March 27, 2020, the Commission discussed this issue and adopted the following guidance related to the use of indefinitely confined status to assist local election officials working with absentee voters:
>
> 1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstance. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.
>
> 2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

WEC, Guidance for Indefinitely Confined Voters (Mar. 29, 2020), at 1.[12] In the same guidance, the WEC referred to an earlier pronouncement noting that "[d]uring the current public health crisis, many voters of a certain age or at-risk populations may meet that standard of indefinitely confined until the crisis abates" and that "[s]tatutes do not establish the option to require proof or documentation from indefinitely confined voters." *Id.*, at 2.

---

[12] https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Clerk%20comm%20re.%20Indefinitely%20Confined%203.29.20.pdf.

In arguing that this guidance was inconsistent with Wisconsin law, President Trump fails to offer any cogent explanation of exactly how the guidance went astray of the statutory requirements.  Nothing about stating that a voter, based on their own individual circumstances, might be indefinitely confined given the COVID-19 pandemic violates the statute.  *See* Wis. Stat. § 6.86(2)a ("An elector who is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period may by signing a statement to that effect require that an absentee ballot be sent to the elector automatically for every election.").  Likewise, nothing in the text of the statute permits clerks to affirmatively require proof of a voter's indefinite confinement status, so the guidance also did not violate the law in directing clerks that they could not demand such proof from voters.  *See* Wis. Stat. § 6.86(2)(b) (stating only that a clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service").  In fact, in an order entered on March 31, 2020, the Wisconsin Supreme Court concluded that the WEC guidance of March 29, 2020 was lawful, stating that the guidance "provide[d] the clarification on the purpose and proper use of the indefinitely confined status that is required at this time." *Jefferson, et al. v. Dane Cnty.*, 2020-AP-557, Mar. 31, 2020 Order, at 2.[13]  Only by completely ignoring an order of the highest court in Wisconsin can President Trump argue that the WEC guidance somehow violated Wisconsin election law.[14]

Moreover, President Trump's argument is founded on the faulty, speculative premise that some unspecified number of electors claiming to be indefinitely confined in 2020 were not entitled

---

[13] *See* Jones Decl., Ex. 2.
[14] President Trump also references statements issued by the Dane and Milwaukee County clerks in March 2020 on this same issue.  Compl., ¶¶ 91-97.  These pronouncements came before and were corrected by the guidance issued by the WEC, however, a fact the President also conveniently ignores.

to claim such a status. Other than his own self-serving assessment that "tens of thousands of ballots were counted without full compliance and contrary to the manner the Wisconsin Legislature directed" (Compl., ¶ 104), however, President Trump presents no evidence actually calling into question any of these ballots. As the statute and the WEC's guidance make abundantly clear, whether a voter is indefinitely confined is a determination the voter must make on their own and, absent receipt of reliable information to the contrary, one that state and local election officials must respect. President Trump offers no evidence that even a single elector claiming such status – either from the defendant jurisdictions or anywhere else in Wisconsin – was not in fact indefinitely confined. Without such proof, there simply is no basis to conclude that any voter claiming indefinite confinement status did so improperly, let alone evidence sufficient to interfere with the results of the entire presidential election on such a theory.

### 2. Witness Addresses On Absentee Ballot Envelopes.

President Trump also asserts that municipal clerks violated Wisconsin election law by adding information missing from witness addresses on absentee ballot certificate envelopes. Compl., ¶¶ 235-58. President Trump's argument incorrectly interprets the applicable statute and ignores both the substance and import of guidance provided to municipal clerks throughout Wisconsin by the WEC since before the 2016 general election.

President Trump's argument improperly attempts to add a limitation to the statute governing absentee ballots that the plain language of the statute does not include. The procedures for absentee voting in Wisconsin are set forth in Wis. Stat. § 6.87. Under those procedures, upon receipt of a proper request for an absentee ballot from an elector, a municipal clerk returns a ballot

to the elector with what is known as a certificate envelope. Wis. Stat. § 6.87(1)-(2).[15]  The back of

the certificate envelope includes printed text by which the elector makes certain certifications in

returning the ballot and a second individual attests to having witnessed the elector mark the ballot

and execute the certification.  *Id.*  With respect to the witness portion of the certification, the statute

specifies that the certification is to include the witness' printed name, address, and signature.  *Id.*

Under § 6.87(6b), "[i]f a certificate is missing the address of a witness, the ballot may not

be counted."  However, the statute also expressly contemplates that a certificate envelope that has

missing witness address information may be corrected between its receipt and election day.  Under

§ 6.87(9), "[i]f a municipal clerk receives an absentee ballot with an improperly completed

certificate or with no certificate, the clerk may return the ballot to the elector . . . whenever time

permits the elector to correct the defect and return the ballot . . . ."  Importantly, the statute does

not speak to whether a clerk may also correct missing witness address information on a certificate

envelope using other means – it neither authorizes it nor prohibits it.  To the extent President

Trump argues to the contrary, he seeks to add a prohibition that simply does not exist in the plain

language of the statute.

The WEC issued guidance to all municipal clerks in Wisconsin in advance of the 2016

general election on how to handle the circumstance where an absentee ballot certificate envelope

is returned with missing or insufficient witness address information.  WEC, Amended: Missing or

Insufficient Witness Address on Absentee Certificate Envelopes (Oct. 18, 2016) ("2016

Guidance").[16]  The 2016 Guidance was approved unanimously by the WEC, and it remains in

---

[15] *See* Wisconsin Elections Commission, Absentee Certificate Envelope (EL-122) (rev. 2020-08) (https://elections.wi.gov/sites/elections.wi.gov/files/2020-08/EL-122%20Standard%20Absentee%20Ballot%20Certificate-portrait%20%28rev.%202020-08%29.pdf).
[16] https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/guidance_insufficient_witness_address_amended_10_1_38089.pdf.

23

place today. See WEC, Correcting Misinformation About Wisconsin's Election, at 4-5 (Nov. 10, 2020).[17]

Noting that §§ 6.87(2) and (6d) are silent as to what constitutes an "address," the 2016 Guidance states that the WEC has "set a policy that a complete address contains a street number, street name and name of municipality." *Id.*, at 1. Recognizing that "in many cases, at least one component of the address could be missing; usually the municipality" from absentee certificate envelopes returned by electors, the 2016 Guidance instructs all municipal clerks in Wisconsin that "[t]he WEC had determined that clerks must take corrective actions in an attempt to remedy a witness address error." *Id.* (emphasis in original).

The 2016 Guidance outlines various means by which municipal clerks are to "do all that they can reasonably do to obtain any missing part of the witness address," including filling in the missing information themselves if they are able to "reasonably discern" the missing information from other information on the certificate envelope, from their own personal knowledge, or from lists, databases, or other sources at the clerk's disposal. *Id.*, at 2. In addition, the 2016 Guidance instructs that municipal clerks may contact an elector so that the elector can appear in person to add the missing information, provide it to the clerk by phone, facsimile, email, or mail, request that the clerk return the certificate envelope so that the elector can add the missing information, or spoil the ballot and return a new one. *Id.* In the event municipal clerks add witness address information to a certificate envelope, the 2016 Guidance instructs clerks to indicate that they provided such assistance by adding their initials next to the information that was added. *Id.*

Four years later, and in advance of the 2020 general election, the WEC – under a new chairperson, with a new administrator, and with three members new to the WEC since 2016 –

---

[17] https://elections.wi.gov/node/7241.

issued additional guidance reiterating and reaffirming the substance of the 2016 Guidance. *See* WEC, Spoiling Absentee Ballot Guidance (Oct. 19, 2020) ("2020 Guidance").[18]  The WEC also provides the exact same guidance to all municipal clerks in its Election Administration Manual. *See* WEC, Election Administration Manual for Municipal Clerks ("Elections Administration Manual"), at 99 (Sept. 2020).[19]

Thus, at the time of the 2020 general election, the WEC's guidance directing all municipal clerks in Wisconsin to add missing witness address information to absentee ballot certificate envelopes had been in place without change for over four years.  The WEC had approved and reaffirmed the guidance under two separate chairpersons, with different sets of commission members, and with two different administrators.  According to the WEC, no fewer than eleven statewide elections have been held since the 2016 Guidance was adopted, including the 2016 general election, the 2020 spring primary, and this year's general election.  And no candidate or campaign, including President Trump in 2016, objected to the guidance until now.  WEC, Correcting Misinformation About Wisconsin's Election, at 5.

President Trump's argument that the 2016 Guidance (and, by extension, also the 2020 Guidance and the Election Administration Manual itself) is illegal is without merit.  As noted above, § 6.87, by its plain language, does not address the ability of clerks to correct or supplement missing witness address information on an absentee ballot certificate envelope.  Nor is it reasonable to assume that it necessarily would.  By signing the certificate envelope, a witness is attesting to the fact that the certification signed by the elector is in fact true and that the witness

---

[18]https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Spoiling%20Ballot%20Memo%2010.2020.pdf.
[19]https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Election%20Administration%20Manual%20%282020-09%29.pdf.

saw the elector mark the ballot, place the marked ballot in the envelope, and then sign the certification. Reasonably read, the requirement that the witness' address also be included on the certificate envelope exists to ensure that the witness can later be identified and located. Who supplies the witness address information – whether it be the witness, the elector, or a municipal clerk based on any reliable means available – is not material either to the validity of the witness' certification or to the ability to later locate the witness. President Trump's challenge on this issue is without merit.

## F. The Remedy Requested By President Trump Has Absolutely No Basis In Law.

Even setting aside the many problems with the merits of President's Trump's claims addressed above, the remedy he seeks is extraordinary. He asks this Court, after declaring that defendants violated the U.S. Constitution, to "remand[ ] this case to the Wisconsin Legislature to … determine what remedy, if any, the Wisconsin Legislature should impose within its authority pursuant to the Electors Clause." Compl., at p.72, "Prayer for Relief," ¶ 4.

There is absolutely no basis in the law for President Trump to request, or for this Court to deliver, such relief. President Trump does not cite a single instance – and the Milwaukee County defendants' research has not uncovered any – where a federal court remanded a case to a state legislature and instructed the legislature how to proceed. On the contrary, the Seventh Circuit and other federal courts have repeatedly recognized that they have no authority to instruct a legislative body what to do. *See, e.g., Pitts v. Unarco Indus., Inc.,* 712 F.2d 276, 280 (7th Cir. 1983) ("[I]t is not the courts' business to instruct the Indiana legislature."); *U.S. v. Bd. of Sch. Comm'rs of Indianapolis,* 677 F.2d 1185, 1190 (7th Cir. 1982) ("It is not the province of a federal court to instruct the legislature."); *see also Longshore v. U.S.,* 77 F.3d 440, (Fed. Cir. 1996) ("It is not for this court to instruct Congress on how to oversee and manage its creations.").

26

## II.     PRESIDENT TRUMP IS NOT ENTITLED TO INJUNCTIVE RELIEF.

President Trump seeks "expedited declaratory and injunctive relief," which he variously describes as both preliminary and final.  In essence, the requested declaration would amount to a nullification of the results of the presidential election in Wisconsin.  The scope of the injunctive relief requested by the President, on the other hand, is unclear.

The standards for preliminary and permanent injunctions differ slightly, but both address the same core concepts of equity.  A preliminary injunction is "an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.,* 796 F.3d 656, 661 (7th Cir. 2015).  Courts in the Seventh Circuit "engage[ ] in a two-step analysis to decide whether such relief is warranted." *Id.*  First, the movant must make a threshold showing that: "(1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Id.* at 662.  Then, in the second step, the court must consider: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest")." *Id.*  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success." *Id.*  In turn, a plaintiff seeking a permanent injunction must demonstrate all of the following: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay, Inc. v. Mercexchange, LLC*, 547 U.S. 388, 391 (2006).

27

President Trump's demand for injunctive relief, whether preliminary or permanent, fails under these well-established standards. Most importantly, there is no reasonable likelihood the President will succeed on the merits. He also has an adequate remedy under Wisconsin law, will not suffer irreparable harm without an injunction, and the balance of the equities and the public interest militate against the relief he has requested.

### A. President Trump Has No Likelihood Of Success On The Merits.

For the reasons discussed above, President Trump has no likelihood of ultimate success on the merits of his claims. He lacks standing, he is far too late in seeking relief, and this Court should abstain from interfering in what is essentially a matter of state law. Further, President Trump's claims lack any merit under the Constitution and Wisconsin election law.

### B. There Is An Adequate Remedy At Law And No Irreparable Harm.

A plaintiff's delay in seeking an injunction is one factor to be considered in determining whether that plaintiff will suffer irreparable harm without the injunction. *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979). A plaintiff's delay "undercuts the sense of urgency … and suggests that there is, in fact, no irreparable injury." *Rexnord, Inc. v. Laitram Corp.*, 628 F. Supp. 467, 473-74 (E.D. Wis. 1986) (citation omitted). Here, as discussed above, President Trump has delayed for months, if not years, in seeking relief for the alleged violations of Wisconsin election law. He cannot plausibly assert he is at risk of irreparable harm absent a last-minute injunction.

Regardless, President Trump also cannot claim to be at risk of irreparable injury given that he has a remedy for the alleged wrongs under § 9.01(6) of the Wisconsin Statutes and is currently pursuing relief via that statute in the Milwaukee County Circuit Court.

### C. The Balance Of The Equities Weighs Strongly Against Granting The Requested Relief, And The Relief Is Not In The Public Interest.

On the one hand, President Trump's complaint presents strained claims that Wisconsin's election laws were misapplied by the WEC and municipal clerks, claims for which President Trump could have sought relief, either from the WEC or in the courts, long before the election but chose not to. President Trump couples these thin charges with a complete absence of proof that any individual ballots were actually cast by ineligible electors. Put simply, the equities are, at best, weak on President Trump's side of the equation.

On the other hand, this Court is invited to disenfranchise the entire Wisconsin electorate and hand the decision about who should represent Wisconsin in the Electoral College to the state legislature. President Trump would have over 3.2 million Wisconsin voters pay the highest price possible for these alleged deficiencies in the administration of the election – the loss of their votes. The harm to the voters of Wisconsin from such a result would be dramatic and irreparable. Their voice in the democratic process, and their chance to have a say in the nation's choice of president would be sacrificed even though they did nothing wrong. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) ("The right to vote includes the right to have the ballot counted."). As one federal district judge explained in dismissing a complaint brought seeking to prevent the certification of the presidential election results in Pennsylvania: "[E]ven if they could state a valid claim, the Court could not grant plaintiffs the relief they seek…. Though every injury must have its proper redress, a court may not prescribe a remedy unhinged from the underlying right being asserted. By seeking injunctive relief preventing certification of the Pennsylvania election results, President Trumps ask this Court to do exactly that." *Boockvar*, 2020 WL 6821992, at *12.[20]

[20] Recognizing the inequity of such a result, Wisconsin law does not allow for the disenfranchisement of even a single voter based on misadministration or other error by elections officials. *See, e.g.*, *Ollmann v. Kowalewski*, 238 Wis. 574, 300 N.W.2d 183, 185 (1941); *State ex rel. Symmonds v. Barnett*, 182 Wis. 114, 195 N.W. 707, 712 (1923).

The harm to the public's faith in the transparency, fairness, and integrity of the electoral system in Wisconsin – already tested by hyperbolic and baseless claims of widespread voter fraud – would be just as extreme and permanent. Such an intrusion into an election that is now over one month old would be extraordinarily inequitable and unwise, and it would not in any way be in the public interest. *See*, *e.g.*, *Donald J. Trump for President, Inc. v. Secretary Commonwealth of Pennsylvania*, No. 20-3371, 2020 WL 7012522, at *9 (3d Cir. Nov. 27, 2020) ("Democracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof. The public must have confidence that our Government honors and respects their votes.") (non-precedential opinion); *S.W. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented.") (internal citation omitted); *Wood v. Raffensperger*, No. 20-cv-04651-SDG, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020) ("To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways.").

At the end of the day, President Trump comes before this Court having without excuse delayed seeking any form of relief until after the voters of Wisconsin had their say. He seeks emergency relief that would shift the blame for alleged problems with the statewide administration of the election onto the voters of this state. And he seeks that relief on meritless claims relating to the administration of the election. The balance of equities weighs strongly against any such interference by this Court with the results of the election, as does the public interest.

## CONCLUSION

For the reasons stated herein, this Court should deny President Trump's motion for emergency declaratory and injunctive relief and dismiss the complaint in its entirety, with prejudice and with such other and further relief as this Court deems appropriate.

Dated at Milwaukee, Wisconsin this 8th day of December, 2020.

**MILWAUKEE COUNTY OFFICE OF CORPORATION COUNSEL**

Margaret C. Daun
Milwaukee County Corporation Counsel
901 N. 9th Street, Suite 303
Milwaukee, WI 53233
(414) 278-4300 (phone)
margaret.daun@milwaukeecountywi.gov

**HANSEN REYNOLDS LLC**

*/s/ Andrew A. Jones*
Andrew A. Jones
Andrew J. Kramer
James F. Cirincione
301 N. Broadway, Suite 400
Milwaukee, WI 53202
(414) 455-7676 (phone)
(414) 273-8476 (fax)
ajones@hansenreynolds.com
akramer@hansenreynolds.com
jcirincione@hansenreynolds.com

John W. McCauley, SBN:1104739
10 E. Doty Street, Suite 800
Madison, WI 53703
(608) 841-1351 (phone)
jmcauley@hansenreynolds.com

*Attorneys for Defendants*
*George L. Christenson and Julietta Henry*