# EXHIBIT 7

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 1 of 7   Document 94-7

2020 WL 7018314 (Table)
Only the Westlaw citation is currently available.
Supreme Court of Pennsylvania.

THE HONORABLE MIKE KELLY, SEAN PARNELL, THOMAS A. FRANK, NANCY KIERZEK, DEREK MAGEE, ROBIN SAUTER, MICHAEL KINCAID, AND WANDA LOGAN
v.
COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GENERAL ASSEMBLY, HONORABLE THOMAS W. WOLF, KATHY BOOCKVAR
APPEAL OF: COMMONWEALTH OF PENNSYLVANIA, HONORABLE THOMAS W. WOLF, KATHY BOOCKVAR

No. 68 MAP 2020
|
Filed: November 28, 2020

**ORDER**

PER CURIAM

 *1  **AND NOW**, this 28th day of November, 2020, pursuant to 42 Pa.C.S. § 726,[1] we **GRANT** the application for extraordinary jurisdiction filed by the Commonwealth of Pennsylvania, Governor Thomas W. Wolf, and Secretary of the Commonwealth Kathy Boockvar ("Commonwealth"), **VACATE** the Commonwealth Court's order preliminarily enjoining the Commonwealth from taking any further action regarding the certification of the results of the 2020 General Election, and **DISMISS WITH PREJUDICE** the petition for review filed by the Honorable Mike Kelly, Sean Parnell, Thomas A. Frank, Nancy Kierzek, Derek Magee, Robin Sauter, and Wanda Logan ("Petitioners"). All other outstanding motions are **DISMISSED AS MOOT**.

Petitioners filed the petition for review in Commonwealth Court on November 21, 2020, setting forth a facial challenge to those provisions of Act 77 of 2019,[2] establishing universal mail-in voting in the Commonwealth of Pennsylvania. Petitioners sought a declaration that the aforementioned provisions were unconstitutional and void *ab initio*, and injunctive relief prohibiting the certification of the results of the General Election held on November 3, 2020. As a remedy, Petitioners sought to invalidate the ballots of the millions of Pennsylvania voters who utilized the mail-in voting procedures established by Act 77 and count only those ballots that Petitioners deem to be "legal votes." Alternatively, Petitioners advocated the extraordinary proposition that the court disenfranchise all 6.9 million Pennsylvanians[3] who voted in the General Election and instead "direct[ ] the General Assembly to choose Pennsylvania's electors." Petition for Review at 24.

Upon consideration of the parties' filings in Commonwealth Court, we hereby dismiss the petition for review with prejudice based upon Petitioners' failure to file their facial constitutional challenge in a timely manner. Petitioners' challenge violates the doctrine of laches given their complete failure to act with due diligence in commencing their facial constitutional challenge, which was ascertainable upon Act 77's enactment. It is well-established that "[l]aches is an equitable doctrine that bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another." *Stilp v. Hafer*, 718 A.2d 290, 292 (Pa. 1998).

The want of due diligence demonstrated in this matter is unmistakable. Petitioners filed this facial challenge to the mail-in voting statutory provisions more than one year after the enactment of Act 77. At the time this action was filed on November 21, 2020, millions of Pennsylvania voters had already expressed their will in both the June 2020 Primary Election and the November 2020 General Election and the final ballots in the 2020 General Election were being tallied, with the results becoming seemingly apparent. Nevertheless, Petitioners waited to commence this litigation until days before the county boards of election were required to certify the election results to the Secretary of the Commonwealth. Thus, it is beyond cavil that Petitioners failed to act with due diligence in presenting the instant claim. Equally clear is the substantial prejudice arising from Petitioners' failure to institute promptly a facial challenge to the mail-in voting statutory scheme, as such inaction would result in the disenfranchisement of millions of Pennsylvania voters.[4]

 *2  Accordingly, we grant the application for extraordinary jurisdiction, vacate the Commonwealth Court's order

preliminarily enjoining the Commonwealth from taking any further action regarding the certification of the results of the 2020 General Election, and dismiss with prejudice Petitioners' petition for review. All other outstanding motions are dismissed as moot.

Justice Wecht files a concurring statement.

Chief Justice Saylor files a concurring and dissenting statement in which Justice Mundy joins.

**CONCURRING STATEMENT**

JUSTICE WECHT

I join the Court's order because I wholeheartedly agree that, whatever the merits of Petitioners' claims regarding the constitutionality of Act 77,[1] their request for retrospective relief as to the 2020 General Election is barred by the doctrine of laches. I write separately to explain my view as to the limited relief available when courts are faced with a wholesale challenge to the results of an election.

As today's order aptly notes, "[l]aches is an equitable doctrine that bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another." *Stilp v. Hafer*, 718 A.2d 290, 292 (Pa. 1998) (citing *Sprague v. Casey*, 550 A.2d 184, 187 (Pa. 1988); *see also Costello v. United States*, 365 U.S. 265, 282 (1961); *cf. Sprague*, 550 A.2d at 188 ("He who seeks equity must do equity."). Whether laches should apply is a fact-specific question to be determined case by case. *See Leedom v. Thomas*, 373 A.2d 1329, 1332 (Pa. 1977). A respondent who resorts to laches must establish two elements: First, the party must demonstrate a lack of diligence on behalf of the claimant. In that regard, "[t]he test is not what the plaintiff knows, but what he might have known by the use of the means of information within his reach with the vigilance the law requires of him." *Taylor v. Coggins*, 90 A. 633, 635 (Pa. 1914). Second, the respondent must show an "injury or material prejudice" resulting from that delay. *Gabster v. Mesaros*, 220 A.2d 639, 641 (Pa. 1966).

Traditionally, "the defendant bears the burden to demonstrate that enforcing the plaintiff's rights would be inequitable under the circumstances." *Sernovitz v. Dershaw*, 127 A.3d 783, 791 (Pa. 2015). In the context of a challenge to the results of an election, however, due consideration must also be accorded to the rights of those voters who cast ballots in good faith reliance upon the laws passed by their elected representatives. *See Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 243 (6th Cir. 2011) ("To disenfranchise citizens whose only error was relying on [state] instructions ... [is] fundamentally unfair."). Given the impracticality of joining as essential parties the millions of Pennsylvanians whose votes Petitioners seek to discard here, the judiciary must consider their interests when balancing the equities. *Cf. Delisle v. Boockvar*, 234 A.3d 410, 411 (Pa. 2020) (*per curiam*) (Wecht, J., concurring) ("[I]t cannot be gainsaid that there is no *post hoc* remedy sufficient to cure the arbitrary deprivation of the 'right of suffrage,' which 'is a fundamental matter in a free and democratic society.'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964)).[2]

**\*3** Respondents' recitations lay bare Petitioners' want of diligence in this case. Petitioners could have brought this action at any time between October 31, 2019, when Governor Wolf signed Act 77 into law, and April 28, 2020, when this Court still retained exclusive jurisdiction over constitutional challenges to it. *See* Act 77 § 13(2)-(3). The claims then could have been adjudicated finally before the June primary, when no-excuse mail-in voting first took effect under Act 77—and certainly well before the General Election, when millions of Pennsylvania voters requested, received, and returned mail-in ballots for the first time. Petitioners certainly knew all facts relevant to their present claims during that entire period. Indeed, "the procedures used to enact [Act 77] were published in the Legislative Journal and available to the public" since at least October 2019. *See Stilp*, 718 A.2d at 294. Likewise, "[t]he provisions of the Constitution that the [General Assembly] purportedly violated were also readily available." *See id.* And yet, Petitioners did nothing.[3] Petitioner Wanda Logan ran and lost in a special election in February after certain aspects of Act 77 took effect.[4] And not only she, but U.S. Representative Mike Kelly and congressional candidate Sean Parnell also participated in the 2020 primary elections under Act 77, as modified by Act 12,[5] in June of this year.[6] But it occurred to none of them to challenge the constitutionality of Act 77 before then, or indeed before participating in and contemplating the results of the 2020 General Election.

Because "[a]n election is the embodiment of the popular will, the expression of the sovereign power of the people," *In re Wheelock's Contested Election*, 82 Pa. 297, 299 (1876),

any request to invalidate its results must meet a high evidentiary threshold. *See Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988) ("The voiding of a state election 'is a drastic if not staggering' remedy.") (citation omitted). Extraordinary claims demand extraordinary proof. To that end, it is well-settled that to annul an election in this Commonwealth "requires proof of fraud or other unlawful practices of such magnitude and so interwoven with the casting and counting of the votes as to obviously deprive the election returns of all validity." *See Winograd v. Coombs*, 20 A.2d 315, 316 (Pa. 1941); *cf. Appeal of Zupsic*, 670 A.2d 629, 638 (Pa. 1996); *In re Ayre*, 134 A. 477, 478 (Pa. 1926) ("To warrant throwing out the vote of an entire district[,] the disregard of the law must be so fundamental as to render it impossible to separate the lawful from the unlawful votes.").

Petitioners cannot carry their enormous burden. They have failed to allege that even a single mail-in ballot was fraudulently cast or counted. Notably, these Petitioners sought to intervene in a federal lawsuit in which the campaign of President Donald J. Trump—an ostensible beneficiary of Petitioners' efforts to disenfranchise more than onethird of the Commonwealth's electorate—explicitly disclaimed any allegation of fraud in the conduct of Pennsylvania's General Election. *See Donald J. Trump for President, Inc. v. Secretary Commonwealth of Pennsylvania*, No. 20-3371 (3d Cir. Nov. 27, 2020), slip op. at 2 ("[A]s [Trump Presidential Campaign] lawyer Rudolph Giuliani stressed, the Campaign 'doesn't plead fraud. ... [T]his is not a fraud case.' " (quoting Mot. To Dismiss Hr'g Tr. 118:19-20, 137:18)). The absence of fraud allegations from this matter—not to mention actual evidence of fraud—alone is fatal to Petitioners' claims.

More importantly, though, there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election and recommit the choice to the General Assembly to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters. The United States Constitution's Presidential Electors Clause commands that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. CONST. art. II, § 1, cl. 2. While the method of appointment varies somewhat by State,[7] *see McPherson v. Blacker*, 146 U.S. 1, 25-26 (1892) (describing alternative "method[s] of appoint[ing]" presidential electors), our General Assembly "direct[ed]" the "Manner" of appointing Pennsylvania's electors by popular vote nearly a century ago pursuant to its broad lawmaking power.[8]

**\*4** Unchanged since its enactment in 1937, Article XV of the Election Code[9] prescribes the prevailing method of selecting the Commonwealth's electors:

> At the general election to be held in the year 1940, and every fourth year thereafter, there shall be elected by the qualified electors of the Commonwealth, persons to be known as electors of President and Vice-President of the United States, and referred to in this act as presidential electors, equal in number to the whole number of senators and representatives to which this State may be entitled in the Congress of the United States.

25 P.S. § 3191.[10] The Code further describes the electors' constitutional duties:

> The electors *chosen, as aforesaid*, shall assemble at the seat of government of this Commonwealth, at 12 o'clock noon of the day which is, or may be, directed by the Congress of the United States,[11] and shall then and there perform the duties enjoined upon them by the Constitution and laws of the United States.

*Id.* § 3192 (emphasis added). Lastly, the Code outlines the electors' power to replace a member of their delegation due to that member's death or "fail[ure] to attend at the seat of government at the time appointed by law," *id.* § 3193, and also establishes their entitlement to a *per diem* to compensate for travel expenses, *id.* § 3194 (providing for "the sum of three dollars for every day spent in traveling to, remaining at, and returning from the place of meeting aforesaid, and ... mileage at the rate of three cents per mile to and from his home").

Conspicuously absent from the Election Code are any mechanisms by which to circumvent these procedures so as to permit the General Assembly to substitute its preferred slate of electors for that "elected by the qualified electors of the Commonwealth." *Id.* § 3191. Thus, any effort to alter that "method of appointment," *McPherson*, 146 U.S. at 25, at this late stage would require the adoption of new law in accordance with constitutional mandates, including presentment of the legislation to the governor to sign or veto. *See* PA. CONST. art. III, § 9; *Wolf v. Scarnati*, 233 A.3d 679, 687 (Pa. 2020); *cf. Smiley v. Holm*, 285 U.S. 355, 367-68 (1932) (holding "that the exercise of the authority" to regulate federal elections conferred upon state legislatures by the federal Constitution "must be in accordance with the method which the state has prescribed for legislative enactments,"

including observance of "the veto power"); *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 807-08 (2015).[12]

***5** In any event, even if the Legislature were inclined to intervene, Petitioners' efforts would be futile with respect to the foregoing election regardless. Congress has declared that each State's method "for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State" must have been established "*by laws enacted prior to the day fixed for the appointment of the electors*"—*i.e.*, before November 3, 2020. *See* 3 U.S.C. § 5 (emphasis added). Accordingly, to persist in seeking to overturn the result of any election by legislative putsch is a fool's errand—and an arguably unconstitutional one at that. *See* PA. CONST. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.").

Having delayed this suit until *two* elections were conducted under Act 77's new, no-excuse mail-in voting system, Petitioners—several of whom participated in primary elections under this system without complaint—play a dangerous game at the expense of every Pennsylvania voter. Petitioners waived their opportunity to challenge Act 77 before the election, choosing instead to "lay by and gamble upon receiving a favorable decision of the electorate." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973) (*en banc*). Unsatisfied with the results of that wager, they would now flip over the table, scattering to the shadows the votes of millions of Pennsylvanians. It is not our role to lend legitimacy to such transparent and untimely efforts to subvert the will of Pennsylvania voters.[13] Courts should not decide elections when the will of the voters is clear.

### CONCURRING AND DISSENTING STATEMENT

CHIEF JUSTICE SAYLOR

I agree with the majority that injunctive relief restraining certification of the votes of Pennsylvanians cast in the 2020 general election should not have been granted and is unavailable in the present circumstances. As the majority relates, there has been too much good-faith reliance, by the electorate, on the no-excuse mail-in voting regime created by Act 77 to warrant judicial consideration of the extreme and untenable remedies proposed by Appellees.[1] Accordingly, I join the *per curiam* Order to the extent that it vacates the preliminary injunction implemented by the Commonwealth Court.[2]

That said, there is a component of Appellees' original complaint, filed in the Commonwealth Court, which seeks declaratory relief and is unresolved by the above remedial assessment. Additionally, I find that the relevant substantive challenge raised by Appellees presents troublesome questions about the constitutional validity of the new mail-in voting scheme.[3]

***6** One of Appellants' main responses is that the citizenry, and perhaps future generations, are forever bound by the Legislature's decision to insert, into Act 77 itself, a 180-day time restriction curtailing challenges to the substantive import of the enactment. *See* Act of Oct. 31, 2019, P.L. 552, No. 77, § 13(3). However, I find this assessment to be substantially problematic.[4] Further, as Appellees observe, ongoing amendments to an unconstitutional enactment so insulated from judicial review may have a compounding effect by exacerbating the disparity between what the Constitution requires and the law as it is being enforced. Thus, Appellees raise a colorable challenge to the viability of this sort of limitation, which can result in effectively amending the Constitution via means other those which the charter itself sanctions. *See* PA. CONST., art. XI (Amendments).

To the degree that Appellees wish to pursue this challenge in the ordinary course, upon the realization that their proposed injunctive remedies will be considered no further, I would allow them to do so in the Commonwealth Court upon a remand. In this regard, relative to the declaratory component of the request for relief, I also would not invoke the doctrine of laches, since the present challenge arises in the first election cycle in which no-excuse mail-in voting has been utilized. Moreover, "laches and prejudice can never be permitted to amend the Constitution." *Sprague v. Casey*, 520 Pa. 38, 47, 550 A.2d 184, 188 (1988).

Consistent with my position throughout this election cycle, I believe that, to the extent possible, we should apply more ordinary and orderly methods of judicial consideration, since far too much nuance is lost by treating every election matter as exigent and worthy of this Court's immediate resolution. In this respect, I would honor the Commonwealth Court's traditional role as the court of original and original appellate jurisdiction for most election matters. Finally, I am decidedly

against yet another award of extraordinary jurisdiction at the Secretary's behest.

Justice Mundy joins this Concurring and Dissenting Statement.

**All Citations**

Slip Copy, 2020 WL 7018314 (Table)

Footnotes

1 Section 726 provides that "[n]otwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done." 42 Pa.C.S. § 726.

2 Act of October 31, 2019, P.L. 552, No. 77 ("Act 77").

3 See Pennsylvania Department of State, Unofficial Returns, available at: https://www.electionreturns.pa.gov/ (last visited Nov. 27, 2020).

4 While the Commonwealth also relies upon Section 13(3) of Act 77, providing for a 180-day period in which constitutional challenges may be commenced, given our reliance upon the doctrine of laches, we do not speak to this basis for dismissal.

1 Act of October 31, 2019, P.L. 552, No. 77.

2 *See also* Richard L. Hasen, *Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937, 998 (2005) ("Courts should see it as in the public interest in election law cases to aggressively apply laches so as to prevent litigants from securing options over election administration problems.").

3 Even worse, at least one Petitioner actively encouraged his supporters to cast mail-in ballots for him in his bid for Congress. *See* Ryan Deto, *Sean Parnell is suing Pa. over mail-in voting, even though he praised mail-in voting earlier this year*, PITTSBURGH CITY PAPER (Nov. 21, 2020), https://www.pghcitypaper.com/pittsburgh/sean-parnell-issuing-pa-over-mail-in-voting-even-though-he-praised-mail-in-voting-earlier-thisyear/Content?oid=18413927.

4 *See* Act 77 §§ 14, 15 (instructing that the Act "shall apply to elections held on or after April 28, 2020," but providing that all but two sections "shall take effect immediately").

5 Act of March 27, 2020, P.L. 41, No. 12.

6 Parnell lost in the General Election to incumbent U.S. Representative Conor Lamb.

7 Most notably, Maine and Nebraska allocate their electors by congressional district, with the winner of the States' popular vote receiving two additional "bonus" electors.

8 Significantly, among the first election laws adopted by our Legislature in October 1788, following the Commonwealth's ratification of the U.S. Constitution the previous December, was one providing for the popular election of presidential electors on a general ticket with congressional representatives. *See* 1 THE DOCUMENTARY HISTORY OF THE FIRST FEDERAL ELECTIONS, 1788-1790 at 281, 299-302 (Merrill Jensen & Robert A. Becker, eds., 1990).

9 Act of June 3, 1937, P.L. 1333, art. I, § 101, *codified as amended at* 25 P.S. §§ 2600-3591.

10 As far as ascertaining the specific identities of the electors, the Code elsewhere provides for their nomination by "[t]he nominee of each political party for the office of President of the United States." 25 P.S. § 2878.

11 Federal law provides that "[t]he electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct." 3 U.S.C. § 7. This year, electors shall meet in Harrisburg on December 14, 2020.

12 Moreover, taken to its logical end, Petitioners' plea to "prohibit[ ] [Respondents] from certifying the results of the General Elections which include mail-in ballots," Pet. for Review at 24, if accepted, necessarily would bar the certification of every election that took place on November 3—including half of the Pennsylvania Senate, the full membership of the Pennsylvania House of Representatives (and Representative Kelly's own election to the United States House for that matter). Given the quorum quandary such a move would precipitate, it is unclear how the General Assembly—whose members are set to begin "[t]heir term of service" on December 1, PA. CONST. art. II, § 2—could possibly be reconstituted in time to select an alternate slate of electors by the federal "safe harbor" deadline of December 8, *see* 3 U.S.C. § 5, absent the election certifications that Petitioners seek to block.

| | |
|---|---|
| 13 | *See Koter v. Cosgrove*, 844 A.2d 29, 33 (Pa. Cmwlth. 2004) ("The continuing and efficient operation of government is dependent upon the prompt resolution of election contests. Our system depends upon the timely certification of a winner."). |
| 1 | *Accord Donald J. Trump for President, Inc. v. Sec'y Commonwealth of Pa*, No. 20-3371, *slip op.* at 21 (3d Cir. Nov. 27, 2020) (relating that "the public interest strongly favors finality, counting every lawful voter's vote, and not disenfranchising millions of Pennsylvania voters who voted by mail"). *See generally* LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 599, 600 (3d ed. 2000) (explaining that there is no "general principle that all constitutional violations must be remediable in the courts" and that "it is simply untenable that there must be a judicial remedy for every constitutional violation" (quoting *Webster v. Doe*, 486 U.S. 592, 613, 108 S. Ct. 2047, 2059 (1988) (Scalia, J., dissenting)); RICHARD H. FALLON, JR. & DANIEL J. MELTZER, NEW LAW, NON-RETROACTIVITY, AND CONSTITUTIONAL REMEDIES, 104 - 1731, 1786 (1991) (describing rights without "individually effective remedies" as a "fact of our legal tradition"). |
| 2 | The only caveat is that I would do so in the direct appeal proceedings and without a special grant of extraordinary jurisdiction. *See infra*. |
| 3 | Appellees explain that early decisions of this Court interpreted the phrase "offer to vote," as it appears in the provisions of the Pennsylvania Constitution governing public elections, to require in-person voting as an element of suffrage, subject only to exceptions delineated in the Constitution itself. *See* PA. CONST., art. VII § 1 (discussing the qualification of Pennsylvania electors in terms of the election district "where he or she shall *offer to vote*" (emphasis added)); *Chase v. Miller*, 41 Pa. 403, 419 (1982) ("To 'offer to vote' by ballot is to present oneself, with proper qualifications, at the time and place appointed, and to make manual delivery of the ballot to the officers appointed by law to receive it."); *In re Contested Election in Fifth Ward of Lancaster City*, 281 Pa. 131, 136-37 (1924) (discussing constitutionally-prescribed exceptions to in-person voting). Appellants' answer appears to be that times have changed, even if a governing provision of the Constitution has not. *See* Brief for Appellants at 23 ("Both [the *Chase* and *Lancaster County* decisions] based their holdings on a fear of absentee voting that (continued...) no longer exists, and is not reflected in other current, constitutional voting practices provided for by the Election Code."). To the degree that Act 77's time limitation on judicial review would be deemed itself to violate the Constitution, *see infra*, I believe the resolution of the underlying substantive controversy merits close review. |
| 4 | Notably, this Court has otherwise previously rejected the Legislature's attempt to impose time limitations on challenges to legislation that do not themselves comport with constitutional norms. *See, e.g., Glen-Gery Corp. v. ZHB of Dover Twp.*, 589 Pa. 135, 155, 907 A.2d 1033, 1044-45 (2006). |

---

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.