## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

DONALD J. TRUMP, Candidate for President of the
United States of America,

        Plaintiff,

    v.

THE WISCONSIN ELECTIONS COMMISSION, and its
members, ANN S. JACOBS, MARK L. THOMSEN,
MARGE BOSTELMANN, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official capacities,
SCOTT MCDONELL in his official capacity as the Dane
County Clerk, GEORGE L. CHRISTENSON in his
official capacity as the Milwaukee County Clerk,
JULIETTA HENRY in her official capacity as the
Milwaukee Election Director, CLAIRE WOODALL-
VOGG in her official capacity as the Executive Director
of the Milwaukee Election Commission, MAYOR TOM
BARRETT, JIM OWCZARSKI, MAYOR SATYA
RHODES-CONWAY, MARIBETH WITZEL-BEHL,
MAYOR CORY MASON, TARA COOLIDGE, MAYOR
JOHN ANTARAMIAN, MATT KRAUTER, MAYOR
ERIC GENRICH, KRIS TESKE, in their official
capacities; DOUGLAS J. LA FOLLETTE, Wisconsin
Secretary of State, in his official capacity, and TONY
EVERS, Governor of Wisconsin, in his official capacity.

        Defendants.

Case No.: 20CV1785

---

## BRIEF OF DEFENDANT GOVERNOR TONY EVERS
## IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFF'S COMPLAINT

---

Jeffrey A. Mandell          jmandell@staffordlaw.com
Rachel E. Snyder           rsnyder@staffordlaw.com
Richard A. Manthe         rmanthe@staffordlaw.com
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900     *Attorneys for Defendant,*
Post Office Box 1784             *Governor Tony Evers*
Madison, WI 53701-1784
Telephone: 608-256-0226         (Additional counsel on next page)

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
psmith@campaignlegalcenter.org

# INTRODUCTION

Yesterday, federal courts in Michigan and Georgia dismissed two more baseless lawsuits brought as part of the effort to overturn the results of the presidential election and have President Trump secure a second term by legislative fiat rather than the will of the voters. *See King v. Whitmer*, No. 2:20-cv-13134-RSW, Op. & Order, ECF No. 62 (E.D. Mich. Dec. 7, 2020) (dismissing claims brought by Trump presidential electors alleging "widespread fraud in the distribution, collection, and counting of ballots in Michigan"); *Pearson v. Kemp*, No. 1:20-cv-04809-TCB, Minute Order, ECF No. 74 (N.D. Ga. Dec. 7, 2020) (granting motion to dismiss complaint brought by Trump presidential electors in Georgia based on substantially similar allegations).[1]

Unlike the plaintiffs in *King* and *Pearson*, President Donald J. Trump, the Plaintiff here, ***does not make any allegation whatsoever of fraud*** in connection with the Wisconsin election. Yet the request President Trump makes of the Court in this case is every bit as corrosive to American democracy as the wholly unsupported and frivolous fraud claims in the other cases. President Trump asks this Court to disregard the results of the votes cast by nearly 3.3 million Wisconsin voters, and instead direct the Wisconsin legislature to appoint electors of its choosing. Even worse, he bases this request on his disagreements with a series of rules and procedures ***that were all in place, and which he could have challenged, well before the election***.

Rather than challenge these rules and procedures before the election, when they could have been changed before any Wisconsin voters relied upon them, President Trump chose to lay in the weeds, see how the Wisconsin vote came out, and then only once he lost ask this Court to throw

---

[1] Pursuant to Civil L. R. 7(j)(2), all unpublished cases, orders, and dispositions cited are filed in conjunction with this brief.

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 3 of 33   Document 95

out the results of the election based on rules and procedures hundreds of thousands of Wisconsin voters relied on when they exercised their fundamental right to vote. That is not how this works.

As Judge Bibas recently wrote in the Third Circuit's rejection of similar claims brought by President Trump's campaign challenging the election results in Pennsylvania:

> Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here. The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani stressed, the Campaign "doesn't plead fraud. … [T]his is not a fraud case." Mot. to Dismiss Hr'g Tr. 118:19-20, 137:18. Instead, it objects that Pennsylvania's Secretary of State and some counties restricted poll watchers and let voters fix technical defects in their mail-in ballots. It offers nothing more. …
>
> The Campaign's claims have no merit.… Plus, tossing out millions of mail in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too.

*Donald J. Trump for President, Inc. v. Sec'y of the Commonwealth of Pa.*, No. 20-3371, 2020 WL 7012522, at *1 (3d Cir. Nov. 27, 2020). The Third Circuit concluded that throwing out the votes of millions of Pennsylvania voters based on claims that Pennsylvania election officials had not administered their election in a manner that comported with state law would be unconscionable because "[v]oters, not lawyers, choose the President. Ballots, not briefs, decide election." *Id*. at *9.

Undeterred by these sharp admonitions from the Third Circuit, President Trump subsequently (and even more belatedly) initiated this action. Paralleling his campaign's failed Pennsylvania claims, he now asks this Court to discard the votes of millions of Wisconsin voters based on supposed failures by Wisconsin election officials to administer the Wisconsin election in accordance with Wisconsin law. These arguments are subject to dismissal on several grounds.

As a threshold matter, the Complaint fails to state a cause of action—quite literally. Though styled as a "Complaint for Expedited Declartory [*sic*] and Injunctive Relief Pursuant to Article II of the United States Constitution," the Complaint contains no "claim for relief" comporting with

Fed. R. Civ. P. 8(a)(2), and nothing that could be read as setting forth a count or cause of action under any body of law. Instead, it seems to be some sort of an assertion under Article II of the U.S. Constitution that, despite the will of the Wisconsin people, this Court should declare that he "likely" won and encourage the Legislature to devise a remedy on his behalf. (Cmplt. at 72) This is not a properly pled claim.

But, even assuming it is possible to discern a claim under some body of law in President Trump's Complaint (and it cannot), any such claim would fail on several independent grounds. *First*, under the pleading standards established by the Supreme Court in *Twombly* and *Iqbal*, the notion that the President could obtain the relief he seeks here—discarding millions of votes and overturning the election results—from a federal court because state election officials allegedly administered the election in a manner that did not comport with state law is not merely implausible, it is profoundly anti-democratic and contrary to the rule of law.

*Second*, any claim President Trump may have based on his assorted grievances would be properly brought in state, not federal, court. Wisconsin has prescribed procedures for the adjudication of election disputes. Doctrines of abstention and exclusive jurisdiction make it incumbent on litigants to use those procedures, and President Trump is in fact currently availing himself of those procedures in parallel with this case. Furthermore, what President Trump inappropriately seeks from this Court is an advisory opinion. If the state legislature believed Wisconsin officials were administering the state election in a manner that violated state law, it could have acted before the election; and it likewise could act prospectively to clarify any procedures it may want to modify for future elections. And, as other courts have ruled, the facts that *this* election has been completed and certified renders any claim President Trump otherwise might have in this Court moot. All of this renders the instant case non-justiciable.

*Third*, because President Trump did not challenge the Wisconsin election rules, practices and administrative guidance underlying his complaint before Election Day, but instead chose to lay in the weeds while millions of voters cast their votes, this case is barred by laches.

Because those defects cannot be cured, the Complaint should be dismissed with prejudice.

## THE ALLEGATIONS OF PLAINTIFF'S COMPLAINT

Plaintiffs' 72-page complaint begins with a straightforward enough description of the parties (Dkt. 1 ¶¶1-22), the alleged basis for venue and jurisdiction (*id.* ¶¶23-25), a brief summary of various concerns regarding the actions of Wisconsin election officials that allegedly violated Wisconsin law (*id.* ¶¶26-31), and a statement of the urgency of resolving this dispute through any necessary appeals or petitions before the Electoral College meets on December 14, 2020, six days from today (*id.* ¶¶32-36). It likewise concludes in a fairly conventional fashion for a complaint in federal court—with a conclusion, followed by a prayer for judgment that, while unsustainable for reasons explained below, roughly tracks the form used by litigants to ask a court to confer relief. (*Id.* at 70-72) In between, Plaintiff alleges 266 paragraphs, spanning 64 pages, of what is described as "Background," along with numerous subheadings. (*Id.* ¶¶ 37-302)[2]

Notably absent from the Complaint is the statement of a claim, or anything designated as a "count" or a "cause of action." Rather, the Complaint airs assorted grievances about how Wisconsin election officials administered the election in Wisconsin. Thus, Plaintiff alleges that:

(1) Wisconsin election officials did not adequately police voters who certified themselves as "indefinitely confined" (*id.* ¶¶83-108);

(2) mayors in some cities adopted policies to ensure citizens could exercise their right to vote during the Covid-19 pandemic, including allowing delivery of absentee ballots to "drop-boxes" both before and on Election Day (*id.* ¶¶172-76, 181-87, 207-11);

---

[2] The Complaint has no table of contents. Appendix A to this motion sets forth a table of contents showing the section headings in Plaintiff's Complaint so that the issues raised here are illustrated clearly.

(3) Wisconsin election officials did not adequately monitor witness certifications for absentee ballots (*id.* ¶¶235-55); and

(4) the mayors of Wisconsin's five largest cities limited public observation of the absentee ballot counting process in a manner that did not comport with Wisconsin election law (*id.* ¶¶ 282-93).

Collectively, Plaintiff asserts that these actions usurped the authority of the Wisconsin Legislature to determine how the State's electors would be chosen, and that this somehow violated the Elections and Electors Clauses of the U.S. Constitution.

The lengthy "Background" section of Plaintiff's complaint also includes a discussion of the Elections and Electors Clauses (*id.* ¶¶37-63), the Wisconsin Legislature's knowledge of the various issues identified in the Complaint (*id.* ¶¶64-72), Wisconsin's photo ID requirement for voters (*id.* ¶¶74-82), professed concerns underlying Wisconsin's limitations on absentee voting (¶¶109-30), and a discussion of various concerns about the impacts of mail-in voting generally (*id.* ¶¶144-62). The "Background" section further notes that the 2020 election was expected to be competitive, and that the competitiveness of the election created a heightened risk of potential fraud. (*Id.* ¶¶131-43)

The Complaint notes that, because of the Covid-19 pandemic, and for other reasons, there was as a "massive increase" in mail-in voting in Wisconsin during the 2020 presidential election. (*Id.* ¶163) The Complaint does not suggest this was unexpected, or that the exigencies of the pandemic did not provide a legitimate reason for a substantial increase in mail-in voting.

Buried within the 64-page "Background" section is paragraph 162. Read charitably, this is the closest the Complaint comes to alleging anything approaching a claim, count, or cause of action. It states: "[t]he path forward that upholds the law and seeks to restore faith in the legal process related to Wisconsin elections is for the Court to declare that these failures by Wisconsin election officials, which conflicted with duties under the Election Code, abridged the Legislature's

5

authority under the Electors Clause." (*Id.* ¶162) This paragraph mirrors a similar statement in paragraph 31, which also "asks this Court to immediately remand this matter to the Wisconsin Legislature"—a procedure unknown and wholly foreign to American jurisprudence and the Constitutional separation of powers. The jurisdiction and venue portions of the Complaint (*id.* ¶¶23-25) invoke a smattering of statutes and provisions of the U.S. Constitution (28 U.S.C. § 1983; U.S. Const. Art. I, § 4 and Art. II, § 1, cl. 4, as well as the First[3] and Fourteenth Amendments; and 28 U.S.C. §§ 1331, 1333(a), 2201 and 2202 (the last two of which, comprising the Declaratory Judgment Act, allow courts to adjudicate parties' contested rights upon the filing of an "appropriate pleading").

The Complaint *does not* allege that a single Wisconsin voter did anything but cast their ballot in reliance on the election procedures in place on Election Day. It does not allege any fraud on the part of election officials or voters. And it does not allow there is any basis (other than rank supposition) for doubting the certified results of the election in Wisconsin, in which the winner was President-Elect Biden and the loser was President Trump.

## ARGUMENT

Plaintiff's Complaint is utterly meritless and should be dismissed for several reasons. *First*, Plaintiff fails to state *any* claim at all in compliance with Fed. R. Civ. P. 8 and 12(b)(6), let alone any plausible claim that even comes near meeting the *Twombly/Iqbal* plausibility standard. *Second*, Plaintiff's grievances are non-justiciable in this Court because they are subject to the exclusive remedies provided in state law, they inappropriately request an advisory opinion from this Court, and they are moot. *Third*, even if Plaintiff's case was properly before this Court, it is barred by the

---

[3] Nothing in the Complaint explains how the First Amendment is implicated here.

doctrine of laches. For all these reasons, this Court should dismiss Plaintiff's Complaint with prejudice and without adjudicating Plaintiff's motion for injunctive relief.

## I.    The Complaint Does Not State any Plausible Claim—or, Indeed, Any Claim at All.

Fundamentally, any federal-court complaint must contain three elements: (1) a short and plain statement of the grounds for the court's jurisdiction; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought. Fed. R. Civ. P. 8(a). To satisfy the second element, a plaintiff must allege a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not include detailed factual allegations, but a plaintiff must "provide the grounds of his entitlement to relief" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 554 (internal quotation marks and citations omitted).

Here, Plaintiff's Complaint neglects to provide even a formulaic recitation of the elements of *any* cause of action, let alone any anything that supports an inference that the allegations (however voluminous) could state any cognizable claim for relief. Plaintiff parades through a hodge-podge of concerns about mail-in voting generally and the alleged deficiencies of Wisconsin election officials during the 2020 election in particular, but he nowhere grapples with the conundrum of identifying any cause of action that could plausibly support the relief he seeks— *i.e.*, casting aside the votes of nearly 3.3 million Wisconsin voters who exercised their fundamental right to vote in the presidential election—nor invokes any Constitutional or statutory provision that could support such breathtaking relief. Plaintiff cites 42 U.S.C. § 1983 in passing (Cmplt. ¶23), but he makes no effort to reconcile requested relief that would deprive voters of *their* fundamental right to vote with the notion that doing so could somehow vindicate *his* civil rights. There is no plausible basis for concluding that the President of United States may pursue a civil rights claim in federal court to invalidate the rights of millions of individual voters and confer upon himself the

possibility of additional electors who would vote for him in the Electoral College. But that is exactly the result Plaintiff seeks here.[4]

Even if the Court were to ignore Plaintiff's pleading failures and focus on the legal grievances he asserts, those legal grievances are also meritless as a matter of law.

## A. Plaintiff cannot show any violation of the Electors and Election Clauses because the WEC's guidance is consistent with Wisconsin law.

State legislatures can, consistent with the Electors and Elections Clauses, delegate authority to administer elections. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814 (2015). Wisconsin has a detailed statutory framework governing elections, but the Legislature has delegated to the WEC authority to administer elections. *See* Wis. Stat. § 5.05(1) ("General authority. The elections commission shall have the responsibility for the administration of chs. 5 to 10 and 12 and other laws relating to elections and election campaigns…."). Plaintiff challenges guidance reflecting longstanding interpretations of Wisconsin election law. Plaintiff raises five primary arguments under Wisconsin law: (1) election officials must discard any absentee ballot for which the witness provided incomplete address information; (2) ballots submitted by voters who designated themselves indefinitely confined should be discounted; (3) ballot drop-boxes are illegal; (4) Center for Tech and Civil Life (CTCL) grants were unlawful; and

---

[4] Because he literally states no claim, Plaintiff likewise does not allege his standing to bring one. Courts have held that private plaintiffs, whether voters or candidates, lack standing under the Electors and Elections Clause. *Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120, at *19 (3d Cir. Nov. 13, 2020); *accord Hotze v. Hollins*, No. 4:20-cv-03709, 2020 WL 6437668, at *2 (S.D. Tex. Nov. 2, 2020); *King*, Op. & Order, at *28-*30. *Cf. Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) (per curium) (holding electors had standing to bring *pre-election* challenge to procedures implemented *by state court order* for upcoming election). And, as a matter of prudential standing, a plaintiff may "assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Here, Plaintiff's arguments rest entirely on the rights of third parties: the right of the Legislature (which has chosen not to litigate). Plaintiff, himself, has not alleged and cannot claim to have suffered any individualized harm or violation of his own rights. He thus lacks standing to proceed in this Court.

(5) election observers did not have adequate access. All of these arguments are baseless and fail on the merits.

### 1. Longstanding WEC guidance on witness address information is consistent with Wisconsin law.

Despite the WEC having longstanding guidance concerning election officials assisting with deficient witness addresses, Plaintiff now argues that guidance contravenes Wisconsin law. On October 18, 2016, the WEC advised all municipal clerks that, if an absentee-ballot envelope had a missing or incomplete witness address, clerks could make reasonable attempts to obtain the missing information.[5] Witness address guidance is consistent with Wisconsin law, which encourages clerks to correct errors with witness addresses: clerks may "return the ballot to the elector, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time permits the elector to correct the defect and return the ballot." Wis. Stat. § 6.87(9). This is not an exclusive remedy. Although a ballot without a witness address cannot be counted if it has not been cured prior to 8:00 p.m. on Election Day, nothing in the statute prohibits the clerk from taking steps to cure a missing address. Doing so is consistent with the statutory instruction that provisions of the elections code "shall be construed to give effect to the will of the electors, if that can be ascertained." Wis. Stat. § 5.01(1).[6] No statute commands that the witness

---

[5] https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/guidance_insufficient_witness_address_amended_10_1_38089.pdf (last visited Dec. 5, 2020). Notably, the proposal to adopt this guidance was made by a Republican appointee to the WEC, was supported by the Wisconsin Department of Justice (under the leadership of a Republican Attorney General), and was unanimously adopted by the WEC. This guidance was in place during the last presidential election, in which the President carried Wisconsin, yet he had no issue with the guidance then. Indeed, the November 2020 election was the twelfth consecutive election for which this guidance has been in place.

[6] Arguably, Wis. Stat. § 6.84 overrides this legislative command by requiring that several provisions related to absentee voting be strictly applied. Assuming without conceding that section 6.84 is constitutional, by its own terms it does not apply to Wis. Stat. § 6.87(9).

must be the person to fill in the address, nor does any statute prohibit another person to fill in the address information. Thus, the WEC's longstanding guidance is consistent with Wisconsin law.

Plaintiff also attacks October 19, 2020 guidance that allows a witness to supplement an absentee-ballot certification without the voter present. (Cmplt. ¶247) Again, this guidance comports with Wisconsin law, as there is no simultaneous signature/address requirement. That is precisely why Wis. Stat. § 6.87(9) allows a clerk to effectuate corrections to witness certifications.

## 2. The provision on "indefinitely confined" voters has been longstanding.

Plaintiff misconstrues Wisconsin law to argue that the WEC's guidance on indefinitely confined voters is unlawful. The text of the provision now numbered as Wis. Stat. § 6.86(2)(a) has existed in the Wisconsin Statutes for more than 40 years and has been unchanged since 1985. For three-and-a-half decades, that provision has provided an alternate method for voters to obtain a mail-in absentee ballot if they are "indefinitely confined." Section 6.86(2)(a) recognizes that some electors are indefinitely confined in ways that preclude voting in person, and offers an alternative, based on an elector's statement that they are indefinitely confined.

Section 6.86(2)(a) does not excuse indefinitely confined voters from additional safeguards that apply to mail-in absentee ballots, including the requirement that each ballot be signed by the voter, witnessed by an adult U.S. citizen, securely stored by the municipal clerk until Election Day, and carefully opened, reviewed, and tabulated during a public canvas. Wis. Stat. §§ 6.87, 6.88. On March 29, 2020, the WEC issued guidance specifically addressing "Indefinitely Confined Absentee Applications."[7] In that guidance, the WEC stated that the statutory definition of "age, illness, infirmity or disability" does not require a voter to meet a particular qualification and

---

[7] https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Clerk%20comm%20re.%20Indefinitely%20Confined%203.29.20.pdf (last visited Dec. 6, 2020).

"indefinitely confined status need not be permanent,"[8] noting that voters "self-certify" whether they are indefinitely confined.[9] The WEC instructed municipal clerks to "remove the name of any elector from the list of indefinitely confined electors upon receipt of reliable information that an elector no longer qualifies for that designation and service."[10]

Plaintiff complains that the WEC's March 29, 2020 guidance provided that "many voters of a certain age or in at-risk populations *may* meet that standard of indefinitely confined…."[11] (Cmplt. ¶84) This does not contradict the statute. WEC does not command that all voters meet the standard. The guidance simply recognizes that a highly infectious disease that has infected over 400,000 Wisconsinites[12] and killed over 3,700[13] will have more significant health effects for certain at-risk groups, such as the immunocompromised.[14] Some voters *may* meet the standard to self-certify as indefinitely confined status based on their particular circumstances.[15]

In a labored effort to reach a contrary result, Plaintiff reads words into the statute, and would impose a mandate for clerks to seek out information that a voter is indefinitely confined. (Cmplt. ¶89) That is nowhere to be found in the statutory text. There is no obligation for a clerk to affirmatively seek out and verify every voter is indefinitely confined.

---

[8] *Id.*

[9] *Id.*

[10] *Id.* at 3.

[11] *Id.* at 2.

[12] https://www.dhs.wisconsin.gov/covid-19/data.htm#summary (last visited Dec. 7, 2020).

[13] *Id.*

[14] https://www.dhs.wisconsin.gov/covid-19/data.htm#summary (last visited Dec. 7, 2020).

[15] Importantly, the Wisconsin Supreme Court has reviewed the March 29 guidance and deemed it accurate. *See Jefferson v. Dane Cty.*, No. 2020AP557-OA, Order, at *2 (Wis. Mar. 31, 2020) (noting in context of order in response to temporary injunction motion that the WEC guidance "provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time").

Notably, Plaintiff has not claimed or provided any evidence that a single voter who claimed indefinitely confined status did so improperly. Plaintiff asserts only his belief that it was odd so many people claimed this status during the COVID-19 pandemic. (*Id.* ¶106) But it is imminently logical that the pandemic would increase the number of people who considered themselves indefinitely confined. And, because the *Jefferson* lawsuit brought increased attention to the indefinitely confined provision, more people may have known about and chosen to avail themselves of the law. The *Jefferson* case remains pending before the Wisconsin Supreme Court, where the merits were argued at the end of September. If that court had concerns about voters using (or misusing) the statute for the November election, it could and would have granted additional preliminary relief. It did not do so, and Plaintiff provides no basis for this Court to second-guess that decision.

### 3. Secure drop boxes are a legitimate way for voters to return absentee ballots.

Ballot drop boxes are entirely consistent with Wis. Stat. § 6.87(4)(b)1. Absentee ballots may be mailed or delivered in person to the voter's municipal clerk. A ballot deposited in a drop box is delivered in person because municipal election officials collect the deposited ballots from the drop box and deliver them to the municipal clerk. This is no different than depositing a ballot in a mailbox or delivering it to the municipal clerk or designated election official who then places the ballot in a secure location until it gets counted on Election Day.

WEC guidance ensures that drop boxes will be entirely secure. WEC issued its guidance consistent with President Trump's Cybersecurity and Infrastructure Security Agency recommendations.[16] The drop box must be secured and locked at all times.[17] Only election officials

---

[16] https://elections.wi.gov/sites/elections.wi.gov/files/2020-08/Drop%20Box%20Final.pdf at 1 (last visited December 5, 2020).

[17] *Id.* at 3.

may have access to keys or the combination lock.[18] WEC also recommends using tamper-evident seals and, ideally, 24-hour monitoring.[19] To further secure the ballots, WEC recommends using chain-of-custody logs.[20]

A letter written expressly on behalf of the Speaker of the Assembly and the Senate Majority Leader endorsed drop-boxes as lawful and "wholeheartedly support[s]" their use.[21] This overt stamp of approval for ballot drop-boxes from Wisconsin's legislative leaders contradicts Plaintiff's argument that the practice somehow subverts Wisconsin law.

Plaintiff argues that municipalities collected ballots after 8:00 p.m. on Election Day. (Cmplt. ¶207) But he provides no proof that ballots were collected belatedly. He alleges some theoretical event that may have happened, but, even one month after the election, he cannot find a single instance where this actually occurred. In fact, the WEC provided guidance to municipal clerks on October 22, 2020 that ballots must be retrieved from ballot boxes and delivered to counting locations no later than 8:00 p.m.[22] Without any specific facts that show ballots were actually retrieved after voting had closed, this argument carries no weight.

While Plaintiff cherry picks some examples of what municipalities may have done regarding use of drop-boxes (Cmplt. ¶201), Plaintiff has not claimed that any of those drop boxes were subject to fraud in any way. Indeed, when it comes to fraud in general, Plaintiff has only alleged that Wisconsin was a "potential target for fraud" (*id.* at 31), but has not alleged actual fraud

---

[18] *Id.*

[19] *Id.*

[20] *Id.* at 4.

[21] Letter from Misha Tseytlin to Madison City Clerk Maribeth Witzel-Behl (Sept. 25, 2020), available at http://www.thewheelerreport.com/wheeler_docs/files/092520troutman.pdf

[22] https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Election%20Night%20Results%20Clerk%20Memo%20FINAL%2010.30.2020%20Update.pdf at 1-2 (last visited Dec. 5, 2020).

occurred. At most, Plaintiff only alleges drop boxes could have been unsecure. (*Id.* ¶200) Without proof, that allegation is meaningless.

### 4. Eight jurisdictions, including the Eastern District of Wisconsin, have already denied Plaintiff's challenges to the CTCL grants.

In his effort to retroactively nullify the votes of almost 3.3 million Wisconsin voters, Plaintiff attacks a nonpartisan grant program aimed at facilitating safe and efficient voting during the pandemic. CTCL's goal of increasing voting access during the global pandemic does not conflict with any Wisconsin laws. *See, e.g.*, Wis. Const. art. III (recognizing right to vote as a fundamental right).

Courts in eight states—including this Court—have already rejected the theories Plaintiff presses here. As Judge Griesbach found in the order denying a request to enjoin Wisconsin cities from accepting CTCL grants, Wisconsin law does not prohibit cities from accepting nonpartisan private funds to facilitate voting access. *Wis. Voters All. v. City of Racine*, No. 20-C-1487, 2020 WL 6129510, at *2-3 (E.D. Wis. Oct. 14, 2020). Judge Griesbach confirmed—as did the seven other courts that heard similar cases around the country—that no federal law, including the Elections Clause, prohibits CTCL grants. *See Ga. Voter All. v. Fulton Cty.*, No. 1:20-CV-4198-LMM, 2020 WL 6589655, at *5 (N.D. Ga. Oct. 28, 2020); *S.C. Voter's All. v. Charleston Cty.*, No. 20-CV-03710, ECF No. 5 (D.S.C. Oct. 26, 2020); *Pa. Voters All. v. Ctr. Cty.*, No. 4:20-CV-01761, 2020 WL 6158309, at *7 (M.D. Pa. Oct. 21, 2020); *Tex. Voters All. v. Dallas Cty.*, No. 4:20-CV-00775, 2020 WL 6146248, at *21 (E.D. Tex. Oct. 20, 2020); *Iowa Voter All. v. Black Hawk Cty.*, No. C20-2078-LTS, 2020 WL 6151559, at *5 (N.D. Iowa Oct. 20, 2020); *Election Integrity Fund v. City of Lansing*, No. 1:20-CV-950, 2020 WL 6605987, at *3 (W.D. Mich. Oct. 19, 2020); *Minn. Voters All. v. City of Minneapolis*, No. CV 20-2049 (MJD/TNL), 2020 WL 6119937, at *9 (D. Minn. Oct. 16, 2020).

Similarly, Plaintiff's naked assertions that the CTCL grants "disparately impact" rural voters or had a partisan influence lack any factual basis. (Cmplt. ¶¶227-31) CTCL funding did not go only "to Wisconsin's largest cities." (*Id.* ¶226) To the contrary, 216 Wisconsin separate municipalities and towns have been awarded CTCL grants.[23] State statutes expressly permit limiting observer access.

Plaintiff's arguments about inadequate access for poll observers are also easily dispatched. Wisconsin law grants municipalities discretion to limit observers. The statute unambiguously provides "[t]he chief inspector or municipal clerk may reasonably limit the number of persons representing the same organization who are permitted to observe under this subsection at the same time." Wis. Stat. § 7.41(1). Likewise, election officials may remove an observer if the observer causes a disruption to election activities or engages in electioneering. Wis. Stat. § 7.41(3). Thus, while observers may be present during election operations, that right is not absolute and is subject to reasonable limitations. Further, if there were violations of state law, the appropriate remedy is to file a complaint with the WEC, *see* Wis. Stat. § 5.06 and Wis. Admin. Code ch. EL 20, or for the candidate or political party to seek a declaratory relief on Election Day, not to seek emergency relief in federal court a full month after the election. Alternatively, if the President had concerns that his campaign was unable to monitor the counting of votes, he had—and availed himself of— the opportunity to trigger a fully transparent recount; the recount process includes participants from all campaigns and thereby cures any alleged limitation on the participation of observers on Election Day.

---

[23] Center for Tech and Civic Life, "CTCL Program Awards Over 2,500 COVID-19 Response Grants" (Oct. 29, 2020), available at https://www.techandciviclife.org/grant-awards/ (last visited Dec. 8, 2020).

Finally but importantly, even if observers were denied reasonable access (of which there is no proof), that would not be grounds to invalidate any votes, let alone overturn an election in which 3.3 million people voted.

**B.    Plaintiff is not entitled to relief under the Fourteenth Amendment.**

Plaintiff's allusions to equal protection and due process principles,[24] like the Elections and Electors Clause argument, fails because WEC's guidance is entirely consistent with Wisconsin law. To the extent Plaintiff suggests unequal treatment under Wisconsin's election laws, that fails because there is no unequal treatment or because a rational basis exists for the laws.

The "rational-basis variant of substantive due process differs little, if at all, from the most deferential form of equal protection review." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). "Unless a governmental practice encroaches on a fundamental right," substantive due process and equal protection "require[] only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). Substantive due process is "not a blanket protection against unjustifiable interferences with property." *Id.*

From the outset, it is important to note that the WEC's guidance treated all voters equally. Any voter had the opportunity to obtain an absentee ballot. Any voter believing themselves indefinitely confined could notify their municipal clerk. And although Plaintiff alleges election laws discriminated against "able bodied voters" (Cmplt. ¶148) that is not a protected class.

---

[24] Plaintiff's allegations regarding equal protection and due process are, at best, nebulous. For example, it is unclear whether Plaintiff believes the actions of Wisconsin officials somehow implicate his procedural or substantive due process rights. Nor is it clear if he is suing as a class of one, or rather on behalf of some broader group whose rights were allegedly infringed by the challenged practices. Presumably this is an attempt at making a substantive Due Process claim, and the President is a class of one.

It is further unclear how Plaintiff's rights to equal protection and due process are implicated at all by the "misapplication" of voting laws. Even if Plaintiff's allegations and legal interpretations were accurate (which they are not), the laws did not affect his ability to vote, nor establish any connection between his ability to campaign or have voters cast their ballots in favor of him. Put simply, there is no causal nexus between the application of Wisconsin's election laws and Plaintiff's rights under the Equal Protection and Due Process Clauses.

This case strongly resembles *Hennings v. Grafton*, where six electors requested a new election because of "inaccurate tabulation of votes in fifty precincts and 'arbitrary' action by the defendant county clerk as chief election official, all stemming directly or indirectly from the malfunctioning of electronic voting devices." 523 F.2d 861, 862-63 (7th Cir. 1975). Despite clear evidence of inaccurate vote counts, the court held that "not every election irregularity … will give rise to a constitutional claim and an action under § 1983. Mere violation of a state statute by an election official, for example, will not." *Id.* at 864. The Seventh Circuit continued:

> Voting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation, assuming these events to have occurred, fall far short of constitutional infractions, absent aggravating circumstances of fraud or other wilful conduct….

*Id.* The Seventh Circuit further asserted that "errors and irregularities … are inevitable, and no constitutional guarantee exists to remedy them." *Id.* at 865. This controlling case alone would foreclose any of the arguments brought by Plaintiff.

Nonetheless, even the merits show there are no constitutional claims. The Equal Protection Clause does not require uniform treatment, but only that any differences be rationally based on a legitimate government interest. Indefinitely confined voter laws ensure that vulnerable voters— any voter who is indefinitely confined due to "age, physical illness or infirmity or is disabled," Wis. Stat. § 6.86(2)(a)—can safely cast their ballots. Protecting such voters' safety while ensuring

they can vote is a legitimate governmental interest. Other guidance issued by the WEC serves the purpose of ensuring that elections account for the preferences of all eligible voters who choose to participate. Wis. Stat. § 5.01(1) provides that Wisconsin's election laws "shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions." Wis. Stat. § 7.50(2) reiterates that point, stating that ballots "shall be counted for the person or referendum question for whom or for which they were intended, so far as the electors' intent can be ascertained from the ballots notwithstanding informality or failure to fully comply with other provisions of chs. 5 to 12." As Wisconsin Supreme Court Chief Justice Roggensack recently noted, "The right to vote is protected by Wis. Const. art. III, § 1. Therefore, a vote legally cast and received by the time the polls close on Election Day must be counted if the ballot expresses the will of the voter." *O'Bright v. Lynch*, No. 2020AP1761-OA, Order, at *3, ¶7 (Wis. Oct. 29, 2020) (Roggensack, C.J. concurring).

WEC guidance furthers that purpose while still remaining entirely consistent with absentee voting requirements. For example, the witness address guidance does not remove the requirement for an address, but allows clerks the discretion to help correct that error so a ballot is not discounted because of a technicality. There is nothing nefarious nor illegal about this. The WEC's guidance is rationally related to ensuring everyone who wants to safely vote can do so.

## II.    Plaintiff's Allegations Are Not Justiciable in this Court.

### A.    The exclusive remedy for Plaintiff's allegations is in state court.

The gravamen of Plaintiff's Complaint, "alleged irregularity, defect, or mistake committed during the voting or canvassing process," is addressed by the sole remedy of a recount process outlined in state law. Wis. Stat. § 9.01(11). The recount statute "constitutes the exclusive judicial remedy" for such claims under state law. *Id*. The plain language of the statute is unambiguous on this point, as recently confirmed by the Wisconsin Supreme Court. *Trump v. Evers*, No.

2020AP1971-OA, Order at *2 (Wis. Dec. 3, 2020); *see also id.* (Hagedorn, J. concurring) ("[C]hallenges to election results are also governed by law. … [Section 9.01] provides that these actions should be filed in the circuit court, and spells out detailed procedures for ensuring their orderly and swift disposition."); *Wis. Voters Alliance v. Wis. Elections Comm'n*, No. 2020AP1930-OA, Order at *3 (Wis. Dec. 4, 2020) (Hagedorn, J. concurring in denial of petition for original action, joined by a majority of the Justices) (noting that one reason petition for original action was "woefully deficient" was because it failed to "consider the import of election statutes that may provide the 'exclusive remedy,'" namely, Wis. Stat. §§ 5.05(2m) and 9.01).

Plaintiff requested a recount, which he lost, though he is appealing the results in state circuit court pursuant to Wisconsin law. In other words, Plaintiff's allegations of election law "violations" are in fact currently being litigated by him precisely where they must be brought: via the recount process in state court. Federal jurisdiction is not available to circumvent the Wisconsin Legislature's designated forum for challenging an election simply by bootstrapping concerns about compliance with the U.S. Constitution onto a smattering of alleged concerns regarding election-related procedures, nor can a federal court step in to give Plaintiff an opportunity to litigate simultaneously the same issues in two forums.

Wisconsin has instituted a strict set of procedures for challenging election results, permitting such challenges only when election results are close (no more than a 1% difference between the leading candidates), and requiring such challenges to be brought and proceed promptly. Wis. Stat. § 9.01(1)(a)5.b. To permit Plaintiff to both avail himself of these procedures and seek federal adjudication of the same issues at the same time, through the artifice of filing a federal lawsuit bootstrapping federal constitutional and civil rights principles onto what at bottom are grievances about state officials purportedly failing to properly follow state election law, would

eviscerate Wisconsin's careful process for properly and quickly deciding election challenges. If aggrieved candidates are not limited to Wisconsin's strict procedural and timing requirements for challenging election results, what's to stop other disappointed candidates from filing lawsuit after lawsuit until January 20 (if not beyond)? Such a result would not just offend state law, but would permit crafty litigants to blow past federal guideposts for finalizing the presidential election results; it would further destabilize our democracy and undermine the will of Congress, the Wisconsin legislature and, above all, the will of Wisconsin's voters. *See also infra* Part III B (abstention) and III (laches).

    **B.**     **The Court should abstain from deciding this case.**

    This Court should abstain from exercising jurisdiction over this case under both the *Pullman* and the *Colorado River* doctrines.

    To begin with, *Pullman* abstention is warranted here. A court should abstain under *Pullman* when "there is a substantial uncertainty as to the meaning of state law" and "there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Wis. Right to Life State Political Action Comm., v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011) (quotation omitted). In other words, this Court should abstain if it concludes that "the resolution of a federal constitutional question might be obviated if state courts were given the opportunity to interpret ambiguous state law." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716–17 (1996). These criteria are easily met here: in accordance with Wisconsin state law, Wisconsin courts are currently considering a recount appeal raising issues that overlap with those Plaintiff asserts here. *See Trump v. Biden*, No. 2020CV7092, Order for Consolidation and for Appointment of Judicial Officer (Milwaukee Cty. Cir. Ct. Dec. 3, 2020).

*First*, the Wisconsin state law issues underlying Plaintiff's allegations are sufficiently uncertain to warrant abstention. When similar issues were raised in a petition for leave to commence an original action in the Wisconsin Supreme Court, three Justices of that court characterized the allegations as presenting a "matter of statewide concern that requires a declaration" of the relevant Wisconsin law. *See Wisc. Voters All.*, Order at \*4 Roggensack, Ziegler, and Bradley, JJ., dissenting). Particularly in light of the sensitive issues of state law implicated by Plaintiff's allegations, the Court should abstain from addressing those issues pending state courts' consideration of them.

*Second*, there exists a reasonable probability that the recount appeal will clarify enough issues of state law to significantly narrow or eliminate altogether the federal constitutional issues Plaintiff alleges are presented in this case. All of Plaintiff's allegations hinge on purported violations of Wisconsin law, and the recount appeal is likely to provide a resolution on many of them. Among others, the recount appeal is likely to address the proper interpretation of Wisconsin Stat. § 6.87's absentee ballot signature verification requirements (*see* Recount Pet. ¶4;[25] Cmplt. ¶¶235–58, 273–80), Wisconsin Stat. § 6.86(2)'s voter identification requirements (*see* Recount Pet. ¶6; Cmplt. ¶¶70-108), Wisconsin Stat. §§ 7.41(1) and 7.52(1)(a)'s public access procedures (Recount Pet. ¶¶5, 7; Cmplt. ¶¶283–95). The recount appeal is also likely to provide clarification as to the appropriate remedies under Wisconsin state law in these circumstances. There is therefore a strong probability that resolution of the state-law recount appeal process will obviate this Court's need to address most or all of the federal constitutional issues raised here. Accordingly, to "avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication,"

---

[25] Attached to this brief as Exh. 19.

this Court should refrain from injecting itself into the middle of this dispute. *Railroad Commission of Texas* v. *Pullman Co.*, 312 U.S. 496, 500 (1941).

If this Court were not inclined to abstain under the *Pullman* doctrine, it should abstain under *Colorado River*. Under that doctrine, a federal court may abstain from exercising jurisdiction over a matter in deference to a parallel state-court proceeding. *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813, 817 (1976). It applies when "the state and federal actions are actually parallel" and when sufficient "exceptional circumstances" apply to warrant a federal court's declining to exercise its jurisdiction. *Tyrer v. City of S. Beloit*, 456 F.3d 744, 751 (7th Cir. 2006). Those factors include (1) the "difficulties posed when a state and federal court concurrently assume jurisdiction over the same res"; (2) the "inconvenience of the federal forum"; (3) the "desirability of avoiding piecemeal litigation"; (4) the "order in which the state and federal proceedings were filed"; (5) whether "state or federal law provides the rule of decision"; and (6) whether "the state action will adequately protect the federal plaintiff's rights." *Id.* All of these criteria are met here.

*First*, as explained above, there are parallel state and federal actions underway here. For actions to be parallel, "it is not necessary that there be formal symmetry" between them. *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004). Instead, when "substantially the same parties are contemporaneously litigating substantially the same issues in another forum," the actions are parallel for *Colorado River* purposes. That is the case here. Plaintiff's recount appeal names the WEC and many of the same other defendants as are in this case. The recount appeal and the case arise out of the same election and focus on the same jurisdictions. And the two proceedings raise sufficiently "similar legal and factual issues" to be meaningfully parallel. *Id.*

*Second*, exceptional circumstances are present here. No res is at stake and the federal forum does not pose a significant inconvenience to any party, but all of the other exceptional circumstances factors strongly favor abstention. Wisconsin law provides the rule of decision in both cases—not only as to substantive election law concerns, but as to the appropriate procedure for challenging election results under state law. The short timeline under which Wisconsin law requires a recount appeal proceed guarantees that the two proceedings will generate duplicative, confusing, and piecemeal litigation. Further, state recount proceedings were commenced first. And there is little risk that Plaintiff's rights will not be adequately protected in state court, as those rights all stem from the contention that *state* law was not followed.

Taken together, the *Colorado River* factors strongly warrant this Court's abstention—as the Michigan court held yesterday in similar circumstances. *See King*, Op. & Order at *21-23.

### C.     Plaintiff inappropriately asks this Court for an advisory opinion.

The Complaint asks this Court to issue an advisory opinion, apparently for the benefit of the Wisconsin Legislature. That request must be denied. "As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *United Postal Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947); *Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[I]t is quite clear that 'the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.'" (quoting C. Wright, *Federal Courts* 34 (1963))). This prohibition "implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III." *Flast*, 392 U.S. at 96. The role assigned by Article III is limited to "disputes . . . capable of *resolution* through the judicial process." *Id.* (emphasis added). Article III, therefore, may only be invoked in a case capable to be "*decide[d]*" by a federal court, "subject to review only by superior courts in the

Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case; because 'a "judicial power" is one to render dispositive judgments.'" *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995) (quoting Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 926 (1990)) (emphasis in original). If a suit cannot be resolved in a dispositive manner by a court, then it "is not a proper case or controversy," and thus "the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

A dispute is not capable of resolution by the judiciary, and thus not within the Article III power of federal courts, if another branch of government renders the final decision. This principle is as old as the Republic. In *Hayburn's Case*, 2 Dall. 409 (1792), the Supreme Court rejected a law vesting judges with duties reviewable by executive officials and Congress. Under that law, the court's "judgments . . . might . . . have been revised and controlled by the legislature, and by an officer in the executive department. Such revision and control we deemed radically inconsistent with the independence of that judicial power which is vested in the courts." *Id.* Likewise, the Supreme Court held in *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948), that Congress could not vest federal courts with review of agency action and render adherence to the court's judgment subject to the discretion of the President.

The Complaint, by its own terms, asks this Court to render an advisory opinion—a judicial recommendation about the law that Plaintiff admits the Legislature would be empowered to adopt or disregard. Plaintiff alleges that "[q]uestions about the laws surrounding the election and whether those laws were followed by state officials are justiciable even though in the unique context of the Electors Clause it is the State Legislature alone that has the *final* say on those questions and on the appointment of that State's electors." (Cmplt. ¶70 (emphasis in original); *id.* ¶67 ("Plaintiff

24

recognizes that in relation to the Electors Clause of Article II of the U.S. Constitution it is ultimately the exclusive province of the Wisconsin Legislature to determine the remedy for violation of Article II of the U.S. Constitution in Wisconsin."); *id.* at 72, Prayer for Relief ¶4 (requesting remand to the Legislature to "determine what remedy, if any," should be imposed))

Essentially, Plaintiff wants this Court to advise the Legislature that, in the Court's opinion, the Electors Clause has been violated, in the hope that the Legislature might take some action to mandate the appointment of the Trump electors. But to accept Plaintiff's invitation would be "to render an advisory opinion in its most obnoxious form—advice that the [Wisconsin Legislature] has not asked, tendered at the demand of a private litigant, on a subject concededly within the [Wisconsin Legislature's] exclusive, ultimate control." *Chicago & S. Air Lines*, 333 U.S. at 113.[26]

It is true, of course, that "[i]t is emphatically the province and duty of the judicial department to say what the law is." (Cmplt. ¶68 (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)) But federal courts' duty to "say what the law is" derives from—and is bounded by— Article III. Federal courts do not have a roving commission to expound upon the law. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 176 (2016) (Roberts, C.J., dissenting) ("Chief Justice Marshall established that 'it is the province and duty of the judicial department to say what the law is.' Not because there is a provision in the Constitution that says so—there isn't. Instead, the federal courts wield that power because they have to decide cases and controversies, and '[t]hose who apply [a] rule to particular cases, must of necessity expound and interpret that rule.'" (quoting *Marbury*) (alterations in original)). Because Plaintiff himself alleges that another branch

---

[26] This rule applies equally to requests for declaratory judgments. *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (noting that Article III limitations are "as true of declaratory judgments as any other field" (internal quotation marks omitted)). This Court lacks jurisdiction to declare what Plaintiff contends is within the exclusive and final power of another branch to declare.

of government has the final power to decide this matter—and that any decision of this Court would be mere advice rendered en route to an ultimate decision by the Legislature—the duty to say what the law is does not arise here.

Nor does it matter that the Complaint asks this Court to make various declaratory judgments and to "[e]njoin any actions inconsistent with the Court's declaration and judgment." (Compl. at 72, Prayer for Relief ¶ 5) Unless and until Plaintiff can identify some defendant whose ongoing conduct he wants this Court to modify, these provisions are mere make-weights. This case is a strategic filing aimed at persuading the Legislature to void the election. Nothing more. A federal court may not participate in such an effort without violating Article III.

## D. Plaintiff's requests for relief are moot.

Plaintiff's arguments are also barred because his requested relief is moot. Federal courts may adjudicate only "live cases and controversies." *See Murphy v. Hunt*, 455 U.S. 478, 481 (1982). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Stotts,* 230 F.3d at 990 (internal quotation marks and citations omitted). "When a case is moot, it must be dismissed as non-justiciable." *Id*. at 991.

All of Plaintiff's requests for relief relate to the general election held on November 3, 2020, and its results. (Cmplt., at 71-72) In part, Plaintiff asks the Court to (1) declare that Defendants conducted the 2020 general election in violation of the Electors Clause; (2) declare that Defendants violated the Equal Protection and Due Process Clauses in connection with the conduct of the 2020 general election; (3) declare that the constitutional violations likely tainted more than 50,000 ballots; and (4) remand the case to the Wisconsin Legislature to consider the declared violations and determine a remedy. (*Id*.) But, by the time Plaintiff filed his Complaint, not only had all 72 counties in Wisconsin finished canvassing their results and reported those results to the WEC: (1)

both Dane and Milwaukee Counties had completed a full recount and reported their results to the WEC; (2) the WEC Chairperson had completed the statewide canvass and certified the results: (3) Governor Evers had signed the certificate of ascertainment and submitted the slate of presidential electors to the U.S. Archivist; and (4) the U.S. Archivist had confirmed receipt. As Judge Parker in Michigan put it, by the time Plaintiff filed his Complaint, the "ship ha[d] sailed." *See King*, Op. & Order, at *13. Similarly, Judge Pryor of the Eleventh Circuit stated:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when results are already final and certified.

*Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866, at *6 (11th Cir, Dec. 5, 2020).

The Wisconsin Legislature established the procedures for conducting elections in this State long in advance of the 2020 election, State officials already interpreted and implemented those procedures in conducting the election, the Legislature did not effectively seek any further modification to State before voters cast their votes, and the State has already certified the election results. The Wisconsin Legislature has unambiguously specified that the bedrock principle governing any construction of the State's election laws is "***to give effect to the will of the voters***."Wis. Stat. § 5.01(1) (emphasis added). There is no basis for revisiting the long-established "will of the voters" principle and instead construing Wisconsin law to allow the Legislature to appoint electors in any manner other than in accord with the state canvass. Because the Legislature has already spoken definitively, Plaintiff's request that the Court in effect declare the results of the election void and to refer any subsequent determination of a remedy to the Legislature is moot, as judges in several other states have concluded. "[T]here is no basis in law by which the courts may grant Petitioner's request to ignore the results of an election and recommit the choice to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters." *Kelly v.*

*Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020)) (Wecht, J., concurring); *see also Wood v. Raffensberger*, No. 1:2020-cv-04651-SDG, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020), *aff'd*, 2020 WL 7094866, at *6 (11th Cir. Dec. 5, 2020) (concluding that "interfer[ing] with the result of an election that has already been concluded would be unprecedented and harm the public in countless ways").

### III. The Doctrine of Laches Bars Plaintiff's Complaint.

Even if Plaintiff properly plead any justiciable claims, which he did not, the doctrine of laches clearly bars his Complaint because he has unreasonably delayed bringing these allegations to the detriment not only of Defendants, but also of the nearly 3.3 million voters in Wisconsin who voted in this last election under the good-faith belief they were following the correct procedures to have their votes counted. "Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant. In the context of elections, this means that any claim against a state electoral procedure must be expressed expeditiously." *Fulani*, 917 F.2d at 1031. In the elections context, federal courts regularly dismiss claims brought both before and after elections based on laches, "lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988). This is because of "the extremely disruptive effect of election invalidation and the havoc it wreaks upon local political continuity." *Id.*; *see also, e.g.*, *Knox v. Milw. Cty. Bd. of Election Comm'rs*, 581 F. Supp. 399, 402 (E.D. Wis. 1984) (laches warranted denial of preliminary injunction to restrain county elections where complaint was filed seven weeks before election).

Indeed, relating to the election at issue here, a federal court in Georgia rejected similar challenges to the presidential election results in that state on laches grounds. *See Wood*, 2020 WL 6817513. In doing so, the court stressed that laches principles are particularly salient in post-

election cases because of the potential impact on the rights of voters and on public confidence in the electoral process. Unlike a pre-election challenge to the rules, the court explained, the plaintiff there (Wood) "wants the rules for the already concluded election declared unconstitutional and over one million absentee ballots called into question. Beyond merely causing confusion, Wood's requested relief would disenfranchise a substantial portion of the electorate and erode public confidence in the electoral process." *Id.* at *8. The same is true here. Plaintiff unreasonably delayed bringing his Complaint not only until after the election, but nearly a month after Election Day. This delay is manifestly unwarranted and unreasonable, providing ample grounds for dismissal.

There can be no doubt that Plaintiff's delay, if it somehow resulted in his desired relief of invalidating the Wisconsin election results so that the Legislature can decide who won, would prejudice both Defendants and the nearly 3.3 million Wisconsinites who cast their votes in the election. Local municipal officials, often part-time workers, administered this election, and Wisconsin voters participated in this election, in reliance on the propriety of the pre-election policies that Plaintiff only now belatedly seeks to challenge. Had Plaintiff raised and diligently pursued his challenges to these policies and before the election, as he should have, then any required changes to election procedures could have been implemented in response to any court rulings before the election—before, that is, the voters of Wisconsin participated in the election in reliance on these very policies. Courts routinely decline to change the rules of elections in the days and weeks leading up to an election, because of the significant prejudice caused by last-minute changes, which can result in voter confusion and depressed turnout. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). A court decision to *retroactively* change the rules *after* the election, and to invalidate millions of votes in the process, is even more unacceptable.

Federal appellate courts have repeatedly held that voters should not have their votes nullified for having followed guidance, policies, and court decisions in effect when they cast their ballot. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1074-75 (1st Cir. 1978); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012). These courts have relied both on fundamental notions of fairness and on federal constitutional due-process protections. And this very election cycle, the U.S. Supreme Court followed suit in *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020). In that case, the Supreme Court stayed a district court's order, in effect reinstating a briefly enjoined state-law witness requirement for absentee ballots. *See id.* But, in doing so, the Supreme Court expressly stated that any votes cast while the district court's order had been in effect "may not be rejected for failing to comply with the witness requirement." *Id.* The Court recognized the need to validate voters' reliance on the rules in place at the time they voted.

Nullifying millions of votes cast in the November general election based on Plaintiff's inexcusably belated challenges to policies in place well before the election and actions occurring on Election Day would violate due process just as surely as the decisions struck down in *Griffin* and *Husted*, and would run afoul of the U.S. Supreme Court's decision in *Andino*. Violating both the voting and due process rights of Wisconsinites would be hugely, unfairly, and indisputably prejudicial.

## CONCLUSION

For the reasons above, Defendant Governor Tony Evers's Motion to Dismiss (Dkt. 84) should be adjudicated before the Court considers Plaintiff's request for injunctive relief, the Governor's Motion should be granted, and Plaintiff's Complaint should be dismissed with prejudice.

Dated: December 8, 2020

Respectfully submitted,

/s/ Jeffrey A. Mandell

Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Post Office Box 1784
Madison, WI 53701-1784
Telephone: 608-256-0226
jmandell@staffordlaw.com
rsnyder@staffordlaw.com
rmanthe@staffordlaw.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
Telephone: (202) 736-2200
psmith@campaignlegalcenter.org

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
Telephone: 713-651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

*Attorneys for Defendant,*
*Governor Tony Evers*