IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

DONALD J. TRUMP,

       Plaintiff,

    v.                            Case No. 20-CV-1785

THE WISCONSIN ELECTIONS
COMMISSION, et al.,

       Defendants.

**BRIEF OF WISCONSIN ELECTIONS COMMISSION AND ITS MEMBERS
AND SECRETARY OF STATE DOUGLAS LAFOLLETTE
IN SUPPORT OF THEIR MOTION TO DISMISS AND
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR DECLARATORY AND INJUNCTIVE RELIEF**

JOSHUA L. KAUL
Attorney General of Wisconsin

COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

STEVEN C. KILPATRICK
Assistant Attorney General
State Bar #1025452

THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

Attorneys for Wisconsin Elections
Commission and its members, and
Secretary of State La Follette

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219 (CTR)
(608) 266-1792 (SCK)
(608) 266-8690 (TCB)
(608) 267-8904 (GJK)
(608) 294-2907 (Fax)
rothct@doj.state.wi.us
kilpatricksc@doj.state.wi.us
bellaviatc@doj.state.wi.us
johnsonkarpg@doj.state.wi.us

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

STATEMENT OF THE CASE .......................................2

ARGUMENT ......................................................................5

    I.    Plaintiff's federal claims fail as a matter of law. ...........5

        A.    Plaintiff lacks Article III standing.........................6

            1.    Plaintiff has no legally protected interest. ................6

            2.    Plaintiff's alleged injury is speculative and conjectural. ................8

            3.    Plaintiff's alleged injury is not redressable............. 10

        B.    Plaintiff's allegations of state election law violations fail to state an Elections or Electors Clause claim. ........... 11

        C.    Laches bars Plaintiff's claims because they rest on guidance given by election officials long ago. .................... 15

        D.    The Eleventh Amendment bars Plaintiff's request that this Court enjoin state officials to comply with state law...................................................................... 17

    II.    Plaintiff's underlying state law claims fail, even if this Court were to consider them.................................................. 18

        A.    Plaintiffs identify no Commission guidance that contradicts state law on indefinitely confined voters. ....... 18

        B.    The Commission properly advised local election officials about the use of absentee ballot drop boxes. ........ 21

        C.    The Commission properly advised local clerks that they could complete missing address information............ 23

i

III.    The remedy Plaintiff seeks—invalidating the entire statewide presidential election—is unavailable. .......................... 24

       A.    A federal court may not override a popular presidential election so that a state legislature may make its own choice. ........................................................... 26

       B.    To the extent Plaintiff seeks to rely on 3 U.S.C. § 2, that statute does not apply to the circumstances presented here. ..................................................................... 28

CONCLUSION ................................................................................ 30

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 4 of 35   Document 98

## INTRODUCTION

Over three million Wisconsin voters cast a ballot for president in the November general election; Plaintiff Donald Trump received around 20,000 fewer votes than his opponent. Now, he seeks something unprecedented in our nation's history. He asks a federal court to overturn the results of a statewide popular vote and turn the choice of presidential electors over to the state legislature, disenfranchising millions of voters and ignoring the state's chosen method of selecting electors. It would be hard to imagine more undemocratic relief or a more dramatic intrusion into a state's electoral process.

This case has no business in a federal court. Plaintiff's basic complaint is that state election officials failed to comply with state election law. But federal courts have long recognized that intervening in the state electoral process in situations like these would seriously damage the federal-state comity on which our system of government depends. That is why mere violations of state elections law do not equate to federal constitutional claims, whether under the Electors and Elections Clauses or any others. Even if they did, those provisions sometimes protect the rights of state legislatures to set a state's election laws; private citizens like Plaintiff have no standing to assert a state legislature's rights. Similarly, the Eleventh Amendment bars a federal court from ordering state officials to follow state law, as Plaintiff requests. And laches merits dismissal of this whole case due to Plaintiff's inexcusable decision to wait until now to challenge election administration methods long in place and publicly known before the November election.

This case should be dismissed for multiple reasons, long before considering Plaintiff's meritless quibbles with how state election officials administered state election law or the undemocratic and unconstitutional remedy he seeks.

## STATEMENT OF THE CASE

The Wisconsin Elections Commission (the "Commission") is responsible for administering elections in Wisconsin. *See* Wis. Stat. § 5.05(1). One of the Commission's main responsibilities is to provide guidance regarding the requirements of state election law to local election officials and the voting public. *See, e.g.*, Wis. Stat. §§ 5.05(12), 7.08(3), 7.08(11). Although the Commission maintains the statewide list of registered voters (*see* Wis. Stat. §§ 5.05(15), 6.36), it does not have a direct role either in issuing in-person and absentee ballots to voters or in receiving and counting those ballots. That job is left to local election officials at the county and municipal level. *See generally* Wis. Stat. §§ 7.10 (county clerk duties), 7.15 (municipal clerk duties), 7.51–7.60 (local canvassing provisions). Once local officials complete those tasks, they transmit the results to the Commission, which in turn tallies up the statewide results and certifies them. *See* Wis. Stat. § 7.70.

This case involves three pieces of guidance given by the Commission to local election officials and the voting public related to absentee voting, which hit record levels in the November election (Ex. 29[1]), presumably due to COVID-19.

---

[1] Citations to "Ex." reference the exhibits to Plaintiff's complaint, filed at docket entry 12.

First, the Commission published guidance in March 2020 about when absentee voters in Wisconsin may claim to be "indefinitely confined" under Wis. Stat. § 6.86(2)(a), a status that relaxes default photo identification requirements for absentee voting under Wis. Stat. § 6.87(4)(b)2. (Ex. 2.) The Commission emphasized that voters must make an "individual" decision based on their "current circumstance[s]" and that the status should "not be used . . . simply as a means to avoid the photo ID requirement." (Ex. 2 at 1.) It then noted that "[d]uring the current public health crisis, many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates." (Ex. 2 at 2.)

The Wisconsin Supreme Court reviewed this guidance in March, concluding that it "provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time."[2]

Second, in August 2020, the Commission published guidance about the use of absentee ballot drop boxes. (*See generally* Ex. 13–14.) It described these as "secure, locked structure[s] operated by local election officials" that provide a "secure and convenient means for voters to return their by[-]mail absentee ballot." (Ex. 14.) The Commission's guidance emphasized that drop boxes "must be secured and locked at all times" and "sealed with one or more tamper evident seals." (Ex. 13 at 3.) It also instructed that "[c]hain of custody logs must be completed every time ballots are collected." (Ex. 13 at 4.) The use of these drop boxes across Wisconsin received

_____

[2] Order, *Jefferson v. Dane Cty.*, No. 2020AP557-OA (Wis. Mar. 31, 2020), https://www.wpr.org/sites/default/files/2020ap557-oa_3-31-20_order.pdf.

significant media attention in the months leading up to the November election. (Ex. 16, 24–26.) Wisconsin's state legislative leaders called drop boxes "lawful" and "wholeheartedly support[ed] voters' use" of them.[3]

Third, back in 2016, the Commission advised local election officials about how to handle missing address information on absentee ballot witness certifications.[4] The Commission noted that, under Wis. Stat. § 6.87(6d), an absentee ballot may not be counted if the accompanying witness certification lacks an address. It then advised that clerks should "take corrective actions in an attempt to remedy a witness address error." (Haas Mem. 1.) In the Commission's view, this would "promote uniformity in the treatment of absentee ballots statewide." (Haas Mem. 2.) The Commission reiterated that guidance before the November 2020 election. (Ex. 35 at 3.)

Plaintiff alleges that these three pieces of Commission guidance constituted "ultra vires acts by Wisconsin public officials" that were "inconsistent with state law." (Dkt. 1 ¶ 26.) In his view, these alleged state law violations "usurped the Wisconsin Legislature's exclusive authority to direct the election for Presidential electors in Wisconsin" and thereby violated the Electors and Elections Clauses. (Dkt. 1 ¶ 29.) Those constitutional provisions vest authority in "the Legislature" of each state to

---

[3] Letter from Misha Tseytlin, Troutman Pepper Hamilton Sanders LLP, to Maribeth Witzel-Behl, City Clerk, City of Madison (Sept. 25, 2020), https://www.wpr.org/sites/default/files/september_25_2020_letter_to_city_clerk_witzel-behl.pdf.

[4] *See* Memorandum from Michael Haas, Interim Elections Adm'r, Wis. Elections Comm'n, to Wis. Mun. Clerks & Milwaukee City Elections Comm'n (Oct. 18, 2016), https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/guidance_insufficient_witness_address_amended_10_1_38089.pdf ("Haas Mem.").

4

regulate "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives", U.S. Const. art. I, § 4, cl. 1., and to direct the selection of presidential electors, U.S. Const. art. II, § 1, cl. 2, respectively.[5] To remedy these alleged violations, Plaintiff seeks: (1) a declaration that the violations occurred and that they "likely" affected 50,000 ballots; (2) unspecified accompanying injunctive relief; and (3) an order "remanding" this case to the Wisconsin Legislature for further action. (Dkt. 1:71–72.)

## ARGUMENT

### I.    Plaintiff's federal claims fail as a matter of law.

Before this Court considers whether state election officials properly applied state election law, it should dismiss Plaintiff's federal claims for multiple threshold reasons. First, Plaintiff lacks Article III standing for his Elections and Electors Clause claims because they grant no rights to private citizens and Plaintiff alleges a speculative injury that this Court could not redress. Second, ordinary state law violations, even if they occurred, cannot support federal constitutional claims. Third, Plaintiff's unreasonable delay merits dismissal on laches grounds. Fourth, the Eleventh Amendment prohibits enjoining state officials to comply with state law.

---

[5] Plaintiff also mentions in passing First Amendment, equal protection, and due process claims, but "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 476 n.6 (7th Cir. 2009) (citation omitted). (Dkt. 1 ¶¶ 23, 29, 199; 6 ¶ 14.)

### A. Plaintiff lacks Article III standing.

Plaintiff's Elections and Electors Clause claims fail first because he lacks Article III standing to assert them.

To establish standing, Plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.*

These are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," and so "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[A]t the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Id.*

### 1. Plaintiff has no legally protected interest.

Plaintiff—a private citizen—lacks a legally protected interest in the state legislature's prerogatives under the Elections and Electors clause.

Most recently, in *Bognet v. Sec'y of the Comm. of Pennsylvania*, No. 20-3214, 2020 WL 6686120 (3d Cir., Nov. 13, 2020), the Third Circuit rejected standing based on claims by a candidate and voters that a state court's unilateral extension of Pennsylvania's statutory absentee ballot receipt deadline violated the Elections and

Electors Clauses. *Id.* at *4. Just like Plaintiff here, the candidate in *Bognet* asserted that his injury derived from his "right to have government administered in compliance with the Elections Clause and Electors Clause." *Id.* at *6. But the Third Circuit explained that "private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause." *Id.* The same is true for Electors Clause claims, given the two provisions' "considerable similarity." *Id.* at *7. Just like the congressional candidate in *Bognet*, Plaintiff is also a private citizen and candidate who has no protected rights under the Elections and Electors Clauses.

Plaintiff's lack of standing can be contrasted with the valid Elections Clause claim in *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787 (2015). There, the Arizona Legislature challenged a state constitutional amendment that transferred authority over redistricting from the Legislature to an independent commission. The Supreme Court held that the state legislature had standing to assert an Elections Clause claim because it was "an institutional plaintiff asserting an institutional injury." *Id.* at 802. But in another redistricting case brought by private citizens, *Lance v. Coffman*, 549 U.S. 437 (2007), the Supreme Court found no standing to assert an Elections Clause claim. There, "[t]he only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed," and that was an "undifferentiated, generalized grievance about the conduct of government." *Id.* at 442.

7

Both *Arizona State Legislature* and *Lance* underscore why Plaintiff—a private plaintiff with no institutional interest in the Elections or Electors Clause—offers just a "generalized grievance" shared with all citizens that cannot support standing.

Plaintiff's reliance on *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), is unpersuasive. (Dkt. 6 ¶¶ 5–6.) That outlier case should not be followed here because its terse standing analysis, *Carson,* 978 F.3d at 1058, did not consider these Supreme Court cases distinguishing state legislatures—which sometimes have an institutional interest under the Elections Clause—and private citizens—who categorically do not. Indeed, *Bognet* expressly rejected *Carson*'s standing analysis. *See Bognet*, 2020 WL 6686120 at *8 n.6; *see also King v. Whitmer*, No. 20-cv-13134, 2020 WL 7134198, at *7 (E.D. Mich. Dec. 7, 2020) (rejecting reliance on *Carson* and dismissing similar Elections and Electors Clause claims on standing grounds). This Court should follow *Bognet* and *King* and hold that these constitutional provisions do not provide rights to private citizens like Plaintiff.

## 2. Plaintiff's alleged injury is speculative and conjectural.

Even if Plaintiff had a legally protected interest, he fails to carry his evidentiary burden to show a concrete injury rather than a conjectural one. The problem here is simple: Plaintiff offers no proof whatsoever of how many votes were affected in the three categories of alleged state election law violations he identifies. It is therefore impossible to conclude that he suffered any injury at all.

8

Plaintiff lost the presidential contest in Wisconsin by around 20,000 votes.[6] His theory of injury seems to be that, absent the state law violations he purports to identify, this 20,000-vote margin would have been eliminated and he would have won. But he offers nothing more than a guess about the "likely" quantity of affected votes in his prayer for relief: "[T]he constitutional violations of the Defendants *likely* tainted more than 50,000 ballots, a number well in excess of the current estimated difference between the vote totals for the Republican and Democrat candidates for President." (Dkt. 1:72 (emphasis added).)

There is not a single shred of evidence in Plaintiff's complaint or its exhibits showing that 50,000 votes were affected by these alleged state law issues. Nor is there any evidence that throwing out the affected votes would leave Plaintiff with more votes than his opponent. Instead, this 50,000-vote figure apparently amounts to a guess, not evidence of a concrete harm sufficing to prove standing at the merits stage.

The Third Circuit also recognized this problem in *Bognet*. There, the candidate-plaintiff failed to show that a "greater proportion" of the votes he challenged would have been cast for his opponent or that those votes were "sufficient in number to change the outcome of the election to [the plaintiff's] detriment." *Bognet*, 2020 WL 6686120 at *8. This case features the same complete lack of evidentiary support—he offers no facts showing that the state law violations he alleges affected a "greater

---

[6] Wisconsin Elections Commission, *WEC Canvass Reporting System County by County Report, 2020 General Election,* Nov. 30, 2020, https://elections.wi.gov/sites/elections.wi.gov/files/County%20by%20County%20Report%20-%20President%20of%20the%20United%20States%20post%20recount.pdf.

proportion" of votes for his opponent than him and that the affected votes were "sufficient in number to change the outcome." *Id.*

Without any such evidence, Plaintiff fails to carry his burden of proof on this "indispensable part of [his] case" and thus fails to establish standing. *Lujan*, 504 U.S. at 561.

### 3.     Plaintiff's alleged injury is not redressable.

Plaintiff also cannot show "a likelihood that the requested relief will redress the alleged injury," the final injury-in-fact requirement for standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "Satisfaction of this requirement ensures that the lawsuit does not entail the issuance of an advisory opinion . . . ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 (1983).

The first set of Plaintiff's requested remedies are purely declaratory and would not redress his alleged injury—losing the election in Wisconsin. He simply asks for declarations that constitutional violations occurred and that those violations "likely tainted" more ballots than separate him from his opponent. (Dkt. 1:71–71.) That would amount to nothing more than an impermissible advisory opinion, as the November results would remain in place, leaving Plaintiff with his same injury.[7]

Indeed, Plaintiff essentially concedes that this Court cannot redress his injuries through his odd request that it "[r]emand[ ] this case to the Wisconsin

---

[7] Although Plaintiff also asks this Court to "enjoin[ ] any actions inconsistent" with those declaratory judgments, he never specifies what any such injunctive relief would entail. (Dkt. 1:72.) Even if he had, the Eleventh Amendment would bar injunctive relief against state officials for violating state law. *See infra* Argument I.D.

Legislature to consider the Defendants' violations of the Electors, Equal Protection and Due Process Clauses and determine what remedy, if any, the Wisconsin Legislature should impose within its authority pursuant to the Electors Clause." (Dkt. 1:72.) Leaving aside the fact that this Court cannot somehow "remand" an issue to a state legislature, the request itself acknowledges that this Court cannot issue relief that would remedy his election loss.

## B. Plaintiff's allegations of state election law violations fail to state an Elections or Electors Clause claim.

Plaintiff's only federal claims invoke the Elections and Electors Clauses. Setting Plaintiff's factual allegations aside, those claims fail as a matter of law because his disagreement with how state officials administered state elections law does not state a violation of the Elections and Electors Clauses.

It is black-letter law that "'[a] violation of state law does not state a claim under § 1983,' and, more specifically, 'a deliberate violation of state election laws by state election officials does not transgress against the Constitution.'" *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) (citation omitted); *see also Bognet* 2020 WL 6686120, *6 ("[F]ederal courts are not venues for plaintiffs to assert a bare right 'to have the Government act in accordance with law." (citation omitted)); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations—no matter how egregious those violations may appear within the local legal framework.").

This non-interference principle rests on a "caution against excessive entanglement of federal courts in state election matters":

> The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss.

*Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986) (citation omitted).

Plaintiff's theory relies solely on state law claims and thus violates this core federalism principle. He alleges "a number of *ultra vires* acts by Wisconsin public officials charged with administering the election that were inconsistent with state law." (Dkt. 1 ¶ 26.) More specifically, Plaintiff alleges that Wisconsin election officials violated state election law in three ways: that officials issued "guidance [that] contradicts Wis. Stat. § 6.86(2)(a)" regarding when absentee voters may claim "indefinite confinement" status (Dkt. 1 ¶ 85); that "all absentee ballots cast at the illegal, un-manned absentee ballot drop boxes in Wisconsin were cast in direct contravention of the Wisconsin election code" (Dkt. 1 ¶ 178); and that officials "engaged in the prohibited practice of ballot tampering by manipulating absentee ballot envelope certifications in compliance with yet another *ultra vires* guidance issued by the Wisconsin Elections Commission which . . . violated state law." (Dkt. 1 ¶ 235.) None of these alleged state law violations can support a federal constitutional claim under cases like *Shipley* and *Bodine*.

Plaintiff's contrary position would swallow this fundamental rule of federalism. In his view, these alleged state law violations "usurped the Wisconsin Legislature's exclusive authority to direct the election for Presidential electors in Wisconsin." (Dkt. 1 ¶ 29.) That theory proves far too much, as it would convert virtually *any* alleged state law violation into a federal constitutional claim. The general rule that "[a] violation of state law does not state a claim under § 1983," *Shipley*, 947 F.3d at 1062, would no longer have any teeth and losing candidates could evade it simply by alleging an Elections or Electors Clause violation. That result would threaten to replace Wisconsin's "elaborate state election contest procedures" with federal court intervention in the "multitudinous questions that may arise in the electoral process," just as *Bodine* warned against. 788 F.2d at 1272.

Indeed, this unpredictable collision between federal and state proceedings can be seen playing out here and now. This week, President Trump is litigating his challenge to Wisconsin's recount results through the "elaborate state election contest procedures" under Wis. Stat. § 9.01. *See Trump v. Biden*, No. 20CV7092 (Milwaukee Cty. Cir. Ct.). The parties here are due to appear before this Court on December 10, 2020, and substantially the same parties are also scheduled to appear in state court to address the same state law issues, as soon as this Court's December 10 hearing ends. At the end of the day (literally), the parties could receive one answer from the state court and another from this Court. It would be hard to better illustrate the federalism concerns raised by opening the federal courthouse doors to Plaintiff's state election law grievances.

That is exactly why the Michigan federal court in *King* just yesterday dismissed an Elections and Electors Clause claim like this one. There, too, the plaintiffs alleged that "Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code." *King*, 2020 WL 7134198, at *11. The court recognized that "Plaintiffs' claims are in fact state law claims disguised as federal claims" and dismissed them:

> By asking the Court to find that they have made out claims under the clauses due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review. Plaintiffs cite to no case—and this Court found none—supporting such an expansive approach.

*Id.*

To justify federal court intervention in this state election law dispute, Plaintiff cites only two inapposite cases: *Bush v. Gore*, 531 U.S. 98 (2000), and *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020). First, Plaintiff relies on Justice Rehnquist's concurring opinion in *Bush*, an opinion that did not garner a majority and thus has no precedential effect. In any event, Justice Rehnquist addressed whether a "state court . . . infringed upon the legislature's authority" by essentially suspending various state election statutes during the 2000 Florida recount. *Bush*, 531 U.S. at 114. Plaintiff's theory here—that state election officials violate the Electors Clause when they violate state election law—has nothing to do with state courts expressly modifying state statutes, like in *Bush*. As for *Carson*, that case involved the Minnesota Secretary of State's attempt to extend an express statutory deadline for the receipt of mail-in ballots. 978 F.3d 1051, 1060 (8th Cir. 2020).

14

Plaintiff here does not allege that Wisconsin officials altered unambiguous statutory provisions. Instead, he argues that the Commission's guidance does not conform to *his* interpretation of what Wisconsin's elections laws mean. That is not a cognizable constitutional claim. Plaintiff's Elections and Electors Clause claims fail as a matter of law.

### C.  Laches bars Plaintiff's claims because they rest on guidance given by election officials long ago.

Even though every single election administration issue about which Plaintiff complains has been publicly known for months—and in one case, *years*—he inexplicitly waited to challenge them until after the November election. This unreasonable delay merits dismissal on laches grounds, especially since Plaintiff seeks to disenfranchise Wisconsin voters who already cast their absentee ballots in reliance on guidance from state election officials.

"Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060 (7th Cir. 2016) (citation omitted). "The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept." *Id.* "In the context of elections, . . . any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990).

As for Plaintiff's challenge to voters who claimed to be "indefinitely confined," he complains about guidance given *months* ago to local election officials and voters. (Exs. 2–4.) Indeed, this very issue has been pending before the Wisconsin Supreme

15

Court since last April.[8] The same is true for Plaintiff's attack on the propriety of local election officials filling in missing address information on absentee ballot witness certificates. Local officials did so due to the Commission's advice from over *four years ago*.[9] The Commission repeated that guidance back in October of this year. (Ex. 35.) And Wisconsin's efforts to set up absentee ballot drop boxes received plenty of public discussion in the months leading up to the fall election, as Plaintiff himself acknowledges by citing a plethora of such materials. (Exs. 13–14, 16, 24–26.)

Plaintiff could have challenged every one of these election administration methods long before Wisconsin voters cast their ballots. That delay was clearly unwarranted. If Plaintiff had brought a timely challenge before the election—and succeeded—Wisconsin voters could have adjusted their understanding of applicable voting procedures and cast their ballots accordingly. Instead, Plaintiff waited until *after* the election and now seeks to pull the rug out from under voters who cannot recast their ballots. Rewarding this delay would obviously prejudice—indeed, disenfranchise—the millions of Wisconsin voters who cast their ballots in reliance on these long-announced election rules. Laches prevents precisely this kind of gamesmanship by litigants who unreasonably sleep on their rights to the detriment of the public interest.

---

[8] *See* Petitioners' Initial Brief, *Jefferson v. Dane Cty.*, No. 2020AP557-OA (Wis. Apr. 24, 2020), https://acefiling.wicourts.gov/document/eFiled/2020AP000557/258987.

[9] *See* Memorandum from Michael Haas, Interim Elections Adm'r, Wis. Elections Comm'n, to Wis. Mun. Clerks & Milwaukee City Elections Comm'n (Oct. 18, 2016), https://elections.wi.gov/sites/elections.wi.gov/files/memo/20/guidance_insufficient_witness_address_amended_10_1_38089.pdf.

Indeed, the Michigan federal court in *King* dismissed similar election challenges on laches grounds, where the plaintiffs "could have brought their claims well in advance of or on Election Day" but did not. 2020 WL 7134198, at *7. The justification for applying laches was "at its peak," given that "[w]hile Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified." *Id.* The same is true here.

### D. The Eleventh Amendment bars Plaintiff's request that this Court enjoin state officials to comply with state law.

Plaintiff seeks relief based on "ultra vires acts by Wisconsin public officials charged with administering the election that were inconsistent with state law." (Dkt. 1 ¶ 26.) He asks this Court to "enjoin[ ] [Defendants] from further violating the Wisconsin Election Code." (Dkt. 6 ¶ 14.) The Eleventh Amendment prohibits this kind of relief.

The Eleventh Amendment bars "relief against state officials on the basis of state law, whether prospective or retroactive." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). The Supreme Court has explained that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.*; *see also Rose v. Bd. of Election Comm'rs for City of Chi.*, 815 F.3d 372, 375 n.2 (7th Cir. 2016) ("[A]ny argument to the effect that the state did not follow its own laws is barred by the Eleventh Amendment.").

Plaintiff's federal constitutional claims turn entirely on his allegations that state election officials improperly administered state election law. As explained above, his Elections and Electors Clause claim turns on purported violations of state election law regarding voters' indefinite confinement status (Dkt. 1 ¶¶ 83–108), absentee ballot drop boxes (Dkt. 1 ¶¶ 174–215), and clerks filling in missing address information on absentee ballot envelopes (Dkt. 1 ¶¶ 235–80). A federal court injunction against state election officials for these alleged violations of state election law would create the exact federalism problem against which the Eleventh Amendment guards.

## II.   Plaintiff's underlying state law claims fail, even if this Court were to consider them.

This Court should decline to reach the merits of Plaintiff's state law claims for all the reasons discussed above. But even if it were to glance at these claims, none of them add up to violations of state law that suffice to reverse the election results.

### A.    Plaintiffs identify no Commission guidance that contradicts state law on indefinitely confined voters.

Plaintiff's first set of claims surrounds a state law provision that allows voters to cast absentee ballots without meeting ordinary photo identification requirements. (Dkt. 1 ¶¶ 83–108.) To do so, the voter must claim to be "indefinitely confined because of age, physical illness or infirmity or . . . disabled for an indefinite period." Wis. Stat. § 6.86(2)(a). That status entitles the voter to provide a signed statement attesting to their name and address, "in lieu of providing proof of identification." Wis. Stat. § 6.87(4)(b)2. Plaintiff alleges that, on March 29, 2020, the Commission issued

18

incorrect guidance regarding how the COVID-19 pandemic interacted with these provisions. (Dkt. 1 ¶¶ 84–86.) Specifically, he asserts that the Commission's guidance "plainly conveyed . . . that the COVID-19 pandemic *alone*" sufficed to claim indefinite confinement status. (Dkt. 1 ¶ 86.)

That mischaracterizes what the Commission said. The Commission made clear that the pandemic could have an effect on a voter's indefinite confinement status only if an individual voter's age or health condition, the very factors listed in the statute, confined them to their home: "[d]uring the current public health crisis, many voters of a certain age or in at-risk populations *may* meet that standard of indefinitely confined until the crisis abates." (Ex. 2 at 2.)  And the Commission warned against misuse of the status: "Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability. . . . We understand the concern over the use of indefinitely confined status and do not condone abuse of that option . . . ." (Ex. 2 at 1–2.)

That advice was entirely appropriate and consistent with applicable state law. The Commission did not advise that any particular populations necessarily *would* satisfy the indefinite confinement conditions. Instead, it emphasized that some individuals *may* satisfy the criteria. And that is obviously true. Because COVID-19 is more deadly among certain age groups and people with certain pre-existing conditions, certain voters may indeed need to drastically limit—if not entirely cease—leaving their homes until the pandemic subsides.

Plaintiff also wrongly asserts that the Commission improperly advised that a voter's indefinite confinement status could never be "check[ed] or challenge[d]." (Dkt. 1 ¶ 89.) To the contrary, the Commission expressly advised that "the municipal clerk shall remove the name of any elector from the list of indefinitely confined electors upon receipt of reliable information that an elector no longer qualifies for that designation and service." (Ex. 2 at 3.)

Perhaps most damaging to Plaintiff's critique of the Commission's March 29, 2020, guidance, the Wisconsin Supreme Court has already reviewed that guidance and approved it. Again, back in March, soon after local officials issued separate comments about which Plaintiff also complains (Dkt. 1 ¶ 92–93 Ex. 3), plaintiffs sued those officials in the Wisconsin Supreme Court. *See Jefferson v. Dane Cty.*, No. 2020AP557-OA (Wis. Sup. Ct.). After those locals' comments, the Commission issued the March 29 guidance at issue here.

In a March 31, 2020, order, the Wisconsin Supreme Court noted that "WEC has met and has issued guidance on the proper use of indefinitely confined status under Wis. Stat. § 6.86(2) in its March 29, 2020 publication, 'Guidance for Indefinitely Confined Electors COVID-19.'" *See supra* n.1 at 2. The court "conclude[d] that the WEC's guidance quoted above provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time." *Id.* And the court enjoined a local election official from providing any further guidance inconsistent with the Commission's. *Id.*

Plaintiff also offers no proof of a single voter who cast a ballot in the general election who did *not* qualify for indefinite confinement status. Instead, he simply points to the Commission's (accurate) guidance and observes that the number of voters identified as indefinitely confined increased from around 72,000 in 2019 to roughly 244,000 in November 2020. (Dkt. 1 ¶ 106.)   Plaintiff forgets that far more people voted in November 2020 than any election in 2019, and so it is unsurprising that the numbers rose in 2020. He offers no evidence that the percentage of indefinitely confined voters was proportionately greater in 2020, much less in excess of the amount of voters who, in the face of a pandemic, would appropriately determine that they were indefinitely confined due to age or a health condition.

## B. The Commission properly advised local election officials about the use of absentee ballot drop boxes.

Next, Plaintiffs attack the use of drop boxes to collect absentee ballots. (Dkt. 1 ¶¶ 174–215.) They say that Wis. Stat. § 6.87(4) prevents the use of this common ballot collection technique, one that courts have repeatedly affirmed in recent weeks.[10] Justice Gorsuch recently praised Wisconsin's robust use of drop boxes:

> Returning an absentee ballot in Wisconsin is also easy . . . . Until election day, voters may, for example, hand-deliver their absentee ballots to the municipal clerk's office or other designated site, or they may place their absentee ballots in a secure absentee ballot drop box. Some absentee ballot drop boxes are located outdoors, either for drive-through or walk-

---

[10] *See e.g. Donald J. Trump for Pres., Inc., v. Boockvar*, No. 20-cv-966, 2020 WL 5997680, *40–46, *51 (W.D. Pa. Oct. 10, 2020) (Pennsylvania's use of "unmanned drop boxes" did not violate federal equal protection or substantive due process rights); *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 357, 361 (Pa. 2020) (rejecting challenge to use of drop boxes"); *Bolus v. Boockvar*, No. 3:20-CV-01882, 2020 WL 6880960, at *5 & n.4 (M.D. Pa. Oct. 27, 2020) (finding use of drop boxes does not violate federal constitutional rights).

up access, and some are indoors at a location like a municipal clerk's office. . . . The Wisconsin Elections Commission has made federal grant money available to local municipalities to purchase additional absentee ballot drop boxes to accommodate expanded absentee voting.

*Democratic Nat'l Comm. v. Wis. State Legislature*, No. 20A66, 2020 WL 6275871 (U.S. Oct. 26, 2020) (Gorsuch J., concurring). Even state legislative leaders, including the Assembly Speaker and Senate Majority Leader, called drop boxes "lawful" and "wholeheartedly support voters' use" of them.[11]

Those drop boxes are indeed lawful. Plaintiff's argument misconstrues Wis. Stat. § 6.87(4)(b)1., which provides that absentee ballots "shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." Plaintiff assumes that this creates an exclusive method of "in person" delivery: dropping off the ballot at the clerk's office or home (which is where some municipal clerks operate). But if dropping off a ballot at the clerk's office is acceptable, there is no good reason to conclude that dropping off the ballot at another place designated by the clerk is not. And as for Plaintiff's concerns about security and uniformity, the Commission provided detailed statewide guidance about how to use drop boxes in a secure and uniform fashion. (Ex. 13–14.)

And as with his claim about indefinitely confined voters, Plaintiff offers no evidence to quantify how many absentee ballots were deposited in drop boxes. It is therefore sheer speculation for Plaintiff to conclude that invalidating them would

---

[11] Letter from Misha Tseytlin to Maribeth Witzel-Behl, City Clerk, City of Madison (Sept. 25, 2020), https://www.wpr.org/sites/default/files/september_25_2020_letter_to_city_clerk_witzel-behl.pdf.

change the election results. That is doubly true because drop boxes were used both in counties that Plaintiff won and those that he did not.[12] Plaintiff does not show that discarding *all* drop box votes would reduce his opponent's vote total more than his.

### C. The Commission properly advised local clerks that they could complete missing address information.

Plaintiff's last complaint is with local election clerks who filled in missing address information on absentee ballot witness certifications, as the Commission advised them to do. (Dkt. 1 ¶¶ 235–80.) Wisconsin law provides that an absentee voter must, after placing her voted ballot in the ballot envelope, complete a certification in the presence of a witness. Wis. Stat. § 6.87(2), (4)(b)1. This certification must be accompanied by a witness signature and address. Wis. Stat. § 6.87(2). "If a certificate is missing the address of a witness, the ballot may not be counted." Wis. Stat. § 6.87(6d). Moreover, if a clerk receives an absentee ballot "with an improperly completed certificate or with no certificate," the clerk may return the ballot to the voter for correction. Wis. Stat. § 6.87(9).

Plaintiff would add a new rule to section 6.87: that an absentee ballot must not be counted if certificate is missing address information *or* if election officials wrote in any missing information themselves. But he offers no convincing reason to read any such rule into the statute. Instead, he misreads Wis. Stat. § 6.87(9), arguing that because the statute allows clerks to return incomplete ballots to voters for correction,

---

[12] For instance, Plaintiff highlights a drop box located in Hayward, Wisconsin, located in Sawyer County—a county in which Plaintiff received more votes than his opponent. *See supra* fn. 6 at 3.

it thereby prohibits clerks from completing missing address information themselves. But no such prohibition exists in the statute's plain text.

The Commission's reading is more appropriate. Upon receiving an absentee ballot with incomplete address information, possibly weeks before election day, a clerk need not sit on her hands knowing the ballot will not be counted. Rather, the clerk "may" return the ballot to the voter. In many cases, a ballot may be incomplete in a way that a clerk could not cure without returning the ballot to the voter: the voter signature is missing, the witness signature is missing, the witness name is missing, and so on. The allowance provided by section 6.87(9), expressed in permissive terms, merely confirms that the clerk need not simply accept a deficient certificate as-is. What it does not say is that all other methods for curing certificates are forbidden.

Leaving aside the merits, Plaintiff again offers no evidence about how many absentee ballots exist on which clerks filled in missing address information. So, once more, there is no basis to conclude that invalidating ballots in this category would change the election results.

*    *    *

None of Plaintiff's state law claims have any merit and, equally important, he offers no evidence to show that invalidating ballots in these categories would eliminate his 20,000-vote deficit. These claims provide no basis for relief.

## III. The remedy Plaintiff seeks—invalidating the entire statewide presidential election—is unavailable.

Even if Plaintiff could state a valid federal claim and had offered evidence to support it, he seeks an unavailable and unconstitutional remedy. Plaintiff purports

24

to ask this Court to do no more than to rule on certain allegations that Wisconsin election officials, in administering the November election, violated certain provisions of Wisconsin's election code. (Dkt. 1 ¶¶ 26–30.) But he also asks the Court "to immediately remand this matter to the Wisconsin Legislature to review the nature and scope of the infringement declared and determine the appropriate remedy for the constitutional violation(s) established, including any impact upon the allocation of Presidential electors for the State of Wisconsin." (Dkt. 1 ¶ 31.) That amounts to a request for this Court to allow the Wisconsin Legislature to discard the popular Presidential election result and directly appoint a slate of presidential electors of its own choosing.

Such relief would be procedurally unprecedented, substantively extraordinary, and unconstitutional. Plaintiff points to the role of state legislatures under Article II, § 1, which suggests an intent to rely on 3 U.S.C. § 2, a never-before-used statute that allows a state to appoint its electors on a date later than the national election day. But both Article II and 3 U.S.C. § 2 must be construed consistent with the constitutional requirement of due process. To retroactively override Wisconsin's statutorily designated method for choosing presidential electors after the election has taken place, as Plaintiff seeks, would disenfranchise the more than 3.2 million Wisconsinites who voted in that election, in stark violation of due process.

As the Pennsylvania Supreme Court rightly put it recently, "there is no basis in law by which the courts may . . . ignore the results of an election and recommit the choice to the [the state legislature] to substitute its preferred slate of electors for the

one chosen by a majority of [the state's] voters." *Kelly v. Commonwealth of Pennsylvania*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020).

### A. A federal court may not override a popular presidential election so that a state legislature may make its own choice.

The U.S. Constitution provides that each state shall appoint its presidential electors "in such Manner as the Legislature thereof may direct." Art. II, § 1. In accordance with that provision, the Wisconsin Legislature has directed by statute that Wisconsin's presidential electors shall be appointed by popular election:

> By general ballot at the general election for choosing the president and vice president of the United States there shall be elected as many electors of president and vice president as this state is entitled to elect senators and representatives in congress. A vote for the president and vice president nominations of any party is a vote for the electors of the nominees.

Wis. Stat. § 8.25(1); *see also* Wis. Stat. §§ 5.10, 5.64(1)(em). The November 3, 2020, presidential election was conducted via popular vote in furtherance of that legislative directive. Having now been carried out, that directive cannot be retroactively undone by this Court or the Wisconsin Legislature based on Article II.

Although Article II, § 1, gives each state legislature broad authority to initially direct the manner in which that state's presidential electors shall be appointed, once a state legislature has directed that the electors shall be appointed by popular election, the people's "right to vote as the legislature has prescribed is fundamental." *Bush*, 531 U.S. at 104 (per curiam). That fundamental right to vote includes "the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941).

In addition, it is well established that Article II does not give a state legislature absolute power to regulate the appointment of presidential electors in any way it pleases, because that power is granted "subject to the limitation that [it] may not be exercised in a way that violates other specific provisions of the Constitution," including provisions that protect the fundamental right to vote. *Williams v. Rhodes*, 393 U.S. 23, 29 (1968). Accordingly, where a state legislature has provided for presidential electors to be chosen by popular vote, it may not impose burdens on the right to vote that violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* By the same logic, a state legislature that has directed popular election of presidential electors also cannot thereafter regulate such elections in a way that would violate the Due Process Clause of the Fourteenth Amendment.

It is hard to imagine a burden on the fundamental right to vote greater than the complete invalidation of a popular election that has already taken place, and the retroactive declaration of a winner by legislative fiat. While Article II allows a state legislature to change a previously prescribed method for choosing the state's electors, it cannot make such a change under circumstances in which the change would violate the due process rights of voters. Accordingly, for *future* elections, the Wisconsin Legislature could amend the existing statutes so as to direct a change from popular election to some other method, including direct legislative appointment of presidential electors. But Article II does not authorize a federal court to invalidate the results of a popular election so that a state legislature can select a new method of picking presidential electors after an election has occurred.

27

Contrary to Plaintiff's suggestion, therefore, direct appointment of electors by the Wisconsin Legislature is not an available remedy for alleged violations of state election statutes by state election officials.

## B. To the extent Plaintiff seeks to rely on 3 U.S.C. § 2, that statute does not apply to the circumstances presented here.

The "remand" to the Wisconsin Legislature that Plaintiff requests also suggests an intent to rely on 3 U.S.C. § 2, which provides that, "[w]henever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2. To the extent Plaintiff is really arguing that, because of the procedural irregularities he purports to identify, Wisconsin "failed to make a choice" of its presidential electors and, therefore, the Wisconsin Legislature may now appoint those electors itself, he is wrong. Such a reading of 3 U.S.C. § 2 would raise serious doubts about its constitutionality, and the statutory language is readily susceptible to a less problematic interpretation.

Under Plaintiff's apparent view, 3 U.S.C. § 2 allows a state legislature to step in even when a state conducts a popular presidential election on election day, just because post-election litigation challenges the validity of certain votes. There would be grave doubts, however, about the constitutionality of a statute that would allow a state legislature, whenever popular election results are disputed, to simply replace the popular choice with its own slate of electors. Such an unreasonable outcome would

28

disenfranchise everyone who already voted and violate due process, as discussed above. That interpretation of 3 U.S.C. § 2 cannot be correct.

The better reading of the statute applies only to true election day "failures" where some extraordinary occurrence prevents the state from completing its electoral process on election day—consider, for example, a statewide natural disaster or similar emergency that prevents all election day voting. Then the state may complete the appointment of its electors on a later date. Applying the statute only when wide swaths of the public could not vote due to something akin to an "act of god" avoids the constitutional due process concerns described above.

That approach is also more consistent with the statute's legislative purpose. It arose when Congress established a national election date in 1845. Act of Jan. 23, 1845, 5 Stat. 721 (1845) (codified at 3 U.S.C. § 1). Congress recognized that, in states that adopt a popular vote, any runoffs might make it impossible to select electors on that date. *See* Cong. Globe, 28th Cong., 2d Sess. 10, 14 (1844) (remarks of Rep. Hale). It was similarly noted that natural disasters or extreme weather might interfere with an election on election day. *Id.* at 15 (statement of Rep. Chilton). To ensure that such reasons would not cause a state to forfeit its electors by failing to complete the appointment process on election day, Congress enacted the provision now codified at 3 U.S.C. § 2. *See* Michael T. Morley, "Postponing Federal Elections Due to Election Emergencies," 77 Washington & Lee Law Review Online 179, 188–89 (2020).

Here, it is undisputed that Wisconsin held its popular vote on November 3, 2020, and therefore it "[made] a choice on the day prescribed by law." To be sure, it

may take some time to count and recount ballots and complete related state court litigation. But Plaintiff's challenge to the validity of certain votes does not mean Wisconsin "failed" to select its presidential electors on that day, as contemplated by 3 U.S.C. § 2. Where the state legislature has given the people the right to vote for President, and where the people have exercised that fundamental right, the goal of any subsequent election dispute in the courts is simply to determine whom the people have chosen, not to retroactively override their choice by turning it over to the state legislature.

## CONCLUSION

Defendants' motion to dismiss should be granted and Plaintiffs' motion for expedited declaratory and injunctive relief should be denied.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

STEVEN C. KILPATRICK
Assistant Attorney General
State Bar #1025452

THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

Attorneys for Wisconsin Elections
Commission and its members, and
Secretary of State La Follette

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219 (CTR)
(608) 266-1792 (SCK)
(608) 266-8690 (TCB)
(608) 267-8904 (GJK)
(608) 294-2907 (Fax)
rothct@doj.state.wi.us
kilpatricksc@doj.state.wi.us
bellaviatc@doj.state.wi.us
johnsonkarpg@doj.state.wi.us