# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

DONALD J. TRUMP, Candidate for President
of the United States of America,

        Plaintiff,

Case No. 2:20-cv-01785-BHL

vs.

WISCONSIN ELECTIONS COMMISSION,
et al.,

       and

WISCONSIN STATE CONFERENCE
NAACP, et al.,

        Defendants.

---

## CONSOLIDATED BRIEF OF DEFENDANT-INTERVENORS WISCONSIN STATE CONFERENCE NAACP, DOROTHY HARRELL, WENDELL J. HARRIS, SR., AND EARNESTINE MOSS IN SUPPORT OF MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Defendant-Intervenors Wisconsin State Conference NAACP, Dorothy Harrell, Wendell J. Harris, Sr., and Earnestine Moss (collectively "Wisconsin NAACP"), submit this brief in support of their motion to dismiss and in opposition to Plaintiff's motion for a preliminary injunction. We ask this Court to review and decide the motion to dismiss first, however, because that will save this Court and the parties substantial time and effort. To this end, we refer the Court to the Wisconsin NAACP's recently-filed joinder motion [Dkt. 90] directed at those motions filed today by other defendants seeking to stay Thursday's evidentiary hearing pending resolution of the threshold legal issues.

Simply put, this lawsuit should be dismissed with prejudice on the pleadings. It is but one of 40-plus cases that have been filed around the country by President Trump or his political allies seeking to invalidate the results of the November 3, 2020, presidential election. It is the sixth such suit in Wisconsin alone. The substance and timing of the instant case and the extraordinary and unconstitutional relief it seeks constitute a continuation of an unprecedented abuse of the court system to which credence need not and should not be given.

Plaintiff has already placed a significant enough burden on the Court, so the Wisconsin NAACP will try not to repeat all of the substantive arguments that we expect the state and local defendants will make. Rather, we seek to highlight some of the most compelling reasons why this Court should dismiss this action summarily without an evidentiary hearing. Four issues stand out: (1) Plaintiff lacks standing to pursue his claims ; (2) federal courts in particular are not the proper forum for suits like this; (3) Plaintiff's inexcusable delay in filing this action deprives him of the right to the relief he seeks; and (4) the relief he seeks—the invalidation of approximately 3.2 million votes lawfully cast by eligible Wisconsin voters—is so inapt, so wrong, and indeed so absurd as to mandate rejection of the President's plea without further proceedings.

In offering this perspective, the Wisconsin NAACP relies on the lessons taught by federal district court and appellate judges in Pennsylvania, Georgia, and Michigan, who ruled that gussying up run-of-the-mill state election claims as federal constitutional claims is insufficient to invoke the jurisdiction of federal courts, and that suits brought more promptly than this one were still brought too late. We rely also on the opinions of members of the Wisconsin Supreme Court who, even while disagreeing on whether that court was the proper forum for an original action challenging these election results, raised serious threshold questions about the availability of the extraordinary relief requested by the President's allies in those cases.

2

For these reasons, the Complaint should be dismissed. Even were it necessary for the Court to reach Plaintiff's preliminary injunction request, that motion should be summarily denied, because Plaintiff cannot possibly demonstrate a likelihood of success on the merits. But there is more: the lack of merits to his claims and the availability of relief in state courts demonstrate that any harm alleged is nonexistent, let alone irreparable; his utter lack of diligence in pursuing his claims undercuts completely any notion of immediacy of harm; and the balance of the equities obviously weighs against Plaintiff's outlandish request to eviscerate the votes cast by over 3.2 million eligible voters, whose only fault, according to any reading of Plaintiff's claims, is that they cast their votes pursuant to the instructions given by election officials.

Before proceeding, we offer one final thought. Wisconsin NAACP is not simply an organization whose mission includes ensuring that voters' votes are counted, important as that mission is. It is dedicated specifically to advancing the interests of Black voters in our democracy. To that end, the national NAACP has partnered with one of the country's leading civil rights organizations, the Lawyers' Committee for Civil Rights Under Law, to work with experienced trial counsel in several states, including Wisconsin, to ensure that the votes of Black voters are not invalidated in this election. Indeed, it is no accident that President Trump's focus in this case is on the voters of Milwaukee County, home to Wisconsin's largest city and Black population. Indeed, five of the seven witnesses Plaintiff plans to call at the preliminary injunction hearing are Milwaukee-based. [ECF No. 51.] This follows a pattern where the Trump Campaign and its allies have singled out alleged "corruption" in other cities with large Black populations.[1]

---

[1] *See e.g.*, Transcript of Oral Argument Proceedings in Re: Motion to Dismiss, *Donald v. Trump for President v. Boockvar*, No. 20-3371 (M.D. Pa., Nov. 17, 2020), at 18-19, attached as **Exhibit A** hereto (President Trump's lawyer Rudy Giuliani alleging massive voter fraud in Philadelphia, Pittsburgh, Detroit, Milwaukee, and Atlanta).

For all of these reasons, Wisconsin NAACP respectfully asks this Court to scrutinize Plaintiff's claims in that light and recognize them not only as an existential threat to our democracy—which they are—but also as a particular threat to the votes of members of minority populations whose access to the ballot box has been historically obstructed.

Plaintiff's Complaint does not deserve a day in court, let alone the imprimatur of judicial relief.

## ARGUMENT

## I.     PLAINTIFF LACKS STANDING TO BRING THIS ACTION.

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). It is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

To avoid dismissal on standing grounds, Plaintiff must show (1) an "injury in fact," meaning "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood the injury will be redressed by a favorable decision. *Spokeo*, 136 S. Ct. at 1547–48 (quoting *Lujan*, 504 U.S. at 560–61); *accord Democratic Party of Wisconsin v. Vos*, 996 F.3d 581, 585 (7th Cir. 2020). Plaintiff must "demonstrate standing for each claim he seeks to press and for each form of relief that is sought"—*Town of Chester, N.Y.*

*v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017)—and shoulders "the burden of establishing [each] element[]." *Lujan*, 504 U.S. at 561. Plaintiff has failed to meet his burden of establishing each element of Article III standing, and as a result this Court lacks jurisdiction to hear this case.

## A. Plaintiff Has No Cognizable Interest Protected By the Electors Clause.

Plaintiff asserts he "has standing as a candidate for President of the United States under the Electors Clause of the United States Constitution because he has been injured in fact by the violations described in the Complaint." Plaintiff's Motion for Expedited Declaratory and Injunctive Relief (hereinafter "Motion for PI") ⁋ 5. The Electors Clause grants to "the Legislature" of "[e]ach State" the right to prescribe the "Manner" for the "appoint[ment]" of "Electors." U.S. Const. art. II, § 1, cl. 2. The Wisconsin Legislature has done so, by providing for selection of Electors by popular vote and for official certification of the results of that vote. This entire process has already been completed for the November 3, 2020, presidential election.

Plaintiff does not have standing to challenge the implementation of this process under the Electors Clause because that Clause does not grant any right or interest to anyone other than the state legislature. Thus, only the Wisconsin Legislature would have standing to bring suit under the Electors Clause, because only its interests would be at stake if the selection process departed in some material way from what it has directed. The Supreme Court has held that individual citizens do not have standing under the Electors or Elections Clause. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam) ("The only injury plaintiffs allege is that the law—specifically the Elections

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 5 of 21   Document 100

Clause—has not been followed.").[2] And lower courts have found that only a state or state legislature has standing to bring such a claim. *See, e.g.*, *Corman v. Torres*, 287 F.Supp.3d 558, 573 (M.D. Pa. 2018) (finding that "the Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly"). Indeed, the only cases in which the Supreme Court has found standing to bring an Elections Clause or Electors Clause claim are those brought by or on behalf of a state, a state legislature, or a working majority of a state legislature. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799-804 (2015) (holding that plaintiff Arizona Legislature had standing because a voter initiative to establish an independent redistricting commission eliminated its ability to implement a redistricting plan, thus causing a "concrete and particularized" institutional injury). In *Ariz. State Legislature*, the Court distinguished *Rainey v. Byrd*, 521 U.S. 811 (1997) (six individual members of Congress lacked standing to challenge the line-item veto), from *Coleman v. Miller*, 307 U.S. 433 (1939) (working majority of Kansas State Legislature had standing to challenge lieutenant governor's tie-breaking vote in favor of a federal constitutional amendment).

The only authority Plaintiff cites in support of his purported standing under the Electors Clause, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), is not binding on this Court and is wrongly decided and unpersuasive. In *Carson*, the court concluded that the plaintiff presidential Electors had standing to challenge a state-court consent decree that extended the receipt deadline for mail-in ballots under federal law. *Id*. at 1058-59. In doing so, the court relied principally on *Bond v.*

---

[2] Because the Electors Clause and the Elections Clause have been construed by the Supreme Court as parallel counterparts, and the interests protected by each Clause both vest solely in "the Legislature" of each state, the requirements for standing to enforce either Clause are necessarily the same. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting) (discussing how Electors Clause similarly vests power to determine manner of appointing electors in "the Legislature" of each State); *Foster v. Love*, 522 U.S. 67, 69 (1997) (characterizing Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995) (noting that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause). *See also Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13, 2020) (discussing same).

6

*United States*, 564 U.S. 211 (2011), and *Bush v. Gore*, 531 U.S. 908 (2000). *See Carson*, 978 F.3d at 1059. That reliance was misplaced. In *Bond*, the Supreme Court held that an individual charged with violation of a federal statute has prudential standing to challenge that statute as allegedly impinging on his state's police powers "in contravention of constitutional principles of federalism" enshrined in the Tenth Amendment. *Bond*, 564 U.S. at 223–24. There is no mention in the *Bond* opinion of the Electors or Elections Clause or of the Supreme Court's Elections-Clause-standing decision in *Lance v. Coffman*. The *Carson* court nevertheless applied *Bond* to standing under the Electors Clause, without itself so much as mentioning either *Lance v. Coffman* or *Corman v. Torres*.

The *Carson* court's reliance on *Bush v. Gore* is equally meritless. The language from *Bush* to which the *Carson* court refers, 978 F.3d at 1059 (citing *Bush*, 531 U.S. at 103), is merely the *Bush* Court's recitation of the "questions presented" by the petition. While those "questions presented" included one under the Electors Clause, the Court, because it ruled on the basis of the Equal Protection Clause, never addressed whether petitioner had standing to assert a claim under the Electors Clause or the merits of any such claim. *See Bush,* 531 U.S. at 103-111. Defendant-Intervenors submit that, as the Third Circuit, the Northern District of Georgia, and the Eastern District of Michigan have recently found, *Carson* is wrongly decided and unpersuasive. *See Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *6-9 (3d Cir. Nov. 13, 2020); *Wood v. Raffensperger, et. al.*, No. 1:20-CV-04651-SDG, 2020 WL 6817513, at *5 (N.D. Ga. Nov. 20, 2020); *King v. Whitmer*, No. 20-13134, 2020 WL 7134198, slip op. at 26-29 (E.D. Mich., Dec. 7, 2020).

It is important to recognize that, were the standing rule otherwise, every alleged violation of a state's election laws in connection with a federal election would give rise to a federal

constitutional case under the Elections or Electors Clause. Any candidate who claimed that election officials had done anything inconsistent with a state's election statutes could bring a claim in federal court, effectively federalizing enforcement of the election laws of all 50 states. Indeed, that is precisely what Plaintiff attempts to do here: his complaint comprises entirely complaints that Wisconsin election officials failed to comply with state statutes governing the election, but he seeks to bootstrap his way into federal court through reliance on the Electors Clause. As demonstrated, he does not have standing to do so.

### B. Plaintiff's Alleged Injuries are Purely Speculative and Not Redressable by a Victory in This Court.

Plaintiff appears to assert standing solely under the Electors Clause. Motion for PI ⁋⁋ 5-6. But, insofar as he alleges injury in the form of violations of the Equal Protection and Due Process[3] Clauses, Complaint ⁋ 199; Motion for PI ⁋ 2, these alleged injuries are purely speculative and therefore neither "concrete and particularized" nor "actual or imminent," as is required to establish injury in fact sufficient to confer Article III standing. *Spokeo*, 136 S. Ct. at 1547–48. Even if Plaintiff had demonstrated such an injury, he has not demonstrated that it would be redressable by this Court, and he could never do so. *Id*.

First, the nature of Plaintiff's alleged injuries is unclear at best. While Plaintiff makes numerous general and vague references to "fraud," he fails to allege even a single concrete example of an improperly cast or counted ballot, an improperly discarded ballot, or any other circumstance that might lead to a change in the vote totals if it were remedied. Instead, Plaintiff unspools a laundry list of general complaints about the conduct of the election, which he alleges "violated equal protection and due process standards, significantly undercutting the predictable and uniform

---

[3] Despite referring to both the Equal Protection and Due Process Clauses together in each instance, Plaintiff ultimately fails to allege a recognizable Due Process violation.

application of the law." Complaint ¶ 29. Despite failing to present any evidence that this alleged lack of "uniformity" might have affected the ballot count in any way—let alone rise to the level of an equal protection violation—Plaintiff requests that this Court "[d]eclar[e] that the constitutional violations of the Defendants likely tainted more than 50,000 ballots." Complaint at 72.

Second, even if Plaintiff had demonstrated that some number of ballots were somehow "tainted," in order to satisfy the redressability element of Article III standing he would have to demonstrate that discarding these ballots would likely change the outcome of the election in his favor. Plaintiff has not even attempted to do so—nor could he, because this would require demonstrating that the ballots in question skew so significantly for his opponent that discarding them would shift the vote total decisively in his favor. Moreover, Plaintiff is not even requesting that these ballots be discarded—only "[d]eclar[ed]… tainted." Complaint at 72. Instead, Plaintiff requests injunctive relief "[r]emanding this case to the Wisconsin Legislature to… determine what remedy, if any, the Wisconsin Legislature should impose within its authority pursuant to the Electors Clause." Complaint at 72. Even were this relief within the jurisdiction and authority of this Court—which it is not—it would not be sufficient to establish standing because whether this relief is likely to actually redress Plaintiff's alleged injuries depends on assumptions about potential future action by the Legislature.

Ultimately, effective relief of any kind is unavailable to Plaintiff—Wisconsin has already certified the results of its election and has duly submitted its slate of Electors—and so his alleged injuries are not redressable by this Court. Therefore, he cannot establish Article III standing for that reason alone.

9

## II. THESE CASES DO NOT BELONG IN FEDERAL COURT.

On November 9, 2020, the Trump Campaign filed suit in the Middle District of Pennsylvania alleging a series of election improprieties, similar (and equally frivolous) to those alleged by Plaintiff here. *Donald J. Trump for President, Inc. v. Kathy Boockvar*, No. 4:20-cv-02078, 2020 WL 6821992 (Nov.21, 2020).[4] Initially, United States District Court Judge Matthew Brann scheduled an evidentiary hearing on the plaintiffs' motion for preliminary relief, but after hearing oral argument on the defendants' motion to dismiss, he not only adjourned the hearing without resetting it, but denied the plaintiffs' motion for leave to file a second amended complaint. *Boockvar*, 2020 WL 6821992 at *3-4, 14. On appeal, a unanimous panel of the Third Circuit affirmed the denial of the request to amend the complaint, with Judge Stephanos Bibas writing for the court and ruling that the sort of claims asserted by the Trump Campaign, even though repackaged as federal due process and equal protection claims, "boil down to issues of state law." *Donald J. Trump for President, Inc v. Pa.*, No. 20-3371, 2020 WL 7012522 at *1 (3d Cir. Nov 27, 2020).

Similar claims led to a similar result in a suit filed on November 13, 2020 in the Northern District of Georgia by L. Lin Wood, Jr., in which he alleged a series of election irregularities as frivolous as those raised by the President here. *L. Lin Wood, Jr. v. Brad Raffensperger*, No. 1:20-cv-04651-SDG, 2020 WL 6817513 (N.D. Ga., Nov. 20, 2020).[5] The district court held a hearing, then denied Wood's request for a temporary restraining order. This past Saturday, December 5, the Eleventh Circuit, in an opinion by Chief Judge Pryor, unanimously affirmed, but on grounds

---

[4] As here, the claims included allegations that election officials improperly cured absentee ballots and restricted observers.

[5] Wood alleged, among other things, that defendant had improperly accepted absentee ballots without signature verification and restricted observers to the counting.

10

that the case was not justiciable in the first instance, because federal courts are "courts of limited jurisdiction" and "may not entertain post-election contests about garden-variety issues of vote counting and misconduct that may properly be filed in state courts." *Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866 at *1 (11th Cir., Dec. 5, 2020).

Most recently, Judge Parker of the Eastern District of Michigan also denied the Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief challenging the election results in Michigan, particularly those targeted at Detroit, in a case brought by Sidney Powell and others on November 25, 2020. *King v. Whitmer*, No. 20-13134, 2020 WL 7134198 (E.D. Mich., Dec. 7, 2020). The district court decided the motion without hearing any oral argument. *Id.* at *2. The court found that Plaintiffs' claims were not justiciable in federal court because they were effectively state law claims brought against state officials. *Id.* at *3-5.

This case presents no reason for the Court to veer from the path taken by these sister courts. The claims are substantially the same: alleged deviations from state court laws that govern the handling and counting of absentee ballots. As in the Georgia, Pennsylvania, and Michigan cases, there are no allegations that any specific voter was not qualified to vote or that any specific vote was fraudulently cast—let alone tens of thousands of voters or votes—and certainly no allegation that there were a sufficient number of fraudulent votes to affect the outcome of the Presidential election. There is no reason for this Court to continue this case, and, as explained below, every reason for this Court not to do so. This is even more true because President Trump also brought a challenge in the state circuit court alleging noncompliance with Wisconsin election law which will be decided at a hearing on December 10, 2020.

## III.    PLAINTIFF'S DELAY DEPRIVES HIM OF THE RIGHT TO SEEK RELIEF.

President Trump knew of the basis for every claim he has brought in this lawsuit far earlier than December 3, 2020 when he filed this action:

(1)  The guidance by the Wisconsin Elections Commission (the "Commission") to local clerks regarding application of the "indefinitely confined" category of eligibility for obtaining an absentee ballot during the COVID-19 pandemic was, as Plaintiff himself alleges, issued on **March 29, 2020**.  (Compl., ¶ 84.)[6]

(2)  The grants from private entities to counties for election administration were announced as early as **July 7, 2020**. (*Id.* ¶ 228.)

(3)  The use of un-manned absentee ballot drop boxes was contemplated in the application for private funds that was submitted on **June 15, 2020**.  (Compl., ¶¶ 169, 172.)  The Commission expressly endorsed the use of these drop boxes in official guidance on **August 19, 2020**. (*Id.* ¶ 181.)

(4)  The practice of local clerks filling in missing witness address information on absentee ballot envelopes without requiring the presence of the voter has been allowed by the Commission since at least **October 18, 2016**.[7]  (Compl., ¶ 240.)

(5)  Finally, the President's complaint about the number of poll watchers allowed to observe at the Milwaukee Central Count is avowedly based on an article from the *Milwaukee Journal Sentinel* on **October 20, 2020**, two weeks before the election and more than a month before this lawsuit was filed.  (Compl., ¶ 289, n.84.)

---

[6] The related instructions from the Dane County Clerk were issued on March 25, 2020. (Complaint, ¶ 92.)

[7] It was merely reiterated on October 19, 2020, still weeks before the election, and a month and a half before Plaintiff filed this suit.

12

Nevertheless, the President did not file suit until a month after Election Day, waiting until well after he learned on November 4 that he had lost the election in Wisconsin and until after that result had been certified. Laches bars this suit because of the President's lack of diligence and the prejudice resulting from the delay. Indeed, in the Northern District of Georgia post-election lawsuit, which election was called against Plaintiff much later and still filed **nineteen days before this lawsuit**, the district court found that laches applied. *Wood*, 2020 WL 6817513 at *6-9. Additionally, in the Eastern District of Michigan lawsuit, which was filed a week earlier than this case, the district court also found that laches applied. *King*, 2020 WL 7134198 at *7 ("Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches.")

The Georgia and Michigan courts' decisions square with how federal courts have handled similar cases in the past. Plaintiff may not "'lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)).

Laches applies with particular rigor to election challenges, requiring "any claim against a state electoral procedure [to] be expressed expeditiously." *Fulani*, 916 F.2d at 1031. Before an election, laches requires such claims to be promptly raised lest last-minute court orders confuse voters, disincentivizing voting and undermining public confidence in the fairness of elections. *See, e.g., Purcell v. Gonzales*, 549 U.S. 1, 4-5 (2006); *Bognet v. Sec'y Commw. of Pa.*, No. 20-3214, 2020 WL 668120, at *17-18 (3d Cir. Nov. 13, 2020). And, after an election, laches generally bars parties from challenging the election on grounds they could have raised beforehand. *Soules v.*

13

*Kauaians for Nukoli Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988). Moreover, applying laches avoids the "judicial fire drill[s]" and "mad scramble[s]" required to adjudicate belated challenges to election procedures before post-election deadlines mandated by state law for certification of results. *Stein v. Cortés*, 223 F.Supp.3d 423, 436 (E.D. Pa. 2016) (internal quotation marks omitted).

The President offers no justification for delaying in asserting these claims until now—nor could he, because there is none. Further, the delay is prima facie prejudicial, as the relief he requests would void an entire election of more than 3.2 million eligible Wisconsin voters. *See Hawkins v. Wis. Elections Comm'n*, 393 Wis.2d 629, 635 (2020) (denying petitioners' ballot access claim because, "given their delay in asserting their rights, [the court] would be unable to provide meaningful relief without completely upsetting the election."). And, by overturning the democratic will of the people as expressed through their votes, Plaintiff's requested relief would seriously and irreparably undermine the Commission's efforts to ensure public trust and confidence in Wisconsin's electoral system, including the trust and confidence of voters like those represented by the Wisconsin NAACP, who have always had to fight for recognition as equals. *See Hawkins*, 393 Wis.2d at 635-636 (denying relief in ballot access case against the Commission where it would cause "confusion and disarray and would undermine confidence in the general election results."). Most important, it would severely prejudice more than 3.2 million Wisconsin voters who cast ballots for the presidential candidate of their choice during the 2020 General Election. Equity cannot possibly sanction such a result.

## IV. THE REMEDY REQUESTED IS PROHIBITED AS A MATTER OF LAW.

Overturning the results of an election—as the President asks this Court to do—would be an extraordinary intervention by the judiciary into democratic processes. Again, the recent cases

provide useful guidance. As the Third Circuit already found, granting the kind of relief requested by the President by—"*throwing out millions of votes—is unprecedented***.*" *Trump v. Pa.*, 2020 WL 7012522 at *7 (emphasis in original). In Pennsylvania, the Third Circuit rightly concluded that "[v]oters, not lawyers, choose the President. Ballots, not briefs, decide elections." *Id.* at *9. Judge Parker of the Eastern District of Michigan reached a similar conclusion: "[T]he Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do. ¶ The People have spoken." *King*, 2020 WL 7134198 at *13. Indeed, granting relief would violate the longstanding principle that "all qualified voters have a constitutionally protected right to vote and to have their votes counted." *Reynolds v. Sims,* 377 U.S. 533, 554 (1963) (citing *Ex parte Yarbrough,* 110 U.S. 651 (1884) and *United States v. Mosley*, 238 U.S. 383 (1915)).

It is hard to imagine such a remedy could ever be appropriate, but certainly it is not here, where the President has failed to even allege—much less demonstrate—that a single unlawful vote was counted or valid ballot discarded. Nor has he pled a single cognizable claim. Plaintiff instead alleges what amounts to a laundry list of speculative and circumstantial claims about the **potential** for fraud and about the conduct of the election as a whole, which he asserts led to a "lack of uniform standards" and "disparate impact upon different classes of voters" related to the widespread use of mail-in ballots by Wisconsin voters necessitated by the COVID-19 pandemic. But even if Plaintiff's claims were legitimate, invalidating the ballots of Wisconsin voters—who justifiably relied on the voting procedures made available to them by the Wisconsin Legislature and the

15

Commission—cannot possibly be the appropriate remedy. Tossing out votes cast by eligible voters in reliance on official instructions how to vote would violate the due process rights of every voter. *See, e.g.*, *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 595, 597–98 (6th Cir. 2012) (holding that rejecting ballots invalidly cast due to poll worker error likely violates due process).

Further, contrary to the President's allegations, this is not *Bush v. Gore*. There, the Supreme Court specifically distinguished the issue before it—whether there existed arbitrary and disparate variations in the standards applied to whether a ballot should be counted—from "[t]he question … whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." 531 U.S. at 109. The prevailing rule is that, absent such arbitrary differences in the standards used to determine whether individual ballots should be counted or not—an issue not even hinted at in Plaintiff's blunderbuss challenge here—differences in election administration between local entities are not only permissible, but expected. *See, e.g., Short v. Brown*, 893 F.3d 671, 679 (9th Cir. 2018); *Ne. Ohio Coal. for Homeless v. Husted*, 837 F.3d at 636; *Wexler v. Anderson*, 452 F.3d 1226, 1231-33 (11th Cir. 2006); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d at 181; *Paher v. Cegavske*, No. 20-243, 2020 WL 2748301, at *9 (D. Nev. May 27, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680, at *44-45.

The President's request for injunctive relief "[r]emanding this case to the Wisconsin Legislature to consider the Defendants' violations of the Electors, Equal Protection and Due Process Clauses and determine what remedy, if any, the Wisconsin Legislature should impose within its authority pursuant to the Electors Clause," Compl., ¶ 72; Mot. for Prelim. Inj. [Dkt. 6], ¶ 18, is beyond bizarre. Legislatures do not adjudicate constitutional violations, so the President's request cuts against the institutional role of each branch of our republic and each level of

16

government. Here, the Wisconsin Legislature has already acted within its authority: it vested the right to vote for President in the people of Wisconsin, and the right to vote includes the right to have that vote counted. *See Reynolds*, 377 U.S. at 554 (1964); *U. S. v. Classic*, 313 U.S. 299, 315 (1941); *U.S. v. Mosley*, 238 U.S. 383, 386 (1915).

## V.    PLAINTIFF IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

Preliminary-injunctive relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[A]n applicant for preliminary relief bears a significant burden." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). A plaintiff seeking such relief must first show that: "(1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (citations omitted). Then, if the plaintiff meets this initial burden, the Court weighs the harm that the plaintiff will suffer without a preliminary injunction against the harm the other party will suffer if one is granted. *Id*. Finally, the Court must consider how the preliminary injunction serves the public interest, if at all, which includes considering the effects of the injunction on non-parties. *Id*. The plaintiff bears the burden of "a clear showing" that the case warrants preliminary injunctive relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). In the present case, Plaintiffs have made none of these necessary showings.

"It is not enough that the chance of success on the merits be 'better than negligible.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Sofinet v. INS*, 188 F.3d 513, 514 (7th Cir. 1999)); *see also Ill. Republican Party*, 973 F.3d at 763. Rather, the party seeking the injunction must make a "strong showing" of their likely success on the merits. *Id*. Plaintiff here has no likelihood of

success on the merits, because he lacks standing to bring his claims, *see supra* § I, and because this Court is an improper venue to adjudicate his claims as he alleges only violations of state law, *see supra* § II. Defendant-Intervenors trust the other Defendants will thoroughly address Plaintiff's utter failure to present any evidence in support of any votes being "tainted" as a result of Defendants' actions, but this failure also precludes a finding Plaintiff is likely to succeed on the merits. The availability of relief in state court further demonstrates that any harm alleged is nonexistent, let alone irreparable absent an injunction issued by this Court. Trump v. Pennsylvania, 2002 WL 7012522 at *8 ("Because the Campaign can raise these issues and seek relief through state courts and then the U.S. Supreme Court, any harm may not be irreparable." And Plaintiff's delay and utter lack of diligence in pursuing his claims, *see supra* § III, undercuts his argument that this alleged harm is now so immediate as to justify a preliminary injunction.

Even if Plaintiff were able to meet his burden of a strong showing of likelihood of success on the merits and irreparable harm absent an injunction—which he cannot—the balance of the harms weighs overwhelmingly against an injunction. Enjoining entirely the results of a statewide election would disenfranchise millions eligible voters, which sister courts in this election cycle have found would strongly against the public interest. The District Court in Georgia captured the compelling reasons why the balancing of harms and public interest weigh against those seeking to undo the election:

> The Court finds that the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on Wood. To reiterate, Wood seeks an extraordinary remedy: to prevent Georgia's certification of the votes cast in the General Election, after millions of people had lawfully cast their ballots. To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways. [citations]. Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise of over one million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to Wood, this Court finds no basis in fact or in law to grant him the relief he seeks.

18

*Wood*, 2020 WL 6817513 at *13 (citations omitted); *see also Trump v. Pa.*, 2020 WL 7012522 at *7, 9; *King*, 2020 WL 7134198 at *13.

In that vein, the Wisconsin Supreme Court has recognized that a remedy that would nullify the votes of millions of voters is simply a bridge too far.  In the past two weeks, three original actions were brought directly to the Wisconsin Supreme Court to change the result of the election. In each, a majority of that court held that such actions need to be brought in the circuit court first, if they can be brought at all.  *Trump v. Evers*, No. 2020AP1971-OA (Wis. S. Ct., Dec. 3, 2020), attached as **Exhibit B**; *Mueller v. Wis. Elections Comm'n*, No. 2020AP1958-OA (Wis. S. Ct. Dec. 3, 2020), attached as **Exhibit C**; *Wis. Voters Alliance v. Wis. Elections Comm'n*, No. 2020AP1930-OA (Wis. S. Ct., Dec, 4, 2020), attached as **Exhibit D**.

Beyond simply disposing of the cases, Justice Hagedorn's recent concurrence, joined by three other justices who comprised the majority in *Wisconsin Voters Alliance,* made clear that the remedies sought by President Trump and his supporters would cause irreparable damage to our democracy if granted or even given serious thought:

> Something far more fundamental than the winner of Wisconsin's electoral votes is implicated in this case. At stake, in some measure, is faith in our system of free and fair elections, a feature central to the enduring strength of our constitutional republic. It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering. The relief being sought by the petitioners is the most dramatic invocation of judicial power I have ever seen. Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election. Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again. This is a dangerous path we are being asked to tread. The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.

19

*Wis. Voters Alliance*, (slip. op. at 3) (Wis. Sup. Ct., Dec. 4, 2020) (Hagedorn, J., concurring).[8]

## CONCLUSION

For the reasons set forth above, Wisconsin State Conference NAACP, Dorothy Harrell, Wendell J. Harris, Sr., and Earnestine Moss respectfully requests that this Court summarily dismiss this case.

Dated this 8th day of December 2020.

/s/ *Joseph S. Goode*

Joseph S. Goode (WI State Bar No. 1020886)
Mark M. Leitner (WI State Bar No. 1009459)
John W. Halpin (WI State Bar No. 1064336)
Allison E. Laffey (WI State Bar No. 1090079)
LAFFEY, LEITNER & GOODE LLC
325 E. Chicago Street
Suite 200
Milwaukee, WI 53202
(414) 312-7003 Phone
(414) 755-7089 Facsimile
jgoode@llgmke.com
mleitner@llgmke.com
jhalpin@llgmke.com
alaffey@llgmke.com

---

[8] Even Chief Justice Roggensack, while dissenting in all three cases on the grounds that the Wisconsin Supreme Court should exercise original jurisdiction, acknowledged in one of her dissents that "[t]he remedy Petitioners seek may be out of reach for a number of reasons." *Trump v. Evers*, No. 2020AP1971-OA (slip. op. at 6) (Wis. S. Ct., Dec, 3, 2020) (Roggensack, C.J., dissenting)

20

Kristen Clarke (*admission pending*)
Jon Greenbaum
Ezra Rosenberg
Ajay Saini (*admission pending*)
Jacob Conarck
Ryan Snow (*admission pending*)
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW
9th Floor
Washington, DC 20005
(202) 662-8315 (phone)
(202) 783-0857 (fax)
kclarke@lawyerscommittee.org
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jconarck@lawyerscommittee.org
rsnow@lawyerscommittee.org
asaini@lawyerscommittee.org

*Attorneys for Defendant-Intervenors Wisconsin
State Conference NAACP, Dorothy Harrell,
Wendell J. Harris, Sr., and Earnestine Moss*

21