# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DONALD J. TRUMP, Candidate for President of the United States of America,<br><br>        Plaintiff<br><br>v.<br><br>THE WISCONSIN ELECTIONS COMMISSION, et al.,<br><br>        Defendants. | No. 2:20-cv-01785 |

# BRIEF OF INTERVENOR-DEFENDANT
# DEMOCRATIC NATIONAL COMMITTEE'S IN OPPOSITION TO PLAINTIFF DONALD J. TRUMP'S MOTION FOR EXPEDITED DECLARATORY AND INJUNCTIVE RELIEF (ECF NO. 6)

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................................ 1

BACKGROUND .............................................................................................................. 7

    A.    The "indefinitely confined" exemption ................................................. 7

    B.    The Center for Tech & Civic Life, "the five Mayors' Plan," and drop boxes ...... 9

    C.    Witness address requirement ............................................................... 11

LEGAL STANDARD ..................................................................................................... 12

ARGUMENT.................................................................................................................. 14

    I.    The Court should dismiss this case because President Trump lacks standing .... 14

    II.    The doctrine of laches bars President Trump's claims........................................ 17

    III.    The Eleventh Amendment bars the President's claims ...................................... 19

    IV.    The Court should abstain from exercising jurisdiction ...................................... 21

    V.    President Trump's Complaint fails to state a claim on which relief can be granted ...... 23

    VI.    President Trump is not entitled to injunctive relief, and certainly is not entitled to a "remand" to the Wisconsin Legislature for that body to "determine the appropriate remedy." ...... 25

        A.    President Trump cannot establish irreparable harm and has an adequate remedy at law ...... 26

        B.    The balance of equities and public interest weigh heavily against the issuance of an injunction or "remand" to the Wisconsin Legislature ...... 27

CONCLUSION ............................................................................................................... 27

Case 2:20-cv-01785-BHL   Filed 12/08/20   Page 2 of 31   Document 101

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Democratic National Committee ("DNC") appreciates this Court's grant of permission to intervene in this litigation under Fed. R. Civ. P. 24(b). *See* ECF No. 61. The DNC will strive to comply with the Court's admonition to "work to ensure that judicial economies are maintained" and that the DNC's participation "will not be a burden on further proceedings." *Id.* at 4. With that in mind, the DNC is filing this single brief setting forth both its opposition to the President's "Motion for Expedited Declaratory and Injunctive Relief" (ECF No. 6) and the largely identical arguments in support of its Motion to Dismiss the President's Complaint (ECF No. 1) under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). As set forth below, the extraordinary declaratory and injunctive relief the President seeks should be denied in its entirety and the Complaint should be dismissed without leave to amend.

The Plaintiff, Donald J. Trump in his capacity as "Candidate for President of the United States," alleges that the defendant state and local election officials "ran an unconstitutional and unlawful Presidential election in Wisconsin"; seeks a declaration that these state and local officials "infringed and invaded upon [sic] the Wisconsin Legislature's prerogative and directions under Article II of the U.S. Constitution regarding the conduct of the 2020 Presidential election in Wisconsin"; and asks this Court "to immediately ***remand this matter to the Wisconsin Legislature***" for further relief. Compl. ¶¶ 31, 302 (emphasis added).

The DNC obviously has a substantial stake in the outcome of this litigation. Its nominees for President and Vice-President, President-elect Joseph R. Biden, Jr. and Vice President-elect Kamala D. Harris, won the 2020 national popular vote five weeks ago by over seven million votes. Biden and Harris have secured an Electoral College victory of 306-232, which will be finalized next Monday, December 14, 2020. In Wisconsin, the Biden-Harris ticket initially won by a margin

of 20,585 votes.  The partial recount demanded by President Trump and Vice President Pence, which at their behest was targeted at only two of Wisconsin's 72 counties, increased the Biden-Harris winning margin in Wisconsin to 20,682 votes.

Biden and Harris are therefore entitled—as a matter of state and federal law—to Wisconsin's ten electoral votes.  *See* Wis. Stat. §§ 5.10, 5.64(1)(em), 7.70(5)(b), 8.18, 8.25(1).  The results of the Wisconsin Presidential election have been certified by the Chairperson of the Wisconsin Elections Commission ("WEC"), and Governor Evers in turn has signed the Certificate of Ascertainment and transmitted it to the Archivist of the United States. *See* 3 U.S.C. § 6; *see also* Wis. Stat. §§ 7.70(3)(a), 7.70(5)(b).  Wisconsin's Presidential election is over.

Except in the courts.  President Trump and his allies have now filed *seven* challenges in Wisconsin's state and federal courts since November 12, three of which remain pending:  (1) this action brought by President Trump, purportedly in defense of "the Wisconsin Legislature's prerogative and [statutory] directions," Compl. ¶ 31; (2) *Feehan v. Wisconsin Elections Commission,* E.D. Wis. No. 2:20-cv-1771, brought by a Wisconsin voter who also is a nominated Trump elector, pending before Chief Judge Pepper; and (3) President Trump's state court challenge to the recount results, pending in *Trump v. Biden,* Milwaukee Cnty. Case No. 2020-CV-7092 and Dane Cnty. Case No. 2020-CV-2514.[1]

Some of these lawsuits have, in the words of Wisconsin Supreme Court Justice Brian Hagedorn last Friday, sought to "invalidate the entire Presidential election in Wisconsin by

---

[1]  Three of the other Wisconsin post-election cases were petitions for original actions filed in Wisconsin Supreme Court; all were denied.  *See Trump v. Evers,* No. 2020AP1971-OA (petition denied Dec. 3, 2020) (Ex. 1); *Mueller v. Jacobs,* No. 2020AP1958-OA (petition denied Dec. 3, 2020) (Ex. 2); *Wisconsin Voters All. v. Wisconsin Elections Comm'n,* No. 2020AP1930-OA, at 2 (petition denied Dec. 4, 2020) (Ex. 3).  The remaining case challenging the Wisconsin election results was *Langenhorst v. Pecore,* No. 1:20-cv-1701-WCG (E.D. Wis.), filed on November 12 but voluntarily dismissed on November 16.

declaring it 'null'—yes, the whole thing," a result that "would appear to be **unprecedented in American history**." *Wisconsin Voters All. v. Wisconsin Elections Comm'n,* No. 2020AP1930-OA, at 2 (Wis. Dec. 4, 2020) (Hagedorn, J., concurring) (emphasis added) (Ex. 3). The President's state recount effort tries a different tack. It does not seek to invalidate the entire Wisconsin vote, but rather to weaponize the recount process by targeting large numbers of ballots in only Dane and Milwaukee Counties—the two most urban, nonwhite, and Democratic counties in the State. Voters in both targeted counties cast ballots in reliance on WEC guidance, practices, and forms dating back as long as a decade. Indeed, voters and local election officials throughout Wisconsin relied on the challenged WEC guidance, practices, and forms in last month's election, but President Trump seeks in the recount to invalidate only the ballots of Dane and Milwaukee County voters who did so. This sort of targeted disenfranchisement would blatantly violate equal protection guarantees.

This lawsuit, though based on many of the same generalized post-hac grievances about the WEC's interpretations of various Wisconsin election statutes, seeks a different, equally unprecedented remedy. The President asks this Court to declare that various WEC interpretations of Wisconsin election statutes are wrong, and that these state agency interpretations of state law "infringed and invaded upon the Wisconsin Legislature's prerogative and directions under Article II of the U.S. Constitution regarding the conduct of the 2020 Presidential election." Compl. ¶ 31. Not only would the President have this Court adjudicate state law claims against state officials, he demands an outlandish and nonexistent remedy:

> Plaintiff asks this Court to immediately **remand this matter to the Wisconsin Legislature** to review the nature and scope of the infringement declared and determine the appropriate remedy for the constitutional violation(s) established, including any impact upon the allocation of Presidential electors for the State of Wisconsin.

*Id.* (emphasis added).

These requests are frivolous on their face. There is, of course, no such thing as a "remand" of litigation from a federal district court to a state legislature. And just like the *Wisconsin Voters Alliance* case that Justice Hagedorn described—which raised many of the same allegations that are being recycled in this litigation—President Trump's submissions "fall[] far short of the kind of compelling evidence and legal support we would undoubtedly need to countenance the **court-ordered disenfranchisement of every Wisconsin voter**." No. 2020AP1930-OA, at 2 (Hagedorn, J., concurring) (emphasis added) (Ex. 3). There are multiple grounds for denying the President's untimely and utterly meritless requests for emergency relief. These include:

- The President lacks Article III standing as either a voter or a candidate to press these claims. He lacks standing, as well, to bring suit to defend "the Wisconsin Legislature's prerogative and [statutory] directions" for conducting elections in this State. Compl. ¶ 31. His claims of vote dilution and other alleged injuries (even if they had a plausible basis, which they do not) are no more than generalized grievances, not individual harms *to him.*

- Most of the President's claims are barred by laches because he could have sought judicial relief *prior* to the election, well *before* 3.2 million Wisconsin voters had cast their ballots. And *all* of his claims are barred by laches because he has waited for so long *after* the election—nearly a full month—to bring suit.

- The President's claims also are barred under blackletter Eleventh Amendment law. He cannot ask a federal court to adjudicate state law claims against state actors, and he cannot turn those claims into federal questions by relabeling them as due process, equal protection, or other federal constitutional violations.

- Basic principles of federalism and comity also counsel both *Pullman* and *Colorado River* abstention.

- The President states no claim upon which relief can be granted.

- The President satisfies none of the requirements for the injunctive relief he seeks. He is not likely to succeed on the merits, he has failed to establish that he will suffer irreparable harm, and both the public interest and the equities weigh decisively against him.

This Court should deny President Trump's Motion for Expedited Declaratory and Injunctive Relief. As requested in the accompanying Motion to Dismiss being filed by the DNC, the Court also should expeditiously dismiss this suit in its entirety. President Trump and his allies have now brought more than 60 lawsuits in state and federal courts throughout the Nation seeking to challenge the election results, and in many instances to nullify those results outright.[2] None of those cases has succeeded. Nor should this one.

State and federal judges from across the ideological spectrum have united in rejecting these sorts of flimsy and audacious attacks on the Presidential election results and the rule of law, as many of the citations throughout this brief will attest. Lawsuits like these not only are an abuse of process, they continue to, and perhaps are intended to, erode public confidence in our electoral system. The corrosive effects are like battery acid on the body politic. There must be an end to spurious litigation, and courts must communicate that to current and would-be litigants and their lawyers. As Justice Hagedorn emphasized last week in his *Wisconsin Voters Alliance* concurrence:

> Something far more fundamental than the winner of Wisconsin's electoral votes is implicated in this case. At stake, in some measure, is faith in our system of free and

---

[2]  Alanna Durkin Richer, *Trump loves to win but keeps losing election lawsuits*, AP NEWS (Dec. 4, 2020), https://apnews.com/article/donald-trump-losing-election-lawsuits-36d113484ac0946fa5f0614deb7de15e.

fair elections, a feature central to the enduring strength of our constitutional republic. It can be easy to blithely move on to the next case with a petition so obviously lacking, but this is sobering. The relief being sought by the petitioners is **the most dramatic invocation of judicial power I have ever seen.** Judicial acquiescence to such entreaties built on so flimsy a foundation would do indelible damage to every future election. Once the door is opened to judicial invalidation of presidential election results, it will be awfully hard to close that door again. This is a dangerous path we are being asked to tread. The loss of public trust in our constitutional order resulting from the exercise of this kind of judicial power would be incalculable.

Ex. 3 at 2 (emphasis added). Other courts have joined not only in dismissing, but in strongly condemning, insidious lawsuits like these seeking the "drastic," "breathtaking," "unprecedented," and "disenfranchising" relief of nullifying the voters' decision and awarding the election to President Trump. *Donald J. Trump for President, Inc. v. Pennsylvania,* No. 20-3371, 2020 WL 7012522, at **1-7 (3d Cir. Nov. 27, 2020).

Just yesterday, *two* federal district courts dismissed similar lawsuits seeking to overturn the election results based on unfounded claims of widespread voter fraud and official wrongdoing. Judge Parker of the U.S. District Court for the Eastern District of Michigan admonished:

> [T]he Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government. Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do.

Slip Op. at 35-36, *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (Ex. 4). Judge Batten of the U.S. District Court for the Northern District of Georgia also dismissed a similar lawsuit yesterday in *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020).[3]

---

[3] Nicole Carr, *Federal judge dismisses Sidney Powell lawsuit seeking to decertify Georgia's elections,* WSB-TV2.com (Dec. 7, 2020), (available at: https://urldefense.proofpoint.com/v2/url?u=https-3A__protect-2Dus.mimecast.com_s_EVT4Cv29yYU778N0uQNLbw_&d=DwMF-

Respectfully, this Court should likewise not only deny the President's requested relief, but dismiss and condemn this litigation in the strongest terms possible.

## BACKGROUND

The President's Complaint and motion papers are a cut-and-paste assemblage of various grievances that have been raised in other post-election Wisconsin lawsuits, packaged together under a new constitutional theory. Rather than seeking to invalidate the entire election or to target large numbers of voters in Milwaukee and Dane Counties for disenfranchisement, the President in this case asks a federal court to hold that various interpretations of Wisconsin's absentee-voting laws by the WEC were in "purposeful disregard" of supposedly plain statutory language, which supposedly "infringed and invaded upon the Wisconsin Legislature's prerogative and [statutory] directions." Compl. ¶ 31. The President identifies three categories of such state agency malfeasance. We discuss each in turn.

### A.     The "indefinitely confined" exemption

Wisconsin voters who self-certify that they are "indefinitely confined because of age, physical illness or infirmity or . . . disabled for an indefinite period" are not required to submit photocopies of their photo IDs with their absentee ballot applications. Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)(2). After the pandemic hit Wisconsin in March and the Evers Administration issued a "Safer-at-Home Order" on March 24, some county clerks advised voters on social media they could claim to be "indefinitely confined" pursuant to the order for purposes of voting absentee in the April 7 spring election. Both the WEC and the Wisconsin Supreme Court disagreed with that

g&c=XRWvQHnpdBDRh-
yzrHjqLpXuHNC_9nanQc6pPG_SpT0&r=ujHaccxZeCkVMgPPje6IryfbR0QhDRwqm2pPPtsv
haw&m=Eq0xjcOJkBwSYhlm3PuGAZhfC4GhCttJ4_A4ZTuutbw&s=bRBVgiwxyHTp-
Rvu36TxkTFObbXDtRBq3fwpDppFaSY&e=)

broad and unqualified reading. Instead, the WEC issued, and the State's high court endorsed, much narrower guidance that left the decision to individual voters subject to certain guidelines.

The WEC's March 29, 2020 guidance, which remains in effect, provides in pertinent part:

1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstance. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

Ex. 5 at 1. The WEC's guidance emphasizes that, "[d]uring the current public health crisis, *many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates*." Ex. 5 at 2 (emphasis added).[4]

In a March 31, 2020 order, the Wisconsin Supreme Court granted the Republican Party of Wisconsin's motion for a temporary restraining order, directing the Dane County Clerk to "refrain from posting advice as the County Clerk for Dane County inconsistent with" the above quote from the WEC guidance. *Jefferson v. Dane Cnty.*, No 2020AP557-OA (Mar. 31, 2020) (Ex. 6). Neither the WEC nor the Wisconsin Supreme Court provided further guidance before the November 3

_____

[4] Wisconsin has a decades-long legislative policy of taking voters at their word concerning "indefinite confinement." The relevant portion of what is now numbered Section 6.86(2)(a) has been unchanged since 1985, when the Legislature eliminated a formal affidavit requirement for those claiming to be "indefinitely confined" and allowed voters to self-certify instead. *See* WIS. STAT. § 6.86(2) (1985). Consistent with this statutory self-certification approach, the Commission's guidance emphasizes the importance of avoiding any "proof" requirements. "Statutes do not establish the option to require proof or documentation from indefinitely confined voters. Clerks may tactfully verify with voters that the voter understood the indefinitely confined status designation when they submitted their request, but they may not request or require proof." Ex. 5 at 2.

election; WEC's March 29 guidance (as endorsed by the State's highest court) thus remained in effect through the election, and voters throughout the State relied upon it.

Having lost the election, the President now argues that the WEC's definition of "indefinitely confined" is far too lenient, that WEC should have allowed local officials to demand further proof, and that WEC should have taken further efforts to limit reliance on the "indefinitely confined" exemption in the midst of the worst global pandemic in over a century. Compl. ¶¶ 74-108. Never mind that the Wisconsin Supreme Court itself endorsed that guidance in its March 31 order in *Jefferson v. Dane County* (Ex. 6); never mind that the Wisconsin high court could have expedited its consideration of the *Jefferson* case (which remains pending) so as to provide more detailed guidance *before* the election about claiming the "indefinitely confined" exemption, but decided not to; never mind that the Legislature at any time could have enacted clarifying legislation but sat on its hands.

The President offers no explanation for why he waited until *after* the election to challenge WEC's guidance, as he easily could have done under Wis. Stat. § 227.40(1). Nor does the President offer any actual facts showing that the WEC's supposedly problematic interpretation led to any abuse of the "indefinitely confined" provision.

### B. The Center for Tech & Civic Life, "the five Mayors' Plan," and drop boxes

Much of the President's Complaint is devoted to a meandering set of allegations in support of a claim that the "Mayors in Wisconsin's five largest cities adopted an unlawful plan to expand absentee voting using prohibited, un-manned, drop boxes and the Wisconsin Elections Commission supported the unlawful plan." Compl. p. 37 (heading). A central actor in this claim is the Center for Tech & Civic Life ("CTCL"), which is accused by the President of attempting to "open[] the doors to ballot harvesting and voter coercion." *Id.* ¶ 223.

In fact, as Judge Griesbach found in rejecting a pre-election challenge to CTCL's election-related activities, the Center is "a private non-profit organization" that, through its COVID-19 Response Grant Program, has awarded grants to municipalities of all sizes "to assist them in safely conducting a national election in the midst of the public health emergency created by the COVID-19 pandemic." *Wisconsin Voters All. v. City of Racine*, No. 20-C-1487, 2020 WL 6129510, *1 (E.D. Wis. Oct. 14, 2020) (Griesbach, J.), *stay denied,* 2020 WL 6591209 (E.D. Wis. Oct. 21, 2020), *stay denied*, No. 20-3002 (7th Cir. Oct. 23, 2020), *stay denied,* No. 20A75 (U.S. Oct. 29, 2020) (Kavanaugh, J., in chambers).   In the leadup to the November election, CTCL offered grants "to every local election department in every state in the union to ensure that they have the staffing, training, and equipment necessary so that this November every eligible voter can participate in a safe and timely way and have their vote counted." Ex. 7 at 1.  As Judge Griesbach found, although the President repeatedly suggests these grants went only to five cities in Wisconsin (Milwaukee, Madison, Green Bay, Racine, and Kenosha), in fact, over 100 Wisconsin municipalities throughout the State, urban and rural, received grants from CTCL on a strictly non-partisan basis.  *City of Racine,* 2020 WL 6129510, **1-2.  CTCL made these grants to the Cities of Altoona, Amery, and Antigo, at one end of the alphabet, all the way through to the Town of Weston, the Township of Wien, and the Village of Wilton at the other end, along with another hundred municipalities in between.  *See* Ex. 7 at 23–27.

As for the use of drop boxes, state law provides that an absentee ballot envelope "shall be mailed by the elector, ***or delivered in person,*** to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(B)(1) (emphasis added).  The WEC has long interpreted the "delivered in person" option to mean that, instead of mailing her ballot, a voter may deliver it "in person" to the municipal clerk at one or more secure places designated by the clerk.  *See* Ex. 8 at 2 ("Under Wis.

Stat. §6.87(4)(b)(1) municipal clerks may establish opportunities for voters to hand deliver their ballot in their jurisdictions.").

In response to the COVID-19 pandemic and to the serious concerns about the speed and reliability of the U.S. Postal Service, the WEC on August 21, 2020 issued a guidance document for local election officials outlining their permissible "drop box options for secure absentee ballot return for voters." Ex. 9 at 1. "A drop box is a secure, locked structure operated by local election officials," where voters may conveniently and safely return their by-mail absentee ballots without having to rely on the USPS or enter government office buildings. *Id.* The WEC's guidance document specifies the numerous security precautions that local officials must take when using such boxes (including the use of secure locks, tamper-evident seals, security cameras, and chain-of-custody logs). *Id.* at 3–4. The WEC guidance also encourages local election officials to "repurpose" existing municipal "infrastructure set up for secure collection of payment and materials," such as mail slots used for tax payments and public library book drop slots. *Id.* at 1–2.

For a variety of reasons—convenience, fear of the pandemic, and distrust of USPS service, among others—secure drop boxes were popular with Wisconsin voters throughout the State. There ultimately were over 500 secure drop boxes used in all 72 counties in the weeks leading up to the election. *See* Compl. ¶ 189 n.3.

The DNC is not aware of any problems with absentee-ballot drop boxes identified during the statewide canvass or partial recount processes. The President's Complaint has not alleged any specific incidents of ballot-tampering, ballot theft, or other abuses of ballot drop boxes.

C.    **Witness address information**

An absentee voter must complete her ballot and sign a "Certification of Voter" on the absentee ballot envelope in the presence of a witness. Wis. Stat. § 6.87(4)(b). The witness must

then sign a "Certification of Witness" on the envelope, which must include the witness's address. Wis. Stat. § 6.87. Since October 2016, the WEC has instructed municipal clerks that, while they may *never* add missing *signatures*, they "*must* take corrective action" to add missing *witness addresses* if they are "'reasonably able to discern'" that information by contacting the witnesses or looking up the addresses through reliable sources. Ex. 10 at 1. The WEC has repeated these instructions in multiple guidance documents over the past four years. *See* Ex. 11 at 3 (guidance in current WEC Election Administration Manual that clerks "may add a missing witness address using whatever means are available," and "should initial next to the added witness address"). This construction was adopted unanimously by the WEC over four years ago; has governed in *eleven* statewide races since then, including the 2016 presidential election and recount; has been relied upon by local election officials and voters throughout the State; and has never been challenged through Chapter 227 judicial review or otherwise. Ex. 12 at 4–5.

Until now. Like the plaintiffs in many of the other Wisconsin court challenges over the past month, the President argues that WEC has exceeded its statutory authority over the past four years in requiring clerks to attempt to fill in missing witness address information, and seeks to exclude all such ballots cast last month. Compl. ¶¶ 240-80. Here again, he offers no explanation for why he waited until *after* the election to raise this challenge.

## LEGAL STANDARD

**Motion to dismiss**. The standards for a motion to dismiss are relevant in two respects. They govern this Court's consideration of the various motions to dismiss that are being filed in this action, including by the DNC. But they also are relevant in considering the President's "Motion for Expedited Declaratory and Injunctive Relief," because a plaintiff's claims have no likelihood of success on the merits, and thus cannot support injunctive relief, if they fail to state a

claim upon which any form of relief ultimately can be granted.

In deciding a motion to dismiss, the Court presumes the veracity of all well-pleaded material allegations in the Complaint, *see Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015), but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)). "[C]onclusory statements of law . . . and their unwarranted inferences . . . are not sufficient to defeat a motion to dismiss for failure to state a claim." *N. Tr. Co. v. Peters*, 69 F.3d 123, 129 (7th Cir. 1995).

The President's drumbeat of claims about alleged "fraud" are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), which require a party pleading fraud to "state with particularity the circumstances constituting fraud." This standard "ordinarily requires describing the 'who, what, when, where, and how'" of the fraud. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *see also Walton v. Walker,* 364 Fed. App'x 256, 258 (7th Cir. 2010) (seemingly "paranoid" allegations of "a vast, encompassing conspiracy" must meet a "high standard of plausibility" before a plaintiff may proceed, with the court "making the determination of plausibility" by "rely[ing] upon judicial experience and common sense") (citation omitted).

**Motion for preliminary injunction**. To obtain a preliminary injunctive relief "a movant 'must make a threshold showing that (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Tully v. Okeson*, 977 F.3d 608, 612-13 (7th Cir. 2020). Then, "if the movant makes this threshold showing, the court proceeds to consider the balance of harms between the parties and the effect of granting or denying a

preliminary injunction on the 'public interest.'" *Id.* (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

This is a demanding standard in any case but, where, as here, a plaintiff seeks a mandatory injunction, it is heightened. *See, e.g.*, *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) ("Mandatory preliminary injunctions—those 'requiring an affirmative act by the defendant'—are 'ordinarily cautiously viewed and sparingly issued.'") (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)).

## ARGUMENT

## I.     The Court should dismiss this case because President Trump lacks standing.

President Trump lacks Article III standing to pursue his claims because he has not shown, as he must, that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543 (2016) (citation omitted).

*First*, the President has not pled an injury in fact. The Complaint identifies no specific cause of action, instead asserting generally that the 2020 election "was not conducted consistent with the direction of the Wisconsin Legislature," resulting in alleged "violations of the Electors, Equal Protection and Due Process Clauses" of the Constitution. Compl. ¶ 302 & 72. Instead of pleading that such supposed violations injured *Trump*, however, the Complaint alleges that Defendants "infringed and invaded upon the *Wisconsin Legislature's* prerogative and directions." *Id.* ¶ 30 (emphasis added). But President Trump cannot sue to vindicate such alleged "infringement" of the Wisconsin Legislature's rights. The Third Circuit, presented with similar claims by voters and a candidate for federal office, explained why: "Because Plaintiffs are not the General Assembly, nor do they bear any conceivable relationship to state lawmaking processes, they lack standing to sue over the alleged usurpation of the General Assembly's rights under the

-14-

Elections and Electors Clauses." *Bognet v. Sec'y Commw. Of Pa.* No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13, 2020).

The President also pleads no facts showing that he, rather than the Legislature, was injured by the alleged "infringement." Instead, he requests a "remand" to permit the Legislature itself to "review the nature and scope of the infringement" and "determine the appropriate remedy for the constitutional violation(s) established, including *any impact* upon the allocation of Presidential electors." *Id.* (emphasis added). Such ambivalent allegations do not come close to establishing that the President, in his capacity as a candidate, was injured by another party's "unfair advantage in the election process." *Donald J. Trump for President v. Cegavske*, No. 2:20-CV-1445, 2020 WL 5626974, at *6 (D. Nev. Sep. 18, 2020). Ultimately, the President asserts an "undifferentiated, generalized grievance about the conduct of government" that is insufficient to support Article III standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam); *see also Wood v. Raffensperger*, No. 1:20-cv-04561, 2020 WL 6817513, at *5 (N.D. Ga. Nov. 20, 2020); aff'd, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020); *Hotze v. Hollins*, No. 4:20-CV-03079, 2020 WL 6437668, at *2 (S.D. Tex. Nov. 2, 2020) ("Every citizen, including the Plaintiff who is a candidate for federal office, has an interest in proper execution of voting procedure. Plaintiffs have not argued that they have any specialized grievance beyond an interest in the integrity of the election process, which is common to all members of the public." (internal quotation marks omitted)).

*Second*, even if President Trump had pled an injury, which he has not, he could not show that any such injury is redressable by this Court. He asks the Court to ignore the voters' will and "remand" this case to the Legislature "to consider the Defendants' violations . . . and determine what remedy, if any, the Wisconsin Legislature should impose." Compl. at 72. As a procedural

matter, that is impossible. There is no mechanism in federal civil procedure for this Court to "remand" a lawsuit to a legislative body. Nor has the President actually explained how doing so would redress any supposed injury *he* suffered; indeed, he expressly would leave it to the Legislature to determine "what remedy, *if any*," is appropriate. *Id.* (emphasis added). To the extent the President intends that this Court, in "remanding" the case to the Legislature, should set aside the result of the election, *see id.* (seeking declaration that "constitutional violations … likely tainted more than 50,000 ballots"), that is also impossible, including because Wisconsin's Certificate of Ascertainment has already been transmitted to the National Archives. *See Wood v. Raffensperger*, 2020 WL 7094866, *6 ("Because Georgia has already certified its results, Wood's requests to delay certification and commence a new recount are moot. 'We cannot turn back the clock and create a world in which' the 2020 election results are not certified." (citation omitted)).

*Finally*, granting President Trump's requested "remedy" would itself impermissibly work multiple constitutional and statutory violations. As authorized under Article II of the U.S. Constitution, the State of Wisconsin has determined that presidential electors should be selected by popular vote, not by the Legislature. *See* Wis. Stat. § 8.25(1); *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). That decision cannot be reversed as it relates to an election that has already occurred, and even a prospective change would require lawmaking, not a court order. *See Smiley v. Holm*, 285 U.S. 355, 373 (1932). Separately, only Congress has the power to determine the time of choosing electors, *see* U.S. Const. art. II, § 1, cl. 4, and Congress decided that choice should occur on Election Day, *i.e.*, November 3, 2020, with narrow exceptions not applicable here. Thus, a "remand" for the Legislature to make a new choice would violate federal law, *see* 3 U.S.C. § 1. More fundamentally, setting aside the election would unlawfully disenfranchise the over 3.2 million Wisconsin voters who cast ballots last month. *See Shipley v. Chicago Bd. of Election*

*Comm'rs*, 947 F.3d 1056, 1061 (7th Cir. 2020). Even if the President identified any actual flaws in the procedures used to conduct the election, which he has not, changing the rules after the fact and with no opportunity to "cure" would be quintessentially unfair to voters, violating substantive and procedural due process, *see Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1971), the First Amendment, *see Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), and the equal protection rights of every voter who chose the winning slate, *see Bush*, 531 U.S. at 104-05.

## II.     The doctrine of laches bars President Trump's claims.

Even if the President were able to establish that he has standing to pursue his claims (and, for the reasons discussed above, he is not), the doctrine of laches independently bars any relief. "Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant." *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir. 1990). The doctrine applies with special force and urgency in the election-law context. A long line of Seventh Circuit decisions emphasizes that election-law claims "must be brought 'expeditiously' . . . to afford the district court 'sufficient time *in advance of an election* to rule without disruption of the electoral cycle.'" *Jones v. Markiewicz-Qualkinbush,* 842 F.3d 1053, 1061 (7th Cir. 2016) (citations omitted) (emphasis added); *see also Bowes v. Indiana Secretary of State*, 837 F.3d 813, 818 (7th Cir. 2016) ("plaintiffs in general must act quickly once they become aware of a constitutional violation, so as not to disrupt an upcoming election process"); *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004) ("It would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season."); *Fulani*, 917 F.2d at 1031 (denying relief where plaintiffs' delay risked "interfer[ing] with the rights of other Indiana citizens, in particular the absentee voters"); *Navarro v. Neal*, 904 F. Supp. 2d 812, 816 (N.D. Ill. 2012) ("By waiting so long to bring this action, plaintiffs 'created a situation in which any remedial order would throw the state's preparations for the election into turmoil.'"), *aff'd*, 716 F.3d 425 (7th Cir. 2013).

-17-

Through not using the term "laches," the U.S. Supreme Court has long "insisted that federal courts not change electoral rules close to an election date." *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641-42 (7th Cir. 2020) (citing, *inter alia*, *Purcell v. Gonzalez*, 549 U.S. 1 (2006)), *stay denied*, No. 20A66, 2020 WL 6275871 (Oct. 26, 2020). Wisconsin law is in accord. *See Hawkins v. Wisconsin Elections Comm'n*, 2020 WI 75, ¶¶ 9-10, 393 Wis. 2d 629, 948 N.W.2d 877 (2020) (rejecting petition for original action filed two months *before* the 2020 general election where the Court concluded there was insufficient time to grant "any form of relief that would be feasible," and that granting relief would "completely upset[] the election," cause "confusion and disarray," and "undermine confidence in the general election results"). Overturning the results of an election *after* it has been held, as the President attempts to accomplish, would create far more confusion, disarray, and loss of public confidence in the results.

All of the elements of laches are satisfied here. The President and his counsel are guilty of egregious delays. The practices he challenges were in place long before November 3rd and could have readily challenged before the election. The WEC's guidance, for example, could have been challenged at any time before the election in a declaratory judgment action under Wis. Stat. § 227.40(1). These "exclusive" review procedures could have been used to present claims that the WEC's guidance "exceeds the statutory authority of the agency," *id.* § 227.40(4)(a), which is precisely what the President is claiming here. But President Trump and his counsel inexcusably waited nearly a full month *after* the election before bringing suit—and until *after* Wisconsin had certified its presidential election results—to seek relief.

Nor is there any question that the DNC and its nominees, the public, and the administration of justice in general would be prejudiced if the Court excused President Trump's delay in bringing this suit. The requested relief would retroactively disenfranchise some, or all, of Wisconsin's

voters *after* voting has concluded and would destroy confidence in the electoral process. As explained yesterday in *King v. Whitmer*, the "rationale for interposing the doctrine of laches is at its peak" in these post-election cases. Slip Op. at 19, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (Ex. 4). "Interference with impending elections is extraordinary, and interference with an election after voting has begun is unprecedented." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 919 (9th Cir. 2003) (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). As Justice Hagedorn emphasized last week, such interference with an election *after* it has concluded "would appear to be unprecedented in American history." *Wisconsin Voters All.,* No. 2020AP1930-OA, at 2 (Hagedorn, J., concurring) (Ex. 3).

## III. The Eleventh Amendment bars the President's claims.

The Eleventh Amendment also separately and independently bars the President's claims. It prohibits federal courts from granting "relief against state officials on the basis of state law, whether prospective or retroactive." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *see also Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999) ("[F]ederal courts cannot enjoin a state officer from violating state law.") This is true even when state law claims are styled as federal causes of action. *See Colon v. Schneider*, 899 F.2d 660, 672 (7th Cir. 1990) (rejecting plaintiff's attempt to "transmute a violation of state law into a constitutional violation" and noting that such state law claims would be barred by the Eleventh Amendment); *see also, e.g.*, *Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution").

-19-

None of the President's claims escapes this bar. In substance, he asks the Court to determine that state officials violated state law and compel state officials to do what he believes Wisconsin law requires. He defines the central issue at one point as "Whether Election Administrators Adhered to the Direction of the Wisconsin Legislature in the Conduct of the Presidential Election." Compl. p. 14. He wants "this Court to declare that these failures by Wisconsin's election officials, which conflicted with their duties under the [Wisconsin] Election Code, abridged the Legislature's authority under the Electors Clause." *Id.* ¶ 162; *see also id.* ¶ 26 (claiming the "Wisconsin public officials" engaged in "*ultra vires* acts" that were "inconsistent with state law and the directions of the Wisconsin Legislature as set forth in the Wisconsin Election Code"); *id.* ¶ 280 ("the Wisconsin Elections Commission usurped the authority of the Wisconsin Legislature").

The President's "Motion for Expedited Declaratory and Injunctive Relief" only serves to underscore that his issues are truly state law claims masquerading as the basis for a federal action. Once again, it asserts purported violations of Wisconsin law. The President claims that, "[b]y ignoring the Wisconsin Legislature's express directions . . .Defendants have violated the Wisconsin Election Code." ECF No. 6 at ¶ 2. He seeks an order from this Court "[e]njoin[ing] the Defendants from any further actual or threatened actions that would infringe on the authority of the Wisconsin Legislature." *Id.* ¶ 12(c); *see id.* ¶ 14 (requesting that Defendants be "enjoined from further violating the Wisconsin Election Code").

Granting the President's request would violate the Eleventh Amendment. *See Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) ("[T]o treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law. State rather than federal courts are the appropriate institutions to enforce state rules."); *see also, e.g.*,

-20-

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 360-61 (6th Cir. 2008) (holding *Pennhurst* bars claim that Secretary of State violated state election law).

## IV. The Court should abstain from exercising jurisdiction

The Court also should decline to exercise jurisdiction over this lawsuit overwhelmingly asserting issues of state election law under multiple well-settled abstention doctrines.

*First*, abstention is warranted under the *Pullman* doctrine, which "applies when the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law." *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011) (internal quotation marks omitted). *Pullman* abstention is appropriate if there is (1) "a substantial uncertainty as to the meaning of the state law" and (2) "a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Id.* at 150 (internal quotation marks omitted). Here, the central contention of the Complaint is that Defendants took actions that were "inconsistent with state law and the directions of the Wisconsin Legislature as set forth in the Wisconsin Election Code." Compl. ¶ 26. The bulk of President Trump's allegations describe supposed state law violations, including in relation to "indefinitely confined" voting status, *see id.* ¶¶ 83-108, drop boxes, *see id.* ¶¶ 168-217, and the process for curing missing witness addresses on absentee ballots, *see id.* ¶¶ 235-280. The President accuses Defendants and other Wisconsin officials of, among other things, "undermining the Wisconsin Election Code," *id.* ¶ 29, "improperly chang[ing] the application of Wisconsin law," *id.* ¶ 90, and engaging in "disobedience to the Wisconsin Legislature's directions," *id.* ¶ 143. Accordingly, to adjudicate the President's claims would

require this Court to resolve alleged "uncertainty" about the meaning of Wisconsin law.[5]  And it is at least "reasonably probable" that the Wisconsin courts' adjudication of the state law issues President Trump raises would "obviate the need for a federal constitutional ruling."  *Wisconsin Right to Life*, 664 F.3d at 150.  If a Wisconsin court correctly rejected the President's contention that Defendants violated state law, there would be no need for this Court to opine about whether constitutional injury arose from such alleged violations.

*Second*, abstention is warranted under the *Colorado River* doctrine, which provides that a federal suit "should yield to a parallel state suit" if (1) "the concurrent state and federal actions are actually parallel" and (2) "the necessary exceptional circumstances exist to support a stay or dismissal."  *DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*, 953 F.3d 469, 477 (7th Cir. 2020) (internal quotation marks omitted).  There is a concurrent and parallel state court action:  President Trump's appeal from the WEC's post-recount determinations "involve[s] the same parties, the same facts, and the same issues" and likely "will dispose of all claims presented in the federal case."  *Id.* at 478.  The necessarily exceptional circumstances exist:  among other things, both actions concern state law, and the recount is not only "adequa[te] . . . to protect [Plaintiff's] rights," *id.* at 477, but is the "exclusive judicial remedy" under Wisconsin law "for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or

---

[5]  In fact, some of the same state law issues Plaintiff raises are the subject of pending litigation in the Wisconsin Supreme Court.  *See generally Jefferson v. Dane Cty.*, No 2020AP557-OA (challenge to official interpretation of "indefinite confinement" provisions of Wisconsin law).  The "indefinite confinement" and "witness address" issues are both also being litigated in the Wisconsin recount appeals.  *See generally Trump v. Biden,* Milwaukee County Case No. 2020-CV-7092; Dane County Case No. 2020-CV-2514.  And only last week, in dissenting from the denial of an original action petition that concerned similar challenges, Wisconsin Chief Justice Roggensack described the petition as raising "significant legal issues that cry out for resolution by the Wisconsin Supreme Court."  *Trump v. Evers*, No. 2020AP1971-OA (Wis. Dec. 3, 2020) (Roggensack, C.J., dissenting).

canvassing process," Wis. Stat. § 9.01(11). The claims in the federal case, meanwhile, are "vexatious or contrived," for all the reasons set forth herein. *Depuy Synthes Sales, Inc.*, 953 F.3d at 477. Indeed, a federal court in Michigan found *Colorado River* abstention appropriate in a similar case only yesterday. *See* Slip Op. at 20-23, *King v. Whitmer*, No. 2:20-cv-13134, (E.D. Mich. Dec. 7, 2020) (Ex. 4). Well-established principles support the same result here.

## V. President Trump's Complaint fails to state a claim on which relief can be granted.

Even if the Court were to exercise jurisdiction, which it should not, the Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) because it has not alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The Complaint describes no cause of action this Court can adjudicate. Instead, it asserts generally that "the 2020 Presidential Election in Wisconsin was not conducted consistent with the direction of the Wisconsin Legislature thereby violating the U.S. Constitution," including its "Electors and Elections Clauses and the Equal Protection and Due Process Clauses." Compl. ¶ 302 & 71. Nothing in the Complaint states a claim under any of these provisions.

The Elections and Electors Clauses of the Constitution vest authority in "the Legislature" of each state to regulate "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and to direct the selection of presidential electors, U.S. Const. art. II, § 1, cl. 2, respectively. President Trump's contention that Defendants violated state election procedures, even if it had any merit, which it does not, does not establish a violation of these constitutional provisions. Only yesterday, another federal district court rejected a similar strategy where, as here, the plaintiffs did not "explain how or why such violations of state election procedures automatically amount to violations of the clauses." Slip Op. at 30, *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Dec. 7, 2020) (Ex. 4). Instead, the plaintiffs' claims were "in fact

state law claims disguised as federal claims." *Id.* So too here. This Court, like the court in *King*, should reject the theory that "any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review." *Id.*

Nor does President Trump come close to stating an equal protection claim. The Complaint includes only a handful of vague references to equal protection principles. It asserts, for example, that the use of ballot drop boxes allegedly without "uniform standards" rendered them "constitutionally suspect under the Equal Protection and Due Process Clauses." Compl. ¶ 199. As explained *supra*, such generalized grievances are insufficient to support standing, much less state a claim. *See Wood*, 2020 WL 6817513, at *5; *Hotze*, 2020 WL 6437668, at *2. As a result, multiple courts have rejected attempts to plead equal protection claims based on allegedly "non-uniform" election procedures. *See, e.g.*, *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *14 (M.D. Pa. Nov. 21, 2020), (rejecting "the proposition that every rule or system must ensure uniform treatment") *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020).[6]

The President falls even further short of pleading a violation of due process. The Complaint contains no non-conclusory references to due process principles. To the extent the President means to allege that due process was violated by supposed deviations from Wisconsin election law, "[t]he Constitution is not an election fraud statute," and "[i]t is not every election irregularity … which will give rise to a constitutional claim." *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1271

---

[6] Concerning voting by mail, the Complaint cannot even decide which subgroup of voters supposedly received unequal treatment, *compare* Compl. ¶ 146-47 (alleging that "mail-in voters are more susceptible to undue influence and even coercion and intimidation" and "[t]herefore, for instance, mail-in balloting is susceptible to systemic discrimination against the infirm and the elderly") *with id.* ¶ 148 ("Mail-in balloting also discriminates against able-bodied voters, those who can vote in-person on Election Day …."). Much less does the Complaint plausibly allege that *the President in his capacity as a candidate* was treated unequally.

-24-

(7th Cir. 1986) (internal quotation marks omitted). Instead, to "strike down an election on substantive due process grounds," a plaintiff must show "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998); *see also Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir. 1986) (to implicate due process, election defects must "go well beyond the ordinary dispute over the counting and marking of ballots"). Here, President Trump does not allege that Defendants caused any disenfranchisement at all. Instead, it is *the President himself* who seeks to disenfranchise millions of Wisconsin voters by discarding the election results and "remanding" to the Legislature. The Complaint should be dismissed.

## VI. President Trump is not entitled to injunctive relief, and certainly is not entitled to a "remand" to the Wisconsin Legislature for that body to "determine the appropriate remedy."

For the reasons discussed above, the President cannot establish a "likelihood of success on the merits." *Tully*, 977 F.3d at 612-13. He has failed to carry his burden on any of the remaining factors necessary to entitle him to preliminary relief, much less the extraordinary and unprecedented relief he seeks. No court has ever done what the President asks this Court to do— throw out the election results and "remand" the dispute to a state legislature for it to determine the "appropriate remedy." Compl. ¶ 31. As the Third Circuit put it recently when the Trump Campaign sought an order prohibiting Pennsylvania's officials from certifying election results, such relief—"throwing out millions of votes—is unprecedented" and a "drastic remedy." *Donald J. Trump for President, Inc.* 2020 WL 7012522, at *7. "Voters, not lawyers, choose the President. Ballots, not briefs, decide elections." *Id.* at *9.

### A. President Trump cannot establish irreparable harm and has an adequate remedy at law.

The President has not shown injury or a likelihood of success on the merits of his constitutional claims.  So, his assertion that he will suffer irreparable harm based on those violations is unfounded.  Further, his delay before seeking relief weighs against the probability of irreparable injury.  *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001); *see also* Wright & Miller, 11A *Federal Practice and Procedure*, § 2948.1 (3d ed., Apr. 2017 update) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  The President's alleged injuries occurred (if at all), on or before election day.  Yet he waited until nearly four weeks after election day, after the election had been certified, to file this lawsuit.  This Court should consider his inexcusable delay in determining whether he is entitled to "emergency" relief.

The President also has an adequate remedy at law, weighing against a finding of irreparable harm.  *See United States v. Rural Elec. Convenience Co-op. Co.*, 922 F.2d 429, 432 (7th Cir. 1991) ("It is well settled that the availability of an adequate remedy at law renders injunctive relief inappropriate.").  In this case, Wisconsin law provides mechanisms to dispute election results. Because President Trump can engage these mechanisms--and has done so through the recount and judicial appeals from it--he has an adequate remedy at law. *See, e.g.*, *Donald J. Trump for President, Inc.*, 2020 WL 7012522, at *8 ("Because the Campaign can raise these issues and seek relief through state courts and then the U.S. Supreme Court, any harm may not be irreparable."); *see also Rural Elec. Convenience Co-op. Co.*, 922 F.2d at 433 (observing that "a party's ability to assert its claims as a defense in another proceeding constitutes an adequate remedy at law").

**B.**     **The balance of equities and public interest weigh heavily against the issuance of an injunction or "remand" to the Wisconsin Legislature.**

The balance of equities and public interest cut sharply against granting injunctive relief. For a federal court to "remand" a case to the Wisconsin Legislature over a month after the Presidential election for the Legislature to decide how to award Wisconsin's ten electoral votes would, at the risk of understatement, wreak havoc on Wisconsin's elections processes, violate the constitutional rights of millions of Wisconsinites, and undermine if not destroy public confidence and trust in the election's results. *See United States v. Classic*, 313 U.S. 299, 315 (1941) ("Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted …."); *Shipley*, 947 F.3d at 1061 ("It is undeniable that the right to vote is a fundamental right guaranteed by the Constitution.  The right to vote is not just the right to put a ballot in a box but also the right to have one's vote counted." (citations omitted)).

For these reasons, in the past several weeks, courts have rightly refused to issue similar injunctions. *See Donald J. Trump for President, Inc.*, 2020 WL 7012522, at *8–9 (construing Trump Campaign's request to enjoin Pennsylvania's certification of results as a request to disenfranchise voters, and refusing to do so); *Wood*, 2020 WL 6817513 at *13 (denying request to enjoin Georgia from certifying its election results, concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways"), 2020 WL 7094866 (11th Cir. Dec. 5, 2020).  This Court should do the same.

## CONCLUSION

For the foregoing reasons, the Democratic National Committee respectfully requests that the Court deny President Trump's Amended Motion for Expedited Declaratory and Injunctive Relief" in its entirety.

DATED:  December 8, 2020

Respectfully Submitted,

s/ *Michelle M. Umberger*

Seth P. Waxman*
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com

David S. Lesser
Jamie Dycus
Christopher Bouchoux*
Joseph J. Yu*
Charles Bridge*
WILMER CUTLER PICKERING HALE AND
DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
david.lesser@wilmerhale.com
jamie.dycus@wilmerhale.com
christopher.bouchoux@wilmerhale.com
joseph.yu@wilmerhale.com
charles.bridge@wilmerhale.com

Matthew W. O'Neill
    SBN 1019269
FOX, O'NEILL &
    SHANNON, S.C.
622 North Water Street,
    Suite 500
Milwaukee, WI 53202
(414) 273-3939
mwoneill@foslaw.com

Charles G. Curtis, Jr.
    SBN 1013075
Michelle M. Umberger
    SBN 1023801
Sopen B. Shah
    SBN 1105013
Will M. Conley
    SBN 1104680
PERKINS COIE LLP
One East Main St., Suite 201
Madison, WI 53703
(608) 663-7460
ccurtis@perkinscoie.com
mumberger@perkinscoie.com
sshah@perkinscoie.com
wconley@perkinscoie.com

Marc E. Elias*
John Devaney
Zachary J. Newkirk*
PERKINS COIE LLP
    700 Thirteenth St., N.W.,
    Suite 800
Washington, D.C. 20005
(202) 654-6200
melias@perkinscoie.com
jdevaney@perkinscoie.com
znewkirk@perkinscoie.com

*Counsel for Respondent-Intervenor*

*\* Admission pending*

**CERTIFICATE OF SERVICE**

I hereby certify that on Tuesday, December 8, 2020, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Michelle M. Umberger*
Counsel for Proposed Intervenor