**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | | |
|---|---|---|
| Donald J. Trump, Candidate for President of the United States of America, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:20-cv-01785-BHL |
| vs. | ) ) | |
| The Wisconsin Elections Commission, et al. | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S CONSOLIDATED REPLY BRIEF IN SUPPORT OF MOTION**
**FOR INJUNCTIVE AND DECLARATORY RELIEF**
**AND BRIEF IN RESPONSE TO MOTIONS TO DISMISS**

William Bock III, Indiana Atty. No. 14777-49
James A. Knauer, Indiana Atty. No. 5436-49
Kevin D. Koons, Indiana Atty. No. 27915-49
Kroger, Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, Indiana 46204-5125
Reception: (317) 692-9000

*Attorneys for Plaintiff Donald J. Trump*

## TABLE OF CONTENTS

INTRODUCTION ................................................................. 4

ARGUMENT ...................................................................... 5

    A.    Focus of this lawsuit: The November 3 Presidential Election was not conducted in the "manner" directed by the Wisconsin Legislature, and therefore it would violate Article II of the U.S. Constitution to appoint electors based on its results ................................................. 5

    B.    This case is justiciable, neither standing nor mootness prevent the Court from reaching the merits ......................... 9

          1.    Standing ................................................... 10

          2.    This action is not moot ............................... 15

    C.    The doctrine of laches cannot justify avoiding the merits. ................... 16

    D.    This court must reach the merits; there is no basis for abstaining ............................................................. 20

          1.    *Wilton/Brillhart* doctrine does not apply .................. 20

          2.    *Colorado River* does not apply .................... 23

          3.    Pullman abstention ................................... 24

    E.    The 11th Amendment does not immunize the State defendants from this suit for both declaratory and prospective injunctive relief. ................................ 25

    F.    The Wisconsin Elections Commission and municipal election officials did not conduct this election "in such Manner as the Legislature thereof may direct." ................... 29

          1.    Plaintiff was not required to file a complaint with the Wisconsin Elections Commission as a condition to this action, because he was not eligible to do so. ................. 30

          2.    The Heart of the Matter—The Municipal Defendants believe the Wisconsin Election Code is "directory, not mandatory." ......................... 31

3.    Using approximately 500 unmanned drop boxes clearly violated the Wisconsin Election Code. ............................ 32

4.    Defendants unlawfully directed pollworkers to alter numerous ballots to cure defects which, by statute, can only be cured by a voter ........................................... 35

5.    Defendants ignored the Legislature's reliability safeguards for absentee ballots by circumventing photo ID requirements through misuse of the "indefinitely confined" exception. ................................. 38

G.    Plaintiff is entitled to declaratory and injunctive relief ...................... 39

CONCLUSION ......................................................................................... 44

## **INTRODUCTION**

As expected, Defendants[1] attempt to couch Plaintiff's action as thwarting the will of Wisconsin voters, when in fact, Plaintiff seeks to vindicate his right to compete for the Office of President of the United States in the State of Wisconsin in an election that complies with Article II of the U.S. Constitution. Any blame for disenfranchising voters lies at the feet of Defendants, who put voters at risk by willfully usurping the Wisconsin Legislature's exclusive authority—vested by Article II of the Constitution—for directing the manner of appointing Presidential Electors. The Defendants were even forewarned that their deviations from the Wisconsin Election Code might jeopardize the votes of Wisconsin citizens, yet they willfully plunged ahead.

---

[1] Throughout this Reply, the following party definitions and abbreviations have been used: The term "**Municipal Defendants**" refers to Defendants Scott McDonell, Maribeth Witzel-Behl, Mayor Cory Mason, Tara Coolidge, Mayor John Antaramian, Matt Krauter, Mayor Eric Genrich, Kris Teske, and Mayor Satya Rhodes-Conway; the term "**Milwaukee City Defendants**" refers to Defendants Mayor Tom Barrett, Jim Owczarski, and Claire Woodall-Vogg; the term "**Milwaukee County Defendants**" refers to George L. Christenson and Julietta Henry; and the term "**WEC**" refers to Defendants Wisconsin Elections Commission, and its members, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Dean Knudson, Robert F. Spindell as well as Douglas J. La Follette, Wisconsin Secretary of State, who joined in the Response.

## ARGUMENT

**A.** **Focus of this lawsuit: The November 3 Presidential Election was not conducted in the "manner" directed by the Wisconsin Legislature, and therefore it would violate Article II of the U.S. Constitution to appoint electors based on its results**

This case is about methods of voting used, but never approved by the Wisconsin Legislature. We have in this case new terms, never heard of before in the history of Wisconsin elections, terms like "absentee ballot drop boxes" and the almost Orwellian: "human drop boxes."

It has been said over and over by the administrators who ran the election in Wisconsin that it was the most secure and reliable election in the State's history. The evidence in this case demonstrates those statements to be dramatically untrue.

Contrary to the requirements of the Wisconsin Election Code, the election administrators at the Wisconsin Election Commission and in Milwaukee and Dane Counties pushed an absentee ballot election, the less secure of the two methods of voting under Wisconsin law. And then the administrators pushed to make their absentee ballot election even less secure. They did this, unelected election administrators did this, by deviating from the law, substituting their "wisdom" for the laws passed by the State Legislature and signed by the Governor.

Absentee ballot drop boxes are illegal under Wisconsin Law. Yet, the Wisconsin Elections Commission disbursed millions of dollars to local units of government to purchase drop boxes for use in the Presidential election. Thus, not only did the Wisconsin Elections Commission deviate from the Election Code by adding drop box

voting as a new method of voting in the State, the Commission funded violation of the law throughout the State.

And that's not all, election administrators took absentee ballot witness certifications, made under penalty of perjury on the back of absentee ballot envelopes, and marked them up like they were a grade school homework assignment. In so doing, they undermined the purpose of the certification to serve as a reliable indicator that the envelope contained a vote from a valid elector.

Next, the Commission and election administrators obliterated the photo identification law adopted by the Legislature, meant to prevent fraud, by widening a narrow exception for "indefinitely confined" voters to fit every voter in the State – a construction that rendered the words of the statute meaningless. Then in a move, not permitted or justified by the Code, the Wisconsin Elections Commission issued guidance to clerks telling them that they could not contest a voter's claim to be indefinitely confined. In this way what was written as a limited exception, and provided that indefinitely confined voters did not have to provide photo identification when voting absentee, became applicable to the entire State, effectively gutting Wisconsin's photo ID law.

In short, Wisconsin's most influential election administrators at the Wisconsin Election Commission and in Wisconsin's two most populous counties dramatically lowered guardrails that made this election, in terms of the rules applied, less secure, less reliable, less fair and more susceptible to fraud than perhaps any

election in Wisconsin's history. And all of this happened without the sort of public access, oversight and transparency that are fundamental in a free society.

Most importantly, these massive changes to Wisconsin law were accomplished through administrative fiat, usurping the constitutional authority of the Wisconsin Legislature. Article II of the United States Constitution requires that each State "shall appoint" its Presidential electors "in such Manner as the *Legislature thereof* may direct." U.S. CONST. art. II, § 1, cl. 4 (emphasis added).[2]

This means that, "in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000).

As Chief Justice Rehnquist said, the constitutional delegation of power to the state legislature means that "the text of [state] election law itself, and not just its interpretation by the courts of the States, takes on independent significance." *Bush v. Gore*, 531 U.S. at 112–13 (Rehnquist, C.J., concurring).

"[A] significant departure from the [State's] legislative scheme for appointing Presidential electors" or for electing members of the federal Congress "presents a

---

[2] *See also* id. art. I, § 4, cl. 2 (providing that, in each State, the "Legislature thereof" shall establish "[t]he Times, Places and Manner of holding Elections for Senators and Representatives").

federal constitutional question" that courts must address. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring).

The evidence in this case demonstrates that when conducting the 2020 Presidential election in the State of Wisconsin, the State's administrative officials failed to follow the Wisconsin Election Code.

In *Cook v. Gralike* the Supreme Court considered the similar Elections Clause, noting it constituted a limited delegation. The Court said, "Through the Elections Clause, the Constitution delegated to the States the power to regulate the 'Times, Places and Manner of holding Elections for Senators and Representatives," subject to a grant of authority to Congress to "make or alter such Regulations.' Art. I, § 4, cl. 1." *Cook v. Gralike*, 531 U.S. 510, 522, 121 S. Ct. 1029, 1038, 149 L. Ed. 2d 44 (2001).

Each State is delegated authority to cast electoral votes for president in 2020, but, only if 3 conditions are met:

> 1) a statewide vote for electors is held on Nov. 3; (required by 3 U.S.C. § 1)
>
> 2) that election must be held in the manner directed by the state legislature; (required by U.S. CONST. Art. II, § 1, cl. 2) and
>
> 3) the electors must cast their votes on Dec. 14 (required by 3 U.S.C. § 7).

If a State fails to meet any condition, it cannot cast its electoral votes for President and Vice President, just as in any other situation, public or private, the result reached by the agent is invalid if the conditions of the delegation are not honored.

Fortunately for the State of Wisconsin, the Electoral Count Act does contain a savings provision that permits the State Legislature to appoint electors in the event the Presidential election held in the State or to be held in the State does not meet constitutional standards or otherwise fails. One can imagine a number of reasons why the Presidential election can fail in addition to not meeting Constitutional standards.

To cover such situations Congress enacted 3 U.S.C. § 2 which provides:

> Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct.

The State of Wisconsin's Article II duty to follow properly adopted state election law is fundamentally important because Article II of the Constitution reposes the authority to appoint Presidential electors solely in the State Legislatures. This decision by the Framers was a key choice, and it flowed directly from the Framers' recognition that federalism and separation of powers are indispensable to protecting the liberty of the American people.

**B.** **This case is justiciable, neither standing nor mootness prevent the Court from reaching the merits**

"Chief Justice Marshall famously wrote that it is 'the province and duty of the judicial department to say what the law is.'" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quoting *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)). Defendants, like the federal courts will do, "begin [their] analysis with the

threshold issue of justiciability." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 328 (1999).

Justiciability considers whether a matter is "properly suited for resolution by the federal courts." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2491 (2019). Justiciability bears on jurisdiction, and without jurisdiction, "the federal courts cannot proceed." *Wernsing v. Thompson*, 423 F.3d 732, 742–43 (7th Cir. 2005); *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) ("when a case is "nonjusticiable—[it is] outside the courts' competence and therefore beyond the courts' jurisdiction.").

"'[The] case-or-controversy requirement subsists through all stages of federal proceedings, trial and appellate.' Another way to state the justiciability principles set forth above is that 'Article III denies federal courts the power to decide questions that cannot affect the rights of the litigants in the case before them.'" *Zessar v. Keith*, 536 F.3d 788, 794 (7th Cir. 2008) (citations omitted). "Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification." *Poe v. Ullman*, 367 U.S. 497, 508 (1961).

Here, Defendants raise the justiciability questions of standing and mootness. We address standing first.

## 1. Standing

"First and foremost is the question of standing. 'Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Wernsing v. Thompson*, 423 F.3d 732, 742–43 (7th Cir. 2005) (quoting *Allen v.*

*Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).) "Standing has essentially three components. A plaintiff must show that he has suffered an 'injury in fact,' that the challenged action caused the injury, and that the injury can likely be redressed by the cause of action." *Krislov v. Rednour*, 226 F.3d 851, 857 (7th Cir. 2000). Here, President Trump satisfies each element of standing.

The first two elements should be evident without elaboration. President Trump was denied the Constitutional right to have electors appointed in a lawful manner in an election in which he was a candidate—in this case the "lawful manner" is that manner directed by the legislature (i.e. according to the State of Wisconsin's duly enacted election statutes). *See* U.S. Const. art II, §1, cl. 4.[3]

In *L. Lin Wood, Jr., Plaintiff-Appellant, v. Brad Raffensperger, in his official capacity as Sec'y of State of the State of Georgia, Rebecca N. Sullivan, in her official capacity as Vice Chair of the Georgia State Election Bd., et al., Defendants-Appellees.*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020), the plaintiff sued as a citizen and donor for violations of the Election Clause, Electors Clause, Equal Protection Clause, and irregularities in the recount violating his rights under the Due Process Clause. The Eleventh Circuit denied Wood standing, holding he had not alleged merely a generalized grievance. However, the Court held that "a political candidate harmed by the recount would satisfy [the injury in fact]

---

[3] Notably, President Trump is not contending here that his injury was not winning per se, but rather not having an election conducted pursuant to the Constitution.

requirement because he could assert a personal, distinct injury." *Id*. The Eleventh

Circuit was not considering standing to bring a state recount action, but the right to

bring constitutional claims based on the state's conduct of the election.

Similarly, in *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), the Eighth Circuit

considered a COVID-inspired change to state election deadlines for absentee ballots

that was adopted by the Minnesota Secretary of State. The *Carson* court reversed

the Secretary's change based on the Elector Clause, holding the Secretary had

invaded the province of the Legislature and that presidential "Electors have Article

III standing as candidates." *Carson*, 978 F.3d at 1058. Obviously, if a Presidential

Elector has standing under Article III, the candidate likewise has standing.

The cases cited by the Municipal Defendants (*Bognet* (citing *Allen v. Wright*,

468 U.S. 737) and *Lance v. Coffman*, 549 U.S. 437, 442 (2007)) are classic taxpayer

standing cases,[4] with no relationship to the issue at hand where a candidate alleges

an election the candidate participated in, was conducted contrary to the statute.

"To qualify for standing, a claimant must present an injury that is concrete,

particularized, and actual or imminent." *Davis v. Fed. Election Comm'n*, 554 U.S.

724, 733 (2008). Here, a candidate was harmed by the Defendants' failure to comply

with the Wisconsin election statutes.

---

[4] Allen involved parents suing the Internal Revenue Service for failing to adopt procedures to deny tax-exempt status to discriminatory school districts, and Coffman involved citizens suing after a post census-redistricting dispute.

Similarly, Defendants cite to *Lance v. Coffman*, 549 U.S.437 (2007) for the proposition that President Trump did not have standing. But *Lance* is inapposite. In *Lance*, four citizens brought suit alleging the Colorado Constitution, as interpreted by the Colorado Supreme Court violated their rights under the Elections Clause. *Id.* at 1196. None of the litigants had a differentiated or particularized interest in the dispute. As the Court reiterated, "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lance v. Coffman*, 549 U.S. 437, 439 (2007).

In contrast, a candidate has a particularized interest in the conduct of an election. Where the intent of standing doctrine is to ensure "a plaintiff must have more than 'a general interest common to all members of the public'" (*Lance*, 549 U.S. at 440) – a candidate satisfies that requirement, as both the Eighth and Eleventh Circuits have recently held. *Carson*, 978 F.3d 1051; *Wood,* 2020 WL 7094866.

Second, the actions complained of plainly caused the injury. The actions described of in the complaint contravened State Election Law which, for purposes of a Presidential election is, under Article II treated as federal law; thus, the election was not held in the manner directed by the state legislature.

The remaining element is whether the injury can be redressed by this action. *Wernsing v. Thompson*, 423 F.3d 732, 742–43 (7th Cir. 2005) ("Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") And the answer is yes.

As the Seventh Circuit held in *Krislov*, the plaintiff (President Trump) "must show that [he] would benefit in a tangible way from the district court's intervention." *Krislov*, 226 F.3d at 858. Here, President Trump moves the Court to declare the election void because the Defendants failed to hold the election pursuant to the State of Wisconsin's duly enacted election statutes. The result of a void election, like any void action, means the election (action) did not occur. Federal law provides the means for appointment of electors in that circumstance.

> Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct.

3 U.S.C. § 2.

Here, if the Court voids the election because it was not conducted pursuant to Constitutional direction, federal statutes provide a means to take the place of a void election. The electors will have been appointed in a lawful manner, thereby addressing the injury incurred. Furthermore, electors appointed in an unconstitutional manner will not be countable for President Trump's opponent, lessening the impact of the Constitutional violation on President Trump.

## 2.    This action is not moot

The Municipal Defendants claim this action is moot because the election has been certified. However, the electoral process in Wisconsin is continuing as the recount and contest continues.

The Wisconsin Elections Commission has taken the position that final resolution of judicial controversies can take as long as January 6 because, under the Constitution, none of the votes cast for president are even *opened* before that date. As the Wisconsin Elections Commissions explained in its earlier filing in this Wisconsin Supreme Court (the Original Action), the winner of Wisconsin's ten electoral votes can be certified "after the electors have convened and cast their electoral votes," and before January 6.[5] Response of Respondents Wisconsin Elections Commission and Commissioner Ann Jacobs in Case. No. 20AP1971-OA, filed Dec. 1, 2020, at 8.[6] Therefore, this matter is not moot, nor will it be moot after December 14.

As WEC explained in the Original Action filing, 3 USC § 6 provides that a state governor may issue a certificate of ascertainment based on the canvassing and then

---

[5] The WEC Original Action brief, dated December 1, 2020, is attached as Exhibit A.

[6] *See also Bush v. Gore*, 531 U.S. 98, 144 (2000) (Ginsburg, J., dissenting) (noting that the date that has "ultimate significance" under federal law is "the sixth day of January," the date set by 3 U.S.C. § 15 on which "the validity of electoral votes" is determined); Laurence H. Tribe, *Comment: eroG .v hsuB and Its Disguises: Freeing Bush v. Gore From Its Hall of Mirrors*, 115 Harv. L. Rev. 170, 265-66 (2001) (noting that the only real deadline for a State's electoral votes to be finalized is "before Congress starts to count the votes on January 6").

a subsequent certificate of "determination" upon the conclusion of all election challenges. *Id.* The certificate of "determination" notifies the U.S. Congress of the state decision when Congress convenes on January 6 to count the electoral votes. Consequently, the WEC has acknowledged that this matter is not moot, and could not be for at least four more weeks.

Furthermore, because the Municipal Defendants have used election means contrary to law, and claim not that the errors have been corrected but instead that they are lawful, the actions are presumably likely to repeat, and will evade review. Of course "capable of repetition yet evading review" is "a recognized exception to the mootness doctrine." *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000).

Furthermore, President Trump has articulated the potentiality of running for office again if he were not determined to have won the 2020 election.[7] *See Krislov*, 226 F.3d at 858 (candidate's articulation of interest in running for office again prevents mootness from barring suit).

## C.  The doctrine of laches cannot justify avoiding the merits.

WEC and the Secretary of State, the DNC, the Wisconsin NAACP, Governor Evers, the Municipal Defendants, and Milwaukee all claim the doctrine of laches bars this action. Defendants can only make this argument by ignoring the facts and law surrounding this dispute.

---

[7] https://www.washingtonpost.com/politics/trump-2024-rematch/2020/11/21/58ce87ac-2a8d-11eb-8fa2-06e7cbb145c0_story.html.

To dismiss this case on the basis of laches, the Court must find President Trump exercised a lack of diligence asserting his claims and that the Defendants were prejudiced. *Lingenfelter v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir. 1982)

At the outset, laches requires that the party against whom the defense is asserted did not act diligently. *Lingenfelter*, 691 F.2d at 340.

As discussed at length in the Complaint, the wrongful actions complained of were taken in accordance with guidance issued by the Wisconsin Elections Commission ("WEC"). It frequently cannot be conclusively determined at the outset whether that guidance will have any impact upon the election or, indeed, whether that guidance might be changed as a result of public pushback. Therefore, it cannot reasonably be expected that a candidate would sue immediately upon issuance of a guidance by the WEC. The WEC issues scores of guidance documents every election cycle. It is only when that guidance is followed on a large scale in a way that becomes publicly known that it can even be thought that a candidate should consider suit. Just last week President Trump filed his original action in the Wisconsin Supreme Court. (No. 2020AP001971-OA) As set forth in its brief, WEC provides that its guidance is "advice" – it does not hold the force of law. *Id*. citing WEC, Recount Manual November 2020, at pp. 7-8, n. 5, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2019-02/Recount%20Manual%20Final%20%288-2018%29.pdf.

WEC's view is consistent with the interpretation of the Wisconsin Supreme Court, holding that WEC manuals and memos: "are not law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions." *SEIU v. VOS*, 2020 WI 67, ¶ 102. As the Wisconsin Supreme Court held, the guides "explain" statutes and rules or provide "guidance or advice" about how the executive branch is "likely to apply" a statute or rule. *Id.* They impose no obligations, set no standards, and bind no one. *Id.* Therefore, it is almost certain that any suit challenging a guidance early in the process would be met with a claim the challenge was not ripe or based upon a speculative fear of injury.

As also identified in the Original Action, WEC can, and does, change its advice. WEC, Recount Manual November 2020, at pp. 7-8, n. 5, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Recount%20Manual%20Final%20%2811-2020%29%20highlight.pdf; *see also* Recount Manual August 2018, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2019-02/Recount%20Manual%20Final%20%288-2018%29.pdf. WEC claims that its advice can be changed, enhanced, revoked or ignored at any time as evidenced by the limitless number of advisories, letters, opinions, and booklets which it generates. The effect of all this is that a candidate will not know clearly the extent to which the WEC's guidance will be implemented at the time it is issued and a suit at that time would likely be futile.

Incredibly, the Municipal Defendants argue that even the election statutes are

"directory, not mandatory."[8] Their position adds to the view that until a candidate knows what rules will in fact be adhered to, an action to prevent deviations from the statute would not be ripe.

To expect any candidate, let alone a candidate running in fifty states, to protest every potentially changeable bit of guidance that may be issued is an unreasonable burden. Instead, there was no obligation to challenge the actions deviating from the elections statutes until the advice had been put into actions. In fact, until the actions were taken, the issues were not even ripe, as the advice was suggestive *and* subject to change.

Once the actions were taken, and the election was underway, whether suit was filed the day after the election or a month later is really of no moment. The Defendants' actions resulted in an election that violated the Electors' Clause – the election was not conducted pursuant to the laws promulgated by the Wisconsin legislature. As a result, the election was void. It became void and the passage of time did not make it more or less void.

Returning to the Original Action, President Trump noted that the legality of the "advice" deviating the meaning of "indefinitely confined" from the statutory definition was already litigated and determined to be illegal. *See Jefferson v. Dane*, No. 2020AP557-OA, March 31, 2020 Order at 2. Yet the Municipal Defendants persisted in their illegal acts. Similarly, the Republican Party of Wisconsin warned the City of

---

[8] According to Merriam Webster, "directory" means providing advisory but not compulsory guidance.

Madison Clerk that the "Democracy in the Park" activities were illegal. The City of Madison went forward regardless.

Laches does not apply here. President Trump has not sat on his rights. Further, even if the Court were to conclude otherwise, the Defendants have not been prejudiced. The election was void as a result of their actions. An earlier suit could not have cured the violations the Defendants willfully participated in.

**D.** **This court must reach the merits; there is no basis for abstaining**

**1.** *Wilton/Brillhart* **doctrine does not apply**

The Municipal Defendants and Milwaukee County Defendants move for dismissal pursuant to the *Wilton/Brillhart* doctrine. Predicated on the fact the Declaratory Judgment Act affords federal courts the discretion to decide whether to determine a litigant's rights, the *Wilton/Brillhart* doctrine provides that the federal court has the "opportunity, rather than a duty" to grant declaratory relief. *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 714 (7th Cir. 2009).

The Defendants' argument fails for two reasons. First, it applies only to cases in diversity, not cases based upon a federal question. Second, Plaintiff's non-declaratory judgment claims stand alone.

First, *Wilton/Brillhart* applies to cases heard in diversity. Twelve years ago, this Court held: "To abstain, the parallel state court proceeding must present 'the same issues, *not governed by federal law*, between the same parties…'" *Nissan N. Am., Inc. v. Andrew Chevrolet, Inc.*, 589 F. Supp. 2d 1036, 1041 (E.D. Wis. 2008) (*q*uoting *Royal Indemnity Co. v. Apex Oil Co.,* 511 F.3d 788, 793 (8th Cir. 2008).

20

Looking to *Brillhart*, the limitation is clear:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, *not governed by federal law*, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

> Where a district court is presented with a claim such as was made here, it should ascertain whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court.

*Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942).

Here, the case is brought under federal question jurisdiction, not diversity. See Complaint ¶ 24. *Wilton/Brillhart* is simply inapplicable. Even if a federal question was not at issue, abstention still would not be appropriate because both declaratory and non-declaratory relief is requested.

*Wilton/Brillhart* did not address a situation where declaratory and non-declaratory relief is sought and the Seventh Circuit questioned how it would be applied. *R.R. St.*, F.3d at 715 ("But where, as here, both declaratory and non-declaratory relief is sought, does the *Wilton/Brillhart* standard even apply, and, if so, under what circumstances?"). Therefore, the Seventh Circuit surveyed how the doctrine had been applied in the Ninth Circuit and Fifth Circuit, and adopted the Ninth Circuit's application – holding:

> Where state and federal proceedings are parallel and the federal suit contains claims for both declaratory and non-declaratory relief, the district court should determine whether the claims seeking non-declaratory relief are independent of the declaratory claim. If they are

> not, the court can exercise its discretion under *Wilton/Brillhart* and
> abstain from hearing the entire action. But if they are, the
> *Wilton/Brillhart* doctrine does not apply and, subject to the presence of
> exceptional circumstances under the *Colorado River* doctrine, the court
> must hear the independent non-declaratory claims

*Id.* at 716-17.

Applying the rule of law set forth above, the Seventh Circuit considered whether the non-declaratory judgment claims could stand alone – "jurisdictionally and substantively." Holding the remaining claims could stand without the declaratory judgment claims, the Seventh Circuit held *Wilton/Brillhart* did not apply. *Id.* at 717.

Likewise here, if the declaratory judgment claim were excised, the prayer for injunctive relief would remain. President Trump, based on the facts alleged would be entitled to a mandatory injunction (as discussed in Part G, *infra*) requiring Governor Evers to issue a certificate of determination consistent with, and only consistent with, the appointment of electors by the Wisconsin legislature.

Because the non-declaratory judgment claim is independent of the declaratory judgment action, *Wilton/Brillhart* does not apply and abstention is inappropriate.

Even if the Court held the injunctive relief claim does not stand alone, abstention pursuant to *Wilton/Brillhart* remains merely within the discretion of this Court. *R.R. St.*, 569 F.3d at 715 ("a court may dismiss or stay an action"). This Court is under no compunction to abstain. Nor does *Wilton/Brillhart* contain even a presumption of abstention. To the contrary, this Constitutional issue of great public

import is worthy of review by the federal courts, rather than an exercise of discretion to abstain from hearing the matter.

## 2. *Colorado River* does not apply

The DNC, Governor Evers, and the Milwaukee Defendants urge the Court to abstain pursuant to Colorado River. They are incorrect and fail to observe that "federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *Culp v. Flores*, 454 F. Supp. 3d 764, 771 (N.D. Ill. 2020) (quoting *AXA Corp. Sols. v. Underwriters Reins. Corp.*, 347 F.3d 272, 278 (7th Cir. 2003)).

An "unflagging obligation" should not be set lightly aside. To the contrary abstention is appropriate only in exceptional circumstances and "[t] here is a presumption against abstention." *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 646 (7th Cir. 2011).

This Court must determine if there are "the clearest of justifications" to surrender jurisdiction. *Culp v. Flores*, 454 F. Supp. 3d at 771. In doing so, the court weighs ten non-exclusive factors. *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014) *AAR Int'l Inc.,* 250 F.3d at 522. The factors are:

> (1) whether the state has assumed jurisdiction over property;
> (2) the inconvenience of the federal forum;
> (3) the desirability of avoiding piecemeal litigation;
> (4) the order in which jurisdiction was obtained by the concurrent forums;
> (5) the source of governing law, state or federal;
> (6) the adequacy of state-court action to protect the federal plaintiff's rights;
> (7) the relative progress of state and federal proceedings;
> (8) the presence or absence of concurrent jurisdiction;
> (9) the availability of removal; and
> (10) the vexatious or contrived nature of the federal claim.

*Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014).

While factors 3 and 8 may caution in favor of abstention. The remaining eight (8) factors are either neutral or counsel against abstention. Significantly, as the Seventh Circuit held in *Houn*, "although no one factor is determinative, the Supreme Court has cautioned that 'the presence of federal-law issues must always be a major consideration weighing against surrender.'" *Huon v. Johnson & Bell, Ltd.*, 657 F.3d at 648 (internal citation omitted). Furthermore, absent or neutral factors weigh in favor of exercising jurisdiction (against abstention).

Here, the Defendants must lean heavily on the desire to avoid piecemeal litigation and the presence of concurrent jurisdiction. Yet those interest pale in comparison to the federal courts' weighty interests in Constitutional claims. Particularly where there is a presumption against abstention, Defendants simply cannot demonstrate a necessity for abstention.

**3.      Pullman abstention**

Finally, the Municipal Defendants, Governor Evers, and the Milwaukee County Defendants seek abstention under the *Pullman* doctrine. "*Pullman* abstention is appropriate 'only when (1) there is a substantial uncertainty as to the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling.'" *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011).

Simply on its face, there is no basis to invoke the *Pullman* doctrine. There is no substantial uncertainty regarding the meaning of any of the Wisconsin election statutes implicated by this suit. What is at issue is the decision by local officials (elected and unelected) deciding not to follow the unequivocal statutes as written by the legislature. Further, there is no clarification underway in any litigation. The recount will not clarify the law. Consequently, abstention is inappropriate.

Significantly, the Seventh Circuit observed that "[t]he Supreme Court has recently stated that *Pullman* abstention operates *only where* 'the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law.'" *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 365 (7th Cir. 1998) (emphasis added). The constitutional question here will not be determined elsewhere. Furthermore, while the Defendants raise objections of delay (laches), they fail to acknowledge that the risk of delay that they seek by invoking abstention is a consideration to determine abstention is inappropriate. *Kendall-Jackson Winery, Ltd. v. Branson*, 82 F. Supp. 2d 844, 860 (N.D. Ill. 2000).

As there is no uncertain state law to decipher, *Pullman* abstention is inappropriate.

**E.** **The 11th Amendment does not immunize the State defendants from this suit for both declaratory and prospective injunctive relief.**

Only two parties have raised 11th Amendment sovereign immunity arguments—the Democratic National Committee (Dkt. 101 p. 19) and WEC. (Dkt.

98 p. 17.) In general, "The Eleventh Amendment grants *states* immunity from private suits in federal court without their consent." *Nuñez v. Indiana Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016) (emphasis added).[9] The DNC is a political partisan group that does not wield any power of the state and voluntarily injected itself in this action as an intervening party. Its brief fails to explain how it can raise Eleventh Amendment immunity objections on behalf of the State of Wisconsin.

There are three exceptions to Eleventh Amendment immunity: (1) suits against state officials seeking prospective equitable relief for violations of federal law; (2) Congressional abrogation of the state's immunity; and (3) the state's waiver of immunity and consent to suit in federal court. *Id.* Except for WEC, the other State Defendants have not raised this defense.

In any event, both WEC and the DNC recognize that the Plaintiff seeks relief under the first exception for prospective equitable relief as permitted under *Ex Parte Young*, 209 U.S. 123 (1908). They assert the Plaintiff's federal constitutional claims are based solely on violations of *state* law rather than *federal* law, and thus they argue, 11th Amendment immunity precludes this Court from hearing those claims under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)

---

[9] 11th Amendment immunity extends only to state officials, not municipal officers. *Richman v. Sheahan*, 270 F.3d 430, 439 (7th Cir. 2001) ("The Eleventh Amendment does not apply to suits against counties or other local government entities.") None of the municipal defendants have raised this defense.

(holding that the 11th Amendment denies federal courts from granting relief against states on the basis of *state* law).

However, these arguments fail to recognize the intersection of state and federal law uniquely presented in cases arising under Article II's Electors Clause. The President has brought his claims on the grounds that Article II delegates *federal* constitutional authority for conducting presidential elections exclusively the State Legislature. This means that

> in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, *the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution.*"

*Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000). "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring). Following *Bush v. Gore*, several other courts have likewise held that the 11th Amendment does not bar federal suits pertaining to violations of state election law under Article II's Electors Clause. *Donald J. Trump for President, Inc. v. Bullock*, 2020 WL 5810556, at *5 (D. Mont. Sept. 30, 2020) ("Plaintiffs contend that Governor Bullock, not the 'Legislature,' has altered the time, place, and manner of Montana's federal elections in contravention of the United States Constitution. … **This is quintessentially a federal question** [and] no Eleventh Amendment barrier blocks adjudication.") (emphasis added); *Democracy N.*

*Carolina v. N. Carolina State Bd. of Elections*, 2020 WL 6589362, at *1–2 (M.D.N.C. Oct. 2, 2020), amended on reconsideration, 2020 WL 6591367 (M.D.N.C. Oct. 5, 2020) ("[T]his court intends to address whether the North Carolina State Board of Elections, by and through its most recent Memo 2020-19, has, through Executive action, unconstitutionally modified the North Carolina legislative scheme for appointing Presidential electors. ***That is a constitutional question, not a question of state law***.") (emphasis added).

None of the cases cited by Defendants involve questions of fidelity to the Legislature's manner of conducting presidential elections under the Electors Clause. (*See* Dkt. 101 pp. 19–20 and Dkt. 98 p. 17) (citing *Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999) (dairy regulations); *Colon v. Schneider*, 899 F.2d 660, 672 (7th Cir. 19900 (state prison regulations); *Massey v. Coon*, No. 87-3768, 1989 WL 884 at *2 (9th Cir. Jan. 3, 1989) (objections to pro tem judges); *Balsam v. Sec'y of State*, 607 F.App'x 177, 183–84 (3d Cir. 2015) (pendent state law claims); *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (provision of fire rescue services); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 360–61 (6th Cir. 2008) (Voting Rights Act claims); *Rose v. Bd. of Election Comm'rs for City of Chi.*, 815 F.3d 372, 375 (7th Cir. 2016) (claims by candidate for city alderman).

As a result, Defendants' attempts to avoid federal judicial review should be denied.

**F.** **The Wisconsin Elections Commission and municipal election officials did not conduct this election "in such Manner as the Legislature thereof may direct."**

Executive branch and local officials made *ultra vires* modifications to the Legislature's explicit directions for the manner of conducting absentee voting in Wisconsin for the presidential election. Plaintiff recognizes that no election is perfect and anecdotal irregularities can occur. However, the Defendants' actions subject to this suit are not mere anecdotal irregularities but reflect *ultra vires* modifications to the Legislature's directions set out in the Election Code, which the Defendants promulgated systemically and structurally through policy directives, guidance, and instructions to be carried out by subordinate election officials and workers. And these directives were, in fact, carried out with extensive and tangible effect.

"The [Wisconsin E]lections [C]ommission shall have the responsibility for the *administration* of chs. 5 to 10 and 12 and other laws relating to elections and election campaigns, other than laws relating to campaign financing." Wis. Stat. § 5.05(1) (emphasis added). While the Commission is empowered to "[p]romulgate rules under ch. 227 applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections," Wis. Stat. § 5.05(1)(f), "a rule is not valid if the rule exceeds the bounds of correct interpretation." Wis. Stat. § 227.11(2)(a). Even so, the Commission did not attempt to promulgate its *ultra vires* modifications at issue here through formal rulemaking but rather through published "guidance" documents, which "do[] not have the force of law." Wis. Stat. §

227.112(3). Yet despite lacking the force of law, the Commission's Guidance

Documents directed clerks throughout the state to violate the Legislature's

directives, and in accordance with the WEC's urging, the law was repeatedly and

systematically violated.

1.      **Plaintiff was not required to file a complaint with the Wisconsin Elections Commission as a condition to this action, because he was not eligible to do so.**

The Municipal Officials incorrectly assert that Plaintiff was required to file a

complaint with the Wisconsin Election Commission as a condition to filing this

action. (Dkt. 70 p. 25) (citing Wis. Stat. § 5.06(3)). However, the relevant statute

provides:

> *No person who is authorized to file a complaint under sub. (1)*, other than the attorney general or a district attorney, *may commence an action or proceeding* to test the validity of any decision, action or failure to act on the part of any election official with respect to any matter specified in sub. (1) without first filing a complaint under sub. (1), nor prior to disposition of the complaint by the commission.

Wis. Stat. § 5.06(2) (emphasis added). However, under Subdivision (1), Plaintiff was

not (and is not) eligible to file a complaint with the WEC, because he is not a

Wisconsin elector: "Whenever any *elector*…believes that a [violation has occurred],

the *elector* may file a written sworn complaint with the commission…." Wis. Stat. §

5.06(1) (emphasis added); *see* Wis. Stat. § 6.02 (designating "electors" as Wisconsin

residents).

This action was instituted by the Plaintiff, who as alleged in the Complaint, is a

Florida resident. (Compl. ¶ 1.) Thus, by its plain language, Wis. Stat. § 5.06(2) does

not require Plaintiff to file a complaint with the WEC as a condition to bringing this action.

**2.    The Heart of the Matter—The Municipal Defendants believe the Wisconsin Election Code is "directory, not mandatory."**

The Municipal Defendants stunningly assert that "nearly all" the Wisconsin Election Code requirements are "directory, not mandatory."[10] (Dkt. 70 p. 26.) This captures the very root of the problem this action seeks to redress—Wisconsin election officials treated the Legislature's clear directives as mere suggestions, rather than mandatory procedures. In support, the Municipal Defendants cite Wis. Stat. § 5.01(1), but ignore the emphasized clause:

> ***Except as otherwise provided***, chs. 5 to 12 shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions.

Wis. Stat. § 5.01(1). In the 1980s—decades before the specter of either a Trump or Biden candidacy—the Wisconsin Legislature clearly expressed its policy determination that absentee voting is a *privilege* not a *right*:

> [V]oting by absentee ballot is a ***privilege*** exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of ***voting by absentee ballot must be carefully regulated*** to prevent the potential for fraud or abuse[.]

Wis. Stat. § 6.84(1) (emphases added). In stark contrast to the Defendants' flippant attitude toward the absentee voting procedures the Legislature also directed:

---

[10] Merriam Webster's defines "directory" as "providing advisory but not compulsory guidance." https://www.merriam-webster.com/dictionary/directory

> ***Notwithstanding s. 5.01(1)***, with respect to ***matters relating to the absentee ballot process***, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. ***shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted.*** Ballots counted in contravention of the procedures specified in those provisions ***may not be included in the certified result*** of any election.

Wis. Stat. § 6.84(2). Defendants' flippant attitude toward these clear mandates is alarming.

### 3. Using approximately 500 unmanned drop boxes clearly violated the Wisconsin Election Code.

In one of its "mandatory" code sections detailing the absentee voting procedure, the Wisconsin Election Code specifies exactly where and how absentee ballots may be cast and deposited: "The envelope [containing the absentee ballot] shall be *mailed* by the elector, or *delivered in person*, to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b)1; *see Olson v. Lindberg*, 2 Wis. 2d 229, 238, 85 N.W.2d 775, 781 (1957) ("None of the 18 absentee ballots which were invalid by reason of the fact that they were not delivered to the town clerk at his office or mailed there, may be counted.")

Moreover, the Legislature has made a single exception, providing for alternate sites to which voters may return absentee ballots, but those alternate sites "***shall be staffed*** by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Wis. Stat. § 6.855(3) (emphasis added). Moreover, the alternate sites "shall be located as near as practicable to the office of the municipal clerk or board of election

commissioners," and "no site may be designated that affords an advantage to any political party." Wis. Stat. § 6.855(1). Likewise, Wis. Stat. § 7.15(2m) provides, "[I]n a municipality in which the governing body has elected to an establish an alternate absentee ballot site under s. 6.855, ***the municipal clerk shall operate such site as though it were his or her office*** for absentee ballot purposes and shall ensure that such site is ***adequately staffed***." (Emphases added.)

Yet the WEC guidance explicitly violated the Legislature's directive:

A ballot drop box provides a secure and convenient means for voters to return their by mail absentee ballot. A drop box is a secure, locked structure operated by local election officials. Voters may deposit their ballot in a drop box at any time after they receive it in the mail up to the time of the last ballot collection Election Day. Ballot drop boxes can be staffed or unstaffed, temporary or permanent.

(Compl. Ex. 13 p. 1.)

The Municipal Defendants and Governor Evers assert that the drop boxes were nevertheless secure. (Dkt. 70 p. 23; Dkt. 95 p. 12.) While that might be the subject of a fact dispute, and thus inappropriate for resolution on a motion to dismiss, it is immaterial. By specifying how alternate sites "shall be" established and managed, the Legislature already expressed its collective wisdom on how to maintain the security of those sites. Under Article II, the Legislature—and only the Legislature—gets to make that determination for Wisconsin, and it has determined that "[b]allots cast in contravention of th[os]e procedures…may not be counted [and] may not be included in the certified result of any election." Wis. Stat. § 6.84(2). The fact that

the Governor, WEC, and Municipal Defendants believe they can create a better (or at least equally secure) process is of no moment, as the Constitution requires them to follow the Wisconsin Legislature's directions. And while legislatures in *other states* may have exercised their prerogative under Article II to authorize drop boxes in *their states*, as WEC argues (Dkt. 98 p. 21 n.10), that does not give WEC and municipal clerks the freedom to ignore the *Wisconsin* Legislature's prerogative under Article II to direct the manner of conducting elections in *Wisconsin*.

In another "mandatory" code section for absentee voting procedures, the Legislature has directed that "[t]he [absentee] ballot shall be returned so it is delivered to the polling place no later than 8 p.m. on election day." Wis. Stat. § 6.87(6). If it is not, it "may **not be counted**." Wis. Stat. § 6.87(6) (emphasis added).

Yet the drop box registry lists numerous entries expressly stating "Final Pick-Up 8:00 p.m. on November 3, 2020," making delivery to the polling place by the exact same time impossible. (Compl. Ex. 18 p. 3.)[11] This, too, violated the Legislature's directives.

Governor Evers incorrectly and disingenuously argues that "WEC issued its guidance consistent with President Trump's Cybersecurity and Infrastructure

---

[11] The Municipal Defendants have attached a photograph purporting to depict a single drop box in a single location, but the supporting affidavit, submitted by one of its attorneys in this case, contains no foundation of his personal knowledge or assert that it is representative of all drop boxes in Madison, let alone the entire State. (May Decl. ¶¶ 1, 13 [Dkt. 73] and Ex. 11, [Dkt. 73-11].) In any event, the attempt to introduce a photograph through a motion to dismiss is entirely improper and does not disprove the information published about numerous other drop boxes in Plaintiff's Exhibit 18.

Security Agency [CISA] recommendations." (Dkt. 95 p. 12.) However, as the

President emphasized in his Complaint, WEC omitted and ignored an important

CISA warning: "If you are considering the use of ballot drop boxes, ***you should***

***review your existing laws and requirements*** and determine whether emergency

changes may be necessary." (Compl. ¶¶ 184–85 Ex. 15.) And the Milwaukee City

Defendants argue that the drop boxes were warranted to accommodate "widespread

safe election practices encourage by the WEC during the COVID-19 pandemic."

(Dkt. 76 p. 8.) But "[h]owever well-intentioned and appropriate from a policy

perspective in the context of a pandemic during a presidential election, it is not the

province of a state executive official to re-write the state's election code, at least as

it pertains to selection of presidential electors." *Carson v. Simon*, 978 F.3d 1051,

1060 (8th Cir. 2020). "There is no pandemic exception to the Constitution." *Id.*

4.  **Defendants unlawfully directed pollworkers to alter numerous**
    **ballots to cure defects which, by statute, can only be cured by a voter**

The Wisconsin Election Code is crystal clear and mandatory: "If a[n absentee

voter's] certificate is *missing the address of a witness, the ballot may not be*

*counted.*" Wis. Stat. § 6.87(6d). WEC and the Milwaukee County Defendants

wrongly accuse the Plaintiff of seeking to re-write the statute. (Dkt. 98 p. 23; Dkt.

81 pp. 22–23.) Rather, it is Defendants who would add a new rule—that a ballot

must not be counted, *unless the clerk can ascertain the missing information and fills*

*it in.* (Dkt. 98 p. 23; Dkt. 95 pp. 9–10.) The Election Code does not authorize clerks

or anyone other than the voter to "cure" missing information from the certification; rather, the code specifies the procedure for remedying a deficient certificate:

> If a municipal clerk receives an absentee ballot with *an improperly completed certificate or with no certificate*, *the clerk may <u>return the ballot to the elector</u>*, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time *permits <u>the elector to correct the defect</u> and return the ballot* within the period authorized under sub. (6) [i.e. to the polling place by 8 p.m. on Election Day].

Wis. Ann. § 6.87(9).

However, rather than follow the Legislative's directive that the ballot may either be returned to the voter to correct it or "may not be counted," WEC issued its own last-minute, *ultra vires* "guidance" to all Wisconsin clerks modifying this directive:

| | |
|---|---|
| **DATE**: | October 19, 2020 |
| **TO**: | Wisconsin County Clerks |
| | Wisconsin Municipal Clerks |
| | City of Milwaukee Election Commission |
| | Milwaukee County Election Commission |
| **FROM**: | Meagan Wolfe |
| | Administrator |

On Election Day, if a voter needs to correct information on the absentee certificate envelope, they and/or their original witness, depending on what the error is, must appear at the polling place or central count. This would be due to missing voter information, missing voter signature, or missing witness signature. The witness can appear without the voter to add their signature or address. Please note that the clerk should attempt to resolve any missing witness address information prior to Election Day if possible, and this can be done through reliable information (personal knowledge, voter registration information), through a phone call with the voter or witness). The witness does not need to appear to add a missing address.

(Comp. Ex. 35 [ECF 12-35] pp. 1, 3.) WEC justifies its guidance arguing the statute above states the clerk "may" return the envelope to the voter. (Dkt. 98 p. 24.) And that's true. The clerk is not *required* to return the envelope to the voter. But the fact that a clerk "may" return the envelope to a voter does not authorize or gives a clerk discretion to fill in the missing information unilaterally or otherwise. Even assuming the statute gives clerks that discretion, there are no detailed statewide standards to guide the clerk's discretion to determine when to return the envelope to a voter or when to fill it out him- or herself.

The testimony and evidence at the hearing will show that workers in the Clerks' offices—not the voters—attempted to "cure" voters' certifications—contrary to the Legislature's directive—by adding missing witness addresses in red ink. The declaration of Claire Woodall-Vogg, Executive Director of Milwaukee City Elections Commission, readily admits her office's systemic following of WEC's unlawful advice. If witness information was missing from the voter's certification, "we added the municipality," "we would add the address," "we added it [the missing information]." (Dkt. 80 pp. 2–3 ¶¶ 7a–7d.)

Additional evidence at the hearing will show that during the absentee ballot canvassing, when ballot counters raised challenges to ballots containing these alterations, Defendant Woodall-Vogg refused to allow these challenges, made an announcement that such challenges would not even be entertained, and the ballot counters were bullied into submissive silence. Pollwatchers were likewise denied

meaningful access to challenge the unlawful practices and any attempts to do so were similarly shot down.

Both the Milwaukee County and Milwaukee City Defendants act like missing witness address information is no big deal. For election workers to alter sworn certifications on an absentee ballot envelope obviously makes little sense in terms of process management, chain of custody, or election integrity and there exist no detailed statewide standards that would authorize or guide such conduct by election workers.

**5.      Defendants ignored the Legislature's reliability safeguards for absentee ballots by circumventing photo ID requirements through misuse of the "indefinitely confined" exception.**

In their Motion to Dismiss, the Municipal Defendants assert the Dane County Clerk McDonell obeyed the Wisconsin Supreme Court's order after it found his publicly posted advice might mislead voters to vote illegally and enjoined him from such further postings. (Dkt. 70 p. 28.) This is a fact assertion inappropriate to decide a motion to dismiss.

Moreover, the Defendants incorrectly argue that the Wisconsin Supreme Court in *Jefferson v. Dane County* (May Decl. Ex. 5, Dkt. 73-5) adjudicated the validity of WEC's March 29, 2020, guidance (Compl. Ex. 2, Dkt. 12-2) in its entirety. (Dkt. 70 pp. 21–22; Dkt. 98 p. 20; Dkt. 95 p. 11 n.15; Dkt. 81 p. 21; Dkt. 76 p. 8.) The Court merely held that McDonell's public advice urged voters to violate Wisconsin election law and ordered any future postings to conform to two paragraphs of the WEC guidance. (Dkt. 73-5 pp. 2–3.) The Court confined its holding to the two specific

paragraphs quoted in its order and did not adjudicate the remaining content from

the WEC guidance, which suggested that "[d]uring the current public health crisis,

*many voters* of a certain age or in at-risk populations may meet that standard of

indefinitely confined until the crisis abates." (Compl. Ex. 2 p. 2). In an apparent

recognition of the guidance's overreach, Governor Evers re-writes the guidance in

his brief, arguing that "*Some* voters *may* meet the standard…." (Dkt. 95 p. 11.)

### G.    **Plaintiff is entitled to declaratory and injunctive relief**

The Declaratory Judgment Act provides:

> [A]ny court of the United States…may declare the rights and other
> legal relations of any interested party seeking such declaration,
> whether or not further relief is or could be sought. Any such
> declaration shall have the force and effect of a final judgment or decree
> and shall be reviewable as such.

28 U.S.C. § 2201.

"[T]he Declaratory Judgment Act does not 'extend' the 'jurisdiction' of the

federal courts." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191,

197 (2014). Rather, the Declaratory Judgment Act, "place[d] a remedial arrow in the

district court's quiver." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).

As set forth above, a case and controversy exists. Despite the protestations of

the Defendants, President Trump suffered a particularized harm, different than the

public. The harm was the result of a collection of practices each of which were

contrary to Wisconsin election statutes. As a result, he was denied the

Constitutional right to have electors appointed in a lawful manner in an election in

which he was a candidate.

Each State is delegated authority to cast electoral votes for president in 2020, but, only if 3 conditions are met:

> 1) a statewide vote for electors is held on Nov. 3; (required by 3 U.S.C. § 1)
>
> 2) that election must be held in the manner directed by the state legislature; (required by U.S. CONST. Art. II, § 1, cl. 2) and
>
> 3) the electors must cast their votes on Dec. 14 (required by 3 U.S.C. § 7).

If a State fails to meet any condition, it cannot cast its electoral votes for President and Vice President, just as in any other situation, public or private, the result reached by the agent is invalid if the conditions of the delegation are not honored. President Trump is entitled to a declaratory judgment that the election was not conducted in a lawful manner and therefore electoral votes cast on December 14 as a result of the flawed election are not valid.

Fortunately for the State of Wisconsin, the Electoral Count Act does contain a savings provision that permits the State Legislature to appoint electors in the event the Presidential election held in the State or to be held in the State does not meet constitutional standards or otherwise fails.

To cover such situations Congress enacted 3 U.S.C. § 2 which provides:

> Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct.

As the Wisconsin Elections Commissions explained in its earlier filing in this Wisconsin Supreme Court (the Original Action) (and discussed *supra*), the winner of Wisconsin's ten electoral votes can be certified "after the electors have convened and

cast their electoral votes," and before January 6. Response of Respondents

Wisconsin Elections Commission and Commissioner Ann Jacobs in Case. No.

20AP1971-OA, filed Dec. 1, 2020, at 8.[12]

As WEC explained in the Original Action filing, 3 U.S.C. § 6 provides that a

state governor may issue a certificate of ascertainment based on the canvassing and

then a subsequent certificate of "determination" upon the conclusion of all election

challenges. *Id*. The certificate of "determination" notifies the U.S. Congress of the

state decision when Congress convenes on January 6 to count the electoral votes.

Consequently, the WEC has acknowledged that this matter is not moot, and could

not be for four more weeks.

Consistent therewith, this Court should issue injunctive relief ordering

Governor Evers to issue a certificate of determination consistent with, and only

consistent with, the appointment of electors by the Wisconsin legislature.

Injunctive relief requires the showing of irreparable harm, that monetary

damages are inadequate to remedy the injury, that the equitable remedy is

warranted upon balancing the hardship between the parties, and the public interest

---

[12] *See also Bush v. Gore*, 531 U.S. 98, 144 (2000) (Ginsburg, J., dissenting) (noting that the date that has "ultimate significance" under federal law is "the sixth day of January," the date set by 3 U.S.C. § 15 on which "the validity of electoral votes" is determined); Laurence H. Tribe*, Comment: eroG .v hsuB and Its Disguises: Freeing Bush v. Gore From Its Hall of Mirrors*, 115 Harv. L. Rev. 170, 265-66 (2001) (noting that the only real deadline for a State's electoral votes to be finalized is "before Congress starts to count the votes on January 6").

would be well served. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892, 2011 WL 488879 (7th Cir. 2011).

As discussed throughout and as will be demonstrated at the hearing, President Trump was harmed by Defendants' failure to conduct an election in the manner prescribed by the Wisconsin legislature. Defendants' actions cannot be undone and an equitable remedy is the only available remedy.

Defendants will predictably argue that the President's remedy will disenfranchise Wisconsin voters. Defendants have it backwards. Defendants' decisions and actions disenfranchised Wisconsin voters.

Their decisions and actions deviating from Wisconsin law resulted in an election that was not conducted in the manner described by the legislature. Their decisions and actions resulted in a void election, and their decisions and actions resulted in the inability of Wisconsin to appoint electors as a result of the election.

It is President Trump who vindicates the rights of Wisconsin voters by ensuring Wisconsin will submit electoral votes on January 6, 2021. And that submission must come from the voters' representatives in the Wisconsin legislature pursuant to 3 U.S.C. § 2 ("the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct").

Defendants' briefs emit a coordinated theme, warning of the effect on future elections if this Plaintiff is successful this time. That concern is easily allayed.

Ultimately, rights are safeguarded, liberty is protected, and elections are fair when state officials follow the law. When they do not do so, as here, the long-term ramifications for the public's faith in the electoral process is undermined and the foundations of democracy are threatened. For democracy to remain, vibrant elections must be run with clear and settled rules. The constitutional checks and balances for Presidential elections must be respected.

Local officials acting without limitations to change the rules in an election for President are an existential threat to the constitutional structure for elections. As this election demonstrates, the outcome of the voting in just a few counties in the entire country can tip the electoral balance. Article II represents the Framers' decision to deny that power to executive branch, administrative, and local officials, but if Article II is to have any teeth, it must be enforced. To do otherwise would cause the Electoral College to be tainted with the votes of electors chosen in an unconstitutional election. Not only are Wisconsin voters the losers in such a scenario, voters throughout the country and the rule of law would lose as well.

Unelected bureaucrats and municipal officials should not subvert the will of the legislature which is delegated the responsibility to determine the manner of the election. If nothing is done now to demonstrate violations of the election laws have real consequences, there will be long term effects. Partisans will be encouraged to violate the laws. Citizens' trust in the governmental institutions, and the belief in transparent and fair elections will continue to erode.

John Adams said, ours is "a government of laws, and not of men." (John Adams, 1779). The entire American experiment from the Declaration of Independence in 1776 when distilled down, into just four words, is this: The Rule of Law.

President Trump asks that the Rule of Law be followed. Defendants ask that this Court allow them to determine the law as is convenient and best for them.

## CONCLUSION

For the foregoing reasons, Plaintiff President Donald J. Trump respectfully requests the Court to deny the Motions to Dismiss and to grant his request for declaratory and injunctive relief, and for all other just and proper relief.

DATED: December 9, 2020.

> Respectfully Submitted,
>
> KROGER, GARDIS & REGAS, LLP
>
> /s/ William Bock, III
>
> William Bock III, Indiana Attorney No. 14777-49
> James A. Knauer, Indiana Attorney No. 5436-49
> Kevin D. Koons, Indiana Attorney No. 27915-49
> KROGER, GARDIS & REGAS, LLP
> 111 Monument Circle, Suite 900
> Indianapolis, IN 46204
> Phone: (317) 692-9000
>
> *Attorneys for Plaintiff Donald J. Trump*

## CERTIFICATE OF SERVICE

A copy of the foregoing document was served upon all parties' counsel of record via this Court's CM/ECF service on this 9th day of December, 2020.

> /s/ William Bock, III