# EXHIBIT 505

| List of 2020 Wisconsin Election-Related Cases | | | | |
|---|---|---|---|---|
| Case Name | Case Number | Court | Date Case Filed | Date of Final/Most Recent Disposition |
| State ex rel. Zignego v. Wisconsin Elections Commission | 2019AP002397 | WI Supreme Court | 12/17/2019 | Oral argument 09/29/2020; final disposition pending |
| Jefferson v. Dane County | 2020AP000557 | WI Supreme Court | 3/27/2020 | Oral argument 09/29/2020; final disposition pending |
| DNC v. Bostelmann | 20-cv-249 | W.D. Wisconsin | 3/18/2020 | Pending on remand - last W.D. filing 11/4/2020 |
| Gear v. Bostelmann | 20-cv-278 | W.D. Wisconsin | 3/26/2020 | Pending on remand - last W.D. filing 11/4/2020 |
| Swenson v. Bostelmann | 20-cv-459 | W.D. Wisconsin | 5/18/2020 | Pending on remand - last W.D. filing 11/4/2020 |
| Edwards v. Vos | 20-cv-340 | W.D. Wisconsin | 4/13/2020 | Pending on remand - last W.D. filing 11/4/2020 |
| Common Cause v. Thomsen | 19-cv-323 | W.D. Wisconsin | 4/22/2019 | Pending - last text order 12/7/2020 |
| Lewis v. Bostelmann | 20-cv-284 | W.D. Wisconsin | 3/26/2020 | Pending, in part - last filing 9/10/2020 |
| Andrew Goodman Foundation v. Bostelmann | 19-cv-955 | W.D. Wisconsin | 11/19/2019 | 8/25/2020 |
| Bright v. Lynch | 2020AP001761 | WI Supreme Court | 10/26/2020 | 10/29/2020 |
| West, et al. v. Wisconsin Elections Commission | 2020CV000812 | Brown County | 8/28/2020 | 9/11/2020 |
| Hawkins v. Wisconsin Elections Commission | 2020AP001488 | WI Supreme Court | 9/3/2020 | 9/14/2020 |
| Ratner Judge, et al. v. City of Madison Board of Canvassers | 2020CV002029 | Dane County | 9/30/2020 | 11/19/2020 |
| WI Voters Alliance v. City of Racine | 20-cv-1487 | E.D. Wisconsin | 9/24/2020 | 10/14/2020 |
| Langenhorst v. Pecore | 20-cv-1701 | E.D. Wisconsin | 11/12/2020 | 11/16/2020 |
| WI Voters Alliance v. Wisconsin Elections Commission | 2020AP1930 | WI Supreme Court | 11/24/2020 | 12/4/2020 |
| Mueller v. Wisconsin Elections Commission | 2020AP1958 | WI Supreme Court | 11/27/2020 | 12/3/2020 |
| Trump v. Evers | 2020AP1971 | WI Supreme Court | 12/1/2020 | 12/3/2020 |
| Feehan v. Wisconsin Elections Commission | 20-cv-1771 | E.D. Wisconsin | 12/1/2020 | Pending - Reply briefs filed 12/8/2020 |
| Trump v. Wisconsin Elections Commission | 20-cv-1785 | E.D. Wisconsin | 12/2/2020 | Pending - Motion to stay hearing denied 12/8/2020 |
| Texas v. Michigan, Pennsylvania, Wisconsin & Georgia | | U.S. Supreme Court | | Pending - responses due 12/10/2020 |
| Trump v. Biden | 2020CV007092 | Milwaukee County | 12/3/2020 | Pending - Answers filed 12/09/2020 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| _____ ) | | |
| Jill Swenson | ) | |
| Melody McCurtis | ) | |
| Maria Nelson | ) | |
| Black Leaders Organizing for Communities | ) | |
| Disability Rights Wisconsin | ) | |
| | ) | |
| | ) | No. 3:20-cv-00459 |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Marge Bostelmann, Julie M. Glancey, Ann S. Jacobs, | ) | |
| Dean Knudson, Robert F. Spindell, Jr., and | ) | |
| Mark L. Thomsen, Commissioners of the Wisconsin | ) | |
| Elections Commission; | ) | |
| | ) | |
| Meagan Wolfe, Administrator of | ) | |
| the Wisconsin Elections Commission. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ ) | | |

**COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF**

# INTRODUCTION

1.     The April 7, 2020 election was unlike any other in Wisconsin's history, tainted by breakdowns in critical aspects of the election process and disenfranchisement of a substantial number of Wisconsin voters. Two days before the election, the Surgeon General of the United States likened the novel coronavirus ("COVID-19") pandemic to the Pearl Harbor and September 11 attacks, warning the nation to prepare for the "saddest week of most Americans' lives."[1] While all other states with primaries scheduled in April delayed their elections, Wisconsin held its election in the midst of a global pandemic. Defendants and others took steps to attempt to administer the election fairly, including some at the order of this Court, but those actions were insufficient to protect the rights of Wisconsin voters. As a result, voters were forced to choose between forgoing their constitutional rights to participate in their democracy or risking the health of themselves and their loved ones in order to vote. Tens of thousands of voters were disenfranchised by failures in the absentee and in-person voting systems. The election shook the public's faith in the democratic process.

2.     This outcome was foreseeable and, for too many Wisconsin voters, including Plaintiffs, preventable. For over a month before the election, Defendants were aware of the growing danger of COVID-19 and the attendant risks of administering an election during the escalating pandemic. With each passing day, public health officials grew louder in their calls for social distancing, urging Americans to stay at home. Each day brought more deaths and more new infections. By election day, 83 Wisconsinites had died of coronavirus and 2,440 residents were known to be infected with the virus. At the same time, election experts from across the country expressed alarm over the lack of actionable steps taken by the state to conduct an

---

[1] Quint Forgey, *Surgeon General Warns This Week 'Is Going to Be Our Pearl Harbor Moment'*, POLITICO (Apr. 5, 2020), *available at* https://www.politico.com/news/2020/04/05/surgeon-general-pearl-harbor-moment-165729.

election in such extraordinary circumstances. As municipal and county clerks warned about the lack of capacity and resources to carry out the election properly, nine mayors, including the mayors of the five largest cities in Wisconsin, demanded that the election be postponed.[2]

3.      What ensued has been described by one election law expert as the biggest election failure since the Voting Rights Act was enacted in 1965.[3] Voters encountered obstacles at almost every stage of the election process, including: navigating the online systems designed to register voters and request absentee ballots; requesting absentee ballots, which were either never delivered or delivered too late; and voting in person. Before election day, 111 voting jurisdictions reported not having enough poll workers to open even one polling place; on election day, Milwaukee had 5 (of its usual 180) polling locations, Green Bay had 2 (of its usual 31) polling locations, and Waukesha had only 1 (of its usual 15). Voters who did go to the polls in many places encountered long waits and voting locations without adequate safety supplies for voters and poll workers alike.

4.      Plaintiffs bring this case to prevent a replay of this mass disenfranchisement in either the August Partisan Primary or the November General Election. Like the April 7 election, those elections will take place against the backdrop of COVID-19 and the extraordinary challenges it presents to election administrators and voters. There is a growing consensus among experts that COVID-19 will alter the daily lives of Americans at least into next year, and certainly through November. Whatever the precise course of the pandemic between now and the coming elections, there is no question that community transmission and attendant risks will

---

[2] Joseph Ax, *Citing Coronavirus, Wisconsin Mayors Urge Postponement of Tuesday's Election*, REUTERS (Apr. 5, 2020), *available at* https://www.reuters.com/article/us-health-coronavirus-election-wisconsin/citing-coronavirus-wisconsin-mayors-urge-postponement-of-tuesdays-election-idUSKBN21O0CZ.

[3] Shawn Johnson, *To the Polls in a Pandemic: How Wisconsin Went Ahead with an Election Amidst a Public Health Crisis*, WIS. PUBLIC RADIO (Apr. 13, 2020), *available at* https://www.wpr.org/polls-pandemic-how-wisconsin-went-ahead-election-amidst-public-health-crisis.

continue to impact the demand for online registration and for absentee voting methods, safe protocols for in-person voting, and other mechanics and processes of voting and election administration. The U.S. Constitution and the Voting Rights Act of 1965 require Defendants to administer upcoming elections in a way that avoids forcing voters to choose between their votes and their safety.

5. The U.S. Constitution guarantees that no eligible Wisconsin citizen will be deprived of the right to vote. Plaintiffs are individuals who were deprived of that right in the April 7 election and organizations whose work to ensure that Wisconsinites can participate in elections is burdened by Defendants' failure to provide a safe and accessible election under pandemic conditions. Plaintiffs allege that Defendants, by failing to take appropriate actions to ensure that Wisconsinites can safely access the ballot, violated Section 11(b) of the Voting Rights Act, the First and Fourteenth Amendments of the U.S. Constitution, and the Americans with Disabilities Act ("the ADA"). They bring this civil action to enjoin Defendants—Commissioners and the Administrator of the Wisconsin Elections Commission—from similarly violating Wisconsinites' rights to vote during future elections affected by COVID-19.

6. As the April 7 election demonstrated, Defendants maintain and administer an election system that—amidst a pandemic that both Wisconsin and national public health officials expect will continue and might well intensify between now and November—forces voters to choose between casting a ballot and protecting their own, their families', and their communities' health. In the April 7 election, Defendants failed to take available steps necessary to allow voters to vote safely, either in person or by the absentee voting procedures provided by Wisconsin law; and, despite the reports of substantial voter disenfranchisement, they have not taken sufficient steps to remedy those failures in advance of the coming elections. The burdens imposed by those

failures, moreover, did not fall equally on voters across the state. As a result, voters faced starkly different opportunities to safely cast a ballot depending on where they live, their age, their disability status, and their race.

7.     Plaintiffs do not contest the results of the April 7 election. Plaintiffs instead come before this Court to obtain an order requiring Defendants to administer impending elections in a manner that will not violate eligible voters' federally protected rights to participate in those elections. To be sure, Wisconsin's April 7 election was conducted in the face of a public health crisis that few foresaw until the month before the election, and many election officials worked very hard to manage the challenges it posed. Those challenges, however, do not alter the fundamental commands of the U.S. Constitution, the Voting Rights Act, and the Americans with Disabilities Act: that Defendants take reasonable steps to ensure that all voters can safely access the ballot and participate equally in a fair democratic process.

8.     Specifically, to comply with the requirements of federal law, Defendants must ensure that in-person voting can be safely conducted during the impending elections, including by mandating that all polling locations be managed in compliance with social distancing guidelines to minimize COVID-19 transmission risk; that there is an adequate number of poll workers to open and administer safe, in-person polling locations; that ample, safe opportunities for in-person absentee voting are available; that all voters who request and are qualified to receive absentee ballots in fact timely receive those ballots; that voters can safely, effectively, and timely return their absentee ballots so their votes are counted; and that online systems designed to register voters and request absentee ballots are sufficient to handle anticipated voter traffic. Critically, to restore public confidence in the electoral process and prevent further

disenfranchisement, Defendants must also educate the Wisconsin public about how they can safely vote—either in person or by absentee ballot—in the impending elections.

9.      Defendants failed to implement such measures for the April 7 election and have not taken steps to do so for the rapidly approaching August and November elections. Careful preparations are necessary to meet the inevitable challenges of conducting safe, fair elections amidst a pandemic. And those preparations must be undertaken sufficiently in advance of election day. Implementing changes to the administration of elections requires planning and preparation. Yet Defendants have not adopted policies that would implement the changes necessary to avoid the widespread disenfranchisement and substantial burdens on the right to vote that plagued the April 7 primary. Absent intervention by this Court—including by requiring Defendants to adopt such necessary policies when authorized by state law, and by enjoining state laws that currently preclude Defendants from taking necessary measures—the same electoral process breakdown and resulting violation of Plaintiffs' rights under federal law is likely to recur during the impending August Partisan Primary and November General Election.

## PARTIES

### I.  Plaintiffs

10.     **Plaintiff Jill Swenson** is a resident of Appleton, Wisconsin, and a registered voter. Ms. Swenson is sixty-one years old and has early stage chronic obstructive pulmonary disease ("COPD"), an inflammatory lung disease. Ms. Swenson was unable to vote in person because of the risk to her physical health and safety represented by the COVID-19 pandemic. She requested and received a mail-in absentee ballot, but she lives alone and was unable to secure an in-person witness. Consistent with this Court's order in *Democratic Nat'l Comm. v. Bostelmann,* No. 20-CV-249-WMC, 2020 WL 1638374, *18-20 (W.D. Wis. Apr. 2, 2020), she

mailed in an un-witnessed absentee ballot on the morning of April 3, 2020. After the Seventh

Circuit stayed that order, *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545,

1546, Order (7th Cir. Apr. 3, 2020), and as a result of Defendants' decision not to provide voters

like Ms. Swenson a reasonable opportunity to cure, Ms. Swenson's ballot was not counted. She

was thus disenfranchised in the April 7 election. Ms. Swenson does not currently have a safe and

effective way to cast a ballot in the upcoming elections.

      11.    **Plaintiff Melody McCurtis** is a resident of Sherman Park in Northwest

Milwaukee, Wisconsin, and a registered voter. Ms. McCurtis lives with her

immunocompromised mother, so it was unsafe for her to vote in person due to the COVID-19

pandemic. As a Black community organizer, she is also aware of the disproportionate rates of

infection and death in the Black community, and these elevated risks added to her fears. She

timely requested an absentee ballot on March 22, 2020. Her ballot never arrived. In order to vote

in the April 7 election, Ms. McCurtis was forced to endanger her mother and endure a wait of

more than two hours at Washington High School. Ms. McCurtis was unsafe because voters in

line were not able to maintain social distance, because the polling location did not provide voters

with personal protective equipment, and because voting equipment did not appear to be sanitary.

Ms. McCurtis plans to vote in August and November and presently does not have a safe,

equitable way to cast her ballot.

      12.    **Plaintiff Maria Nelson** is a resident of Appleton, Wisconsin, and a registered

voter. Ms. Nelson has breast cancer and has been undergoing treatment since February 2019. As

a result, she did not feel safe voting in person. Ms. Nelson timely emailed her absentee ballot

request to the Appleton Clerk's office. She did not receive an absentee ballot by April 7, 2020.

Ms. Nelson was unable to vote in person on April 7 because of the risk to her physical health and

safety represented by the ongoing COVID-19 pandemic. Ms. Nelson was thus disenfranchised in the April 7 election. Ms. Nelson does not currently have a safe and effective way to cast a ballot in the upcoming elections.

13. **Plaintiff Black Leaders Organizing for Communities ("BLOC")** is a civic engagement project based in Milwaukee, Wisconsin, and a fiscally sponsored project of Tides Advocacy, a California nonprofit. BLOC mobilizes Black Wisconsinites to participate at all levels of government and encourages communities of color to fulfill their potential for electoral impact in Milwaukee. As part of its work, BLOC educates the Black community in Milwaukee about voter eligibility rules and the options for casting a ballot, and it conducts a get-out-the-vote field program. In the run-up to the April 7 election, BLOC was forced to divert significant resources in response to the constitutional and statutory violations challenged here. BLOC staff were forced to spend additional time troubleshooting online registration and absentee ballot request issues, walking voters through changing deadlines, and providing them with information about what in-person voting in Milwaukee would look like. This diversion of resources has continued through the May 12th Special Election and will continue through the August and November elections if these violations are not remedied.

14. **Plaintiff Disability Rights Wisconsin ("DRW")** is a statewide nonpartisan, nonprofit, non-stock corporation organized under the laws of Wisconsin. DRW is based in Madison, and maintains offices across the state, including in Menasha, Milwaukee, Green Bay, and Rice Lake. DRW's mission is to address the issues facing, and to ensure the rights of, all people with disabilities in Wisconsin. DRW is a member of the National Disability Rights Network and is designated by the Governor of Wisconsin to act as the congressionally mandated protection and advocacy system for Wisconsin citizens with disabilities, pursuant to Wis. Stat.

§ 51.62; 29 U.S.C. § 794e; 42 U.S.C. §§ 15041, *et seq.*; and 42 U.S.C. §§ 10801, *et seq.*
Accordingly, DRW has a state and federal mandate to protect and advocate for the rights of
people with disabilities in Wisconsin, including those with developmental disabilities, mental
illness, and traumatic brain injury. As part of this mandate, DRW oversees self-advocacy training
and other programs and services to assist people with disabilities, including to secure election
access, registering to vote, accessing polling places, and casting their ballots, and it staffs a Voter
Hotline to assist voters with disabilities. DRW also co-leads the Wisconsin Disability Vote
Coalition. In the run-up to the April 7 election, DRW was forced to divert significant resources
in response to the constitutional and statutory violations challenged here. DRW had to produce
numerous resources and trainings for voters that it would not have otherwise produced, and it
had to spend staff time untangling the options for voters with disabilities and assisting voters
who were at risk of being disenfranchised. This diversion of resources has continued through the
May 12th Special Election and will continue through the August and November elections if these
violations are not remedied. DRW also brings this suit on behalf of people with disabilities in
Wisconsin who face significant obstacles to voting as a result of coronavirus and will either be
disenfranchised or exposed to heightened risk of illness if their legal rights to safely vote are not
vindicated.

## II.  Defendants

15.    **Defendants Marge Bostelmann**, **Julie M. Glancey**, **Ann S. Jacobs**, **Dean
Knudson**, **Robert F. Spindell, Jr.**, and **Mark L. Thomsen** are the six Commissioners of the
Wisconsin Elections Commission and are named as Defendants in their official capacities.
Together, they comprise the Wisconsin Elections Commission, the body that administers and

8

enforces Wisconsin's election laws other than those related to campaign finance. Wis. Stat. § 5.05(1), (2w).

16.     **Defendant Meagan Wolfe** is sued in her official capacity as the Administrator of the Wisconsin Elections Commission. She is the chief elections officer of the state. Wis. Stat. § 5.05(3g).

17.     Defendants have acted under color of state law at all times relevant to this action.

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution and by the Voting Rights Act, 52 U.S.C. §§ 10101, *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq.* This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the U.S. Constitution and federal statute and seeks equitable and declaratory relief for the deprivation of federal constitutional and statutory rights under color of state law.

19.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and 28 U.S.C. § 1920.

20.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

22.     Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials located in Madison, Wisconsin. A

substantial part of the events giving rise to these claims occurred and continues to occur in this

district, making venue also proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### I.   Defendants and the Wisconsin Elections Commission

23.     The Wisconsin Elections Commission ("the Commission") administers and

enforces all "laws relating to elections and election campaigns, other than laws relating to

campaign financing," which are administered separately by the Wisconsin Ethics Commission.

Wis. Stat. § 5.05(1), (2w).

24.     The Commission consists of six members, four appointed by legislative leaders

and two nominated by the Governor. Wis. Stat. § 15.61. Defendants Bostelmann, Glancey,

Jacobs, Knudson, Spindell, and Thomsen are the members of the Commission.

25.     The Commission operates "under the direction and supervision of an

administrator," who also serves as the "chief election officer" for the state. Wis. Stat.

§ 15.61(1)(b); Wis. Stat. § 5.05(3g). Defendant Wolfe is the Administrator of the Commission.

26.     The Commission maintains wide-ranging authority over the architecture of

Wisconsin's electoral system. The Commission retains authority to promulgate rules "applicable

to all jurisdictions for the purposes of interpreting or implementing the laws regulating the

conduct of elections or election campaigns, other than laws regulating campaign financing, or

ensuring their proper administration." Wis. Stat. § 5.05(1)(f).

27.     Among many other things, the Commission's authority includes:

- Issuing appropriate guidance or formal advisory opinions, or promulgating

  administrative rules, necessary to implement any state or federal court decision that is

  binding on the Commission. Wis. Stat. § 5.05(5t).

- Providing financial assistance to eligible counties and municipalities for election administration costs, consistent with other provisions of state law. Wis. Stat. § 5.05(10)-(11).

- Conducting or prescribing requirements for educational programs to inform electors about voting procedures, voting rights, and voting technology. Wis. Stat. § 5.05(12).

- Ensuring that the voting system used at each polling place permits all individuals with disabilities to vote without the need for assistance and with the same degree of privacy that is accorded to nondisabled electors voting at the same polling place. Wis. Stat. § 5.25(4); and

- Prescribing uniform instructions for municipalities to provide to absentee electors. Wis. Stat. § 6.869.

28.     The Commission may also "reconsider at any time any written directives or written guidance provided to the general public. . . with regard to the enforcement and administration" of Wisconsin election law, including by county and municipal officials. Wis. Stat. § 5.05(16)(c).

29.     Defendants at all times acted under color of state law.

## II.     The Coronavirus Pandemic and Wisconsin's Response

### A.   COVID-19 and its Health Effects

30.     In the United States, the first confirmed case of the novel coronavirus known as COVID-19 was identified in Washington State on January 21, 2020.

31.     People infected by COVID-19 exhibit a wide range of symptoms, most prominently cough or shortness of breath or difficulty breathing.[4] In addition, according to the

---

[4] Ctrs. for Disease Control and Prevention, "Symptoms of Coronavirus," *available at* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 8, 2020).

U.S. Centers for Disease Control and Prevention ("CDC"), five other symptoms indicate that a person may have COVID-19, including: fever, chills, muscle pain, sore throat, and new loss of taste or smell.[5]

32.     COVID-19 is an especially infectious virus because it is frequently transmitted by people who are not experiencing symptoms. It may take up to 14 days after exposure to the virus for a person to exhibit any symptoms, and people may be most infectious prior to exhibiting symptoms. One study estimated that 44 percent of people infected contracted the virus from people who felt healthy at the time.[6] In fact, some people may remain asymptomatic carriers and nonetheless transmit the virus.[7] Others recover fully from their symptoms and continue shedding the virus that can infect others.[8]

33.     The highly infectious nature of the disease—including its long incubation period and the number of asymptomatic, pre-symptomatic, and post-symptomatic carriers—poses significant concerns for populations that are most vulnerable to COVID-19, such as the elderly and the immunocompromised. The CDC identifies older adults as having a higher risk of developing more serious complications from COVID-19 and recommends that they stay home as much as possible when the virus is spreading in the community. The CDC has also warned that immunocompromised people (including smokers, those undergoing cancer treatment, bone marrow or organ transplantation, and those with poorly controlled HIV or AIDS, and immune deficiencies), as well as individuals with lung disease, asthma, heart conditions, severe obesity,

---

[5] *Id.*
[6] Katherine Harmon Courage, *How People Are Spreading Covid-19 Without Symptoms*, Vox (Apr. 22, 2020), *available at* https://www.vox.com/2020/4/22/21230301/coronavirus-symptom-asymptomatic-carrier-spread.
[7] *Id.*
[8] *Are COVID-19 Patients Contagious After Symptoms*, LABMATE (Apr. 16, 2020), *available at* https://www.labmate-online.com/news/laboratory-products/3/breaking-news/are-covid-19-patients-contagious-after-symptoms/52030.

diabetes, chronic kidney disease undergoing dialysis, and liver disease are at higher risk of

developing more serious complications from COVID-19 illness.[9] The Kaiser Family Foundation

estimated that 92.6 million Americans ages 18 and older—nearly 40 percent of all American

adults—are at heightened risk from COVID-19.[10]

34.     People outside of these groups, however, are not free from risk. The Wisconsin

Department of Health Services has warned that "[y]ounger people, and particularly those who

are 18 to 30 years old, aren't immune to COVID-19."[11] A recent CDC analysis of coronavirus

cases from mid-February to mid-March found that a fifth of those who needed to be hospitalized

were ages 20 to 44, and nearly half were ages 20 to 54.[12] In Wisconsin, people ages 20 to 49

account for 50 percent of all COVID-19 cases.[13]

35.     COVID-19 is infecting and killing Black people at disproportionately high rates

across the United States. The latest available data indicates that the COVID-19 mortality rate for

Black Americans is 2.6 times higher than the rate for Whites and 2.3 times higher than the rate

for Asians and Latinos.[14] A *Washington Post* analysis of available data and census demographics

shows that "counties that are majority-black have three times the rate of infections and almost six

---

[9] Ctrs. for Disease Control and Prevention, "People Who Are at Higher Risk for Severe Illness," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last updated Apr. 15, 2020).

[10] Wyatt Koma, *et al.*, *How Many Adults Are at Risk of Serious Illness If Infected with Coronavirus? Updated Data*, KAISER FAMILY FOUNDATION (Apr. 23, 2020), *available at* https://www.kff.org/global-health-policy/issue-brief/how-many-adults-are-at-risk-of-serious-illness-if-infected-with-coronavirus/.

[11] Wis. Dep't of Health Servs., "Outbreaks in Wisconsin," *available at* https://www.dhs.wisconsin.gov/outbreaks/index.htm (last visited March 26, 2020).

[12] Ctrs. for Disease Control and Prevention, "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) — United States, February 12–March 16, 2020" (Mar. 27, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w#T1_down.

[13] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases," *available at* https://www.dhs.wisconsin.gov/covid-19/cases.htm (last updated May 11, 2020).

[14] APM Research Lab, "The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.**,**" *available at* https://www.apmresearchlab.org/covid/deaths-by-race (last updated May 8, 2020).

times the rate of deaths as counties where white residents are in the majority."[15] This trend is also discernable at the individual state level, where Black people disproportionally are infected with, and die of, COVID-19.

36.     In Wisconsin, Governor Tony Evers has called the disproportionally high COVID-19 rates and deaths in the Black community "a crisis within a crisis." Although Black Wisconsinites comprise just 6.7 percent of the state's population, they account for roughly a third of COVID-19 deaths and nearly a quarter of COVID-19 cases.[16] In Milwaukee County, an analysis found that areas that are "predominantly black are experiencing disproportionately high numbers of reported cases and concentrations of coronavirus clusters," adding that "[r]ace is emerging as [a] key factor in determining who lives and who dies as this virus sweeps through the county."[17] Indeed, Blacks in Milwaukee are dying at nearly double the rate of their respective share of the population.[18]

37.     Overall, according to the World Health Organization, "around 1 in every 5 people who catch COVID-19 needs hospital treatment."[19] To date, in Wisconsin, 18 percent of cases

---

[15] Reis Thebault, *et al.*, *The Coronavirus Is Infecting and Killing Black Americans at an Alarmingly High Rate*, THE WASHINGTON POST (Apr. 7, 2020), *available at* https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true.

[16] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Deaths," *available at* https://www.dhs.wisconsin.gov/covid-19/deaths.htm (last updated May 11, 2020); Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases"; U.S. Census Bureau, "QuickFacts Wisconsin," *available at* https://www.census.gov/quickfacts/WI (last accessed May 12, 2020).

[17] Joel Rast, *et al.*, *Milwaukee's Coronavirus Racial Divide: A Report on the Early Stages of COVID-19 Spread in Milwaukee County*, UNIVERSITY OF WISCONSIN-MILWAUKEE (Apr. 2020), *available at* https://uwm.edu/ced/wp-content/uploads/sites/431/2020/04/COVID-report-final-version.pdf.

[18] *Compare* Milwaukee County, "COVID-19 Dashboard," *available at* https://county.milwaukee.gov/EN/COVID-19 (last accessed May 12, 2020), *with* U.S. Census Bureau, "QuickFacts Milwaukee County, Wisconsin," *available at* https://www.census.gov/quickfacts/fact/table/milwaukeecountywisconsin/RHI225218 (last accessed May 12, 2020).

[19] World Health Organization, "Getting Your Workplace Ready for COVID-19" (Mar. 3, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/getting-workplace-ready-for-covid-19.pdf.

have required hospitalization, 4 percent of cases have required intensive care, and 3.9 percent of cases have ended in death.[20]

38.     According to the CDC, the best way to protect against illness from COVID-19 is to avoid exposure. As a result, the CDC recommends putting "distance between yourself and other people outside your home" if COVID-19 is spreading in your community.[21]

### B. February and March in Wisconsin

39.     On February 5, 2020, Wisconsin announced its first known case of COVID-19, the twelfth confirmed case in the United States.[22]

40.     During a February 27 Commission meeting, the first at which COVID-19 was discussed, Defendant Knudson, the Chair of the Commission, dismissed the need to plan for a COVID-19 outbreak, saying "at worst . . . there would be either long lines or a delay in reporting" and boasting about the Commission's "robust procedures" for absentee voting.[23] When pressed on how to ensure that every voter would have access to the polls during a coronavirus outbreak, Defendant Knudson changed the subject.

41.     On March 11, 2020, the World Health Organization declared an international pandemic. On the same day, municipal clerks in Wisconsin began raising concerns about the impact on the upcoming election, including polling place closures and poll worker shortages. On that date, Wisconsin had six confirmed COVID-19 cases.[24]

---

[20] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases."
[21] Ctrs. for Disease Control and Prevention, "How to Protect Yourself & Others," *available at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last accessed May 11, 2020).
[22] Bill Miston & Katie Delong, *DHS officials confirm 1st case of coronavirus in Wisconsin, patient in 'home isolation'*, FOX NEWS 6 (Feb. 5, 2020), *available at* https://fox6now.com/2020/02/05/dhs-officials-confirm-1st-case-of-coronavirus-in-wisconsin/.
[23] WisconsinEye, "Wisconsin Elections Commission February 2020 Meeting" (Feb. 27, 2020), *available at* https://wiseye.org/2020/02/27/wisconsin-elections-commission-february-2020-meeting/, at 1:46:07 - 1:50:38.
[24] Shamane Mills, *COVID-19 Cases in Wisconsin Jump from 3 to 6*, WIS. PUBLIC RADIO (Mar. 11, 2020), *available at* https://bit.ly/2xPVCOZ.

42.     On March 12, 2020, Governor Tony Evers declared a health emergency in response to the virus, authorizing the Department of Health Services to "take all necessary and appropriate measures to prevent and respond to incidents of COVID-19" and activating the Wisconsin National Guard.[25] Soon after the Governor's announcement, fearful that nursing homes would become incubators for infection, the Defendants allowed municipal clerks to move polling places and directed municipalities not to use the statutory Special Voting Deputy process that facilitates absentee voting by residents of nursing homes and other care facilities.[26]

43.     By March 15, 2020, as the number of confirmed COVID-19 cases in Wisconsin rose to 33,[27] Milwaukee city officials stated they would need 1,800 new poll workers to replace older poll workers at higher risk of serious illness.

44.     On March 17, 2020, the Wisconsin Department of Health Services banned gatherings of 10 or more people. In response, the Mayor of Green Bay noted that the city would be "unable to administer a normal election."[28]

45.     The next day, multiple Defendants acknowledged that it was not possible for the state to have a safe and fair election on April 7. Defendant Ann Jacobs said that she "no longer believe[d] that we are able to fairly and properly administer this election without delay or postponement, . . . I believe we're putting people at risk." Defendant Mark Thomsen echoed that

---

[25] Wis. Executive Order No. 72, Relating to a Proclamation Declaring a Health Emergency in Response to the COVID-19 Coronavirus (Mar. 12, 2020), *available at* https://bit.ly/3eEZpPR.
[26] Meeting of the Wis. Elections Commission (Mar. 12, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/March%2012%20Commission%20Meeting%20Agenda%20and%20Materials.pdf.
[27] *33 Positive COVID-19 Cases in Wisconsin*, Fox News 11 (Mar. 15, 2020), *available at* https://bit.ly/2Kkde8m.
[28] Shawn Johnson, *Wisconsin Bans Crowds Of 10 Or Larger; Order Bars and Restaurants Closed*, Wis. Public Radio (Mar. 17, 2020), *available at* https://www.wpr.org/wisconsin-bans-crowds-10-or-larger-order-bars-and-restaurants-closed.

16

concern, saying, "We're going to have an election where no one can vote safely — that's absurd," and Defendant Julie Glancey argued in favor of an election by mail-in ballot only.[29]

46.     Defendants also issued a memorandum highlighting shortages of absentee ballot envelopes, polling locations, poll workers, and cleaning equipment.[30] As Defendants encouraged voters to vote absentee, local clerks across the state estimated a shortage of 600,000 envelopes.

47.     On March 20, 2020, a bipartisan group of mayors from Green Bay, Appleton, and Neenah urged that the election be delayed. At that point, there were 216 confirmed cases and three Wisconsinites had died.[31] The same day, this Court ordered extended online voter registration until March 30, 2020. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *9 (W.D. Wis. Mar. 20, 2020).

48.     On March 22, 2020, citing COVID-19, the Wisconsin Supreme Court suspended jury trials until at least May 22.

49.     On March 24, 2020, Department of Health Services Secretary-designee Andrea Palm issued Emergency Order No. 12, the Safer At Home Order, which banned all public and private gatherings of any number of people among members of different households, closed non-essential businesses, and required that everyone maintain social distancing of at least six feet

---

[29] Laurel White, *State Election Officials Spar Over Possible Postponement Of April 7 Election*, WIS. PUBLIC RADIO (Mar. 18, 2020), *available at* https://www.wpr.org/state-election-officials-spar-over-possible-postponement-april-7-election.
[30] Wis. Elections Commission, "Update Regarding COVID-19 Election Planning" (Mar. 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Com_.%20memo%20re%20COVID-19%20Election%20Planning%203.18.20.pdf.
[31] *Officials: 216 Confirmed Cases of COVID-19 in the State; 3,455 Negative Tests*, FOX6 NOW (Mar. 20, 2020), *available at* https://fox6now.com/2020/03/20/wisconsin-dhs-206-confirmed-cases-of-covid-19-in-the-state/.

from any other person.[32] In response, Defendant Wolfe issued a memorandum stating that in-person absentee voting, sometimes known as early voting, must continue.[33]

50.      On March 25, 2020, the Wisconsin Senate began preparing for virtual sessions to enable remote voting on legislation. On March 26, 2020, the Wisconsin State Capitol building closed to the public. Assembly Speaker Robin Vos and Senate Majority Leader Scott Fitzgerald told reporters that they did not expect to change the date of the April 7 election.[34]

C. Events Leading up to the April 7 Election

51.      On April 2, 2020, after an extensive evidentiary hearing, this Court entered an injunction (a) ordering that absentee ballots received by April 13, 2020 at 4 p.m. be counted; (b) extending by one day, to April 3, 2020, the window to request an absentee ballot; and (c) adjusting the requirement under Wis. Stat. § 6.87(2) that absentee voters have a witness sign their ballot. *Democratic Nat'l Comm. v. Bostelmann,* No. 20-CV-249-WMC, 2020 WL 1638374, *22 (W.D. Wis. Apr. 2, 2020).

52.      With respect to the absentee witness requirement, the Court ordered that Defendants "accept an unwitnessed ballot that contains a written affirmation or other statement by an absentee voter that due to the COVID-19 pandemic, he or she was unable to safely obtain a witness certification despite his or her reasonable efforts to do so, provided that the ballot is otherwise valid." *Id.*, at *20.

53.      The next day, April 3, 2020, the Seventh Circuit stayed the portion of this Court's decision that adjusted the witness requirement for absentee voters but declined to modify the

---

[32] Wis. Dep't of Health Servs., Emergency Order No. 12, Safer at Home Order, *available at* https://bit.ly/3cObK2D.
[33] Wis. Elections Commission, "Emergency Order No. 12 Does Not Eliminate In-Person Absentee Voting - COVID-19" (Mar. 24, 2020), *available at* https://elections.wi.gov/node/6773.
[34] Will Kenneally, *Legislative Leaders Want April Election to Move Forward*, PBS WISCONSIN (Mar. 25, 2020), *available at* https://pbswisconsin.org/news-item/legislative-leaders-want-april-election-to-move-forward/.

District Court's extension of the absentee ballot deadline. *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545, 1546, order (7th Cir. April 3, 2020).

54.     Also on April 3, Governor Evers issued an Executive Order calling a special legislative session so that the Legislature could postpone the April 7 election due to COVID-19.[35] The next day, both the Wisconsin Assembly and the Senate adjourned the special session within seconds, ensuring that the election would go forward as planned.

55.     On April 6, 2020, at 12:46 p.m., just eighteen hours before polls opened, Governor Evers issued Executive Order No. 74, suspending in-person voting for the April 7 election until June 9, or a different date ordered by the legislature.[36] Less than 5 hours later, the Wisconsin Supreme Court enjoined the Governor's order, holding that he did not have the power to change the date of the election.[37]

56.     Several hours after that, the United States Supreme Court held that all absentee ballots had to be postmarked by April 7 to be counted, partially overturning this Court's Order. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, __ S. Ct. __, 2020 WL 1672702, at *2 (Apr. 6, 2020).

57.     By election day, 83 Wisconsinites had died of coronavirus. Wisconsin had 2,440 reported coronavirus cases, and the Safer At Home Order remained operative.[38]

---

[35] Wis. Executive Order No. 73, Relating to a Special Session of the Legislature to Provide for an All-Mail Spring Election and Special Election for the 7th Congressional District During the COVID-19 Pandemic (Apr. 3, 2020), *available at* https://docs.legis.wisconsin.gov/code/executive_orders/2019_tony_evers/2020-73.pdf.

[36] Office of the Governor, "Gov. Evers Suspends In-Person Voting, Calls Legislature into Special Session on April 7 Election" (Apr. 6, 2020), *available at* https://content.govdelivery.com/accounts/WIGOV/bulletins/2852119; Wis. Executive Order No. 74, Relating to Suspending In-Person Voting on April 7, 2020, Due to the COVID-19 Pandemic (Apr. 6, 2020), *available at* https://content.govdelivery.com/attachments/WIGOV/2020/04/06/file_attachments/1420231/EO074-SuspendingInPersonVotingAndSpecialSession.pdf.

[37] Zac Schultz, *Live: Where Wisconsin's Election Currently Stands*, PBS WISCONSIN (Apr. 6, 2020), *available at* https://pbswisconsin.org/news-item/live-where-wisconsins-election-currently-stands/.

[38] German Lopez, *Wisconsin's Election Day Is a Public Health Disaster*, VOX (Apr. 7, 2020), *available at* https://www.vox.com/2020/4/7/21212005/coronavirus-wisconsin-voting-lines-election-primary-court; *Wisconsin*

III.     **Widespread Disenfranchisement in the April 7 Election**

58.     The fears surrounding the administration of the election were realized. Neil Albrecht, the Executive Director of the Milwaukee Election Commission, stated that "[i]t was chaos, and chaos is never good for the administration of an election."[39] MIT Professor Charles Stewart III, a leading empirical scholar of election administration, has estimated that poll closings kept more than 16,000 people from casting ballots in Milwaukee alone.[40] Clerks never sent absentee ballots to over 11,000 voters who requested them,[41] and more than 14% of absentee ballots requested and sent to voters were not received back for counting as of April 8, in significant part as a result of mail delays.[42]

59.     Moreover, the Wisconsin Department of Health Services has identified 52 cases of COVID-19 among poll workers and voters who were at in-person voting locations during the April 7 election and could have contracted the disease at those locations.[43]

60.     Defendants' administration of the April 7 election failed on numerous dimensions, described in detail below. These failures caused substantial disenfranchisement, particularly among elderly voters, voters with disabilities, immunocompromised voters, and voters of color. Fundamentally, Defendants lacked a coherent, effective plan to ensure that each

---

*Coronavirus Map and Case Count*, N.Y. TIMES, *available at*
https://www.nytimes.com/interactive/2020/us/wisconsin-coronavirus-cases.html (last updated May 11, 2020).
[39] Daphne Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*, FRONTLINE PBS (Apr. 21, 2020), *available at*
https://www.pbs.org/wgbh/frontline/article/wisconsin-election-coronavirus-absentee-ballots/.
[40] Charles Stewart III, @cstewartiii, Twitter (Apr. 15, 2020, 11:12 p.m.), *available at*
https://twitter.com/cstewartiii/status/1250623188150751232; Charles Stewart III, *Important Lessons from the Wisconsin Primary*, Mischiefs of Action (Apr. 17. 2020), *available at*
 https://www.mischiefsoffaction.com/post/important-lessons-from-the-wisconsin-primary.
[41] Wis. Elections Commission, "Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary" (Apr. 6, 2020), *available at* https://elections.wi.gov/node/6817.
[42] Wis. Elections Commission, "Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary" (Apr. 8, 2020), *available at* https://elections.wi.gov/node/6833.
[43] Scott Bauer, *52 Who Worked or Voted in Wisconsin Election Have COVID-19*, ABC NEWS (Apr. 29, 2020), *available at* https://abcnews.go.com/Health/wireStory/52-worked-voted-wisconsin-election-covid-19-70406317.

20

and every voter had a full and fair opportunity to vote while remaining protected from the threat presented by COVID-19.

A.  Defendants' Failure to Manage Online Registration and Absentee Ballot Problems Disenfranchised Voters

61.     Defendants failed to maintain digital systems sufficient to meet the needs of Wisconsin voters with respect to online registration and absentee ballot requests.

62.     Wisconsin law requires eligible voters to register in order to cast a ballot. Wis. Stat. § 6.27. Eligible voters can register in person or by mail until 5:00 p.m. on the third Wednesday before election day, or online until 11:59 p.m. on the third Wednesday before election day. Wis. Stat. § 6.28(1). Thus, for the April 7 election, the deadline for registration was set by statute on March 18, 2020. With respect to online registration, this Court's Order subsequently extended the deadline until March 30, 2020. *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *9 (W.D. Wis. Mar. 20, 2020).

63.     Those who miss these deadlines can register at the municipal clerk's office until close of business on the Friday before election day, Wis. Stat. § 6.29(2)(a), or in person on election day. *See generally* Wis. Stat. § 6.55.

64.     Eligible voters who register to vote electronically or by mail must provide a copy of an "identifying document that establishes proof of residence." Wis. Stat. § 6.34(2). To do so, they must not only have access to the document, but be able to upload or photocopy it. The only exception to this requirement is for individuals registering electronically, who do not have to provide such documentation if they provide "the number of a current and valid operator's license [or] identification card." Wis. Stat. § 6.34(2m). To vote at polls, eligible voters must present an approved voter ID. Wis. Stat. § 6.79.

65.     The Wisconsin Division of Motor Vehicles ("DMV") is responsible for issuing all driver's license, state ID, or official voter ID cards to Wisconsin residents. Many people can still only obtain a qualifying voter ID by actually visiting a DMV office in person, including those who are applying for a Wisconsin identification card for the first time, or who have not held a qualifying Wisconsin ID in recent years. Many of those in this category are voters with disabilities.

66.     Wisconsin allows voters to vote by absentee ballot without providing an excuse for why they cannot vote in person. *See* Wis. Stat. § 6.20. Eligible voters can request an absentee ballot by mail; in person at the municipal clerk's office; by signing a statement and requesting to receive an absentee ballot under special procedures for voters who are indefinitely confined; by an agent, under special procedures for voters who are hospitalized; by delivery to a special voting deputy; or by e-mail or fax. Wis. Stat. § 6.86(1)(a).

67.     Defendants administer the digital systems that track voter registration and absentee balloting. MyVote is the public-facing website that allows eligible voters to review general information, register to vote, request an absentee ballot, view the contents of their ballot, view their voting history, and find their polling place. WisVote is Wisconsin's statewide voter list and election-management database, accessible to election officials.

68.     When a request for an absentee ballot is made by a voter in the MyVote website, the system converts it into an email. Next, a municipal elections clerk must review the email to verify the voter's identification, manually enter the information into WisVote, and print mailing labels.[44]

---

[44] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.

69.     MyVote has seen increased traffic in the last few years. It has experienced outages since at least early 2020, which Defendant Wolfe acknowledged in a memorandum on February 18, 2020.[45] Defendants failed to take sufficient action to remedy and prevent those outages, and as a result the outages continued during high-demand periods in the run-up to the April 7 election. During the specific periods of time that voters sought to register to vote or request an absentee ballot for that election, the MyVote website suffered from outages and was sometimes erroneously closed to new requests.[46]

70.     Absentee ballot requests also caused problems for the system.[47]

71.     An investigation by the Milwaukee Journal Sentinel, FRONTLINE, and Columbia Journalism Investigations into Wisconsin's April 7 election named the "[i]nadequate computer system" as one of the main problems in the election. [48] It found eligible voters in Lodi, Pewaukee, Marshfield, Shorewood, and Bristol who had trouble requesting absentee ballots online, either because the system simply crashed or because they had to give up after spending hours in front of a computer trying to make their request. The investigation also found that— across eight cities—Wisconsin voters said they requested absentee ballots only to be later informed that the state's system had no record of their request.[49]

72.     Defendants do not appear to have secured the server capacity and bandwidth necessary to support the surge of online registrations and online absentee ballot requests that was inevitable for an election conducted under the threat of COVID-19.

---

[45] Wis. Elections Commission, "Update for Clerks on MyVote Address Problems" (Feb. 18, 2020), *available at* https://elections.wi.gov/node/6688.
[46] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.
[47] *Id.*
[48] *Id.*
[49] *Id.*

73.     Defendants did not take action to divert traffic away from the website, such as mailing to every registered voter an absentee ballot request form.

74.     Defendant Wolfe wrote in a memorandum after the election that the WisVote system "performed very well but required round the clock monitoring and auditing to handle this unique and unprecedented user behavior and traffic."[50]

75.     In the same memorandum, she acknowledged with respect to MyVote that "there were unique challenges and obstacles for some voters at the election," while maintaining that Commission staff had been successful in "accommodating a significant level of voter turnout." *Id.* at 4.

B.   Defendants' Failures to Ensure Distribution of Requested Absentee Ballots Disenfranchised Voters

76.     Defendants failed to ensure that voters who requested absentee ballots timely received them, resulting in the disenfranchisement of those, like immunocompromised voters, unable to vote in person.

77.     Under Wisconsin law, voters can request absentee ballots until 5:00 p.m. on the fifth day before an election, and in-person requests must be made at the municipal clerk's office by the Sunday preceding an election. Wis. Stat. § 6.86(1)(b). Municipal clerks must send an absentee ballot within one business day of when the request was received. Wis. Stat. § 7.15(cm).

78.     For the April 7 election, the deadline for the receipt of absentee ballot requests was set by statute as April 2, 2020. With respect to mail, fax, or email absentee ballot requests, this Court's Order subsequently extended the deadline to April 3, 2020. *Democratic Nat'l Comm.*

---

[50] Wis. Elections Commission, "Summary of April 7, 2020 Election" (April 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.

*v. Bostelmann*, No. 20-CV-249-WMC, ___ F.Supp.3d ___, 2020 WL 1638374, at *2 (W.D. Wis. Apr. 2, 2020).

79.    Wisconsin law requires voters to present a copy of their proof of identification with their application for an absentee ballot. Wis. Stat. § 6.86(1)(ac).

80.    Approximately 73% of votes ultimately cast in the April 7 election were absentee ballots;[51] by contrast, in the 2016 General Election, just 27% of the votes were cast absentee.[52]

81.    However, many voters, especially immunocompromised voters, were unable to participate in the April 7 election as a result of Defendants' failures to ensure effective and timely distribution of absentee ballots.

82.    Wisconsin Elections Commission data show that on election day, more than 12,000 requested absentee ballots had not yet been sent to voters. Voters around the state who had timely requested absentee ballots never received them. One survey found that voters from almost 100 Wisconsin cities and towns reported not receiving an absentee ballot, despite having requested one—in most cases at least two weeks in advance of the election.[53]

83.    Moreover, according to the Commission's website, 14.5% of 1,284,438 absentee ballots sent to voters (over 186,000 votes) had not been returned by April 13, 2020.[54] In comparison, in the 2016 general election, only 14,480, or 1.7%, of the 845,243 absentee ballots

---

[51] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.

[52] Wis. Elections Commission, "Elections and Voting Statistics," *available at* https://elections.wi.gov/elections-voting/statistics (last accessed May 9, 2020); Wis. Elections Commission, "General Election Voter Registration and Absentee Statistics 1984-2016.xlsx," *available at* https://elections.wi.gov/sites/elections.wi.gov/files/page/general_election_voter_registration_and_absentee_s_40046.xlsx (last accessed May 12, 2020).

[53] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.

[54] Wis. Elections Commission, "Absentee Ballot Statistics for April 7" (Apr. 13, 2020), *available at* https://elections.wi.gov/node/6765.

25

sent were reported as having not been received for counting.[55] Though it is impossible to know what proportion of absentee ballots were not returned because voters did not timely receive them, the disproportionate non-return rate suggests that thousands of additional voters who timely requested ballots never actually received them. These data do not take into account how many of the returned ballots were actually counted. One estimate put the number of returned ballots that were not counted because of mail delays and confusion about deadlines in the tens of thousands.[56]

84.   Several problems contributed to this failure to ensure effective distribution of absentee ballots:

- ***First***, a shortage of envelopes appears to have delayed the mailing of absentee ballots. On March 18, for example, Defendants noted that clerks across the state estimated a shortage of approximately 600,000 envelopes.[57] Although Defendants worked with paper suppliers to address the shortage, it created a backlog that contributed to delays.[58]

- ***Second***, election clerks struggled to keep up with the large volume of absentee ballot requests, and Defendants did not provide them with additional funding or staff to help. The Madison City Clerk reported that there was "no way humanly possible" for officials to mail out ballots at the rate they were receiving requests, despite working 110 hours a week.[59] She suggested that exhausted officials were

---

[55] Wis. Elections Commission, "Absentee Ballot Report" (Nov. 14, 2016), *available at* https://elections.wi.gov/node/4414.

[56] Scott Bauer & Nicholas Riccardi, *Parties Mine Wisconsin for Clues to Voting in the Virus Era*, AP NEWS (Apr. 14, 2020), *available at* https://apnews.com/99f183ea43fd558e08393d2b064bb801.

[57] Wis. Elections Commission, "Update Regarding COVID-19 Election Planning."

[58] Emily Bazelon, *Will Americans Lose Their Right to Vote in the Pandemic?*, N.Y. TIMES MAGAZINE (May 5, 2020), *available at* https://www.nytimes.com/2020/05/05/magazine/voting-by-mail-2020-covid.html.

[59] Chen, *et al.*, *'They Should Have Done Something': Broad Failures Fueled Wisconsin Ballot Crisis, Investigation Shows*.

more likely to make errors in fulfilling the ballot requests. Indeed, some voters reported receiving multiple ballots, while one couple reported receiving empty envelopes without a ballot. Another voter did not receive a ballot until after the election because it had been mailed without a street name and had been returned to the clerk's office as undeliverable.

- **_Third_**, mail delivery problems, of which Defendants were on notice, contributed to this failure. Defendants were aware of "potential delays in mail delivery" by the United States Postal Service ("USPS") as early as March 18, and, although Defendants sought to stay in touch with USPS to learn about delays and "encouraged clerks to communicate and coordinate with local post offices," this response was insufficient.[60]

85.    The problems turned out to be overwhelming. In Milwaukee, numerous voters never received an absentee ballot even though their ballots had been issued two weeks before the election. In the week leading up to the election, Fox Point Village Hall received returns from USPS of 100 to 150 undelivered absentee ballots per day, with officials making at least seven trips to the post office to re-mail the undelivered ballots.[61] On the morning of the election, officials received a plastic mail bin containing 175 absentee ballots that appeared to have never been sent to voters, including several ballots intended for a different municipality.[62] The day

---

[60] Wis. Elections Commission, "Update Regarding COVID-19 Election Planning."

[61] _Returned to Sender: Postal Officials Investigating Wisconsin Absentee Ballots That Were Never Delivered_, WIS. PUBLIC RADIO (Apr. 9, 2020), _available at_ https://www.wpr.org/returned-sender-postal-officials-investigating-wisconsin-absentee-ballots-were-never-delivered.

[62] Jeff Rumage, _Post Office Returns Hundreds of Absentee Ballots That Were Supposed to Be Delivered to Fox Point Voters_, MILWAUKEE JOURNAL SENTINEL (Apr. 8, 2020), _available at_ https://www.jsonline.com/story/communities/northshore/news/fox-point/2020/04/08/wisconsin-election-fox-point-absentee-ballots-never-made-voters/5119812002/.

after the election, a postal worker discovered three containers of undelivered absentee ballots intended for voters in Oshkosh and Appleton.[63]

86.     Defendants failed to ensure a uniform appropriate response to these challenges, and as a result, voters' ability to cast a ballot that would be counted varied widely and arbitrarily, depending on the location of the residential address at which they were registered to vote. For example, to ensure the orderly distribution of absentee ballots to voters who wanted to avoid in-person voting, some municipalities, including Whitefish Bay and Bayside, mailed every registered voter within the municipality an absentee ballot request form.[64] Those municipalities experienced significantly higher rates of voter participation than did most municipalities that did not take this step.

87.     All of this makes clear that Defendants failed to ensure that all registered voters who timely requested absentee ballots received them in time to participate in the April 7 election.

C.   Defendants' Failure to Make Adequate Provisions for Voters to Return Absentee Ballots Disenfranchised Voters

88.     Wisconsin law provides that absentee ballots must be "delivered to the polling place no later than 8 p.m. on election day." Wis. Stat. § 6.87(6). This means that absentee ballots must be physically received by that time in order to count.

89.     With respect to the April 7 election, this Court's Order enjoined "the enforcement of the requirement under Wis. Stat. § 6.87(6) that absentee ballots must be received by 8:00 p.m. on election day to be counted and extend[ed] the deadline for receipt of absentee ballots to 4:00 p.m. on April 13, 2020." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, ___

---

[63] *Returned to Sender: Postal Officials Investigating Wisconsin Absentee Ballots That Were Never Delivered*, WIS. PUBLIC RADIO.

[64] Craig Gilbert, *How Two Communities on Milwaukee's North Shore Achieved Sky-High Levels of Absentee Voting Despite Coronavirus*, Milwaukee Journal Sentinel (Apr. 10, 2020), *available at* https://www.jsonline.com/story/news/politics/elections/2020/04/10/wisconsin-absentee-ballot-forms-sent-whitefish-bay-bayside-voters/5129125002/.

28

F.Supp.3d ___, 2020 WL 1638374, at *2 (W.D. Wis. Apr. 2, 2020). On April 6, the U.S.

Supreme Court partially stayed that injunction, requiring that "a voter's absentee ballot must be

either (i) postmarked by election day, April 7, 2020, and received by April 13, 2020, at 4:00

p.m., or (ii) hand-delivered as provided under state law by April 7, 2020, at 8:00 p.m."

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, __ S. Ct. __, 2020 WL

1672702, at *2 (Apr. 6, 2020).

90.    More than 100,000 absentee ballots were received in the extended window—

namely, after April 7 and before April 13.[65]

91.    For many voters, including Plaintiffs Swenson and Nelson, personally delivering

a ballot to the municipal clerk, as anticipated by Wis. Stat. § 6.86(6), was not an option due to

the need to maintain social distance to preserve their health. Defendants had acknowledged that

USPS was experiencing significant delay issues as early as March 18. However, they nonetheless

failed to ensure that the many voters seeking and receiving absentee ballots in the weeks before

the election would be able to return them so that their votes could be counted.

92.    For example, Defendants failed to require that municipalities establish secure

drop boxes so that voters could return absentee ballots while maintaining social distancing and

without relying on USPS. Defendant Wolfe issued a memorandum on March 31 that identified

drop boxes as an option, but it did not require or even recommend that option.[66]

---

[65] Richard Pildes, *How Many Absentee Ballots in WI Came In on Time Because of the Court Decision to Extend the Receipt Deadline?*, ELECTION LAW BLOG (Apr. 15, 2020), *available at* https://electionlawblog.org/?p=110746.
[66] Wis. Elections Commission, "FAQs: Absentee Ballot Return Options: USPS Coordination and Drop Boxes" (Mar. 31, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Ballot%20Return%20Options%203.31.2020.pdf.

93.     This failure presented particular difficulties after the Supreme Court's April 6 decision requiring either that ballots be postmarked by 8 p.m. on April 7 or that they be hand-delivered by that time. 2020 WL 1672702, at *2.

94.     Most significantly, Defendants failed to take action to ensure that validly cast absentee ballots without a postmark would be counted. Some voters who responded to this Court's decision by placing their ballots in the mail on April 7, before the deadline, were nonetheless disenfranchised because no postmark appeared on their ballot — a fact entirely beyond the control of those voters. The Madison City Clerk reported several thousand ballots missing a postmark, and some ballots bearing two different postmarks, one dated before April 7 and one dated after. Milwaukee, Greenfield, Manitowoc, Fitchburg, and Sister Bay also received ballots without postmarks. Clerks in Luxembourg and Elm Grove reported ballot envelopes with postmarks so light that the date on them was unreadable.

95.     Defendants failed to promulgate rules or issue guidance to ensure uniform, appropriate treatment of ballots without a postmark that arrived on April 8, the day after the election, be counted, even though the president of the Wisconsin State Association of Letter Carriers confirmed that ballots received on April 8 had "almost certainly" been mailed by April 7.[67]

---

[67] Riley Vetterkind, *Elections Commission Deadlocks Over Whether to Count Ballots Without Postmarks*, Wis. State Journal (Apr. 11, 2020), *available at* https://madison.com/wsj/news/local/govt-and-politics/elections-commission-deadlocks-over-whether-to-count-ballots-without-postmarks/article_74e0285c-76d7-5471-a82e-144b78609f48.html.

D. Defendants' Enforcement of Wis. Stat. § 6.87(4)'s Witness Requirement Disenfranchised Voters at High Risk From COVID-19

96.     As to voters at elevated risk for COVID-19, including elderly and immunocompromised voters, Wisconsin's absentee ballot-witnessing requirement effectively denied citizens the right to vote.

97.     Under Wisconsin law, absentee ballots must be witnessed and signed by another adult citizen who is not a candidate on the ballot. Wis. Stat. § 6.87(4). For elderly and immunocompromised voters, including Plaintiff Swenson, in-person voting was not an option because of the infection risk presented by contact with other people. But absentee voting also presented a risk to the health to these voters because of the requirement that an adult citizen witness them sign the ballot.

98.     In Wisconsin, the envelopes in which absentee ballots are returned must include the following language in the "Certification of Voter" box:

> I certify that I exhibited the enclosed ballot unmarked to the witness, that I then in (his)(her) presence and in the presence of no other person marked the ballot and enclosed and sealed the same in this envelope in such a manner that no one but myself and any person rendering assistance under s. 6.87(5), Wis. Stats., if I requested assistance, could know how I voted.

Wis. Stat. § 6.87(2).

The absentee ballot witness is required to certify to the following language:

> I, the undersigned witness, subject to the penalties of s. 12.60 (1)(b), Wis. Stats., for false statements, certify that I am an adult U.S. citizen and that the above statements are true and the voting procedure was executed as there stated. I am not a candidate for any office on the enclosed ballot (except in the case of an incumbent municipal clerk). I did not solicit or advise the elector to vote for or against any candidate or measure.

*Id.* Defendants have promulgated a form envelope for absentee ballots that contains these certifications and provides space for the relevant signatures and witness address information.

31

99.     Defendants failed to take action to ensure that immunocompromised voters could successfully comply with this requirement. Defendant Wolfe issued a memorandum declaring that there were "no exemptions in the law for the witness requirement."[68] Although the memorandum suggested some ways voters might comply with the requirements while maintaining a physical quarantine, Plaintiff Swenson did not believe that she could plausibly use them to keep herself safe and cast a ballot.

100.    This Court recognized that the mechanisms were insufficient at least as applied to certain populations, "in particular those who are immunocompromised or elderly." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, ___ F.Supp.3d ___, 2020 WL 1638374, at *2- (W.D. Wis. Apr. 2, 2020). This Court's Order enjoined "the enforcement of Wis. Stat. § 6.87(2) as to absentee voters who have provided a written affirmation or other statement that they were unable to safely obtain a witness certification despite reasonable efforts to do so, provided that the ballots are otherwise valid." *Id.*

101.    The following day, April 3, 2020, the Seventh Circuit stayed enforcement of this aspect of the injunction. *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538, 1539, 1545, 1546, Order (7th Cir. Apr. 3, 2020).

102.    In response, Defendants adopted a rule that disenfranchised Plaintiff Swenson and other voters who had complied fully with then-operative law. On April 5, 2020, almost two days after the Commission's initial advisory notice on the topic, Defendants concluded that "[e]ach absentee ballot for this election must have the required witness signature and address in order to

---

[68] Wis. Elections Commission, "Absentee Witness Signature Requirement Guidance COVID-19" (Mar. 29, 2020), *available at* https://elections.wi.gov/node/6790.

be counted, including ballots that were returned when this Court's original order was in effect for approximately 24 hours."[69]

103.    Defendants' action invalidated ballots—like that of Plaintiff Swenson—that complied at the time they were submitted with this Court's then-valid order and Commission guidelines. The only option that Defendants presented for voters who had cast these ballots was to present a witness to election officials in person—defeating both social distancing and the entire purpose of absentee voting.

E.    Defendants Failed to Safeguard the Availability of In-Person Absentee Voting

104.    Defendants failed to take action to ensure adequate opportunities for in-person absentee voting (also known as "early voting") throughout the state. In-person absentee voting allows voters to apply for and obtain an absentee ballot in person, and then to complete and cast the ballot immediately. This increasingly popular method of voting is particularly important during the pandemic because it accommodates voters who are unable to obtain a mail-in absentee ballot for a variety of reasons, such as lack of ready access to the online application system, a transient mailing address, homelessness, and other difficulties. It also alleviates the burden on election day voting by spreading out the period of in-person voting and allowing those voters who prefer to vote in-person—perhaps because they do not trust the mail to deliver or return their ballot—to do so at uncrowded, safer locations at a more convenient time.

105.    In-person absentee voting can also be conducted on a "drive through" basis, allowing voters to obtain and cast a ballot while minimizing contact with other people or shared surfaces.

---

[69] Wis. Elections Commission, "Updated Absentee Witness Signature Requirement Guidance - COVID-19" (Apr. 5, 2020), *available at* https://elections.wi.gov/node/6816.

106.     During the April 7 election period, Defendants failed to take action to ensure adequate in-person absentee voting opportunities, or to ensure that available opportunities were properly publicized. For example, all three of the City of Milwaukee's in-person absentee voting locations abruptly closed on March 23, 2020, following an announcement the previous day. The city subsequently reopened one early voting site downtown but made it available only as a drive-through, thereby limiting it to those voters with access to a car. These voting changes were poorly publicized, leaving many voters confused or simply unaware of early voting options in the city. Moreover, the closure of early voting locations outside of downtown disproportionately affected the ability of residents of low-income and predominantly Black and Latino neighborhoods to vote.

107.     Similarly, in Green Bay, in-person absentee voting opportunities were severely limited. In-person absentee voting was confined to a single site that was only open on ten weekdays leading up to the election. On eight of those ten days, voting was limited to four midday hours. Capacity was further limited during in order to permit social distancing.

108.     More broadly, opportunities for in-person absentee voting varied dramatically across the state in terms of the number of locations, hours, and manner of voting (*i.e.*, drive through vs. walk in). These options were also generally poorly publicized. Defendants' actions and inaction with respect to in-person absentee voting thus deprived voters of a safer alternative to in-person election day voting and put additional pressure on the mail-in absentee system that failed so many voters.

F.   <u>Defendants Failed to Ensure An Adequate Number of Election Day Polling Places</u>

109.     Defendants failed to take action to ensure that adequate in-person voting locations would be available to all voters around the state. As a result, in some jurisdictions a high

proportion of polling places did not open, and voters who sought to vote in-person—whether because they had not received an absentee ballot or because they had always intended to vote in person—faced hurdles to casting a ballot.

110.     Wisconsin law requires that "[p]olling places shall be established for each election at least 30 days before the election." Wis. Stat. § 5.25(3).

111.     Each of these polling places "shall be accessible to all individuals with disabilities," and Defendants are charged with the responsibility to ensure that voting systems at these polling places allow voters with disabilities to vote privately and independently. *Id.* § 5.25(4)(a).

112.     Voters with disabilities who require the use of assistive technology available to them at polling places have no option to avoid in-person voting. Many other voters require in-person voting options when the online registration system fails or they do not receive a requested absentee ballot on time. Still others vote in person because of the symbolic significance of voting at a polling place on election day.

113.     Defendants failed to ensure that Wisconsin voters could safely exercise the right to vote, including by ensuring an adequate numbers of poll workers—referred to as election inspectors by Wisconsin statute—available to operate the number of polling places that would enable safe and uncrowded voting.

114.     Almost 60 percent of Wisconsin municipalities reported a shortage of poll workers ahead of the April 7 election as volunteers sought to protect themselves against COVID-19. These staffing shortages were especially acute because many older poll workers were unwilling to risk their health. According to a survey conducted by Defendants prior to the election, 111 voting jurisdictions in Wisconsin believed they would not have enough workers to

open even one polling place on election day, and 126 additional jurisdictions thought they did not have enough workers to open "all desired polling places."[70]

115.    These massive anticipated poll worker shortages led to unprecedented reductions in the number of polling locations in some jurisdictions. Milwaukee faced the most closures of any city, opening just 5 of its 180 polling sites. While the city usually has 2,000 election workers, on April 7 it had only 400. One news report noted that some communities with just a tenth of Milwaukee's population had more polling sites open.[71]

116.    Although the Governor eventually mobilized the National Guard to work at the polls, many municipalities were not aware of that option until after they had announced poll closures. City of Milwaukee Election Commission Executive Director Neil Albrecht, who made a request for National Guard assistance months earlier, said that he learned about the Governor's decision through media reports.[72] Albrecht said that if he had known about the assistance, he could have opened more polling locations in Milwaukee, but it was "too little too late" right before the election.[73] In any event, according to a survey conducted by Defendants, only 2,400 National Guard members were available to address the 7,000 person shortage in poll workers.[74]

117.    As a result, the 19,000 Milwaukee voters who voted in person encountered wait times of up to two-and-a-half hours. Plaintiff McCurtis waited in line to vote at Washington High

---

[70] Wis. Elections Commission, "Special Teleconference-Only Meeting, Polling Place Supply and Personnel Shortages Memorandum" (Mar. 31, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/Complete%20Packet%203_31.pdf.

[71] Corrinne Hess & Megan Hart, *Wisconsin Polls Close But Hundreds Of Voters Remain In Line*, WIS. PUBLIC RADIO (Apr. 7, 2020), *available at* https://www.wpr.org/wisconsin-polls-close-hundreds-voters-remain-line.

[72] Molly Beck, *Gov. Tony Evers to Use National Guard Members to Work the Polls Amid Massive Shortage of Workers*, MILWAUKEE JOURNAL SENTINEL (Apr. 1, 2020), *available at* https://www.jsonline.com/story/news/politics/elections/2020/04/01/tony-evers-use-national-guard-members-work-polls-amid-massive-shortage-workers/5102869002/.

[73] *Id.*

[74] Marisa Wojcik, *State Increases Contact Tracing After In-Person Voting*, PBS WISCONSIN (Apr. 10, 2020), *available at* https://pbswisconsin.org/news-item/state-increases-contact-tracing-after-in-person-voting/.

School for more than two hours. When the polls were set to close at 8:00 p.m., hundreds of

Milwaukee voters were still waiting in line, Plaintiff McCurtis among them.

118.    Milwaukee had offered drive-up in-person absentee voting in the days leading up

to the election, but on the last day it was possible to vote in that manner, lines of cars stretched

for blocks downtown and the wait lasted hours.[75]

119.    That Milwaukee was so hard hit by these issues is particularly troubling because

Milwaukee is home to 69.4% of Wisconsin's Black population[76]—meaning that Black

Wisconsin voters were disproportionately likely to be affected by polling place closures.

120.    In Green Bay, which opened just two of its 31 polling sites because just 17 of its

270 usual poll workers were able or willing to work,[77] voters faced wait times of up to four

hours.[78] In Waukesha, which has a population of 70,000, just one polling location out of the

usual 15 was open.

121.    Defendants' failures to ensure safe access to polling places on election day also

resulted in arbitrary disparities, in which whether a voter had access to safe voting options

depended on where that voter lives. For example, in stark contrast to Milwaukee and Green Bay,

in Madison, 66 out of 92 polling sites were open. Madison also began offering curbside voting as

early as Friday, April 1 to high-risk voters. While the voting process was altered, it nonetheless

proceeded smoothly. Similarly, in some rural counties across Wisconsin, voting went more

smoothly, without the same extended wait times.

---

[75] Aaron Maybin, *'I Had to Go Do This:' Some Waited 2 Hours on Final Day of Drive-Thru Voting in Milwaukee*, FOX 6 (Apr. 5, 2020), *available at* https://fox6now.com/2020/04/05/i-had-to-go-do-this-some-waited-2-hours-on-final-day-of-drive-thru-voting-in-milwaukee/.
[76] Wis. Dep't of Health Servs., "African Americans in Wisconsin: Overview," *available at* https://www.dhs.wisconsin.gov/minority-health/population/afriamer-pop.htm (last revised Sept. 10, 2018).
[77] *Wisconsin Primary Recap: Voters Forced to Choose Between Their Health and Their Civic Duty*, N.Y. TIMES (Apr. 7, 2020), *available at* https://www.nytimes.com/2020/04/07/us/politics/wisconsin-primary-election.html.
[78] *Wisconsin Heads to the Polls Amid Coronavirus Pandemic*, WIS. PUBLIC RADIO (Apr. 7, 2020), *available at* https://www.wpr.org/wisconsin-heads-polls-amid-coronavirus-pandemic.

122.     Nearly a month before the April 7 election, Defendant Wolfe acknowledged that poll worker shortages were likely to be a problem, but she did not take action sufficient to remedy the problem. While she provided several recruiting suggestions and instructed clerks to contact the Commission if they were experiencing "significant poll worker shortages," the "possible recruitment efforts" that the Commission suggested it might undertake did not solve the problem.[79]

123.     Defendants' failure to take action here had a particularly significant effect because underlying legal requirements made it extremely unlikely that municipalities could solve their poll-worker problems on their own. Wisconsin statutes provide that each election official, including each inspector, must be "a qualified elector of a county in which the municipality where the official serves is located." Wis. Stat. § 7.30(2). The county-residence requirement forbids recruiting inspectors from other parts of the state.

124.     This statute also means that municipalities within the same county can draw from the same pool of inspectors. Defendants did not attempt to facilitate, encourage, or coordinate such intra-county poll-worker sharing.

125.     As a result, significant disparities in the availability of polling places and the concomitant wait to vote persisted even within the same county. For example, while the City of Milwaukee experienced the numerous problems described above, other cities within Milwaukee County looked very different. In Wauwatosa, a city which borders Milwaukee with a population

---

[79] Wis. Elections Commission, "COVID-19 Frequently Asked Questions (FAQ's) and Guidance on Procedural Changes for Care Facility Absentee Voting and Polling Place Relocation" (Mar. 13, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-03/UPDATED%20-%20Clerk%20comm%20re%20FAQ%20and%20SVD%20and%20Polling%20Place%20Procs_3_13_20.pdf.

of over 46,000, polling locations were largely empty, and in Germantown, with a population of just less than 20,000, there were no lines at all during the day of the election.[80]

126.    Defendants' failures with respect to polling place locations and poll workers led to a situation in which voters in some Wisconsin jurisdictions—but not others—were forced to locate an unfamiliar polling place to cast a ballot in person and, in some cases, to wait in very long lines to cast a ballot in person, or to forgo voting altogether.

G.    Defendants' Failure to Ensure Safe In-Person Voting Resulted in Widespread Voter Intimidation

127.    In conducting an election during a pandemic, Defendants failed to ensure that in-person voting was safe in each jurisdiction around the state. As alleged above, numerous failures by Defendants resulted in extremely long lines at polling places. In addition, the availability of personal protective equipment (PPE) for poll workers varied widely around the state. These failures increased the risks that voters faced of contracting COVID-19 from a poll worker.

128.    Milwaukee was and is the epicenter of Wisconsin's COVID-19 pandemic, and as of the April 7 primary election, it accounted for over half of coronavirus cases and 81 percent of related deaths.[81] As a result, the city, which is home to nearly 70 percent of the state's Black residents, was one of the most dangerous places to vote. Many Milwaukee voters reported being afraid to vote in person. Other voters compared voting in person on April 7 to moments in civil

---

[80] *Election Day Blog Recap: Milwaukee Releases Tuesday's Voter Turnout; Late Lines After Polls Closed*, MILWAUKEE JOURNAL SENTINEL (Apr. 7. 2020), *available at* https://www.jsonline.com/story/news/politics/2020/04/07/wisconsin-april-7-presidential-primary-election-updates-voting-pandemic-milwaukee-polling-places/2959757001/.
[81] Ella Nilsen & Li Zhou, *How Wisconsin's Election Disenfranchised Voters*, VOX (Apr. 7. 2020), *available at* https://www.vox.com/2020/4/7/21212053/wisconsin-election-coronavirus-disenfranchised-voters.

rights history when seeking to cast a ballot meant risking your life.[82] Given the disparate racial impact of COVID-19 on the Black community, these comparisons are especially apt.

129.    The health risk presented by these lines during COVID-19 were objectively intimidating to voters. As a result, some voters were actually deterred from voting, opting to stay home or to leave a polling place before casting a ballot rather than wait in line and increase the risk to their physical well-being and the well-being of their families.

130.    Others, like Plaintiff McCurtis, who chose to remain in line to vote, did so in the face of dangerous voting conditions, risking their health in order to exercise the right to vote.

131.    Numerous voters expressed their fear to reporters and on social media. The Governor acknowledged that voters were "scared of going to the polls."[83]

132.    Nonetheless, after the election, Defendant Wolfe claimed in her summary memorandum that voters had reported to the Commission "that they felt safe in polling places and that there were adequate sanitation supplies." [84]

H.  Burdens on Voters with Disabilities

133.    The Commission's failures also severely burdened immunocompromised voters as well as other voters with disabilities who require assistive technology available only at in-person polling places.

---

[82] Christina A. Cassidy & Gretchen Ehlke, *Black Voters Weighed History, Health in Wisconsin Election*, AP NEWS (Apr. 8, 2020), *available at* https://apnews.com/be402510fea98fd7c37067ca05fd8e1a ("'We had to be willing to die to get our vote, and the same thing is happening right now,' said Thomas, a 33-year-old director of youth ministry at a Milwaukee church."); Miela Fetaw & Hunter Woodall, *'I Could Get the Virus If I Vote': Wisconsin's Terrifying Election Day*, THE DAILY BEAST (Apr. 7, 2020), *available at* https://www.thedailybeast.com/people-are-going-to-die-in-this-election-wisconsin-votes-amid-coronavirus-pandemic-1 ("'Was I scared? Hell yea I'm scared!' he said. 'This virus is taking out the black people in this community, but I knew what I had to do. My daddy couldn't vote during his time, so I voted for him.'").

[83] Scott Bauer & Steve Peoples, *Wisconsin Moves Forward with Election Despite Virus Concerns*, AP NEWS (Apr. 6, 2020), *available at* https://apnews.com/97db30e6564b9b5eedfc300234ea6630.

[84] Wis. Elections Commission, "Summary of April 7, 2020 Election" (April 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.

134.    Voters who are immunocompromised are voters with disabilities during the COVID-19 pandemic. These voters must isolate themselves from other people in order to minimize the risk that they will contract COVID-19 and experience severe illness or death. As a result, they can cast only absentee ballots; in-person voting is not available to them.

135.    Because Defendants failed to ensure that all voters who requested absentee ballots received them and failed to ensure that absentee voters had access to drop boxes to ensure delivery of their ballots, these voters were disenfranchised. They were also disenfranchised by the witness verification requirement to the extent these immunocompromised voters could not safely secure a witness to verify their ballot.

136.    Some voters with disabilities, like blind voters, must utilize assistive technology available only at in-person polling locations in order to vote privately and independently.

137.    Some voters fall into both of these categories—they are immunocompromised and require the use of assistive technology at an in-person polling place. These voters had no safe opportunity to vote privately and independently, and they were therefore disenfranchised.

**IV.    Absent Judicial Intervention, These Failures Are Practically Certain to Recur in August and November**

138.    When Defendants administer the August and November elections, the COVID-19 pandemic will be ongoing. As a result, regardless of the precise circumstances of the pandemic on those election days, the demand for online registration and absentee voting will remain elevated, and safety measures to protect in-person voters will remain vital. However, as the April 7 election showed, Defendants do not have policies or other measures in place to ensure safe voting in the upcoming August and November elections.

A.    The Ongoing COVID-19 Pandemic

139.     As of the time of this filing, there have been 11,275 cases reported in Wisconsin and 434 deaths.[85]

140.     As of this filing, approximately 294 new cases are diagnosed each day in Wisconsin, as measured by the seven-day average.[86] The rate of COVID-19 confirmed cases in metropolitan areas continues to grow. In Green Bay, Janesville-Beloit, Appleton, and Racine, the daily growth rate of confirmed cases is over 7%. And some metropolitan areas are seeing continually increasing growth rates.[87] It is not yet clear whether Wisconsin has reached the peak of this initial wave of infections.[88]

141.     It is unlikely that a vaccine will be available until at least 2021,[89] and until then, the country will need to continue to take precautions to minimize the spread of COVID-19.[90]

142.     Experts predict that there will be multiple peaks in Wisconsin, with their timing tied directly to the duration of the Safer At Home Order and the availability of testing.[91]

---

[85] Wis. Dep't of Health Servs., "Outbreaks in Wisconsin," *available at* https://www.dhs.wisconsin.gov/outbreaks/index.htm (last updated May 14, 2020); Wis. Dep't of Health Servs., "COVID-19: Wisconsin Cases"; Wis. Dep't of Health Servs., "COVID-19: Wisconsin Deaths."
[86] Wis. Dep't of Health Servs., "COVID-19: Wisconsin Summary Data," *available at* https://www.dhs.wisconsin.gov/covid-19/data.htm (last accessed May 14, 2020).
[87] Univ. of Madison, Wis. "Coronavirus in Wisconsin: How Fast It's Growing," *available at* https://data-viz.it.wisc.edu/wi-metro-growth-rate/ (last accessed May 14, 2020).
[88] *Wisconsin Sees 4-day Spike in Coronavirus Cases*, WISN 12 (May 4, 2020), *available at* https://www.wisn.com/article/wisconsin-sees-spike-in-new-coronavirus-cases/32361185.
[89] Stephen M. Kissler, *et al.*, *Projecting the Transmission Dynamics of SARS-CoV-2 Through the Postpandemic Period*, American Association for the Advancement of Science (Apr. 14, 2020), *available at* https://science.sciencemag.org/content/early/2020/04/24/science.abb5793.
[90] Lena H. Sun, *CDC Director Warns Second Wave of Coronavirus Is Likely to Be Even More Devastating*, THE WASHINGTON POST (Apr. 21, 2020), *available at* https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.
[91] Wis. Dep't of Health Servs., "Johns Hopkins Modeling WI COVID-19 - GOAL" (Apr. 24, 2020), *available at* https://www.dhs.wisconsin.gov/publications/p02643a.pdf.

42

143.    According to Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, a second round of COVID-19 cases in the United States is "inevitable" in the fall.[92]

144.    The Commission is scheduled to conduct two more elections in 2020: the August 11, 2020 partisan primary and the November 3, 2020 general election. On each of these dates, it is overwhelmingly likely that COVID-19 transmission will continue in Wisconsin, that no vaccine will exist, and that many voters will accordingly retain an objectively reasonable fear of the risk to their physical safety presented by traditional in-person voting.

B.    Turnout in November Will Exacerbate Problems

145.    If Defendants' election system was unable to ensure that voters in April were enfranchised during the COVID-19 pandemic, it will be that much more inadequate in November absent significant changes.

146.    Nearly three million Wisconsin voters cast ballots in the 2016 presidential election.[93] With experts predicting higher than usual voter turnout nationwide this November,[94] the number of Wisconsin voters who seek to participate in the presidential election is likely to be more than twice the 1.5 million voters who participated in the April 7 election.[95]

147.    If the proportion of voters seeking to cast absentee ballots in the November election is similar to the proportion in April, Defendants' system would need to be equipped to

---

[92] Nicole Chavez, *Another Wave of Coronavirus Will Likely Hit the US in the Fall. Here's Why and What We Can Do to Stop It*, CNN (May 2, 2020), *available at* https://www.cnn.com/2020/05/02/health/coronavirus-second-wave-fall-season/index.html.
[93] *Election 2016: Wisconsin Results*, N.Y. TIMES (Aug. 1, 2017), *available at* https://www.nytimes.com/elections/2016/results/wisconsin.
[94] Susan Milligan, *Preparing for a Voter Surge*, U.S. NEWS (Sept. 20, 2019), *available at* https://www.usnews.com/news/elections/articles/2019-09-20/experts-predict-huge-turnout-in-2020.
[95] *Live: Wisconsin Supreme Court and Statewide Election Results*, N.Y. TIMES, *available at* https://www.nytimes.com/interactive/2020/04/07/us/elections/results-wisconsin-spring-elections.html (last accessed May 9, 2020).

distribute and receive back more than twice as many absentee ballots as it did in April, and it would need to be able to ensure that more than twice as many voters could vote safely in person. If a lower proportion of voters seeks to vote absentee, then that system would need to be able to ensure that any even larger number of voters could vote safely, and free from intimidating conditions, in person.

148.    Defendants must equip municipal and county clerks to successfully count this unprecedented number of absentee ballots.

C.    <u>Defendants Have Not Taken Steps Sufficient to Correct the Ongoing Problems with Wisconsin Elections under COVID-19</u>

149.    While Defendants have announced some actions that they plan to take to improve upon the administration of the April 7 election, these actions are not sufficient to ensure that subsequent elections during the pandemic will protect voters' rights under the Constitution and federal statutes.

150.    **First**, Defendants have not taken sufficient action to ensure that MyVote will be able to support the large-scale online registration and at-home absentee voting which will continue to be necessary during the impending August and November elections. In her April 7 Election Summary Memorandum, Defendant Wolfe wrote on this topic that staff would "work to augment voter workflows for online voter registration and absentee ballot requests."[96] The memorandum did not address outages or mention securing additional capacity.

151.    Absent significant improvement of computer-system infrastructure, Wisconsin voters will not have adequate access to online absentee ballots or online registration during the August and November elections.

---

[96] Wis. Elections Commission, "Summary of April 7, 2020 Election" (April 18, 2020), *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/April%207%20Election%20Summary%20and%20Next%20Steps.pdf.

152. **Second**, Defendants have failed to take sufficient action to ensure that voters who timely request absentee ballots for subsequent 2020 elections will receive those ballots in time to participate in those elections. On this topic, Defendant Wolfe's memorandum stated that staff "*hopes* to incorporate intelligent mail barcodes into the absentee process and incorporate that information into the MyVote system," but offers no concrete commitment or contingency plan. (emphasis added).[97]

153. Although the City of Milwaukee has announced that it will distribute absentee ballot request forms to each registered voter in advance of the November election, Defendants have not indicated that they will provide or seek to facilitate this opportunity for all Wisconsin voters, thereby dramatically increasing the likelihood that the expected late surge in absentee ballot requests before a presidential election conducted during a pandemic will overwhelm the system and lead to further disenfranchisement. And because some municipalities will invariably become more overwhelmed than others, this expected late surge will exacerbate the unequal access and opportunities for voters in different municipalities.

154. Without mailed distribution of absentee ballot request forms, Wisconsin voters on the wrong side of the digital divide—who lack internet access or familiarity with online resources—are particularly likely to be disenfranchised because they will not be able to access MyVote in order to easily request an absentee ballot. Black, Latino, elderly, and rural voters are disproportionately likely to be on the wrong side of the digital divide.[98]

---

[97] *Id.*

[98] U.S. Census Bureau, "The Digital Divide: Percentage of Households by Broadband Internet Subscription, Computer Type, Race and Hispanic Origin" (Sept. 11, 2017), *available at* https://www.census.gov/library/visualizations/2017/comm/internet.html; Andrew Perrin, *Digital Gap Between Rural and Nonrural America Persists*, PEW RESEARCH CENTER (May 31, 2019), *available at* https://www.pewresearch.org/fact-tank/2019/05/31/digital-gap-between-rural-and-nonrural-america-persists/; Andrea Caumont, *Who's not online? 5 factors tied to the digital divide*, PEW RESEARCH CENTER (May 31, 2019), *available at* https://www.pewresearch.org/fact-tank/2013/11/08/whos-not-online-5-factors-tied-to-the-digital-divide/.

155.   **Third**, Defendants have failed to take sufficient action to ensure that all voters who receive absentee ballots can cast their ballots and have them counted.

156.   The statutory deadline for requesting an absentee ballot is just five days before election day, Wis. Stat. § 6.86(1)(b), and clerks can wait up to one business day before mailing a ballot. Wis. Stat. § 7.15(cm). Defendants have acknowledged that postal mail can take up to a week to transport a ballot both from clerk to voter and voter back to clerk, for a total of two weeks. As a result, some voters who timely request absentee ballots, receive them, cast their votes, and timely return them by postal mail will still be disenfranchised. Nonetheless, Defendants have failed to require or facilitate the availability of secure drop boxes in each municipality for the socially distant return of absentee ballots.

157.   Even with drop boxes, absent judicial relief ensuring that mailed absentee ballots postmarked by election day are accepted for counting, some voters who timely request absentee ballots will inevitably be disenfranchised again.

158.   Defendants have no policy or other measures in place to create any more workable alternatives for voters at high risk from COVID-19, especially immunocompromised voters, who cannot safely comply with the witnessing requirements for absentee ballots set forth in Wis. Stat. § 6.87(2).

159.   **Fourth**, Defendants have no policy or other measures in place to ensure that voters statewide have sufficient access to in-person absentee voting opportunities, including both walk-in early voting and drive-through early voting. In-person absentee voting is essential for those who are unable, for a variety of reasons, to obtain an absentee ballot by mail or through the online system. It is also essential in order to spread out in-person voting over a longer period,

46

thereby reducing the likelihood that election day polling locations will be overwhelmed and allowing better compliance with safety precautions against spread of coronavirus.

160.     **Fifth,** Defendants, although recognizing the critical shortage of poll workers that led to widespread polling place closures, have no policy or other measure in place to facilitate recruitment of poll workers or provide assistance in facilitating the equitable distribution of poll workers within counties. Instead, Defendant Wolfe's memorandum stated that the Commission would (1) "work with" and "survey" jurisdictions to keep abreast of their shortages; (2) maintain a ticket for personnel with the State Emergency Operations Center; and (3) develop training for last-minute poll-worker certification.[99]

161.     **Sixth**, Defendants have failed to take adequate action to ensure that in-person absentee and election day polling places will be safe during the August and November elections, and that voters are made aware in advance of these changes so that the failures of the April 7 election do not have an intimidating effect on voters in August and November. While Defendant Wolfe wrote that, for the August and November elections, Commission staff would assist jurisdictions in finding sanitary supplies and masks and gloves for poll workers, Defendants have taken no action to require voters or poll workers to wear masks or take other precautions to ensure that voters feel secure in appearing at polling places.[100]

162.     **Seventh**, Defendants have not put forward a plan to ensure that all members of the voting public have the information they need to register online, request an absentee ballot, and successfully return that ballot, so that no one at high risk for COVID-19 and thus unable to vote in person is disenfranchised in August or November. They have not put forward a plan to

---

[99] Wis. Elections Commission, "Summary of April 7, 2020 Election."
[100] *Id.*

ensure that voters on the wrong side of the digital divide have the information they need to register and request an absentee ballot.

163.    As a result of these failures, the harms experienced by the voters of Wisconsin, and by Plaintiffs in particular, are overwhelmingly likely to recur in the August and September elections absent relief here.

## V.    Plaintiffs' Injuries

**Jill Swenson**

164.    Plaintiff Jill Swenson is sixty-one years old and has, among other serious ailments, early stage chronic obstructive pulmonary disease ("COPD"), an inflammatory lung disease that causes obstructed airflow from the lungs. Ms. Swenson is in one of the highest-risk populations for COVID-19.

165.    Ms. Swenson is a regular voter and makes it her usual practice to vote in person on election day. This year, because of her age and health, Ms. Swenson felt unsafe voting in person at her polling location or returning an absentee ballot in person at Appleton City Hall. After several unsuccessful attempts to scan in her identification, she successfully requested a mail-in absentee ballot online at the end of February. It arrived about a week later.

166.    By March 11, Ms. Swenson had begun to self-quarantine. She did not leave her home or interact with others in person. Ms. Swenson was unable to find anyone who could safely witness her ballot. Her friends and neighbors were either failing to practice social distancing, still working at essential businesses, or recently recovered from possible COVID-19.

167.    On March 31, Ms. Swenson contacted the Commission for advice on how to submit her ballot. The Commission told Ms. Swenson to have someone come to her home and hand the ballot back-and-forth through a window or door. It also pointed her to a website with

guidance suggesting that voters leave their ballot outside for day before a witness handles the ballot, and then wait another day before handling the witnessed ballot. Ms. Swenson did not feel safe inviting anyone over. The Commission also told Ms. Swenson she could bring her absentee ballot to Appleton City Hall, but she felt unsafe doing so because interacting with staff and other members of the public could cause her serious illness or death.

168.     When Ms. Swenson learned about the Court's April 2 order allowing voters to submit un-witnessed absentee ballots by mail, she completed and mailed her absentee ballot immediately, with a note stating that she lived alone, feared contracting COVID-19, and could not find a witness, and that she was submitting an unwitnessed ballot in conformity with the court order. Later that day, the Seventh Circuit stayed enforcement of that Order. Several days later, Ms. Swenson learned through news reports that her ballot would be invalidated and that her vote would not count. She was deeply upset; she cherishes exercising her right to vote.

169.     Ms. Swenson was not aware of any opportunity to cure the defect with her absentee ballot and knew that attempting to vote in person after submitting even an invalidated absentee ballot would be unlawful.

170.     If the witnessing requirement remains in effect during the August and November elections, Ms. Swenson will not have a safe way to vote—and to ensure her vote is counted—in Wisconsin's August and November elections.

**Melody McCurtis**

171.     Plaintiff Melody McCurtis lives in the Sherman Park neighborhood of Milwaukee, Wisconsin. She is a lifelong voter who votes in almost every election, large or small. She lives in a multi-generational household that includes her mother, who has hypertension, high blood pressure, and an enlarged heart, putting her at increased risk of COVID-19 complications.

49

As a community organizer, Ms. McCurtis was aware of the disparate impact that COVID-19 had had on the Black community in Milwaukee. Her polling location at Washington High School is located in Sherman Park, the epicenter of the COVID-19 crisis in the Black community. Knowing all this, Ms. McCurtis requested an absentee ballot on March 22.

172.     Ms. McCurtis's ballot never arrived. On April 6, Ms. McCurtis called the Clerk's office, but there was no answer. She called again on April 7, and was told that she had no choice but to vote in person. Although Ms. McCurtis's mother was afraid of Ms. McCurtis voting in person, Ms. McCurtis joined the blocks-long line outside of Washington High School around 6:30 p.m. on election day. She cast her ballot at 9:09 p.m.

173.     During the wait of more than two-and-a-half hours, Ms. McCurtis experienced intimidation, fear, and frustration. Voters in line were not able to practice social distancing due to the large number of people in line and the failure of election officials to enforce the practice. The polling location did not provide PPE for voters, and it had run out of sanitary pens. Ms. McCurtis observed seniors and individuals with disabilities waiting in the long line. In addition, there was a noticeably high police presence, including the National Guard. Yet despite the high police presence, no one stopped a young woman who spent over an hour dancing along the line of voters, entering voters' personal space and creating a health risk for those in line.

174.     As she waited in line, Ms. McCurtis observed a member of the National Guard approach and speak to a female voter. The woman stepped out of line and left. That National Guard member then approached Ms. McCurtis and said "You know this will be a two-hour wait, right?" The National Guard member appeared to be discouraging voters from remaining in line. Ms. McCurtis asked him to stop speaking to voters and refrain from discouraging voters from remaining in line, but she was not able to monitor whether he did so. This experience deeply hurt

50

Ms. McCurtis, who is a community organizer focused on encouraging Metcalfe Park community members to vote.

175.    Ms. McCurtis still feels the traumatic impact of being subjected to such an unsafe voting experience; the heavy police presence and long line of Black voters reminded her of the violence surrounding earlier generations of Black Americans' efforts to vote. On April 7, she felt afraid for her health and physical safety, and the health and physical safety of her community. In light of her experience in April, Ms. McCurtis reasonably fears that she will not be able to exercise her right to vote in August and November without exposing herself, and therefore her mother, to significant health risks.

**Maria Nelson**

176.    Plaintiff Maria Nelson has breast cancer and is currently undergoing chemotherapy treatment. She is also a regular voter and enjoys taking her two young children to the polls to teach them the importance of voting. Because of highly publicized reports explaining that immunocompromised individuals are most at risk from the COVID-19 pandemic, Ms. Nelson felt unsafe voting in person at her polling location on election day. Because of this, on March 31, she timely emailed the Appleton City Clerk and requested an absentee ballot. She received a call in response from the Clerk's office stating that the Clerk's office would be sending an absentee ballot by mail. Ms. Nelson agreed, assuming that the Clerk's office was accurately representing its ability to send her a timely ballot.

177.    Ms. Nelson's absentee ballot did not arrive before April 7. Instead, it arrived on April 8, too late to be used. On election day, Ms. Nelson was not able to vote in person because she felt too unsafe and was not willing to risk her life by voting in person. As a result, Mrs. Nelson was disenfranchised.

178.     If Defendants do not remedy the defects in the in-person and absentee voting systems, Ms. Nelson will not have a safe and reliable way to cast a ballot in the August and November elections.

**Black Leaders Organizing for Communities**

179.     Plaintiff BLOC mobilizes Black Wisconsinites to participate at all levels of government and encourages communities of color to fulfill their potential for electoral impact in Milwaukee. As part of its work, BLOC educates the Black community in Milwaukee about voter eligibility rules, voter ID requirements, the importance of voting, and the opportunity for early voting. BLOC primarily operates as a robust field program. For example, BLOC knocked on approximately 227,000 doors in Milwaukee in 2018, encouraging Black residents to engage in civic participation, including voting. Ahead of the April 7 election, BLOC had hired 50 ambassadors to knock on an anticipated 44,000 doors. Each ambassador went through more than 30 hours of civics training, including training on registering voters and how to vote. Much of that training became out of date as Defendants' policies and deadlines shifted again and again in the days leading up to April 7. Because of the COVID-19 pandemic, BLOC ambassadors have reduced capacity and are working half of their ordinary hours. BLOC is paying ambassadors for their full hours.

180.     In light of Defendants' failures to provide adequate and safe voting opportunities in the face of the COVID-19 pandemic, BLOC had to uproot its highly effective field program and divert significant resources to digital outreach to Black Wisconsin voters, including implementing a texting and phone-banking campaign to educate voters on how to cast mail-in absentee ballots. This required setting up new technological tools, and training BLOC's ambassadors on those tools remotely. While BLOC would inevitably had to have made changes

to its field program in light of COVID-19, Defendants' policies and practices significantly increased that burden. As deadlines and absentee ballot requirements shifted, BLOC had to repeatedly push out additional training and information to its remote staff and ensure that updated messages were being sent to constituents. BLOC's staff created graphics and social media posts for every new deadline and policy change; ordinarily, minimal new content would be created, and BLOC would be able to reuse any new content. BLOC will be unable to reuse most of the new content created for April.

181.    BLOC was also unable to fulfill its mission of encouraging Black Wisconsinites to vote. BLOC had to contact voters multiple times as policies changed. Each call was longer than usual, as BLOC staff spent time explaining confusing online systems, helping voters scan identification over the phone, and walked them through changing deadlines. Because of this, and because BLOC staff had been and continues to work reduced hours, BLOC was unable to meet its goals for voter contacts leading up to the April 7 election (but at the same cost to BLOC). But for Defendants' failures, much of this work would have been unnecessary. Instead, BLOC would have focused on traditional get-out-the-vote efforts, speaking to voters about candidates and issues. BLOC was not able to have those conversations with voters this year and, because of the numerous barriers facing its constituents, was not able to meet its goals related to getting significant numbers of the Black community to vote.

182.    BLOC's organizational planning for the summer and fall are on hold, because BLOC has no way of knowing what policies or deadlines will be in place for the August and November elections. Many voters with whom BLOC works did not receive an absentee ballot by April 7, 2020. Others found the absentee ballot request system confusing and difficult to use. Many of those voters feared for their health and safety due to the ongoing COVID-19 pandemic,

including because COVID-19 has disproportionately affected the Black community. They were too afraid to vote in person on April 7. As a result, those voters were disenfranchised and unable to cast a ballot in the election.

183.    Absent relief here, many voters with whom BLOC works will be similarly disenfranchised and burdened during subsequent elections. As a result, BLOC will be forced to continue to divert resources in order to attempt to enfranchise these voters, to counteract the uncertainty Defendants' policies and practices are creating, and to reach the increased number of Black voters facing unsafe voting conditions.

184.    Although BLOC has invested heavily in building community trust in the election system and building community power through civic engagement, BLOC is now faced with re-building that trust after many of the voters with whom BLOC works were disenfranchised due to Defendants' failures. This shift in programmatic focus will likely mean generating new messaging and outreach campaigns. The lost trust created by Defendants' failures and the disenfranchisement of BLOC's constituents has made it harder for BLOC to achieve its mission.

**Disability Rights Wisconsin**

185.    Plaintiff DRW's mission is to address the issues facing, and to ensure the rights of, all people with disabilities in Wisconsin. DRW has a state and federal mandate to protect and advocate for the rights of people with disabilities in Wisconsin, including those with developmental disabilities, mental illness, and traumatic brain injury. As part of this mandate, DRW oversees self-advocacy training and other programs and services to assist people with disabilities, including to secure election access, including registering to vote, accessing polling places, and casting their ballot. DRW also leads the Wisconsin Disability Vote Coalition.

186.     In light of Defendants' failures to provide adequate and safe voting opportunities in the face of the COVID-19 pandemic, DRW had to produce numerous resources and trainings ahead of the April 7 election that it would not have otherwise produced, at the expense of staff time and DRW's other programmatic priorities. For example, DRW organized four Zoom briefings to explain the special circumstances and changing policies around the April 7 election. As requirements changed, DRW had to update and rewrite resources provided to voters five to six times, including its popular Election FAQ document. With each update, DRW staff had to spend time liaising with the Commission to make sure they were conveying accurate information. Ordinarily, DRW would have to create only a single version of these materials. DRW also had to attend emergency meetings of the Commission, prepare for at least two unplanned calls with WEC, and coordinate on an emergency basis with other Wisconsin organizations to ensure voters were getting accurate information.

187.     Because of this unplanned and additional work, significant staff time was spent responding to Defendants' failures and informing DRW's constituents about how to vote. This staff time was diverted from other DRW priorities, such as creating key reference materials for parents of children with serious disabilities, completing federal grant reporting requirements, and coordinating Wisconsin's Mental Health Task Force.

188.     DRW continues to have to divert resources in response to Defendants' failures and in anticipation of future disenfranchisement, if policies are not changed. DRW has devoted significant staff time to organizing Zoom briefings for the May 12 election, and it is currently coordinating with other Wisconsin groups on a joint voter-education plan for future elections, and developing a campaign to encourage voters to vote absentee. As a part of campaign planning, DRW is conducting in-depth research, including interviews, on how other states

provide for accessible absentee voting. None of this work was previously planned, and all of it takes staff time away from previously planned work and affects DRW's ability to fulfill its mission.

189.    Many of the Wisconsinites with disabilities on whose behalf DRW advocates face significant obstacles to voting as a result of coronavirus. They will either be disenfranchised or exposed to heightened risk of illness if their legal rights to safely vote are not vindicated. DRW also brings this suit on their behalf.

## CLAIMS FOR RELIEF

### Count 1: Violation of Section 11(b) of the Voting Rights Act
### (All Plaintiffs)

190.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

191.    Section 11(b) of the Voting Rights Act provides that:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307(b).

192.    Defendants violated Section 11(b) of the Voting Rights Act by failing to take objectively reasonable precautions to enable Wisconsin citizens to vote free of fear of contracting COVID-19. *See Hicks v. Knight*, Civ. No. 15,727, 10 Race Rel. L. Rep. 1507-09 (E.D. La. 1965) (finding that a city violated federal voting rights law when it failed to take reasonable measures to protect voter registration group from physical danger).

56

193.    Defendants did not take objectively reasonable steps to run an absentee-voting program that guaranteed registered voters who timely requested ballots the ability to reliably and safely cast their ballots from home. They did not provide municipal clerks with the resources necessary to timely process an unprecedented volume of absentee ballot requests. They did not provide a means of complying with the absentee ballot witness requirement that was safe and feasible for voters at high risk from COVID-19. And they did not ensure that drop boxes would be available for absentee voters who wanted to ensure timely receipt of their voted ballots.

194.    Defendants did not take objectively reasonable precautions to ensure that every voter had access to a safe polling site or in-person absentee voting location that allowed for adequate social distancing practices. They took insufficient steps to ensure, for instance, that there were enough poll workers in each county to staff an adequate number of polling sites to forestall long lines and crowds, and they did not facilitate the equitable sharing of poll workers across jurisdictions within a county. They did not require that poll workers or voters wear masks.

195.    As a result, many Wisconsin voters—even those who had timely requested absentee ballots—were forced to choose between risking their physical safety to vote and abstaining from voting.

196.    Defendants' failure to take objective reasonable precautions to ensure that each Wisconsin voter could vote free of fear of contracting COVID-19 intimidated and injured Plaintiffs.

197.    Plaintiff Swenson was too intimidated by fear of contracting COVID-19 both to vote in person and to get a witness to sign her absentee ballot. As a result, she was disenfranchised. Absent relief, she will be intimidated again in subsequent elections during the pandemic.

198.    Plaintiff McCurtis was intimidated and threatened by the unsafe conditions she encountered in voting at Washington High School in Milwaukee. Absent relief, she will anticipate similar conditions at polling places during subsequent elections during the pandemic, and thus will remain intimidated.

199.    Plaintiff Nelson was too intimidated by fear of contracting COVID-19 to vote in person, and she did not receive her timely requested absentee ballot. As a result, she was disenfranchised. Absent relief, she will be intimidated again in subsequent elections during the pandemic.

200.    Widespread voter intimidation has forced DRW and BLOC to divert resources from other activities in order to ensure that voters are not afraid to cast ballots in subsequent elections during the pandemic.

201.    Defendants have not taken sufficient steps to remedy their failure to protect voters from intimidation during the April election.

202.    Unless enjoined by the Court, Defendants will continue to violate Section 11(b) of the Voting Rights Act.

### Count 2: Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (Plaintiff McCurtis, Organizational Plaintiffs)

203.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

204.    The Fourteenth Amendment prohibits Wisconsin from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

205.    "Having once granted the right to vote on equal terms, [a state] may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*,

531 U.S. 98, 104-105 (2000). Defendants cannot "arbitrarily deny" Wisconsinites "the right to vote depending on where they live." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008).

206.    Defendants' administration of the April 7 election arbitrarily advantaged voters in some jurisdictions and disadvantaged those who resided in others, including especially voters in Milwaukee.

207.    Defendants failed to take sufficient action to remedy known poll worker shortages. They also failed to facilitate the equitable sharing of poll workers within counties, leading to situations in which municipalities in the same county had radically different staffing levels and thus provided radically different experiences for voters.

208.    Defendants' arbitrary and disparate administration of the April election injured Plaintiff McCurtis by subjecting her, as a resident of the City of Milwaukee, to a voting system more dysfunctional than that experienced by Wisconsinites in many jurisdictions—who voted without waiting in line for more than two and a half hours.

209.    Defendants' arbitrary and disparate administration of the April election has forced the Organizational Plaintiffs to divert resources from other activities in order to ensure that voters in Milwaukee, Green Bay, and other municipalities that experienced severe problems in April are enfranchised in subsequent elections during the pandemic.

210.    Defendants' actions, taken under color of law, deprive Plaintiffs of rights, privileges, or immunities secured to them by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

211.    Defendants' actions and failures to act have subjected Plaintiffs to arbitrary disparities in their ability to have their votes counted depending on where they live.

212.     Unless enjoined by the Court, Defendants will continue to violate the Equal

Protection Clause.

## Count 3: Violation of the First and Fourteenth Amendments
## to the U.S. Constitution
## (All Plaintiffs)

213.     Plaintiffs reallege and incorporate by reference the allegations contained in the

preceding paragraphs.

214.     United States citizens' voting rights are protected by the First and Fourteenth

Amendments to the U.S. Constitution. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick*

*v. Takushi*, 504 U.S. 428 (1992).

215.     Defendants' actions unduly burdened Plaintiffs Swenson, McCurtis, and Nelson's

constitutionally protected voting rights by forcing them to choose between exercising their rights

to vote and their personal safety.

216.     As a result, Defendants' actions imposed a severe—and sometimes impossible—

burden on Plaintiffs' right to vote.

217.     Defendants' administration of the April election in a manner that imposed severe

burdens on voters has forced the Organizational Plaintiffs to divert resources from other

activities in order to ensure that voters are nonetheless enfranchised in subsequent elections

during the pandemic.

218.     Defendants have no countervailing legitimate governmental purpose in forcing

individuals to choose between the right to vote and their safety.

219.     Unless enjoined by the Court, Defendants will continue to violate the First and

Fourteenth Amendments.

## Count 4: Violation of the Due Process Clause of the Fourteenth Amendment
## to the U.S. Constitution

**(Substantive Due Process)**
**(All Plaintiffs)**

220.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

221.    The Fourteenth Amendment prohibits Wisconsin from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. As a result, Defendants cannot engage in willful conduct "which undermines the organic processes by which candidates are elected." *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975).

222.    On information and belief, Defendants had actual knowledge that, without significant action on their part, the April 7 election could not be held in a manner that would not disenfranchise thousands of voters, but they nonetheless failed to take these appropriate and timely steps. The result was an election "so devoid of standards and procedures as to violate substantive due process." *Brunner*, 548 F.3d at 478.

223.    Defendants did not take actions sufficient to ensure that voters could cast absentee ballots and have them counted despite postal service delays that had been acknowledged by Defendants. They did not take actions sufficient to ensure that in-person polling places would remain safe. As a result, tens of thousands of Wisconsin voters were disenfranchised.

224.    Defendants' willful failure to conduct a safe election with adequate standards and procedures injured Plaintiffs. Plaintiffs Swenson and Nelson were fully disenfranchised; Plaintiff McCurtis was forced to risk her health and that of her family members to cast a ballot.

225.    Defendants' administration of the April election without implementing adequate standards or procedures has forced the Organizational Plaintiffs to divert resources from other activities in order to ensure that voters are nonetheless enfranchised in subsequent elections during the pandemic.

61

226.   Defendants are not taking adequate steps to cure their willful failure to hold a constitutionally adequate election. They have not enacted or proposed solutions to ensure that voters can cast absentee ballots and have them counted despite USPS delays. They have not enacted or proposed solutions sufficient to ensure that in-person polling places will remain safe.

227.   Unless enjoined by the Court, Defendants will continue to violate the Due Process Clause in the August and November elections.

### Count 5: Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (Procedural Due Process) (Plaintiffs Swenson and Nelson, Organizational Plaintiffs)

228.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

229.   The Due Process Clause of the Fourteenth Amendment also prohibits the Defendants from denying any person of a protected property or liberty interest without fair process. At the core of these procedural protections is the right to adequate notice with respect to any deprivation of a protected interest, and a fair opportunity to be heard on the matter at a meaningful time and in meaningful manner. *See Mathews v. Eldridge,* 424 U.S. 319 (1976).

230.   All eligible Wisconsin voters have a fundamental right to vote protected by the U.S. Constitution and Wisconsin law. Wis. Stat. § 6.02. All eligible Wisconsin voters also have a right to request and receive an absentee ballot for any reason, Wis. Stat. § 6.85, *et seq.*, and to have their properly cast absentee ballots counted, Wis. Stat. §§ 6.88, 7.52. Each of these rights is a protected liberty or property interest that triggers the fundamental procedural protections of the Due Process Clause.

231.   Defendants violated Plaintiffs' procedural rights under the Due Process Clause with respect to the right to obtain an absentee ballot. Defendants violated this right by failing to

provide: adequate notice of the procedures by which individuals might cure any errors in a request for an absentee ballot; adequate notice that an absentee ballot would not be delivered to the voter in time to cast the ballot; clear, timely, and effective procedures by which to exercise the right to vote in the event an absentee ballot did not arrive in sufficient time before election day; and clear, timely, and effective procedures by which a voter could seek redress in the event of an erroneous deprivation of the right to obtain an absentee ballot. Defendants further violated these rights by failing to adopt constitutionally adequate rules, directives, or similar guidance on these matters statewide.

232.    Defendants also violated Plaintiffs' procedural rights under the Due Process Clause with respect to the right to have absentee ballots counted. Defendants violated this right by failing to provide timely notice that an absentee ballot had been rejected before election results are certified, including with respect to absentee ballots rejected on the grounds that the ballot allegedly lacked necessary signatures or other details, or because of alleged problems with the postmark or other evidence that the ballot was timely cast. Wis. Stat. §§ 6.88, 7.52. Defendants also failed to provide voters a constitutionally adequate opportunity to be heard on the validity of their ballots before they were excluded from the certified election results. *Id.*

233.    Defendants further violated Plaintiffs' procedural rights under the Due Process Clause by failing to provide timely, meaningful, and effective notice of changes in voting protocols, procedures, and requirements precipitated by the coronavirus pandemic. Defendants' failure to communicate effective notice of such changes to the public created widespread confusion in the April 7 election about how eligible voters could or could not exercise their fundamental right to vote. This failure resulted in Plaintiffs, like Plaintiffs Swenson and Nelson, losing their fundamental right to vote and other protected interests, including the right to obtain

and cast an absentee ballot rather than incur the health risk of going to a polling place on election day. Defendants have not cured those failures and have a continuing obligation under the Due Process Clause to provide effective, timely notice to voters with respect to the protocols, procedures, and other requirements they must satisfy in order to exercise their fundamental right to vote either in person or absentee. Defendants have also violated these requirements by failing to implement rules, directives, or similar guidance with respect to such matters statewide.

234.    Defendants' heavy reliance on websites, particularly MyVote Wisconsin, as a means of providing notice to voters failed to satisfy the requirements of procedural due process with respect to the large number of Wisconsin residents who do not have ready access such means of communication, including those who lack necessary technical skills, those with disabilities, and those who simply do not have ready access to computers or the internet. This failure disproportionately affects low-income, disabled, elderly, and minority voters, and forces the Organizational Plaintiffs to expend significant additional resources to carry out voter education, voter outreach, and get-out-the-vote activities with respect to the populations that they each serve.

235.    Defendants are not taking adequate steps to cure these violations of procedural due process in the August and November elections.

236.    Unless enjoined by the Court, Defendants will continue to violate procedural rights guaranteed by the Due Process Clause.

### Count 6: Violation of the Americans with Disabilities Act
### (Plaintiffs Swenson and Nelson, Organizational Plaintiffs)

237.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

238.    Under Title II of the ADA, state and local governments must not impose requirements on participation in public services, programs, or activities, including voting, that prevent individuals with disabilities from fully and equally enjoying that participation, and must make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability. 42 U.S.C. § 12132. "Title II of the ADA requires [such entities] to ensure that people with disabilities have a full and equal opportunity to vote. The ADA's provisions apply to all aspects of voting, including voter registration, site selection, and the casting of ballots, whether on Election Day or during an early voting process."[101]

239.    Immunocompromised individuals and those who suffer a significant medical vulnerability that would place them at high risk of serious bodily injury or death should they leave the confines of their home, or should they interact with a non-member of their household, have a disability within the meaning of the ADA.

240.    Defendants have failed to safeguard these individuals' right to participate in our democracy in at least three ways.

241.    First, through the conduct described above, Defendants have failed to ensure that such individuals who request absentee ballots receive them, as necessary to allow them to vote, and to count their ballots if they are able to mail them back. Defendants must maintain a voting process that ensures those with such disabilities can register for, receive, vote, and have counted their absentee ballots.

242.    Second, Defendants have failed to provide reasonable accommodations to voters with disabilities from the photo-ID and in-person witness requirements for absentee voting, Wis. Stat. § 6.87(2). Many Wisconsin voters with disabilities live alone and cannot safely arrange for

---

[101] U.S. Dep't of Justice, "The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities," *available at* https://www.justice.gov/file/69411/download (last accessed May 14, 2020).

an in-person witness. Many Wisconsin voters with disabilities also do not have access to the technology necessary to provide copies of their photo-ID with absentee voting materials. Defendants have failed to accommodate these voters by, for example, replacing the witness verification requirement with a self-certification requirement, and finding alternatives to the photo-ID requirement. In so doing, Defendants have violated the ADA by denying these voters the right to participate in Wisconsin's voting process by reason of their disability.

243.    Third, blind individuals and others who require the use of assistive technology available only in person to vote privately and independently also have a disability within the meaning of the ADA. By failing to guarantee safe access to in-person voting for these voters, Defendants have violated the ADA.

244.    Defendants are not taking adequate steps to avoid these violations of the ADA.

245.    Unless the requested relief is granted, Plaintiffs Swenson and Nelson and those similarly situated will suffer irreparable harm in that they will be discriminated against and denied equal access to participation in voting in violation of the ADA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court:

A.  Declare that administering an election during the COVID-19 pandemic in the manner that Defendants administered the April 7, 2020 election violates Section 11(b) of the Voting Rights Act, the First and Fourteenth Amendments of the U.S. Constitution, and the Americans with Disabilities Act;

B.  Order Defendants, for the August and November 2020 elections, to:

1. Take all appropriate actions to ensure that in-person voting, whether exercised by casting an absentee ballot or by casting a ballot on election day, can be safely conducted;

2. Require that accessible voting machines be available at all in-person absentee voting locations;

3. Take all appropriate actions to ensure an adequate number of poll workers to administer safe polling places;

4. Ensure that each registered voter in Wisconsin receives an absentee ballot request form and that all residents of care facilities have adequate opportunities to register to vote and request absentee ballots;

5. Take all appropriate actions to ensure that all voters who request and are qualified to receive an absentee ballot in fact receive such absentee ballot, and that any voter whose request for an absentee ballot is rejected or not processed for any reason be notified and given the opportunity to cure any defect in a timely manner;

6. Take all appropriate actions to upgrade electronic voter registration systems so they can process the anticipated elevated number of online registrations and absentee ballot requests;

7. Take all appropriate actions to coordinate with, and require municipalities to coordinate with, the United States Postal Service to ensure the timely delivery and return of, and counting of, absentee ballots;

8. Require municipalities to establish secure drop boxes for in-person return of absentee ballots and to increase in-person absentee voting opportunities that are safe and accessible, including, for instance, drive-through voting;

9. Provide timely notice to any voter whose absentee ballot is rejected as to the reason for rejection, as well as an opportunity to cure or contest the ballot rejection.

10. Engage in a public education campaign to apprise the public on: how to request, vote, and return absentee ballots; the locations and times for in-person absentee voting; all early voting opportunities in each community; the provisions being made for safe in-person voting; and any changes in election day polling locations.

C.  Enjoin the enforcement of:

1. Wis. Stat. § 7.30(2) with respect to the requirement that each election official be an elector of the county in which the municipality is located;

2. Wis. Stat. § 6.87(2) as to immunocompromised voters who cannot safely secure an in-person witness, to be replaced by a verification subject to penalty of perjury;

3. Wis. Stat § 6.86(1)(ac) with respect to immunocompromised and disabled voters without means to provide photo identification, to be replaced by a verification subject to penalty of perjury or other means of identifying the voter;

4. Wis. Stat § 6.87(6) and require that absentee ballots postmarked by election day or not bearing a postmark but received within a week of election day be counted;

5. Wis. Stat. §§ 6.88, 7.51 with respect to the requirement that absentee ballots not be counted before election day; and

6. Wis. Stat. § 7.52 with respect to the requirement that a municipality pass an ordinance in order to count absentee ballots at a central location.

D.  Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988(b), 28 U.S.C. § 1920, and other applicable laws; and

E.  Grant such other relief as the Court deems just and proper.

Dated: May 18, 2020

By:   /s/ Leah Godesky

Anton Metlitsky^
Leah Godesky
Yaira Dubin
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com
lgodesky@omm.com
ydubin@omm.com
^ *Motion for admission forthcoming*

Molly M. Lens
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
(310) 553-6700
mlens@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
jzarrow@omm.com

Laurence M. Schwartztol
THE PROTECT DEMOCRACY PROJECT
15 Main St., Suite 312
Watertown, MA 02472
(202) 856-9191
larry.schwartztol@protectdemocracy.org

Rachel E. Goodman
THE PROTECT DEMOCRACY PROJECT
115 Broadway, 5th Fl.
New York, NY 10006
(202) 997-0599
rachel.goodman@protectdemocracy.org

Jamila Benkato*
Farbod Kaycee Faraji*
Cameron Kistler
THE PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington DC 20006
(202) 579-4582
jamila.benkato@protectdemocracy.org
farbod.faraji@protectdemocracy.org
cameron.kistler@protectdemocracy.org
*Admitted to practice in California, not
D.C.; practice consistent with D.C. App. R.
49(c)(3).*

Douglas M. Poland
State Bar No. 1055189
RATHJE WOODWARD LLC
10 E Doty Street
Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

Jeffrey A. Mandell
State Bar No. 1100406
STAFFORD ROSENBAUM LLP
222 West Washington Avenue
P.O. Box 1784
Madison, WI 53701-1784
(608) 256-0226
jmandell@staffordlaw.com

Jonathan Manes
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
160 E Grand Ave, Sixth Floor
Chicago, IL 60611
(312) 503-0012
jonathan.manes@law.northwestern.edu

*Counsel for Plaintiffs*

69

In the United States District Court
For the Eastern District of Wisconsin
Green Bay Division

| | |
|---|---|
| **Michael Langenhorst, Michael D. LeMay, Stephen Fifrick**, <br>    *Plaintiffs,* <br>      *v.* <br> **Laure Pecore**, in her official capacity as Clerk of Menominee County, Wisconsin; **Scott McDonell**, in his official capacity as Clerk of Dane County, Wisconsin; **George L. Christenson**, in his official capacity as Clerk of Milwaukee County, Wisconsin; **Julietta Henry**, in her official capacity as Milwaukee County, Wisconsin Elections Director; **Rick Baas**, **Dawn Martin**, and **Tim Posnanski**, in their official capacities as Milwaukee County, Wisconsin Election Commissioners; **Ann S. Jacobs**, in her official capacity as Chair of the Wisconsin Elections Commission, **Mark L. Thomsen**, in his official capacity as Vice-Chair of the Wisconsin Elections Commission, **Marge Bostelmann**, in her official capacity as Secretary of the Wisconsin Elections Commission; **Julie M. Glancey**, **Dean Knudson**, and **Robert F. Spindell, Jr.** in their official capacities as Wisconsin Election Commissioners; and **Tony Evers**, in his official capacity as Governor of the State of Wisconsin, <br>    *Defendants* | Case No.: _____ <br><br> **Verified Complaint for Declaratory and Injunctive Relief** |

## Verified Complaint for Declaratory and Injunctive Relief

Plaintiffs Michael Langenhorst, Michael D. LeMay, and Stephen Fifrick (collectively

"Voters") complain as follows:

1

# Introduction

1. This is a civil action for declaratory and injunctive relief concerning violations of Voters' voting and equal-protection rights by election officials' inclusion of illegal Presidential Elector results in certain counties, which inclusion unlawfully dilutes Voters' lawful votes and requires invalidation of those presidential-election results in counties with evidence that sufficient illegal ballots were included in the results to change or place in doubt the results of the November 3, 2020 presidential election in this state.

2. In particular, Plaintiffs possess advanced technical capability to conduct statistical analyses identifying errors and anomalies such double votes, votes by non-registered persons, votes by persons who are deceased or moved out of state, and the like. Plaintiffs seek immediate production of registration, election, and other data to conduct and present those analyses to the Court.

3. Voters seek a remedy excluding presidential-election results from such counties in the certification activities for Presidential Electors described in 3 U.S.C. § 6:

> It shall be the duty of the executive of each State, as soon as practicable after the conclusion of the appointment of the electors in such State by the final ascertainment, under and in pursuance of the laws of such State providing for such ascertainment, to communicate by registered mail under the seal of the State to the Archivist of the United States a certificate of such ascertainment of the electors appointed, setting forth the names of such electors and the canvass or other ascertainment under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast; and it shall also thereupon be the duty of the executive of each State to deliver to the electors of such State, on or before the day on which they are required by section 7 of this title to meet, six duplicate-originals of the same certificate under the seal of the State; and if there shall have been any final determination in a State in the manner provided for by law of a controversy or contest concerning the appointment of all or any of the electors of such State, it shall be the duty of the executive of such State, as soon as practicable after such determination, to communicate under the seal of the State to the Archivist of the United States a certificate of such determination in form and manner as the same shall have been made; and the certificate or certificates so received by the Archivist of the United States shall be preserved by him for one year and shall be a part of the public records of his office and shall be open to public inspection; and the Archivist of the United States at the first meeting of Congress thereafter shall transmit to the two Houses of Congress copies in full of each and every such certificate so received at the National Archives and Records Administration.

2

## Jurisdiction and Venue

4.   This action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the U.S. Constitution.

5.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), 2201, and 2202.

6.   Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred or will occur in this District. Alternatively, venue is proper under 28 U.S.C. § 1391(b) because at least one of the Defendants to this action resides in this District and all Defendants reside in this State.

## Parties

7.   All Plaintiffs are eligible registered voters in this State and were qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in this State.

8.   Plaintiff Michael Langenhorst is an eligible registered voter in Wisconsin, and was qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in Wisconsin. He is a resident of Door County.

9.   Plaintiff Michael LeMay is an eligible registered voter in Wisconsin, and was qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in Wisconsin. He is a resident of Brown County.

10.   Plaintiff Stephen Fifrick is an eligible registered voter in Wisconsin, and was qualified to, and did, vote for a presidential candidate in the November 3, 2020 presidential election in Wisconsin. He is a resident of Oconto County.

11.   All Defendants are persons authorized by federal and state law to be involved in the process of certifying Presidential Electors as described in 3 U.S.C. § 6.

3

12. Laure Pecore is the Clerk of Menominee County, Wisconsin. In that capacity, she certifies the results of elections within Menominee County and submits the same to the Wisconsin Election Commission. Wis. Stat. § 7.60.

13. Defendant George L. Christenson is the Clerk of Milwaukee County, Wisconsin, and Julietta Henry is the Milwaukee County, Wisconsin Elections Director, and Rick Baas, Dawn Martin, and Tim Posnanski, are Milwaukee County, Wisconsin Election Commissioners. The Milwaukee County Clerk and the Milwaukee County Election Commission canvas and certify the results of elections within the County of Milwaukee and submit the same to the Wisconsin Election Commission. Wis. Stat. § 7.60. These defendants are all sued in their official capacities.

14. Scott McDonell is the Clerk of Dane County, Wisconsin. In that official capacity, he certifies the results of elections within Dane County and submits the same to the Wisconsin Election Commission. Wis. Stat. § 7.60.

15. Ann S. Jacobs, sued in her official capacity, Mark L. Thomsen, sued in his official capacity, Marge Bostelmann, sued in her official capacity, and Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., sued in their official capacities, are Wisconsin Election Commissioners. Under Wis. Stat. § 7.70(1)(a), the Wisconsin Election Commission records the election results by counties and pursuant to subsection (3) canvasses the returns and makes certifications on or before the first day of December following a general election. Under Wis. Stat. § 7.70(5)(a) & (b), the Wisconsin Election Commission prepares certificates of election and for presidential electors, and "prepare[s] a certificate showing the determination of the results of the canvass and the names of the persons elected," to present to the Governor for signature.

16. Defendant Governor Evers, sued in his official capacity, is required as the state "executive" to finalize, execute, and send required certificates for Presidential Electors under 3

4

U.S.C. § 6. *See also* Wis. Stat. § 7.70(5)(b) ("the [G]overnor shall sign, affix the great seal of the state, and transmit the certificate by registered mail to the U.S. administrator of general services.").

# Facts

17.    The state certification of Presidential Electors prescribed in 3 U.S.C. § 6, will occur this year by December 8, and the Electoral College votes on December 14. Voters seek a decision from this Court well before then to allow for possible appeal as necessary, as set out in a separate motion for expedited consideration.

18.    By the law of this state, Wis. Stat. § 7.70, the Chairperson of the Wisconsin Election Commission or a designee of the Chairperson shall canvass the returns on or before the first day of December following a general election. Wis. Stat. § 7.70(3). Immediately after the time for filing a petition for recount expires, the Wisconsin Election Commission prepares certificates of election, *id.* § 7.70(5) and for presidential electors "prepare[s] a certificate showing the determination of the results of the canvass and the names of the persons elected," to present to the Governor for signature. *Id.* Sec. 7.70(5)(b)[state law provisions regarding the process of certifying Presidential Electors and deadline dates for various actions].

***Presidential-Election Results in Key Counties***

19.    The unofficial statewide vote count for Wisconsin was 1,630,503 to 1,610,076 in favor of Biden/Harris. *Unofficial Election Results 2020 by County 11-5-2020*,

https://elections.wi.gov/node/7234 (last visited Nov. 10, 2020). Milwaukee County vote count was 317,251 for Biden/Harris, 134,355 for Trump/Pence. *Milwaukee County Election Results*

https://county.milwaukee.gov/EN/County-Clerk/Off-Nav/Election-Results/Election-Results-Fall-2020 (last visited Nov. 10, 2020). In Menominee County, the vote count was 1303 to 278 in

5

favor of Biden/Harris. *Official Results for November 3, 2020 General Election*,

https://www.co.menominee.wi.us/i/f/OFFICIAL%20RESULTS%20FOR%20NOVEMBER%20
3.pdf (last visited Nov. 10, 2020). In Dane County, the vote count was 260,157 to 78,789 in

favor of Biden/Harris. *Dane County Clerk's Office Voter Information,*

https://elections.countyofdane.com/Election-Result/124 (last visited Nov. 10, 2020).

***Sufficient Evidence Exists to Place in Doubt Presidential-Election Results in Key Counties***

20.    There exists sufficient evidence to place in doubt the November 3 presidential-election

results in identified key counties. Some of that evidence follows.

21.    The Supreme Court has already concluded (citing evidence)[1] that vote fraud occurs

more with mailed ballots than in-person ballots, making that true as a matter of law. *Crawford v.

Marion Cty. Elect'n Bd.*, 553 U.S. 181, 191-97 (2008); *see also Griffin v. Roupas*, 385 F.3d

1128, 1130-31 (7th Cir. 2004) (same). In close races such fraud can swing elections. Since

*Crawford* already recognized this risk, it *need not be proven*. Absentee ballots that are sent to

addresses where individuals have moved, etc. are an even greater threat because they leave

unclaimed ballots available to those who would use them for vote fraud. The Seventh Circuit

recognizes that [v]oting fraud is a serious problem in U.S. elections generally" that is especially

"facilitated by absentee voting," *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004),

because "voting by mail makes vote fraud much easier to commit," *Nader v. Keith*, 385 F.3d

729, 734 (7th Cir. 2004).

---

[1] *Crawford* relied in part on the Carter-Baker Report, prepared by a bipartisan commission co-chaired
by President Carter, which said mailed ballots are "the largest source of potential voter fraud" and are
"likely to increase the risk of fraud and of contested elections." Commission on Federal Election Reform,
*Building Confidence in U.S. Elections* 35, 46 (2005), *available at* bit.ly/3dXH7rU.

22.    As *Crawford* conclusively establishes, Congress found that election validity depends on an accurate, effective systems of voter registration and tabulation, and the lack of such a system precludes reliability and public confidence in election outcomes.

> "A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each other, voters did not need to identify themselves. But in the United States, where 40 million people move each year, and in urban areas where some people do not even know the people living in their own apartment building let alone their precinct, some form of identification is needed.
>
> "There is no evidence of extensive fraud in U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo [identification cards] currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." Building Confidence in U.S. Elections § 2.5 (Sept.2005), App. 136–137 (Carter–Baker Report) (footnote omitted).

*Crawford*, 553 U.S. 193–94, 128 S. Ct. 1618 (footnotes omitted).

23.    *Crawford* establishes in particular the fraud risk inherent in mailed ballots. Examples abound in *Crawford*'s cited authorities and in The Heritage Foundation's *A Sampling of Recent Election Fraud Cases from Across the United States* with1,296 cases of documented voter fraud in recent years. *See* heritage.org/voterfraud. Recently, in Patterson, New Jersey, four men were charged with criminal election fraud involving mail-ballot voting.[2] There was also evidence of a voter carrying numerous ballots and postal workers leaving ballots sitting out in building lobbies, making them available for fraudulent use.[3] A Democratic operative described his vote-fraud experience, noting it is "plenty common" and explaining schemes he's readily employed, including ballot harvesting, ballot tampering, coercion, and bribery.[4] These examples reenforce

---

[2] Vogt, *All-Mail Pandemic Election Ends IN Fraud Charges Against NJ Politicians*, New Jerzey 101.5, June 25, 2020, nj1015.com/all-mail-pandemic-election-ends-in-fraud-charges-against-nj-politicians/?trackback=fbshare_mobile.

[3] Re, *Mail-in voting faces slew of issues nationwide, as emergency USPS memo sounds alarm*, Fox News, July 22, 2020, www.foxnews.com/politics/mail-in-voting-faces-slew-of-issues-nationwide.

[4] Levine, *Confessions of a voter fraud: I was a master at fixing mail-in ballots*, The New York Post, August 29, 2020, nypost.com/2020/08/29/political-insider-explains-voter-fraud-with-mail-in-ballots.

7

what *Crawford*, *Griffin*, and *Nader* established—that mailed ballots pose a real and higher risk of fraud that legislatures must balance in prescribing an election's manner.

24. Wisconsin greatly expanded the scope of mailed ballots in 2020. By October 28, 1,778,157 Wisconsin voters had requested absentee ballots. Stephanie Saul, *Supreme Court Galvanizes Push for Early Voting by Wisconsin Democrats*, N.Y. Times, Nov. 4, 2020 (https://www.nytimes.com/2020/10/27/us/politics/wisconsin-absentee-ballots-election.html) (last visited Nov. 11, 2020). In total Menominee County sent out 616 (of which 560 were returned), Dane County sent out 266,957 (254,335 were returned), and Milwaukee County sent out 345,871 (of which 325,587 were returned). *See* Wisconsin Elections Commission, *Absentee Ballot Report: Nov. 3, 2020 General Election* (Nov. 6, 2020) (https://elections.wi.gov/index.php/node/7236) (last visited Nov. 11, 2020).

25. Those numbers are equal to 34.4% of Menominee County's registered voters, 62% of Milwaukee County's registered voters, and 68.2% of Dane County's registered voters. *See* Wisconsin Elections Commission, Nov. 1, 2020 *Voter Registration Statistics* (Nov. 1, 2020) (https://elections.wi.gov/index.php/node/7236) (last visited Nov. 11, 2020).

26. Mailed ballots pose special fraud risks, and state legislatures have the authority and are equipped to balance access and integrity in the mailed-ballot context. *Griffin*, 385 F.3d at 1130-31. In Wisconsin, an absentee voter typically must provide a valid ID for voting, like a driver's license. *See* Joseph T. Kreye, Staci Duros, Wisconsin Legislative Reference Bureau, *Memorandum:* Questions *Related to "Indefinitely Confined" Absentee Ballots* (Mar. 26, 2020) ("LRB Memo").

(https://legis.wisconsin.gov/senate/13/fitzgerald/media/1401/absenteeballotquestions_fitzgerald_

8

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 80 of 295   Document 119-5
Case 1:20-cv-04651-W   Document 4-1   Filed 11/12/20   Page 8 of 25

03262020.pdf ) (last visited Nov. 11, 2020). But the 2020 election saw a 238% increase in a type of absentee ballot that does not require the ID normally required of an absentee ballot. Starting in early spring 2020, the Town of Menominee encouraged voters to vote absentee, included instructions and standards, including that "indefinitely confined" voters "are not required to provide a photo ID." Town of Menominee, Press Release, *Voters Encouraged to Vote Absentee for April 7 Election* (Mar. 16, 2020)

(https://www.co.menominee.wi.us/i/f/Menominee%20County-Town%20of%20Menominee%20Encouraging%20Absentee%20Voting%20Due%20to%20COVID-19.pdf ) (last visited Nov. 11, 2020).

27.    As a result, Menominee County saw the greatest increase in indefinitely confined voters in the state. MacIver Institute, *A Quarter-Million Wisconsin Voters Claim To Be "Indefinitely Confined" And Not Bound By Voter ID* (Oct. 29, 2020)

(https://www.maciverinstitute.com/2020/10/a-quarter-million-wisconsin-voters-claim-to-be-indefinitely-confined/ ) (last visited Nov. 11, 2020).

28.    Dane County and Milwaukee County openly advised voters to indicate that they are "indefinitely confined," under Wis. Stat. § 6.86(2) and thus, inter alia, excused from providing a photo ID. *See* Laurel White, Wisconsin Public Radio, *County Clerks' Guidance On Voter ID Law Amid Pandemic Irks Wisconsin GOP* (Mar. 26, 2020) (https://www.wpr.org/county-clerks-guidance-voter-id-law-amid-pandemic-irks-wisconsin-gop ) (last visited Nov. 11, 2020).

29.    The Chair of the Wisconsin Senate Committee on Elections recognized that these counties' unilaterally disregarding the legal standards governing "indefinitely confined" status would effectively "disenfranchise electors in other areas of the state" and that even if properly adopted and employed statewide, the practice should be limited so that only already-registered

9

requesters were allowed to forego the photo ID requirement, and that newly-filed indefinitely confined forms should be effective for only this election. *Letter from Senator Kathy Bernier to Wisconsin Elections Commission* (Mar. 26, 2020)

(https://www.wpr.org/sites/default/files/bernier_-_letter_to_elections_commission.pdf)[5] (last visited Nov. 11, 2020).

30.    Regardless of the validity of the defendant counties' actions in encouraging the application for "indefinitely confined" absentee ballots, 243,900 of such ballots were distributed by the time of the 2020 general election.[6] This includes 23,379 (an increase of 16,943 over 2019) in the City of Milwaukee and 8993 (an increase of 6199 over 2019) in Madison by May 20, 2020.[7]Wisconsin Elections Commission *Meeting of the Wisconsin Elections Commission* 55 (May 20, 2020). (https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/ WEC%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%20PowerPoint%20Presentation.pdf ) (last visited Nov. 11, 2020).

---

[5] The Wisconsin Legislative Reference Bureau advised that

it would seem inconsistent with current law for a clerk or other election official to suggest that every individual in this state is indefinitely confined for purposes of receiving an absentee ballot, and without providing voter identification, because of emergency orders issued by DHS relating to a public health emergency that do not require residents to remain at home for all purposes.

LRB Memo. The statutory meaning of "indefinitely confined" is the subject of ongoing litigation that currently rests with the Wisconsin Supreme Court.

[6] Once "qualified," voters receive absentee ballots unless and until they notify officials that their "indefinite confinement" has ended—that is, a voter self-certifies their status. Nearly 200,000 voters used the exception to vote without ID in the spring primary, *see* Patrick Marley, Milwaukee Journal Sentinel*, Nearly 200,000 Wisconsin Voters Did Not Have to Show a Photo Id in the April Election*  (May 26, 2020) (https://www.jsonline.com/story/news/politics/2020/05/26/200-000-wisconsin-voters-did-not-have-show-id-april-election/5246892002/), and another 49,769 did so in the fall general election. *See* Dan O'Donnell,   MacIver Institute, *How The Wisconsin Elections Commission Destroyed Fair Elections In Wisconsin* (Nov. 5, 2020) (https://www.maciverinstitute.com/2020/11/how-the-wisconsin-elections-commission-destroyed-fair-elections-in-wisconsin/) (last visited Nov. 11, 2020).

[7] This does not include, of course, those additional indefinitely confined voters added between May and the general election.

10

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 82 of 295   Document 1-5
Case 2:20-cv-01785-BHL   Filed 11/12/20   Page 10 of 25   Document 4-5

31.    Wisconsin Statutes § 6.87(6d) specifies that an absentee ballot be signed by a witness and include the witness's address and provides that "[i]f a certificate is missing the address of a witness, the ballot may not be counted." Instructions provided by the Wisconsin Elections Commission for absentee ballots dated Aug. 18, 2020 warned that if the address was missing, the ballot would not be counted. Wisconsin Elections Commission, *Uniform Instructions for Wisconsin Absentee Voters* 1 (https://elections.wi.gov/sites/elections.wi.gov/files/2020-09/Uniform%20Absentee%20Instructions%20-%20Current%20-%20By-Mail%20Voters.pdf) (last visited Nov. 11, 2020).

32.    On October 19, Wisconsin Election Commission sent instructions to clerks that this defect could in fact be "cured" by the clerk without the witness appearing. Wisconsin Elections Commission, *Spoiling Absentee Ballot Guidance* 3 (Oct. 19, 2020) (https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Spoiling%20Ballot%20Memo%2010.2020.pdf ) (last visited Nov. 11, 2020). The phrase "[i]f a certificate is missing the address of a witness, the ballot may not be counted" has not been authoritatively construed as "directory" rather than mandatory, *see Lanser v. Koconis*, 62 Wis.2d 86, 91 (1974), and thus clerks have no authority to accept the ballot rather than invalidate it.[8]

33.    Election workers, overwhelmed by the sudden flood of mailed ballots, have less ability to carefully review them to screen out fraudulent ones, creating a substantial risk that fraudulent votes will be counted and vote-dilution disenfranchisement will occur.

34.    Wisconsin has a history of voter fraud claims. Since 2016, when records of such instances were first required to be reported to the state Legislature, Wisconsin has had 238

---

[8] And even if the statute could properly be construed by the Wisconsin Elections Commission as directory on October 19, the Commission has unconstitutionally employed different and unclear standards affecting the validity of a vote and the affected votes should be excluded from the final count. *See infra* ¶ 56.

reported cases of possible voter fraud. Laurel White, Wisconsin Public Radio, *Wisconsin Clerks Reported 238 Possible Voter Fraud Cases Since 2016* (Nov. 10, 2020) (https://www.wpr.org/wisconsin-clerks-reported-238-possible-voter-fraud-cases-2016) (last visited Nov. 11, 2020). These include[9] 109 cases of undeliverable Election Day registration confirmations, 38 cases of voting twice in the same election, either in separate municipalities or by mail and again in person, and 14 cases of voting by felons, non-citizens, "ineligible," or deceased voters, and 3 cases of providing an incorrect address in a registration. *Id.*

35. Wisconsin State Assembly Speaker has ordered an investigation ahead of the Trump campaign's impending recount,[10] to focus on the "inefficiency" of Milwaukee's central counting, reports of voter fraud, and the "removal of voters from the rolls who no longer live here." Jason Calvi, *Speaker Vos Calls for Election Review after Questions Swirl of Voter Fraud* (https://www.fox6now.com/news/speaker-vos-calls-for-election-review-after-questions-swirl-of-voter-fraud) (last visited Nov. 11, 2020).

36. Brown County's elected County Clerk notified an attorney at the Wisconsin Election Commission that two partisan consultants who were not election inspectors, one working for a nonprofit via an outside grant to the City of Green Bay and the other a community liaison for the Democratic mayor of Green Bay, had, contrary to law, advised and instructed poll workers at the Brown County central counting facility with regard to handling and counting ballots. *See* Jim Piwowarczyk & Jessica McBride, Wisconsin Right Now, *Green Bay Election Count Was "Tainted," Says Brown County Clerk* (https://www.wisconsinrightnow.com/2020/11/10/green-

---

[9] 69 cases were reports of 17-year-olds attempting to vote in 2017, allegedly based on misinformation that they were eligible as long as they turned 18 by the fall election.

[10] *See* Bill Stepien *Trump Campaign Statement on Wisconsin* (Nov. 4, 2020) (https://www.donaldjtrump.com/media/trump-campaign-statement-on-wisconsin/) (last visited Nov. 11, 2020).

bay-election-tainted-clerk/?amp=1) (last visited Nov. 11, 2020). Two election observers, one of

which is an election attorney, said that the two were, in fact, "directing" and "engaging with

people very directly on ballots," "advising people on how to process ballots," and "involved"

when "poll workers would raise their hand."

37.    [11]JC lives in the City of Milwaukee. On November 3, she went to her polling place to

vote in person. When she arrived and attempted to sign in and obtain a ballot, poll worker told

her that she had already requested an absentee ballot by mail. However, JC had never requested

an absentee ballot, and therefore requested a ballot to vote in person. When she told the poll

worker that she had not requested an absentee ballot and wanted to vote in person, the worker

replied "That's OK" and gave her a ballot. When JC finished voting, a poll worker was standing

next to the tabulating machine, asking voters what ward they were, and taking their ballots and

looking at them before placing them in the machine. JC refused to give the worker her ballot and

placed it in the machine herself. Also, her daughter had earlier begun registering to vote online,

but decided not to upload her identification, so never completed the online process and never

requested an absentee ballot by mail. However, her daughter later received an absentee ballot by

mail anyway.

38.    LL is an election supervisor in the Village of Menomonee Falls. On election day, while

moving from table to table and around the polling location, she was asked many times by poll

---

[11] Allegations in paragraphs 37 – 42 were collected by counsel on or about November 11, 2020. On
knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, counsel
asserts upon information and belief that the contentions in paragraphs 31-34 have evidentiary support or
will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.
The several gathered reports in paragraph 35 could not be verified one by one under the severe time
constraints typical of election litigation. The disjuncture between the time needed to gather and present
evidence of widespread voter dilution by illegal ballots and the time inherently available to do so
underscores the need for the reasonable method of providing plaintiffs the data-based statistical approach
that is proposed herein.

13

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 85 of 295   Document 1-5
Case 2:20-cv-01785-BHL   Filed 11/11/20   Page 13 of 25   Document 1-2

workers if a voter who had been issued an absentee ballot was allowed to vote in-person when the ballot's signature box is printed "Absentee Issued." She advised the workers that the voter could vote in person as long as the voter had not returned the absentee ballot. Through the day, at least 10 of those voters stated to the effect, "I didn't even ask for this ballot." LL and the workers asked those voters to tear the absentee ballots before voting in person. The voters did so and gave the torn ballots to the workers to include with election materials.

39.    Because Menomonee Falls elections staff is careful about checking obituaries and removing absentee ballots of those who die before election day, LL also randomly checked several online obituaries in Dane and Milwaukee Counties and cross-checked names against the WEC voter list at myvotewi.gov. In less than 10 minutes, LL found three instances of deceased individuals in Dane and Milwaukee Counties who were still shown by myvotewi.gov as having voted absentee:

Mary L. Benson, Wauwatosa – born 11/12/1945 d. 10/16/20 – Completed absentee received 10/1/20.

Patricia (Patti) Farrell, Milwaukee – b. 9/1/1951 d. 10/20/20 – Completed absentee received  9/29/20

Dr. John Odom, Madison – b. 9/22/1948, d. 10/30/20 – Completed absentee received 9/23/20

40.    T.S. and G.S. from Eau Claire, Wisconsin received instructions from the WEC by mail advising how to request ballots and vote by mail. They did not respond and did not request ballots from WEC, either by mail or on line. However, each received a ballot addressed from the WEC personally addressed to them. They destroyed the ballots and voted in person.

41.    CL is a college student in North Dakota, registered to vote in Wisconsin. She requested to be mailed an absentee ballot so that she could vote by mail. She received instructions from WEC to submit ID. However, before returning the request and submitting ID, she received a

ballot by mail and never did submit the ID. She destroyed the ballot and returned to Wisconsin to vote in person.

42.   CL is from Prescott, Wisconsin. While canvassing for the Susan B. Anthony List, a resident told her he had received 10 ballots mailed to him from the WEC, even though he did not request them. He stated that his neighbors had also received 10 ballots without requesting them.

43.   This evidence suffices to place in doubt the November 3 presidential-election results in identified counties and/or the state as a whole. Indeed, issues with thousands of votes cast warrants investigation of the rest.

***Further Evidence To Be Provided From Relevant Records***

44.   In addition to the foregoing evidence, Voters will provide evidence, upon information and belief, that sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results. This will be in the form of expert reports based on data analysis comparing state mail-in/absentee, provisional, and poll-book records with state voter-registration databases, United States Postal Service ("USPS") records, Social Security records, criminal-justice records, department-of-motor-vehicle records, and other governmental and commercial sources by using sophisticated and groundbreaking programs to determine the extent of illegal voters and illegal votes, including double votes, votes by ineligible voters, votes by phantom (fictitious) voters, felon votes (where illegal), non-citizen votes, illegal ballot harvesting, and pattern recognition to identify broader underlying subversion of the election results. Plaintiffs have persons with such expertise and data-analysis software already in place who have begun preliminary analysis of available data to which final data, such as the official poll list, will be added and reports generated.

15

45.   Upon information and belief, the expert report will identify persons who cast votes illegally by casting multiple ballots, were deceased, had moved, or were otherwise not qualified to vote in the November 3 presidential election, along with evidence of illegal ballot stuffing, ballot harvesting, and other illegal voting. This evidence will be shortly forthcoming when the relevant official documents are final and available, for which discovery may be required, and the result of the analysis and expert reports based thereon will show that sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results.

46.   Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.

## Claims

### Count I

**Certifying Presidential Electors Without Excluding Certain Counties Would Violate Voters' Fundamental Right to Vote by Vote-Dilution Disenfranchisement.**

**(42 U.S.C. § 1983; U.S. Const. amends. 1 and 14)**

47.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

48.   Certifying Presidential Electors without excluding certain counties would violate voters' fundamental right to vote by vote-dilution disenfranchisement.

49.   The counties at issue are those identified in the Facts where sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election results.

16

50. The right to vote, with the included right to have one's vote counted, is protected by the First and Fourteenth Amendments and is fundamental, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966), and well-established: "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted, *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

51. "The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 555 (internal citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.*

52. If Defendants certify presidential-election results from counties where sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election result, Voters' valid, legal votes will be unconstitutionally diluted by illegal votes.

53. As recognized in *Donald J. Trump for President v. Bullock*, 2020 WL 5810556 (D. Mont. Sept. 30, 20200, individual voters have standing to bring a vote-dilution disenfranchisement claim, *id.* at *7 & n.4. "[T]he Supreme Court has repeatedly enumerated the principle that claims alleging a violation of the right to vote can constitute an injury in fact despite the widespread reach of the conduct at issue." *Id.* at 7. *See also Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("[A] person's right to vote is 'individual and personal in nature,'" so "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage" (citations omitted)). Under the generalized-grievance formulations in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), this claim is not a generalized grievance. *Lujan* said it turns on whether a plaintiff (i) is merely asserting "citizen" standing, i.e., the same claim that could be asserted by "every citizen," and (ii) just trying to

17

make the government do its job. *Id.* at 560-61. Voters don't bring their claims under mere "citizen" standing but rather assert personal harms from the violation of their own fundamental right to vote. Their claim is particularized, challenging only what violates their rights. Their harm is not the same as for every "citizen." "[D]enying standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. SCRAP*, 412 U.S. 660, 686-68 (1973); *see also, FEC v. Akins*, 524 U.S. 11, 24 (1998). Voters' harm is four levels more specific than "every citizen['s]" for their claim: (1) within "citizens" are those eligible to register as voters—only they have the potential to become registered voters; (2), within eligible voters are registered voters—only they have a right to vote; (3) within eligible, registered voters are those who actually voted—only they have a vote subject to vote-dilution disenfranchisement; and (4) within these eligible, registered, voters who actually voted are those in a jurisdiction where there are counties with evidence that sufficient illegal ballots were included in the results to change or place in doubt the results of the November 3 presidential election. Those very specific voters with a very specific claim don't assert a generalized grievance, and they include Voters. Thus, Voters have standing.

54.    As established in the Facts discussion, existing and forthcoming evidence establish that in identified counties illegal voting has occurred in connection with the presidential-election results, which establishes that Voters' votes have been unconstitutionally diluted. So the presidential-election elections in those counties should be invalidated and not included in the certification of votes for selecting Presidential Electors.

55.    The relevant standard for invalidating election results from a particular jurisdiction generally is that "'the party contesting the election demonstrates an irregularity or illegality

sufficient to change or place in doubt the result.'" 26 Am. Jur. 2d Elections § 389   (quoting

*Gore v. Harris*, 772 So.2d 1234 (Fla. 2000), *rev'd on other grounds*, *Bush v. Gore*, 531 U.S. 98

(2000)). "Ordinarily, an election may be contested only for matters that would impeach the

fairness of the result." *Id.* (citing *Duncan v. McMurray*, 249 S.W.2d 156 (Ky. 1952); *Appeal of*

*Soucy*, 649 A.2d 60 (N.H. 1994); *Fielding v. South Carolina Election Com'n*, 408 S.E.2d 232

(S.C. 1991). "An election will not be invalidated unless the party contesting the election

demonstrates an irregularity or illegality sufficient to change or place in doubt the result." *Id.*

(citing *Middleton v. Smith*, 539 S.E.2d 163 (Ga. 2000)).

56.     In *Harris*, the Florida statute included as grounds for contesting an election "'Receipt of

a number of illegal votes or rejection of a number of legal votes sufficient to change or place in

doubt the result of the election.'" 772 So.2d at 1250 (citation and emphasis omitted). *Harris*

summarized the standard thus: "It is not enough to show a reasonable possibility that election

results could have been altered by such irregularities, or inaccuracies, rather, a reasonable

probability that the results of the election would have been changed must be shown." *Id.* at 1255.

57.     This generally recognized standard is reflected in this State's "outcome" rule that

applies in most cases of election irregularities—however, Wisconsin law treats differently a case

involving deprivation of the right to vote. *McNally v. Tollander*, 100 Wis.2d 490, 500 (1981)

(citing *Clapp v. Joint School District*, 21 Wis.2d 473 (1963)). Where, as Voters believe the case

to be here, "the exclusion of [a large number of] voters "so undermines the appearance of

fairness in the election . . . the election must be set aside." *Id.* at 503. That is, in Wisconsin, "in a

case where deprivations of the right to vote are so significant in number or so egregious in

character as to seriously undermine the appearance of fairness, we hold such an election must be

19

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 91 of 295   Document 1-9
Case 2:20-cv-01785-BHL   Filed 12/02/20   Page 19 of 25   Document 1-5

set aside, *even where the outcome of the election might not be changed*." *Id.* at 505 (emphasis

added). Lest there be any doubt on this, the Wisconsin Supreme Court instructed that

> "courts should use their discretion to avoid elections where proven violations have
> undermined the appearance of fairness of an election. For example, when many voters see
> election officials stuffing ballot boxes, or when large numbers of voters are prevented from
> voting, public confidence in the integrity of the election and popular acceptance of the
> winner may be severely impaired. In such cases a new election might be justified to remedy
> these effects, regardless of the likelihood that the election's outcome was altered."

*Id.* at 505-06 (quoting Developments In The Law of Elections, 88 Harv.L.Rev. 1111, 1330

(1975).

58.    In addition to *states* routinely providing for invalidating election results, including in

the Presidential Electors context, the U.S. Supreme Court *itself* in *Bush*, 531 U.S. 98, required

that partial recounts in some counties (that unconstitutionally employed different and unclear

standards for determining voter intent) be excluded from the final count in the Florida 2000

presidential election because of the constitutional flaws identified, *id.* at 107-12.

59.    The foregoing articulations of the standard for invalidating election results in a

particular jurisdiction—including proof of reasonable probability by credible statistical

evidence—should be applied here to determine whether the election results in certain counties

should be excluded for purposes of certifying Presidential Electors. In some situations where

election results are invalidated, a new election is ordered. *See, e.g.*, *Pabey v. Pastrick*, 816

N.E.2d 1138 (Ind. 2004). But with the Electoral College scheduled to be certified by December 8

and to meet and vote on December 14, 2020, there is insufficient time for a new election in the

counties involved. Moreover, the Electoral College is unique and statutory provisions provide

special procedures for moving the Electoral College vote along expeditiously since the

presidency is at issue. So the proper remedy here is to exclude the results from jurisdictions

meeting the standard for disqualifying elections from the final results that are certified and reported for Presidential Electors.

60.   Because illegal votes dilute legal votes, the evidence establishes, and will establish, that the rights of Voters have been violated by vote-dilution disenfranchisement. Consequently, the presidential-election results from the counties identified should not be included in certified and reported totals for Presidential Electors from this state.

## Prayer for Relief

61.   Declare that the inclusion of illegal votes in identified counties violates Voters' right to vote under the First and Fourteenth Amendment by vote-dilution disenfranchisement.

62.   Declare that the proper remedy for this constitutional violation as applied to presidential-election results is to exclude presidential-election results from those counties for the Presidential Elector certification under 3 U.S.C. § 6 for this state.

63.   Under that remedy, declare that there is sufficient evidence that illegal votes were counted in the identified county or counties to change or place in doubt the results of the November 3, 2020 presidential election results in contested counties, so that the county's presidential-election results must be invalidated.

64.   Enjoin Defendants from preparing and conducting the certification activities for Presidential Electors described in 3 U.S.C. § 6 (and applicable state law implementing the federal provision) without excluding the presidential-election results from the identified counties.

65.   Award Voters their costs and attorneys fees under 42 U.S.C. § 1988 and any other applicable authority; and

66.   Grant any and all other such relief as this Court deems just and equitable.

21

Date: November 12, 2020

Respectfully Submitted,

*Local Counsel for Plaintiffs*

/s/ *Michael D. Dean*

_____

Michael D. Dean (WI # SBN 01019171)
   miked@michaelddeanllc.com

P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044

*Lead Counsel for Plaintiffs*

James Bopp, Jr. (IN #2838-84)
   jboppjr@aol.com
Richard E. Coleson (IN #11527)
   rcoleson@bopplaw.com
Jeffrey P. Gallant (VA #46876)
   jgallant@bopplaw.com
Rob Citak (KY #98023)
   rcitak@bopplaw.com

True the Vote, Inc.
Validate the Vote Project
THE BOPP LAW FIRM, PC
1 South Sixth St.
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434

## Verification

I, Michael D LeMay, declare as follows:

**1.** I am a resident of Wisconsin.

**2.** If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified Complaint for Declaratory and Injunctive Relief.*

**3.** I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on November 10, 2020.

# Verification

I, _Michael Langenhorst_, declare as follows:

**1.** I am a resident of Wisconsin.

**2.** If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*.

**3.** I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on November __11__, 2020.

# Verification

I, Stephen Fifrick, declare as follows:

    **1.** I am a resident of Oconto County, Wisconsin.

    **2.** If called upon to testify, I would testify competently as to the matters set forth in the foregoing *Verified Complaint for Declaratory and Injunctive Relief.*

    **3.** I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding. 28 U.S.C. § 1746.

Executed on November _10_ , 2020.

                                     _____
                                      Stephen Fifrick

**FILED**
**08-28-2020**
**Clerk of Circuit Court**
**Brown County, WI**
**2020CV000812**
**Honorable John P.**
**Zakowski**
**Branch 6**

# WISCONSIN CIRCUIT COURT
# BROWN COUNTY

|  |  |
|---|---|
| Kanye West, Michelle Tidball, and Fred Krumberger,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>Wisconsin Elections Commission,<br><br>　　　　　　Defendant. | Case No. _____<br><br><br><br>**Summons** |

THE STATE OF WISCONSIN, To Wisconsin Elections Commission, 212 East Washington Avenue, Third Floor, Madison, WI 53703:

You are hereby notified that the Plaintiff named above has filed a lawsuit or other legal action against you. The complaint, which is attached, states the nature and basis of the legal action.

Within twenty (20) days of receiving this summons, you must respond with a written answer, as that term is used in chapter 802 of the Wisconsin Statutes, to the complaint. The court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the court, whose address is 100 South Jefferson Street, Green Bay, WI 54301 and to Erick G. Kaardal and Gregory M. Erickson, Plaintiffs' attorneys, whose address is 150 South Fifth Street, Suite 3100, Minneapolis, MN 55402. You may have an attorney help or represent you.

If you do not provide a proper answer within twenty (20) days, the court may grant judgment against you for the award of money or other legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated: August 28, 2020.

/s/Erick G. Kaardal
Erick G. Kaardal, 1035141
Gregory M. Erickson, 1050298
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, MN 55402
Telephone:    (612) 341-1074
Facsimile:    (612) 341-1076
Email:    kaardal@mklaw.com
Email:    erickson@mklaw.com
Attorney for the Plaintiffs

2

FILED
08-28-2020
Clerk of Circuit Court
Brown County, WI
2020CV000812
Honorable John P.
Zakowski
Branch 6

# WISCONSIN CIRCUIT COURT
# BROWN COUNTY

| | |
|---|---|
| Kanye West, Michelle Tidball, and Fred Krumberger, | Case No. _____ |
| Plaintiffs, | |
| v. | **Complaint** |
| Wisconsin Elections Commission, | |
| Defendant. | |

The plaintiffs allege the following for their complaint.

## Introduction

The decision of the Wisconsin Elections Commission ("the Commission") to deny Kanye West's and Michelle Tidball's nominating papers for President and Vice President, respectively, as untimely has exceeded its authority under Article II, § 1, cl. 2 of the United States Constitution. Article II, § 1, cl. 2, provides that "[e]ach State shall appoint, in such Manner as the *Legislature* thereof may direct," electors for President and Vice President. (Emphasis added.) Accordingly, the Commission in its decision cannot add or subtract from legislatively-enacted statutes directing the appointment of electors for President and Vice President.

In this case, the Commission unconstitutionally added an unconstitutional requirement to Wisconsin Statutes § 8.20(8)(am) affecting the deadline for filing of the nomination papers. The Commission imposed a more restrictive time limitation for nomination papers to be submitted than the statutory "not later than 5 p.m." The

Commission also impeded the election nomination process by not unlocking building doors after 4:30 p.m. knowing that a candidate needed immediate access when arriving immediately before the statutory deadline of "not later than 5 p.m."

The Commission accepted the Plaintiffs' nomination papers for Kanye West as President and Michelle Tidball for Vice President, but treated them as untimely under the statutory deadline of "not later than 5 p.m." To the contrary, even assuming that the nominating petition papers were accepted by a Commission Elections Specialist at 5:00:14 p.m., that too satisfies the § 8.20(8)(am) statutory text of "not later than 5 p.m." because it was not 5:01 p.m. yet. The Commission, unconstitutionally under Article II, § 1, cl. 2, inserted into the text of § 8.20(8)(am), the text ":00:00" between the statutory text of "5" and "p.m." to claim that 14 seconds within that period were cause to declare the West nomination papers as untimely. Under Article II, § 1, cl. 2, the Commission exceeded its legal authority by unconstitutionally adding a requirement to what the "legislature" had directed in § 8.20(8)(am).

By taking these actions, the Commission violated Article II, § 1, cl. 2 of the United States Constitution; thus, the plaintiffs' nomination papers were timely under Wisconsin Statutes § 8.20(8)(am). The Court should issue a declaratory judgment and an injunction in favor of Kanye West and Michelle Tidball to place them on Wisconsin's November 3 general election ballot as candidates for President and Vice President, respectively.

**Jurisdiction and Venue**

1.     The Plaintiffs invoke this Court's jurisdiction under Wisconsin Statutes § 5.06, section 8. The statute reads:

2

(8) Any election official or complainant who is aggrieved by an
order issued under sub. (6) may appeal the decision of
the commission to circuit court for the county where the official
conducts business or the complainant resides no later than 30
days after issuance of the order. Pendency of an appeal does not
stay the effect of an order unless the court so orders.

2.     The Plaintiffs seek declaratory injunctive relief under the Wisconsin

Declaratory Judgments Act under Wisconsin Statutes § 806.04.

3.     Venue is proper in this Court under Wisconsin Statutes 801.50 because

Plaintiff and presidential elector Fred Krumberger resides in Brown County.

## Parties

### A.  The Plaintiffs

#### *Plaintiff Fred Krumberger*

4.     Plaintiff Fred Krumberger is a presidential elector for Kanye West and

Michelle Tidball and is a voter, resident, and taxpayer in Wisconsin. He resides in Brown

County.

#### *Plaintiff Kanye West*

5.     Plaintiff Kanye West is a candidate for President of the United States and is a

voter, resident, and taxpayer in Wyoming.

#### *Plaintiff Michelle Tidball*

6.     Plaintiff Michelle Tidball is a candidate for Vice President of the United States

and is a voter, resident, and taxpayer in Wyoming.

#### *Defendant Wisconsin Elections Commission*

7.     Defendant Wisconsin Elections Commission is an executive branch agency

located in Madison, Wisconsin.

3

## Standing

8.      Plaintiffs have suffered a real and concrete injury that is directly traceable to the Defendant Wisconsin Elections Commission under Wisconsin Statutes § 5.06, section 8.

9.      Plaintiff Kanye West and his running mate Michelle Tidball, have been denied access to Wisconsin's November 2020 general election ballot as presidential and vice-presidential candidates, respectively, because of the Commission's decision.

10.      Fred Krumberger, as a West and Tidball presidential elector and voter, has been denied his right to cast his support for them in the December 2020 Electoral College vote if Kanye West wins the Wisconsin popular vote in the November 3 general election.

11.      The injury is caused by the Defendant Commission's decision dated August 20, 2020. A true and correct copy of the decision is attached as Exhibit A.

12.      The Court's declaratory judgment and injunction requiring Kanye West and his running mate Michelle Tidball to be on the general election ballot will redress the plaintiffs' injuries.

## Statement of Facts

## Procedural Background

13.      Supporters of Kanye West for President collected signatures from Wisconsin voters on nomination papers on or about August 3rd and 4th to add Mr. West and his vice-presidential running mate Michelle Tidball to Wisconsin's November 2020 general election ballot

14.      Kanye West and Michelle Tidball are independent candidates for President and Vice President, respectively.

4

15.    West announced his candidacy for President on July 4, 2020, and named Tidball as his running mate shortly thereafter.

16.    It is undisputed that the nominating papers complied with Wisconsin's regulations regulating all candidates for public office. Wisconsin Election Law 2.05, subdivisions (1) and (2):

> (1)  Each candidate for public office has the responsibility to assure that his or her nomination papers are prepared, circulated, signed, and filed in compliance with statutory and other legal requirements.
>
> (2)  In order to be timely filed, all nomination papers shall be in the physical possession of the filing officer by the statutory deadline. Each of the nomination papers shall be numbered, before they are filed, and the numbers shall be assigned sequentially, beginning with the number "1". Notwithstanding any other provision of this chapter, the absence of a page number will not invalidate the signatures on that page.

17.    After obtaining the more than the minimum necessary number of voter signatures—over 2,000—supporters of the West campaign filed the nominating papers with the Commission.

18.    Supporters of the West campaign complied with the requirements of Wisconsin Statutes § 8.20(8)(am) regarding when signatures could be acquired and the filing deadline, here, August 4:

> Nomination papers for independent candidates for president and vice president, and the presidential electors designated to represent them, may be circulated no sooner than July 1 and may be filed not later than 5 p.m. on the first Tuesday in August preceding a presidential election.

19.     The nomination papers were filed with the Commission office, located on the third floor of the office building located at 212 East Washington Avenue in Madison on August 4.

20.     Among representatives of the West campaign at the time of the Commission filing was attorney Lane Ruhland of the Husch Blackwell law firm.

**The Commission knowingly kept the building's doors locked which impeded access to the Commission's offices.**

21.     On August 4, Ms. Ruhland was in contact with the Commission staff regarding West's nomination papers, namely issues related to general compliance.

22.     On August 4, the Commission staff told Ms. Ruhland in a phone conversation that the building at 212 East Washington Avenue, Madison—the Commission office's location—would be locked.

23.     The Commission staff also verbally communicated that the second layer of double doors to the main floor of the building, the only access to the building, would be locked.

24.     At all times, the Commission knew of the statutory deadline for candidates to file their nominating papers. The Commission knew the statutory deadline to be "not later than 5 p.m."

25.     At all times, the Commission knew the building's doors would be locked before 5 p.m.

26.     The building's doors were locked before 5 p.m.

27.     Locked doors impede access to buildings.

28.     Locked doors to the building impeded access to the Commission offices.

6

29. The Commission knew that locked doors of the building would impede free access to its office.

30. The Commission could have unlocked the building's doors prior to the statutory deadline for accepting nominating papers.

31. The Commission could have retained one of the many government employees in Madison, Wisconsin, to be at the locked door on August 4 before 5 p.m. to allow people in the locked door so that they could timely deliver their nominating papers.

32. Instead, the Commission chose to keep the building's doors locked.

33. The Commission knowingly kept the building's doors locked.

34. The locked doors impeded access for candidates and their supporters to timely deliver their nominating papers.

35. Specifically, the Commission, by keeping the building's doors locked and proceeding as it did, impeded West supporters from timely entering the building to file West's nominating papers.

36. Likewise, the Commission staff, in a conversation with Ms. Ruhland earlier on August 4, did not inform Ms. Ruhland that the Commission's general compliance telephone number she was using was NOT the phone number to contact Commission staff to open the building's locked doors.

37. Later, Commission staff instructed Ms. Ruhland that when she arrived at the building she was to call the number found on the outside of the building and thereafter, a Commission staff member would come down to the main floor and unlock the double doors of the building.

7

38.    Ms. Ruhland and two other West nominating petition coordinators arrived at the Commission building before 5:00:00 p.m.

39.    Before 5:00:00 p.m., Ms. Ruhland searched for the number outside the building to call to have Commission staff to unlock the doors and get access to the building.

40.    Ms. Ruhland found the phone number posted near the inner layer of double doors. She read the phone number. She called the phone number to gain access to the locked building as Commission staff had instructed her to do.

41.    As Ms. Ruhland approached the locked building to obtain the phone number to gain access, she did not see any person at the locked doors to allow her access to the building.

42.    Before 5:00:00 p.m., Ms. Ruhland called the number found on the outside of the building.

43.    "Not later than 5:00 p.m.," a Commission Election Specialist, unlocked the inner layer of double doors on the main floor of the building and allowed Ms. Ruhland and the other two West campaign representatives access to the building.

44.    The Commission Election Specialist accepted the West nominating papers as "not later than 5 p.m."

45.    Only later did the Commission find the acceptance to be late based on an estimated time of delivery of 5:00.14.

**The Election Commission failed to keep accurate track of time when approaching the time deadline for the submission of the nomination papers.**

46.    Ms. Ruhland is unaware of the timing device used by the Commission to note the time, its accuracy, or its use as an official timepiece.

8

47.    The Commission staff member who unlocked the locked building doors did not identify how he knew the time, what time piece he was using, or identify anyone authorized to keep time for the Commission.

48.    Although the Commission accepted the nominating papers a Commission staff member stated that the acceptance occurred at 5:00:14 p.m.—14 seconds after 5:00 p.m.

49.    No time stamp or other document has been provided to prove that the time was actually 5:00.14 p.m. There is no note of or any notice of any official timepiece or time keeper for the Elections Commission.

## Claim

**The Commission erroneously treated the nomination papers of the Kanye West campaign, timely under § 8.20(8)(am), as untimely.**

50.    The Plaintiffs incorporate the complaint's previous paragraphs.

51.    An agency decision shall be set aside or modified if the agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action.

52.    The Commission decision, processes, and procedures utilized to find the West campaign nomination papers as untimely resulted in unconstitutional burdens on Plaintiffs and the West campaign.

53.    The Commission has exceeded its authority under Article II, § 1, cl. 2 of the United States Constitution in denying the petition as untimely.

54.    Article II, § 1, cl. 2, provides that "[e]ach State shall appoint, in such Manner as the *Legislature* thereof may direct," electors for President and Vice President. (emphasis added)

9

55.     The Commission in its decision cannot add or subtract from legislatively-enacted statutes directing the appointment of electors for President and Vice President.

56.     In this case, the Commission unconstitutionally added two requirements to Wisconsin Statutes § 8.20(8)(am) affecting the filing of the nomination papers: (1) a procedure where petitioners had to search for a phone number on the outside of a building to call a Commission staff person to unlock the doors to the Elections Commission building; and (2) a more restrictive time limitation for nomination papers to be submitted than the statutory "not later than 5 p.m."

57.     The legislatively-enacted statute states that, "[n]omination papers for independent candidates for president and vice-president, and the presidential electors designated to represent them…may be filed not later than 5 p.m. on the first Tuesday in August preceding a presidential election." Wis. Stat. § 8.20(8)(am).

58.     Wisconsin Statutes § 8.20(8)(am), under Article II of the U.S. Constitution, precludes the Elections Commission's procedures to impede candidates to reach the Commission's office's to file nominating papers by keeping building doors locked, requiring West nominating circulators or others to search for a phone number on the outside of a building to call a Commission staff person to unlock the doors to the building to gain access to the Elections Commission.

59.     Article II of the U.S. Constitution and Wisconsin statutes require that the doors to the Commission's office—as with the November 3 polling places—must not be locked prior to statutory deadlines.

10

60.     The nomination papers for Kanye West as President and Michelle Tidball for Vice President were presented to the filing officer in compliance with the statutory text "not later than 5 p.m."

61.     Even assuming, based on an official clock, that the nominating petition papers were presented to the filing officer at 5:00:59 p.m. (which has not been alleged here) that too satisfies the § 8.20(8)(am) statutory deadline of "not later than 5 p.m." because it was not 5:01 p.m. yet. 5:00:59 p.m. would be within the statutory deadline of "not later than 5 p.m."

62.     Only by the Commission unconstitutionally inserting into the statute ":00:00" between "5" and "p.m." could the Commission reject the nomination papers as untimely as it did. Ex. A.

63.     By adding the two unconstitutional requirements to § 8.20(8)(am), the Commission violated Article II, § 1, cl. 2 of the United States Constitution.

64.     The plaintiffs' nomination papers were timely under Wisconsin Statutes 8.20(8)(am).

65.     The Court should issue a declaratory judgment and injunction in favor of the Kanye West and Michelle Tidball causing them to be on the November 3 general election ballot as candidates for President and Vice President, respectively.

### Prayer for Relief

Therefore, the plaintiffs respectfully ask that this Court to:

1.     Declare that Wisconsin Elections Commission acted unconstitutionally to interpret Wisconsin Statutes § 8.20(8)(am) by ultimately declaring the Kanye West and Michelle Tidball independent candidate nominating papers for President and Vice President

11

as untimely filed and that the proper interpretation of Wisconsin Statutes § § 8.20(8)(am) is nomination papers must be accepted if presented before 5:01:00 p.m.

2.    Issue an injunction enjoining the defendant to accept the nomination papers of the plaintiffs as timely and directing the Wisconsin Elections Commission to ensure Kanye West and Michelle Tidball appear on the November 2020 general election ballot as candidates for President and Vice President;

3.    Award the Plaintiffs all costs, expenses, and fees allowed by law; and

4.    Award the Plaintiffs such other and further relief as this Court deems just.

Dated: August 28, 2020.

/s/Erick G. Kaardal
Erick G. Kaardal, No. 1035141
Gregory M. Erickson, No. 1050298
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, MN 55402
Telephone:    (612) 341-1074
Facsimile:    (612) 341-1076
Email:        kaardal@mklaw.com
Email:        erickson@mklaw.com
Attorneys for the Plaintiffs

FILED
09-30-2020
CIRCUIT COURT
DANE COUNTY, WI
2020CV002029
Honorable Mario White
Branch 7

STATE OF WISCONSIN       CIRCUIT COURT       DANE COUNTY

SARI RATNER JUDGE
    2520 Norwood Place
    Madison, WI 53726

MIRIAM RATNER                               Case No. _____
    6205 Mineral Point Road               Case Code 30701
    Apt. 421
    Madison, WI 53705

MOLLY LUBIN
    503 Sheldon Street
    Madison, WI 53711

JUDY REED
    4001 Hiawatha Drive
    Madison, WI 53711

ELANA MATTHEWS
    4714 Tokay Boulevard
    Madison, WI 53711

                *Plaintiffs*,
      *v.*

BOARD OF CANVASSERS FOR THE CITY OF MADISON
    210 Martin Luther King, Jr. Blvd
    Madison, WI 53703

                *Defendant*.

## SUMMONS

THE STATE OF WISCONSIN

To each person named above as a Defendant:

You are hereby notified that the Plaintiffs named above have filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

Within 20 days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes. The Answer must be sent or delivered to the Court, whose address is Clerk of Circuit Court, Dane County Circuit Court, 215 S. Hamilton Street, Madison, WI 53703, and to Stafford Rosenbaum LLP, P.O. 1784, Madison, Wisconsin, 53701-1784. You may have an attorney help or represent you.

If you do not provide a proper answer within 20 days, the Court may grant Judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A Judgment may be enforced as provided by law. A Judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated: September 30, 2020

STAFFORD ROSENBAUM LLP

_Electronically signed by Atty. Douglas M. Poland_
Douglas M. Poland (State Bar No. 1055189)
Jeffrey A. Mandell (State Bar No. 1100406)
Rick A. Manthe (State Bar No. 1099199)
Rachel E. Snyder (State Bar No. 1090427)

2

222 West Washington Avenue, Suite 900
Post Office Box 1784
Madison, Wisconsin 53701-1784
dpoland@staffordlaw.com
jmandell@staffordlaw.com
rmanthe@staffordlaw.com
rsnyder@staffordlaw.com
608.256.0226

STATE OF WISCONSIN     CIRCUIT COURT     DANE COUNTY

SARI RATNER JUDGE
    2520 Norwood Place
    Madison, WI 53726

MIRIAM RATNER                                    Case No. _____
    6205 Mineral Point Road                  Case Code 30701
    Apt. 421
    Madison, WI 53705

MOLLY LUBIN
    503 Sheldon Street
    Madison, WI 53711

JUDY REED
    4001 Hiawatha Drive
    Madison, WI 53711

ELANA MATTHEWS
    4714 Tokay Boulevard
    Madison, WI 53711

        *Plaintiffs*,
    *v.*

BOARD OF CANVASSERS FOR THE CITY OF MADISON
    210 Martin Luther King, Jr. Blvd
    Madison, WI 53703

        *Defendant*.

## COMPLAINT

Plaintiffs, by and through their attorneys, Stafford Rosenbaum LLP, for their

Complaint against Defendant, allege and state as follows:

This action seeks judicial confirmation that the City of Madison's "Democracy in the Park" event allowing voters to return their absentee ballots at secure locations within the City's parks was and is lawful, and that all ballots returned by voters, or that will be returned by voters at future similar events, are not *per se* invalid simply because they were returned by voters through the Democracy in the Park event.

## INTRODUCTION

The power of Wisconsin's citizens to select their representatives through voting is a fundamental constitutional right and a foundation of our democratic institutions. The outbreak of a global pandemic, COVID-19, has made exercising that right potentially perilous, and even deadly. As a result, in the two elections conducted so far in 2020 under the shadow of the COVID-19 pandemic, Wisconsin voters have availed themselves of Wisconsin's generous statutory alternatives to voting in person in unprecedented numbers, and have overwhelmingly voted by absentee ballot instead of voting in-person on Election Day. In Wisconsin's April 2020 presidential primary, over seventy percent of all votes cast (approximately 1,138,491 votes) were absentee.[1] In the August 11 presidential primary, approximately seventy-five percent of all votes cast were absentee.[2] By contrast, over the prior decade, Wisconsin averaged less than six percent of all votes being cast by absentee ballot.[3] The imminent November presidential election will almost certainly include more total votes, more absentee ballots, and a similarly astronomical absentee voting percentage

---

[1] *See* https://elections.wi.gov/node/6908 and click "April 2020 Absentee Voting Report.pdf" (last accessed September 28, 2020).
[2] *See* https://elections.wi.gov/node/7127 and click "Election Statistics Report 2020 Partisan Primary Election" (last accessed September 29, 2020).
[3] *See* Wisconsin Elections Commission, *April 7, 2020 Absentee Voting Report*, at 6 (May 15, 2020).

2

as the April election.[4] As of September 28, 2020, municipal clerks have already sent out more than 1.1 million absentee ballots, of which nearly 240,000 have already been submitted.[5] Adding to the challenge of administering an election amidst a global pandemic are the widely reported issues that have caused the United States Postal Service to warn that it will likely be unable to keep up with mail demands, leading to lost and delayed mailings.[6]

In the face of a global pandemic, an unprecedented volume of mail-in absentee ballot requests, and a struggling postal system, Wisconsin municipalities have sought creative solutions to ensure that all eligible citizens who want to vote have meaningful opportunities to do so. In response to requests from local voters for options to return their absentee ballots in person the City of Madison ("City") announced in late August that it would hold an event called "Democracy in the Park" on September 26 and October 3, where voters could submit absentee ballots to poll workers, throughout the City's 206 parks.[7]

On September 25, 2020, the eve of the first of the two planned events, legal counsel for Wisconsin's legislative leadership sent a letter to City of Madison Clerk Maribeth Witzel-Behl, addressing what counsel called "the imminent, illegal collection of absentee ballots that your office intends to perform tomorrow through your so-called "Democracy

---

[4] *See* https://elections.wi.gov/node/6908 and click "April 2020 Absentee Voting Report.pdf" (last accessed September 28, 2020).

[5] *See* https://madison.com/wsj/news/local/govt-and-politics/in-first-visit-to-madison-jill-biden-pushes-voters-to-do-more-in-the-democratic/article_348f52c0-be11-5a74-a1ee-6c6a606568b7.html (last accessed September 28, 2020).

[6] *See* https://www.npr.org/2020/09/01/908395806/postal-service-watchdog-outlines-concerns-surrounding-election-readiness (last accessed September 28, 2020).

[7] *See* https://cityofmadison.com/news/democracy-in-the-park-event-planned-for-september-26-october-3 (last accessed September 28, 2020).

3

in the Park" campaign."[8] In the same letter, counsel asserted that "given the apparent unlawfulness of the absentee-ballot-collection efforts of your 'Democracy in the Park' campaign, there is a grave risk that all ballots you collect through this campaign will be challenged in court and ultimately invalidated. ... We urge you in the strongest possible terms to abandon this unlawful effort immediately, in order to avoid the threat of invalidated ballots and needless litigation." Despite the threat of litigation, the event was held and reportedly was a tremendous success, with more than 10,000 absentee ballots returned safely.[9]

Plaintiffs are individual City residents and registered Wisconsin voters who requested and received absentee ballots before September 26, 2020, and either submitted their absentee ballots at the September 26 Democracy in the Park event, or were planning to do so at either that or the October 3 event, but did not or will not do so. Given the threat of litigation to invalidate all absentee ballots returned by voters through the Democracy in the Park event stated in the September 25, 2020 letter to Clerk Witzel-Behl, those Plaintiffs who submitted their absentee ballots at the September 26 event have significant concerns that their absentee ballots will be challenged in court and potentially could be invalidated. And those Plaintiffs who have not yet submitted their absentee ballots at a Democracy in the Park event have been intimidated by the threat of litigation in counsel's September 25

---

[8] *See* Poland Aff., Ex. 1.
[9]    *See*   https://madison.com/ct/news/local/govt-and-politics/madison-voters-drop-off-over-10-000-absentee-ballots-during-democracy-in-the-park-event/article_8b8e1204-4a69-5135-908e-081777a44795.html#tracking-source=home-top-story (last accessed September 28, 2020).

4

letter and either did not or will not submit their absentee ballots at the Democracy in the Park events due to the threat of a lawsuit to invalidate and therefore negate their votes.

Plaintiffs' request of the Court is therefore simple: In light of the real and imminent threat by Wisconsin's legislative leadership, made through its regular retained outside counsel, that they will sue to invalidate Plaintiffs' (and others') absentee ballots for the November 3, 2020 general election simply because those absentee ballots were returned by voters to the City of Madison Clerk's office at the Democracy in the Park events, Plaintiffs ask this Court to issue a declaration that the return of absentee ballots to the City of Madison Clerk's office at the Democracy in the Park events accords with Wisconsin election law, and that their absentee ballots are not unlawful, illegally cast, or subject to being invalidated under Wisconsin law merely because they were returned by voters at the Democracy in the Park events.

## PARTIES

1.     Plaintiff Sari Ratner Judge is a natural person and registered voter who intends to submit her absentee ballot at an October 3, Democracy in the Park event, and currently resides at 2520 Norwood Place, Madison, WI 53726.

2.     Plaintiff Miriam Ratner is a natural person and registered voter who intends to have her absentee ballot submitted at an October 3, 2020 Democracy in the Park event, and currently resides at 6205 Mineral Point Road, Apt. 421, Madison, WI 53705.

3.     Plaintiff Molly Lubin is a natural person and registered voter who submitted her absentee ballot at Democracy in the Park event on September 26, 2020, and currently resides at 503 Sheldon Street, Madison, WI 53711.

5

4.      Plaintiff Judy Reed is a natural person and registered voter who submitted her absentee ballot at a Democracy in the Park event on September 26, 2020, and currently resides at 4001 Hiawatha Drive, Madison, WI 53711.

5.      Plaintiff Elana Matthews is a natural person and registered voter who submitted an absentee ballot at a Democracy in the Park event on September 26, 2020, and currently resides at 4714 Tokay Boulevard, Madison, WI 53711.

6.      Defendant the Board of Canvassers for the City of Madison is a duly created municipal board of canvassers for the City of Madison pursuant to Wis. Stat. § 7.53, and located at 210 Martin Luther King Jr. Blvd., Madison, WI 53703.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this dispute pursuant to Article VII, Section 8 of the Wisconsin Constitution and Wis. Stat. § 753.03, which provide for subject matter jurisdiction over all civil matters within this state. Wis. Stat. § 806.04, the Declaratory Judgment Act, specifically grants this court jurisdiction to declare rights, status, and other legal relations between parties.

8.      Defendant is responsible for canvassing election ballots cast within the City of Madison and is subject to this Court's jurisdiction. *See* Wis. Stat. § 7.53(2). Defendant is subject to this Court's jurisdiction because it is a duly created subsidiary of the City of Madison, a municipal corporation located in Dane County. Wis. Stat. §§ 66.0213(1) and 801.05; *See also City of Madison v. Hyland, Hall & Co.*, 73 Wis. 2d 364, 3701-371, 243 N.W.2d 422, 426 (1976).

6

9.     Venue is proper in Dane County because it is the county where the claims arose. Wis. Stat. § 801.50(2)(a).

## RELEVANT LEGAL AUTHORITY

10.     Wis. Stat. § 6.87 controls absentee voting procedures, and also provides that voters can mail ballots or deliver them in-person to the voter's municipal clerk.

## RELEVANT FACTS

### The Need for Increased Absentee Ballot Return Options

11.     It is widely known that COVID-19, a highly infectious disease, has been declared a global pandemic, and that the disease can lead to serious health complications.[10] Since March of 2020, Wisconsin has seen increasing COVID-19 infections, and September of 2020 has produced exponential growth in cases throughout Wisconsin.[11]

12.     The COVID-19 pandemic has led to a large increase in absentee voting. In the April 2020 presidential primary election, over seventy percent of votes cast were absentee ballots, a percentage exceeding absentee voting in previous elections by more than an order of magnitude. It has been widely reported that the November presidential election will similarly see a high percentage of absentee voters.[12] By September 17, 2020, the date on which Wisconsin municipal clerks were required to begin sending out requested absentee ballots of the November election, *see* Wis. Stat. § 7.15(1)(cm),  more than 1

---

[10] *See* https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says  (last accessed September 28, 2020).
[11] *See* https://www.dhs.wisconsin.gov/covid-19/cases.htm  (last accessed September 28, 2020*).*
[12] *See* https://madison.com/wsj/news/local/govt-and-politics/in-first-visit-to-madison-jill-biden-pushes-voters-to-do-more-in-the-democratic/article_348f52c0-be11-5a74-a1ee-6c6a606568b7.html (last accessed September 28, 2020).

7

million absentee ballots had already been requested.[13] Under Wisconsin law, voters may continue requesting mail-in absentee ballots until Thursday, October 29, 2020. *See* Wis. Stat. § 6.86(1)(b).

13.    Wisconsin's 1,850 municipal clerks rely upon the United States Postal Service to deliver mail-in absentee ballots to election those voters who request them.[14] And many voters rely upon the Postal Service to return their mail-in absentee ballot to their municipal clerk. Wisconsin law facilitates this reliance by requiring that municipal clerks pre-pay return postage for mail-in absentee ballots. *See* Wis. Stat. § 6.87(3)(a).

14.    In recent months, it has been widely reported that the Postal Service will not be able to efficiently process and deliver the avalanche of mail-in absentee ballots anticipated for the November election. The Postal Service has advised most states, including Wisconsin, that it expects unreasonably long delays and other difficulties to affect election-related mail.[15]

15.    The City of Madison has already received over 80,000 absentee ballot requests.[16] Many City residents reportedly have contacted the City Clerk's Office to ask about in-person options for returning their mail-in absentee ballot.[17]

---

[13] *Id.*
[14] *See* https://elections.wi.gov/voters/absentee (last accessed September 28, 2020).
[15]    *See*    https://madison.com/wsj/news/local/govt-and-politics/wisconsin-officials-press-usps-for-assurances-on-election-related-mail/article_990d728f-1e86-55cb-bb9f-1cf01cf05310.html (last accessed September 30, 2020).
[16] *See* https://madison.com/ct/news/local/govt-and-politics/voting-absentee-in-the-nov-3-election-here-s-what-you-need-to-know/article_f1a2ac2c-0044-5d1f-a956-60186125554e.html (last accessed September 28, 2020)
[17] *See* https://cityofmadison.com/news/democracy-in-the-park-event-planned-for-september-26-october-3 (last accessed September 28, 2020).

8

## Democracy in the Park

16.    In late August, the City of Madison announced that it had organized a "Democracy in the Park" event for late September and early October to provide a safe and easy option for Madison voters to return their absentee ballots.  Instead of voting at an enclosed, indoor polling place, or risking the loss of a ballot in the mail, voters could submit absentee ballots to poll workers stationed in more than 200 City parks. On August 31, 2020, the City formally noticed that it would hold Democracy in the Park events.[18]

17.    The City's plan included stationing poll workers in 206 parks across Madison to accept delivery of mail-in absentee ballots from voters who already requested and received their ballots.[19] Poll workers wore high-visibility vests and were posted next to "Vote" signs placed in every City park. Poll workers wore facial masks to reduce the risk of spreading COVID-19.[20]

18.    The City held a Democracy in the Park event from 9:00 a.m. to 3:00 p.m. on Saturday, September 26, 2020. Approximately 10,813 voters submitted their mail-in absentee ballots to poll workers during this Democracy in the Park event.[21]

19.    The City has announced plans to hold an additional Democracy in the Park event from 9:00 a.m. to 3:00 p.m. on Saturday, October 3, 2020.[22]

---

[18] *Id.*

[19] *See* https://cityofmadison.com/news/democracy-in-the-park-event-planned-for-september-26-october-3  (last accessed September 29, 2020).

[20] *Id.*

[21] *See* https://madison.com/wsj/news/local/govt-and-politics/city-clerk-more-than-10-000-ballots-collected-during-democracy-in-the-park/article_aff6c990-93ea-53c9-86a0-58d799384071.html (last accessed September 30, 2020).

[22] *See* https://www.cityofmadison.com/news/democracy-in-the-park-event-planned-for-september-26-october-3 (last accessed September 29, 2020).

**Security of Ballots Returned by Voters at Democracy in the Park**

20.     The 1,850 municipal clerks for Wisconsin's cities, villages, and towns are responsible for administering elections in their respective jurisdictions. State law imposes numerous requirements governing the administration of elections and receiving absentee ballots. *See* Wis. Stat. §§ 6.86-6.88.

21.     The City instituted security protocols to ensure the Democracy in the Park event complied with all relevant ballot-security requirements. Sworn, trained poll workers were present to accept ballots in every park.[23] The poll workers in each park had a designated secure bag, provided by the City Clerk's office, in which to place all ballots submitted.[24] Poll workers maintained a chain-of-custody log to ensure all ballots were accounted for at all times.[25] The poll workers in the parks accepted completed mail-in absentee ballots; poll workers neither issued new ballots in the parks, nor accepted written applications for mail-in absentee ballots.[26]

22.     The City provided explicit instructions to its election officials for maintaining ballot security. The City provided seals to ensure no ballots could be accessed or tampered with.[27] Every election official must take an oath of office prior to working the events.[28] The City also provided instructions for handling numerous circumstances, including: someone submitting an absentee ballot in an envelope bearing valid voter and

---

[23] *See* Affidavit of Sari Ratner Judge ("Judge Aff."), Ex. 1.
[24] *Id.*
[25] *See* Poland Aff., Ex. 2.
[26] *Id.*
[27] Judge Aff., Ex. 1
[28] *Id.*

witness signatures; a voter who brought their blank absentee ballot to the park absentee ballot return site; a voter who brought a completed absentee ballot in a sealed absentee ballot envelope that was missing a witness signature; and a voter who brought an already-completed absentee ballot in an unsealed absentee ballot envelope that was missing a witness signature.[29]

23.    The City has asserted that the procedures used by the City Clerk during the Democracy in the Park event are equivalent to the procedures used to secure all absentee ballots.[30]

24.    The City also ensured that election observers from both the Republican and Democratic parties had the opportunity to observe the absentee ballot return sites at every park during the Democracy in the Park event.[31]

25.    Absentee ballots returned by voters at the parks during the Democracy in the Park event will be scanned via the barcode on the absentee ballot envelope so that voters can verify via the MyVote.wi.gov web portal that their ballots have been received, logged, and securely stored in the City Clerk's office until they can be counted on Election Day.[32]

### The Legislature's Threat to Invalidate Ballots

26.    On Friday, September 25, 2020—nearly four weeks after the City announced its Democracy in the Park event and less than 24 hours before the event was to begin—

---

[29] *See* Judge Aff. Ex. 1.
[30] *See* Poland Aff. Ex. 2.
[31] *Id.*
[32] *See* https://madison.com/ct/news/local/govt-and-politics/madison-voters-drop-off-over-10-000-absentee-ballots-during-democracy-in-the-park-event/article_8b8e1204-4a69-5135-908e-081777a44795.html (last accessed September 28, 2020).

11

counsel for Assembly Speaker Robin Vos and State Senate Majority Leader Scott Fitzgerald sent a letter (hereinafter the "Letter") to City Clerk Maribeth Witzel-Behl with the following subject line: "The City of Madison's 'Democracy in the Park' Campaign's Illegal Collection of Absentee Ballots."[33]

27.     The Letter alleged broadly, without citation or explanation, that the City's Democracy in the Park event was not compliant with Wisconsin law such that "there is a grave risk that all ballots you [the City] collect through this campaign will be challenged in court and ultimately invalidated." The Letter urged the City to cancel the events "in order to avoid the threat of invalidated ballots and needless litigation."[34]

28.      The following morning, the day of the September 26 Democracy in the Park event, Madison City Attorney Michael Haas responded to the Letter, explaining why absentee ballots  returned at Democracy in the Park would not be invalid solely because they were submitted at that event.[35]

**HARMS TO PLAINTIFFS**

29.     Plaintiff Sari Ratner Judge ("Judge") is a registered Madison voter who requested and received an absentee ballot for the November 3 general election. In March 2020, Plaintiff Judge used the MyVote website to request absentee ballots for all three elections in 2020 (the April 7 Spring Election, the August 11 Partisan Primary, and the November 3 General Election) because she was concerned about being exposed to COVID-19; she is employed by the University of Wisconsin-Madison in a position where she

---

[33] *See* Poland Aff., Ex. 1.
[34] *See id.*
[35] *See* Poland Aff., Ex. 2.

interacts with students, and, from what she observed and learned at the time, she believed that COVID-19 would endure through the entire year. Plaintiff Judge is concerned that her vote will not be received if her absentee ballot is mailed because of the United States Postal Service's struggles.

30.     When Plaintiff Judge learned of the Democracy in the Park event, she believed it would be a perfect opportunity for her to deliver her absentee ballot safely, conveniently, and on time. Before the Letter in which legislative leaders threatened to take legal action challenging all absentee ballots returned by voters at the Democracy in the Park events, Plaintiff Judge intended to submit her absentee ballot at one of the City's Democracy in the Park events.

31.     In light of the threatening letter submitted by the state legislators, Plaintiff Judge did not submit her ballot during the September 26, 2020 event, and is concerned that if she submits her ballot during the planned October 3, 2020 event, the ballot might be invalidated by a future lawsuit such as threatened in the Letter.

32.     Plaintiff Judge therefore seeks an order from this Court declaring that the return of her absentee ballot at the October 3 Democracy in the Park event was not unlawful under Wisconsin law, and that the return of her absentee ballot at the event does not invalidate her ballot.

33.     Plaintiff Miriam Ratner ("Ratner") is a Madison registered voter who resides at Oakwood Village, a continuing care facility. Ratner has voted via absentee ballot for years because she has physical mobility issues that make it impossible for her to stand for extended periods of time. Ratner voted by mailing an absentee ballot in the 2020 spring

13

election and August 2020 partisan primary because she had a broken leg at the time, and the COVID-19 pandemic resulted in severe access restrictions placed on her care facility.

34. Ratner requested and received her absentee ballot for the November 2020 general election, but is now concerned that mail delivery of her completed absentee ballot is insecure and may not be delivered to the City Clerk's office in time to be counted. Instead, Ratner intends to have her daughter, Plaintiff Judge, deliver Ratner's ballot at a Democracy in the Park event on Saturday, October 3, 2020. However, after learning of legislators threatening to invalidate ballots submitted at Democracy in the Park, Ratner is concerned that her vote may be invalidated if she submits her ballot at a Democracy in the Park event.

35. Therefore, Plaintiff Ratner seeks an order from this Court declaring that the return of her absentee ballot at the October 3 Democracy in the Park event is not unlawful under Wisconsin law, and that the return of her absentee ballot at the event does not invalidate her ballot.

36. Plaintiff Molly Lubin ("Lubin") is a Madison registered voter and practicing psychiatrist. Lubin voted by absentee ballot in the spring 2020 election to reduce her risk of contracting COVID-19.

37. Although Lubin was comfortable returning her ballot by mail in the 2020 spring election, concerns with the United States Postal Service have consequently led her to believe that sending her ballot by mail will be insecure and not delivered in time for her vote to count. Additionally, Lubin is still concerned about the risk of COVID-19. Lubin also has a hearing disability, and she relies upon lip reading to effectively communicate.

14

Voting in-person in crowded spaces makes it difficult to hear and understand poll worker instructions, especially in light of the fact that poll workers now wear masks.

38.    Lubin was delighted to learn that Madison planned a Democracy in the Park event that would allow her to safely and securely deliver her absentee ballot. On September 26, Lubin attended a Democracy in the Park event at Hillington Green Park and delivered her absentee ballot to a registered election official.

39.    Given that legislators have threatened litigation to invalidate ballots submitted at Democracy in the Park events, Lubin now fears that her vote will not be counted. Therefore, Plaintiff Lubin seeks an order from this Court declaring that the return of her absentee ballot at the September 26, 2020 Democracy in the Park event is not unlawful under Wisconsin law, and that the return of her absentee ballot at the event does not invalidate her ballot.

40.    Plaintiff Judy Reed ("Reed") is a registered voter who has resided in Madison since 1974. Reed has voted in-person or by in-person absentee since November of 2010. However, Reed is 78 years old, and is at a heightened risk of adverse health effects from COVID-19. Consequently, Reed voted in the 2020 spring election and August partisan primary via mailed absentee ballot to avoid her crowded polling place.

41.    Reed requested and received an absentee ballot for the November 2020 general election, but is concerned that problems with the United States Postal Service may result her vote not counting due to untimely delivery of her ballot.

42.    After learning of Madison's Democracy in the Park event, Plaintiff Reed determined that was the best option to deliver her ballot because it would be outdoors, less

15

crowded, would guarantee delivery of her ballot, and it was one block from her home. Reed attended a Democracy in the Park event on September 26, 2020 at Hiawatha Circle Park in Madison, Wisconsin, and delivered her absentee ballot to a registered poll worker.

43.    Now that state legislators have threatened litigation to invalidate Reed's ballot, she is concerned that her submitted ballot will be invalidated and not counted. Therefore, Plaintiff Reed seeks an order from this Court declaring that the return of her absentee ballot at the September 26, 2020 Democracy in the Park event is not unlawful under Wisconsin law, and that the return of her absentee ballot at the event does not invalidate her ballot.

44.    Plaintiff Elana Matthews ("Matthews") is a Madison registered voter who has voted in Madison since approximately 2003. Matthews usually votes in-person on Election Day. However, due to fear of being exposed to COVID-19, Matthews voted via mailed absentee ballot in the 2020 spring election. Matthews's concerns with COVID-19 continue, and she requested and received an absentee ballot for the November 2020 election to avoid in-person voting at the likely higher voter turnout general election.

45.    After learning about the Democracy in the Park event, Matthews decided to utilize the alternative ballot submittal option. Matthews believed the risk of COVID-19 exposure was lower at the Democracy in the Park event, and she was unsure if she could trust the postal service to deliver her ballot in time to be counted.

46.    On September 26, 2020, Matthews attended a Democracy in the Park event at Oak Park Heights Park where she subsequently delivered her ballot to a registered poll worker.

16

47.    With legislators now threatening litigation to invalidate her ballot, Plaintiff Matthews fears that her returned ballot may be invalidated and not counted. Therefore, Plaintiff Matthews seeks an order from this Court declaring that the return of her absentee ballot at the September 26, 2020 Democracy in the Park event is not unlawful under Wisconsin law, and that the return of her absentee ballot at the event does not invalidate her ballot.

## CAUSE OF ACTION
### *Declaratory Judgment and Injunctive Relief against Defendants*

48.    Plaintiffs restate and re-allege paragraphs 1 through 47 above as if fully set forth herein.

49.    Wis. Stat. § 806.04 authorizes entry of an order declaring the legal rights of plaintiffs, even before a harm has taken place.

50.    Wis. Stat. § 806.04 is liberally construed and administered to achieve its remedial purpose. *Olson v. Town of Cottage Grove*, 2008 WI 51, ¶42, 309 Wis. 2d 365, 749 N.W.2d 211. The statute's purpose is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." Wis. Stat. § 806.04(12). Indeed, "declaratory relief is appropriate wherever it will serve a useful purpose." *Lister v. Bd. of Regents of Univ. Wisconsin Sys.*, 72 Wis. 2d 282, 307, 240 N.W.2d 610 (1976). A plaintiff "need not actually suffer an injury before availing himself of the Act." *Olson*, 2008 WI 51, ¶43. In furtherance of that purpose, a party "may seek a construction of a statute" prior to an adverse result. *State ex rel. Lynch v. Conta*, 71 Wis. 2d 662, 674, 239 N.W.2d 313 (1976).

17

51.     Plaintiffs seek a declaration interpreting Wis. Stat. § 6.87(4)(b)1and applying it to the City's Democracy in the Park event.

52.     Wis. Stat. § 6.87(4)(b)1 requires that an elector must either mail their absentee ballot to the clerk, or deliver the ballot in-person to the elector's municipal clerk. The Wisconsin Elections Commission issued guidance interpreting this provision as allowing the use of "drop boxes" as a method of personal delivery. *See* Wisconsin Elections Commission Administrator Meagan Wolfe, *Absentee Ballot Drop Box Information* (August 19, 2020).[36] One of the drop box options is a staffed, outdoor drop off location. *Id.* at 2. At this type of site, election officials accept the ballot from the voter and deposits the ballot in a ballot box. *Id.* To maintain ballot security, the Elections Commission recommends using tamper evident seals on the ballot box, and implementing a chain of custody log. *Id* at 3-4.

53.     City election officials staffed the absentee ballot return sites during the Democracy in the Park event to receive absentee ballots returned by voters on September 26, 2020. *See, e.g.* Poland Aff., Ex. 2. The City used a chain of custody log and tamper-evident seals to secure ballot boxes. Poland Aff., Ex. 2.

54.     It is the City of Madison's stated intent that election officials will staff absentee ballot drop off sites during the Democracy in the Park event on October 3, 2020. The City will use chain of custody logs and tamper evident seals to secure ballot boxes. Judge Aff., Ex. 1; Poland Aff., Ex. 2.

---

[36] *See* https://elections.wi.gov/node/7036 and click on the attachment "Drop Box Final.pdf" (last accessed September 30, 2020).

55.     Since the City has complied with all legal requirements to use drop boxes the sites are secure and valid locations at which voters may submit their mail-in absentee ballots.

56.     The threatening letter sent by the highest ranking members of Wisconsin's Legislature has created a controversy ripe for judicial determination because it unequivocally demonstrates the Legislature will pursue litigation to invalidate any ballots cast during the Democracy in the Park events.

57.     The threat of invalidating ballots already cast affects the rights of those Plaintiffs who have already cast a ballot during the Democracy in the Park events.

58.     The threat of invalidating ballots has caused some Plaintiffs to refrain from submitting their ballots at the Democracy in the Park event.

59.     The right to vote absentee is a clear legal right and protectable interest. *See* Wis. Const. art. III, § 1; Wis. Stat. §§ 6.84-6.88. Therefore, declaratory judgment and injunctive relief to protect that right is necessary.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request this Court grant the following relief:

A.     Enter an order, pursuant to Wis. Stat. § 806.04, declaring that the Democracy in the Park events provide valid absentee ballot submittal locations;

B.     Enter an order, pursuant to Wis. Stat. § 806.04, declaring that all lawfully completed ballots submitted at the September 26, 2020 Democracy in the park event are not *per se* invalid because they were submitted at a Democracy in the Park event;

19

C.     Enter an order, pursuant to Wis. Stat. § 806.04, declaring that all lawfully completed ballots that will be returned by voters at the October 3, 2020 Democracy in the park event are not *per se* invalid because they were submitted at a Democracy in the Park event;

D.     Order any other relief as the Court deems just and equitable.

Dated: September 30, 2020

*Electronically signed by Atty. Douglas M. Poland*
Douglas M. Poland (State Bar No. 1055189)
Jeffrey A. Mandell (State Bar No. 1100406)
Rick A. Manthe (State Bar No. 1099199)
Rachel E. Snyder (State Bar No. 1090427)

STAFFORD ROSENBAUM LLP

STAFFORD ROSENBAUM LLP
222 West Washington Avenue, Suite 900
Post Office Box 1784
Madison, Wisconsin 53701-1784
dpoland@staffordlaw.com
jmandell@staffordlaw.com
rmanthe@staffordlaw.com
rsnyder@staffordlaw.com
608.256.0226

20

# SUPREME COURT OF WISCONSIN

FILED

MAR 2 7 2020

CLERK OF SUPREME COURT
OF WISCONSIN

No. _20AP 55 7-0A_

MARK JEFFERSON; REPUBLICAN PARTY OF WISCONSIN,
PETITIONER,

v.

DANE COUNTY, WISCONSIN; SCOTT MCDONNELL, IN HIS OFFICIAL
CAPACITY AS DANE COUNTY CLERK,
RESPONDENTS.

## EMERGENCY PETITION FOR ORIGINAL ACTION

Eric M. McLeod
State Bar No. 1021730
Lane E. Ruhland
State Bar No. 1092930
HUSCH BLACKWELL LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
(608) 255-4440
(608) 258-7138 (fax)
eric.mcleod@huschblackwell.com
lane.ruhland@huschblackwell.com


Lisa M. Lawless
State Bar No. 1021749
HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
(414) 273-2100
(414) 223-5000 (fax)
lisa.lawless@huschblackwell.com

*Counsel for Petitioner*

HB: 4812-6960-8888.1

## ISSUES PRESENTED BY THE CONTROVERSY

(1)    Whether the Dane County Clerk has the authority to issue an interpretation of Wisconsin's election laws allowing all voters in Dane County to request and cast an absentee ballot without providing a photo ID.

(2)    Whether all Wisconsin voters may forgo State requirements to provide a photo ID when requesting an absentee ballot on grounds that Emergency Order #12 makes them "indefinitely confined because of age, physical illness or infirmity."

HB: 4812-6960-8888.1

# INTRODUCTION

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted). To ensure that the right to vote is fully realized, States must enact clear and uniform state guidelines to make elections "fair and honest" and to bring "order, rather than chaos, [to] the democratic process[]." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

The existence of a national and statewide emergency cannot—indeed, must not—change our structure of government. Under our constitution, the responsibility for drafting and revising our election laws lies with the legislature. Additional responsibility for elections lies with the Wisconsin Elections Commission, which has the exclusive authority to "[p]romulgate rules ... applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns ... or ensuring their proper administration." Wis. Stat. § 5.05(1)(f).

Respondents, however, have claimed the authority through the county clerk to rewrite the State's election laws and to issue authoritative declarations interpreting their provisions. Wisconsin

HB: 4812-6960-8888.1

state law requires electors to present photo ID when voting absentee, and it authorizes only limited exceptions to this requirement. Specifically, state law provides that an elector need not provide photo ID if he or she "is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)(5).

Despite this clear statutory text and their lack of authority to issue binding interpretations unique to their county, Respondents have declared that *all* Wisconsin voters—regardless of whether they are actually "indefinitely confined" or actually suffering a "physical illness or infirmity" due to COVID-19—can vote absentee in the upcoming election without presenting a photo ID.

This interpretation is wrong and requires this Court's immediate correction. As the Wisconsin Legislative Reference Bureau recently concluded, "Emergency Order 12 by its very terms does not render all Wisconsin residents indefinitely confined." *See Questions Related to "Indefinitely Confined" Absentee Ballots*, Wisconsin Legislative Reference Bureau at 5, (Mar. 26, 2020), bit.ly/3bGVOyD. Thus, county clerks have no legal authority "to encourage voters to claim to be indefinitely confined because of the

HB: 4812-6960-8888.1

governor's 'safer at home' order as a way to avoid presenting voter identification when requesting an absentee ballot." *Id.* At 3. None of Respondents' arguments to the contrary can overcome the plain language of Wisconsin's election laws.

Without this Court's intervention, the upcoming election will take place under two sets of different rules—one for voters in Dane county, and one for voters in the rest of the State. Even worse, Respondents' declaration likely will disenfranchise those same voters that Respondents purport to protect, as those votes that were cast improperly cannot be counted. And at least one county (Milwaukee County) has released a similar interpretation, and it is possible that more counties will follow suit. This is guaranteed to bring additional chaos and confusion across the State.

The unprecedented circumstances arising from COVID-19 should not be deployed to sow doubt and confusion about the conduct of public elections, but that is what appears to be happening. County and municipal election officials across Wisconsin are claiming the unilateral authority to rewrite Wisconsin's election laws. Lawsuits are being filed seeking changes to the upcoming election—often to invalidate longstanding provisions of law that have survived previous

challenges. *See, e.g., Lewis v. Knudson*, No. 20-cv-284 (W.D. Wis.) (seeking an order directing the WEC to postpone the current election). And voters are unsure of what comes next. This Court's guidance is urgently needed. The Court should grant this Petition for Original Action.

## STATEMENT OF FACTS

1.   Petitioner, Mark Jefferson, is an adult citizen and eligible elector in the State of Wisconsin who resides in the Town of Albion in Dane County, Wisconsin. Mr. Jefferson has already voted by absentee ballot and provided a photo ID in order to obtain his ballot. Mr. Jefferson is concerned that voters who improperly obtain a ballot without providing a photo ID will vote unlawfully, thereby diluting his lawful vote.

2.   Petitioner, Republican Party of Wisconsin, is a state political party that supports Republican candidates in elections throughout the State of Wisconsin. Its office is located at 148 East Johnson St., Madison, WI 53703.

3.   Respondent Dane County is a county in Wisconsin. Its office is located at 210 Martin Luther King Jr. Blvd., Madison, WI 53703.

4. Respondent Scott McDonell is the Clerk of Dane County. His office is located at City County Building, Room 106 A, 210 Martin Luther King Jr. Blvd., Madison, WI 53703.

5. Wisconsin will hold its Spring Election and Presidential Preference Primary on April 7, 2020. *See* WEC, *Spring 2020 Election and Presidential Preference Primary*, bit.ly/3dx84Ds.

6. The election, however, is already well underway. As of this filing, Wisconsin has received more than 700,000 absentee ballot requests. *See* WEC, *Absentee Requests for April 7 Spring Election*, bit.ly/33N2FDT; Craig Gilbert, *In a state used to political drama, Wisconsin's April 7 election is awash in doubt, dispute and uncertainty*, Milwaukee J. Sent. (Mar. 26, 2020), bit.ly/2UmXWFW. Registered voters can continue requesting absentee ballots until April 2, 2020. *See* WEC, *Important Information about COVID-19 Coronavirus*, bit.ly/3bt2kZr.

7. In March 2020, States across the country began taking measures to address the spread of COVID-19 (or the coronavirus).

8. On March 24, 2020, Governor Tony Evers issued Emergency Order #12, the "Safer at Home Order." *See* EO #12, bit.ly/2WLhHs8 (App. 1-16). That Order stated that "individuals

present within the State of Wisconsin are ordered to stay at home or at their place of residence." Order § 1.

9. The Order, however, created numerous exceptions to the direction to stay at home. Individuals in Wisconsin may, for example, leave their homes to get groceries and household products, travel to and work at businesses that provide essential services, and engage in outdoor leisure activities. Order §§ 1, 11.

10. The next day, March 25, 2020, Respondent Dane County Clerk Scott McDonell issued the following statement on his Facebook page:

> I have informed Dane County Municipal Clerks that during this emergency and based on the Governors Stay at Home order I am declaring all Dane County voters may indicate as needed that they are indefinitely confined due to illness. This declaration will make it easier for Dane County voters to participate in this election by mail in these difficult times. I urge all voters who request a ballot and have trouble presenting [a] valid ID to indicate that they are indefinitely confined.
>
> People are reluctant to check the box that says they are indefinitely confined but this is a pandemic....
>
> The process works like this:
> - A voter visits myvote.wi.gov to request a ballot.
> - A voter can select a box that reads "I certify that I am indefinitely confined due to age illness, infirmity or disability and request ballots be sent to me for every election until I am on longer confined or fail to return a ballot."

- The voter is then able to skip the step of uploading an ID in order to receive a ballot for the April 7 election.

Voters are confined due to the COVID-19 illness. When the Stay at Home order by the Governor is lifted, the voter can change their designation back by contacting their clerk or updating their information in myvote.wi.gov.

Voters who are able to provide a copy of their ID should do so and not indicate that they are indefinitely confined.

McDonell Facebook Post (Mar. 25, 2020), bit.ly/39qLrNv (App. 17-21).

11. On March 25, 2020, Milwaukee County Clerk George L. Christenson issued a similar statement on the Office of the Milwaukee County Clerk's Facebook page:

I have informed municipal clerks in Milwaukee County that during this emergency, and based on the Governor's Safer at Home Order as well as guidance from the Wisconsin Election Commission, that it is appropriate that Milwaukee County voters requesting an absentee ballot may declare themselves as indefinitely confined to their homes. By declaring themselves indefinitely confined, it will be easier for Milwaukee County voters to participate in this election by mail in these difficult times.

I urge all voters who request a ballot and do not have the ability or equipment to upload a valid ID to indicate that they are indefinitely confined. Voters should not be reluctant to check the box that says they are indefinitely confined because this is a pandemic

and this option exists in state law to help preserve everyone's right to vote.

The process works like this:
- A voter visits myvote.wi.gov to request a ballot.
- A voter can select a box that reads "I certify that I am indefinitely confined due to age, illness, infirmity, or disability and request ballots to be sent to me for every election until I am no longer confined or fail to return a allot."
- The voter is then able to skip the step of uploading an ID in order to receive a ballot for April 7th election.

Voters are confined to their homes due to COVID-19 illness. When the Safer at Home Order by the Governor is lifted, the voter can change the designation back by contacting their municipal clerk or by updating their information on myvote.wi.gov.

Christenson Facebook Post (Mar. 25, 2020), bit.ly/3aolAqS (App.

22-23).

12. As of the date of this filing, the Wisconsin Elections

Commission has not issued any similar interpretation of

Wisconsin's election laws. *See generally* Wisconsin Elections

Commission, *Recent Clerk Communications*, bit.ly/2JgGqg0; *see

also* Wisconsin Elections Commission, *COVID-19 FAQS and

Updates: Online Voter Registration, Absentee Voting, Envelopes,

Sanitizer and Poll Worker Recruitment* (Mar. 22, 2020),

bit.ly/2y4WZZV.

## STATEMENT OF RELIEF SOUGHT

If this Court grants the Petition, Petitioner will ask this Court to issue a declaratory judgment, *see, e.g.,* Wis. Stat. § 806.04, that makes clear that the Governor's Emergency Order #12 does not and cannot affect the rules and procedures under the Wisconsin's election laws and, in particular, (1) that Respondents lack the authority to issue an interpretation of Wisconsin's election law allowing voters in Dane County to vote absentee without a photo ID; and (2) that the Governor's Emergency Order #12, Safer at Home Order, does not authorize all Wisconsin voters—regardless of whether they are actually "indefinitely confined" or actually suffering a "physical illness or infirmity" due to COVID-19—to vote absentee without a photo ID. Petitioner is also seeking a preliminary injunction ordering Respondents to remove their interpretation from public display and issue new statements correcting their interpretation of Wisconsin's election law.

## STATEMENTS OF THE REASONS WHY THIS COURT SHOULD TAKE JURISDICTION

As discussed in more detail in the Memorandum in Support of Petition for Original Action, this Court should grant this Petition.

Ensuring that the upcoming election is administered through uniform and legally correct procedures is an issue of great public importance. It is also essential that this dispute be resolved as swiftly as possible. The election is set to occur on April 7 and absentee voting is ongoing. Without this Court's intervention, the upcoming election will take place under different legal rules throughout the State, and those who have voted in reliance on Respondents' improper interpretations risk being disenfranchised when their votes are later discounted. In addition, the purely legal issues presented by this petition are appropriate for this Court's review.

Respondents' actions, moreover, have no basis in law. It is the job of the *legislature*—not county clerks—to effect any change in election procedures. And any interpretations of the process for absentee voting must come from the Wisconsin Elections Commission, which is statutorily charged with promulgating rules "applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns ... or ensuring their proper administration." Wis. Stat. § 5.05(1)(f). County clerks have no authority to issue

their own interpretations of these absentee voting requirements unique to their own jurisdictions.

Even if Respondents had such interpretive authority, their declaration plainly violates the plain language of Wisconsin's election laws. Under Wisconsin law, an elector need not provide a photo ID only if he or she "is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)(5). None of the Respondents' arguments for allowing *all* Wisconsin electors to vote without a photo ID can override this plain statutory language.

## CONCLUSION

This Court should grant the Petition.

HB: 4812-6960-8888.1

Dated this 27th day of March, 2020.

By: _____

Eric M. McLeod
State Bar No. 1021730
Lane E. Ruhland
State Bar No. 1092930
HUSCH BLACKWELL LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
(608) 255-4440
(608) 258-7138 (fax)
eric.mcleod@huschblackwell.com
lane.ruhland@huschblackwell.com

Lisa M. Lawless
State Bar No. 1021749
HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
(414) 273-2100
(414) 223-5000 (fax)
lisa.lawless@huschblackwell.com

*Counsel for Petitioner*

HB: 4812-6960-8888.1

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

WILLIAM FEEHAN,

                Plaintiff,                CASE NO.  2:20-cv-1771

      v.

WISCONSIN ELECTIONS COMMISSION,
   and its members ANN S. JACOBS,
   MARK L. THOMSEN, MARGE
   BOSTELMAN, JULIE M. GLANCEY,
   DEAN KNUDSON, ROBERT F.
   SPINDELL, JR., in their official
   capacities, GOVERNOR TONY EVERS,
   in his official capacity,

                Defendants.

---

## AMENDED COMPLAINT FOR
## DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

---

## NATURE OF THE ACTION

1.  This civil action brings to light a massive election fraud, multiple violations of Wisconsin Statutes Chapters 5 – 12 (hereafter, "Wisconsin Election Code"), *see, e.g.,* Wis. Stat. §§ 5.03, *et. seq.*, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution.  These violations occurred during the 2020 General Election in the City of Milwaukee, southeastern Wisconsin counties, and throughout the State of Wisconsin, as set forth in the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses. *See* Exh. 19, Declaration of affiant presenting statistical analysis prediction of 105,639 fraudulent ballots cast for Joe Biden in the

1

City of Milwaukee and Exh. 17, Declaration of Russell James Ramsland, Jr. wherein he demonstrates it is statistically impossible for Joe Biden to have won Wisconsin.

2. The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing" techniques. *See* Exh. 16, U. S. Senator Elizabeth Warren (D. Mass.) letter of December 6, 2019 concerning the dangers of private equity control and censorship of election technology in the United States.

3. The fraud has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. *See* Exh. 18, Joint Cybersecurity Advisory issued on October 30, 2020 by the U.S. Department of Justice Federal Bureau of Investigation (FBI) and the Cybersecurity & Infrastructure Security Agency (CISA) warning election officials about actual election system hacking events by Iranian agents in an attempt to manipulate the November 3, 2020 election. This Amended Complaint details an especially egregious range of conduct in Milwaukee County and the City of Milwaukee, along with Dane County, La Crosse County, Waukesha County, St. Croix County, Washington County, Bayfield County, Ozaukee County and various other counties throughout Wisconsin employing Dominion Systems, though this conduct occurred throughout the State at the direction of Wisconsin state election officials.

4. The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Wisconsin, that collectively

add up to multiples of Biden's purported lead in the State of 20,565 votes.

5.   While this Amended Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.  Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief requested herein.

### Dominion Voting Systems Fraud and Manipulation

6.   The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the Wisconsin Elections Commission.  The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

7.   Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  See Exh. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report") and Exh. 8, Statement by Ana Mercedes Diaz Cardozo outlining actual examples of election manipulation by hacking and misuse of technology in Venezuelan elections.  Notably, Chavez "won" every election thereafter.

8.   As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the

3

leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. *Id.* ¶¶ 10 & 14.

9. A core requirement of the Smartmatic software design ultimately adopted by Dominion for Wisconsin's elections was the software's ability to hide its manipulation of votes from any audit. As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

10. The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events. Key components of the system utilize unprotected logs. Essentially this allows

4

an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[1] *See* Exh. 14, Declaration of Ronald Watkins regarding manipulation of Dominion software and built-in optical ballot scanning systems to contrive an election outcome in multiple states.

11.  This Amended Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties or hostile foreign actors to access the system and manipulate election results, and moreover potentially to cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code (pursuant to Wisconsin Statute § 5.905) is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. *See* 52 U.S.C. § 20701.

12.  These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In certifying Dominion Voting Systems Democracy Suite, Wisconsin officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. *See* Exh. 11.

13.  An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and

---

[1]  *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia). The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti. *See* Ex. 9, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[2]

14. In addition to the Dominion computer fraud, this Amended Complaint identifies several additional categories of "traditional" voting fraud that occurred as a direct result of Defendant Wisconsin Election Commission ("WEC") and other Defendants directing Wisconsin clerks and other election officials to ignore or violate the express requirements of the Wisconsin Election Code. First, the WEC issued "guidance" to county and municipal clerks not to reject "indefinitely confined" absentee voters, even if the clerks possess "reliable information" that the voter is no longer indefinitely confined, in direct contravention of Wisconsin Statute § 6.86(2)(6), which states that clerks must remove such voters. Second, the WEC issued further guidance directing clerks – in violation of Wisconsin Statute § 6.87(6)(d), which states that an absentee envelope certification "is missing the address of a witness, the ballot may not be counted" – to instead fill in the missing address information.

15. This Amended Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

    A. A report from Dr. William Briggs, showing that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots;

    B. Reports from Redacted Expert Witnesses who can show an algorithm was used

---

[2] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Exh. 10 ("Appel Study")).

6

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 154 of 295   Document 119-5
Case 2:20-cv-01785-PP   Filed 12/03/20   Page 46 of 91   Document 9-5

to pick a winner.

16. In the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. *See* Exh. 12 (copy of redacted witness affidavit).

17. These and other "irregularities" demonstrate that at least 318,012 illegal ballots were counted in Wisconsin. This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

18. This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

19. This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

20. The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

21. This Court has jurisdiction over the related Wisconsin constitutional claims and state-law claims under 28 U.S.C. § 1367.

22. Venue is proper because a substantial part of the events or omissions giving rise to the

7

claim occurred in the Eastern District. 28 U.S.C. § 1391(b) & (c).

23. Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

24. Plaintiff William Feehan, is a registered Wisconsin voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin. Mr. Feehan is a resident of the City of La Crosse and La Crosse County, Wisconsin.

25. Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

26. Plaintiff Feehan has standing to bring this action as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq (election procedures for Wisconsin electors). As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000)

8

(per curiam).

27. Plaintiff brings this action to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin and to obtain the other declaratory and injunctive relief requested herein. Those results were certified by Defendants on November 30, 2020, indicating a plurality for Mr. Biden of 20,565 votes out of 3,240,867 cast.

28. The Defendants are Wisconsin Elections Commission ("WEC"), a state agency, and its members Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., in their official capacities

29. Defendant Governor Tony Evers is named as a defendant in his official capacity as Wisconsin's governor.

30. Defendant WEC was created in 2015 by the Wisconsin Legislature as an independent agency under the Executive branch to administer Wisconsin's election laws. Wis. Stat. §§ 5.03 & 15.61. The WEC is authorized to adopt administrative rules pursuant to Chapter 227 of the Wisconsin Statutes, but nothing under Wisconsin's election laws authorizes the WEC to issue any documents, make any oral determinations or instruct governmental officials administering elections to perform any act contrary to Wisconsin law governing elections.

31. Furthermore, the Wisconsin Legislature also created municipal elections commissions for municipalities with a population greater than 500,000 and a county elections commissions for counties with a population greater than 750,000. Wis Stat. § 7.20. As a result, the City of Milwaukee Elections Commission was created as well as the Milwaukee County Elections Commission and the Dane County Elections Commission. These county and municipal elections commissions are responsible for administering the elections in their respective jurisdictions.

9

## STATEMENT OF FACTS

32. Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Wisconsin Constitution.

33. The United States Constitution sets forth the authority to regulate federal elections. With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

U.S. CONST. art. II, § 1 ("Electors Clause").

34. None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

35. The WEC certified the Presidential Election results on November 30, 2020. The Presidential election results in Wisconsin show a difference of 20,565 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

36. Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

10

# I. VIOLATIONS OF WISCONSIN ELECTION CODE

### A. WEC Directed Clerks to Violate Wisconsin Election Code Requirements for Absentee Voting by "Indefinitely Confined" without Photo ID.

37. The Wisconsin State Legislature adopted Act 23 in 2011 to require Wisconsin electors to present an identification containing a photograph, such as a driver's license, to either a municipal or county clerk, when registering to vote and when voting. Wis. Stat. §§ 6.34; 6.79 (2). The Wisconsin State Legislature adopted the photo ID requirement to deter the casting of ballots by persons either not eligible to vote or persons fraudulently casting multiple ballots. *League of Women Voters of Wisconsin Education Network, Inc. v. Walker,* 851 N.W.2d 302, 314 (Wis. 2014).

38. Wisconsin's absentee voting is governed by Wisconsin Statutes § 6.84 - § 6.89. Under Wisconsin Statutes §6.86, every absentee elector applicant must present a photo ID when registering to vote absentee except absentee voters who registered as "indefinitely confined," Wis. Stat. §6.86 (ac), meaning someone confined "because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. § 6.86(2)(a). As a result, Wisconsin election procedures for voting absentee based on "indefinitely confined" status circumvent the photo ID requirement, creating an avenue for fraudulent voting.

39. In order to ensure that only those who are "indefinitely confined" may use the "indefinitely confined" absentee ballot in an election, Wisconsin Statutes §6.86 provides that any elector who files an application for an absentee ballot based on indefinitely confined status may not use the absentee ballot if the electoral is no longer "indefinitely confined." Wisconsin Statutes § 6.86 (2)(b) further provides that the municipal clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service."

40. Despite this clear statutory requirement, the Administrator of the Wisconsin Election

Commission, Meagan Wolfe, issued a written directive on May 13, 2020 to the clerks across the State of Wisconsin stating that the clerks cannot remove an allegedly "indefinitely confined" absentee voter from the absentee voter register if the clerk had "reliable information" that an allegedly "indefinitely confined" absentee voter is no longer "indefinitely confined." The directive specifically stated:

> Can I deactivate an absentee request if I believe the voter is not indefinitely confined? No. All changes to status must be made in writing and by the voter's request. Not all medical illnesses or disabilities are visible or may only impact the voter intermittently. (*See* WEC May 13, 2020 Guidance Memorandum).

41. The WEC's directive thus directly contradicts Wisconsin law, which specifically provides that clerks "shall" remove an indefinitely confined voter from the absentee voter list if the clerk obtains "reliable information" that the voter is no longer indefinitely confined.

42. As a result of the directive, clerks did not remove from the absentee voter lists maintained by their jurisdictions the absentee voters who claimed "indefinitely confined" status but who in fact were no longer "indefinitely confined." This resulted in electors who were allegedly "indefinitely confined" absentee voters casting ballots as "indefinitely confined" absentee voters who were not actually "indefinitely confined" absentee voters.

**B. WEC Directed Clerks to Violate Wisconsin Law Prohibiting Counting of Absentee Ballot Certificates Missing Witness Addresses.**

43. In 2015, the Wisconsin Legislature passed Act 261, amending Wisconsin's election laws, including a requirement, codified as Wisconsin Statute § 6.87(d), that absentee ballots include both elector and witness certifications, which must include the address of the witness. If the address of the witness is missing from the witness certification, however, "the ballot may not be counted." *Id.*

44. On October 18, 2016, WEC reacted to this legislation by issuing a memorandum, which,

among other things, permitted clerks to write in the witness address onto the absentee ballot certificate itself, effectively nullifying this express requirement. (*See* WEC October 18, 2016 Guidance Memorandum). Wisconsin election officials reiterated this unlawful directive in publicly posted training videos. For example, in a Youtube video posted before the November 3, 2020 General Election by Clarie Woodall-Voog of the Milwaukee Elections Commission, Ms. Woodall-Voog advised clerks that missing items "like witness address may be written in red."[3]

### C. WEC Directed Clerks to Illegally Cure Absentee Ballots by Filling in Missing Information on Absentee Ballot Certificates and Envelopes.

45. On October 19, 2020, WEC instructed its clerks that, without any legal basis in the Wisconsin Election Code, they could simply fill in missing witness or voter certification information using, e.g., personal knowledge, voter registration information, or calling the voter or witness. The WEC further advised that voters or witnesses could cure any missing information at the polling place, again without citing any authority to do so under Wisconsin Election Code.

### II. EXPERT WITNESS TESTIMONY: EVIDENCE OF WIDESPREAD VOTER FRAUD

### A. Approximately 15,000 Wisconsin Mail-In Ballots Were Lost, and Approximately 18,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

46. The attached report of William M. Briggs, Ph.D., Exh. 2 ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Wisconsin voters collected by Matt Braynard, which was conducted from November 15-17, 2020. *See* Exh. 3 ("Braynard Survey"). The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots

---

[3] *See* https://www.youtube.com/watch?v=hbm-pPaYiqk (video a 10:43 to 11:07).

13

Case 2:20-cv-01785-BHL PP Filed 12/09/20 Page 161 of 295 Document 1-5
Case 2:20-cv-01785-PP Filed 12/03/20 Page 13 of 35 Document 1-5

but whose votes went missing (*i.e.*, marked as unreturned)." Exh. 2. Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 96,771 unreturned mail-in ballots for the State of Wisconsin.

47. With respect to **Error #1**, Dr. Briggs' analysis estimated that **16,316-19,273 ballots** out of the total 96,771 unreturned ballots were recorded for voters who had **not** requested them. *Id.* With respect to **Error #2**, he found **13,991 – 16,757 ballots** out of 96,771 unreturned ballots recorded for voters who **did return their ballots were recorded as being unreturned.** *Id.* Taking the average of the two types of errors together, **29,594 ballots, or 31% of the total, are "troublesome."**

48. These errors are not only conclusive evidence of widespread fraud by the State of Wisconsin, but they are fully consistent with the fact witness statements cited above regarding the evidence about Dominion presented below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

49. With respect to **Error #1**, Dr. Briggs' analysis demonstrates that approximately **17,795 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter. Regarding ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.

50. With respect to **Error #2**, Dr. Briggs' analysis indicates that approximately **15,374 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot

14

destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.** Dr. Briggs' analysis shows that 31% of "unreturned ballots" suffer from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 45%) – and provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

### B. Nearly 7,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Wisconsin.

51. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Exh. 3. Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.[4] *Id.*

### C. A Statistical Study Reveals that Biden Overperformed in those Precincts that Relied on Dominion Voting Machines

52. From November 13th, 2020 through November 28th, 2020, the Affiant conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election. This data included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee. The Affiant's analysis yielded several "red flags" concerning the percentage of votes won by candidate Biden in counties using voting machines provided by Dominion Voting Systems. These red flags occurred in several

---

[4] Mr. Braynard posted the results of his analysis on Twitter.
*See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his Report, (attached hereto as Exh. 3).

15

States in the country, including Wisconsin. (*See* attached hereto as Exh. 4, copy of redacted Affiant, B.S. Mathematics and M.S. Statistics).

53. The Affiant began by using Chi-Squared Automatic Interaction Detection (CHAID), which treats the data in an agnostic way—that is, it imposes no parametric assumptions that could otherwise introduce bias. Affiant posed the following question: "Do any voting machine types appear to have unusual results?" The answer provided by the statistical technique/algorithm was that machines from Dominion Voting Systems (Dominion) produced abnormal results. *Id.*

54. Subsequent graphical and statistical analysis shows the unusual pattern involving machines from Dominion occurs in at least 100 counties and multiple States, including Wisconsin. The results from the vast majority of counties using the Dominion machines is 3 to 5.6 percentage points higher in favor of candidate Biden. This pattern is seen easily in graphical form when the results from "Dominion" counties are overlaid against results from "non-Dominion" counties. The results from "Dominion" counties do not match the results from the rest of the counties in the United States. The results are clearly statistically significant, with a p-value of < 0.00004. This translates into a statistical impossibility that something unusual involving Dominion machines is *not* occurring. This pattern appears in multiple States, including Wisconsin, and the margin of votes implied by the unusual activity would easily sway the election results. *Id.*

55. The following graph shows the pattern. The large red dots are counties in Wisconsin that use Dominion voting machines. Almost all of them are above the blue prediction line, when in normal situations approximately half of them would be below the prediction line (as evidence by approximately half the counties in the U.S. (blue dots) that are below the blue centerline). The p-value of statistical analysis regarding the centerline for the red dots (Wisconsin counties with Dominion machines) is 0.000000049, pointing to a statistical impossibility that this is a "random"

16

statistical anomaly. Some external force caused this anomaly:



*Id.*

56. To confirm that Dominion machines were the source of the pattern/anomaly, Affiant conducted further analysis using propensity scoring using U.S. census variables (including ethnicities, income, professions, population density and other social/economic data), which was used to place counties into paired groups. Such an analysis is important because one concern could be that counties with Dominion systems are systematically different from their counterparts, so abnormalities in the margin for Biden are driven by other characteristics unrelated to the election. *Id.*

57. After matching counties using propensity score analysis, the only difference between the groups was the presence of Dominion machines. This approach again showed a highly statistically

significant difference between the two groups, with candidate Biden again averaging three percentage points higher in Dominion counties than in the associated paired county. The associated p-value is < 0.00005, against indicating a statistical impossibility that something unusual is not occurring involving Dominion machines. *Id.*

58.   The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between three and five point six percentage points. **Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440.** *Id.*

59.   The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- returned ballots that were deemed unreturned by the state: 15,374

- unreturned mail ballots unlawfully ordered by third parties: 17,795

- votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 6,966

- Votes that were improperly relying on the "indefinitely confined" exemption to voter ID: 96,437

- And excess votes arising from the statistically significant outperformance of Dominion machines on behalf of Joe Biden: 181,440

*In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.*

### III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

60.   The State of Wisconsin, in many locations, used either Sequoia, a subsidiary of Dominion Systems, and or Dominion Systems, Democracy Suite 4.14-D first, and then included Dominion

18

Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: *"dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."* (*See* Exh. 5, attached hereto, a copy of the Equipment for WI election systems).

### A. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

61. Affiant Keshel's findings that reflect the discussion cited above:

> While Milwaukee County is focal for transparency and observation violations, including reporting statistically impossible vote counts in the early morning hours away from scrutiny, Dane County has surged far past support totals for President Obama, despite expected difficulties mobilizing student voters to polls. President Trump has reconsolidated the Republican base in suburban Milwaukee and far surpassed his 2016 support levels but has been limited in margin growth by historically improbable Democratic support in these strongholds, which defy years of data in Wisconsin in which the Republican party surged as the Democratic Party plunged. Finally, in strong Trump counties showing a double inversion cycle (one party up, the other down), particularly in rural and exurban Wisconsin, Trump's totals are soaring, and against established trends, Biden's totals are at improbable levels of support despite lacking registration population
> (*See* attached hereto, Exh. 9, Aff. of Seth Keshel, MBA)

| County | Rep '08 | Dem '08 | Rep '12 | Dem '12 | Rep '16 | Dem '16 | Rep '20 | Dem '20 | Dem Percentage of Obama 2008 Votes |
|---|---|---|---|---|---|---|---|---|---|
| Ozaukee | 32,172 | 20,579 | 36,077 | 19,159 | 30,464 | 20,170 | 33,912 | 26,515 | 128.8% |
| % Increase | N/A | N/A | 12.1% | (6.9%) | (15.6%) | 5.3% | 11.3% | 31.5% | |
| ---- | | | | | | | | | |
| Dane | 73,065 | 205,984 | 83,644 | 216,071 | 71,275 | 217,697 | 78,789 | 260,157 | 126.3% |
| % Increase | N/A | N/A | 14.5% | 4.9% | (14.8%) | 0.8% | 10.5% | 19.5% | |
| ---- | | | | | | | | | |
| Waukesha | 145,152 | 85,339 | 162,798 | 78,779 | 142,543 | 79,224 | 159,633 | 103,867 | 121.7% |
| % Increase | N/A | N/A | 12.2% | (7.7%) | (12.4%) | 0.6% | 12.0% | 31.1% | |
| ---- | | | | | | | | | |
| Racine | 45,954 | 53,408 | 49,347 | 53,008 | 46,681 | 42,641 | 54,475 | 50,154 | 117.6% |
| % Increase | N/A | N/A | 7.4% | (0.7%) | (5.4%) | (19.6%) | 16.7% | 17.6% | |

*Id.*

62. Keshel provides a graph reflecting the voter returns in a time-series. The highly unlikely

19

and remarkably convenient attainment of this block of votes provides for a stunning depiction of the election and generates many questions. The analysis provided by Plaintiff's multiple experts, including data, statistics and cyber, will reveal clear evidence of the multiple frauds that combined to change the outcome of the 2020 election.



*See Id.*

**B. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.**

63. **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public. (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020). Rather than engaging in an open and transparent process to give credibility to Wisconsin's

20

Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

64. **Texas.** The same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[5]

65. **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al,* Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

66. A District Judge found that Dominion's BMD ballots are not voter verifiable, and they cannot be audited in a software independent way. The credibility of a BMD ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised. Similar to the issues in Wisconsin, Judge Totenberg of the District Court of Georgia

---

[5] See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, ... such interpretation **for elector verification**, and print **an elector verifiable paper ballot;**" and (2) "produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2). Plaintiffs and other voters who wish to vote in-person are required to vote on **a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does **not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code**.

*See* Order, pp. 81-82. (Emphasis added).

67.  This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir. 2018). The Court found,

> **In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.**

*Id.* at 1294-1295.

68.  The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, *see* Exh. 107, wherein he testified or found:

A.  "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates

22

the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

**C. Foreign Interference/Hacking and/or Manipulation of Dominion Results.**

**1. Evidence of Vulnerability to Foreign Hackers.**

69. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY

ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified**

**Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT)

23

actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(*See* CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Exh. 18.)

70. An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China. (*See* Exh. 12, Spider Declaration, (who remains redacted for security reasons).)

71. The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (*See* Exh. 12, Spider Declaration. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

72. Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests. She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries. On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling"

to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…

(*See* Exh. 13, Aff. of Computer analysis, at par. 32).

73. The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that Wisconsin uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net)"

74. This Declarant further explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

(*See Id.* at ¶32).

75. This Declarant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and specifically the port that Wisconsin uses:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore servers. Wisconsin Port.
>
> China is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service

25

company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server [for] Dominion Software.

(*See Id.* at par. 21).

76.  The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

> **The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \le n^{\frac{1}{2}\log(n)}$$

> Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX." (*See Id.* at pars. 67-69)

> "The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id.* at par. 73)

### 2.  Background of Dominion Connections to Smartmatic and Hostile Foreign Governments.

77.  An expert analysis by Russ Ramsland agrees with the data reflecting the use of an algorithm that causes the spike in the data feed, which is shown to be an injection of votes to change the outcome, because natural reporting does not appear in such a way.

78.  And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl -- and was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes**

26

decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."

79. The report concludes that "Based on the foregoing, I believe these statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Wisconsin, in particular for candidates for President contain at least 119,430 (Para. 13) up to 384,085 (Para. 15) illegal votes that must be disregarded. In my opinion, it is not possible at this time to determine the true results of the Wisconsin vote for President of the United States."

### The History of Dominion Voting Systems

80. Plaintiff can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

> Applicant: SMARTMATIC, CORP.
>
> Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[6]

81. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (*See* Exh. 17, Cardozo Aff. ¶8).

---

[6] *See* Patents Assigned to Smartmatic Corp., *available at:*
https://patents.justia.com/assignee/smartmatic-corp

27

### 3. US Government Warnings Regarding Hacking by Hostile Foreign Governments.

82. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(*See* Exh. 18, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)

### D. Additional Independent Findings of Dominion Flaws.

83. Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiff has since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1. Central Operator Can Remove, Discard or Manipulate Votes.

84. Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu .... " (Exh. 106, Watkins aff. ¶11). ¶8.

85. Mr. Watkins further testifies that the user manual makes clear that the system allows for

28

threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary

determinations on where the vote goes stating:

> 9. During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

> 10. Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

> 11. The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. *Id.* ¶¶ 9-11.

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

86. The Dominion System put in place by its own design violates the intent of Federal law

on the requirement to preserve and retain records – which clearly requires preservation of all

records requisite to voting in such an election.

> **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that,

29

if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

*See* 52 USC § 20701.

### 3. Dominion Vulnerabilities to Hacking.

87. Plaintiff has since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (Exh. 106 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was

30

to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

88. Specific vulnerabilities of the systems in question that have been well documented or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (*See* Exh. 2, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.** (*See* Exh. 15). Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade."[7] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be

---

[7] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017)*, available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E.  Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[8]

F.  Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G.  In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (*See* Exh. 16).

H.  Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[9]

---

[8] *Smartmatic-TIM Running Out of Time to Fix Glitches*, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

[9] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:*

Case 2:20-cv-01785-BHL PP Filed 12/03/20 Page 180 of 295 Document 19-5
Case 2:20-cv-01785-PP Filed 12/03/20 Page 32 of 81 Document 1

89. The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

> This bill addresses election security through grant programs and requirements for voting systems and paper ballots.
>
> The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.
>
> *See* H.R. 2722.

**E. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

90. Dr. Eric Coomer is listed as the co-inventor for several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[10] He joined Dominion in 2010, and most recently served as Voting Systems

---

https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

[10] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer. This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014); (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and

Officer of Strategy and Director of Security for Dominion. Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia. Dr. Coomer's patented ballot adjudication technology into Dominion voting machines sold throughout the United States, including those used in Wisconsin. *See* Exh. 6 (Jo Oltmann Affidavit).

91. In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[11] He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. *See Id.*[12]

92. Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media. An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history). (*See Id.*)

93. Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity. Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (*See* Id).

---

Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

[11] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[12] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW! I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason. You are controlled by fear, reaction and bullsh[*]t. Get your shit together. F[**]K YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt. *Id.* (July 21, 2016 Facebook post).[13]

94. In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Amended Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud. I don't know who is doing it, or how much is happening, but I know it is going on a lot." This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (*See* also Exh. 6)

95. Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.] (*Id.*)

---

[13] In this and other quotations from Dr. Coomer's social media, Plaintiff has redacted certain profane terms.

96. Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post). Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

97. Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1. "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present. In response to a question as to what Antifa would do "if Trump wins this ... election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that ... Hahaha." *Id.* at 2.

98. By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or even propriety***. It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive, and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump. Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches"

36

uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (*Id.*)

99. In sum, as set forth above, for a host of independent reasons, the Wisconsin election results concluding that Joe Biden received 20,608 more votes that President Donald Trump must be set aside.

## COUNT I

### Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.

100. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

101. The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, §1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

102. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932). Regulations for presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

103. Defendants are not part of the Wisconsin Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Wisconsin Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict

with existing legislation.

104. Section I details three separate instances where Defendants violated the Wisconsin Election Code. First, WEC May 23, 2020 "guidance" on the treatment of "indefinitely confined" voters, who are exempt from Wisconsin's photo ID requirement for absentee ballot application, that directly contravened the express requirement in Wisconsin Election Code that clerks "shall" remove an allegedly "indefinitely confined" voter if the clerk has "reliable information" that that voter is not, or is no longer, "indefinitely confined."

105. Second, the WEC's October 18, 2016 guidance directed clerks to violate the express requirements of Wisconsin Statutes § 6.87(6)(d), which states "[i]f a certificate is missing the address of a witness the ballot may not be counted," when it directed clerks to fill in missing information on absentee ballot envelopes.

106. Third, WEC and Wisconsin election officials violated Wisconsin Election Code, or acted *ultra vires*, insofar as they filled in missing witness or voter information on absentee ballots and permitted voters to cure ballots without statutory authorization. Section II provides expert witness testimony quantifying the number of illegal or ineligible ballots that were counted, and lawful ballots that were not, as a result of these and Defendants' other violations.

107. A report from Dr. William Briggs, shows that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

108. Evidence compiled by Matt Braynard, Exh. 3, using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-

38

of-state prior to voting, and therefore were ineligible. Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.

109. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

110. Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Wisconsin should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Governor Evers and Other Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983

### Invalid Enactment of Regulations & Disparate Treatment of Absentee vs. Mail-In Ballots

111. Plaintiff refers to and incorporate by reference each of the prior paragraphs of this Amended Complaint as though the same were repeated at length herein.

112. The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the

39

franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

113. The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

114. The disparate treatment of Wisconsin voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

115. In statewide and federal elections conducted in the State of Wisconsin, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiff, in having the election laws enforced fairly and uniformly.

116. As set forth in Section I above, Defendants failed to comply with the requirements

of the Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiff and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection. Further, Defendants enacted regulations, or issued guidance, that had the intent and effect of favoring one class of voters – Democratic absentee voters – over Republican voters. Further, all of these invalidly enacted rules by Defendant Wisconsin executive and administrative agencies, had the intent and effect of eliminating protections against voter fraud, and thereby enabled and facilitated the counting of fraudulent, unlawful and ineligible votes, which were quantified in Section II. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

117. Defendants have acted and will continue to act under color of state law to violate Plaintiff's right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Wisconsin Constitution, and the Wisconsin Election Code.

118. Plaintiff seeks declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

119. The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving

41

absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

120. In addition, Plaintiff asks this Court to order that no ballot processed by a counting board in the Wisconsin Counties can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Wisconsin law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

## COUNT III

### Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983

### Denial of Due Process On The Right to Vote

122. Plaintiff refers to and incorporate by reference each of the prior paragraphs of this Amended Complaint as though the same were repeated at length herein.

123. The right of qualified citizens to vote in a state election involving federal

candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges and Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to vote in federal elections. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

124. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

125. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes debase and dilute the weight of each validly cast vote. *Reynolds*, 377 U.S. at 555.

126. The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

127. The right to an honest count is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States. *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

128. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("the right

44

Case 2:20-cv-01785-BHL Filed 12/09/20 Page 192 of 295 Document 1-5
Case 2:20-cv-01785-BHL Filed 12/03/20 Page 44 of 51 Document 9-5

of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

129. Section I details the Defendants violations of the Wisconsin Election Code. Section II provides estimates of the number of fraudulent, illegal or ineligible votes counted, and demonstrates that this number is many times larger than Biden's margin of victory.

130. Plaintiff seeks declaratory and injunctive relief enjoining Defendants from certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Wisconsin Board of State Canvassers and the Wisconsin county Boards of Canvassers and that these canvassing boards exercise their duty and authority under Wisconsin law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

## COUNT IV

### Wide-Spread Ballot Fraud

131. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

132. The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

133. Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

45

134. The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between 3 and 5.6 percentage points. Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440. *Id.*

135. The Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.

136. The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See*, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

137. Plaintiff has no adequate remedy at law. Plaintiff contests the results of Wisconsin's 2020 General Election because it is fundamentally corrupted by fraud. Defendants intentionally violated multiple provisions of the Wisconsin Election Code to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

**PRAYER FOR RELIEF**

138.  Accordingly, Plaintiff seeks temporary restraining order instructing Defendants to de-certify the results of the General Election for the Office of President.

139.  Alternatively, Plaintiff seeks an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

140.  In the alternative, Plaintiff seeks a temporary restraining order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Wisconsin Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Wisconsin Election Code violations set forth in Section II of this Amended Complaint.

141.  Order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Wisconsin and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Wisconsin cannot reasonably rely on the results of the

mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Wisconsin should be disqualified from counting toward the 2020 election. Alternatively, the electors of the State of Wisconsin should be directed to vote for President Donald Trump.

142. For these reasons, Plaintiff asks this Court to enter a judgment in his favor and provide the following emergency relief:

1. An order directing Governor Evers and the Wisconsin Elections Commission to de-certify the election results;

2. An order enjoining Governor Evers from transmitting the currently certified election results the Electoral College;

3. An order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election;

4. An immediate temporary restraining order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs, ballot applications, ballot return envelopes, ballot images, paper ballots, and all "election materials" referenced in Wisconsin Statutes § 9.01(1)(b)11. related to the November 3, 2020 Wisconsin election for forensic audit and inspection by the Plaintiff;

5. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

48

6. A declaratory judgment declaring that Wisconsin's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7. A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

8. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11. Immediate production of 48 hours of security camera recordings of all voting central count facilities and processes in Milwaukee and Dane Counties for November 3, 2020 and November 4, 2020.

12. Plaintiff further requests the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and his reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

49

Respectfully submitted, this 3rd day of December, 2020.

LEAD COUNSEL FOR PLAINTIFF

/s Sidney Powell**
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
sidney@federalappeals.com

Of Counsel:

Julia Z. Haller (D.C. Bar No. 466921) **
Brandon Johnson (D.C. 491730) **
Emily P. Newman (Virginia Bar No. 84265) **

2911 Turtle Creek Blvd.
Suite 300
Dallas, Texas 75219

Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

L. Lin Wood **
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

** Applications for admission forthcoming

50

Local Counsel for Plaintiff

Michael D. Dean
Wis. Bar No.01019171
P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044
miked@michaelddeanllc.com


Daniel J. Eastman
Wis. Bar No.1011433
P.O. Box 158
Mequon, Wisconsin 53092
(414) 881-9383
daneastman@me.com

51

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

| | |
|---|---|
| Donald J. Trump, Candidate for President of the United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br>The Wisconsin Elections Commission, and its members, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Dean Knudson, Robert F. Spindell, Jr., in their official capacities, Scott McDonell in his official capacity as the Dane County Clerk, George L. Christenson in his official capacity as the Milwaukee County Clerk, Julietta Henry in her official capacity as the Milwaukee Election Director, Claire Woodall-Vogg in her official capacity as the Executive Director of the Milwaukee Election Commission, Mayor Tom Barrett, Jim Owczarski, Mayor Satya Rhodes-Conway, Maribeth Witzel-Behl, Mayor Cory Mason, Tara Coolidge, Mayor John Antaramian, Matt Krauter, Mayor Eric Genrich, Kris Teske, in their official Capacities; Douglas J. La Follette, Wisconsin Secretary of State, in his official capacity, and Tony Evers, Governor of Wisconsin, in his Official capacity.<br><br>        Defendants. | Case No.<br>_____ |

## COMPLAINT FOR EXPEDITED DECLARTORY AND INJUNCTIVE RELIEF PURSUANT TO ARTICLE II OF THE UNITED STATES CONSTITUTION

The plaintiff, Donald J. Trump, Candidate for President of the United States, by

counsel, alleges:

1

**THE PARTIES**

1.      Plaintiff, Donald J. Trump, is a resident of the State of Florida, is the forty-fifth President of the United States of America, and was a candidate for President of the United States in the November 3, 2020, election held in the State of Wisconsin for the selection of electors for the offices of President and Vice President of the United States.

2.      Ann S. Jacobs, is sued in her official capacity as a member of the Wisconsin Elections Commission ("WEC" or the "Commission").

3.      Mark L. Thomsen is sued in his official capacity as a member of the WEC.

4.      Marge Bostelmann is sued in her official capacity as a member of the WEC.

5.      Dean Knudson is sued in his official capacity as a member of the WEC.

6.      Robert F. Spindell, Jr., is sued in his official capacity as a member of the WEC.

7.      Scott McDonell is sued in his official capacity as the Dane County Clerk.

8.      George L. Christenson is sued in his official capacity as the Milwaukee County Clerk.

9.      Julietta Henry is sued in her official capacity as the Milwaukee Election Director.

10.     Claire Woodall-Vogg is sued in her official capacity as the Executive Director of the Milwaukee Election Commission.

11.     Mayor Tom Barrett is sued in his official capacity as the Mayor of the City of Milwaukee.

12.     Jim Owczarski is sued in his official capacity as City Clerk of the City of Milwaukee.

13.     Mayor Satya Rhodes-Conway is sued in her official capacity as Mayor of the City of Madison.

14.     Maribeth Witzel-Behl is sued in her official capacity as City Clerk of the City of Madison.

15.     Mayor Cory Mason is sued in his official capacity as Mayor of the City of Racine.

16.     Tara Coolidge is sued in her official capacity as City Clerk of the City of Racine.

17.     Mayor John Antaramian is sued in his official capacity as Mayor of the City of Kenosha.

18.     Matt Krauter is sued in his official capacity as City Clerk of the City of Kenosha.

19.     Mayor Eric Genrich is sued in his official capacity as Mayor of the City of Green Bay.

20.     Kris Teske is sued in her official capacity as City Clerk of the City of Green Bay.

21.     Douglas J. La Follette, is sued in his official capacity as the Wisconsin Secretary of State, and by virtue of his responsibility under the Wisconsin Constitution and Wis. Stat. § 6.30 to affix the seal of the State and register commissions.

22. Tony Evers, is sued in his official capacity as the Governor of Wisconsin, and by virtue of his roles as the Chief Executive of the State of Wisconsin and under 3 U.S.C. § 6 in the certification activities for Presidential electors.

## JURISDICTION AND VENUE

23. This action arises under 42 U.S.C. § 1983 and Art. I, § 4, cl. 2, Art. II, § 1, cl. 4 and the First and Fourteenth Amendments of the United States Constitution.

24. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), 2201, and 2202.

25. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred or will occur in this District.

## BRIEF SUMMARY OF *ULTRA VIRES* ACTS BY WISCONSIN OFFICIALS THAT UNDERMINED THE PRESIDENTIAL ELECTION IN WISCONSIN

26. A striking characteristic of the November 3, 2020, election in Wisconsin is that it involved a number of *ultra vires* acts by Wisconsin public officials charged with administering the election that were inconsistent with state law and the directions of the Wisconsin Legislature as set forth in the Wisconsin Election Code.

27. "[A] significant departure from the [State's] legislative scheme for appointing Presidential electors" or for electing members of the federal Congress "presents a federal constitutional question" this Court must answer. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *see also Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304 (1816) (concluding Virginia court misinterpreted state law in order to reach a federal question). The constitutional delegation of power to the state legislature

4

Case 2:20-cv-01785-BHL Filed 12/02/20 Page 203 of 295 Document 119-5
Case 2:20-cv-01785 Filed 12/01/20 Page 43 of 72 Document 1

means that "the text of [state] election law itself, and not just its interpretation by the courts of the States, takes on independent significance." *Bush v. Gore*, 531 U.S. at 112–13 (Rehnquist, C.J., concurring).

28.     At the heart of each violation of the Wisconsin Election Code described in this Complaint was the purposeful disregard of thoughtful legislative safeguards meant to prevent absentee ballot fraud and to promote uniform treatment of absentee ballots throughout the State, including by:

    a.  **Ignoring or compromising state law limits on the availability of mail-in balloting for those reasonably able to cast a ballot in-person** – The intentional acts of election officials which compromised legislative limits on the availability of mail-in ballots, undermined the authority of the state legislature and undercut the Wisconsin Election Code requirements related to photo identification for in-person and absentee electors, reducing the security and integrity of the election by making it easier to engage in mail-in ballot fraud.

    b.  **Proliferating unmanned mail-in ballot drop boxes** – which contradict state law absentee balloting requirements making it easier to engage in ballot harvesting and other forms of mail-in ballot fraud and resulting in the standardless operation of a new form of balloting in the State not permitted under the Wisconsin Election Code.

    c.  **Processing and counting vast numbers of mail-in ballots outside the visibility of poll watchers** – despite Wisconsin law which provides that the voting, processing and tabulation of ballots are to be

observable by members of the public and poll watchers, and undermining this crucial safeguard against fraud which when properly applied promotes public confidence in elections.

d. **Reducing or eliminating mandatory voter information certifications for mail-in ballots** – The intentional acts of election officials which diminished or eliminated state laws requiring that voters provide information on the mail-in ballot envelope, such as the voter's name, address, and signature and the name, address and signature of a witness, undermined the authority of the state legislature, reduced the security and integrity of the election by making it easier to engage in mail-in ballot fraud and created another standardless rule in conflict with the clear terms of the Wisconsin Election Code, preventing uniform treatment of absentee ballots throughout the State.

e. **Permitting "ballot tampering"** – a practice forbidden by state law wherein election workers alter the certification of the voter or witness on mail-in ballots which, contrary to the Wisconsin Election Code, was expressly authorized by the Wisconsin Elections Commission, resulting in disparate and unequal application of the voting laws throughout Wisconsin and opening the door to standardless and subjective determinations of election workers which undermined uniform treatment of absentee ballots throughout the State.

29.     These practices usurped the Wisconsin Legislature's exclusive authority to direct the election for Presidential electors in Wisconsin and also violated equal protection and due process standards, significantly undercutting the predictable and uniform application of the law, while serially undermining the Wisconsin Election Code.

30.     It is the policy of the State of Wisconsin that "voting by absentee ballot is ['in contrast' to the constitutional right of in-person voting] a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse." Wis. Stat. § 6.84(1).

31.     As explained herein, the Plaintiff seeks a very precise remedy to uphold the exclusive authority of the Wisconsin Legislature granted in Article II of the United States Constitution regarding the conduct and manner in Wisconsin for appointing Electors to vote for the President of the United States. Plaintiff seeks a declaration and preliminary and permanent injunction that the Defendants and their practices described in this Complaint infringed and invaded upon the Wisconsin Legislature's prerogative and directions under Article II of the U.S. Constitution regarding the conduct of the 2020 Presidential election in Wisconsin and will, if continued, do so in future elections.[1] After issuance of the requested declaratory and injunctive relief, Plaintiff asks this Court to immediately remand this matter to the Wisconsin Legislature to review the nature and scope of the infringement declared and determine the appropriate remedy for the constitutional violation(s) established, including any impact upon the allocation of Presidential electors for the State of Wisconsin.

---

[1] Plaintiff incorporates his motion for expedited declaratory, preliminary and permanent injunctive relief filed contemporaneously with this Complaint.

7

Case 2:20-cv-01785-BHL Filed 12/02/20 Page 206 of 295 Document 119-5
Case 2:20-cv-01785 Filed 12/01/20 Page 96 of 72 Document 1

# PROCEDURAL CONTEXT

32.     The Electoral College is scheduled to meet on December 14, 2020.[2]

33.     The matters addressed in this Complaint must be considered expeditiously and <u>Plaintiff is contemporaneously with the filing of this Complaint filing a separate motion requesting that this matter be set for a hearing within forty-eight (48) hours on Plaintiff's motion for expedited declaratory, preliminary and permanent injunctive relief or within such other shortened time period which the Court determines reasonable under the circumstances and which will permit all parties an opportunity for appeals at all levels of the federal judicial system to be completed by December 11, 2020</u>.[3]

34.     Given the unique nature of the issues raised herein, Plaintiff's Complaint sets forth the basic legal authorities and principles upon which Plaintiff relies. Therefore, pursuant to Civil L.R. 7(a)(2) Plaintiff is filing a certificate stating that no additional memorandum or other supporting papers will be filed supporting his initial motion for expedited declaratory, preliminary and permanent injunctive relief outside of this Complaint and the exhibits filed in support of this Complaint.

35.     Plaintiff's requests for relief are based on public documents and facts not significantly in dispute and, in any case, should be capable of presentation within a one-day hearing.

36.     Plaintiff's requests for relief are based upon the following allegations.

---

[2] 3 U.S.C. § 7.

[3] This request is underlined to draw it to the attention of the Court, court staff and Defendants' counsel.

Case 2:20-cv-01785-BHL Filed 12/02/20 Page 207 of 295 Document 119-5
Case 2:20-cv-01785 Filed 12/01/20 Page 87 of 72 Document 1

## BACKGROUND

### The Electors Clause of the U.S. Constitution

37.     Article II of the United States Constitution requires that each State "shall appoint" its Presidential electors "in such Manner as the *Legislature thereof* may direct." U.S. CONST. art. II, § 1, cl. 4 (emphasis added).[4]

38.     Thus, "in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Bush v. Palm Beach Cty. Canvassing Bd*., 531 U.S. 70, 76 (2000).

39.     "[T]he state legislature's power to select the manner for appointing electors is plenary." *Bush v. Gore*, 531 U.S. 98, 104 (2000).

40.     Therefore, a state supreme court cannot invoke a state constitution to circumscribe that legislative power. *Palm Beach Cty. Canvassing Bd*., 531 U.S. at 77.

41.     For the same reasons, neither can an executive branch official, such as a Governor of a State, a mayor of a municipality or an election officer in the State, a municipal clerk, or any administrative body or member of such a body, lawfully circumscribe, alter, limit, amend or fail to enforce or refuse to enforce a law enacted by the State Legislature which is, or was intended by the Legislature to be, applicable to the Presidential election in the State.

---

[4] *See also* id. art. I, § 4, cl. 2 (providing that, in each State, the "Legislature thereof" shall establish "[t]he Times, Places and Manner of holding Elections for Senators and Representatives").

## The Election Clauses and Separation of Powers Provisions of the U.S. Constitution Safeguard Liberty and Fair and Free Elections

42.     Whether the State of Wisconsin and its public officials respected the limits of the United States Constitution's Electors Clause is a matter of fundamental national importance not limited to the interests of Wisconsin voters or merely those individuals who voted in the 2020 Presidential Election in Wisconsin.

43.     The U.S. Supreme Court has long recognized that "in the context of a Presidential election," "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983).

44.     "For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Id.*

45.     Consistent with other separation-of-powers provisions in the Constitution, the explicit allocation of authority to state legislatures to regulate federal elections, seen in both the Electors Clause and in the authority of state legislatures stated in Art. I, § 4, cl. 2 to establish the time, place and manner of holding elections for Senators and U.S. Representatives (collectively, the "Election Clauses") are a structural check on governmental power which preserve liberty, freedom, and fair elections for all Americans.[5]

---

[5] Counsel for Plaintiff wishes to credit the compelling arguments raised in the *Brief of the State of Missouri and Nine Other States as Amici Curiae in Support of Petitioners* (*i.e.*, the states of Missouri, Alabama, Arkansas, Florida, Kentucky, Louisiana, Mississippi, South Carolina, South Dakota and Texas) in the case of *Republican Party of Pennsylvania v. Boockvar*, Nos. 20-542, 20-574, On Petition for Writs of Certiorari to the Pennsylvania Supreme Court (filed Nov. 9, 2020). The arguments of the Attorneys General on behalf of their States have been liberally borrowed from herein without further attribution, particularly in relation to separation of powers

10

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 209 of 295   Document 1
Case 2:20-cv-01785   Filed 12/09/20   Page 10 of 25   Document 119-5

46. Encroachment on this authority by another state actor from the other branches of government undercuts the specific design for separation of powers in the federal constitution and diminishes one of the most cherished liberties for all Americans, the right to vote for President of the United States.

47. It is nearly uniformly recognized that the separation-of-powers provisions in the Constitution, which allocate authority to specific governmental actors to the exclusion of others, are designed to preserve liberty.

48. "The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

49. "Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours." *Id.* "The purpose of the separation and equilibration of powers in general . . . was not merely to assure effective government but to preserve individual freedom." *Id.* at 727.

50. Given the overriding importance of both separation of powers and free and fair elections to our republican form of government, upholding the Electors Clause against infringement is a Constitutional issue of the highest magnitude.

51. American liberty is safeguarded by the time-tested structure of our government and the wise provisions for its order found in the United States Constitution.

---

principles under the Electors Clause and the States' concerns regarding maintaining uniform standards against absentee ballot fraud.

11

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 210 of 295   Document 1
Case 2:20-cv-01785   Filed 12/09/20   Page 11 of 73   Document 119-5

52. The idea that the Constitution's division of powers protects liberty applies both to the checks and balances between the branches of government *and* to the checks and balances between the federal government and the States.

53. As James Madison said, in *Federalist 45*: "The State governments may be regarded as constituent and essential parts of the federal government; whilst the latter is nowise essential to the operation or organization of the former. Without the intervention of the State legislatures, the President of the United States cannot be elected at all. They must in all cases have a great share in his appointment, and will, perhaps, in most cases, of themselves determine it."[6]

54. "The federal system rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220–21 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). "[F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond*, 564 U.S. at 221 (2011) (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)). "Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions." *Id*.

55. The Supreme Court recognizes that "federalism enhances the opportunity of all citizens to participate in representative government." *FERC v. Mississippi*, 456 U.S. 742, 789 (1982) (O'Connor, J., concurring in part and dissenting in part). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of

---

[6] *The Federalist Papers*, Federalist No. 45, *available at*: https://avalon.law.yale.edu/18th_century/fed45.asp.

power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

56.     The Election Clauses' grant of authority to state *Legislatures* implements both horizontal and vertical separation of powers. The Clauses allocate to each State—not to federal actors—the authority to dictate the manner of selecting Presidential electors.

57.     And within each State, the Election Clauses explicitly allocate that authority to a single branch of state government: to the "Legislature thereof."

58.     It is not accidental that the Constitution allocates the authority to direct how Presidential Electors will be chosen to state Legislatures alone, rather than executive officers, judicial officers or administrative officials.

59.     The Constitutional Convention's delegates frequently recognized that the Legislature is the branch most responsive to the People and most democratically accountable. *See*, *e.g.*, Robert G. Natelson, *The Original Scope of the Congressional Power to Regulate Elections*, 13 U.PA. J. CONST. L. 1, 31 (2010) (collecting ratification documents expressing that state legislatures were most likely to be in sympathy with the interests of the people); Federal Farmer, No. 12 (1788), *reprinted in* 2 THE FOUNDERS' CONSTITUTION (Philip B. Kurland & Ralph Lerner eds., 1987) (arguing that electoral regulations "ought to be left to the state legislatures, they coming far nearest to the people themselves"); THE FEDERALIST NO. 57, at 350 (C. Rossiter, ed. 2003) (Madison, J.) (stating that the "House of Representatives is so constituted as to support in its members an habitual recollection of their dependence on the people"); *id.* (stating that the "vigilant

and manly spirit that actuates the people of America" is greatest restraint on the House of Representatives).

60.     The historical record is clear that the Founders entrusted the solemn responsibility to determine the manner of election of the President to state legislatures because they recognized that state legislatures – more than any other locus of government power – are the people's representatives and bastions of democratic accountability. A system of federalism, separation of powers, and constitutional government is enshrined in Article II.

61.     By identifying the "Legislature thereof" in each State as the regulator of elections for federal officers, the Election Clauses prohibit the arrogation of power over Presidential elections by non-legislative officials and are a safeguard against corruption.

62.     The Framers recognized that unelected bureaucrats in charge of elections for President of the United States pose a far greater risk to liberty than the People's elected representatives in each State having exclusive and unfettered jurisdiction over the rules for federal elections and the manner of appointing Presidential electors.

63.     Therefore, it is essential that actions which usurp the power invested in the Wisconsin Legislature by the Elections Clauses not stand in the 2020 Presidential Election, and all future elections.

**Whether Election Administrators Adhered to the Direction of the Wisconsin Legislature in the Conduct of the Presidential Election Presents a Justiciable Issue**

64.     It is, of course, imminently likely that the Wisconsin Legislature is aware of some, if not all, of the issues and concerns pertaining to administration of the 2020 Presidential election in the State of Wisconsin.

14

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 213 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/02/20   Page 14 of 25   Document 1

65.     For instance, it has been publicly reported that after the November 3 election the Speaker of the Wisconsin Legislature directed the Committee on Campaigns and Elections to conduct an election integrity investigation using subpoena powers to call witnesses.[7]

66.     This Court may take judicial notice of several election-related lawsuits filed in State and Federal courts pertaining to the election.

67.     Plaintiff recognizes that in relation to the Electors Clause of Article II of the U.S. Constitution it is ultimately the exclusive province of the Wisconsin Legislature to determine the remedy for violations of Article II of the U.S. Constitution in Wisconsin.

68.     However, as the Supreme Court has recognized since at least 1803, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. 137, 177, 2 L. Ed. 60 (1803).

69.     It is therefore proper in our federal system to bring questions concerning violations of laws to the courts.

70.     Questions about the laws surrounding the election and whether those laws were followed by state officials are justiciable even though in the unique context of the Electors Clause it is the State Legislature alone that has the *final* say on those questions and on the appointment of that State's electors.

71.     Courts are called upon to "respect . . . the constitutionally prescribed role of state *legislatures*" while enforcing against other state actors, whether they be courts, executives or election officials, the "responsibility to enforce the explicit requirements of Article II." *Bush v. Gore*, 531 U.S. at 115 (Rehnquist, C.J., concurring).

---

[7] "Assembly Speaker Calls For Investigation of Wisconsin Election," *Wisconsin Public Radio*, November 6, 2020, *available at*: https://www.wpr.org/assembly-speaker-calls-investigation-wisconsin-election. Submitted as Exhibit **1** to Plaintiff's Complaint.

15

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 214 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 15 of 25   Document 119-5

72. Therefore, it is the duty of the courts, when presented with potential violations of the Electors Clause of Article II of the U.S. Constitution, to receive evidence and adjudicate whether a violation has been established.

## WISCONSIN LEGISLATURE'S EXPRESS POLICICIES AND DIRECTIONS REGARDING ELECTIONS

73. The Wisconsin Legislature's directions regarding the conduct of Presidential elections in Wisconsin can be found in the Wisconsin Election Code. Wis. Stat. §§ 5-12 *et seq*.

## Wisconsin Law Requires Photo Identification for In-Person Voters and Most Absentee Voters

74. For instance, the Wisconsin Legislature added a requirement to the Wisconsin Election Code in 2014 that requires an "elector"[8] to present one of ten acceptable forms of photo identification to vote. Wis. Stat. § 5.02 (6m) (a) – (g).

75. Wisconsin's voter photo identification law was upheld by the Wisconsin Supreme Court which noted that, "[s]ince 1859, [it] ha[s] held that 'it is clearly within [the legislature's] province to require any person offering to vote[] to furnish such proof as it deems requisite[] that he is a qualif[i]ed elector." *League of Women Voters of Wisconsin Education Network, Inc. v. Walker*, 851 N.W.2d 302, 305 (Wis. 2014), (quoting *Cothren v. Lean*, 9 Wis. 254, 258 (1859)).

76. Wisconsin's photo identification law applies to all in-person voters[9] and, with only very narrow and limited exceptions, to the *first time* a Wisconsin voter casts an absentee ballot.[10]

---

[8] The term "elector" in the Wisconsin Election Code typically refers to a voter. The terms "voter" and "elector" are generally used interchangeably herein, except when referring to Presidential Electors.

77.     However, once a voter has voted absentee the first time and provided a copy of their identification with their absentee ballot, thereafter when voting absentee the voter need not provide identification, unless their name or address changes. Wis. Stat. § 6.87(4)(b)3.[11]

78.     There are limited exceptions to the photo identification requirement for absentee voters (*i.e.*, the requirement the absentee voter provide a copy of their photo ID the first time they vote absentee) for overseas and military voters and a limited class of essentially disabled absentee voters.

79.     These limited exceptions to the photo identification requirement for absentee voting apply only to: residents of qualified retirement and care facilities,[12] military and overseas voters,[13] and absentee voters who automatically receive absentee ballots as a voter "indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period [and who has] sign[ed] a statement to that effect." Wis. Stat. § 6.86(2)(a).

---

[9] *See* Wis. Stat. § 5.02(6m), 5.02(16c) (pertaining to "identification" and providing that in most instants photo identification is required); § 6.79(2)-(3) (pertaining to providing proof of identification at the polling place).

[10] Wis. Stat. § 6.87(1) ("Unless application is made in person under s. 6.86(1)(ar), the absent elector is exempted from providing proof of identification under sub. (4)(b)2. or 3., or the applicant is a military or overseas elector, the absent elector shall enclose a copy of his or her proof of identification or any authorized substitute document with his or her application. The municipal clerk shall verify that the name on the proof of identification conforms to the name on the application. The clerk shall not issue an absentee ballot to an elector who is required to enclose a copy of proof of identification or an authorized substitute document with his or her application unless the copy is enclosed and the proof is verified by the clerk.").

[11] Wis. Stat. Ann. § 6.87(4)(b)3 provides: "If the absentee elector has received an absentee ballot from the municipal clerk by mail for a previous election, has provided proof of identification with that ballot, and has not changed his or her name or address since providing that proof of identification, the elector is not required to provide proof of identification."

[12] Wis. Stat. § 6.875.

[13] Wis. Stat. § 6.865.

80.     Regarding absentee voters who do not have to provide photo identification because they are indefinitely confined by age, illness or infirmity or disabled for an indefinite period, the voter is entitled to vote absentee if "in lieu of providing proof of identification, [the voter] submit[s] with his or her absentee ballot a statement signed by the same individual who witnesses voting of the ballot which contains the name of the elector and verifies that the name and address are correct." Wis. Stat. § 6.87(4)(b)2.

81.     The transparent purpose of these precisely written exceptions to Wisconsin's photo identification requirement for first time absentee voters is to confine those who need not provide photo identification when voting absentee to only military and overseas voters and those who are institutionalized or of significantly restricted mobility (i.e., "indefinitely confined" or "disabled for an indefinite period") due to one or more of four (4) limiting physical conditions: age, physical illness, infirmity or disability.

82.     Wisconsin law also provides that once an absentee voter provides proof of identification with their initial absentee ballot(s), in subsequent elections in which that person votes absentee they no longer have to provide proof of identification if their name and/or address have not changed. Wis. Stat. § 6.87(4)(b)3.

**Wisconsin Public Officials Misapplied Wisconsin's "Indefinitely Confined" or Indefinite Period of Disability Exceptions, Undermining Wisconsin Election Law and Permitting Likely Tens of Thousands of Voters to Improperly Vote Absentee Without Complying with Wisconsin's Photo Identification Law**

83.     As explained below, in 2020 a number of public officials in Wisconsin's largest municipalities contended that the COVID-19 pandemic rendered voters "indefinitely confined because of age, physical illness or infirmity or . . . disabled for an

indefinite period"[14] and permitted tens of thousands of voters to vote absentee without a condition of age, illness or infirmity that rendered them indefinitely confined or indefinitely disabled.

84. For instance, on March 29, 2020, the Wisconsin Elections Commission issued written guidance distributed to all election officials in the State and posted on the Commission website that "[d]uring the current public health crisis, *many voters* of a certain age or in at-risk populations *may meet that standard of indefinitely confined until the crisis abates*."[15]

85. This guidance contradicts Wis. Stat. § 6.86(2)(a) which requires an actual and verifiable physical or temporal condition being presently experienced by the voter (*i.e.*, age, physical illness or infirmity or disability) to justify an application for an absentee ballot based on indefinite confinement or indefinite disability and not a inchoate fear or apprehension experienced by the voter.

86. Contrary to the express terms of the Wisconsin Election Code, the Commission's guidance sought to alter the Election Code and plainly conveyed to election officials and the public that the COVID-19 pandemic *alone* could satisfy the requirement for the voter to request an absentee ballot.

87. Moreover, as explained above, not only did the Commission's guidance open the floodgates to absentee balloting by every voter in the State of Wisconsin, it opened the door to the wide scale circumvention of Wisconsin's photo identification law

---

[14] Wis. Stat. § 6.86(2)(a).
[15] Guidance for Indefinitely Confined Electors, Covid-19, Wisconsin Elections Commission, March 29, 2020, (emphasis added) *available at*: https://elections.wi.gov/node/6788. Submitted as Exhibit **2** to Plaintiff's Complaint.

19

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 218 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 18 of 72   Document 119-5

which was enacted by the Legislature specifically to help ensure election integrity in the State.

88.    The motives of the Commission in issuing this erroneous guidance are not at issue here, what matters is that the Commission lacked the authority to issue a guidance which *de facto* changed Wisconsin election law and circumvented the Legislature's absentee ballot and photo identification requirements for tens of thousands of voters. *See*, *e.g.*, *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) ("However well-intentioned and appropriate from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code, at least as it pertains to selection of presidential electors.").

89.    The Commission's March 29, 2020, guidance was inaccurate and misleading in other particulars. For instance, it conveyed: "Statutes do not establish the option to require proof or documentation from indefinitely confined voters. *Clerks* may tactfully verify with voters that the voter understood the indefinitely confined status designation when they submitted their request but they *may not request or require proof*."[16] This instruction doubly undermined the Election Code. First, it emphasized to voters that no election official would ever check or challenge their assertion of "indefinitely confined" status, thereby, affirming in writing there would be no ramifications for non-compliance with the law. Second, the instruction tied the hands of election officials throughout the State who were told they could not even "request" a voter confirm the basis for a claim the voter was entitled to receive an absentee ballot. Throughout the Election Code it is clear that the Wisconsin Legislature intends election

---

[16] *Id.*

officials to question and where necessary even challenge the assertions of a voter.[17] To the contrary, the Commission's guidance told Wisconsin's election officials not to enforce the law and effectively gutted Wisconsin's photo identification law and statutory absentee ballot limitations, rendering them substantially less effective in the 2020 Presidential election and for potentially many elections to come.

90.     The consequences of the Commission's erroneous guidance which improperly changed the application of Wisconsin law were at least two-fold:

(1) Contrary to Wisconsin law and the policy of the Wisconsin Legislature, it is estimated that over 150,000 individuals were permitted to vote on November 3, 2020, without producing any photo ID whatsoever (by relying upon the "indefinitely defined" or indefinite period of disability exceptions they could vote simply by submitting a statement from an individual who witnessed them voting); and

---

[17] *See*, *e.g.*, Wis. Stat. §§ 6.325 (elector may be disqualified if an election official "demonstrates beyond a reasonable doubt that the person does not qualify"; election officials "may require naturalized applicants to show their naturalization certificates"); 6.48 ("Any registered elector of a municipality may challenge the registration of any other registered elector"); 6.79 (if an elector claims to be unable to sign the poll list the election officials at the polls may elect not to waive the signature requirement and challenge the elector's ballot, in which case for the elector's vote to be counted the elector must "provide evidence of his or her physical disability to the board of canvassers"); 6.87(1) (requiring a clerk to verify an absentee voter's proof of identification and specifying that the clerk "shall not issue an absentee ballot to an elector who is required to enclose a copy of proof of identification" and has not done so); 6.87(6) (providing that any absentee ballot "not mailed or delivered as provided in this subsection may not be counted"); 6.92 ("each inspector shall challenge for cause any person offering to vote whom the inspector knows or suspects is not a qualified elector or who does not adhere to any voting requirement under this chapter" and providing that the inspector may put any elector under oath or affirmation to examine them with questions about the "qualifications" of an elector); 6.925 (allow for electors to challenge other electors for cause); 6.93 (allowing the votes of absent electors to be challenged for cause); 6.94 (providing that if a challenged elector does not answer questions put to the elector "the inspectors shall reject the elector's vote"); 7.15(e) (setting for the duty of municipal clerks to "inspect systematically and thoroughly the conduct of elections in the municipality so that elections are honestly, efficiently and uniformly conducted").

21

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 220 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 21 of 72   Document 119-5

(2) If this erroneous interpretation of law is not corrected, these individuals will henceforth in future elections be able to vote absentee without showing either ID or even providing a statement from a witness who observed them voting and can vouch for their identification.

91.     Other election officials, including those in Wisconsin's two most numerous counties, Dane and Milwaukee counties, provided erroneous guidance to the public.

92.     For instance, on or about, March 25, 2020, the Clerk of Dane County, Scott McDonell, publicly advised Dane County voters and others throughout the State to declare themselves "indefinitely confined" under Wis. Stat. § 6.86(2) in order to avoid having to provide proof that they are eligible voters.

93.     Defendant McDonell issued the following statement on his Facebook page:

> I have informed Dane County Municipal Clerks that during this emergency and based on the Governors Stay at Home order I am declaring all Dane County voters may indicate as needed that they are indefinitely confined due to illness. This declaration will make it easier for Dane County voters to participate in this election by mail in these difficult times. I urge all voters who request a ballot and have trouble presenting [a] valid ID to indicate that they are indefinitely confined.
>
> People are reluctant to check the box that says they are indefinitely confined but this is a pandemic…. The process works like this:
>
> • A voter visits myvote.wi.gov to request a ballot.
>
> • A voter can select a box that reads "I certify that I am indefinitely confined due to age illness, infirmity or disability and request ballots be sent to me for every election until I am no longer confined or fail to return a ballot.["]
>
> • The voter is then able to skip the step of uploading an ID in order to receive a ballot for the April 7 election. Voters are confined due to the

COVID-19 illness. When the Stay at Home order by the Governor is lifted, the voter can change their designation back by contacting their clerk or updating their information in myvote.wi.gov. Voters who are able to provide a copy of their ID should do so and not indicate that they are indefinitely confined.[18]

94.     The foregoing instruction by the Dane County Clerk went even beyond the encouragement of the Wisconsin Elections Commission to side-step the law and actively encouraged voters to purposefully request an absentee ballot and declare themselves indefinitely confined in order to avoid the photo identification requirements of Wisconsin law.

95.     The Dane County Clerk would later be reprimanded by the Wisconsin Supreme Court for his encouragement to voters to avoid the law. But the damage was irretrievable, particularly because the Wisconsin Elections Commission never retracted its erroneous guidance that advised voters in the November 3, 2020, election that no one would even question their use of the "indefinitely confined" exception to avoid the photo identification and absentee ballot laws.

96.     On March 25, 2020, the Dane County Clerk emailed the same announcement and instructions to all clerks responsible for administering elections in the municipalities within Dane County.[19]

97.     A similar notice was given by the Milwaukee County Clerk.[20]

---

[18] *See* Exhibit **3** to Plaintiff's Complaint (Screenshot of re-posted Facebook Post of Scott McDonell) (emphasis added).

[19] "Absentee voters in Milwaukee, Dane counties can say they're 'indefinitely confined' and skip photo ID, clerks say," *Milwaukee Journal Sentinel*, March 25, 2020, *available at*: https://www.jsonline.com/story/news/local/milwaukee/2020/03/25/absentee-voters-milwaukee-dane-counties-can-skip-photo-id-coronavirus-indefinitely-confined/5085017002/. Submitted as Plaintiff's Exhibit **4**.

[20] *Id.*

23

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 222 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 23 of 72   Document 119-5

98. After the Primary Election members of the Wisconsin Legislature made clear that the COVID-19 pandemic did not change mandatory provisions of Wisconsin election law which still could and should be applied uniformly during the pandemic.

99. For instance, Wisconsin Senators Roger Roth and Jim Steineke wrote, "[w]hile we of course need to make adjustments to our everyday lives to help flatten the curve for COVID-19 and keep our health care workers, elderly, and most vulnerable safe, making sweeping changes to our most basic right, voting, should be the last thing we consider, especially given the flexibility of Wisconsin's current system."[21]

100. But the Wisconsin Elections Commission never withdrew its erroneous guidance which facilitated avoiding the requirements of Wisconsin law.

101. Whatever excuses may be given for the conduct of election officials before the primary election, by the time of the November 3, 2020 General Election there could be no reasonable or lawful contention that the COVID-19 pandemic provided an excuse to avoid Wisconsin's election laws. *Carson*, 978 F.3d at 1060.

102. By failing to abide by its statutory obligation to engage in the proper application of Wisconsin's absentee ballot provisions and Wisconsin's voter identification law, the Wisconsin Elections Commission and Defendant County and Municipal Clerks and other public officials, ensured an unequal and inconsistent application of the law and permitted thousands of ballots to be accepted based on the improper and inaccurate claim that the COVID-19 pandemic continued to justify a wide scale failure to apply Wisconsin voting laws.

---

[21] "Rep. Jim Steineke and Sen. Roger Roth: All-mail ballot proposal: return to sender," *The Cap Times*, April 20, 2020, *available at*: https://madison.com/ct/opinion/column/rep-jim-steineke-and-sen-roger-roth-all-mail-ballot-proposal-return-to-sender/article_68db7ebd-a638-53e9-ba06-f499342f0b98.html. Submitted as Plaintiff's Exhibit **5**.

24

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 223 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 24 of 75   Document 119-5

103.    These actions by the Commission, other Defendants and election officials throughout Wisconsin were directly contrary to Wisconsin law for all the reasons discussed above.

104.    The conduct of these state and local officials directly affected the 2020 Presidential Election in Wisconsin which was decided by some 20,000 votes, making it impossible to know with certainty who won the Presidential Election as tens of thousands of ballots were counted without full compliance and contrary to the manner the Wisconsin Legislature directed in the Wisconsin Election Code.

105.    Regarding the Presidential Election in Wisconsin, it is clear that due to the conduct of the Defendants unlawful ballots under Wisconsin Law and the Electors Clause of the U.S. Constitution were cast and counted, throughout the State.

106.    In 2019, roughly 72,000 Wisconsin voters were identified as indefinitely confined. However, at least in part because of the Wisconsin Elections Commission's inaccurate guidance and other such actions, by November 2020 that number had risen to 243,900 voters, effectively overturning Wisconsin's voter identification law as to some 170,000 or more individuals, and dramatically increasing the number of mail-in ballots in the State contrary to the policy and direction of the Wisconsin Legislature.[22]

107.    The interpretative usurpation and erroneous official guidance from the Wisconsin Elections Commission, which altered the application of the Election Code and effectively annulled certain provisions of the Election Code, circumvented the Wisconsin

---

[22] *See*, *e.g.*, "Republicans say thousands in Wisconsin may have circumvented voter ID requirement," Washington Examiner, Nov. 10, 2020, *available at*: https://www.washingtonexaminer.com/news/republicans-say-thousands-in-wisconsin-may-have-circumvented-voter-id-requirement. Submitted as Plaintiff's Exhibit **6**.

25

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 224 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 25 of 72   Document 119-5

Legislature's express direction that voting by absentee ballot is a "privilege,"[23] not a right, and that absentee balloting must be "carefully regulated to prevent the potential for fraud or abuse."[24]

108.    These outright usurpations of the Wisconsin Legislature's authority by Wisconsin officials, including the Wisconsin Elections Commission, municipal and county clerks and others who provided inaccurate guidance to voters, encouraging voters to violate the law and then accepting those violations as though they were lawful, fostered predictable administrative issues, including by circumventing Wisconsin's photo identification law and expanding the number of absentee ballots, which made Wisconsin's election less secure, more difficult to administer, and more subject to error.

## The Wisconsin Legislature Expressly Disfavors Mail-In Voting and Has Sought to Limit the Practice in Wisconsin

109.    Wisconsin is a "no excuse" absentee voting state, meaning that a registered Wisconsin voter "who for any reason is unable or unwilling to appear at the polling place in his or her ward or election district" is entitled to request an absentee ballot. Wis. Stat. § 6.85(1).

110.    However, the fact that absentee balloting is available to all only means that the State has chosen not to superintend or monitor a voter's personal choice to vote absentee or not, it does not mean that the State encourages absentee voting.

111.    Rather, the Wisconsin Legislature has directed that absentee balloting is to be "carefully regulated" and has in place a clear system of rules regarding absentee voting that must be enforced by the State's election officials.

_____

[23] Wis. Stat. § 6.84(1).
[24] *Id*.

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 225 of 295   Document 1
Case 2:20-cv-01785   Filed 12/09/20   Page 26 of 72   Document 119-5

112.     The Wisconsin Election Code states a fact-based, healthy concern that mail-in balloting heightens the risk of fraud in elections conducted in Wisconsin.

113.     The Wisconsin Legislature makes it the express policy of the State of Wisconsin that "voting is a constitutional right, the vigorous exercise of which should be strongly encouraged. *In contrast, voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place.* The legislature finds that *the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse*; to prevent overzealous solicitation of absentee electors who may prefer not to participate in an election; to prevent undue influence on an absent voter to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses." Wis. Stat. § 6.84(1) (emphasis added).

114.     The Wisconsin Legislature's express written policy limiting mail-in balloting and emphasizing the Legislature's concern about mail-in ballot fraud is supported by substantial, well-known, and publically available, data and information, including the regular statements of the United States Supreme Court and many other courts around the country, which consistently and regularly warn of the dangers of mail-in ballot fraud.

**The Wisconsin Legislature's Concerns with Mail-In Ballot Fraud Are Reasonable and Well Founded**

115.     In *Crawford v. Marion County Election Board*, the U.S. Supreme Court recognized that fraudulent voting "perpetrated using absentee ballots" demonstrates "that not only is the risk of voter fraud real but that it could affect the outcome of a close

election." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 195-96 (2008) (opinion of Stevens, J.) (emphasis added).

116. This is why the bi-partisan Carter-Baker Commission on Federal Election Reform co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker concluded that "[a]bsentee ballots remain the largest source of potential voter fraud." BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, at 46 (Sept. 2005).[25]

117. According to the Carter-Baker Commission, "[a]bsentee balloting is vulnerable to abuse in several ways." *Id*. These abuses include interception of blank ballots, "pressure" and "intimidation" of elderly and vulnerable voters, "vote buying schemes" that are "far more difficult to detect when citizens vote by mail," and ballot tampering by third-party operatives after a ballot is marked. *Id*. The Commission noted that "absentee balloting in other states has been a major source of fraud." *Id*. at 35. And the Commission recommended that "States … need to do more to prevent … absentee ballot fraud." *Id*. at v.

118. Likewise, the most recent edition of the U.S. Department of Justice's Manual on *Federal Prosecution of Election Offenses*, published by its Public Integrity Section, highlights the same concerns with a higher degree for fraud to be perpetrated through mail-in ballots. *See* U.S. Dep't of Justice, Federal Prosecution of Election Offenses (8th ed. Dec. 2017), at 28-29 ("*DOJ Manual*").[26]

---

[25] BUILDING CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM (Carter-Baker Commission), Sept. 2005, *available at*: https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf. Submitted as Plaintiff's Exhibit **7**.
[26] *Federal Prosecution of Election Offenses*, 8th Ed. (2017), available at https://www.justice.gov/criminal/file/1029066/download. Submitted as Plaintiff's Exhibit **8**.

28

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 227 of 295   Document 119-5
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 23 of 72   Document 1

119.   The *DOJ Manual* states: "Absentee ballots are particularly susceptible to fraudulent abuse because, by definition, they are marked and cast outside the presence of election officials and the structured environment of a polling place." *Id.*

120.   The *DOJ Manual* reports that "the more common ways" that election-fraud "crimes are committed include … [o]btaining and marking absentee ballots without the active input of the voters involved." *Id.* at 28.

121.   And the *DOJ Manual* notes that "[a]bsentee ballot frauds" committed both with and without the voter's participation are "common." *Id.* at 29.

122.   The Department of Justice has for many years recognized the susceptibility of absentee balloting to higher levels of fraud and cheating. The 6th edition of the DOJ Manual (1995) contains the same "particularly susceptible" language on p. 23. It also says, "[t]he most frequently encountered election frauds are absentee ballot fraud and ballot box stuffing." p. 82.

123.   The high risks of mail-in ballot fraud are why many other nations disfavor or restrict entirely the use of mail-in ballots.

124.   For instance, a database of election survey responses from the Harvard Dataverse called *Perceptions of Electoral Integrity*, (PEI-7.0)[27] found that out of 166 countries only 40 used mailed ballots in their most recent national election.

125.   Out of the 216 countries and territories analyzed by the *International Institute for Democracy and Electoral Assistance Voting from Abroad Database*, only 88 permitted voters abroad to cast ballots in presidential elections.[28]

---

[27] Perceptions of Electoral Integrity, (PEI-7.0), Harvard Dataverse, Norris, Pippa; Grömping, Max, 2019, a*vailable at*: https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/PDYRWL. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

29

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 228 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 23 of 72   Document 119-5

126.     Merely weeks ago, a Missouri court considered extensive expert testimony reviewing absentee-ballot fraud cases and distilled their common features. *See Findings of Fact, Conclusions of Law, and Final Judgment in Mo. State Conference of the NAACP v. State*, No. 20AC-CC00169-01 (Circuit Court of Cole County, Missouri Sept. 24, 2020), *aff'd*, 607 S.W.3d 728 (Mo. *en banc* Oct. 9, 2020). The court found that cases of absentee-ballot fraud "have several common features that persist across multiple recent cases: (1) close elections; (2) perpetrators who are candidates, campaign workers, or political consultants, not ordinary voters; (3) common techniques of ballot harvesting, (4) common techniques of signature forging, (5) fraud that persisted across multiple elections before it was detected, (6) massive resources required to investigate and prosecute the fraud, and (7) lenient criminal penalties." *Id*. at 17.

127.     The court concluded that "fraud in voting by mail is a recurrent problem, that it is hard to detect and prosecute, that there are strong incentives and weak penalties for doing so, and that it has the capacity to affect the outcome of close elections." *Id*. In this recent case brought by the NAACP, the court recognized that "the threat of mail-in ballot fraud is real." *Id*. at 2.

128.     Some authorities have recognized that mail-in balloting can encourage and perpetuate systemic discrimination against the elderly and the illegal harvesting of coerced ballots from the institutionalized and infirm.

129.     *The New York Times* has reported:

---

[28] Voting from Abroad Database, International Institute for Democracy and Electoral Assistance, *available at*: https://www.idea.int/data-tools/data/voting-abroad. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020); *See, e.g.*, *Voting Fraud Is a Real Concern. Just Look Around the World* (summarizing mail-in voting restrictions in European nations). *Available at*: https://www.newsweek.com/voting-fraud-real-concern-just-look-around-world-opinion-1522535. Submitted as Plaintiff's Exhibit **9**.

30

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 229 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 30 of 73   Document 119-5

Election administrators have a shorthand name for a central weakness of voting by mail. They call it granny farming.

"The problem," said Murray A. Greenberg, a former county attorney in Miami, "is really with the collection of absentee ballots at the senior citizen centers." In Florida, people affiliated with political campaigns "help people vote absentee," he said. "And help is in quotation marks."

Voters in nursing homes can be subjected to subtle pressure, outright intimidation or fraud. The secrecy of their voting is easily compromised. And their ballots can be intercepted both coming and going.[29]

130.     Thus, the Wisconsin's Legislature's policy disfavoring mail-in balloting and the Wisconsin Election Code's provisions which seek to erect barriers to mail-in ballot fraud are rational and well within the discretion and authority of the Wisconsin Legislature.

## The Anticipated Competitiveness of the 2020 Presidential Election in Wisconsin Made it A Potential Target for Fraud

131.     It is material not only that the Defendant governmental officials undermined the Wisconsin Legislature's express directions and written guardrails against mail-in ballot fraud, but that these state actors did so to prepare for *this* Presidential election in Wisconsin.

132.     As discussed in numerous court cases, including those cited above, and in the study done by President Carter and Secretary Baker, and as acknowledged by the U.S. Department of Justice, it is well known that the risk of fraud increases in *close* elections.

133.     The U.S. Department of Justice's Manual on *Federal Prosecution of Election Offenses* emphasizes that election fraud typically occurs when the parties

---

[29] "Error and Fraud at Issue as Absentee Voting Rises," *The New York Times*, Oct. 6, 2012, *available at:* https://www.nytimes.com/2012/10/07/us/politics/as-more-vote-by-mail-faulty-ballots-could-impact-elections.html. Submitted as Plaintiff's Exhibit **10**.

31

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 230 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 31 of 72   Document 119-5

anticipate a close election, creating a strong motive to try to flip the outcome of the election through fraudulent activity. DOJ Manual, at 2-3, 27. As the Manual states, "the conditions most conducive to election fraud are close factional competition within an electoral jurisdiction for an elected position that matters." *Id*. at 2-3. "Election fraud does not normally occur in jurisdictions where one political faction enjoys widespread support among the electorate, because in such a situation it is usually unnecessary or impractical to resort to election fraud in order to control local public offices." *Id*. at 27. "Instead, election fraud occurs most frequently when there are fairly equal political factions, and when the stakes involved in who controls public offices are weighty." *Id*. "In sum, election fraud is most likely to occur in electoral jurisdictions where there is close factional competition for an elected position that matters." *Id*.

134.    As the U.S. Department of Justice recognizes, the potential for election fraud is highest where there is expected a "close" election "for an elected position that matters" – nothing could better describe the anticipated 2020 Presidential election in Wisconsin.

135.    It was not a secret and was well known and much publicized, for months before that the 2020 Presidential Election in Wisconsin might be pivotal to the national outcome.

136.    The *Real Clear Politics* elections site listed Wisconsin as a "top battleground" state throughout 2020.[30]

137.    President Trump only won Wisconsin's Presidential election in 2016 by just under 23,000 votes.

---

[30] *See, e.g.*, Real Clear Politics Top Battleground States Page, *available at*: https://www.realclearpolitics.com/elections/trump-vs-biden-top-battleground-states/. Submitted as Plaintiff's Exhibit **11**.

32

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 231 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/02/20   Page 32 of 72   Document 119-5

138.    Wisconsin's reputation as a "top battleground state" was borne out in the 2020 Presidential election.

139.    Wisconsin engaged in a recount in Dane and Milwaukee Counties, with preliminary vote totals from the November 3, 2020 election showing an approximate 20,000 vote difference statewide between President Trump and former Vice President Joe Biden.

140.    Due to the anticipated close Presidential election in Wisconsin, the state's election officials should have been on high alert against fraud and sought to strictly enforce the Wisconsin Legislature's express policy disfavoring mail-in balloting.

141.    However, in numerous ways Defendants did the opposite.

142.    More than 30% of the ballots counted in the preliminary tabulations related to the 2020 Presidential election were mail-in ballots.

143.    Thus, Defendants' disobedience to the Wisconsin Legislature's directions regarding the conduct of the Presidential election pertaining to handling absentee ballots usurped the Legislature's "plenary" power under Article II of the Constitution and also increased the risk that fraud could infect a substantial number of the ballots counted in this election.

**The Disparate Impact of Mail-In Balloting**

144.    Mail-in balloting is not simply disfavored because of its susceptibility to fraud.

145.    Mail-in balloting is also disfavored because of its disparate impact upon different classes of voters and because of the very different way mail-in voters are treated vis-à-vis in-person voters.

146. As the Wisconsin Legislature has observed, mail-in voters are more susceptible to undue influence and even coercion and intimidation because mail-in balloting is done in private and outside the ability of the strict rules of the polling place to protect the voter.

147. Therefore, for instance, mail-in balloting is susceptible to systemic discrimination and abuse against the infirm and the elderly.

148. Mail-in balloting also discriminates against able-bodied voters, those who can vote in-person on Election Day, as Wisconsin's written state policy encourages.

149. This is so because in practice mail-in voting works against those who cast their ballot in-person in multiple pernicious ways.

150. For instance, the Wisconsin Legislature exercised its authority and judgment to protect Wisconsin voters against potential voter fraud by enacting voter identification legislation requiring Wisconsin voters to produce photo identification when they cast a ballot at a polling place.

151. Yet, Wisconsin voters who cast a mail-in ballot do not sign the poll book and do not have their identification checked by poll workers, unless voting by absentee for the first time, and are therefore not subject to continuing application of Wisconsin's photo identification law.

152. The voting process is different and less secure for mail-in voters in other ways.

153. Mail-in voting takes place in private and outside the purview of poll workers.

154. Consequently, mail-in voting also does not present the same opportunity to challenge the claimed identity of the voter that exists when every in-person voter must sign the voting list, to produce photo identification and is subject to challenge by a live poll worker and/or poll watcher. *See* Wis. Stat. § 6.79.

155. These are certainly some of the reasons that the Wisconsin Legislature has classified mail-in voting as a privilege and not a right.

156. Mail-in voting treats similarly situated voters differently, placing more obligations upon the in-person voter, while simultaneously creating a risk that in-person voters' votes will be diluted through the increased risk of fraud that mail-in balloting presents.

157. These elements clarify why many countries outside the United States ban mail-in balloting altogether or limit it far more than occurred in the 2020 Presidential election in Wisconsin.

158. These factors also clarify why it is crucial that the Wisconsin Legislature's express policy to closely regulate mail-in balloting be upheld and enforced.

159. Ultimately, when protections against voter fraud are lowered it disillusions the electorate and drives honest citizens out of the process. Nothing could be worse for democracy.

160. As the U.S. Court of Appeals for the Seventh Circuit observed earlier this year in a case upholding Wisconsin's absentee voting requirements, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *DNC v. Bostelmann*, No. 20-1538, 2020 WL 3619499, at *2 (7th Cir. Apr. 3, 2020) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S. Ct. 5, 7, 166 L. Ed. 2d 1 (2006)).

35

Case 2:20-cv-01785-BHL Filed 12/09/20 Page 234 of 295 Document 1
Case 2:20-cv-01785 Filed 12/02/20 Page 35 of 75 Document 119-5

161.     By failing to implement the directions of the Wisconsin Legislature in the Election Code, as required by the Electors Clause for Presidential Elections, state election officials inexorably set the State upon a path that generated the very distrust and disillusionment in the election process the Seventh Circuit warned about just months ago.

162.     The path forward that upholds the law and seeks to restore faith in the legal process related to Wisconsin elections is for this Court to declare that these failures by Wisconsin's election officials, which conflicted with their duties under the Election Code, abridged the Legislature's authority under the Electors Clause.

## 2020 PRESIDENTIAL ELECTION IN WISCONSIN

163.     In part due to the nearly year old COVID-19 pandemic, but also for many reasons contributed to by Defendants, there was a massive increase in mail-in balloting in the November 3, 2020, election in Wisconsin.

164.     Wisconsin voters have not voted absentee in large numbers before this year.

165.     For instance, some 146,932 mail-in ballots were returned in the 2016 General Election in Wisconsin out of more than 3 million votes cast.[31]

166.     In stark contrast, it is reported that some 1,275,019 mail-in ballots, nearly a 900% increase over 2016, were returned in the November 3, 2020 election.[32]

167.     While it can be contended that the increase in mail-in balloting is attributable to the COVID-19 pandemic, public documents demonstrate this is not the only reason.

---

[31] Source: U.S. Elections Project, *available at*: http://www.electproject.org/early_2016. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).
[32] Source: U.S. Elections Project, *available at*: https://electproject.github.io/Early-Vote-2020G/WI.html. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

**Mayors in Wisconsin's Five Largest Cities Adopted an Unlawful Plan to Expand Absentee Voting Using Prohibited, Un-Manned, Drop Boxes and the Wisconsin Elections Commission Supported the Unlawful Plan**

168.     Following the 2020 primary election, local officials in Wisconsin's five largest cities agreed to promote the expansion of mail-in voting in their cities and to adopt practices promoting and expanding mail-in voting that were banned by the Wisconsin Legislature.

169.     On June 15, 2020, the Mayors of the Cities of Madison, Milwaukee, Racine, Kenosha and Green Bay submitted a grant request to a not-for-profit organization, "Center for Tech & Civic Life," ("CTCL"), that the Mayors called "Wisconsin Safe Voting Plan 2020."[33]

170.     However, despite the name of the plan, it did not apply to the whole of Wisconsin, but only to their five cities.

171.     The five Mayors wrote that, "[a]s mayors in Wisconsin's five biggest cities" they had agreed to "work collaboratively" in relation to the remaining elections in 2020, including the 2020 Presidential election.[34]

172.     The five Mayors sought funding from CTCL to "[e]ncourage and [i]ncrease [a]bsentee [v]oting ([b]y [m]ail and [e]arly [i]n-person," to [u]tilize secure

---

[33] Wisconsin Safe Voting Plan 2020 Submitted to the Center for Tech & Civic Life, June 15, 2020, by the Mayors of Madison, Milwaukee, Racine, Kenosha and Green Bay (hereafter, "The 5 Mayors' Voting Plan") *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf. Submitted as Plaintiff's Exhibit **12**.

[34] 5 Mayors' Voting Plan, p. 1.

37

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 236 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/02/20   Page 36 of 72   Document 1

drop-boxes to facilitate return of absentee ballots" and to "[e]xpand . . . [c]urbside [v]oting."[35]

173.    The five Mayors' coordinated effort, particularly when the Wisconsin Legislature recognizes absentee voting as subject to an increased risk of fraud and stated it should be "carefully regulated," contradicted a fair and evenhanded approach toward election administration across Wisconsin and conflicted with the duties the Wisconsin Election Code imposes upon election officials.[36]

174.    For instance, the Mayors' plan to use "drop-boxes to facilitate return of absentee ballots" in Wisconsin's largest cities is directly contrary to Wisconsin law providing that absentee ballots may only be "mailed by the elector, or delivered *in person* to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b)1 (emphasis added).

175.    The fact that other methods of delivering absentee ballots, such as through unmanned drop boxes, are *not* permitted is underscored by Wis. Stat. § 6.84(2) which provides "with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. *shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election*." Wis. Stat. § 6.84(2) (emphasis added).

176.    Therefore, absentee ballot drop boxes are clearly illegal under Wisconsin law, and the Mayors' plan to use them, and indeed to proliferate them in their cities—for

---

[35] *Id*. at 4.
[36] The Wisconsin Election Code defines an "Election official" as "an individual who is charged with any duties relating to the conduct of an election," Wis. Stat. § 5.02(4e), which clearly encompasses mayors given that municipalities are charged with administering elections under Wisconsin law.

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 237 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/02/20   Page 38 of 72   Document 1

instance, Green Bay sought funding to install drop boxes at grocery stores and gas stations[37]— was a serious breach of the Wisconsin Election Code.[38]

177.    The use of these un-manned absentee ballot boxes is so seriously in violation of the Wisconsin Election Code that the Wisconsin Legislature has mandated that ballots collected in such a manner, "may not be included in the certified result of any election." Wis. Stat. § 6.84(2).

178.    Therefore, all absentee ballots collected at the illegal, un-manned absentee ballot drop boxes in Wisconsin were cast in direct contravention of the Wisconsin Election Code. As a result, these ballots have no legal weight in determining the outcome of the Presidential Election. The cities and other units of government that counted them simply broke the law and willfully defied the clear direction of the Wisconsin Legislature as to the Presidential election, committing a manifest violation of the Electors Clause.

179.    The Wisconsin Legislature is so concerned about the sites at which absentee ballots may be delivered that it specifically describes in the Election Code "Alternate absentee ballot site[s]" and details the procedure by which the governing body of a municipality may designate a site or sites for the delivery of absentee ballots "other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." Wis. Stat. 6.855(1) (emphasis added).

---

[37] 5 Mayors' Voting Plan, p. 10.
[38] As discussed below, there are several clear policies in the Wisconsin Election Code which are undermined by absentee ballot drop boxes, such as the desire to ensure that absentee voters are free to prepare and cast their ballots in secret, free from coercion and the desire to avoid ballot harvesting, *i.e.*, the practice of representatives of parties or candidates collecting ballots from individuals and delivering them to the polls, which can be coercive and subject balloting to other possibilities for manipulation.

39

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 238 of 295   Document 119-5
Case 2:20-cv-01785-BHL   Filed 12/02/20   Page 38 of 75   Document 1

180.     Any alternate absentee ballot site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners, or employees of the clerk or the board of election commissioners." Wis. Stat. 6.855(3).  Likewise, Wis. Stat. 7.15(2m) provides, "[i]n a municipality in which the governing body has elected to an establish an alternate absentee ballot sit under s. 6.855, the municipal clerk shall operate such site as though it were his or her office for absentee ballot purposes and shall ensure that such site is adequately staffed." Thus, unmanned absentee ballot drop-off sites as proposed by the Mayors, and ultimately used throughout their cities in the 2020 Presidential election, are prohibited by the Wisconsin Legislature.

181.     Despite the clear provisions of the Election Code described above, the Wisconsin Elections Commission endorsed the concept of un-manned absentee ballot drop boxes in official guidance to local Wisconsin election officials on August 19, 2020.[39]

182.     Notably, the guidance posted by the Commission on its website contained no analysis of the legality of such drop boxes under Wisconsin law.[40]

183.     As stated in the Commission's August 19 guidance, that guidance was drawn directly from a document distributed by the Cybersecurity and Infrastructure Security Agency (CISA) Elections Infrastructure Government Coordinating Council and Sector Coordinating Council's Joint COVID Working Group, an agency of the U.S. federal government.

---

[39] Wisconsin Elections Commission Memoranda, To: All Wisconsin Election Officials, Aug. 19, 2020, *available at*: https://elections.wi.gov/sites/elections.wi.gov/files/2020-08/Drop%20Box%20Final.pdf. Submitted as Plaintiff's Exhibit **13**.

[40] *Id*.; *see also* Wisconsin Elections Commission Notice, "Absentee Ballot Drop Box Information," To: Wisconsin County Clerks, Wisconsin Municipal Clerks, City of Milwaukee Election Commission, Milwaukee County Election Commission, Aug. 19, 2020, *available at*: https://elections.wi.gov/node/7036. Submitted as Plaintiff's Exhibit **14**.

184.    The CISA guidance document,[41] which was copied and reissued virtually verbatim (except for several telling exclusions discussed below) by the Wisconsin Elections Commission, included the following warning:

> *If you are considering the use of ballot drop boxes, you should review your existing laws and requirements and determine whether emergency changes may be necessary.* A full list of state practices can be found at the National Conference of State Legislators (NCSL) website listed in the Additional Resources section.[42]

185.    However, the foregoing warning was deleted from the guidance issued by the Wisconsin Elections Commission which guidance, as discussed above, patently conflicts with Wisconsin state law.

186.    As a consequence of the Commission's unlawful guidance, unauthorized, illegal, un-manned absentee ballot drop boxes were used in Wisconsin in the 2020 Presidential Election.

187.    Through the Commission's irresponsible August 19, 2020 guidance and related actions which encouraged local election officials in Wisconsin to implement, un-manned absentee ballot drop boxes in violation of Wisconsin law, the Commission created a wholly new process and procedure for casting an absentee ballot in Wisconsin not sanctioned by state law or the Wisconsin Legislature.

188.    On information and belief, it is understood that these failures by the Commission, the Mayors in Wisconsin's five largest cities and election administrators throughout Wisconsin resulted in unlawful, un-manned absentee ballot drop boxes being used in hundreds of locations throughout the State.

---

[41] CISA Ballot Drop Box Paper, *available at*: https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf. Submitted as Plaintiff's Exhibit **15**.
[42] *Id.* (emphasis added).

41

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 240 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 41 of 72   Document 119-5

189.	In fact, is understood that over five hundred un-manned, illegal, absentee ballot drop boxes were used in the Presidential election in Wisconsin.[43]

190.	Un-manned absentee ballot drop boxes opened the absentee voting process in Wisconsin to the unsavory and, in Wisconsin illegal, practice of ballot harvesting which is otherwise prevented by the requirement in the Election Code that absentee ballots may be voted only by depositing absentee ballots in the mail or by the voter delivering them directly to an authorized election worker at a designated absentee ballot site under Wis. Stat. § 6.855.

191.	Un-manned absentee ballot drop boxes permit a ballot harvester to drop off multiple absentee ballots at a time which cannot be legitimately accomplished when the statutory procedures for voting an absentee ballot in person are followed. *See* Wis. Stat. § 6.87.

192.	Absentee ballot harvesting opens the election process to the potential for fraud and coercion, identified by the Wisconsin Legislature as a prime concern and reason for the strict limitations on absentee voting contained in the Wisconsin Election Code. *See* Wis. Stat. 6.84(1) ("to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate . . . or other similar abuses").

---

[43] "Ballot drop boxes offer 'a safe place' for voting in Wisconsin's election," *Wisconsin Center for Investigative Journalism*, October 29, 2020, ("The drop box in the Green Bay suburb where Vincent deposited her ballot is one of more than 500 in the state, according to the Wisconsin Elections Commission.") *available at*: https://www.channel3000.com/ballot-drop-boxes-offer-a-safe-place-for-voting-in-wisconsins-election/ Submitted as Plaintiff's Exhibit **16**; "Search for a ballot drop box in your community using this tool," *Wisconsin Watch*, October 27, 2020, ("With Election Day just days away, voters are being urged to deposit their absentee ballots in one of the over 500 secure drop boxes across the state."), *available at*: https://www.wisconsinwatch.org/2020/10/wisconsin-absentee-ballot-drop-box-search/. Submitted as Plaintiff's Exhibit **17**.

42

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 241 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 42 of 72   Document 119-5

193. The Wisconsin Elections Commission's endorsement of standard-less, un-manned absentee ballot drop boxes violated the Wisconsin Election Code and fundamentally altered the 2020 President election in Wisconsin, breaking the detailed statutorily mandated custody, presentment and voting procedures for absentee ballots, *see* Wis. Stat. §§ 6.855, 6.87, 6.875, 6.88, 7.15(2m), thereby voiding the legality of all absentee ballots placed in these un-manned absentee ballot drop boxes. *See* Wis. Stat. §§ ("Notwithstanding s. 5.01(1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)(2). and (4) shall be construed as mandatory. *Ballots cast in contravention of the procedures specified in those provisions may not be counted*. Ballots counted in contravention of the procedures specified in those provisions *may not be included in the certified results of any election*.").

194. Because absentee ballot drop boxes are barred by the Wisconsin Election Code, there are no chain of custody and public access and observation standards or rules regarding the use of such drop boxes in the Wisconsin Election Code.

195. The Wisconsin Elections Commission's guidance on un-manned absentee ballot drop boxes contained absolutely no direction, instructions or standards for local election officials regarding the important aspects of ballot chain of custody, and openness to the public that are emphasized throughout the Wisconsin Election Code in relation to all other aspects of the voting and ballot handling processes.[44]

---

[44] *See*, *e.g.*, Wis. Stat. §§ 6.855, 6.86, 6.87, 6.875, 6.88.

196. Tellingly, the following section from the CISA guidance document was entirely omitted from the Commission's guidance to Wisconsin election officials:

**Election Night and Closing Boxes**

You need to give special consideration to returning temporary ballot drop boxes and locking permanent drop boxes on election night. Organizing teams from other county or city departments is one way to accomplish this. Essentially you need bipartisan teams to be at every ballot drop-off location precisely when polls close. Their responsibilities include:

☐ Identifying the voter or car in line at the time polls close and ensuring they have the opportunity to deposit their ballots.

☐ Retrieving the temporary indoor boxes and returning them to the counting facility.

☐ Locking the drop slot on the 24-hour boxes and transferring ballots to a ballot transfer bag or box and returning them to the counting facility.

☐ Completing "chain of custody" forms.[45]

197. No uniform standards were issued by the Commission regarding election night procedures, removing absentee ballots from the boxes, transport of the ballots to wards or counting centers, procedures for maintaining the security and chain of custody of the absentee ballots and for ensuring public accountability and observation throughout the process. These are all important aspects of the integrity of an election for which the Wisconsin Legislature has shown a strong concern in the Election Code. *See*, *e.g.*, Wis. Stat. 6.88.

198. Rather, in the rush to push the use of drop boxes, not only did the Commission not adopt standards for their use, the Commission deleted even the

---

[45] CISA Ballot Drop Box Paper, *available at*: https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf. Submitted as Plaintiff's Exhibit **15**.

44

Case 2:20-cv-01785-BHL Filed 12/09/20 Page 243 of 295 Document 119-5
Case 2:20-cv-01785 Filed 12/02/20 Page 44 of 72 Document 1

barebones notice about the need for standards in the meagre guidelines it issued. Thus, local officials were not even advised to consider adopting standards to guide the use of the ballot drop boxes.

199.    Without such standards and procedures there can be no assurance that the drop boxes and their contents were handled consistently throughout the State, regarding who had access to the ballots from the time they left the voters hands until they were ultimately delivered to election officials or even that ballots throughout the State were properly collected from the hundreds of unauthorized sites around the State. Therefore, even if the use of unmanned drop boxes were permissible under State law, it is clear that there was an abject lack of uniform standards regarding the handling, security and openness of the process to the public in connection with the new use of un-manned, absentee ballot drop boxes, rendering them constitutionally suspect under the Equal Protection and Due Process Clauses of the U.S. Constitution. *See Bush v. Gore*, 531 U.S. at 109 (observing that the election recount process at issue there was "inconsistent with the minimum procedures necessary to protect the fundamental right of each voter") ("there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied"); *Anderson v. Celebrezze*, 460 U. S. 780, 788, (1983) (States should adopt "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself."); *Storer v. Brown*, 415 U. S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.").

45

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 244 of 295   Document 1
Case 2:20-cv-01785   Filed 12/09/20   Page 45 of 72   Document 119-5

200.     Regarding un-manned absentee ballot boxes in Wisconsin in the 2020 President election, and as to the ballots that were housed therein, there can be no assurance that the ballots were secured, maintained, and transported in an equal and fair way because there were simply *no standards* in place in relation to these boxes.

201.     Rather, it is apparent that, although the use of these drop boxes was sanctioned by the Wisconsin Elections Commission, which operated an interactive list of such locations, using absentee ballot drop boxes in these locations was not subject to uniform rules or any acceptable standards, and there were no uniform chain of custody procedures or standards connected to their use. A review of an interactive list of absentee ballot drop boxes provided on the internet by the Wisconsin Elections Commission (the "WEC Drop Box List")[46] bears out the lack of any uniform standards related to the unmanned, absentee ballot drop boxes used in the 2020 Presidential election in Wisconsin:

-     For the drop box located in Hayward, Wisconsin, the information provided to the public on the WEC Drop Box List is: "Drop Box - Use Water & Sewer payment drop box located in the back of City Hall by the bulletin board."[47]

-     On the WEC List for the City of Menasha, Wisconsin there is a "Library Drop Box" with the instruction: "Designated book drop slot,"[48] apparently

---

[46] The WEC Drop Box List was accessible to the public and linked through internet articles. *See*, *e.g.*, "Search for a ballot drop box in your community using this tool," *Wisconsin Watch*, October 27, 2020, (Links to the WEC Drop Box List and allows public to search list of all drop boxes in state.), *available at*: https://www.wisconsinwatch.org/2020/10/wisconsin-absentee-ballot-drop-box-search/. Submitted as Plaintiff's Exhibit **17**; Screenshots of all of the drop box locations on the WEC Drop Box List are submitted as Plaintiff's Exhibit **18**.

[47] *See* Plaintiff's Exhibit **19**.

[48] *See* Plaintiff's Exhibit **20**.

indicating that absentee ballots may have been intermingled with library books and evidently that access to the ballots was available to library staff.[49]

- In the town of Vermont in Dane County the drop box instruction was: "Please drop ballots through the mail slot in the door."[50]

- For the Village of Deforest in Dane County the drop box instruction was: "Please use the night depository found in the vestibule of Village Hall to drop off your absentee ballot 24/7."[51]

- In the Village of Boyd the public was instructed: "Ballots can be placed in mail slot in front door of Village Hall."[52]

202. Thus, the Wisconsin Elections Commission and hundreds of election jurisdictions around the State acting under the imprimatur of the Commission, contrary to the express directions of the Wisconsin Legislature in the Wisconsin Election Code, employed a mish-mash of last minute unauthorized absentee ballot drop off locations which lacked uniform standards regarding security and chain of custody of the ballots and opened up the absentee ballot voting process to the very concerns for ballot harvesting identified by the Legislature in Wis. Stat. 6.84(1).

203. While everyone understands that public officials working in cities and towns across Wisconsin are dedicated and selfless, it should not be a moment of pride that the Wisconsin Elections Commission offered so little guidance that absentee ballots could be intermingled with library books and utility bills without any requirement for

---

[49] There were numerous drop boxes located at libraries and other locations where it appears the same slots or boxes were used to deposit books, utility bill payments and perhaps other papers somewhat less critical than ballots in a presidential election.
[50] *See* Plaintiff's Exhibit **21**.
[51] *See* Plaintiff's Exhibit **22**.
[52] *See* Plaintiff's Exhibit **23**.

chain of custody rules or fixed standards regarding who could access ballots. Nor did the Commission apparently require records to be kept of any of this.

204.    Milwaukee alone used 15 unauthorized, illegal, un-manned absentee ballot drop boxes in connection with the 2020 Presidential Election.[53]

205.    The illegal drop boxes were a last minute, unexpected addition to the election landscape in Wisconsin. For instance, Madison, Wisconsin added 14 un-manned, absentee ballot drop boxes on October 16, 2020, just two and a half weeks before the Presidential Election.[54] One of these drop boxes was placed in a large public park in Madison not adjacent to any building, making it an obvious potential location for dropping off multiple ballots in a ballot harvesting operation.[55]

206.    Pictures of these un-manned drop boxes are accessible in the articles referenced in the footnotes below and clearly demonstrate they do not meet the requirements for an alternate absentee ballot site described in the Wisconsin Election Code.[56]

207.    Yet another failure of the un-manned absentee ballot drop box program was that it ended up extending the election in some locations beyond the 8 p.m. deadline set in the Wisconsin Election Code for the close of the polls and the end of balloting. *See*

---

[53] *See*, *e.g.*, "Milwaukee gears up for historic election in which up to 70% of voters may not cast a ballot at polls on Nov. 3," *Milwaukee Journal Sentinel*, September 15, 2020, *available at*: https://www.jsonline.com/story/news/local/milwaukee/2020/09/15/milwaukee-offers-15-absentee-ballot-drop-boxes-november-election/5650834002/, Submitted as Plaintiff's Exhibit **24**; "Milwaukee absentee ballot drop boxes to be replaced this week with permanent versions," *Milwaukee Journal Sentinel*, October 27, 2020, *available at*: https://www.jsonline.com/story/news/politics/elections/2020/10/27/milwaukee-absentee-ballot-drop-boxes-replaced-week/6046375002/, Submitted as Plaintiff's Exhibit **25**.
[54] "City of Madison Unveils Secure Absentee Ballot Drop Boxes," *cityofmadison.com*, October 16, 2020, available at: https://www.cityofmadison.com/news/city-of-madison-unveils-secure-absentee-ballot-drop-boxes. Submitted as Plaintiff's Exhibit **26**.
[55] *Id*; The description for the Elver Park location on the WEC Drop Box List says, "Box is located in island of the circle drive near the park shelter." *See* Exhibit **27**.
[56] *See* photographs in connection with articles identified in footnotes above.

48

Case 2:20-cv-01785-BHL Filed 12/09/20 Page 247 of 295 Document 119-5
Case 2:20-cv-01785 Filed 12/09/20 Page 48 of 75 Document 1

Wis. Stat. §§ 6.78 ("The polls at every election shall be open from 7 a.m. until 8 p.m."). 6.87(6) (regarding absentee ballots, "[t]he ballot shall be returned so it is delivered to the polling place no later than 8 p.m. on election day."); 7.52 (regarding counties that canvass absentee ballots at a location other than the polling place, the municipality is only to "canvass all absentee ballots received by the municipal clerk by 8 p.m. on election day").

208.    Officials in a number of municipalities around Wisconsin announced that ballots could be deposited in un-manned drop boxes until 8 p.m. on Election Day.[57] This was incorrect, however, as a matter of law. As the un-manned drop boxes are not a polling place, a clerk's office, or an alternate absentee ballot site, ballots contained in drop boxes at 8 p.m. on Election Day could no longer be lawfully counted.

209.    Observance of the deadline for the close of the polls and the end of the balloting is clear in the Wisconsin Election Code, representing the firm and considered judgment of the Wisconsin Legislature that there must be an absolute cut-off for the time *and* place at which ballots must be received by 8 p.m. In locations in which absentee ballots are counted at the polls there is no grace period for ballots that have been mailed but not yet delivered to the polls as Wis. Stat. § 6.87(6) makes clear. Likewise, where absentee ballots are counted centrally only such ballots as have been "received by the municipal clerk by 8 p.m. on election day"[58] may be counted.

210.    Of course, as the Election Code does not contemplate un-manned absentee ballot drop boxes, there is no grace period in the Code for ballots placed in a drop box that were not delivered to the polls, to the municipal clerk's office or to an alternate

---

[57] *See*, Screenshots of drop box locations on the WEC Drop Box List submitted as Plaintiff's Exhibit **18**.
[58] Wis. Stat. § 7.52(1)(a).

49

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 248 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 48 of 72   Document 119-5

absentee ballot site. *See* Wis. Stat. §§ 6.855, 7.15(2m). Alternate absentee ballot sites must be "staffed" therefore un-manned drop boxes do not qualify. *Id.*

211. The importance of the timing and delivery provisions related to absentee balloting in the Wisconsin Election Code are clear, and under the Electors Clause they cannot be set aside by any state actor save the Wisconsin Legislature. *See Carson*, 978 F.3d at 1060-61 (finding that the Minnesota Secretary of State's "plan to count mail-in ballots received after the deadline established by the Minnesota Legislature will inflict irreparable harm on the [Presidential] Electors").

212. As the Eighth Circuit held in *Carson*, an election official's plan to count ballots received after the statutory deadline in a Presidential election violates the Electors Clause.

213. Likewise, decisions of election officials to count ballots from ballot boxes that were not emptied until 8 p.m. is just one more way that the poorly planned and executed drop box program created substantial and unfortunate conflicts with the Election Code to the detriment of both candidates and voters.

214. The unlawful unmanned ballot drop boxes used in Madison, Milwaukee, Racine, Kenosha and Green Bay in the 2020 Presidential Election, were an integral part of the five Mayors' plan to "encourage higher percentages of [the Mayors'] electors to vote absentee."[59]

215. Because of the unlawful drop boxes and the promotion of absentee voting in which Milwaukee planned to engage, that City "anticipate[d] that 80% of residents will vote absentee by mail."[60]

---

[59] 5 Mayors' Voting Plan, p. 7.
[60] *Id.* at 8.

216.    Recognizing "very small numbers of voters had traditionally chosen to cast ballots by mail," the five Mayors sought through their coordinated plan to "promote absentee voting,"[61] including through unlawful, unmanned drop boxes, "in the midst of a global pandemic when many voters are . . . apprehensive about in-person voting."[62]

217.    Yet, the five Mayors' Voting Plan included no data or analysis supporting the claim that in-person voting with social distancing and mask wearing was any less safe than voting via curbside voting or illegal drop boxes.

218.    The Mayors received the entire $6,324,567 request for funding they sought from CTCL[63] and the impact of the funding and their plan to expand absentee voting in their cities is undeniable.

219.    Madison recorded 90% turnout in the November 3, 2020 election;[64] Green Bay's turnout was 90%;[65] Milwaukee's turnout was 83%[66] and Kenosha's turnout was

---

[61] *Id*. at 7.
[62] *Id*.
[63] *See* "The 5 Mayors' Voting Plan") *available at*: https://www.techandciviclife.org/wp-content/uploads/2020/07/Approved-Wisconsin-Safe-Voting-Plan-2020.pdf. Submitted as Plaintiff's Exhibit **12**; CTCL Press Release: *CTCL Partners with 5 Wisconsin Cities to Implement Safe Voting Plan*, July 7, 2020, *available at*: https://www.techandciviclife.org/wisconsin-safe-voting-plan/. Submitted as Plaintiff's Exhibit **28**.
[64] Comparing 178,346 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 161,836 votes. Vote totals for the 2020 Election in Madison are *available in*: https://badgerherald.com/news/2020/11/04/voter-turnout-in-madison-dane-county-surpasses-record-2016-numbers/ Submitted as Plaintiff's Exhibit **29**.
[65] Comparing 52,064 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 47,375 votes. Vote totals for the 2020 Election in Green Bay are *available in*: https://www.greenbaypressgazette.com/story/news/politics/elections/2020/11/03/green-bay-election-2020-voters-go-polls-wisconsin/6117086002/. Submitted as Plaintiff's Exhibit **30**.
[66] Comparing 294,459 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 246,934 votes. Vote totals for the 2020 Election in Milwaukee are *available in*: https://county.milwaukee.gov/EN/County-Clerk/Off-Nav/Election-Results/Election-Results-Fall-2020. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).

51

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 250 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 51 of 72   Document 119-5

86%,[67] all compared to the number of registered voters they listed in their June 15, 2020, application for grant funding.

220.    These are extraordinary turn out ratios.

221.    However, the extraordinary voter turnout in these cities was achieved via an unlawful absentee-ballot expansion plan that flouted state law limits on absentee voting, reduced barriers to fraud, and introduced manifold opportunities for abuse by rushing in an untested, unauthorized, standardless new absentee balloting process in Wisconsin.

222.    Rather than seek to raise the protections surrounding mail-in ballots to address the increased risk of fraud associated with this type of voting, there was a directed effort by the five largest cities in Wisconsin to reduce the guardrails against mail-in ballot fraud and make the voting system less, rather than more, secure.

223.    CTCL funding like that received by the Mayors of Wisconsin's five largest cities to promote a massive absentee ballot expansion program and opened the doors to ballot harvesting and voter coercion, among other practices about which the Wisconsin Legislature has expressly stated its concerns, was also received by other jurisdictions across America.

224.    Publically available records indicate that at least 250 million dollars was made available for jurisdictions administering elections and channeled through CTCL,[68]

---

[67] Comparing 47,433 registered voters, *see* 5 Mayors' Voting Plan, p. 2, to 41,251 votes. Vote totals for the 2020 Election in Kenosha are *available in*: https://www.kenosha.org/departments/city-clerk-treasurer/elections. (Not reproduced due to volume of data.) (Accessed Dec. 1, 2020).
[68] "CTCL Receives $250M Contribution to Support Critical Work of Election Officials," Sept. 1, 2020, a*vailable at*: https://www.techandciviclife.org/open-call/. Submitted as Plaintiff's Exhibit **31**.

which by CTCL's own admission originated from a very limited donor base of one or two wealthy individuals.[69]

225. It appears that in connection with the 2020 election season CTCL has distributed throughout the United States an amount roughly comparable to that appropriated by the U.S. Congress for election administration in the CARES Act in March, 2020, *for the entire United States*.[70] The extraordinary amounts of CTCL's grants to election administrators raise questions regarding the transparency and reporting standards applicable to entities which work directly with powerful politicians and election administrators and are, through their funding, able to influence the elections process.

226. In Wisconsin, the more than $6.3 million received from CTCL by the State's five largest cities for their Mayors' Voting Program nearly equaled the total of $7.2 million in total federal CARES Act funding available to the Wisconsin Elections Commission and dwarfed the $4.1 million in CARES Act funds available to the entire state to help local election officials "prepare for Fall 2020 elections amid the COVID-19 pandemic."[71]

227. However, the CTCL funding does not only evidence a potential municipal vs. rural bias[72] and it is not only concerning because it paid for programs which, at least in part undermined, rather than upheld state election law.

---

[69] *Id*.
[70] *See* CTCL website, noting $400 million contribution to election administration through the CARES Act. *Available at*: https://www.techandciviclife.org/open-call/.
[71] "WEC Prepares for Fall Elections by Approving Block Grants to Municipalities and Mailing to Voters - COVID-19," Wisconsin Elections Commission, May 29, 2020, *available at*: https://elections.wi.gov/node/6917. Submitted as Plaintiff's Exhibit **32**.
[72] The CTCL website lists grants to other entities in Wisconsin but the *amount* of these grants does not appear to be available. *See*

228. There is also an evident partisan political correlation. The funding in the so called "Safe Voting Plan" announced by CTCL on July 7, 2020, went to five municipalities in which Democrat Presidential Candidate Hillary Clinton won more votes than Republican Presidential Candidate Donald Trump in the 2016 Presidential Election.

229. The partisan correlation of funding under the "Safe Voting Plan" in Wisconsin in 2020 is summarized in the following table[73]:

| Jurisdiction/City | Grant Amount | Trump 2016 Votes | Clinton 2016 Votes | Clinton Percentage |
|---|---|---|---|---|
| Madison | $ 1,271788 | 23,053 | 120,078 | 83.89% |
| Milwaukee | $ 2,154,500 | 45,167 | 188,653 | 80.68% |
| Racine | $ 942,100 | 8,934 | 19,029 | 68.05% |
| Kenosha | $ 862,779 | 15,829 | 22,949 | 58.98% |
| Green Bay | $ 1,093,400 | 19,821 | 21,291 | 51.78% |
| **Totals** | **$ 6,324,567** | **112,804** | **372,000** | **76.73%** |

230. While correlation does not always equal causation, the facial correlation between partisan political interests and the illegal program of absentee ballot expansion should provoke questions from any fair-minded observer.

231. The fact that CTCL is not a grassroots organization and that hundreds of millions of dollars of its funding comes from one or two individuals adds further concern.

232. When multiple violations of state law regarding the administration of a single Presidential election can be tied to a single out-of-state organization that invested

https://docs.google.com/spreadsheets/d/1E7P3owIO6UlpMY1GaeE8nJVw2x6Ee-iI9d37hEEr5ZA/edit#gid=1993755695. (Not reproduced due to volume of data.) (Accessed Nov. 29, 2020.)
[73] The elections data is accessible at: https://elections.wi.gov/elections-voting/results/2016/fall-general.

54

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 253 of 295   Document 1
Case 2:20-cv-01785   Filed 12/09/20   Page 54 of 72   Document 119-5

enormous sums in the administration of that very election: this correlation adds further strength to the conclusion that those election law violations undermined the direction of the Wisconsin Legislature.

233.    In other words, the duty of the Wisconsin Elections Commission was to pay closer attention to the directions of the Wisconsin Legislature than to facilitating the projects funded by CTCL.

234.    However, the record described above demonstrates that when it comes to the massive absentee balloting program expansion in Wisconsin and the proliferation of un-manned absentee ballot drop boxes throughout the State, CTCL's directions (as reflected through the projects it funded) were followed more closely in the Presidential election than the directions of the Wisconsin Legislature.

## The Wisconsin Elections Commission Unlawfully Directed Election Officials to Tamper with Absentee Ballot Witness Certifications

235.    Adding to these concerns, it is now understood that election workers in the five Wisconsin cities, whose employment by the cities was almost certainly funded by the generous, private, targeted July, 2020 CTCL grant, also engaged in the prohibited practice of ballot tampering by manipulating absentee ballot envelope certifications in compliance with yet another *ultra vires* guidance issued by the Wisconsin Elections Commission which, as explained below, violated state law and abrogated the Legislature's authority regarding the conduct of the election.

236.    Election workers at the Central Count location in the City of Milwaukee were observed marking on absentee ballot envelopes and altering absentee ballot

55

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 254 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 55 of 73   Document 119-5

certifications contained on the envelope.[74] For election workers to alter under oath certifications on an absentee ballot envelope obviously makes little sense in terms of process management, chain of custody, or election integrity and there exist no detailed statewide standards that would authorize or guide such conduct by election workers.

237. The Wisconsin Election Code requires that election inspectors examine absentee ballot envelope certifications to find whether "the certification has been properly executed."[75] "When the inspectors find that a certification is insufficient . . . inspectors shall not count the ballot." Only then is an election official to write on the ballot envelope – "inspectors shall endorse every ballot not counted on the back, 'rejected (giving the reason)'." Wis. Stat. § 6.88(3)(b).

238. Therefore, the Election Code treats absentee ballot envelope certifications as evidence in a legal process. These certifications are sworn statements made expressly "subject to the penalties of s. 12.60(1)(b), Wis. Stats., for false statements." Wis. Stat. § 6.87.2. The absentee ballot is subject to being counted or not based upon whether the inspectors find the certification sufficient.

239. As a matter of forensics and evidence handling, election workers being instructed to enter information on an absentee ballot certification makes no sense. This is

---

[74] *See* Affidavit of Bartholomew R. Williams, (prevented from meaningful observation at Milwaukee Absentee Ballot Central Count location; observed that ballot counters were refusing to announce name of the elector and observed election staff looking up names of ballot witness and inserting witness addresses without contacting witness or elector); Submitted as Plaintiff's Exhibit **33**; Affidavit of Anne Marie Klobuchar (when she arrived at the Milwaukee Central Count location they were not permitting Republicans to observe so she registered as an Independent, she observed absentee ballots arriving at Central Count with already opened envelopes, she observed approximately 75 absentee ballots where red marks appeared to indicate dates or other information had been changed, she observed absentee ballots that appeared to be in non-official envelopes but was too far away to be able to see what was being done with the ballots), Submitted as Plaintiff's Exhibit **34**.
[75] Wis. Stat. § 6.88(3)(b).

akin to court staff altering an affidavit or other sworn instrument before it is seen by the judge, and without the judge knowing who made the alterations and why, or when they were made.

240.    Yet, on October 19, 2020, the Wisconsin Elections Commission issued a "Spoiling Absentee Ballot Guidance" advising election officials that an absentee ballot "witness does not need to appear to add a missing address."[76] As Plaintiff's affidavits indicate, this erroneous guidance by the Commission was followed by election workers who completed addresses for witnesses and counted ballots with incomplete witness certifications contrary to state law, *see* Wis. Stat. § 6.84(2) (such ballots "may not be included in the certified result of any election"), resulting in an unknown number of unlawful votes being counted from absentee ballots submitted without photo identification and without compliance with witnessing requirements required in state law.

241.    The clear language of the Election Code forbids these alterations. Wisconsin Statutes § 6.87(6d) states, "[i]f a certificate is missing the address of a witness the ballot may not be counted;" and Wis. Stat. § 6.87 (9) requires any defects in an absentee voter's certification to be cured only by the absent voter and by 8 p.m. on election day.

242.    Again, why the Wisconsin Elections Commission decided to alter the Election Code is not known, nor relevant.[77] What matters is they changed the law without authority to do so.

---

[76] Spoiling Absentee Ballot Guidance, Wisconsin Elections Commission, October 19, 2020, available at: https://elections.wi.gov/node/7190. Submitted as Plaintiff's Exhibit **35**.
[77]  Just a few months earlier on August 18, 2020, the Commission instructed voters that a witness to a voter's absentee ballot "must sign and provide their full address (street number, street name, city) in the Certification of Witness section" of the absentee ballot envelope and, consistent with the law, cautioned voters that, "**[i]f any of the required information above is missing, your**

57

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 256 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 57 of 75   Document 119-5

243.     What can be said, however, is the Commission's directive was unwise. By instructing election workers to write on a ballot envelope certification before it was ruled on by the inspectors the Commission increased the potential for tampering and confusion, while undermining a key evidentiary link in the absentee balloting system.

244.     A barrier crossed by the directive was the sanctity and reliability of the certification itself.  Once a third party is authorized to write on the evidence, concerns begin to arise regarding what else might get written in. If a witness address can be added, why not a signature?

245.     The Commission's guidance upset other important aspects of the security net that the Legislature put in place.

246.     The Legislature has gone to significant length and detail in the Election Code to ensure the absentee elector is at all times in control of the destiny of their ballot.

247.     However, the Commission undermined the Legislature's voter-centric approach in the Commission's October 19, 2020 guidance by ordering that, "[t]he *witness can* appear <u>without the voter</u> to *add their signature or address*."[78]

248.     The Commission's directive also undermined the forensic value of the absentee ballot witnessing process.

249.     For good reason notaries are not permitted to sign jurats days or weeks after the fact. They must affirm a document was signed on the date they act as a witness. The reason the certification form prescribed by the Legislature for an absentee ballot

---

**ballot will not be counted.**" Uniform Instructions for Wisconsin Absentee Voters, Wisconsin Elections Commission, August 18, 2020, *available at*: https://elections.wi.gov/sites/elections.wi.gov/files/2020-09/Uniform%20Absentee%20Instructions%20-%20Current%20-%20By-Mail%20Voters.pdf. Submitted as Plaintiff's Exhibit **36**.

[78] Spoiling Absentee Ballot Guidance, Plaintiff's Exh. 35 (emphasis added).

58

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 257 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/09/20   Page 58 of 72   Document 1

envelope does not reference a date is likely because the statutory process itself does not permit witnesses to come back after the fact and alter or sign their certification.

250. Indeed, if a witness can come back after the fact to sign a certification there is nothing that could prevent a witness from *withdrawing* their certification, thereby invalidating the absentee ballot.

251. It is therefore easy to see how the Commission's improvident guidance is a recipe for chaos.

252. Just as importantly, the Commission's abrogation of plain statutory language takes control away from the voter, allowing others outside the voter's sphere of influence (or even knowledge) to take actions that affect the validity of his or her vote.

253. But the Commission's directive went even further. It required that "clerk[s] should attempt to resolve any missing witness address information prior to Election Day if possible, and this can be done through reliable information (personal knowledge, voter registration information, through a phone call with the voter or witness)." *Id*.

254. This was pure bureaucratic diktat, not supported by any of the statutory citations perfunctorily included at the end of the directive.

255. Through this mandate the Commission turned clerks into the Commission's functionaries, requiring clerks to hound voters and witnesses for missing information on the ballot envelope and empowering clerks to insert this information into the certification without even authorization from the voter, who, after all, is the person who would know if the clerk's supposition about what the clerk considers "personal knowledge" or "reliable information" is accurate.

59

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 258 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 58 of 75   Document 119-5

256.     It is impossible to believe that when legislators voted to require "certificate[s]" from an absentee elector and witness via a form similar to that set forth in Wis. Stat. § 6.87(2) that any legislator could have conceived a process where the "witness" (or more accurately someone an election official thinks was the witness) could provide a missing signature days after the fact without even giving notice to the voter.

257.     No supposition is required. It is clear the Legislature did not intend such a process because the Election Code provides simply and clearly, "If a certificate is missing the address of a witness, the ballot may not be counted." Wis. Stat. § 6.87(6d).

258.     A thorough review of the absentee balloting process in the Wisconsin Election Code also exposes the utter incongruity of the Commission's directive with the statutory language itself.

## The Voter-Centric Approach to Absentee Balloting in the Wisconsin Election Code

259.     The Wisconsin Election Code absentee balloting process is, in fact, *very* different from the absentee balloting process implemented by the Wisconsin Elections Commission through its guidance documents which during 2020 repeatedly amended Wisconsin Election Law and changed the way elections are administered in Wisconsin.

260.     While the Wisconsin Elections Commission has recently bought into an absentee ballot free for all, the Wisconsin Election Code charts a more measured course.

261.     Starting with recognition of the potential for fraud and abuse in the absentee ballot process (*i.e.*, the need for "voting by absentee ballot [to] be carefully regulated to prevent the potential for fraud or abuse"[79]) the Election Code describes a closely regulated *voter-centric* system where both the voter and the public (*i.e.*, other voters) are protected by giving the voter alone— not absentee ballot witnesses, and

---

[79] Wis. Stat. § 6.84(1).

60

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 259 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 60 of 75   Document 119-5

certainly not anonymous bureaucratic functionaries—control over whether the voter's absentee ballot is cast. The voter may ask for assistance during the absentee process, but the Election Code empowers the voter alone and places responsibility upon the voter alone to make all crucial choices regarding the voter's absentee ballot and whether it will be cast and counted.

262.    As a consequence, the absentee balloting process set forth in the Wisconsin Election Code, in contrast to the new system the Commission has enacted through fiat, provides for a more measured, structured, reliable, and ultimately safer and more secure approach.

263.    The voter-centric absentee ballot process described in the Election Code starts with the necessity of the voter *alone* requesting an absentee ballot. Wisconsin Statutes § 6.86(1)(ar) states, "[e]xcept as authorized in s. 6.875(6), the municipal clerk shall not issue an absentee ballot unless the clerk receives a written application therefor from a qualified elector of the municipality."

264.    The only arguable exception to a voter-centric approach of the absentee ballot *requesting* process is in Wis. Stat. §6.875(6), relating to "[a]bsentee voting in person inside residential care facilities and qualified retirement homes [which] shall be conducted by municipalities *only* in the manner described in [Wis. Stat. §6.875],"[80] which permits a municipal clerk to set up a visit to the facility for the purpose of giving the residents an opportunity to vote in person by absentee ballot. *See* Wis. Stat. §6.875(6).  This reasonable exception, however, is closely regulated through detailed rules to protect the security of the process, including that "2 special voting deputies" must conduct the visit with explicit advance public notice requirements and the deputies to be

---

[80] Wis. Stat. § 6.875(2)(a) (emphasis added).

61

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 260 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/02/20   Page 61 of 73   Document 1

appointed by the two largest political parties in the state, among other things. *See* Wis. Stat. 6.875(4)(a), (4)(b), (5), (6)(a). Thus, this narrow exception really proves the rule. The detailed manner in which the Election Code governs absentee voting in retirement facilities serves to underscore the Legislature's underlying intent to create a structured, closely regulated, system of absentee voting.

265. Unless the voter *requesting* an absentee ballot is exempt from the requirement to provide proof of identification (pursuant to limited exceptions discussed above), "*the absent elector shall enclose* a copy of his or her proof of identification" with the application. Wis. Stat. § 6.87(1) (emphasis added). There is no provision authorizing anyone other than the elector to transmit proof of identification to the clerk's office.

266. Likewise, the absentee ballot must be transmitted *only* to the absentee voter and (unless they are a military or overseas voter) via only one of two possibilities: (1) by "mail[ing] the absentee ballot to the elector's residence"[81] or (2) by "deliver[ing] it to the elector *personally* at the clerk's office or at an alternate [absentee ballot] site,"[82] (which pursuant to the Election Code is required to be a staffed clerk's office). Again, the transaction involving an absentee ballot is only between the clerk and the absentee voter. There is no option for the clerk to give another person any aspect of control over the delivery of the ballot to the voter. An absentee ballot cannot be handed off by the clerk to the voter's spouse, friend or designee.

267. Once the absentee voter has received the balloting materials and is ready to *vote* the elector must mark his or her ballot in the presence of a witness. Wis. Stat. § 6.87(4)(b)(1). However, the witness is not permitted to learn how the elector voted. *Id*.

---

[81] Wis. Stat. § 6.87(3)(a).
[82] *Id*. (emphasis added).

62

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 261 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 62 of 75   Document 119-5

While a voter needing assistance can receive it, all aspects of the voting process are supposed to take place at the direction of the voter.

268.    After marking the ballot the voter is to place it in the return envelope and seal the envelope. *Id.* The return envelope has a certificate on it to be completed by both the voter and the witness. Wis. Stat. § 6.87(2). The voter is to sign the certificate and provide an identification number, if any. *Id.* The witness is to print their name and address and sign the certification. *Id.*

269.    In the statutory description of the voting process every piece of paper that is to be enclosed in the return envelope is connected to the phrase "the elector shall enclose," or words to that effect. Wis. Stat. § 6.87(4)(b)(1).

270.    The statute next provides that the return envelope "shall be mailed *by the elector* or *delivered in person* to the municipal clerk issuing the ballot or ballots." *Id.* Again, the Code language specifies a voter-centric system in which the voter is the one who accomplishes delivery of the sealed ballot envelope in one of only two ways: delivery by the elector in person or by mail.

271.    "If a municipal clerk receives an absentee ballot with an improperly completed certificate or with no certificate, the clerk may return the ballot to the elector, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time permits the elector to correct the defect and return the ballot within the period authorized under sub. (6)," i.e., by 8 p.m. on election day. Wis. Stat. § 6.87(9).

272.    "When an absentee ballot arrives at the office of the municipal clerk . . . the clerk shall enclose it, unopened, in a carrier envelope which shall be ***securely sealed***

63

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 262 of 295   Document 1
Case 2:20-cv-01785   Filed 12/09/20   Page 63 of 725   Document 119-5

*and endorsed* with the name and official title of the clerk, and the words 'This envelope contains the ballot of an absent elector and must be opened in the same room where votes are being cast at the polls during polling hours on election day or, in municipalities where absentee ballots are canvassed under s. 7.52, stats., at a meeting of the municipal board of absentee ballot canvassers under s. 7.52, stats.'" Wis. Stat. § 6.88(1) (emphasis added).

273.     The above provisions directly contradict the Wisconsin Elections Commission's October 19, 2020 directive to clerks and election workers to inject themselves into the actual voting process by seeking to proactively amend the absentee ballot envelope certifications. In contrast, the plain statutory language requires that the clerk treat the envelope certification as forensic evidence and "may" either return a ballot that lacks a completed certification or place the ballot envelope in a "carrier envelope which *shall* be securely sealed and endorsed." Wis. Stat. § 6.88(1).

274.     The clear intent of these Code provisions is that once sealed the carrier envelope is to stay sealed not be repeatedly opened by clerk's office employees in an expensive and time consuming quest to participate in the voting process by seeking out information and marking up the absentee ballot envelope certification.

275.     Ultimately, the carrier envelope is to be "enclose[d] . . . in a package and deliver[ed] to the election inspectors of the proper ward or election district or, in municipalities where absentee ballots are canvassed under s. 7.52, to the municipal board of absentee ballot canvassers when it convenes under s. 7.52(1)." Wis. Stat. § 6.88(2).

276.     Once the carrier envelopes are delivered to a poll to be counted on Election Day it is the responsibility of the inspector at that poll to in public "open the

64

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 263 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 64 of 295   Document 119-5

carrier envelope only, and announce the name of the absent elector." Wis. Stat. §
6.88(3)(a).

277.    "When the inspectors find that the certification has been properly
executed" and all other aspects concerning the qualifications of the elector appear to be in
order then the absentee ballot envelope can be opened as part of the ballot counting
process. *Id*.

278.    The foregoing is the absentee balloting process as described in the
Wisconsin Election Code, and it is plainly *not* the process that was implemented by the
Wisconsin Elections Commission through its directives issued to municipal clerks in the
most recent election.

279.    As a matter of clear statutory direction, Wis. Stat. 6.84(2), demonstrates
what a serious matter the unlawful alterations of ballot envelopes that the Commission
directed municipal clerks to undertake were. This provision states that ballots tampered
with in contravention of 6.87(6d), which prohibit a witness's address from being altered
or changed, "may not be included in the certified result of any election." 6.84(2)
(emphasis added).

280.    By instructing clerks and other election officials on the unlawful alteration
of absentee ballot envelopes, the Wisconsin Elections Commission usurped the authority
of the Wisconsin Legislature and administratively amended the Election Code altering
the conduct of the election in violation of Article II of the U.S. Constitution.

**The Conduct of the Mayors in Wisconsin's Five Largest Cities Contributed to a Lack of Public Access to Absentee Ballot Processing and Counting Contrary to Law, Undermining Public Confidence in the Election and Depriving the Public of an Important Aspect of Accountability for Absentee Ballots**

281.    Public access and oversight are an essential safeguard of the absentee balloting process guaranteed by the Wisconsin Election Code.

282.    The five Mayors knew that the intense efforts to generate mail-in ballots in their cities would cause massive logistical issues that would make ballot counting more difficult for citizens to observe and monitor. Thus, they should have worked to protect the public's right to meaningful access as provided for in the Wisconsin Election Code, but did not.

283.    Wisconsin law provides that all aspects of elections in the State are to be open to the public, including absentee ballot counting.

284.    Wis. Stat. 7.41(1) provides:

Any member of the public may be present at any polling place, in the office of any municipal clerk whose office is located in a public building on any day that absentee ballots may be cast in that office, or at an alternate site under s. 6.855 on any day that absentee ballots may be cast at that site for the purpose of observation of an election and the absentee ballot voting process[.]

285.    Wis. Stat. 7.52(1)(a) provides:

Any member of the public has the same right of access to a meeting of the municipal board of absentee ballot canvassers under this subsection that the individual would have under s. 7.41 to observe the proceedings at a polling place.

66

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 265 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 66 of 75   Document 119-5

286.    Yet, as designed, the Mayors' absentee ballot expansion program that was intended to generate absentee ballots from 80% or more of the registered voters in a major city like Milwaukee could never reasonably accommodate public scrutiny.

287.    This fact is evident from the five Mayors' Voting Plan itself which sought funding in the City of Milwaukee for a Central Count location to count absentee ballots where there would be "15 chiefs and 200 election workers." [83]

288.    It would literally require an army to keep tabs on the counting of hundreds of thousands of absentee ballots by more than 200 election workers at the Milwaukee Central Count location. But, it appears no CTCL funding was requested to enhance truly effective public scrutiny and oversight of the absentee ballot canvassing and counting processes.

289.    Moreover, as the affidavits attached to the Complaint indicate, Republicans were limited to only 15 watchers at the Milwaukee Central Count location to try to keep abreast of the activities of more than 200 election workers dealing with mountains of absentee ballots. [84]

290.    The small band of Republican watchers were further hampered by unwritten rules, zealously enforced, that kept Republican watchers so far away from the

---

[83] 5 Mayors' Voting Plan, p. 19.
[84] *See also* "What poll watchers can and can't do at Wisconsin voting sites," *Milwaukee Journal Sentinel*, October 20, 2020, ("Milwaukee election officials currently anticipate about 60 observers will be allowed at central count on Election Day, including 15 from each of the two major political parties."), *available at*: https://www.jsonline.com/story/news/politics/elections/2020/10/20/what-poll-watchers-can-and-cant-do-wisconsin-voting-sites-election-polling-places-election-observers/5941883002/. Submitted as Plaintiff's Exhibit **37**.

absentee ballot canvassing and counting that they could not meaningfully view the process.[85] These restrictions violated Wis. Stats. §§7.41(1) and 7.52(1)(a).

291.    Similarly, observers in other cities which received CTCL funding were prevented from observing absentee ballots being processed.[86]

292.    Likewise, the un-manned absentee ballot box program ushered in by the five Mayors and the Wisconsin Elections Commission provided for none of the public oversight and accountability protections which are applicable to other forms of balloting under the Wisconsin Elections Code (*i.e.*, in-person voting, in-office absentee voting and absentee voting by mail) such as the opportunity for public watchers, notice to the public regarding how the program was administered and uniform chain of custody standards for the ballots.

---

[85] *See* Affidavit of Beth A. Brown, paras. 6-8 (Milwaukee poll watcher who was prevented from observing voting and curb-side voting), Submitted as Plaintiff's Exhibit **38**; Affidavit of Bartholomew R. Williams, (prevented from meaningful observation at Milwaukee Absentee Ballot Central Count location; observed that ballot counters were refusing to announce name of the elector and observed election staff looking up names of ballot witness and inserting witness addresses without contacting witness or elector). Submitted as Plaintiff's Exhibit **33**.

[86] *See* Affidavit of Mary Angelina Horn, (prevented from serving as a poll watcher in Racine, observed questionable conduct such as voters "voting more than once" but no action was taken), Submitted as Plaintiff's Exhibit **39**; Affidavit of Charles A. Armgardt, paras. 5-14, see especially para. 10 (City of Racine watcher: "I was also denied access by election officials to the station within the polling places where mailed or absentee ballots were checked in and counted. At Festival Park Hall, for example, the absentee ballot station was placed in the back of the room, approximately seventy feet from any designated observer area."), Submitted as Plaintiff's Exhibit **40**. ; Affidavit of Steve S. Goetz, para. 6 (poll watcher in Madison, Wisconsin who reported: "I was required to stand in a very small designated area that was at least 10 feet [from] the registration tables, where I could not meaningfully observe the process.") Submitted as Plaintiff's Exhibit **41**; Affidavit of Lana Sloane, para. 6 (was a poll watcher in a precinct in Madison, Wisconsin where watching area was so small that she was told there was only room for one person and that she could only alternate with a Democrat poll observer, accordingly she was unable to watch during 90 minute periods when the Democrat poll watcher was the only observer), Submitted as Plaintiff's Exhibit **42**;
*see also* Affidavit of Kyle Hudson, paras. 3-10 (poll watcher in Sun Prairie was asked to leave and not observe the canvassing of ballots, when he demanded access he was told the only access he would be given was via Zoom call, as the video feed for the canvass continually froze he was unable to observe the canvassing), Submitted as Plaintiff's Exhibit **43**; Affidavit of Jeremy Bowers (Sun Prairie poll watcher who confirms he was excluded from polling place and could only watch via an insufficient Zoom call); Submitted as Plaintiff's Exhibit **44**.

68

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 267 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/02/20   Page 68 of 75   Document 1

293.     Thus, the five Mayors' Voting Plan foresaw and facilitated a massive volume of mail-in ballots that flooded mammoth, centralized, municipal counting centers where the activities of the workers paid for by CTCL funding could not be observed, and many workers therefore counted ballots effectively unobserved.

294.     This scenario is literally the furthest thing one can imagine from the "Legislative policy" set forth in Wis. Stat. § 6.84 that "voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse."

295.     When viewed in light of the patent violations of Wisconsin election law discussed herein, it is evident that the CTCL funding, the five Mayors' Voting Plan coupled with the unlawful directives of the Wisconsin Elections Commission facilitated a disturbing number of illicit acts and practices by Wisconsin election officials which increased the risk of fraud in the November 3, 2020 election and squarely conflicted with the directions of the Wisconsin Legislature.

296.     For all of the foregoing reasons, the 2020 Presidential election in Wisconsin was manifestly different from prior Wisconsin elections due to factors such as the massive number of mail-in ballots voted, the manner in which those ballots were processed, the lack of fidelity to the requirements of the Election Code, and the standard-less application of processes related to the collecting, handling, canvassing, and counting of absentee ballots and the lack of meaningful public observation of these processes.

297.     Separately and collectively, the Defendants' actions dramatically lowered the guardrails against fraud in the Wisconsin Election Code, creating an invitation for mail-in ballot fraud contrary to the intent of the Wisconsin Legislature and undercutting the consistency of election procedures in the State, making the November 3, 2020

69

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 268 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 268 of 295   Document 119-5

election impossible to administer fairly, and rendering the election irredeemably inconsistent with the directions of the State Legislature regarding the conduct of the election.

298.    As the U.S. Supreme Court and Seventh Circuit Court of Appeals both recently warned, such acts which increased the propensity for fraud in a targeted way in a battleground state in what was a close election, can do nothing other than undermine the public's faith in democracy.

299.    Fortunately, the Electors Clause was intended by the Framers as a bulwark against the actions of local executive branch officials who would attempt to subvert the will of the people, as reflected in their state legislature's directions regarding the manner in which electors for the Nation's Chief Executive are to be chosen.

300.    Given the clear statement in the Wisconsin Election Code that the absentee balloting provisions of the Code are "mandatory"[87] and that absentee ballots cast "in contravention of the procedures specified in those provisions may not be included in the certified result of any election,"[88] the Wisconsin Legislature's directions were neither followed during the absentee balloting process when absentee ballot drop boxes were used contrary to Wisconsin law, nor were the Wisconsin Legislature's clear instructions followed when absentee ballots collected in these boxes were counted in the canvassing and/or recount processes. Plainly, it would violate Wisconsin law to certify any election result in which ballots from these illegal ballot drop boxes were counted.

301.    As Justice Gorsuch said little more than a month ago in a case involving Wisconsin's deadline for counting absentee ballots, "[t]he Constitution provides that state

---

[87] Wis. Stat. § 6.84(2)
[88] *Id.*

70

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 269 of 295   Document 119-5
Case 2:20-cv-01785   Filed 12/02/20   Page 70 of 72   Document 1

legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, No. 20A66, 2020 WL 6275871, at *2 (U.S. Oct. 26, 2020) (concurring in denial of application to vacate stay). While Justice Gorsuch and Justice Kavanaugh, who joined the concurrence, were in that case addressing the Elections Clause, their analysis holds equally under the Electors Clause.

302.     The clear meaning of the Electors Clause compels the determination that the 2020 Presidential Election in Wisconsin was not conducted consistent with the direction of the Wisconsin Legislature thereby violating the U.S. Constitution.

## CONCLUSION

By ignoring the Wisconsin Legislature's express directions regarding the collection, handling, processing, canvassing, and counting of absentee ballots and related activities and/or through improper certification of elections and related activities, all in violation of the Wisconsin Election Code and through violations of the Electors and Elections Clauses and the Equal Protection and Due Process Clauses to the United States Constitution, the Defendants ran an unconstitutional and unlawful Presidential election in Wisconsin.

WHEREFORE, Plaintiff Donald J. Trump prays for judgment:

1.     Declaring the Defendants violated the Electors Clause by failing to abide by the directions of the Wisconsin Legislature in connection with the conduct of the 2020 Presidential Election in Wisconsin;

2.     Declaring the Defendants violated the Equal Protection and Due Process Clauses in connection with the conduct of the 2020 Presidential Election in Wisconsin;

71

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 270 of 295   Document 1
Case 2:20-cv-01785-BHL   Filed 12/02/20   Page 71 of 75   Document 119-5

3.   Declaring that the constitutional violations of the Defendants likely tainted more than 50,000 ballots, a number well in excess of the current estimated difference between the vote totals for the Republican and Democrat candidates for President;

4.   Remanding this case to the Wisconsin Legislature to consider the Defendants' violations of the Electors, Equal Protection and Due Process Clauses and determine what remedy, if any, the Wisconsin Legislature should impose within its authority pursuant to the Electors Clause;

5.   Enjoining any actions inconsistent with the Court's declaration and judgment;

6.   Awarding the Plaintiff his costs and attorneys fees under 42 U.S.C. § 1983 and any other applicable authority; and

7.   Awarding all other just and proper relief.


Respectfully Submitted,

KROGER, GARDIS & REGAS, LLP

/s/ William Bock, III

William Bock III, Indiana Attorney No. 14777-49
James A. Knauer, Indiana Attorney No. 5436-49
Kevin D. Koons, Indiana Attorney No. 27915-49

ATTORNEYS FOR PLAINTIFF DONALD J. TRUMP


KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone:  (317) 692-9000

72

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 271 of 295   Document 1
Case 2:20-cv-01785   Filed 12/02/20   Page 72 of 73   Document 119-5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SYLVIA GEAR, MALEKEH K. HAKAMI, )
PATRICIA GINTER, CLAIRE WHELAN, )
WISCONSIN ALLIANCE FOR RETIRED )
AMERICANS, LEAGUE OF WOMEN )
VOTERS OF WISCONSIN, )
                                )
          Plaintiffs, )
                                )      No. 20-CV-278
     v. )
                                )
DEAN KNUDSON, JULIE M. GLANCEY, )
ROBERT F. SPINDELL, JR., MARK L. )
THOMSEN, ANN S. JACOBS, MARGE )
BOSTELMANN, in their official capacity )
as members of the Wisconsin Election )
Commission, MEAGAN WOLFE, in her )
official capacity as the Administrator of the )
Wisconsin Elections Commission, )
                                )
          Defendants. )
_____ )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

       Plaintiffs Sylvia Gear, Dr. Malekeh K. Hakami, Patricia Ginter, Claire Whelan, Wisconsin

Alliance for Retired Americans, and League of Women Voters of Wisconsin ("LWVWI")

(collectively, "Plaintiffs") seek declaratory and injunctive relief as follows:

**NATURE OF ACTION**

       1.      The COVID-19 pandemic presents an unprecedented challenge to our nation,

threatening millions of Americans' lives and livelihoods and severely straining health care

systems, the economy, and all levels and branches of government.  It is wreaking havoc across all

sectors and causing massive disruptions in election administration during this presidential election

year.  COVID-19's high transmission rate poses a severe risk to in-person voters, particularly those

in at-risk groups, and has already resulted in massive withdrawals by volunteer poll workers who

justifiably fear contracting the disease.  A number of states' officials have already felt compelled to postpone primary and other elections in the face of this rapidly escalating public health emergency.

2.      In order to reduce the transmission of COVID-19, on Tuesday March 24, 2020, Governor Tony Evers issued Emergency Order #12, the "Safer at Home" Order, closing all nonessential businesses in Wisconsin and ordering the state's residents to stay at home, with limited exceptions for essential businesses, occupations, and governmental functions.[1]  Governor Evers cautioned the public against making "unnecessary trips" and is requiring that travel be limited to "essential needs like going to the doctor, grabbing groceries, or getting medication."[2]

3.      The Order commands that, "All public and private gatherings of any number of people that are not part of a single household or living unit are prohibited, except for the limited purposes expressly permitted in this Order."[3]  It also requires that, "Elderly people and those who are vulnerable as a result of underlying health conditions should take additional precautions. People at high risk of severe illness from COVID-19 and people who are sick are urged to stay in their home or residence to the extent possible except as necessary to seek medical care."[4]  The Order may be enforced by local law enforcement, and "[v]iolation or obstruction . . . is punishable by up to 30 days imprisonment, or up to $250 fine, or both. Wis. Stat. § 252.25."[5]

---

[1]      Emergency   Order   #12,   Safer   at   Home   Order,   at   2,   *available   at* https://evers.wi.gov/Documents/COVID19/EMO12-SaferAtHome.pdf.
[2]      Gov.   Tony   Evers   (@GovEvers),   TWITTER   (Mar.   23,   2020,   10:34   AM), https://twitter.com/GovEvers/status/1242097501575901187.
[3] *See supra* note 1, Emergency Order #12, at 3.
[4] *Id.* at 4.  "Currently at least 14 states and 22 municipalities have ordered 152,485,515 people or 46% of the U.S. population to stay home as a result of the pandemic, according to data compiled by @CNN using U.S. Census population estimates."
[5] *See supra* note 1, Emergency Order #12, at 16.

2

4.      The pandemic shows no sign of abating before Wisconsin's April 7, 2020 statewide elections, and the emergency order issued by Governor Evers' administration took effect on March 25, 2020 at 8:00 a.m. and will remain in effect until April 24, 2020 at 8:00 a.m.  Additionally, countless eligible Wisconsin voters have been self-quarantining and will continue to self-quarantine for fear of contracting COVID-19, and/or for fear of transmitting the disease, whether they are symptomatic or not.

5.      Election codes in Wisconsin and other states never contemplated such a crisis. Given the rapidly spreading infection, many states' election laws now force voters to choose between exposing themselves to a severe risk to their health and exercising their constitutionally-protected right to vote.  This could not have been anticipated or intended by legislators.  State laws, including state constitutions, also constrain public officials' ability to modify voting procedures to ensure that eligible voters, particularly voters at heightened risk of contracting and dying from COVID-19, can continue to participate in our democracy even during a national public health emergency.

6.      In light of the pandemic, many Wisconsin voters are abandoning plans to vote in person for the April 7, 2020 statewide elections – which include a Wisconsin Supreme Court race, the Democratic primary for the presidential election, and thousands of elections for county and municipal offices throughout the state – and are requesting absentee, mail-in ballots in unprecedented numbers.  As of the morning of March 25, 2020, 626,837 absentee, mail-in ballots have been requested, and 595,195 have been sent.[6]

---

[6] Wisconsin Elections Commission, Absentee Ballot Report - April 7, 2020 Spring Election and Presidential Preference Primary,  https://elections.wi.gov/node/6775/ (last visited Mar. 25, 2020).

3

7.     By Wisconsin law, these absentee, mail-in ballots must be signed by the voter and also signed by a witness who is an adult U.S. citizen. Wis. Stat. § 6.87(4)(b)(1). This requirement poses a significant barrier to absentee, mail-in voting for any self-quarantining eligible voter who lives alone or who does not have an adult U.S. citizen in their household. Indeed, for these voters, it will be simply impossible to satisfy the witness signature requirement to cast an absentee, mail-in ballot, and that voter will be denied their right to vote—caught in an unconstitutionally burdensome and unnecessary choice between their life and their liberty. There are over 675,000 single-member households in Wisconsin, and many other households that include only one adult.[7] More than 250,000 of these single-member households are individuals over the age of 65.[8]

8.     Since in-person voting would pose a severe risk to the bodily integrity and lives of these individuals, that option is no option at all. Taken together, the risks inherent in in-person voting and in securing a witness signature for an absentee mail-in ballot preventing certain eligible Wisconsin voters who live alone or without an adult U.S. citizen in the household from casting a vote. Enforcing this statutory requirement constitutes an undue burden on the right to vote not justified by any legitimate or important government interest of the First and Fourteenth Amendments to the U.S. Constitution.

9.     Plaintiff Patricia Ginter has received a mail-in absentee ballot in the mail; Dr. Malekeh Hakami and Claire Whelan have requested mail-in absentee ballots; Plaintiff Sylvia Gear intends to request a mail-in absentee ballot this week. Because they all live alone and are all self-quarantining during the COVID-19 pandemic, given their advanced age and medical histories, the CDC's recommendations, and now Governor Evers's Emergency Order #12, Plaintiffs have no

---

[7] *See* U.S. Census Bureau, *2013-2017 American Community Survey 5-Year Estimates*, Table 2501, Occupancy Characteristics.
[8] *Id.*

4

way to safely obtain a witness signature on their mail-in absentee ballots certifications.  Absent a court order enjoining the witness signature requirement for the duration of the COVID-19 pandemic, and certainly no less than the duration of Governor Evers's Emergency Order #12 (currently in effect through April 24, 2020, subject to any further extension), they will be denied their right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

11.     This Court has jurisdiction to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

12.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     This Court has personal jurisdiction over Defendant-Commissioners Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr., the members of the Commission, and Meagan Wolfe, the Administrator of the Commission, who are sued in their official capacities.  Defendants Knudson, Glancey, Thomsen, Jacobs, Bostelmann, Spindell, Jr. and Wolfe are state officials who reside in Wisconsin and work in Madison, Wisconsin.

14.     Venue is appropriate in the Western District of Wisconsin, under 28 U.S.C. § 1391(b)(1), because Defendants are state officials working in Madison, Wisconsin.  A substantial part of the events giving rise to these claims occurred and continues to occur in this district, making venue also proper under 28 U.S.C. § 1391(b)(2).

5

## PARTIES

15.     Plaintiff Sylvia Gear is an 83-year-old retired teacher who lives alone at her residence in Cudahy, Wisconsin.  She is a United States citizen, has never lost her right to vote by reason of a felony conviction or a court order, and is a registered Wisconsin voter.  Ms. Gear is a member of Plaintiff Wisconsin Alliance for Retired Americans.  Ms. Gear is at risk of severe complications from the novel coronavirus and COVID-19 because of her age and her medical history as a cancer survivor.  For this reason, she is self-quarantining at her home, and she has not allowed anyone in her house for approximately two weeks.  There have been only two exceptions over the last two weeks: (1) she went to a Pick 'n Save once last week to obtain necessary pain medication that could only be obtained in person, and (2) she went to the bank to deposit a check. While she was at the store, she picked up a few groceries, wearing gloves for protection. Otherwise, she has not been anywhere else except her house in approximately two weeks.  Ms. Gear has also recently had shots for pain from three fractured vertebrae, which make it quite painful and difficult to walk at present.  Because of the COVID-19 pandemic, a scheduled shot for the pain management was canceled and is being rescheduled to a future date.  Ms. Gear usually goes to her sister's house for dinner on Monday, but she has not done that for two weeks.  One of her sisters cooked food for her this week and left it on her doorstep.  Otherwise, Ms. Gear has been able to subsist on the food she has in her home.  She has not been to any of her regular social activities in approximately three weeks, including attending Sisters of St. Francis in St. Francis, Wisconsin and gathering with her teacher friends at a weekly fish fry at a local restaurant.  She had to miss her granddaughter's and grandnephew's birthdays.  Because Ms. Gear is quarantining herself pursuant to government recommendations and now Emergency Order #12, and cutting off all in-person contact unless it is <u>absolutely</u> necessary, *e.g.* to obtain medication, she must vote by

6

mail-in absentee ballot to avoid the severe risks to her health and life posed by in-person voting. She intends to submit a mail-in absentee ballot request online at myvote.wi.gov this week. Ms. Gear is aware that a witness signature is required to cast a mail-in absentee ballot. However, because she lives alone and is self-quarantining, she has no way to obtain a witness's signature on her absentee ballot without seriously endangering herself.

16.     Plaintiff Dr. Malekeh K. Hakami is a 73-year-old clinical psychologist who lives alone at her residence in Pewaukee, Wisconsin. She is a United States citizen, has never lost her right to vote by reason of a felony conviction or a court order, and is a registered Wisconsin voter. Dr. Hakami is at risk of severe complications from the novel coronavirus and COVID-19 because of her age and because she has a history of severe hay fever, for which she has needed shots in the past. For these reasons, she has put herself under self-quarantine at her home. Her daughter-in-law purchases her groceries for her and leaves them at Dr. Hakami's residence; Dr. Hakami does not open the door for her. Dr. Hakami has not allowed anyone to enter her house in approximately two weeks pursuant to government recommendations and now Emergency Order #12, and she is cutting off all in-person contact. Because Dr. Hakami is quarantining herself pursuant to government recommendations and now Emergency Order #12 and cutting off all in-person contact unless it is <u>absolutely</u> necessary, *e.g.* to obtain medication, she must vote by mail-in absentee ballot to avoid the severe risks to her health and life posed by in-person voting. She has submitted an absentee, mail-in ballot request but has not yet received it in the mail. Dr. Hakami is aware that a witness signature is required to cast a mail-in absentee ballot. However, because she lives alone and is self-quarantining, she has no way to obtain a witness's signature on her absentee ballot without seriously endangering herself.

17.     Plaintiff Patricia Ginter is a 72-year-old realtor who lives alone at her residence in Wauwatosa, Wisconsin.  She is a United States citizen, has never lost her right to vote by reason of a felony conviction or a court order, and is a registered Wisconsin voter.  Ms. Ginter is at risk of severe complications from the novel coronavirus and COVID-19 because of her age and her medical history of hypertension.  For this reason, she has been self-quarantining at her home for approximately two weeks, and she has not allowed anyone in her house for a couple of weeks. There has been only one exception over the last two weeks: she went to the grocery store once. Other than what she bought at the grocery store, she has been subsisting on the food in her cupboard and her freezer.  Because Ms. Ginter is quarantining herself pursuant to government recommendations and now Emergency Order #12 and cutting off all in-person contact unless it is absolutely necessary, *e.g.* to obtain food, she must vote by mail-in absentee ballot to avoid the severe risks to her health and life posed by in-person voting.  She applied for and obtained a mail-in absentee ballot.  Ms. Ginter filled out the mail-in absentee ballot, making her choices, but then noticed the witness signature requirement in the instructions.  Because she lives alone and is self-quarantining, she has no way to obtain a witness's signature on her mail-in absentee ballot without seriously endangering herself.

18.     Plaintiff Claire Whelan is a 64-year-old retiree who lives alone at her residence in Appleton, Wisconsin.  She is a United States citizen, has never lost her right to vote by reason of a felony conviction or a court order, and is a registered Wisconsin voter.  Ms. Whelan is a member of the League of Women Voters of Wisconsin of Appleton and therefore a member of Plaintiff League of Women Voters of Wisconsin.  Ms. Whelan is at risk of severe complications from the novel coronavirus and COVID-19 because of her age and her preexisting condition of asthma.  To protect herself, she has been self-quarantining at her apartment for over a week.  Additionally, Ms.

8

Whelan wants to take every precaution to minimize the chance that she is exposed to COVID-19, because she wants to maximize the chance that she can once again visit her mother, who is 93 years old and lives in a nursing home nearby.  She fears bringing the virus into that facility, but also fears that her mother could rapidly decline, while the nursing home remains on lockdown. She saw her mother two Fridays ago, just before the nursing home barred all visitors, family, and volunteers.  Since last Saturday when she went to a grocery store to buy provisions, Ms. Whelan has not been to any other businesses, not even a grocery store or pharmacy.  She was too scared to even fill up her car at a gas station; she did not want to take any chances.  Ms. Whelan has been able to subsist on the food in her home.  Because Ms. Whelan is quarantining herself pursuant to government recommendations and now Emergency Order #12 and cutting off all in-person contact unless it is <u>absolutely</u> necessary, *e.g.* to obtain more food or medication, she must vote by mail-in absentee ballot to avoid the severe risks to her health and life posed by in-person voting.  Ms. Whelan requested a mail-in absentee ballot online on March 20, 2020.  She is waiting until the end of the month, when she drops off her rent check late at night to avoid other people, to see if her ballot has arrived in her mailbox.  Ms. Whelan is aware that a witness signature is required to cast a mail-in absentee ballot.  However, because she lives alone and is self-quarantining, she has no way to obtain a witness's signature on her absentee ballot without seriously endangering herself.

19.     Plaintiff Wisconsin Alliance for Retired Americans ("Wisconsin Alliance") was founded on March 14, 2005.  Wisconsin Alliance has 103,611 members, composed of retirees from public and private sector unions, community organizations and individual activists. It is incorporated in the State of Wisconsin as a 501(c)(4) social welfare organization under the Internal Revenue Code.

9

20.     Alliance for Retired Americans is a national organization with more than 4.3 million members in all 50 states. The national Alliance charters state organizations, such as the Wisconsin Alliance, which then elect officers, form a governing board, affiliate local chapters and organize members in the state.

21.     Wisconsin Alliance's board is presided over by Marlene Ott, a retired member of the National Education Association ("NEA").  President Ott presides over a board with a treasurer, secretary and vice president representatives from the largest affiliates. During monthly meetings, they organize activities, initiate programs, and maintain the governance of Wisconsin Alliance in the state.

22.     Wisconsin Alliance participates in an organizing calendar that resembles and reflects the national Alliance for Retired Americans, with Wisconsin-specific additions. This calendar includes engaging local, state and federal representatives about issues and laws that affect retirees and seniors, highlighting May as Older Americans Month and celebrating the anniversaries of Social Security and Medicare.

23.     Wisconsin Alliance also engages in member education about elections. Historically, Wisconsin Alliance has provided information to members about how their elected leaders have voted on issues that impact the lives of seniors and provided information about how to cast a ballot.

24.     The interests Wisconsin Alliance seeks to protect in this action, the voting rights of its members and of all retired Wisconsinites, are germane to the organization's purpose as detailed above.  As a membership organization, Wisconsin Alliance suffers the constitutional injury of its members, like Plaintiff Sylvia Gear.

10

25.     Plaintiff League of Women Voters of Wisconsin ("LWVWI") is a nonpartisan, nonprofit, non-stock corporation organized under the laws of the State of Wisconsin with its principal office located at 612 West Main St., Suite 200, in the City of Madison, Dane County, Wisconsin.  LWVWI is an affiliate of The League of Women Voters of the United States, which has 750 state and local Leagues in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, and Hong Kong.  LWVWI works to expand informed, active participation in state and local government, giving a voice to all Wisconsinites.

26.     LWVWI, a nonpartisan community-based organization, was formed in 1920, immediately after the enactment of the Nineteenth Amendment granting women's suffrage.  The LWVWI is dedicated to encouraging its members and the people of Wisconsin to exercise their right to vote as protected by the Constitution and the Voting Rights Act of 1965. The mission of LWVWI is to promote political responsibility through informed and active participation in government and to act on selected governmental issues. The League seeks to maximize eligible voter participation through its voter registration efforts and encourage civic engagement through registration and voting.

27.     The LWVWI impacts public policies, promotes citizen education, and makes democracy work by, among other things, removing unnecessary barriers to full participation in the electoral process. Currently LWVWI has 20 local Leagues and approximately 2,200 members, including Plaintiffs Dr. Malekeh Hakami and Claire Whelan. LWVWI works with and through 20 local Leagues in the following cities, counties, and areas throughout Wisconsin: Appleton, Ashland/Bayfield Counties, Beloit, Dane County, Door County, the Greater Chippewa Valley, Greater Green Bay, Janesville, the La Crosse area, Manitowoc County, Milwaukee County, the

Northwoods, Ozaukee County, the Ripon area, Sheboygan County, the Stevens Point area, the Upper St. Croix Valley, the Whitewater area, Winnebago County, and the Wisconsin Rapids area.

28.     LWVWI began as an organization focused on the needs of women and training women voters. It has evolved into an organization concerned with educating, advocating for, and empowering all Wisconsinites. With members in nearly every county in the State, the LWVWI's local Leagues are engaged in numerous activities, including hosting public forums and open discussions on issues of importance to the community. Individual League members invest substantial time and effort in voter training and civic engagement activities, including voter registration and get-out-the-vote ("GOTV") efforts.  LWVWI has developed the statewide Election Observation Program and the Vote411 voter guide for Wisconsin.

29.     LWVWI also devotes substantial time and effort to ensuring that government at every level works as effectively and fairly as possible. This work involves continual attention to and advocacy concerning issues of transparency, a strong and diverse judiciary, fair and equal nonpartisan redistricting, and appropriate government oversight.

30.     The interests LWVWI seeks to protect in this action, the voting rights of its members and all eligible Wisconsin voters, are germane to the organization's purpose as detailed above.  As a membership organization, LWVWI suffers the constitutional injury of its members, like Plaintiff Claire Whelan.

31.     Defendants Dean Knudson, Julie M. Glancey, Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, and Robert F. Spindell, Jr. are sued in their official capacities as the members of the Wisconsin Elections Commission.

32.     Defendant Meagan Wolfe is sued in her official capacity as the Administrator of the Wisconsin Elections Commission.

12

## BACKGROUND

33.     In December 2019, a novel strain of the coronavirus was detected, now named SARS-CoV-2, and the disease it causes became known as COVID-19; it has now spread throughout the world, including to every state in the United States.

34.     On January 30, 2020, the World Health Organization declared COVID-19 to be a Public Health Emergency of International Concern.  On March 11, 2020, the WHO declared that it had become a pandemic.

35.     The novel coronavirus that causes COVID-19 continues to spread at an unprecedented pace around the world and within the United States.  There are currently 68,534 confirmed cases in the United States, and there have been 990 deaths nationwide.[9]  As of the evening of March 25, 2020, authorities had confirmed 585 positive cases of coronavirus in Wisconsin, and seven people have died.  As of March 23, 2020, within 72 hours, positive COVID-19 cases rose in the United States from 15,219 to 33,404 (a 119% increase) and rose in Wisconsin from 206 to 416 (a 102% increase).[10]

36.     Epidemiologists and infectious disease specialists are still gaining visibility on the pandemic, but COVID-19 appears to be much more contagious than influenza, SARS, or MERS, and significantly more lethal than influenza.

37.     According to the Centers for Disease Control and Prevention ("CDC"), people who are 65 years old or older or who have underlying health conditions and diseases, such as chronic lung diseases, asthma, serious heart conditions, and others that suppress immune systems like

---

[9] Mitch Smith et al, *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Mar. 26, 2020).
[10] *See supra* note 1, Emergency Order #12, at 1.

13

HIV/AIDS, are at higher risk of complications from COVID-19.[11]  The CDC's website, relying upon research from the National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases, notes that immunocompromised individuals are at severe risk from COVID-19: "Many conditions can cause a person to be immunocompromised, including cancer treatment, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."[12]  Severe COVID-19 cases can lead to pneumonia and acute respiratory distress syndrome, requiring hospitalization; in critical cases, some patients need to be intubated and put on a ventilator. Younger people have also contracted severe cases of COVID-19 and been hospitalized; some have died.  Significantly, even if a person ultimately recovers from COVID-19, it can leave their lungs severely damaged and weakened.

38.     The CDC has noted that asymptomatic COVID-19-positive individuals can transmit the disease to others.[13]  Studies have confirmed this.[14]  As a result, the disease can spread before individuals know that they are affected, facilitating the rapid contagion.

39.     On March 12, 2020, Governor Tony Evers declared a public health emergency to direct all resources needed to respond to and contain COVID-19 in Wisconsin.

---

[11] *People who are at higher risk for severe illness*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html        (last updated Mar. 22, 2020).

[12] *Id.*

[13] *Coronavirus 2019 (COVID-19): How to Prepare*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last updated Mar. 4, 2020).

[14] Mary Van Beusekom, *Studies profile lung changes in asymptomatic COVID-19, viral loads in patient samples*, CTR. FOR INFECTIONS DISEASE RES. & POL'Y, UNIV. OF MINN. (Feb. 25, 2020), http://www.cidrap.umn.edu/news-perspective/2020/02/studies-profile-lung-changes-asymptomatic-covid-19-viral-loads-patient.

14

40.     On March 13, 2020, President Donald Trump proclaimed a National Emergency concerning COVID-19.

41.     On March 24, 2020, Governor Evers issued Emergency Order #12, the "Safer at Home" Order, which, starting March 25th, has closed all nonessential businesses in Wisconsin and requires the state's residents, with limited exceptions, to stay at home in order to reduce the transmission of COVID-19.[15]   The order begins by stating that, "[T]he entire State of Wisconsin - including residents, businesses, community organizations, and government - need to take all possible actions to reduce further spread of COVID-19 to save lives."[16]   The order continues: "[S]ocial distancing - the practice of keeping at least six feet apart from others and avoiding direct physical contact - is the only effective means of slowing the rate of infection. Despite prior emergency orders banning mass gatherings, the rates of infection continue to drastically increase, necessitating additional measures to slow the rate of infection and save lives."[17]

42.     Emergency Order #12 mandates that "[a]ll individuals present within the State of Wisconsin are ordered to stay at home or at their place of residence, with exceptions" for certain defined "essential activities" such as those to promote individual and family health and safety including obtaining groceries and medications, "essential governmental functions," "essential businesses and operations" such as grocery stores, pharmacies and gas stations, "non-essential minimum basic operations," and "essential travel."[18]   Furthermore, the Order instructs that "[t]o the extent individuals are using shared or outdoor spaces other than their home or residence, they must at all times as reasonably possible maintain social distancing of at least six (6) feet from any

---

[15] *See supra* note 1, Emergency Order #12,
[16] *Id*. at 1.
[17] *Id*. at 2.
[18] *Id*. at 2.

15

other person consistent with Social Distancing Requirements," as defined.[19]  The Order mandates

that "[n]on-essential business and operations must cease. All for-profit and non-profit businesses

with a facility in Wisconsin, except Essential Businesses and Operations as defined below, are

required to cease all activities at facilities located within Wisconsin."[20]

43.     Crucially, for purposes of this litigation, the Order commands that, "All public and

private gatherings of any number of people that are not part of a single household or living unit

are prohibited, except for the limited purposes expressly permitted in this Order."[21]  It also requires

that, "Elderly people and those who are vulnerable as a result of underlying health conditions

should take additional precautions. People at high risk of severe illness from COVID-19 and

people who are sick are urged to stay in their home or residence to the extent possible except as

necessary to seek medical care."[22]

44.     The pandemic shows no sign of abating before the April 7, 2020 statewide

elections, and the emergency order issued by Governor Evers' administration took effect March

25, 2020 at 8:00 a.m. and will remain in effect until April 24, 2020 at 8:00 a.m.  More importantly,

countless eligible Wisconsin voters will continue to self-quarantine for fear of contracting COVID-

19, and/or for fear of transmitting the disease, regardless of whether they are symptomatic or not.

45.     Many Wisconsin voters are abandoning plans to vote in person for the April 7, 2020

statewide elections and are requesting absentee mail-in ballots in unprecedented numbers.  626,837

absentee, mail-in ballots have been requested, and 595,195 have been sent, as of the morning of

March 25, 2020.[23]

---

[19] *Id*. at 2.
[20] *Id*. at 3.
[21] *Id*. at 3.
[22] *Id*. at 4.
[23] Absentee Ballot Report, *supra* note 6.

46.     Registered voters in Wisconsin can apply for and obtain absentee ballots in a variety of ways: by mail-in application; in person at the municipal clerk's office or at an alternate site under Wis. Stat. § 6.855; by signing a statement and filing a request to receive absentee ballots under Wis. Stat. § 6.86(2) or Wis. Stat. § 6.86(2m)(a) (indefinitely confined voters) or Wis. Stat. §§ 6.22(4), 6.24(4), or 6.25(1)(c) (military and overseas voters); by agent as provided in Wis. Stat. § 6.86(3) (hospitalized voters); by delivering an application to a special voting deputy under Wis. Stat. § 6.875(6) (voters in retirement homes and residential care facilities); by email or fax as provided in Wis. Stat. § 6.86(1)(ac); and by online request via myvote.wi.gov.

47.     Absentee ballots are cast and returned in different ways as well.  Many absentee voters mail their absentee ballots to the municipal clerk's office, drop the ballots off or authorize someone to drop them off on their behalf.  Wis. Stat. § 6.87.[24]  In-person absentee voters vote prior to Election Day at designated sites, but their ballots are not processed and counted until Election Day.  Wis. Stat. §§ 6.855, 6.87, 6.88.  All absentee ballots must be returned to the municipal clerk's office by no later than 8:00 p.m. on Election Day.  Wis. Stat. § 6.87(6).

48.     All absentee ballots must be witnessed and signed by an adult U.S. citizen, (other than those cast by military and overseas voters, whose absentee ballots may be witnessed by an adult who is not a U.S. citizen), but that individual need not be a resident of Wisconsin or a registered voter in the state.  Wis. Stat. § 6.87(4)(b)1.[25]  The witness signature requirement applies

---

[24] *See also Uniform Instructions for Wisconsin Absentee Voters*, WIS. ELECTIONS COMM'N, *available         at*         https://elections.wi.gov/sites/elections.wi.gov/files/2019-02/Uniform%20Instructions%20for%20Absentee%20Voting%20-%20All%20Voters%20%20%28Rev.%202-2019%29.pdf (last visited Mar. 25, 2020).

[25] *See also Form EL-122, Standard Absentee Ballot Certificate*, WIS. ELECTIONS COMM'N, *available                                                            at* https://elections.wi.gov/sites/elections.wi.gov/files/gab_forms/4/el_122_standard_absentee_ballot_certificate_portra_17554.pdf (last visited Mar. 25, 2020).

17

to all absentee voters, regardless of the particular method by which the voter cast that absentee ballot.  *Id*.  The absentee ballot certificate contains both a voter certification and a witness certification, which the voter and witness must respectively sign under penalty of perjury.[26]

49.  For in-person absentee voting, the municipal clerks serve as the witnesses, and they must put down the clerk's office address but, upon information and belief, they can just use a stamp.[27]  Other forms of absentee voting, such as for hospitalized voters and voters in nursing homes, through an agent or special voting deputy ("SVD") require the agent or SVD to serve as the witness.

50.  Because Wisconsin law requires that mail-in absentee ballots' certifications be signed by the voter and by a witness who is an adult U.S. citizen,[28] this requirement constitutes an insurmountable hurdle for many eligible Wisconsin voters under self-quarantine.  All eligible Wisconsin voters under self-quarantine who live alone or who do not have an adult U.S. citizen in their household will be unable to satisfy the state's witness signature requirement and cast a mail-in absentee ballot.

51.  According to the U.S. Census Bureau, there are over 675,000 single-member households in Wisconsin, and many other households that include only one adult.[29] More than 250,000 of these single-member households are individuals over the age of 65.[30]

52.  Since in-person voting would pose a severe risk to the bodily integrity and lives of eligible Wisconsin voters who are under quarantine, that option is not viable either.  Indeed, in-

---

[26] *Id*.

[27] *See Absentee Voting 101*, WIS. ELECTIONS COMM'N (Sept. 7, 2016), https://elections.wi.gov/node/4086 (last visited Mar. 25, 2020).

[28] As noted previously, for military and overseas voters, the witness need not be a U.S. citizen.

[29] *See* U.S. Census Bureau, *supra* note 7.

[30] *Id*.

18

person voting, which requires the gathering of many poll workers (or "election inspectors") and voters in a single polling place, would seem to violate Emergency Order #12's clear directives. Under the current circumstances, given the acknowledged public health hazard of contracting COVID-19 from in-person voting and Emergency Order #12's directives to remain at home, the witness signature requirement preventing certain eligible Wisconsin voters from casting a mail-in ballot constitutes an undue burden on the right to vote not justified by any legitimate or important government interest.

53.     Plaintiffs Sylvia Gear, Dr. Malekeh Hakami, Patricia Ginter, and Claire Whelan are all eligible, registered Wisconsin voters who must vote by mail-in absentee ballot to safeguard their lives during this pandemic.  Because they all live alone and are all self-quarantining during the COVID-19 pandemic, given their advanced age and medical histories, the CDC's recommendations, and now Governor Evers's Emergency Order #12, Plaintiffs have no way to safely obtain a witness signature on their mail-in absentee ballots certifications and are therefore effectively disenfranchised by Wis. Stat. § 6.87(4)(b)1.  Absent a court order enjoining the witness signature requirement for the duration of the COVID-19 pandemic, and certainly no less than the duration of Governor Evers's Emergency Order #12 (currently in effect through April 24, 2020, subject to any further extension), they will be denied their right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

54.     Disenfranchising mail-in absentee voters because they are self-quarantining and cannot obtain a witness signature on their ballot certification envelope cannot be justified by any legitimate, important regulatory interest of Wisconsin state government officials, including Defendants.  As is clear from Emergency Order #12, Wisconsin state government officials have a very strong public health interest in limiting in-person voting and incentivizing participation by

19

mail-in absentee ballot.  If the latter option is closed off to individuals who live alone or do not

have an adult U.S. citizen in their household, they may well resort to in-person voting, thereby

running the risk of contracting and spreading COVID-19 and further worsening the pandemic in

Wisconsin.  Others, like Plaintiffs, will be prevented from voting altogether, an unconstitutional

result that this suit seeks to prevent.

## CLAIMS

### COUNT ONE
### (All Plaintiffs)
### (Undue Burden on the Right to Vote in Violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)

55.     The factual allegations contained in paragraphs 1 through 54 are incorporated into

Count One, as though fully set forth herein.

56.     Under the First and Fourteenth Amendments to the U.S. Constitution, any burden

on the right to vote must be balanced against a state's interest in that requirement.  The Supreme

Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id*., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also One Wisconsin Institute, Inc. v. Thomsen*,

15-cv-324-jdp, 2016 WL 4059222 at *3 (W.D. Wis. July 29, 2016) ("This analysis proceeds under

what is known as the *Anderson–Burdick* framework, which sets out a three-step analysis. First, I

determine the extent of the burden imposed by the challenged provision. Second, I evaluate the

20

interest that the state offers to justify that burden. Third, I judge whether the interest justifies the burden.").

57.     The witness signature requirement for absentee mail-in ballots requires mail-in absentee voters to obtain an adult U.S. citizen's signature certifying that the voter cast the mail-in ballot themselves.  Wis. Stat. § 6.87(4)(b)1.

58.     Under the circumstances of the COVID-19 pandemic, which has led both the federal and Wisconsin state government to declare emergencies and has led Governor Evers to issue Emergency Order #12, ordering Wisconsin residents to stay at home (with limited exceptions) and banning "[a]ll public and private gatherings of any number of people that are not part of a single household or living unit," it is not safe, reasonable, or even logical to require mail-in absentee voters who live alone or do not have an adult U.S. citizen living in their household to seek out and obtain a witness's signature in order for the ballot to be validly cast and counted.

59.     Not only does continuing to require a witness signature on a mail-in ballot in the face of this fast-spreading pandemic lack support from a legitimate government interest that is "compelling" or "important," *Burdick*, 504 U.S. at 434, but it would directly contradict the state's proffered interest in maintaining strict separation of people who are not family members, as manifest on every page of Governor Evers' Emergency Order #12.

60.     Given the circumstances of the COVID-19 pandemic, eligible Wisconsin voters who live alone or who do not have an adult U.S. citizen living in their household simply cannot comply with the requirements of Wis. Stat. § 6.87(4)(b)1. and still cast a mail-in absentee ballot that will count.  Therefore, under these circumstances, Section 6.87(4)(b)1. now creates an undue burden on mail-in absentee voters' right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as construed by *Anderson* and *Burdick*.

61.     In-person voting of course is not a reasonable alternative, as that would require these eligible Wisconsin voters to enter a confined space with even more people than would be required to witness the casting of a mail-in absentee ballot and seriously jeopardize their health and life.

62.     Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

63.     For the foregoing reasons, Defendants have deprived and will continue to deprive Plaintiffs of the right to be free of undue burdens on their right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as enforced by 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

(a) Assume jurisdiction over this matter;

(b) Declare that Wis. Stat. § 6.87(4)(b)1. violates the First and Fourteenth Amendments to the U.S. Constitution, as enforced through 42 U.S.C. § 1983;

(c) Issue a temporary restraining order and a preliminary injunction enjoining Defendants from enforcing Wis. Stat. § 6.87(4)(b)1. and from rejecting and/or refusing to process and count absentee mail-in ballots that lack a witness signature for at least such time as Emergency Order #12 remains in place, subject to further extension;[31]

---

[31] Because Defendants cannot feasibly ascertain and police which of Wisconsin's three million-plus registered voters live alone and/or have adult U.S. citizen living in the same household, Plaintiffs seek an injunction blocking this law on its face for at least such time as Emergency Order #12 remains in place, subject to further extension.

(d) Issue a permanent injunction enjoining Defendants from enforcing Wis. Stat. § 6.87(4)(b)1. and from rejecting and/or refusing to process and count absentee mail-in ballots that lack a witness signature for at least such time as Emergency Order #12 remains in place, subject to further extension;

(e) Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

(f) Grant Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and as otherwise permitted by law; and

(g) Grant such other relief as this Court deems just and proper.

23

DATE: March 26, 2020

Respectfully submitted,

/s/ Jon Sherman

Jon Sherman*
D.C. Bar No. 998271
Michelle Kanter Cohen*
D.C. Bar No. 989164
Cecilia Aguilera*
D.C. Bar No. 1617884
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org
(202) 331-0114

Douglas M. Poland
State Bar No. 1055189
David P. Hollander
State Bar No. 1107233
RATHJE WOODWARD LLC
10 E Doty Street, Suite 507
Madison, WI 53703
Phone:  608-960-7430
Fax:  608-960-7460
dpoland@rathjewoodward.com
dhollander@rathjewoodward.com

*Counsel for Plaintiffs*

*Admitted to the U.S. District Court for the
Western District of Wisconsin*

24