# Exhibit B

2006 WL 8435145
Only the Westlaw citation is currently available.
United States District Court, W.D.
Tennessee, Western Division.

Senator Ophelia FORD, William Martin
Suggs, Paul F. Lowe, Gwendolyn
Ellerson, Louvenia Hampton,
and Naomi B. Tate, Plaintiffs,

v.

The TENNESSEE SENATE (composed
of Senators Mae Beavers, Diane Black,
Jim Bryson, Tim Burchett, Rusty Crowe,
Raymond Finney, David Fowler, Bill
Ketron, Randy McNally, Jeff Miller,
Mark Norris, Curtis S. Person, Jr., Ron
Ramsey, Steve Southerland, Jim Tracy,
Michael R. Williams, Jamie Woodson,
Kathryn I. Bowers, Charlotte Burks,
Stephen I. Cohen, Jerry W. Cooper, Ward
Crutchfield, Thelma Harper, Joe M.
Haynes, Douglas Henry, Roy Herron,
Doug Jackson, Tommy Kilby, Rosalind
Kurita, James F, Kyle, Jr., Don McCleary,
John S. Wilder and Plaintiff, Ophelia
Ford, all in their official capacity) and Lt.
Governor John S. Wilder, Defendants.

Case No. 06-2031 D V
|
Signed 02/01/2006

**Attorneys and Law Firms**

David J. Cocke, Evans Petree, PC, Steven J. Mulroy,
Law Office of Steven J. Mulroy, Memphis, TN, Janet M.
Kleinfelter, Office of Attorney General, Nashville, TN, for
Plaintiffs.

William N. Helou, Mglaw, PLLC, Janet M. Kleinfelter, Office
of Attorney General, Nashville, TN, Robert B. Rolwing,
County Attorney's Office, Memphis, TN, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' REQUEST FOR RELIEF AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

BERNICE BOUIE DONALD, UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the Court pursuant on Plaintiffs' request for preliminary injunctive relief pursuant to Fed. R. Civ. P. 65(a) and Defendants' Motions in Opposition thereto, and Motions to Dismiss. Plaintiffs filed suit seeking injunctive and declaratory relief in this Court on January 18, 2006. That same day, the Court granted Plaintiffs' application for a temporary restraining order pending the hearing of Plaintiffs' request for preliminary injunctive relief. On January 25, 2006, the Court held a hearing on Plaintiff's request for injunctive relief, wherein the Court heard testimony and received evidence. For the reasons set forth below the Court finds that the Plaintiffs have stated a cause of action and are entitled to partial relief. The Court holds that this Court does not have jurisdiction to decide an election dispute, as that issue is textually committed to the Tennessee Senate.

**I. FACTS**

This litigation is in response to an election contest concerning the special election for the Tennessee State Senate District 29 seat vacated by John Ford on May 27, 2005. Plaintiff Ophelia Ford ran as the Democratic nominee, while Terry Roland was the Republican nominee.[1] The special election was held on September 15, 2005, and the results, indicating a narrow victory by Plaintiff Ford, were certified by the Shelby County Election Commission to the State Coordinator of Elections. According to the certified results, Plaintiff Ford received 4,333 votes, Roland received 4,320 votes, independent candidate Robert Hodges received 89 votes, and five write-in candidates received nominal votes. Thus, Plaintiff Ford's margin of victory was a mere thirteen votes. Concerned with perceived irregularities with the election, on September 23, 2005, Roland filed election contests in both the Tennessee Senate and the Chancery Court for Shelby County.[2] The Chancery Court action was dismissed pursuant to a consent order entered by that court on November 29, 2005. See Consent Order Of Dismissal, _Terry Roland v._

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

Phil Bredesen, et al., Shelby County Chancery Court, No. CH-05-1767-3.

Regarding the election contest proceedings in the Tennessee Senate, Lieutenant Governor John Wilder, as Speaker of the Senate, empaneled a Special Ad Hoc Committee ("Committee") to investigate the allegations raised in Mr. Roland's election contest and ultimately make recommendations to the full Senate. The Committee has subsequently met several times, including one meeting in Shelby County. The Committee has not yet made any final recommendations concerning the election contest to the full Senate. In the meantime, on January 10, 2006, Plaintiff Ford was provisionally seated by the Senate pending the outcome of the ongoing election contest. On January 17, 2006, the Senate, meeting as a Committee of the Whole, voted 17-14 to send Proposed Senate Resolution 7002 to the floor for a vote by the full Senate. The proposed resolution reflected the Committee of the Whole's finding that the special election in District 29 was so tainted with irregularities that the result of the election was untrustworthy and should be voided. The Senate was scheduled to reconvene on January 19, 2006, at which time it could have taken up consideration of Proposed Resolution 7002. Plaintiffs initiated this suit on January 18, 2006, alleging claims pursuant to the Voting Rights Act, 28 U.S.C. § 1971, and the equal protection and due process guarantees of the Constitution. Plaintiffs now seek a preliminary injunction prohibiting the Tennessee Senate from "effectuating Senate Resolution 7002," "disenfranchising the two classes of voters complained of in the complaint," "using in its election contest any rule, practice or procedure which differs from the rule, practice or procedure in effect prior to the special election," and "enjoining the Senate to use rules, practices, and procedures in an equal and uniform manner so that District 29 voters are treated equally with all other voters." Plaintiffs' Memorandum Of Law ("Plaintiffs' Memo"), R. 28 at 27.

 **\*2** On January 25, 2006, the Court heard testimony from witnesses and entertained argument of counsel on the issues involved in this case.

## II. JURISDICTION AND JUSTICIABILITY

Plaintiffs invoke this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. Plaintiffs' claims alleging constitutional and civil rights violations attributable to Defendants sufficiently plead a matter within to this Court's subject matter jurisdiction. However, a component of the Court's inquiry regarding the propriety of granting the relief requested is whether this matter represents a justiciable case or controversy. That is, while the Court is satisfied that Plaintiffs have sufficiently invoked the Court's subject matter jurisdiction, such a finding alone does not entitle Plaintiffs to consideration of the merits of their claims. Rather, Plaintiffs must also demonstrate that this matter satisfies the various constitutional and/or prudential doctrines of justiciability. Defendants collectively argue that Plaintiffs' claims are non-justiciable on the following grounds: the prohibition on rendering advisory opinions, standing, ripeness, and the political question doctrine. The Court will address each argument below.

## II.A ADVISORY OPINIONS

The core limitation of federal judicial power imposed by the Constitution prohibits federal courts from rendering advisory opinions. See Flast v. Cohen, 392 U.S. 83, 96 (1968). The prohibition exists to ensure the vitality of the separation of powers and that the dispute before the court is amenable to judicial resolution. Id. at 97. Two circumstances characterize disputes calling for impermissible advisory opinions when a federal court is asked to grant some form of relief: first, there is lacking an actual dispute between adverse parties, see U.S. v. Johnson, 319 U.S. 302, 305 (1943), and, second, that the federal court relief requested may not effect some change or otherwise have some measurable effect. See e.g., Chicago & Southern Airlines v. Waterman S. S. Corp., 333 U.S. 103, 113-14 (1948)(refusing judicial review of administrative decisions which, even after hypothetical Supreme Court review, the President was free to treat as mere recommendations pursuant to his executive discretion).

Defendants allege that the prematurity of Plaintiffs' suit, seeking to enjoin the Tennessee Senate from taking some speculated action, renders any judgment by this Court an advisory opinion. Senator Ron Ramsey's Memorandum Of Law And Fact In Support Of His Motion To Dismiss Plaintiffs' Amended Complaint ("Senator Ramsey's Memorandum"), R. 8(2) at 13(citing Muskrat v. United States, 219 U.S. 346, 362 (1911) ). Defendants posit that passing on the validity of the Tennessee Senate's actions at this point will amount to no more than an advisory opinion because the Court would be merely advising the Tennessee Senate of the legality of its potential future course of action, rather than remedying a harm caused by the Senate. Id. The

**Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)**

2006 WL 8435145

Court first notes that the Supreme Court found a request for an advisory opinion inherent in <u>Muskrat</u> because there were not two adverse parties to the litigation in that case. See [Muskrat, 219 U.S. at 361-62](). Second, the particular statute at issue in that case essentially provided for a lawsuit in order to address the validity of a prior act of Congress, therefore the Court refused to pass on the validity of a statute which merely called for the Court to decide the constitutionality of another statute. [Id. at 349-50](). The matter presently before the Court is somewhat distinguishable. First, there can be no doubt that Plaintiffs, at least the voter Plaintiffs, are parties with interests adverse to the Defendants in that Plaintiffs fear the improper and unconstitutional invalidation of their votes due to conduct attributable to the Defendants. Second, Plaintiffs are in federal court to preserve their fundamental constitutional right to vote and have their vote counted, [Reynolds v. Sims, 377 U.S. 533 (1964)](), and they plainly feel that federal court intervention is the only manner in which they can preserve that right from derogation by the Defendants. Thus, Plaintiffs do not seek relief which will cause the Court to render an impermissible advisory opinion.

 **\*3**  The Court notes again its limitations in crafting any form of relief which treads too perilously on the constitutional prohibition of rendering an advisory opinion. However, the Court finds that Plaintiffs' suit does not fail for lack of justiciability as a matter calling for the rendering of an advisory opinion.

## II.B STANDING

The requirement that a plaintiff have standing to bring a claim before the Court is fundamental to the Court's explicit command to exercise jurisdiction only over cases and controversies. Standing seeks to determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." [Warth v. Sedlin, 422 U.S. 490, 498 (1975)](). The Supreme Court has identified three requirements to confer constitutional standing on a plaintiff: 1) the plaintiff must demonstrate that she has suffered injury in fact; 2) injury is fairly traceable to the conduct of the defendant; and 3) that the injury is likely to be redressed by a favorable decision of the federal court. [Bennett v. Spear, 520 U.S. 154, 162 (1997)](). The requirement of demonstrating injury may be satisfied with a showing of "threatened or actual injury resulting from the putatively illegal action." [Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973)](); <u>see</u> <u>also</u> [City of Los Angeles v. Lyons, 461 U.S.]()

[95, 101-02 (1983)]()(explaining that "plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical')([citations omitted]()). Voters have standing when they "are asserting a plain, direct, and adequate interest in maintaining the effectiveness of their votes." [Baker v. Carr, 369 U.S. 186, 208 (1962)]() (internal quotation marks omitted). In addition, parties seeking injunctive and declaratory relief, as are Plaintiffs in this matter, must demonstrate a likelihood of future harm. [City of Los Angeles, 461 U.S. at 111]().

## II.B.1 THE INJURY REQUIREMENT

Defendants first assert that Plaintiffs have "not suffered a distinct and palpable injury," thus failing to meet the constitutional minimum required to confer standing. Memorandum In Support of State Defendants' Motion To Dismiss Plaintiffs' Amended Complaint And Response In Opposition To Motion For Preliminary Injunction ("Defendants' Memo") R. 10 at 13. Defendants argue that Plaintiffs have suffered no actual or imminent injury, but rather seek federal court intervention to prevent a hypothetical or conjectural injury. According to the Defendants, so long as Senate action regarding the voiding the special election is merely proposed, no actual or imminent injury is visited upon the Plaintiffs. Defendants also contend that the disenfranchisement of the classes of voters described in Plaintiffs' Second Amended Complaint amounts to no more than a fear of injury that is too abstract and not sufficiently distinct and personal to the Plaintiffs to confer standing. Thus, Defendants argue, the Plaintiffs' claims are no more than a generalized grievance common to all citizens concerned that the Constitution and laws be applied properly. Defendants' Memo, R. 10 at 14-15.

Plaintiffs contend that, despite the Defendants' characterization of their alleged injury as "hypothetical" and "conjectural," such injury is sufficiently imminent for purposes of finding standing to assert their constitutional claims. Plaintiffs' Memo, R. 28 at 14. Further, Plaintiffs contend that their claims are not generalized grievances for which no standing should be conferred, because the proposed resolution which, if passed in its present form by the full Senate, ostensibly seeks to void the election, does so on the premise that certain discrete groups of votes should be invalidated. Thus, Plaintiffs contend, while all voters of

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

District 29 face general disenfranchisement, certain votes have been targeted for invalidation in violation of various provisions of the Constitutions of the United States and Tennessee and provisions of federal law.

 **\*4** Determining whether the Plaintiffs have standing to bring this action necessarily requires the Court to determine whether the injury contemplated by Plaintiffs has been clearly "threatened" and is therefore sufficiently "imminent" that the Plaintiffs may seek the relief requested in their complaint. The threatened injury to Plaintiffs, invalidation of their votes and at least temporary loss of representation in the Tennessee Senate, certainly is sufficient to satisfy the injury requirement of standing. The imminence of the threatened injury, while still subject to the processes of the Tennessee Senate, appears to this Court to be manifest, given the Plaintiffs' allegation that the Senate "has scheduled a final vote [on Proposed Resolution 7002] by the full Senate for the day after this Court has set as its deadline for ruling." Plaintiffs' Memo, R. 28 at 3. Thus, given that substantially all of the Senators eligible to vote on the resolution have already voted on the resolution once, as a committee of the whole, the potential that Plaintiffs will suffer the injury complained of appears more than "conjectural" or "hypothetical;" indeed to this Court the threatened injury seems imminent. Therefore, the Court finds that Plaintiffs have sufficiently alleged a threatened and imminent injury for which they have standing to seek redress in this Court.

Furthermore, the Court is not persuaded that the injury contemplated by the Plaintiffs is a mere generalized grievance insufficiently personal and distinct to confer standing. Plaintiffs, at least some of whom are among the discrete groups of votes which Defendants are attempting to invalidate, have alleged that injury will result not only from the loss of their representation in the Senate, but also from the voiding of an entire election on the basis of the unconstitutional and illegal treatment of smaller subsets of votes. Thus, while all voters in District 29 might have a generalized grievance that they will lack representation in the Senate, Plaintiffs in this matter have specifically alleged that their individual ballots have been targeted for purposeful, and allegedly unconstitutional, invalidation. Therefore, Plaintiffs in this matter have sufficiently alleged a threatened and imminent injury to satisfy the injury requirement of standing.

### II.B.2 CAUSATION AND REDRESSABILITY

Defendants next contend that Plaintiffs cannot trace any alleged injury to the actions of any named Defendant. Plaintiffs have addressed this contention, in part, by amending their complaint, pursuant to the Court's grant of leave to so amend, to name as a Defendant to this matter "The Tennessee Senate." See Plaintiffs' Second Amended Complaint, R. 26. Thus, Plaintiffs can certainly trace their injury to the Defendant. The Court need not speculate as to whether the harm which it has already found to be imminent will result from the Senate action at issue in this matter. Nothing but the Senate's decision to void the special election will cause the harm contemplated by Plaintiffs; the Court can conceive of no "independent variables" separating the Senate's conduct and the injury, or that the injury is the "indirect result from the independent action of some third party not before the court." Allen v. Wright, 468 U.S. 737, 757 (1984)(citations omitted). Thus, the Court holds that, for the purposes of standing, Plaintiffs have sufficiently demonstrated that their injury is traceable to the Tennessee Senate, presently named as a Defendant in this matter.[3] Defendants do not appear to argue that this Court is incapable of granting relief that will redress the injury contemplated by the Plaintiffs, other than to suggest that any intervention by the Court at this stage will invariably result in the rendering of an advisory opinion. As discussed supra, pages 5-7, the Court is mindful of the prohibition on advisory opinions and will faithfully observe that constitutional limitation on its jurisdiction considering Plaintiffs' requested relief.

### II.C RIPENESS

Ripeness, though often requiring considerations which are entwined with determining a party's standing to bring an action, is a distinct justiciability doctrine focusing on when a party may bring an action, rather than whom may bring such action. The requirement of ripeness serves to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" over injuries that are speculative, and may never occur. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967). In evaluating whether a case is ripe for review, a court must consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149. A court's inquiry regarding the fitness of the particular issues for judicial decision concerns whether the factual record of the case renders the case too premature or abstract for adjudication. See Socialist Labor Party v. Gilligan, 406 U.S. 583, 588-89 (1972). Hardship

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

wrought by a court's decision to withhold consideration may result when: 1) the court's refusal leaves the party to choose between foregoing allegedly lawful conduct or risking substantial sanctions, see Abbott Laboratories, 387 U.S. at 152-53; or 2) enforcement of a challenged statute or decision is certain, and only some delay in commencement of the action purports to render the matter unripe, see Buckley v. Valeo, 424 U.S. 1, 117-18 (1976)(finding a challenge to Federal Election Commission appointment procedures ripe based on "impending future rulings and determinations" by the F.E.C.).

 **\*5** Defendants primarily contend that Plaintiffs' claims lack ripeness because the Tennessee Senate has not finally acted to void the special election. Defendants cite Young v. Klutznick, 652 F.2d 617 (6th Cir. 1981), wherein the Sixth Circuit applied the Abbott test for ripeness set forth above and concluded that the mayor of Detroit's challenge alleging an undercount of minorities in the 1980 census was unripe. Regarding the Abbott inquiry of whether the case was ripe for review, the Court determined that there was an insufficient record on which to evaluate whether the harm alleged to result from the undercount, essentially dilution of the minorities' voting power, was anything more than hypothetical, in part because the state legislature was not required to accept the census count, and that body had not even "expressed a reaction to the census enumeration." Young, 652 F.2d at 626. Here, it is undisputed that the Tennessee Senate has "expressed a reaction" to the events which form the basis of the Plaintiffs' complaint. Proposed Resolution 7002 seeks to void an election based on the targeted invalidation of a number of votes, including those cast by at least some of the Plaintiffs. Furthermore, the Tennessee Senate has already enumerated the reasons why it seeks to void the election. The Plaintiffs need not await the eventual voiding of the election in order to discern all of the Senate's reasons for doing so, for the Senate has already informed Plaintiffs and everyone else why it seeks to void the election.

In Young, the Sixth Circuit, in considering the other prong of the Abbott test for ripeness, the harm resulting to the parties if the court refused consideration, determined that the dilution of the minorities' voting power could not be proven to be a harm certain to occur, even if the state legislature did choose to act on the 1980 census. Young, 652 F.2d at 626. Thus, the alleged harm was in essence a hypothetical postulation on what might occur if the state legislature might one day decide to accept the findings of the 1980 census. In the instant case, while Plaintiffs may only speculate that

the Senate will take up Proposed Resolution 7002 in the near future, a supposition bolstered by Plaintiffs' allegation that the Senate intends to vote on the resolution on the day after this Court's deadline for its decision regarding the injunction, the evidence before the Court certainly lends credence to Plaintiffs' position that anticipated Senate action on this matter is more than conjectural or hypothetical. As Plaintiffs point out, in Young the redistricting process that the plaintiffs in that case feared would lead to dilution of minority votes had not begun, whereas, the Senate process that the instant Plaintiffs fear will deprive them of certain rights has already reached its final stage. Plaintiffs Memo, R. 28 at 6-7.

Finally, Defendants contend that this matter is unripe because the Plaintiffs' claims are "anchored in future events which may not occur as anticipated, or at all." Defendants' Memo, R. 10 at 9 (quoting Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.2d 272, 284 (6th Cir. 1997) ). The Sixth Circuit's language must be understood to limit the ripeness of a matter not on whether the event is anchored in the future, as the Supreme Court has already held that an action may be ripe despite its basis in "impending" events. See supra pg. 13 (discussing Buckley, 424 U.S. at 118). Rather, the Sixth Circuit's language in Magaw must be construed to limit ripeness on the uncertainty over whether a future event will occur as expected or at all. While it is possible that the Tennessee Senate may yet choose not to have a floor vote on Proposed Resolution 7002, it seems clear to this Court that such a vote is highly probable, given, once again, that Plaintiffs allege that the Senate has rescheduled consideration of the resolution for the day after this Court's deadline for ruling on Plaintiffs' request for injunctive relief. Plaintiffs further point out that in other cases the Sixth Circuit has required less than full certainty over the likelihood of future events for purposes of assessing ripeness. See Kardules v. City of Columbus, 95 F.3d 1335 (6th Cir. 1996)(finding ripeness in plaintiffs' claim of "vote impairment" injury while seeking pre-enforcement review of township-village merger contract where injury was only "highly likely" or "highly probable" if two future events occurred: approval of a contract of merger by a committee or local representatives and placement of a merger initiative on a ballot). Accordingly, to give effect to the Sixth Circuit's language in Kardules, this Court finds that less than a full certainty of future events will suffice to render a particular claim ripe for adjudication. Further, the ripeness inquiry required by Abbott necessarily entails a court's equitable consideration of the type of harm that will be suffered should a court refuse consideration of a matter on ripeness grounds. In this case, the Plaintiffs' potential loss of representation in the

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

Senate, as well as the invalidation of their votes on allegedly unconstitutional and illegal grounds suggests substantial and irreparable harm to the Plaintiffs. Accordingly, and for all the reasons given above, the Court finds that Plaintiffs' claims are ripe for adjudication because Plaintiffs face substantial risk of irreparable harm should the Court refuse consideration of their claims, and the Plaintiffs have sufficiently set forth a factual record demonstrating that at least some of the issues raised in this matter are ripe for judicial determination.

**\*6** Next, the Court will address the Constitutional and statutory issues of Due Process, Equal Protection, and Voting Rights raised in Plaintiffs' complaint.

## III. EQUAL PROTECTION

The Equal Protection Clause of the United States Constitution ensures that the rights and privileges of U.S. citizens are not accorded or taken in an arbitrary and capricious manner. Baker v. Carr, 369 U.S. 186 (1962). This clause provides that, "No State shall ... deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. The right to vote is zealously guarded by the Equal Protection Clause. "[E]specially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533 (1964). Other rights, even the most basic, are illusory if the right to vote is undermined. Wesberry v. Sanders, 376 U.S. 1, and 7 (1964). This meticulous scrutiny not only applies to casting a ballot but to the entire voting process, because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Id. at 555; see also Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).

The Equal Protection Clause undoubtedly continues to ensure that the right to vote remains untrammeled during election contests. In Bush v. Gore, the United States Supreme Court faced the task of determining whether the Florida Supreme Court's recount standards for a presidential election were consistent with the guarantees of the Equal Protection Clause. 121 S.Ct. 525 (2000). The United States Supreme Court examined the Florida Supreme Court's mandate to determine the "intent of the voter" and found that the Florida Supreme Court's mandate did not "satisfy the minimum requirement for nonarbitrary treatment of voters to secure the fundamental

right." Id. at 530. The Court noted "that the idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." Id. at 531 (quoting Moore v. Ogilvie, 89 S.Ct. 1493 (1969) ). The U.S. Supreme Court opined that compliance with equal protections in the Florida situation were lacking "in the absence of specific standards to ensure its equal application." Id. Any remedy the Court held "would require not only the adoption (after opportunity for argument) of adequate statewide standards for determining what is a legal vote, and practicable procedures to implement them, but also orderly judicial review of any disputed matters that may arise." Id. at 532. Thus, the lesson from Bush v. Gore is that there must be standards in place to assure the guarantees of the Equal Protection Clause, and that judicial review is appropriate to protect fundamental federal rights.

While the instant case does not involve a statewide election, nonetheless, the fundamental right to vote is at stake. Unlike the Bush case, the Tennessee Senate has not articulated *any* standard to void the election or "disqualify" votes with certainty. In its brief Defendant states, "neither Plaintiff nor Defendant knows what standard will be applied." Defs.' Mem. Supp. Mot. Dismiss at 28 n. 16. In the hearing on injunctive relief, Defendants argued that the Senate would apply the rule announced in the case of Emery v. Robertson County Election Commission, 586 S.W.2d 103 (Tenn. 1979). Emery provides that an election may be voided "upon a sufficient quantum of proof that fraud or illegality so permeated the conduct of the election as to render it incurably uncertain." Id. at 109. However, the Senate must promulgate uniform standards for determining what is a legal vote. Bush v. Gore, 121 S.Ct. at 533. Defendants point to votes challenged on residency grounds, and votes cast by "single signers", as two classes of illegal votes that support voiding the election. Plaintiffs contend that these classes of votes support neither a finding of fraud nor illegality, but rather constitute mere mistakes and omissions. The Senate must resolve the issue in accordance with Equal Protection and Due Process requirements.

**\*7** The standard pronounced in Emery has been sharpened since 1979. In Forbes v. Bell, the Tennessee Supreme Court stated, " '[h]onest mistakes, mere omissions, or irregularities in directory matters—even though gross—if not fraudulent, will not void an election unless they affect the result or at least render it uncertain." 816 S.W.2d 716, 720 (Tenn. 1991) (citing Summit v. Russell, 285 S.W.2d 137, 141 (Tenn. 1955) ). The Tennessee Supreme Court further stated that "technical non-conformity with election statutes will not necessarily

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.   6

void an election" and "[i]nvalidating an election solely on the basis of technical omissions, much like failing "to cross a 't' or dot an 'i' would effectively disenfranchise voters." Forbes, 816 S.W.2d at 721 (quoting Foust v. May, 660 S.W.2d 487, 490 (Tenn. 1983) ). This standard has been applied in Tennessee elections since 1991. Forbes, 816 S.W.2d 716. In this case, James H. Johnson, Administrator of Elections for Shelby County, testified that in his thirty-four year history with the Election Commission, votes have not been routinely excluded because of failure of the technical requirement that voters sign both the application for ballot and the poll book.[4]. Thus, Senate Resolution 7002 represents a radical departure from past practice and penalizes voters for the failings of election officials in contravention of Tennessee case law. See Browning v. Gray, 191 S.W. 525 (Tenn. 1917) (holding that technical failure of polling officials to take oath of office would not void an election because to do so would unnecessarily disenfranchise voters for minor mistake and thwart the will of the community).

The confusion generated by the lack of an articulable standard consistent with Tennessee's previous election practices is further illustrated by Senator Mark Norris's statement that a person's vote could not be counted even if they are registered when "there is an error or mistake or fraud by the voter or whether it's an error or a mistake or fraud by the poll worker, if there is a violation of the law, there is a violation of the law." This seems clearly inconsistent with the State's past practice that "not every irregularity, or even a combination of irregularities, will necessitate the invalidation of an election." Forbes, 816 S.W.2d at 724.

Under the Equal Protection Clause, in order to avoid selective disenfranchisement, election contests must be conducted with specific and consistent non arbitrary standards. Gary v. Sanders, 372 U.S. 368 (1963). (A constitutional violation found where a state accorded arbitrary and disparate treatment to voters in its different counties). Because the Senate has not articulated a clear statement of the standard it is applying that is uniform with past elections, conceivably each Senator may choose to act for different reasons, some or none of which may be consistent with those used in previous elections. Moreover, without an articulated standard, there is no way of determining whether citizens have further suffered denial of a fundamental right.

**\*8** Defendants argue that all ballots for Senate District 29 are being judged uniformly, therefore, there are no Equal Protection concerns. These arguments are flawed as they rest upon an unsound premise and are at odds with settled jurisprudence. Bush v. Gore, supra. The Equal Protection Clause requires that the voters in Senate District 29 be judged by the same "uniform" standards as voters in every other senate district across Tennessee. Tenn. Const. art. IV, § 1. The Tennessee Constitution in mandating a uniform standard espouses a rational basis for treating all voters, rural and urban, black and white, and young and old, alike. The establishment of a different standard that applies only to a discrete subclass of voters in District 29 during a special election, offends the basic premise of Equal Protection. As the Supreme Court in Bush v. Gore did not confine its analysis to the Florida districts that were under mandate to recount, but considered the inequity of allowing a recount in only a portion of the state, Equal Protection does not countenance a special rule for the voters of District 29. Bush v. Gore, 531 U.S. at 107-08. Although there was no election contest involving the rest of the state, the Court in Bush v. Gore considered that there were as many as 110,00 overvotes statewide and the overvotes would only be counted where a manual recount had been ordered. In this case, the Court must likewise consider the standards that are applied in other districts even though there is an election contest involving only District 29. This consideration is necessary to comport with constitutional notions of fairness.

Defendants also argue that in any election contest, the standards for examining votes will always be more rigid than in uncontested elections. Although measures to detect substantial mistakes or illegality may be heightened, the standard used to invalidate votes should not be. It is well settled that a state may not adopt post elections standards for judging the validity of votes that are different from pre-election standards or practices employed to determine a qualified voter. See Roe v. Alabama, 43 F.3d 574 (11th Cir. 1995). For instance, if required signatures are usually directory and not mandatory, in an election contest they must maintain their directory nature. See generally Summit v. Russell, 285 S.W.2d 137, 140 (Tenn. 1955) (election contest case holding that when it appears that no injury was done to the voters or the candidates failure to follow a directory provision did not void an election). Moreover, the standard should also conform to prior election contest standards so that if technical violations do not normally void an election, this standard should remain the same in future election contests. Any departure from this practice would allow some Tennessee voters to elect their representatives under a more lenient standard and cause other Tennessee voters to be more susceptible to selective disenfranchisement.

Case 2:20-cv-01785-BHL Filed 12/09/20 Page 8 of 14 Document 120-2

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

Accordingly, because the Tennessee Senate has failed to adopt and articulate a consistent standard that meets the uniformity requirement of the Equal Protection Clause, the Court finds that disenfranchisement of District 29 voters by excluding their votes and voiding the election would raise grave equal protection concerns.

## IV. DUE PROCESS CLAUSE

The Due Process Clause of the Fourteenth Amendment states, "[n]o State shall deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. Although individual citizens have no constitutional right to vote, once the right to vote is granted, "it is regarded as a fundamental political right, because it is preservative of all other rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). Because the right to vote is fundamental, it is subject to notice and hearing requirements before disenfranchisement. See Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1971) (finding that failure to forewarn that technical violations of elections statute could void ballot constitutes denial of due process of law).

The instant Plaintiffs allege that they have not received proper notice that their votes have been targeted for invalidation and opportunity for hearing from the Senate. Defendants have not presented any proof of notice of potential disenfranchisement. When determining whether notice and hearing is sufficient courts look to the factors articulated in Matthews v. Eldridge, 424 U.S. 319 (1976). These factors include the nature of the interest that will be affected and the risk of erroneous deprivation. Id. at 321. On balance, these constitutional norms require sufficient notice and opportunity for hearing to allow voters to defend their right to suffrage before the possibility of disenfranchisement. In this case, Defendants state that "Ms. Ford and Mr. Roland, and or their representatives were given the opportunity to speak and present evidence." (Mem. Supp. Defs' Mot. Dismiss at 3). Notice to the two political candidates does not constitute notice to the franchisees, the individually targeted voters.

 **\*9** Defendants further state that the Committee heard testimony from a variety of sources including the State Coordinator of Elections and citizens of the 29th District. However, both Plaintiffs Louvenia Hampton and Naomi Tate testified that they did not receive notice of the impending resolution to void the election from the Senate, and further

received no "official" notice that their votes were being challenged. They in fact learned of the proceedings by calls from Senator Ford's attorney about a week before the Court's proceedings which took place on January 25, 2006. This means that the Plaintiffs had not received notice that the Senate was prepared to vote whether or not to void the election by January 16th or 17th even though the vote was scheduled for January 19, 2006.

Defendants claim to have cured this failure to comply with Plaintiffs' constitutional right to due process by extending an "invitation to the Special Ad Hoc Committee meeting on January 24, 2005 [sic]" to them. However, January 24th is almost a week after Resolution 7002 was scheduled for vote. This invitation appears to be an afterthought by the Senate to comply with the U.S. Constitution only after Plaintiffs' lawsuit was filed. Moreover, it is essential that not only the named plaintiffs in this case, but each voter threatened with potential disenfranchisement in Senate District 29, be extended the rights to notice and hearing before their right to vote is potentially taken. This notice must not only be extended to voters but must also be reasonably calculated to allow an opportunity for hearing. Adequate hearings not only protect voters from disenfranchisement without due process of law, but promote voter confidence in the process. Hearings on challenged votes will allow senators to make decisions on residency and domicile, based on factual proof rather than conjecture. While such a process may appear burdensome[5], because the right to vote and have one's vote counted and valued are so fundamental, the resources of government must be brought to bear in order to protect it. The United States Supreme Court in the seminal case Marbury v. Madison, more than 200 years ago opined, "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." One of the first duties of the government is to afford that protection. Marbury v. Madison, 1 Cranch 137, 2 L.Ed 60 (1803).

Plaintiffs also assert that departures from past practice in the way elections have been administered which result in disqualification of voters violates the Due Process Clause. In Roe v. Alabama, the Eleventh Circuit found that an order by the circuit court of the State of Alabama violated the Due Process Clause by changing the policy concerning absentee ballots to allow ballots that would not have been counted under state law to be counted during that election. 43 F.3d 574, 578-85 (11th Cir. 1995). Similarly, other circuits have invalidated election contest procedures that depart from

Case 2:20-cv-01785-BHL   Filed 12/09/20   Page 9 of 14   Document 120-2

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

the norm under the Due Process Clause. See Griffin v. Burns, 570 F.2d 1065 (1st Cir. 1970) (finding that state's retroactive invalidation of absentee and shut-in ballots in primary election presented a due process violation); See also Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1970) (holding that city board election commissioner's application of new anti-duplication rule to nullify previously acceptable nominating petitions and board's decision to disallow signatures which failed to include a middle initial without prior warning to candidates of technical interpretation of statute constituted denial of due process).

**\*10** Defendant does not respond except to state that Ms. Ford cannot establish a liberty or property interest in being seated in the senate and voter plaintiffs cannot establish any liberty or property interest in having their candidate, Senator Ford, seated in the Senate. This Court expresses no opinion on whether or not Plaintiff Ford should be seated, as this is within the province of the Tennessee Senate based on its resolution of the election contest. However, Defendants' argument blatantly fails to address Plaintiffs' fundamental liberty interest in the right to vote. Moreover, Defendants also attempt to argue that the Due Process Clause is not implicated by negligent actions of an official under Daniels v. Williams, 474 U.S. 327 (1986). Daniels, a slip and fall case is easily distinguished from the case at bar. Daniels involved a tort case, wherein *mens rea* was an essential element. Due Process election law cases are clearly and easily distinguishable because the sole issue is whether the Due Process Clause was or was not violated. Defendant arguments on this point are utterly lacking in merit.

Accordingly, because the Senate's actions implicate the fundamental right to vote which is protected by the Due Process Clause of the Fourteenth Amendment the constituents of Senate District 29 are entitled to adequate notice and opportunity to be heard before any prospective disenfranchisement.

## V. VOTING RIGHTS ACT

The Voting Rights Act of 1965 codifies the Fifteenth Amendment's guarantee that no person shall be denied the right to vote on account of race or color. Plaintiffs allege that the Senate's proposed action would disqualify voters based on an error or omission that is not material to determining the voters' eligibility to vote, in violation of Voting Rights Act, 42 U.S.C. 1971(a)(2)(B). Plaintiffs also allege that Defendants'

proposed actions would deny the right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. 1973 *et seq.*

### A. Voting Rights Act, 42 U.S.C. 1971
Voting Rights Act, 42 U.S.C. 1971(a)(2)(B) states:

> No person acting under color of law shall ... deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

Plaintiffs argue that Defendants' actions potentially disenfranchise voters who signed either the application for ballot or the poll book, but did not sign both. Plaintiffs' assert that disenfranchisement in this circumstance violates § 1971 because failure to sign the application for ballot or poll book is not material in determining whether an individual is qualified to vote under Tennessee law.

The Shelby County Election Administrator, James Jones, testified that a voter who signs only the poll book must first show I.D. to a polling official to prove identity, and must then sign a poll book which shows eligibility, based on registration, to vote at that precinct. A voter who signs only the application for ballot signs an oath, under penalty of perjury, that she is whom she says she is, and must then show I.D. to a poll worker who checks to confirm that the person is validly registered. In either case, the voter has provided proof of identity, and registration has been verified. Indeed, the Shelby County Election Administrator's testimony that ballots have never been disqualified because of failure to sign both the application and the book during his thirty-four (34) year tenure also supports the Plaintiffs' proposition that the second signature is a redundant safeguard, helpful but not essential to determining whether an individual was qualified to vote, and its absence cannot justify disenfranchisement under § 1971. Notwithstanding, Tennessee law requires both signing an application and signing the poll book. Testimony by Brook Thompson reveals that the law has not been uniformly applied, and that subsequent legislation permitting variances based on particular county characteristics has been sanctioned by the State of Tennessee. This is counter to the "statewide uniform standard" requirement of the Tennessee Constitution.

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

**\*11** Defendants argue that § 1971 does not apply to the counting of votes, but to solely determining eligibility to vote. This argument is unavailing. 42 U.S.C. § 1971(e) explicitly provides that:

The word "vote" *includes all action necessary to make a vote effective* including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and *having such ballot counted* and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in a election.

42 U.S.C. § 1971(e). Therefore, § 1971 by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted. Accordingly, because The Voting Rights Act, 42 U.S.C. § 1971 prohibits officials from disqualifying votes for immaterial errors and omissions, and the State of Tennessee has in the past treated the failure to sign both the application for ballot and the poll book as an immaterial error, Defendants must avoid abridgement of the rights guaranteed under § 1971 in their actions.

**B. Voting Rights Act, 42 U.S.C. § 1973**

Voting Rights Act, 42 U.S.C. § 1973 states:

No voting qualification or prerequisite or voting standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

42 U.S.C. § 1973.

By its terms, in order to establish a viable claim under § 1973, a plaintiff must show that the voting qualification, standard, or practice was implemented at least in part because of race. 42 U.S.C. § 1973. Plaintiffs assert that although 40% of the voters in the special election were White, none of the 44 voters challenged on residency grounds is White. Plaintiffs further state that although 47% of the voters in the Special Election were Black, 93% of the challenged voters are Black. However, although these statistics underscore the need for objective standards since race is a suspect class in constitutional jurisprudence, they are insufficient to demonstrate that the Senate's actions are racially motivated. The Senate's actions do not potentially disenfranchise only the challenged voters, but rather the entire district. If the Senate should choose to void the election, not only Black voters would be disenfranchised, but each of the White voters also. Moreover, although these statistics are stark, Plaintiffs

do not proffer any evidence that the challenged voter list is inaccurate. Accordingly, because Plaintiffs have failed to show that Defendants actions are based on race or color, Plaintiffs cannot sustain a viable claim under § 1973.

**VI. TENNESSEE CONSTITUTION ARTICLE IV, § 1**

Plaintiffs finally argue that Tennessee Constitution art. IV, § 1 prohibits the Senate from imposing voting requirements in District 29 that are not imposed in every other district of the State. Art. IV, § 1 of the Tennessee Constitution provides:

Every person, being eighteen years of age, being a citizen of the United States, being a resident of the State for a period of time as prescribed by the General Assembly, and being duly registered in the county of residence for a period of time prior to the day of any election as prescribed by the General Assembly, shall be entitled to vote in all federal, state, and local elections held in the county or district in which such person resides. *All such requirements shall be equal and uniform across the state*, and there shall be no other qualification attached to the right of suffrage.

**\*12** Tenn. Const. art. IV, § 1. Plaintiffs assert that this provision along with the Equal Protection Clause and the Due Process Clauses of the United States Constitution prohibits Defendants from voiding the election based upon criteria that are not employed across the state. As the Court has previously stated, application of inconsistent standards violates federal constitutional and statutory principles. Inconsistent application of suffrage requirements also violates Art. IV, § 1 by its unambiguous terms.

Defendants argue that the language of Art. IV, § 1 refers to the qualifications for determining the existence of the right to vote and how the right itself is exercised but does not apply to a determination of whether a particular ballot should be counted or not. However, Defendants' continual attempts to distinguish a person's right to register and cast a vote from a person's right to have their vote counted are of no avail. Although no Tennessee court has ever considered the argument that the right to register and cast a vote is distinct from the right to have that voted counted, most courts considering similar issues have found that there is no legitimate distinction. See Bd. of County Comm'rs of Shelby County v. Benson, 121 F.3d 244, 247 (6th Cir. 1997) (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964) which states, "the right of suffrage can be denied by a debasement or dilution of

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

Accordingly, because Tenn. Const. art. IV, § 1 prohibits the State from instituting disparate election standards, Defendants are required to conduct election contests by the same standards utilized in each of the State's districts.

## VII. DECLARATORY JUDGMENT

As a part of the relief sought, Plaintiffs seek a declaratory judgment pursuant to The Declaratory Judgment Act, 28 U.S.C. § 2201 *et. seq.*

Defendants argue that any relief entered prior to final action by the Senate would constitute an impermissible advisory opinion. Defendants argument is unpersuasive. Parties to an actual case or controversy may seek declaratory relief to define the rights of the parties. Implicit in this statement is the right of the court to grant relief prior to final action so long as there is an actual case or controversy. See Detroit, Toledo and Ironton R.R. Co. v. Consolidated Rail Corp., 767 F.2d 274, 279 (6th Cir. 1985). Declaratory judgment is not precluded by the existence of other adequate remedies at law. Parties may have an actual, yet inchoate, dispute that has not yet reached a point where either party has a coercive remedy, or where a party is unsure of its rights and obligations. An action for a declaratory judgment may be appropriate in order to guide a party's future conduct and safeguard its legal rights. Martin Marietta Energy System v. Industrial Comm'n, 843 F. Supp. 1206, (S.D. Ohio 1994).

In order to render a declaratory judgment, the federal court must have an independent source of subject matter jurisdiction. This Court has determined that subject matter jurisdiction exists based on 28 U.S.C. § 1331, as Plaintiffs have alleged a violation of the Equal Protection and Due Process Clauses, based on actions calculated to deny, debase and dilute their right to vote under the Voting Rights Act. See Gully v. First Nat'l Bank, 299 U.S. 109, 112, 81 L.Ed. 70, 57 S.Ct. 96 (1936).

The test for determining whether an actual controversy exists is whether the facts alleged under all of the circumstances show that there is:

**\*13** • a substantial controversy;

• between parties having adverse legal interests;

• of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Martin Marietta Energy System v. Industrial Comm'n, supra.

For the reasons addressed previously, this Court finds that an actual controversy exists such that declaratory relief is appropriate. The decision whether to grant a declaratory judgment "rests in the sound discretion of the District Court." Id. On the facts presented in this case, the Court finds that relief is warranted.

## VIII. ABSTENTION

Defendants argue that this Court should not interrupt the Tennessee Senate's proceedings under the Younger Abstention Doctrine. In order for the doctrine to apply "there must be an on-going state *judicial proceeding*; those proceedings must implicate important state interests; and there must be an adequate opportunity in the state proceedings to raise constitutional challenges." Abstention Principles I-309 (citing Middlesex County Ethics Commission v. Garden State Bar Association, 457 U.S. 423, 432 (1982) ).

In this case, the Younger doctrine is inapplicable because the Senate proceedings are not judicial proceedings. Although "judicial proceedings" has been interpreted to include not only court proceedings but also administrative proceedings that are judicial in nature, Justice Scalia expressly declared that the doctrine has never been "extended to proceedings that are not judicial in nature." New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350, 370 (1989). Judicial inquiry has been stated by the Supreme Court to investigate, declare and enforce liabilities "as they stand on present or past facts and under laws supposed to already to exist." Id. Judicial proceedings also have a distinct adversarial nature involving a certain degree of protections including the opportunity to have the ultimate determination rendered by an impartial third party. This key protection is absent from the legislative body's proceedings, therefore they are not judicial in nature.

Moreover, the judicial proceedings must bear a close relationship to criminal judicial proceedings. Middlesex, 457 U.S. at 432; see also Moore v. Sims, 442 U.S. 415 (1979) (affirming application of doctrine to civil custody proceedings alleging child abuse); Huffman v. Pursue, 420 U.S. 592 (1972) (applying Younger to civil nuisance action alleging

Case 2:20-cv-01785-BHL Filed 12/09/20 Page 12 of 14 Document 120-2

Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)

2006 WL 8435145

violation of anti-obsenity ordinance). In this case, there are no accusations that Senator Ford has violated any election law or acted improperly. Accordingly because the Senate's proceedings do not bear a close relationship to criminal judicial proceedings the <u>Younger</u> Doctrine is inapplicable.

## IX. CONCLUSION

The Tennessee Senate is the final arbiter of the election contest in Senate District 29. Implicit in the exercise of its duties is the obligation to avoid arbitrary and capricious actions. The right to vote and to have one's vote counted and valued, is a fundamental right which must be zealously protected. Infringement of the right to vote, including the right to have one's vote counted, constitutes *per se* irreparable harm. All citizens, including those voting in a special election, have the right to exercise the voting franchise free from vote dilution, debasement, or denial. Further, Plaintiffs have the right to have their votes judged by the same standards applied in each of Tennessee's ninety-five (95) counties. Plaintiff voters must be accorded fundamental due process before they can be disenfranchised, even through Senate action. As such, the Senate may not exclude the votes of citizen whose residency is challenged without affording such citizen fundamental due process considerations of notice and opportunity to challenge exclusions. While the Senate has the right to decide the election contest, the Senate may not apply a different standard post-election for judging the ballot than was applied pre-election. See Rossello-Gonzalez v. Calderon-Serra, 398 F.3d 1, 16 (1st Cir. 2005).

 *14 The Senate must apply uniform, non-arbitrary, objective standards for determining and defining a legal vote. Such standard must be applied uniformly across each of Tennessee's ninety-five (95) counties. Tenn. Const. art. VI, § 1. Again, the Senate may not apply post-election standards to assess ballot validity that differ from pre-election standards. Voters whose right to vote is challenged must be afforded minimal, meaningful due process to include, notice and opportunity to be heard before they can be disenfranchised. The Senate, in its wisdom may vote to void an election, but only after it has developed and applied statewide uniform standards that govern which votes will be counted, practicable procedures to implement them, with an orderly mechanism for judicial review of disputed matters that may arise. Bush v. Gore, 531 U.S. 98 (2000).

Based on the foregoing, the Court **GRANTS** Plaintiffs' motion for declaratory relief, **DENIES** Plaintiffs' request for further injunctive relief, **DENIES** Defendant Ramsey's Motion to Dismiss for Failure to State a Claim, **GRANTS** Defendants' Motions to Dismiss Plaintiffs' 42 U.S.C. § 1973 claim based on race, and **DENIES** Defendants' motions in all remaining respects.

Before withdrawing the voting franchise from the voters of District 29, the Defendants must demonstrate a compelling reason. As Defendants acknowledge that they are bound to adhere to federal and state voting rights laws, the Court finds that Plaintiffs' request for extraordinary relief in the form of a preliminary injunction should be and is **DENIED** without prejudice.

IT IS SO ORDERED this <u>1st</u> day of February, 2006.

### All Citations

Not Reported in Fed. Supp., 2006 WL 8435145

---

Footnotes

1    Mr. Roland was initially a named defendant in this action. However, Mr. Roland has since been dismissed as a party in this matter. <u>See</u> Consent Order Granting Terry Roland's Motion To Dismiss, R. 22 (January 27, 2006).

2    Among the irregularities cited by Mr. Roland are that apparently at least two votes were cast by persons deceased prior to the election, some votes (no fewer than three) were cast by felons, a number of votes were cast by persons allegedly residing outside Senate District 29, and a number of votes were allegedly rendered invalid due to the voters' failure to comply with the dual signature requirement of state law. <u>See</u> Tenn. Code Ann. § 2-7-112(a). The Tennessee Bureau of Investigation is presently conducting an inquiry into events related to the Special Election.

3    Further, in reaching this determination, the Court does not pass on any Eleventh Amendment issues concerning Plaintiffs' amendment of their complaint to allege its causes of action against the Tennessee Senate only.

4    Q. Now at the committee meeting of the ad hoc committee were you also provided information regarding individuals who apparently didn't sign the poll book or who didn't sign the computerized poll book or the application for ballot?

**Ford v. Tennessee Senate, Not Reported in Fed. Supp. (2006)**

2006 WL 8435145

A. That is—that is correct. We did have a list of people who did not sign one or the other in terms of signing the poll book or signing the application for ballot.

Q. Now let me ask you about that. Is that—is that a common occurrence in elections?

A. In terms of not signing or signing?

Q. Not signing or signing. How often does this problem come up where people don't sign both?

A. Well, in terms of—in terms of one not signing one or the other, that's common. What we tend to do as a part of our post election evaluation of our precincts, and it certainly gives us an opportunity to gauge whether or not polling officials are doing all that they should be doing, in our updating processes we have a situation where a voter has failed to sign the poll book, we will then go to the application for ballot and to verify the fact whether or not that person participated in that election. We use that then to go on and update that voter registration.

Q. Now when you say it's common, it's a common problem, and not just in Senate District 29 but in other precincts and other districts, also?

A. In—in elections, period, I mean, it's not something that's isolated to this election. It's happened in various other elections.

5     The record reflects that out of approximately 106,000 registered voters in Senate District 29, less than 9,000 voted. The votes that are target for additional scrutiny are fewer than 200.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.