```
              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF WISCONSIN
--------------------------------------------------------------
 Donald J. Trump, Candidate for      )
 President of the United States of   )
 America,                            )
                                     )
                    Plaintiff,       )
                                     )
     vs.                             )   Case No. 20-CV-1785
                                     )
 The Wisconsin Elections Commission, )   Milwaukee, Wisconsin
 and its members, Ann S. Jacobs, Mark)
 L. Thomsen, Marge Bostelman, Dean   )   December 10, 2020
 Knudson, Robert F. Spindell, Jr., in)   9:00 a.m.
 their official capacities, Scott    )
 McDonell in his official capacity as)
 the Dane County Clerk, George L.    )
 Christenson in his official capacity)
 as the Milwaukee County Clerk,      )
 Julietta Henry in her official      )
 capacity as the Milwaukee Election  )
 Direction, Claire Woodall-Vogg in her)
 official capacity as the Executive  )
 Director of the Milwaukee Election  )
 Commission, Mayor Tom Barrett, Jim  )
 Owczarski, Mayor Satya Rhodes-Conway,)
 Maribeth Witzel-Behl, Mayor Cory    )
 Mason, Tara Coolidge, Mayor John    )
 Antaramian, Matt Krauter, Mayor Eric)
 Genrich, Kris Teske, in their       )
 official Capacities; Douglas J.     )
 LaFollette, Wisconsin Secretary of  )
 State, in his official capacity, and)
 Tony Evers, Governor of Wisconsin, in)
 his official capacity,              )
                                     )
                    Defendants.      )

--------------------------------------------------------------
         TRANSCRIPT OF EVIDENTIARY HEARING (VIA ZOOM)
           BEFORE THE HONORABLE BRETT H. LUDWIG
              UNITED STATES DISTRICT JUDGE

REPORTED BY:  JOHN SCHINDHELM and SUSAN ARMBRUSTER,
              United States Official Court Reporters

Proceedings recorded remotely by stenography via Zoom,
transcript produced by computer aided transcription.
```



```
 1    APPEARANCES:

 2    For Plaintiff:              Kroger Gardis & Regas LLP
      Donald J. Trump, Candidate  By: William Bock III, Kevin Koons
 3    for President of the        & James Knauer
      United States of America:   111 Monument Cir - Ste 900
 4                                Indianapolis, IN 46204
                                  Ph: 317-692-9000
 5                                Fax: 317-264-6823
                                  wbock@kgrlaw.com
 6
      For Defendant:              Susman Godfrey LLP
 7    Governor Tony Evers         By: Davida Brook and
                                      Stephen Morrissey
 8                                1901 Ave of the Stars - Ste 950
                                  Los Angeles, CA 90061 310-789-3100
 9                                Fax: 310-789-3150 Email:
                                  dbrook@susmangodfrey.com
10
                                  Stafford Rosenbaum LLP
11                                By: Jeffrey A Mandell
                                  222 W Washington Ave- Ste 900
12                                PO Box 1784
                                  Madison, WI 53701-1784
13                                Ph: 1-608-256-0226
                                  Fax: 1-608-256-0226
14                                jmandell@staffordlaw.com

15    For Defendants:             Wisconsin Department of Justice
      Wisconsin Elections         Office of the Attorney General
16    Commission and its          By: Corey F Finkelmeyer and
      Secretary of State, Doug        Colin T Roth
17    LaFollette                  17 W Main St
                                  PO Box 7857
18                                Madison, WI 53707-7857
                                  608-266-7342
19                                Fax: 608-267-8906
                                  finkelmeyercf@doj.state.wi.us
20
      For Defendants:             Hansen Reynolds LLC
21    George L Christenson &      By: Andrew A Jones
      Julietta Henry              301 N Broadway St - Ste 400
22                                Milwaukee, WI  53202
                                  Ph: 1-414-326-4952
23                                Fax: 1-414-273-8477
                                  jones@hansenreynolds.com
24
      Also Present:               Margaret Daun, Milwaukee County
25                                Corporation Counsel
```

2

```
CONTINUED APPEARANCES:

For Defendants:                    Milwaukee City Attorney
Tom Barrett, Claire                By: James M Carroll, Tyrone St.
Woodall-Vogg & Jim                 Junior, and Patrick McClain
Owczarski                          841 N Broadway - 7th Fl
                                   Milwaukee, WI  53202
                                   Ph: 1-414-286-8481
                                   jmcarr@milwaukee.gov

For Madison and Dane
County Defendants:                 Boardman & Clark LLP
Satya Rhodes-Conway,               By: Michael May and James Bartzen
Maribeth Witel-Behl &              1 S Pinckney St
Scott McDonell                     Madison, WI  53703
                                   Ph: 1-608-257-9521
                                   Fax: 1-608-283-1709
                                   mmay@boardmanclark.com

For Defendants:                    Lawton & Cates, S.C.,
Green Bay, Kenosha and             By: Daniel Bach
Racine                             PO BOX 399
                                   146 East Milwaukee Street
                                   Ste 120
                                   Jefferson, WI 53549
                                   920-674-4567
                                   Email: dbach@lawtoncates.com

                                   Lawton & Cates SC
                                   By: Dixon R Gahnz
                                   345 W Washington Ave - Ste 201
                                   Madison, WI 53703
                                   608-282-6200
                                   Email: dgahnz@lawtoncates.com

For Intervening NAACP
Defendants:                        Laffey Leitner & Goode LLC
Wisconsin State Conference         By: Joseph S Goode
NAACP, Dorothy Harrell,            325 E Chicago St - Ste 200
Wendell J Harris, Sr., and         Milwaukee, WI 53202
Earnestine Moss                    Ph: 1-414-312-7003
                                   Fax: 1-414-755-7089
                                   jgoode@llgmke.com

                                   Lawyers' Committee for Civil
                                   Rights
                                   Under Law District Of Columbia
                                   By: Jon Greenbaum
                                   1500 K Street NW - 9th Fl
                                   Washington, DC 20005 202-662-8315
                                   jgreenbaum@lawyerscommittee.org
```

3

```
 1
     CONTINUED APPEARANCES:
 2
     For Intervenor Defendant:      Perkins Coie LLP
 3   Democratic National            By: Charles G Curtis, Jr
     Committee:                     33 E Main St - Ste 201
 4                                  Madison, WI  53703
                                    Ph: 1-608-663-5411
 5                                  Fax: 1-608-663-7499
                                    ccurtis@perkinscoie.com
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                        I N D E X

 2    PLAINTIFF ARGUMENT

 3         BY MR. BOCK.....................................    20

 4    PLAINTIFF ARGUMENT

 5         BY MR. KOONS....................................    75

 6    DEFENSE ARGUMENT

 7         BY MR. MANDELL..................................    90

 8    DEFENSE ARGUMENT

 9         BY MR. GREENBAUM................................   116

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2          **(Call to Order of the Court at 9:15 a.m.)**

3          THE CLERK:  The court is now in session calling case

4    20-CV-1785, Trump vs. Wisconsin Elections Commission, et al.  No

09:18   5    appearances in the courtroom, all appearances by Zoom.

6               Let's start with the appearances for the plaintiff,

7    please.

8          MR. BOCK: Yes.  Thank you.  This is Bill Bock, and in

9    the room with me are Jim Knauer and Kevin Koons.  Also a couple

09:18   10   of people assisting us in the room as well.

11              We are appearing on behalf of the President of the

12   United States as candidate for President of the United States.

13         THE CLERK:  Thank you.  And appearances for Wisconsin

14   Elections Commissions, Wisconsin Department of Justice?

09:18   15         MR. FINKELMEYER:  Good morning.  Assistant Attorneys

16   General Corey Finkelmeyer and Colin Roth on behalf of the

17   Wisconsin Elections Commission and its Secretary of State, Doug

18   LaFollette.

19              THE COURT:  Good morning.

09:18   20         THE CLERK:  And appearances for Milwaukee County

21   defendants?

22         MR. JONES:  Good morning, Your Honor.  Andrew Jones of

23   Hanson Reynolds on behalf of the Milwaukee County Clerk George

24   Christenson and the Milwaukee County Elections Director Julietta

09:18   25   Henry.  Also appearing is Margaret Daun, the Milwaukee County

1   Corporation Counsel.

2           THE COURT:  Good morning.

3           MR. JONES:  Good morning.

4           THE CLERK:  And appearances for Governor Tony Evers?

09:18   5           MS. BROOK:  This is Davida Brook of Stafford

6   Rosenbaum.  With me is my partner Steve Morrissey and our

7   co-counsel Jeffrey Mandell.  Good morning.

8           THE COURT:  Good morning.

9           THE CLERK:  And appearances for City of Milwaukee

09:18   10  defendants?

11          MR. CARROLL:  Yes, Your Honor.  Assistant City

12  Attorneys Jim Carroll, Tyrone St. Junior, and Patrick McClain

13  appear on behalf of the City of Milwaukee defendants, Mayor Tom

14  Barrett, Claire Woodall-Vogg, and Jim Owczarski.  Thank you.

09:18   15          THE COURT:  Good morning.

16          THE CLERK:  And appearances for the Kenosha

17  defendants, the City of Racine defendants and Green Bay

18  defendants?

19          MR. BACH:  Good morning.  Dan Bach and Dixon Gahnz on

09:18   20  behalf of Green Bay, Racine, and Kenosha defendants.

21          THE COURT:  Good morning.

22          THE CLERK:  And appearances for Madison and Dane

23  County defendants?

24          MR. MAY:  Yes.  Appearing for the Madison and Dane

09:18   25  County defendants are Michael May, and along with me is James

1    Bartzen here in the room, of Boardman & Clark in Madison.

2            THE COURT:  Good morning.

3            THE CLERK:  And appearances for the intervenor DNC?

4            MR. CURTIS:  Good morning, Your Honor.  Charles Curtis

09:19  5    with Perkins Coie in Madison, Wisconsin, appearing on behalf of

6    the Democratic National Committee.

7            THE COURT:  Good morning.

8            THE CLERK:  And appearances for intervenor NAACP?

9            MR. GOODE:  Good morning, Your Honor.  Joseph Goode of

09:19  10   Laffey, Leitner & Goode in Milwaukee on behalf of the Wisconsin

11   NAACP defendants.

12           Jon, do you want to make your own appearance?

13           MR. GREENBAUM:  Jon Greenbaum for the Lawyer's

14   Committee for Civil Rights Under Law, also on behalf of the

09:19  15   Wisconsin State Conference NAACP, Wendell J. Harris, Sr.,

16   Dorothy Harrell, and Earnestine Moss.

17           THE COURT:  Good morning.

18           MR. GREENBAUM:  Good morning, Your Honor.

19           THE CLERK:  Any further appearances the Court should

09:19  20   be aware of?

21           (No response.)

22           THE CLERK:  No further appearances.

23           THE COURT:  All right.  So good morning, everyone.

24   We're here for the final pretrial hearing on the merits on

09:20  25   plaintiff's request for declaratory and injunctive relief.

8

1         Before we proceed further, I guess a few preliminary

2    matters we should deal with.  There was -- there have been

3    motions to quash subpoenas of plaintiff's adverse witnesses.

4    There was a motion in limine to exclude the testimony from some

09:20    5    of plaintiff's friendly witnesses, and we had a discussion of

6    that yesterday at the final pretrial, the prehearing, and the

7    Court encouraged the folks to try to work out a consensual

8    resolution.

9         Where do things stand on that, Mr. Bock?

09:21   10         MR. BOCK:  Thank you, Your Honor.  We attempted to

11   work out a resolution.  Yesterday we sent out several drafts of

12   a proposed stipulation, and we're still awaiting on information

13   from the defendants related to some statistics that we asked

14   them about that we'll otherwise need to ask witnesses about.

09:21   15         We were prepared to stay all evening and work into the

16   morning to get that done.  I would say it was approximately

17   2 a.m. our time, 1:00 central that we received word that the

18   governor's counsel and the defense counsel were done for the

19   evening and that we would receive a response to our latest draft

09:22   20   in the morning.

21         Approximately 8:15 a.m., Central time is when we

22   received a draft.  Maybe 8:30 a.m. Central was when we finally

23   received that draft, about a half hour before this call.  The

24   red line was a reverse red line so we could not see the changes

09:22   25   that had been accepted and what was being proposed.

1       And so we're -- all we have now is a fairly lengthy,

2   what, eight-, 10-page document clean that we would have to

3   reread.

4       So, unfortunately, not because of a lack of will on

09:22   5   our part, we can't report that we have a completed stipulation.

6   And I am also unable, because of what I've just reported, to

7   tell you, Your Honor, whether some additional time would resolve

8   those issues or not.

9       THE COURT:  Before I turn to defense counsel,

09:23  10   Mr. Bock, let me ask you this.  Have the parties -- other than

11   the statistical information that you referenced, have the

12   parties otherwise agreed on stipulated facts related to other

13   matters?  Is it just down to that issue?  As far as you are

14   aware.  And I'll let the defendants weigh in.

09:23  15       MR. BOCK:  Yeah.  Well, it's difficult for me to

16   evaluate because we don't have a red line that we can view.

17   Whoever manipulated or handled the red line and sent it to us,

18   it was a reverse red line so we can see what's been taken out

19   and not what's in the document.  And we would have to go through

09:24  20   a pretty lengthy document line by line and compare it to the

21   prior draft in order to see where we are with regard to trying

22   to reach an agreement.

23       THE COURT:  I think there are software programs that

24   can do that, but that's more of the realm of the business

09:24  25   lawyers as opposed to the litigators so I don't know too much

1    about that either.

2           Counsel for the defendant, who -- I guess I was

3    talking to Mr. Mandell before, but is there somebody on the

4    defense side who wants to take the lead on this and report what

09:24    5    the areas of disagreement are?  At some point, I don't want to

6    spend too much time on this if we're just wasting time, but I

7    would like to know what the status is particularly from the

8    defense standpoint.

9           MS. BROOK:  Mr. Mandell, are you going to take this?

09:25    10           I think Mr. Mandell is having some trouble with his

11    audio so I will handle it.  Good morning, Judge Ludwig.  This is

12    Davida Brook on behalf of the governor.

13           Before we get into discussion of the evidentiary

14    issues we'd just like to very briefly note that we wanted to

09:25    15    alert the Court's attention as a supplemental authority to

16    Judge Pepper's ruling last night in which she reiterated the

17    importance of deciding any justiciability issues prior to

18    getting into evidence.  We spoke about this at some length on

19    the pretrial conference yesterday, so I won't belabor it, other

09:26    20    than to say defendants renew their motion that the motion to

21    dismiss be decided and heard prior to any discussion of the

22    evidence; however, we will, of course, proceed in whatever

23    manner the Court prefers.

24           And so I take it the Court would like me to address

09:26    25    the evidentiary issues.

1          THE COURT:  Yes.

2          MS. BROOK:  Thank you, Judge.

3          I actually believe that the parties are incredibly

4    close at reaching a stipulation.  Were we there in person with

09:26  5    you I'd suggest you throw us in the jury room and hammer this

6    out.  Since we're not there in person, I think what makes the

7    most sense is and what would be best from a perspective of

8    judicial economy, is to have the parties briefly confer to

9    resolve any issues.

09:26  10          We did send both a clean version of the proposed

11   stipulated facts back to the plaintiffs as well as a red line

12   comparing any changes from the latest clean version they sent

13   us.  To the extent they would prefer the document in a different

14   format, we're happy to work with them to get it to them in that

09:27  15   format, of course.

16          But in answer to Your Honor's question on the

17   substantive issues, we're very close to reaching agreement on

18   almost everything.  As counsel for plaintiff mentioned, there

19   are some essentially discovery requests that they made via the

09:27  20   stipulated facts to the various defendants that we've all been

21   working around the clock to try to get answers to them for.

22          To the extent we don't have answers for them this

23   morning to put in writing, the witnesses aren't going to have

24   answers to testify to in response to questioning.  So I

09:27  25   certainly don't think it makes sense to, you know, go through

1    that whole process just to get I-don't-knows.  But that would be

2    our proposal, that we take 15 minutes to try to hammer this out

3    and obviate the need for any evidentiary presentation.

4          MR. BOCK:  Your Honor, so, first of all, the

09:27  5    representation regarding the document is not accurate because we

6    cannot view the red line that was sent.

7          THE COURT:  Whatever, I don't care.  Let's not get

8    caught up on bickering on that.

9          MR. BOCK:  Understood.

09:28  10         THE COURT: Go ahead, Mr. Bock.

11         MR. BOCK:  Your Honor, I think that our examinations

12   of these witnesses would be fairly expeditious and we're

13   prepared to proceed.  You know, we don't -- it's past the time

14   for the commencement of the hearing, we attempted to work out a

09:28  15   stipulation, and I respectfully disagree that they don't have

16   the statistical data that we asked for because they've been

17   quoted in the media regarding the statistics that we're asking

18   about.

19         So I'm just going to ask their witnesses about the

09:28  20   statements that they've given to the press about the extent of

21   use, for instance, of the drop boxes and the number of ballots

22   that have been counted coming out of those drop boxes.  And I

23   think that would be more efficient.

24         And at this point we're prepared to proceed and don't

09:29  25   want to waste any more time on this effort to achieve a

1   stipulation, which I don't think that we're going to get to

2   because frankly they're not providing us the information that

3   they have.

4           THE COURT:  Here's what I'm going to do.  No.  No.

09:29   5   Sorry, Ms. Brook.

6           So here's what I'm going to do.  I agree with

7   Ms. Brook.  I'm going to give you guys 15 minutes to talk to one

8   another.  And let me -- I think I was pretty clear yesterday

9   that as far as I can understand the plaintiff's theory, and to

09:29   10  the extent I understand the defendant's defenses, the material

11  facts, the facts that are material to this dispute to the theory

12  that's being raised and to the defenses that are being raised,

13  the material facts are not disputed.

14          I very much would like the parties to work together to

09:30   15  agree on the parameters of those undisputed facts.  And, you

16  know, Ms. Brook indicates there are statistics that -- to the

17  extent plaintiffs are looking for specific statistics the

18  defendants do not have, asking witnesses -- fact witnesses if

19  they know certain statistics off the top of their head is not

09:30   20  going to be productive and the Court would be inclined to grant

21  the motion to quash if that's what we're going to have -- if

22  that's all what we're going to have the witnesses come here to

23  do -- or if that's the main reason we're going to have the

24  witnesses come here, and by "come here" I mean by Zoom.  Because

09:30   25  that's a burden on them and it's really not adding a whole lot.

14

1        That being said, let me encourage Ms. Brook and the

2   defendants, to the extent that they're asked -- to the extent

3   the plaintiff is asking for confirmation of approximations,

4   approximate ballots, you know, statistics like that where we're

09:31   5   not talking about specific numbers but approximations, and the

6   defendants can provide that information if they provided it to

7   the press, or if they have it, you know, let's reach agreement

8   on that because that ought to suffice for everyone's purposes

9   today and we can save ourselves a lot of time and hassle.

09:31   10        So it is 9:31 right now.  We're going to go off the

11   record until 9:50 to give the parties a chance to talk.  When

12   you come back, I expect you'll have an agreement.  If you don't

13   have an agreement, I'm going to want a report on what exactly is

14   remaining to be agreed upon, and it will be based on that that I

09:31   15   decide whether we're going to -- whether I'm going to quash

16   these subpoenas and allow written testimony -- or oral testimony

17   by Zoom today.  Because, again, if we're down to minimal things,

18   it doesn't make sense to have testimony.

19        Mr. Bock, is that clear?

09:32   20        MR. BOCK:  Yes, Your Honor.

21        THE COURT:  And, Ms. Brook, is that clear?

22        MS. BROOK:  Yes.  Thank you, Your Honor.

23        THE COURT:  All right.  So get to it.  We'll be off

24   the record until 9:50.

09:32   25        (Recess taken at 9:32 a.m., until 11:19 a.m.)

1    THE COURT:  So, good morning.  Although I guess it's

2    afternoon where the plaintiff's lawyers are.

3    It's a good thing we started at 9:00.

4    I understand from the communications back and forth

11:19    5    with staff that the parties have reached an agreement on

6    stipulated facts.  And I see that the parties have docketed a

7    stipulation of proposed facts, facts and exhibits.  I have

8    briefly skimmed it, obviously not had a whole lot of time to

9    digest it, but I guess, before we go much further, Mr. Bock, why

11:19    10    don't you report on where we are.

11    MR. BOCK:  Yes, Your Honor.  With very good

12    cooperation I think from everybody and a big thanks to Davida

13    Brook for the laboring oar on entering the edits to the

14    stipulation, we've reached agreement on the document that's been

11:20    15    entered into the Court's file.

16    THE COURT:  And this agreement will obviate the need

17    entirely for witness testimony today; is that correct?

18    MR. BOCK:  It will, Your Honor.  And one thing I

19    should note is that the parties agreed and through the

11:20    20    stipulation that there would be an Exhibit A and B, which would

21    be affidavits that will be signed by the witnesses that the

22    plaintiffs were going to call that were not characterized as

23    hostile witnesses.

24    And we're in the process of working on getting those

11:21    25    documents signed.  The stipulation originally said that we would

1    get those documents in before the end of the hearing, but we

2    realized that we didn't know the technology capabilities nor the

3    transportation capabilities of the individuals who will be

4    signing the affidavit so that was changed to the end of the

11:21    5    proceedings.  So that before the conclusion of the case we would

6    get those two affidavits signed by our witnesses and then the

7    stipulation at that point will be complete.

8            THE COURT:  And what is your estimation on when those

9    affidavits would be submitted?

11:22    10           MR. BOCK:  We are hopeful that that will happen today,

11    Your Honor.  And if there is any change in that for any

12    unforeseen reason, we will certainly let you know immediately.

13           THE COURT:  Thank you.  Ms. Brook, is all that --

14    anything to add to that?  Anything to clarify?

11:22    15           MS. BROOK:  No, Your Honor.  I will pass it over to my

16    colleague Mr. Mandell who I think may have one point of

17    clarification.

18           MR. MANDELL:  Yes, Your Honor.  This is Jeff Mandell

19    for the governor.

11:22    20           Assuming that the Court accepts the stipulation, and I

21    did hear you say you haven't had a chance to fully read it yet,

22    without prejudice to any of our arguments for dismissal under

23    Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), pursuant

24    to Federal Rule of Civil Procedure 52, Governor Evers -- and

11:22    25    restating Governor Evers' evidentiary objections as indicated in

1    documents 114 and 127 on the record, we would request the Court

2    issue findings of fact and conclusions of law and enter a

3    judgment in favor of all defendants.

4              THE COURT:  Thank you.

11:23  5         So that then leaves us with the rest of today's

6    proceedings.  Well, let me first say, thank you to all counsel

7    for working to achieve this agreement on the stipulated facts.

8    I do think that the -- you know, based on the arguments as I

9    understand them, the facts that are material aren't in dispute.

11:23  10   There are some details that perhaps are in dispute and my

11   understanding is those are being worked out in state court.

12             But it is I think best for everyone here today that we

13   have an agreed-upon factual record to resolve the issues that

14   are before us.  So thank you all for doing that.

11:24  15        Next, what I would propose, and I'll listen to

16   alternative suggestions, but what I'd propose is that the

17   parties now present what are essentially closing arguments on

18   the positions in the case.

19             And by calling them closing arguments, I don't mean to

11:24  20   indicate that defendants' motions to dismiss are -- those

21   arguments are off the table because I expect those would be

22   argued now, too.  But I'll call them closing arguments because

23   we've had this expedited proceeding, this expedited hearing,

24   we've gotten the factual record set, and now it's really the

11:25  25   time for legal arguments to say -- to help the Court understand

1    what the parties think the Court should do at this point.

2            What I'd propose is that the plaintiff start,

3    summarizing again sort of the facts and the arguments that the

4    plaintiff believes show he's entitled for -- entitled to the

5    declaratory relief -- and I guess injunctive relief although I

6    still think it's primarily declaratory relief -- that plaintiff

7    thinks he's entitled to.

8            I will -- my plan would be to let the lawyers argue.

9    I may have some questions in the midst of arguments, in the

10   midst of the argument, but I will endeavor to control myself and

11   ask questions at the end.  But we'll see how successful I am at

12   that.

13           Obviously I'll also give the defense counsel the

14   chance to do the exact same thing and argue all of their legal

15   positions, and many of which I appreciate are more

16   motion-to-dismiss type issues as opposed to arguments on the

17   facts.  But, so you'll be free -- I'm not constraining defense

18   counsel in any way.

19           I guess -- well, so does that make sense to both sides

20   as a sensible way to proceed?  Mr. Bock?

21           MR. BOCK:  Yes, Your Honor.

22           THE COURT:  And Mr. Mandell?

23           MR. MANDELL:  Yes, Your Honor.

24           THE COURT:  So that's what we'll do.

25           I would offer one piece of advice just generally to

19

1    both sides.  I'd ask that you stick to the facts that are in the

2    record and you stick to the applicable law as much as you can.

3    That would be most helpful to me and to my law clerks as we're

4    struggling to get this case resolved as quickly as we can.

5            I say that not because that's anything sort of

6    sophisticated or that you've never thought of, but what I'd like

7    to do is to limit the political theater as much as we can.  It's

8    not lost on me that this is a political case, obviously, and

9    that the relief that's been requested, if that relief were

10   granted this would be a most remarkable proceeding and the

11   most -- probably the most remarkable ruling in the history of

12   this court or the federal judiciary.  That's not lost on me, I

13   get that.  But what I'm trying to do is apply the law to the

14   facts that are here and to resolve this in an efficient way so

15   that all of us can get this resolved and move on as promptly and

16   fairly as we can.

17           So with that said, I will turn -- turn things over to

18   Mr. Bock.

19           MR. BOCK:  Thank you, Your Honor.  Before I begin I

20   just wanted to just provide a heads up that if it is okay with

21   the Court, Mr. Koons and I have split the argument amongst us

22   and some of the issues amongst us, so you would then be hearing

23   from two lawyers for the plaintiff.

24           THE COURT:  Sure.  Do you have an estimate of how

25   much time -- how long your argument will take?

1    MR. BOCK:  I don't have a firm one, but I would say 90

2  minutes.

3    THE COURT:  I'm sorry, what was that?

4    MR. BOCK:  90 minutes, Your Honor.

11:28  5    THE COURT:  Okay.  Please proceed.

6                    PLAINTIFF ARGUMENT

7    MR. BOCK:  May it please the court.  Your Honor, on

8  behalf of the President of the United States, Donald J. Trump,

9  thank you for your time today to hear argument and receive

11:29 10  evidence in a case of national importance.

11    From our standpoint, it was telling when the municipal

12  defendants told the Court in their brief that the Wisconsin

13  Election Code was directory, not mandatory.

14    The stipulated evidence submitted to you through

11:29 15  plaintiff's exhibits show that the Wisconsin Elections

16  Commission and municipal defendants have a common view of

17  Wisconsin election law, and that is that the Wisconsin Election

18  Code is merely advisory and not compulsory.

19    This is why we have said that this case is about the

11:29 20  rule of law.  This case is about new methods of voting that were

21  not approved by the Wisconsin Legislature.  We have in this case

22  new terms never mentioned in the text of the Wisconsin Election

23  Code; terms like "absentee ballot drop boxes," and "human drop

24  boxes."  All of the concerns raised in this case with drop

11:30 25  boxes, the alterations of witness certificates on ballot

1    envelopes, and undermining Wisconsin's photo ID law, all tie

2    back to one thing:  A coordinated effort to maximize the number

3    of absentee ballots in the 2020 election.  And none of it was

4    consistent with the express requirements of the Wisconsin

11:30    5    Election Code, which is the authoritative statement of mandatory

6    rules given by the Wisconsin Legislature regarding the conduct

7    of the election in Wisconsin.

8            And I will now -- we have some PowerPoint slides that

9    we need to apparently queue up.

11:31    10            UNIDENTIFIED SPEAKER:  It says our screen share is

11    disabled.

12            MR. BOCK:  Oh, our screen sharing is disabled,

13    Your Honor.  We have slides related to both statutory provisions

14    that we were just going to play as I was giving closing, if

11:31    15    that's okay.

16            THE COURT:  Sure.

17            MR. BOCK:  As well as a few of the exhibits that have

18    been stipulated and are in evidence.

19            THE COURT:  Ms. Perkins, if you can enable the screen

11:31    20    share.

21            THE CLERK:  It should be enabled now.

22            THE COURT:  It should be enabled now.

23            MR. BOCK:  Okay.  So this is, of course, the

24    expression of the policy of the Wisconsin Legislature related to

11:32    25    absentee balloting:

22

1    *That voting by absentee ballot is a privilege*

2    *exercised wholly outside the traditional safeguards of the*

3    *polling place.*

4    *The legislature finds that the privilege of voting by*

11:32    5    *absentee ballot must be carefully regulated to prevent the*

6    *potential for fraud and abuse.*

7    Absentee ballot drop boxes are illegal under Wisconsin

8    law, and we will explain why in a minute.  Yet, as indicated in

9    Exhibit 32, the Wisconsin Elections Commission authorized

11:33    10    $4.1 million to purchase drop boxes and other election materials

11    for use in the presidential election.  Thus, not only did the

12    Wisconsin Elections Commission rewrite the Election Code by

13    adding drop box voting as a new method of voting in the state,

14    the Commission authorized federal funds to be used in violation

11:33    15    of the law throughout the state.

16    It has been said over and over by the administrators

17    who ran the election in Wisconsin, that it was the most secure

18    and reliable election in the state's history.  The evidence in

19    this case demonstrates those statements to be dramatically

11:33    20    untrue.

21    Contrary to the requirements of the Wisconsin Election

22    Code, the election administrators at the Election Commission and

23    in Milwaukee and Dane Counties pushed an absentee ballot

24    election, the least secure of the two methods of voting under

11:34    25    Wisconsin law, and then the administrators pushed changes that

23

1    made their absentee ballot election even less secure.  They did

2    this.  Unelected election administrators did this by rewriting

3    the law, substituting their wisdom for the laws passed by the

4    legislature and signed by the governor.

11:34   5        Election administrators took absentee ballot witness

6    certifications made under penalty of fraud or perjury on the

7    back of absentee ballot envelopes and marked them up as if they

8    were a grade school homework assignment.  In so doing, they

9    undermined the purpose of the certification to serve as a

11:35  10   reliable indicator that the envelope contained a vote from a

11   valid elector.

12        Election administrators injected themselves thereby

13   into the voting process.  Election officials sworn to be neutral

14   and nonpartisan became enmeshed in a campaign to make every vote

11:35  15   count, irregardless of legal standards and legislative

16   direction, rather than to follow the law and ensure that every

17   legal vote count.

18        The Commission and election administrators then took

19   the photo identification law adopted by the legislature and

11:35  20   meant to prevent fraud and they widened a narrow exception for

21   indefinitely confined voters to fit every voter in the state, an

22   absurd construction that by definition rendered the words of the

23   statute meaningless.

24        Then in a move not justified by the code that simply

11:36  25   incentivized breaking the law, the Wisconsin Elections

24

1  Commission issued guidance to clerks telling them that they

2  could not contest a voter's claim to be indefinitely confined.

3  In this way, what was written as a limited exception and

4  provided that indefinitely confined voters did not have to

5  provide photo identification when voting absentee, became

6  applicable to the entire state, effectively gutting Wisconsin's

7  photo ID law.

8        And in the stipulation that you've received,

9  Your Honor, you'll see that this was taken advantage of by

10  approximately 250,000 people in the last election, about 180,000

11  more than the prior presidential election.

12       In short, Wisconsin's most influential election

13  administrators at the Wisconsin Elections Commission and in

14  Wisconsin's two most populous counties dramatically lowered

15  guardrails that made this election in terms of the rules applied

16  less secure, less reliable, less fair, and more susceptible to

17  fraud than perhaps any election in Wisconsin's recent history.

18  And all of this happened without the sort of robust public

19  access, oversight and transparency that are fundamental in a

20  free society.

21       This case fits squarely within a line of recent cases

22  upholding the vitality of Article II of the United States

23  Constitution in preventing a state's electoral process from

24  being hijacked by rogue administrators, whether those

25  administrators be compelled by benign motivations or not.

25

1       For instance, in late October this year, in *Carson vs.*

2  *Simon*, the Eighth Circuit Court of Appeals struck down an

3  allegedly COVID-19 based alteration of the Minnesota Election

4  Code, changing the date for the receipt of absentee ballots

11:38  5  saying:

6       "However well-intentioned and appropriate from a

7  policy perspective in the context of a pandemic during a

8  presidential election, it is not the province of a state

9  executive official to re-write the state's Election Code, at

11:38  10  least as it pertains to selection of presidential electors."

11       Respect for the rule of law requires that

12  administrators honor the province and authority of the

13  legislature even in a pandemic, and especially when those laws

14  are made pursuant to a direct grant of delegated authority to

11:39  15  the state legislature under -- only to the state legislature

16  under Article II of the U.S. Constitution.

17       In *Marbury vs. Madison* Chief Justice Marshall wrote:

18  It is "emphatically the province and duty of the judicial

19  department to say what the law is --"

11:39  20       (Audio glitch.)

21       THE COURT:  Mr. Bock, you've frozen.

22       MR. BOCK:  -- for the rule of law to prevail, courts

23  must uphold checks and balances and separation of powers

24  principles, and Article II is founded squarely on such concerns

11:39  25  for proper boundaries.

26

1          THE COURT:  Mr. Bock?

2          MR. BOCK:  Yes.

3          THE COURT:  Mr. Bock?  Just a second.  You froze up on

4     screen on the Zoom just for 30 seconds there while you were

11:40    5     quoting *Marbury vs. Madison*.  I point that out because I want to

6     make sure we get the link working correctly and I don't want you

7     to -- I don't want to miss your argument.

8          MR. BOCK:  Thank you, Your Honor.

9          Can you see me okay now?

11:40    10          THE COURT:  Yes.

11          MR. BOCK:  Okay.  With that introduction, I will turn

12     to discussion of the evidence before the Court and why it

13     demonstrates a usurpation of legislative authority.

14          And first I'd like to talk about drop boxes.

11:40    15     Plaintiff has submitted as Exhibit 12 the grant proposal sent on

16     June 15th, 2020 by the mayors of Wisconsin's five largest

17     cities, all defendants here, to the Center For Tech and Civic

18     Life, an out-of-state not-for-profit corporation funded

19     primarily through a $250,000 million donation by one or two

11:41    20     individuals.  The mayors' grant proposal requested over

21     $6.3 million to fund election preparations in their five cities,

22     including funding for what was called "absentee ballot drop

23     boxes."  This funding request was granted and the money was

24     appropriated and used by the cities.

11:41    25          The timing of the five mayors' plan is interesting.

27

1    Remember June 15th.  Because it was submitted more than two

2    months before the Wisconsin Elections Commission had ever issued

3    any guidance regarding absentee ballot drop boxes, a term found

4    nowhere in the Wisconsin Election Code.

11:42  5         It was not until August 19th that the Commission

6    issued a guidance document on unmanned absentee ballot drop

7    boxes, which is Exhibit 14.

8         Such, however, was the frenetic pace of drop box

9    addition in Wisconsin in the late summer and fall, that by

11:42  10   several weeks before the November 3 election, Wisconsin had more

11   than 500 drop boxes as reflected in Exhibit 18, which is a list

12   of drop boxes that the Wisconsin Elections Commission has

13   confirmed through their responses to plaintiff's requests for

14   admissions.

11:42  15        As pointed out in the complaint and confirmed in the

16   evidence submitted to the Court, there were ultimately no

17   standards which guided the use of drop boxes.  No mandatory

18   standards.

19        Exhibit 18, which is that list of Wisconsin drop box

11:43  20   sites, reflects that library book deposits were used so that

21   ballots mixed with books.  Utility bill payment slots were used

22   so that ballots mixed with bill payments.

23        Here's a photo submitted as Exhibit 48 that depicts

24   one of these multiuse slots.  This is a picture of a voter

11:43  25   depositing a ballot in a drop box at Oshkosh City Hall.  As you

28

1    can see, the sign says, "Drop Box for tax bills, water bills,

2    parking tickets, absentee ballots."  What are the standards that

3    apply to who could access the absentee ballots put in this

4    multiuse slot at Oshkosh City Hall?  We don't know.  And as an

5    official matter, the Wisconsin Elections Commission doesn't know

6    either.

7         In the Commission's response to our discovery request

8    concerning drop boxes, which is Exhibit 72, there are no uniform

9    standards applicable statewide regarding who may access the

10   ballots placed in a drop box anywhere in the state.  Nor are

11   there minimum security requirements.

12        Certainly without such standards and given the wide

13   array of locations where multiuse drop boxes were used, it is

14   evident that not just election officials had access to these

15   ballots.

16        Many more concerning examples of these multiuse slots,

17   which actually weren't even truly drop boxes at all in many

18   instances, can be found in Plaintiff's Exhibits 18 and 20

19   through 23.

20        The fact is, even election clerks were concerned about

21   the Commission's lack of standards for so-called absentee ballot

22   drop boxes.  One of the interesting documents we received just

23   yesterday from the Election Commission is Exhibit 67, a document

24   which lists questions given to the Commission by election

25   officials and the response of Commission officials.  Here is an

29

1    excerpt from this Commission document which is Exhibit 67.

2         The question: "The drop box I wanted to order was not

3    approved by the village president so he chose one. It is also a

4    payment drop box that will be used by residents to drop utility

11:45  5   payments after hours. I do not like that idea, but there was

6    not any way I was going to win that fight. Disallowed or just a

7    really bad idea?"

8         The answer given by the Wisconsin Elections

9    Commission: "Some municipalities are combining the return of

11:46  10  absentee ballots with existing drop boxes, which is fine.

11   Clerks need to be certain that ballots are retrieved in a timely

12   manner."

13        Confirming, obviously, no standards related to these

14   multiuse drop boxes.

11:46  15        Here is another excerpt from Exhibit 67.

16        Question: "Can municipalities share a drop box?"

17        Answer from the Wisconsin Elections Commission:

18   "There's nothing that prohibits it."

19        Think about that for a minute. That means ballot

11:47  20  envelopes containing ballots are going to be mixed from two

21   locations, and both clerk's offices are instructing voters in

22   their municipality to put ballots in a location where they will

23   be accessed by another municipality.

24        Finally, here is an answer, also from Exhibit 67, that

11:47  25  confirms no uniform standards were in place throughout the state

30

1    and none are required or have been required by the Elections

2    Commission to safeguard the chain of custody of the ballots.

3           The question to the Election Commission from a clerk

4    was:  "Chain of custody for ballot logs, can you give more

11:47  5    detail?  Is this for drop boxes outside as well?  We open the

6    box several times a day.  Does this mean we have to log each

7    time, or is this only for temporary boxes for return ballots and

8    in-person voting?  Where does the log go once completed?"

9           The answer from the Wisconsin Elections Commission:

11:48 10    "We don't have a template, but recommend recording when a drop

11    box is opened and emptied, date/time and by whom.  The log is

12    kept by the clerk with their election materials."

13           The Commission has no chain of custody template.  Not

14    only is there no chain of custody template, the evidence

11:48 15    presented to the Court through the President's stipulated

16    exhibits demonstrate that these more than 500 ballot drop boxes

17    specifically authorized by the Commission throughout the state

18    in violation of the Wisconsin Election Code potentially

19    introduced thousands of individuals with access to multiuse

11:48 20    ballots to the depositories in which the Commission was telling

21    people to vote their ballots.

22           The August 19 Wisconsin Elections Commission guidance

23    document on drop boxes is Exhibit 14.  And this document

24    indicates it was based on an informational document distributed

11:49 25    by the Cybersecurity and Infrastructure Security Agency, or

31

1   CISA, an agency of the federal government.  The CISA document is

2   Exhibit 15.  And it's interesting if you compare Exhibit 14 to

3   Exhibit 15.

4           On page 3 of Exhibit 15 the CISA recommended -- and

5   this is on your screen:

6           "If you are considering the use of ballot drop boxes,

7   you should review your existing laws and requirements and

8   determine whether emergency changes may be necessary."

9           Now, this piece of the CISA recommendation was not

10  included in the guidance document posted on the Commission

11  website.

12          Additionally, the guidance on the Commission website

13  does not have at the bottom of it any citations to the Wisconsin

14  Election Code.

15          On page 5 of Exhibit 15, the CISA recommended:

16          "You need bipartisan teams to be at every ballot

17  drop-off location precisely when polls close."  And that was a

18  quote on page 5.

19          The recommendation for bipartisan teams to monitor the

20  withdrawal of ballots from drop boxes was not passed on to

21  Wisconsin clerks by the Commission in its guidance, despite the

22  fact that a bipartisan approach toward many election procedures

23  is required in the Wisconsin Election Code.

24          Finally, Exhibit 18 reflects the instructions given to

25  voters by a number of the clerks who posted drop box information

1   on the Elections Commission's list, Exhibit 18, that was posted

2   for use by the public.  Those clerks and election officials

3   state on Exhibit 18, in many instances, that ballots must be

4   returned to the drop box no later than 8 p.m. on election day.

11:51  5         And that is a quote from that document in referencing

6   several -- a number of drop boxes.  Of course, that is the time

7   when the polls close, and, therefore, there is an indication

8   that an unknown number of absentee ballots in drop boxes were

9   not delivered to the polls by 8 p.m. on election day as required

11:52  10   by Wisconsin Statute Section 6.87(6), a mandatory provision in

11   the code as to which the code says ballots cannot be counted if

12   they arrive at the counting location after 8 p.m.  An obvious

13   failure due to the complete lack of standards that apply to drop

14   boxes, the new form of voting introduced by the five-city

11:52  15   defendants and the Wisconsin Elections Commission into this

16   election.

17         These things are all bad, but there is more.  As a

18   result of the Wisconsin Elections Commission opening the door to

19   absentee ballot drop boxes, in September Madison city clerk

11:53  20   Maribeth Witzel-Behl began employing what she referred to as,

21   "human drop boxes."

22         The Wisconsin Election Code bars in-person absentee

23   voting outside of two weeks before election day.  The code also

24   requires that alternate absentee ballot sites, which is where

11:53  25   absentee ballots can be delivered to the clerk, be structures

1    that are located as near as practicable to the clerk's office

2    and do not provide a partisan advantage.

3            The clerk was creative, however, if not compliant with

4    the Election Code.  She added an unauthorized use of humans to

11:54    5    collect ballots on top of the newly-found claimed authority of

6    the Wisconsin Elections Commission to authorize drop boxes and,

7    therefore, we have human drop boxes.  She came up with a plan to

8    use these human drop boxes in what she termed "Democracy in the

9    Park."

11:54    10            Of course, human drop boxes is not a term found in the

11    Election Code, but it was used to circumvent the code provisions

12    limiting in-office absentee balloting to the two-week period

13    before the election day.  And the City of Madison used the human

14    ballot drop boxes construction to collect and claim it was legal

11:55    15    to collect over 17,000 ballots more than a month before the

16    election.  And this is in the stipulation in terms of the number

17    of ballots.

18            Here is Exhibit 49, a tweet by the Madison clerk,

19    Madison city clerk, depicting the more than 200 sites at which

11:55    20    so-called human drop boxes were located during Democracy in the

21    Park events, demonstrating the danger of such unauthorized,

22    last-minute, unregulated changes to the Election Code, the

23    danger of politicization of these sorts of activities where

24    there are no standards in place and which make the playing field

11:55    25    less level and create potentially a partisan advantage.

34

1    An example of this is Exhibit 65, which is a radio ad

2    for Democracy in the Park, which, as you can see on Exhibit 49,

3    is claimed to be created, planned, staffed, and paid for by the

4    City of Madison.  But the ad, which we have submitted the audio

11:56    5    of, in Exhibit 65, was paid for by Joe Biden For President and

6    it has his campaign tag line.

7    See, that's the danger when you don't follow the law,

8    when the Elections Commission and local election officials can

9    make it up as they go along and create new rules.  You don't

11:56   10    have a level playing field.  And those new rules that are made

11    by bureaucrats, not by the legislature, they set the terms for

12    the election, and the election can be taken over by those

13    bureaucrats and in some instances used for partisan advantage.

14    That's exactly what happened with that Joe Biden ad in relation

11:57   15    to Democracy in the Park.

16    The use of any drop box, manned or unmanned, is

17    directly prohibited by the Wisconsin Election Code.  The

18    Wisconsin Legislature specifically described in the Election

19    Code alternate absentee ballot sites and detail the procedure by

11:57   20    which the governing body of a municipality -- we can go ahead

21    and highlight it -- "which the governing body of a municipality

22    may designate a site or sites for the delivery of absentee

23    ballots."

24    And you see it there.  It's to be located, as I said,

11:58   25    in a particular location.  It's obviously a structure.  It is

1   not a human being.

2           Okay.  And then we'll move to the next PowerPoint.

3           And this is a continuation of that provision.  It says

4   that the site shall be staffed and accessible to individuals

11:58  5   with disabilities.

6           Any alternate ballot site by statute, quote, "shall be

7   staffed by the municipal clerk or the executive director of the

8   Board of Election Commissioners, or employees of the clerk or

9   the Board of Election Commissioners, according to Wisconsin

11:59  10   Statute 6.855(3).  Obviously the drop boxes of the nonhuman form

11   are not -- were not staffed as required for alternate absentee

12   ballot sites.

13          Likewise, Wisconsin Statute Sections 7.15(2m)

14   provides:  "In a municipality in which the governing body has

11:59  15   elected to establish an alternate absentee ballot site under

16   Section 6.855, the municipal clerk shall operate such site as

17   though it were his or her office for absentee ballot purposes

18   and it shall ensure that such site is adequately staffed making

19   it abundantly clear that this does not apply to drop boxes which

12:00  20   are unmanned."

21          In addition, the use of drop boxes for the collection

22   absentee ballots is directly contrary to Wisconsin law providing

23   that absentee ballots may only be -- and this is on the statute

24   on the screen -- "mailed by the elector or delivered in person

12:00  25   to the municipal clerk issuing the ballot or ballots."

36

1          This is a mandatory directive by the legislature.  And

2     absentee ballots can only be mailed or delivered in person, not

3     dropped off in an unmanned drop box.

4          The fact that other methods of delivering absentee

12:00   5     ballots such as through unmanned drop boxes are not permitted,

6     is underscored by Wisconsin Statute Section 6.84(2), providing

7     that Section 6.87(6) shall be construed as mandatory.

8          The provision continues, as you can see.

9          "Ballots cast in contravention of the procedures

12:01  10     specified in those provisions may not be counted.  Ballots

11     counted in contravention of the procedures specified in those

12     provisions may not be included in the certified results of any

13     election."

14          Making clear that if those mandatory two ways of

12:01  15     receiving ballots, in-person, in the office of the municipal

16     clerk or at an alternate site or through the mail, if a ballot

17     is not transmitted in one of those two ways it cannot be

18     counted.

19          So now we move to a discussion of the indefinitely

12:02  20     confined exception in the Wisconsin Election Code for absentee

21     voters.

22          The Wisconsin Elections Commission and local election

23     officials also took it upon themselves to encourage voters to

24     unlawfully declare themselves indefinitely confined, which under

12:02  25     Wisconsin law allows the voter to avoid photo ID requirements.

37

1  An initial request for an absentee ballot requires photo

2  identification, except for those who register as indefinitely

3  confined or hospitalized according to Wisconsin Statute

4  6.86(2)(a) as indicated on the screen.

12:03  5       It says:  "An elector who is indefinitely confined

6  because of age, physical illness or infirmity, or is disabled

7  for an indefinite period," all -- presently experienced physical

8  conditions.  And those are the only exceptions under this

9  provision of the law.

12:03  10       Should indefinite confinement cease the voter must

11  notify the county clerk who must remove the voter from

12  indefinite confinement status.

13       Wisconsin election procedures for voting absentee

14  based on indefinite confinement enable the voter to avoid the

12:03  15  photo ID requirement and signature requirement.  And that's in

16  the statutory provision on the screen there.

17       The guidance provided by the WEC stated that rather

18  than basing indefinitely confined status -- oh, and this is the

19  guidance, which is our Exhibit 2.

12:04  20       Exhibit 2 indicates that rather than basing

21  indefinitely confined status on the absolute physical criteria,

22  a age, physical illness, or infirmity, or on an indefinite

23  disability, this guidance says that a voter could be eligible

24  for indefinite confinement status based on risk factors for

12:04  25  catching a disease.  It says during the public health crisis,

38

1    "many voters of a certain age or in at-risk populations may meet

2    that standard of indefinitely confined until the crisis abates."

3              So the Election Commission changed the statute,

4    changed the statute the way the statute was applied to include

12:05  5    individuals' beliefs about their at-risk status as a further

6    expansion of indefinitely confined in conflict, direct conflict

7    with the statute.

8              And the guidance provided by the Wisconsin Elections

9    Commission didn't stop there with changing the way the statute

12:05  10    was read.  The guidance went on to undermine the Election Code

11    further by saying:  "The absentee ballot request form asks

12    voters to certify to their indefinitely confined status.

13    Statutes do not establish the option to require proof or

14    documentation from indefinitely confined voters."

12:06  15              Of course, neither do they prohibit that.  And clerks

16    are authorized under the law to uphold the law and make sure

17    that only voters who are entitled to vote absentee receive

18    ballots.  But that requirement of the law is completely

19    undermined by this directive which says:  "Clerks may tactfully

12:06  20    verify with voters that the voter understood the indefinitely

21    confined status designation when they submitted their request,

22    but they may not request or require proof."

23              This instruction doubly undermined the Election Code,

24    including Wisconsin's photo ID requirement.  First it emphasized

12:06  25    to voters that no election official would ever check or

39

1    challenge the assertion of indefinitely confined status, thereby

2    affirming in writing there would be no ramifications for

3    noncompliance with the law.

4            Second, the instruction tied the hands of election

12:07    5    officials throughout the state, despite the fact that they had

6    the authority in the code to make judgments about whether

7    evidence should be provided or whether a ballot should be given.

8    They have that discretion, but it tied their hands and said they

9    could not even request a voter confirm the basis for a claim the

12:07   10    voter was entitled to receive an absentee ballot.

11            The statistics stipulated to by the defendants

12    reflects that the use of the indefinitely confined exception

13    exploded during 2020.  Of course, this guidance was from March

14    29th of 2020.

12:07   15            Of course, this can be tied, at least in part, to the

16    pandemic.  However, the Commission's guidance made the situation

17    worse and prevented election officials from doing their job and

18    enforcing the code by restricting them from asking reasonable

19    questions and asking for documentation to substantiate a request

12:08   20    for indefinitely confined status.  Thereby, the Commission

21    undermined the photo ID provisions in the code.

22            Again, the stipulation provides that at least 240,000

23    people received this designation of indefinitely confined, about

24    180,000 more than in the previous presidential election.

12:08   25            So the photo ID provisions were undermined in a manner

1    likely to be long lasting, because the Wisconsin Election Code

2    also provides that as long as a voter who once declared

3    indefinitely confined status does not change their status, they

4    will never have to submit a photo ID.

12:09    5         So this change in the law and the failure to shepherd

6    and supervise this exception in the law, is going to have

7    long-term ramifications for the photo ID requirement in the

8    State of Wisconsin.

9         And next we'll discuss some of the evidence in the

12:09    10   record related to witness certificate alteration.

11        Under Wisconsin law, voting by absentee ballot also

12   requires voters to complete a certification, including their

13   address and how long they've lived at that location, and to have

14   the envelope witnessed by an adult who must also sign and

12:09    15   indicate their address on the envelope.

16        The sole remedy to cure an improperly completed

17   certificate on a ballot or a ballot with no certificate is the

18   clerk returning the ballot to the elector.  And this is as

19   provided on the screen Section 6.87(9).

12:10    20        Those are -- that is, in the code, the only response

21   authorized to a clerk.  And you will -- Your Honor, the evidence

22   is strong that throughout the state, and particularly if you

23   look at the affidavits that are submitted as part of the

24   certification in Milwaukee, the election workers were told they

12:10    25   couldn't even challenge ballots that had certifications filled

41

1    in by election workers, clerk's office workers.

2          And the Milwaukee city clerk -- or the Milwaukee, I'm

3    sorry, elections administrator, Claire Woodall-Vogg, in the

4    declaration that she submitted in this proceeding to the Court,

12:11  5    goes through, and I believe it's paragraph 7 of her declaration,

6    and acknowledges that based on the guidance from the Wisconsin

7    Elections Commission, that in her office they fill out, based on

8    evidence that they find from a variety of sources, they fill out

9    the address information that is missing on certificates.  So

12:11  10   they act directly contrary to 6.87(9).

11          The code also provides in the next section -- and I

12   can't see the bottom there.  (6d).  6.87(6d).  "If the

13   certificate is missing the address of a witness, the ballot may

14   not be counted."

12:12  15         And the Wisconsin Elections Commission's advice to

16   clerks and the actions of clerks throughout the state absolutely

17   eradicated (6d) from the Wisconsin Election Code.  And because

18   the policy was that the clerks would try to fill in the address

19   of a witness not provided for, as we go through some more

12:12  20   statutes I think you will be very, very convinced of that fact.

21          So, first of all, I want to point out that 6.87(6d),

22   that provision that ballots may not be counted if the

23   certificate is missing, is to be construed as mandatory as

24   provided in 6.84(2).  And I think we can show that now.

12:13  25         This says that 6.87(3) to (7) should be interpreted in

1    this way, obviously including 6.87(6d), that they are to be

2    construed as mandatory and that ballots cast in contravention of

3    the procedures may not be counted.  Ballots counted in

4    contravention of the procedures may not be included in the

12:13    5    certified result of any election.

6        What you have here, Your Honor, is the Wisconsin

7    Legislature making it as emphatically clear as it ever could

8    possibly do how important it was that witness certificates be

9    treated as pieces of evidence.  And other statutes that we'll go

12:14   10    through here will explain that and provide even more detail.

11    But it is emphatically clear they are not to be completed by the

12    clerk.

13        The clerk has one option:  It's send the ballot back

14    to the voter to complete the witness certification.  Let the

12:14   15    voter be in control of whether their ballot is voted, not the

16    people in the clerk's office.  They are not to be running around

17    tracking -- involving themselves in the electoral process and

18    actually taking a role in voting a ballot.

19        Because these statutes are clear, without that witness

12:14   20    address you can't vote the ballot.  So what is happening in

21    these clerk's offices is they are injecting themselves into the

22    actual voting process.  We don't allow that on election day.  We

23    don't allow a clerk to walk into the poll and look over your

24    shoulder and make sure that you completed everything on the

12:15   25    ballot to make sure that your vote counts.  We don't allow that.

43

1    People would think that was absurd.

2           But it's not much different than what they're doing

3    here.  They're injecting themselves into the voting process,

4    they're controlling the process, and they're determining by the

12:15   5    actions of an election official whether a ballot counts or not,

6    and they're not allowing the statute to control.

7           So, now, of course, the Wisconsin Elections

8    Commission's not up front with voters that this is occurring.

9    And the next slide shows you an excerpt from Exhibit 36, which

12:15   10   is what the Wisconsin Elections Commission tells voters.  This

11   is actually mailed out and posted so that voters can learn about

12   the process.  And as to witness signature and address, it says,

13   "Your witness must sign and provide their full," in bold,

14   "address in the certification of witness section."

12:16   15          And then it says, "If any of the required information

16   above is missing, your ballot," in bold, "will not be counted."

17          That's what they tell the public, but that's not what

18   they do.  What they do is found on the next slide.  And this is

19   what they do.  And this is guidance from the Wisconsin Elections

12:16   20   Commission in Exhibit 35.  And this is guidance that was issued

21   I believe on October 19th of this year.

22          "The clerk should attempt to resolve any missing

23   witness address information prior to election day if possible,

24   and this can be done through reliable information, personal

12:17   25   knowledge, voter registration information, through a phone call

1   with the voter or witness."  And, "The witness does not need to

2   appear to add a missing address."

3          So that guidance indicates clerk's offices can fill in

4   the missing address information.  And it happened all throughout

5   the state and it happened significantly in Milwaukee as Claire

6   Woodall-Vogg's declaration confirms.

7          The Wisconsin Elections Commission justifies its

8   guidance regarding this situation, arguing that the statute

9   states that the clerk may return the envelope to the voter if

10  the clerk notices the certification is defective.

11         And that's true.  The clerk is not required to return

12  the envelope to the voter.  But the fact that a clerk may return

13  the envelope to a voter does not authorize or give clerks

14  discretion to fill in the missing information, unilaterally or

15  otherwise.

16         And even assuming the clerk -- the statute gave the

17  clerk that discretion, there are, of course, no detailed

18  statewide standards to guide the clerk's discretion to determine

19  when to return the envelope to a voter or when to fill it out by

20  the clerk.

21         Workers in the clerk's offices, not the voters,

22  attempted to cure voter certification or witness certifications

23  contrary to the legislature's directive.  Again, involving the

24  clerk in decisions about whether to vote a ballot, and those

25  decisions should only be the decisions of the voter.

1          Additionally, despite the clear statement in the

2    Election Code that if a witness certificate is missing the

3    address and that the ballot may not then be counted, the witness

4    testimony that we're providing through affidavit was that during

12:19  5    absentee ballot canvassing when ballot counters raised

6    challenges to ballots containing alterations to the witness

7    affidavit that were in red therefore it's acknowledged they were

8    done by the clerk's office by election workers, that defendant

9    Woodall-Vogg refused to allow these challenges and even made an

12:19  10    announcement at Milwaukee Central Count that such challenges

11    would not be entertained and the ballot counters were not

12    permitted to insist that this clear provision of the Election

13    Code be followed.

14          As explained in the complaint, the provisions of the

12:20  15    Election Code fit well together, providing a clear voter centric

16    approach toward all aspects of absentee balloting, from the

17    request for a ballot through to counting of the ballot.

18          As laid out in the code, there's supposed to be only a

19    single person in control of voting a ballot and that is the

12:20  20    absentee elector themselves.  However, as a result of the

21    Election Commission's erroneous guidance, the principle that the

22    voter is in control has been violated.  Instead the Commission

23    puts the clerk in control of the absentee ballot and authorizes

24    the clerk to mark up the witness certificate, and even develop

12:20  25    evidence, speaking with outside parties, and with the clerk

46

1    ultimately deciding whether to vote the ballot or not.  And this

2    is foreign to the Election Code.  And I'll walk through a

3    further procedure that demonstrates this.

4        This is -- 6.87(3)(a) says:

12:21    5        "The municipal clerk shall mail the absentee ballot to

6    the elector's residence unless otherwise directed by the

7    elector, or shall deliver it to the elector personally at the

8    clerk's office or at an alternate site."

9        Again, establishing that the voter has to get the

12:21   10    ballot directly.

11        The next slide is about marking the ballot once it's

12    received.  And it provides that the elector "shall make and

13    subscribe to the certification before one witness."

14        And then that the elector shall not allow or disclose

12:21   15    to the witness how the elector's vote is cast.

16        The next slide is a picture of the witness

17    certificate.  So on the right is the entire back of the envelope

18    that has both the certification of the voter at the top and

19    below it the certification of the witness.  And then blown up on

12:22   20    the left is the certification of the witness.  And I just want

21    to draw your attention to a few things there.

22        First, that there's a lot of information at the top

23    that the witness is certifying to, and then the certification

24    itself.  That the witness is, quote, "subject to the penalties

12:22   25    for false statements of Wisconsin Statute Section 12.60(1)(b)."

47

1        And I think that that's really important because this

2   is clearly intended to be a document of legal significance.  And

3   as we will see in a minute, as evidence, in fact, that will be

4   considered by the inspectors on election day.

12:23   5        But the Commission instructed clerks and election

6   officials not to treat it that way.  Not to treat it as

7   evidence.  And here's why that's so important.  It's because the

8   inspectors need to look at that witness certificate and decide

9   on whether or not to count the ballot.  But as we just learned,

12:23  10   the clerks took that role away from the inspectors and they

11  decided whether or not to count the ballot.

12        So here are the provisions related to voting and

13  recording the absentee ballot.

14        The inspectors are to say out loud in a manner that

12:23  15  members of the public can hear and see the procedures.

16        They are to open a carrier envelope.  And we will show

17  you I think in a few minutes a provision in the code that says

18  that the clerk has two options.  They can either send the

19  absentee ballot envelope back to the voter for correcting the

12:24  20  certification, or they put it in a carrier envelope.  And as we

21  will show you, that carrier envelope has to then be sealed by

22  the clerk.

23        Those are the only two options.  And the ballot then

24  comes to the polling place on election day.  The name of the

12:24  25  elector is announced.  And then the decisions are made by the

1    inspectors about whether to count the ballot.  And if the

2    inspectors find that the certification, the witness

3    certification and the certification of the voter are properly

4    executed, then they shall open the envelope containing the

5    ballot and the vote then will be counted.

6         The next provision, which we will show you, shows what

7    happens when the certification is insufficient.  In that case,

8    the inspectors shall not count the ballot.  And then, the only

9    place in the Election Code where any person is given an

10   authority to write on the absentee ballot envelope for the first

11   time occurs here.  It says, "The inspectors shall endorse every

12   ballot not counted on the back --" not even on the certification

13   but on the back, "-- rejected, giving the reason."

14        So the Commission's directive undermined -- to have

15   clerks enter in witness information on the envelope, undermined

16   the forensic value of the absentee ballot witnessing process.

17   It's for good reason that notaries are not permitted to sign

18   jurats days or weeks after the fact as authorized by the

19   Commission's wrongful guidance.  Rather, a notary must affirm a

20   document was signed on the date they act as a witness.

21        The reason the certification form prescribed by the

22   legislature for an absentee ballot envelope does not reference a

23   date is likely because the statutory process itself does not

24   permit witnesses to come back after the fact and alter or sign

25   their certification.  And that form prescribed by the

49

1    legislature is in Section 6.87 of the code.

2         Indeed if a witness can come back after the fact to

3    sign a certification, there's nothing that could prevent a

4    witness from withdrawing their certification thereby

5    invalidating the absentee ballot.

6         It's therefore easy to see how the Commission's

7    improvident guidance is -- not only destroys the evidence to be

8    used by the inspectors, but it is a potential recipe for chaos.

9         And just as importantly, the Commission's abrogation

10   of plain statutory language takes control away from the voter,

11   allowing others outside the voter's sphere of influence or even

12   knowledge to take actions that affect the validity of his or her

13   vote.

14        And again the problem is, without standards how is

15   this being done in every county in the state?  When the rules in

16   the Election Code are not followed and you have these vague

17   guidance documents and they cause clerks throughout the state to

18   handle witness certifications differently, how do we know that

19   what's happening in Milwaukee is happening in some other area of

20   the state?  We don't.  There are no standards.  And that's

21   another reason that these directives which were followed by the

22   clerks are unlawful.

23        There's another reason that the involvement by the

24   clerk is not intended by the legislature, and those are, as I

25   mentioned earlier, statutes that describe what the clerk is

1    supposed to do upon receipt of an absentee ballot.  And they

2    provide that the sole option of the clerk upon receipt of a

3    ballot with a defective witness certification is to return it to

4    the voter.  And we'll look at those quickly now.

12:29   5    "If a municipal clerk receives an absentee ballot with

6    an improperly completed certificate or with no certificate, the

7    clerk may return the ballot to the elector."

8    Okay?  So they have an option.  They don't have to,

9    because as is underlined there, "whenever time permits the

12:29   10    elector to correct the defect and return the ballot within the

11    period authorized under (6)."

12    So the clerks can exercise discretion about -- not

13    whether to alter the certification, but whether or not to send

14    the ballot back to the voter so that the voter can fix the

12:29   15    certification.  And their discretion is needed because they have

16    to determine whether or not there's time for a correction, which

17    clearly indicates that no one else can correct it.  If the

18    legislature intended the clerk to make the corrections, it would

19    say so.

12:30   20    The next provision is 6.88(1).  And this is very

21    important, because this is what's supposed to happen when an

22    absentee ballot is received in an envelope at a clerk's office

23    and is emphatically not what happened throughout Wisconsin

24    because of the actions of the Wisconsin Elections Commission.

12:30   25    The statute says, "When an absentee ballot arrives at

51

1    the office of the municipal clerk, or at an alternate site, if

2    applicable, the clerk shall --" shall, mandatory "-- enclose it,

3    unopened, in a carrier envelope which shall be securely sealed

4    and endorsed with the name and official title of the clerk, and

12:30    5    the words, 'This envelope contains the ballot of an absentee

6    elector and must be opened in the same room where votes are

7    being cast at the polls during polling hours on election day, or

8    in municipalities where absentee ballots are canvassed under

9    Section 7.52, at a meeting of the municipal board of absentee

12:31    10    ballot canvassers under 7.52.'"

11    So, Your Honor, this just completely explodes the idea

12    that clerks can change certifications on ballots.  I showed you

13    the statute in the immediately preceding section of the code,

14    6.87(9), which said that the clerk has two options:  They can

12:31    15    retain the ballot, or they can return it to the voter if there

16    are problems with the certification.

17    The very next code section then says that when the

18    clerk receives it, they have to enclose it in a carrier

19    envelope.  And it's not just any carrier envelope, it's one that

12:32    20    is securely sealed and endorsed with the name and official title

21    of the clerk.

22    This is how we're protecting the security of the

23    election.  We are making sure that absentee ballots, as soon as

24    they are received, are placed in a securely sealed carrier

12:32    25    envelope.  This is required and this was not done.  And it

52

1    wasn't done throughout the state, and it made these ballots less

2    secure all throughout the state because it was not done and

3    because the Election Commission told the clerks to involve

4    themselves in keeping the ballots out of these carrier envelopes

12:32 5    and not securing them in their office, and instead giving them

6    to election workers to track down witness information contrary

7    to the code.

8            These are very clear provisions in the Election Code.

9    These are very clear laws.  And these are elements of federal

12:33 10    law and requirements in a contest for election for president of

11    the United States, and they were not followed.

12            They're essential to protect the integrity of the

13    ballot.  That's why the legislature said they are to be

14    construed as mandatory.  And that's why the code says that any

12:33 15    ballot without a witness address cannot be counted.  And the

16    Elections Commission's efforts to override this clear directive

17    of the legislature violated Article II of the Constitution which

18    puts the legislature in charge of determining the rules for an

19    election.

12:33 20            So what is the significance of these violations?  The

21    11 briefs of defendants that we received about a day ago, many

22    of them returned to the same thing:  That these are allegedly

23    technical violations; that they don't matter; that the

24    provisions are -- they're not mandatory, they're just directory,

12:34 25    and whatever the Election Commission and the clerks decide goes.

53

1    Your Honor, in what area of American life is it more

2 important that the rules be followed and that the playing field

3 be level than in an election for president of the United States?

4 Olympic athletes may be banned and stripped of their medals if a

12:34    5 trillionth of a gram of a prohibited substance is found in their

6 sample.  Shouldn't the results for electing the president of the

7 United States be precisely followed?

8    In *Anderson vs. Celebrezze*, a 1983 decision of the

9 United States Supreme Court, the Supreme Court said:

12:35  10    "In the context of a presidential election,

11 state-imposed restrictions implicate a uniquely important

12 national interest, for the president and the vice president of

13 the United States are the only elected officials who represent

14 all the voters in the nation."

12:35  15    After a presidential election there exists only a

16 narrow window of time for court review.  While litigants in

17 other situations may have months or years to investigate their

18 potential claims, in the context of perhaps the most important

19 collective public decision in our nation, there's only a little

12:36  20 over a month to research, investigate, evaluate, consider

21 prosecuting, file and conclude a case before the meeting of the

22 electoral college.

23    Compounding the extraordinarily confined timeframe is

24 the nationwide scope of the election, which is really 50

12:36  25 separate elections.  Another confounding factor is that in many

1    instances one of the candidates is the sitting president who

2    necessarily is unable to devote undivided attention towards

3    seeking redress for any violations of the rules relating to the

4    election.

12:36    5    As a result, it is paradoxically the case that the

6    most important election in the nation is perhaps the most

7    difficult to regulate, raising incentives for local officials to

8    bend the rules to maximize the benefit to their preferred

9    candidate.

12:37    10    Through the exercise of judicial review, the courts

11    can disincentivize bad conduct, but if bad conduct is not

12    reviewed it is in effect encouraged.

13    The electoral college and the winner-take-all

14    apportionment of electors in most states means that both parties

12:37    15    are well aware going into a close election that tipping the

16    balance in even a few counties may make all the difference.

17    Therefore, it is true that in a close election what

18    happens in Madison or Milwaukee can have an outsized effect on

19    the nation.  Absent effective and prompt judicial review to

12:37    20    determine whether the presidential election was conducted within

21    constitutional bounds, the ramifications for the Republic are

22    profound.  An absence of judicial review of the rules in

23    presidential elections will incentivize the players in

24    presidential politics, and in particular municipalities and

12:38    25    local officials who wish to impact the election, to continually

1    test the limits of the rules.  They will, as they did in this

2    case, step well over the line and create new methods of voting,

3    new ballot acceptance standards, and pull down guardrails that

4    the legislature has set high to ensure elections are fair and

5    the playing field level.  And they will do this for a variety of

6    reasons, but we know that they will do it and that's why

7    judicial review is important.

8            Judicial review is the only realistic bulwark against

9    such intrusions on Article II and the authority it grants to

10   state legislatures to write the rules for presidential

11   elections.

12           Further, electors chosen through a tainted election

13   should not adversely impact other states and taint the electoral

14   college vote for president.

15           The Constitution is, of course, a compact of the

16   several states, and the duty of each state is to send a slate of

17   electors chosen in a manner that does not abridge the

18   Constitution.

19           However, an election must be found unconstitutional

20   before a court -- or by a court before the electoral college can

21   be protected.  Neither Wisconsin nor its people have the right

22   to send electors chosen in an unconstitutional way to vote in

23   the electoral college.

24           As the Court is no doubt well aware, just this week

25   the State of Texas initiated a petition for an original action

1    against the State of Wisconsin before the United States Supreme

2    Court.  That filing has apparently now been joined by at least

3    17 other states.  There are 18 other states who are petitioning

4    the United States Supreme Court in a case involving original

12:40    5    jurisdiction against the State of Wisconsin addressing the

6    issues raised in this lawsuit.

7           The other states are concerned for the people of their

8    state because of the failure of the Wisconsin Election

9    Commission to conduct a constitutional election that upheld the

12:41    10    rules of the legislature and ensured that the playing field was

11    not unbalanced by last-minute voting changes and refusals to

12    uphold the high standards for protecting the integrity of the

13    voting process that are in the Election Code.

14           Respect for the rule of law and the rights of other

12:41    15    states demands that the judiciary act to declare constitutional

16    violations when they occur and, if required, to rule that an

17    election held in violation of the Constitution is void and that

18    electors chosen thereby are without authority to act as electors

19    in the electoral college.

12:41    20           So I'd like to turn next to the question of standing

21    which has three components.  The plaintiff must show that he

22    suffered an injury in fact; that the challenged action caused

23    the injury, and; that the injury can likely be redressed by the

24    cause of action.

12:42    25           On the first element, President Trump was denied the

1    constitutional right to have electors appointed in a lawful

2    manner in an election in which he was a candidate.  He has

3    therefore suffered an injury in fact and the challenged action,

4    the unconstitutional actions of the defendants caused that

12:42  5    injury.

6         Candidates are regularly found to have standing in

7    similar cases.  For instance, earlier this month in *Wood vs.*

8    *Raffensperger*, the Eleventh Circuit handled a case in which a

9    plaintiff sued as a citizen and donor for violations of various

12:42  10   constitutional provisions including the Electors Clause.

11        The Eleventh Circuit denied Wood's standing, stating

12   that he had not alleged more than a generalized grievance.

13   However, the Eleventh Circuit stated that "A political candidate

14   harmed would satisfy the injury in fact requirement because he

12:43  15   could assert a personal distinct injury."

16        Likewise in *Carson v. Simon*, the Eighth Circuit

17   considered a COVID-inspired change to state election deadlines

18   for absentee ballots that was adopted by the Minnesota secretary

19   of state, and the *Carson* court reversed the secretary's change

12:43  20   based on the Electors Clause, holding the secretary had invaded

21   the province of the legislature and that presidential "electors

22   have Article III standing as candidates."

23        Obviously if a presidential elector has standing under

24   Article III, the candidate likewise has standing.

12:44  25        The third and last aspect of standing is that the

1    injury can likely be redressed by the cause of action.

2    Therefore, I'll move to the next question, the question of the

3    remedy we are seeking in this case.

4              3 U.S. Code, Section 2 provides that, "Whenever any

5    state has held an election for the purpose of choosing electors

6    and has failed to make a choice on the day prescribed by law,

7    the electors may be appointed on a subsequent day in such a

8    manner as the legislature of such state may direct."

9              Therefore, in the event this court finds the election

10   in Wisconsin failed and is void due to lack of adherence to

11   constitutional standards, as we are requesting, pursuant to

12   3 U.S.C. Section 2, the manner of choosing electors reverts to

13   the Wisconsin Legislature.

14             And at this point, on the record -- I know I made this

15   point off the record in our status conference -- but I'd like to

16   take responsibility for my unartful use of the term "remand" in

17   the complaint to describe the action to be taken by the Court

18   following a determination that Article II of the Constitution

19   has been violated.  As explained in our reply brief, I should

20   have used the term "revert," which more accurately describes

21   what would happen to the power to appoint electors upon the

22   Court's decision that a constitutional violation occurred.

23             At that point there will not be a need for the Court

24   to take further action vis-a-vis the legislature.  The

25   appointment power automatically reverts to the legislature upon

1    the declaration of an unconstitutional and void election.

2            The remedy being sought here, in part, a declaration

3    that the statewide election for president was unconstitutional,

4    would plainly give relief to President Trump as it would void

12:46  5    the legal effect of the statewide election results for

6    president, render void the appointment of any electors based on

7    that election, and give the legislature an opportunity under

8    3 U.S.C. Section 2 to prevent the state from losing its

9    electors.

12:46 10           President Trump has also requested in the fifth

11   request for his relief at the end of the complaint, that the

12   court enjoin actions inconsistent with the declaration that the

13   election is void.  This will include an injunction against the

14   governor issuing a certificate of determination as discussed in

12:47 15   the Wisconsin Elections Commission brief.  The certificate of

16   determination is an act that the governor still must take

17   related to the appointment of electors, and we would ask for an

18   injunction against the issuance of such a certificate based on

19   the election that we are asking be declared void.

12:47 20           It has been suggested that ruling the election void

21   would intrude on the province of the legislature or conflict

22   with the authority of state government.  This is not accurate.

23   Mr. Koons will address some of these points further in his

24   argument.  However, as the Fourth Circuit held this year, quote:

12:47 25           "On the issue of justiciability, it is true that

1  Article II of the Constitution gives state legislatures the

2  power to appoint electors in the manner they see fit, but it is

3  also well-settled that Article II does not vest the states with

4  an unreviewable authority."

12:48  5       And that's *Baten vs. McMaster*, 967 F.3d 345 at

6  pinpoint cite page 351.  That is a 2020, this year, decision of

7  the Fourth Circuit.

8       As Justice Rehnquist said in *Bush v. Gore*, quote:

9       "A significant departure from the state's legislative

12:48  10  scheme for appointing presidential electors," or for electing

11  members of the federal Congress, "presents a federal

12  constitutional question."

13       And we submit that it is a federal constitutional

14  question that this court must address.

12:49  15       In *Donald J. Trump for President, Inc. vs. Bullock*,

16  which can be found at 220 Westlaw 5810556 at page 5, a decision

17  by U.S. District Court on September 30th, 2020 from the District

18  of Montana, the court wrote:

19       "Plaintiffs contend that Governor Bullock, not the

12:49  20  legislature, has altered the time, place and manner of Montana's

21  federal elections in contravention of the United States

22  Constitution."

23       "This is," said the court, "This is quintessentially a

24  federal question and no Eleventh Amendment barrier blocks

12:49  25  adjudication."

1    Similarly, earlier this year on October 2nd, the U.S.

2  District Court For the Middle District of North Carolina, in

3  *Democracy North Carolina vs. North Carolina State Board of*

4  *Elections*, said this:

12:50   5    "This court intends to address whether the North

6  Carolina State Board of Elections by and through its most recent

7  memo has, through executive action, unconstitutionally modified

8  the North Carolina legislative scheme for appointing

9  presidential electors.  That is a constitutional question, not a

12:50  10  question of state law."

11    The kind of administrative rewrite of state election

12  law we have seen in this case emphatically presents a case for

13  federal judicial review, as courts have found again and again.

14    Just over a month ago we've already told you about the

12:51  15  *Carson* case.  That court in the Eighth Circuit said:

16    "However well intentioned and appropriate from a

17  policy perspective in the context of a pandemic during a

18  presidential election, it is not the province of a state

19  executive official to rewrite the state's election code at least

12:51  20  as it pertains to selection of presidential electors."

21    See, what you're hearing, Judge, is that over and over

22  again courts recognize that their responsibility, as Chief

23  Justice Marshall said so long ago, to declare what the law is.

24  The importance of preserving the authority of the state

12:51  25  legislature against invasions by state elected and

1    administrative officials, as well as by state courts, has been

2    emphasized again and again by the United States Supreme Court in

3    cases some of which were cited in our brief such as *Bush vs.*

4    *Palm Beach City Canvassing Board* and *Bush v. Gore*.

12:52    5    And three times just this year the Seventh Circuit

6    Court of Appeals in *Tully vs. Okeson*, 977 F.3d 608, in *Luft vs.*

7    *Evers*, 963 F.3d 665, and in *Democrat National Committee vs.*

8    *Bostelmann*, 977 F.3d 639, the Seventh Circuit intervened or

9    upheld state law -- state legislative requirements against

12:53    10    claims that the pandemic justified modifications in the law.

11    And you will note that these changes made by the Wisconsin

12    Elections Commission were repeatedly justified in the briefing

13    on the theory that this was an appropriate response to the

14    pandemic and the courts have uniformly said no, the law cannot

12:53    15    be changed based on the pandemic.

16    In *Bostelmann* the Seventh Circuit upheld Wisconsin

17    Election Law against a challenge that it was insufficiently

18    flexible in the face of COVID stating that, quote:

19    "Deciding how best to cope with difficulties caused by

12:53    20    disease, is principally a task for the elected branches of

21    government."  And that's at page 643 of that decision.

22    Finally, just a month ago in a case involving

23    Wisconsin's deadline for counting absentee ballots, Justice

24    Gorsuch, joined by Justice Kavanaugh, wrote, in a concurrence on

12:54    25    an application to vacate a stay, wrote this:

63

1           "The Constitution provides that state legislatures,

2    not federal judges, not state judges, not state governors, not

3    other state officials bear primary responsibility for setting

4    election rules."

12:54    5           This court, like many courts before it, should

6    exercise judicial review in an election dispute and in this case

7    vindicate President Trump's rights as a candidate under

8    Article II to prevent the tampering and to redress the tampering

9    with election rules by Wisconsin administrators.

12:54   10           Now I'll move to the topic of disenfranchisement,

11   another common theme by the defendants, including the Democrat

12   National Committee which was added as a party in this case.

13           These defendants have constructed and advanced a myth

14   that a finding that the election in Wisconsin was

12:55   15   unconstitutional would "disenfranchise" more than 3 million

16   Wisconsin voters.

17           This is not a legal claim.  This is not a logical

18   claim.  It's not a claim made by somebody that respects the role

19   of the Court in resolving a dispute like this or the importance

12:55   20   of the rule of law being followed.

21           The Wisconsinites who voted in the presidential

22   election were entitled to vote in a constitutional election

23   conducted in accordance with the law.  No one in America is

24   entitled to vote in an unconstitutional election, nor would many

12:56   25   want to.

1    It cannot be said that the participants in an illegal

2   election were deprived of their right to vote, as there is no

3   right to vote in an illegal election.  And no one has a right to

4   have votes from an unconstitutional election counted.

12:56  5    Now, it is regrettable, and an analogy to an athletic

6   contest as the amici involving Christine Todd Whitman and others

7   analogize the election to a ball game and say that there's a

8   winner and a loser.  That doesn't cover it.  In some cases you

9   go to a game and you find out that what you witness on the field

12:56 10   has been disqualified.  That didn't mean you didn't go to the

11   game, it doesn't mean that something didn't happen, it just

12   means that an event that would count didn't happen.

13    It cannot be said -- I'm sorry.  Regrettably, the

14   rogue actions of the Wisconsin Elections Commission and election

12:57 15   administrators in this case deprived Wisconsin voters of the

16   opportunity to vote in a constitutional election.  And that is

17   sad.

18    But, therefore, as a matter of law the presidential

19   election in Wisconsin was a failed election and of no legal

12:57 20   consequence.  The charge of disenfranchisement is untethered

21   from the applicable law in this case.  It merely seeks to cover

22   up a reckless disregard for the rule of law and incite a

23   decision based on emotion rather than reason.

24    To charge those who would point out the constitutional

12:58 25   defects in an election and identify a constitutional resolution

65

1    for those defects engaged in disenfranchisement combines

2    multiple logical fallacies.  First it's an obvious attempt to

3    deflect attention from election administrators' constitutional

4    violations.  That is what is referred to as a red herring.

12:58    5    Second, the disenfranchisement claim is a non sequitur

6    that ignores voting as a process which involves compliance with

7    legal standards before one's vote may be counted.  If one cannot

8    validly vote, the failure to count their vote is not

9    disenfranchisement.  And an obvious example is that if a

12:58    10    16-year-old attempts to cast a ballot, his vote should not be

11    counted.  The failure to count a minor's ballot is not

12    legitimately called disenfranchisement.  The minor was never

13    entitled to vote in the first place.

14    If anything, it could be said that the Commission

12:59    15    disenfranchised the voters by depriving them of the opportunity

16    to participate in a valid election.  However, it is entirely

17    inaccurate as a matter of logic and law to say that the

18    president is seeking to disenfranchise voters when he merely

19    seeks to require constitutional standards to be applied to this

12:59    20    election.

21    Third, the disenfranchisement charge is a blatant

22    appeal to emotion.  It seeks to rile people rather than to have

23    them focus upon the problem identified and the solutions

24    proposed.  Use of such terminology cements a Faustian bargain in

12:59    25    which reason has been traded for rhetoric.

66

1    Defendants also complained that the election cannot be

2    set aside because allegedly the president has not proved fraud.

3    This assertion is another logical fallacy, Your Honor, a logical

4    fallacy known as a false dilemma.  They are providing an answer

01:00    5    to a question we have not asked.

6    Proof of fraudulently-cast ballots is not a necessary

7    element of a claim that Article II of the Constitution has been

8    violated.  Article II does not speak of ballots and frauds.

9    Article II speaks of the direction of the state legislature.

01:00    10    Therefore, an Article II violation is established upon proof

11    that the directions of the legislature were not followed

12    rendering the election unconstitutional.

13    The idea that the president should be required to

14    prove fraud resulting from defendant's active efforts to change

01:01    15    the law is not supported.  It is unnecessary to prove fraud in

16    order to prove the Commission defendants did not follow the

17    legislature's directions.

18    I will, however, bring to the Court's attention some

19    of the provisions in the stipulation which demonstrate that the

01:01    20    failures to follow state law caused and had a material impact

21    upon the election.

22    For instance, in paragraph 14 of the stipulation, out

23    of -- there were -- the City of Milwaukee has stipulated that

24    there were 169,519 absentee ballots, and of those approximately

01:02    25    108,000 were non-in-person absentee ballots.  And that of those,

1    60 to 70 percent are estimated to have been returned via drop

2    box.  So that would mean that, at a minimum, some 65,000 ballots

3    in the City of Milwaukee to almost 80,000 ballots were returned

4    via drop box.

01:02    5    With respect to the City of Madison and the human drop

6    boxes in the Democracy in the Park event, paragraph 15 recites

7    that 17,271 ballots were received before election day through

8    those Democracy in the Park events and before the in-person

9    absentee voting period opened in those two events.

01:03    10    Related to the indefinitely confined issue, the

11    Wisconsin Elections Commission has stipulated that approximately

12    240,000 requests for absentee ballots based on an indefinitely

13    confined status were received in the past election.  And the

14    number -- the reciprocal number in the 2016 general presidential

01:03    15    election as reflected in paragraph 19 was only 66,611.  And

16    there are statistics in paragraphs 20 and 21 related to the

17    indefinitely confined voters in the cities of Milwaukee and

18    Madison.

19    In terms of the alterations of witness certifications,

01:04    20    as I mentioned, we have the acknowledgement that that was a

21    regular practice in the city of Milwaukee by the election

22    administrator.

23    Additionally, we have the testimony by affidavit from

24    our witnesses confirming that they were not permitted to raise

01:04    25    objections related to those witness certifications and that they

68

1    saw altered certifications I believe when they were reviewing

2    ballots at the Central Count Facility.  And those were done in

3    red as the clerk's office instructed to distinguish them or to

4    point out that they were done by the clerk's office.

5           And let me say there, that the fact that they were

6    done in red doesn't make it right.  It makes it easier to see

7    what happened, but they weren't following a lawful process,

8    number one.

9           So, there is abundant evidence I think in the record

10   related to materiality of the issues that are being raised here.

11   There's also Exhibit 18 which indicates 500 absentee ballot

12   sites located throughout the state and -- more than 500.  And

13   the 60 to 70 percent number, which is a number that is reflected

14   in media articles as well as the statement that was made by

15   Claire Woodall-Vogg that was in the stipulation, if extrapolated

16   across the state we're talking about hundreds of thousands of

17   ballots collected through the drop boxes.  And possibly a half a

18   million or more.

19          But -- so there is certainly strong evidence of the

20   materiality and there's absolutely no requirement to prove

21   fraud.  And the amount of affected ballots in this election is

22   many multiples of the difference in the presidential election as

23   it stands now in the state of Wisconsin.

24          So defendants contend their constitutional violations

25   are not violations, or at least not remediable, because the

01:05
01:05
01:06
01:06
01:07

69

1    president cannot prove that the constitutional violations were

2    the, quote, but for, end quote, cause of him not winning.  And

3    this is again beside the point.

4            Once it is established that the election was

01:07  5   unconstitutional and that it did not meet the standards of

6    Article II, the election must be considered void.  There is no

7    harmless error analysis applicable to constitutional error of

8    this type.

9            Article II -- and this is because of this.  Article II

01:08  10  is intended to protect the authority of state legislatures

11   against encroachment.  It's part of the constitutional system of

12   structural checks and balances.  And we talk about this more in

13   our complaint actually than in the reply brief.

14           But, therefore, once it is established that the

01:08  15  election was not run by the legislature's directions but in

16   accordance with another set of rules, the election is invalid

17   and must either be rerun, or some other method of appointing

18   electors must be undertaken.

19           There can be no harmless error analysis in a

01:08  20  delegitimized or unconstitutional election.  At the point the

21   election is determined to be unconstitutional, the results from

22   that election are void as they were not achieved in accordance

23   with the Constitution.

24           In other words, the state loses the delegated power to

01:09  25  appoint electors when it fails to satisfy the condition -- the

1  delegated condition that an election held to appoint electors

2  take place according to the rules set by the state legislature

3  as required by Article II.

4  The idea of structural error, which so delegitimizes a

01:09  5  process that it cannot be relied upon to produce a valid result

6  is not unusual in the law.  For instance, if peremptory strikes

7  are used by a prosecutor in a criminal case in a racially

8  discriminatory manner, the jury's decision to find the defendant

9  guilty is void and there's no harmless error analysis.  This is

01:09  10  true even when the defendant is guilty beyond any doubt, such as

11  if there were a videotape of the entire crime.  Because the

12  constitutional violation -- in that case a racially-motivated

13  peremptory challenge, in this case a violation of Article II of

14  the Constitution -- they both strike at the legitimacy of the

01:10  15  system itself.  The system cannot be relied -- and because of

16  that, the system cannot be relied upon to produce a reliable

17  result and the trial has to be done over.

18  The idea that certain rights are sufficiently

19  important to organized society that the violation of those

01:10  20  rights will be declared in a lawsuit, even without proof of

21  defined damages, holds in other areas as well.

22  For instance, in *Carey vs. Piphus*, 435 U.S. 247, 266,

23  a 1978 decision in the United States Supreme Court, Justice

24  Powell, writing for the Supreme Court, said:

01:10  25  "Because the right to procedural due process is

1    absolute in the sense it does not depend upon the merits of a

2    claimant's substantive assertions, and because of the importance

3    to organized society that procedural due process be observed,"

4    and then he cites cases, "we believe that the denial of

5    procedural due process should be actionable for nominal damages

6    without proof of actual injury."

7         I've given you two examples of where the courts have

8    found that the rights go to the structure of a system.  And

9    they're so important.  When rights go to the structure of a

10   system, those are so important that any showing of damages or

11   injury beyond a minimal amount is not required for the courts to

12   address it.

13        Likewise the rights addressed in Article II are

14   absolute and they do not depend on the assertion of any degree

15   of or number of fraudulent votes or other injury suffered by

16   President Trump.

17        As the Supreme Court said in *Piphus*, they are

18   actionable without proof of actual injury.  In this context they

19   are actionable without proof of the extent of President Trump's

20   injury, but yet I have shown you, Your Honor, that it affected a

21   material amount of ballots, well over a material amount of

22   ballots in this election.

23        Your Honor, thank you for your patience.  The

24   overriding principle upon which this case is based is the

25   necessity of upholding the rule of law in the Wisconsin

1    election.

2          We have shown you the Wisconsin Elections Commission

3    and other election administrators repeatedly chose not to follow

4    the plain terms of the Wisconsin Election Code.  In practice and

01:13  5    through directives and through their policies, they changed the

6    laws adopted by the legislature.  They turned administrative

7    determinations made by administrative bodies and administrators

8    into new laws that were then implemented around the state.

9          The Constitution does not permit this.  As Justice

01:13  10   Gorsuch recently reminded on October 26th, 2020 in *Democratic*

11   *National Committee vs. Wisconsin State Legislature*, Justice

12   Gorsuch said this:

13          "Our oath to uphold the Constitution is tested by hard

14   times, not easy ones.  And succumbing to the temptation to

01:13  15   sidestep the usual constitutional rules is never costless.  It

16   does damage to faith in the written Constitution as law, to the

17   power of the people to oversee their own government, and to the

18   authority of legislatures, for the more we assume their duties

19   the less incentive they have to discharge them.  Last-minute

01:14  20   changes to longstanding election rules risk other problems too,

21   inviting confusion and chaos and eroding public confidence in

22   electoral outcomes."

23          Justice Gorsuch was speaking to a different situation

24   in the state of Wisconsin.  He couldn't have spoken more

01:14  25   eloquently to this situation and the facts before you,

1    Judge Ludwig, in the state of Wisconsin.

2           Time and again when laws have been broken Americans

3    turn to the judiciary to right the ship, restore the rule of

4    law, and keep the Republic.  A decision in this case to enforce

01:15   5    the rule of law will, as in others before it, no doubt be met

6    with howls of protest from those who favor convenience over the

7    Constitution.  But history records that those who uphold the

8    rule of law and return this country to its bedrock value,

9    adherence to the Constitution, have repeatedly shown us the way

01:15   10   to greater liberty.

11          This is the lesson of great precedents of the Supreme

12   Court, like *Brown vs. Board of Education* and *Loving vs.*

13   *Virginia*.  The rule of law leads to liberty.  For only where

14   there is respect for the rule of law can there be liberty.

01:15   15          President Trump asks that the rule of law be followed.

16   Defendants ask that this court allow them to determine the law

17   as is convenient and best for them.

18          On behalf of President Trump, I submit fidelity to the

19   rule of law in this case requires a declaration that the 2020

01:16   20   presidential election in Wisconsin was unconstitutional.

21          Your Honor, I therefore ask that you enter permanent

22   declaratory and injunctive relief, which includes declaring the

23   presidential election in Wisconsin void under Article II of the

24   Constitution, enjoining any action by Governor Evers to issue a

01:16   25   further certification to presidential electors flowing from the

1    unconstitutional and void election, and enjoining any other

2    actions of defendants contrary to this determination.

3         We further respectfully request that your order

4    plainly specify that it is a final judgment, appealable under 28

01:17  5    U.S.C. Section 1291 to avoid delay in either party seeking

6    appellate review should that be necessary.

7         I want to thank you, Your Honor, and would now like to

8    turn it over to my co-counsel, Mr. Koons.

9         THE COURT:  Well, thank you.  How much time do you

01:17 10    think Mr. Koons' argument will take?  We've been going for a

11    while.

12         MR. BOCK:  Your Honor, can you -- we lost the screen

13    for a second.  I'm sorry.  Can you hear us?

14         THE COURT:  Yes, I can.  My question is --

01:17 15         MR. BOCK:  Now we can hear you.  Sorry, Your Honor.

16    I'm not sure what happened.

17         THE COURT:  No, it's the technology we're dealing

18    with.

19         My question is, how long is Mr. Koons's portion of the

01:18 20    argument?  We've been going for almost two hours now.  My real

21    question is, should we take a break now?  Or is his argument

22    going to be relatively brief?  In which case we would take a

23    break but before the defendants present their positions.

24         MR. KOONS:  Your Honor, this is Kevin Koons.  I think

01:18 25    my argument will be fairly brief.  It's going to be directed

75

1    primarily to some of the issues raised in the defendants'

2    various motions to dismiss.

3              THE COURT:  "Fairly brief" means?

4              MR. KOONS:  Less than 10 minutes.

01:18  5         THE COURT:  Thank you.

6                   PLAINTIFF ARGUMENT

7              MR. KOONS:  As I said, I just want to briefly address

8    some of the arguments that the defendants have raised in their

9    12 or 13 briefs filed on Tuesday night and which we replied to

01:19  10   yesterday at noon.

11         A lot of these arguments are reasons why the

12    defendants do not want you to hear this case.  And as Mr. Bock

13    eloquently stated, this is an area where we believe that the

14    Court does have jurisdiction and ought to declare what the law

01:19  15   is.

16         We're hearing both sides of the fence from these

17    defendants.  They've said that both we're too late as well as

18    too early.  The first issue that has been raised was the issue

19    of mootness.  What we've heard is that we're too late because

01:19  20   the matter is now moot since Governor Evers has issued the

21    certificate of ascertainment.

22         And what we attached to our reply brief yesterday as

23    Exhibit A was the Wisconsin Elections Commission brief filed in

24    the original action in the Wisconsin Supreme Court where they do

01:20  25   a very good job of laying out why our lawsuit is not late.

1        Because the -- really the date of any ultimate

2    significance, as Justice Ginsberg recognized in her dissenting

3    opinion in *Bush v. Gore,* is January 6th which is the -- is when

4    the validity of the electoral votes will be counted in Congress

01:20    5    under Title III of the U.S. Code, Section 15.

6        In fact, if you look at Title III, U.S. Code,

7    Section 6, it makes clear that there are actually two

8    certificates or two possible certificates the governor may

9    issue.

01:20    10        The first is the certificate of ascertainment, which

11    is accomplished after the canvassing of votes and which the

12    governor here issued on November 30th.

13        The second certificate contemplated by 3 U.S.C.

14    Section 6 is a certificate of determination.  And the

01:21    15    certificate of determination is not always issued.  It's issued

16    if there's a contest or controversy concerning the outcome of an

17    election.  And this certificate can be issued even after there

18    is a meeting of the electors on December 14th.  In fact, in

19    2000, Florida Governor Jeb Bush issued both certificates after

01:21    20    the contest in controversy was resolved.  So this case is not

21    moot.

22        The other argument that the defendants have raised

23    regarding untimeliness is that of latches.  They argue that

24    somehow President Trump sat on his rights before bringing this

01:21    25    lawsuit less than a month before the election was held on

77

1     November 3rd.

2          And in the stipulated facts, in paragraph 8, the

3     defendants all agreed that the last county to be canvassed in

4     Wisconsin was November 17th, and that the final state canvass

01:22    5     did not occur until November 30th.  And the president here filed

6     his lawsuit a mere two days later.  So to suggest that the

7     president sat on his rights is just mistaken and misplaced.

8          As Mr. Bock indicated in his closing argument, in a

9     presidential election the candidates are really engaged in 50

01:22   10    different elections around the different states.  Placing a

11    burden on all the candidates to monitor the actions in all 50

12    states in a situation where the guidance is dynamic -- as

13    Mr. Bock's presentation and some of the exhibits you saw, some

14    of these guidance documents were being issued in late October

01:23   15    leading up to the election, and to suggest that a candidate must

16    go around and chase down every guidance document as it's being

17    written, before we even know whether those guidance documents

18    will even be followed by the clerks who they were directed to

19    since they are merely guidance, is burdensome.

01:23   20         So as far as the defense of latches, we submit that

21    simply does not apply.

22         So moving then to the argument that we're too early.

23    And that brings me to the reply brief that Governor Evers filed

24    late last night.  And in his brief he argues that we failed to

01:23   25    respond to certain distinct points and therefore conceded.

78

1       And I want to make clear, we didn't concede anything.

2  And we've substantively replied to all the points raised in his

3  initial motion to dismiss.  We were faced with 12 different

4  briefs that were filed on Tuesday night at 5 p.m. Central, with

01:24  5  a deadline to respond 18 hours later, which we did, and we

6  responded to all those points.

7       He points out in his brief that we were too early

8  because the recount that's going on in Wisconsin provides the

9  exclusive remedy.  And yet he also argues in his brief that we

01:24  10  were too late, jumping onto the arguments of mootness and

11  laches.

12       So while he spent a page and a half on page 18 of his

13  initial brief arguing we're too early, he spends five pages

14  later on arguing that we are too late.

01:24  15       But the real reason why that should not prevent the

16  Court from hearing this case, is that because the recount is

17  looking at ballots.  They're recounting the ballots, the

18  accuracy of the count.  Here we're asking the Court to look at

19  the conduct of the entire election, as Mr. Bock pointed out; the

01:25  20  fact that administrators and non-legislative officials changed

21  the rules of the election midstream.  And that is not something

22  that recounts are particularly directed at and that's something

23  that the Court here has the power to hear.

24       The framers when they set up Article III courts set

01:25  25  them up primarily to handle and hear important federal law

79

1    cases, which this is.

2        The remaining defenses raised by the defendants, the

3    abstention doctrines as well as the Eleventh Amendment immunity,

4    hinge primarily on this and this alone.  And that is, they

01:26    5    advance the theory that we are seeking merely state law

6    remedies.  And that's not true.  Because Article II, as we cited

7    in both the complaint and in our reply brief, delegate authority

8    to state legislatures to determine the manner for conducting

9    presidential elections.

01:26    10        And in *Bush v. Gore*, as well as *Bush v. Palm Beach*

11    *County Canvassing*, the Supreme Court said that when we're

12    dealing with state law that sets up the rules for an election in

13    a presidential election, and I'm quoting from *Bush v. Palm Beach*

14    *County Canvassing Board*, quote:

01:26    15        "The legislature is not acting solely under the

16    authority given to it by the people of the state," that is, the

17    State of Wisconsin, "but by virtue of a direct grant of

18    authority made under Article II, Section 1, Clause 2 of the

19    United States Constitution."

01:27    20        And in *Bush v. Gore*, Justice Rehnquist in his

21    concurring opinion said:

22        "That a significant departure from that legislative

23    scheme for appointing presidential electors presents a federal

24    Constitution question."

01:27    25        In both the *Montana* case and *North Carolina* cases that

80

1    were heard earlier this year, and that's *Donald Trump For*

2    *President vs. Bullock* and *Democracy of North Carolina vs. North*

3    *Carolina State Board of Elections*, both of those cases, district

4    court cases followed the *Bush v. Gore* and the *Bush v. Palm Beach*

01:27    5    *County Canvassing Board*, recognizing that the -- whether or not

6    state officials carry out faithfully the state election code in

7    their respective states is not merely a matter of state law,

8    it's a matter now of federal law and important federal

9    constitutional questions.

01:28    10    So under the abstention doctrines that have been

11    raised, the first is Wilton/Brillhart, which applies to

12    declaratory judgment doctrines.  And they apply where the cases

13    are not governed by federal law.  And that's -- and that was --

14    in fact, that was decided even in your -- in the Eastern

01:28    15    District of Wisconsin in the case of *Nissan North America vs.*

16    *Andrew Chevrolet*, which is 589 F.Supp.2d 1036, where it says

17    that:  "To abstain under the Wilton/Brillhart Abstention

18    Doctrine, the parallel state court proceeding must present the

19    same issues not governed by federal law."

01:28    20    So Wilton/Brillhart does not apply because we're not

21    dealing with a state proceeding that's dealing with federal law,

22    we're dealing with now a federal proceeding dealing with federal

23    law.

24    Also under the Colorado River Doctrine, the same -- if

01:29    25    you apply the factors laid out in Colorado River, while no one

1  factor is determinative, whether or not the federal proceeding

2  involves questions of federal law is a major consideration in

3  declining to abstain and declining to apply Colorado River

4  Doctrine.

01:29  5       The last abstention doctrine that they've raised is

6  the Pullman abstention.  And a Pullman abstention applies when

7  there's some substantial uncertainty about the meaning of the

8  state law and the federal courts will defer to state courts in

9  resolving.

01:29  10      But as Mr. Bock showed you in each of these statutes,

11  the statutes are abundantly clear about the duties and mandatory

12  duties of state election officials that were either not followed

13  or that were changed mid stream.  So there's no reason here to

14  apply a Pullman abstention.

01:29  15      Finally, I want to address the arguments that have

16  been raised regarding Eleventh Amendment sovereign immunity.

17  This was raised initially only by two parties, the Democratic

18  National Committee and the Wisconsin Elections Commission.

19      Yesterday in our pretrial conference we heard the

01:30  20  attorneys for Governor Evers suggest that they needed to also

21  apply this doctrine based on changes that they heard -- what

22  they perceived as changes they heard to the relief being

23  requested.  However, nothing in the relief being requested,

24  whether in the original complaint or that was articulated

01:30  25  yesterday, changed such that they were not already on notice

1   that the Eleventh Amendment might apply as evidenced by the fact

2   that two of the parties already raised this.  And the

3   last-minute attempt to include this in the reply is simply just

4   that, a last-minute attempt to include something that they

5   originally forgot.

6        But essentially all the defendants here are making the

7   same arguments, and that is, that under -- Eleventh Amendment

8   immunity recognizes that states generally have the right to be

9   free from federal -- free from being sued in federal courts by

10   private citizens.  But there are three important exceptions to

11   that rule, one of which is the doctrine under *Ex Parte Young*

12   which recognizes that private parties may sue state officials

13   individually in their official capacity for equitable relief,

14   prospective equitable relief.

15        So the defendants have -- the issue they focused on is

16   the fact that *Ex Parte Young* that was held in the *Pennhurst* case

17   in the U.S. Supreme Court to not apply when the violations being

18   sought to restrain are based solely on state law.  And as I

19   explained a minute ago, that's not the case here.  These are

20   violations of federal law in the sense that Article II has now

21   delegated to the states the ability to set out the election

22   rules for presidential elections.

23        In both the Montana case and the North Carolina case I

24   cited to a moment ago, both cases followed the *Bush v. Gore*

25   admonition that these are important federal constitutional

01:31
01:31
01:31
01:32
01:32

83

1    questions and declined the defendant's invitation to apply

2    Eleventh Amendment immunity and recognized that *Ex Parte Young*

3    did apply.

4         In the cases that the defendants filed last night as

01:32  5    supplemental authority, this would be the Arizona case of *Bowyer*

6    *vs. Ducey* and the *Feehan* case that was decided by your colleague

7    Judge Pepper just last night, neither of those opinions address

8    the fact that this case is being brought under Article II and

9    the important federal constitutional questions that were

01:33 10   recognized in the *Bush* cases.

11        There has been some suggestion that because there's an

12   element of retrospective relief being requested in the sense

13   that we're asking you to declare an election that occurred on

14   November 3rd as being unconstitutional somehow now escapes the

01:33 15   *Ex Parte Young* exception, I want to point the Court to a quote

16   from the *Verizon* case that was in one of the party's briefs.

17   And I'm going to share my screen that has that quote.

18        So the *Verizon* case was one where the Verizon was

19   challenging an order by the Public Service Commission of

01:34 20   Maryland regarding payment of fees and sought to enjoin the

21   enforcement of that order.

22        And as you can see here in this quote, the Supreme

23   Court said that as for Verizon's prayer for declaratory relief,

24   to be sure that it seeks a declaration of both past as well as

01:34 25   future ineffectiveness of that order, and -- but because there

1    was being no monetary penalty put upon the state and its

2    treasury, the court found that there were no Eleventh Amendment

3    concerns by the fact that there was some retrospective element

4    to the relief being requested.

01:34    5    So for these reasons, Your Honor, we'd ask that you

6    deny the pending motions to dismiss and grant the relief that

7    the president has requested.

8    Thank you.

9    THE COURT:  All right, thank you.

01:34    10    It is 1:34 here in Milwaukee.  I'm going to propose

11    that we take a little bit of a break.  I'd like to grab a

12    sandwich, but I would like to move this along and complete

13    the -- complete everything as promptly as we can.

14    So I guess I'd turn to defense counsel and ask you two

01:35    15    questions:  One, how much time do you think you need?  And, two,

16    how much time do you want to take for a break right now?

17    And I realize you're all looking at one another

18    because nobody wants to answer without consulting the others.

19    Perhaps you were instant messaging one another while this was

01:35    20    going on, I don't know.  But I would like answers to those two

21    questions and if you want to take a couple minutes to caucus,

22    that's fine.

23    MR. MANDELL:  Your Honor, it's Jeff Mandell.  If I

24    may, I will venture an answer.

01:35    25    The answer to your first question is I don't believe

1    that we will need as long as the plaintiffs took.  I will

2    endeavor to speak much more briefly.

3            At the same time, I do want to reserve the right of

4    other defendants' counsel to chime in if there is something that

01:36    5    I have left out that is of particular importance to their

6    clients.  But I still think in total we will be shorter than the

7    two hours that we just ran.

8            Secondly, in an effort to ensure that, and to make

9    sure that we do have a chance to touch base and do everything we

01:36   10    can to streamline the presentation, I would ask the Court for a

11    break of approximately an hour.

12            THE COURT:  That makes sense to me.  And the logic of

13    that also makes sense to me that if we take a little more time

14    maybe you can be more focused.  That would be great.

01:36   15            So why don't we take a break to 2:30, which at this

16    point is 54 minutes, and we will resume at 2:30 with the

17    defendants' chance to argue their position and to respond to

18    what the plaintiff has just said.

19            So we will go into recess until 2:30.

01:37   20            Thank you, everyone.

21            (Recess taken at 1:37 p.m.)

22                        *    *    *

23

24

25

1                    AFTERNOON SESSION

2              (Back on the record at 2:30 p.m.)

3              THE CLERK:  The Court is now back in session.

4              THE COURT:  So good afternoon everyone.  We are back

02:34   5    in session for the completion of counsel's arguments.  Counsel

6    for the defendants who is --  Who is leading off?

7              MR. MANDELL:  Your Honor, this is Jeffrey Mandell for

8    Governor Evers.  I will be leading off.  I expect to speak

9    fairly briefly, significantly less than 30 minutes, and I

02:35   10   believe there are two additional defense counsel who are

11   planning to speak.  And obviously if Your Honor has questions

12   for me or anyone else, we're happy to answer them.

13             MR. BOCK:  Before we get started, I have one brief

14   matter of order if I can raise it with the Court.

02:35   15             THE COURT:  Sure.

16             MR. BOCK:  Thank you, Your Honor.  So given the way we

17   started with the stipulation, I just didn't want to leave any

18   room for ambiguity in the record and say that plaintiff's move

19   to admit the stipulation and the Exhibits A and B attached

02:35   20   thereto as well as Plaintiff's Exhibits 1 through 75 and the

21   declaration of Claire Woodall-Vogg, which was submitted by her

22   counsel in this case and filed with the Court.  And we would

23   move for admission and receipt of those exhibits and other

24   evidence into the record in this case.

02:36   25             THE COURT:  And Mr. Mandell, I assume that --  Well,

1    I'm aware of the objection that you raised earlier and the

2    objection that's stated in the -- with particularity in the

3    stipulation itself.  Subject to those, do you have any other

4    objections other than those?

02:36    5         MS. BROOK:  Your Honor, this is Ms. Brook.  If I can

6    take this one.  The only other objections are --  We would move

7    to --  We would move to enter into the record all of the

8    exhibits and documents that are stipulated to in the parties

9    joint stipulation, which include defendant's exhibits as well as

02:36    10   other documents attached to the briefing that defendants

11   provided in this case.  Moreover, I will note that the two

12   affidavits that plaintiffs want in the record, one of which they

13   have now filed, an executed version of the second of which I do

14   not believe they have yet filed an executed version of.

02:37    15        But subject to them filing an executed version of

16   that, then no other additions or corrections.

17        THE COURT:  Mr. Bock.

18        MR. BOCK:  Your Honor, I understand both exhibits to

19   the stipulation, both executed affidavits have now been filed

02:37    20   and were filed initially.  They were both filed together.

21        THE COURT:  The record will reflect whatever documents

22   if they're not signed, obviously Mr. Bock, I'll give you an

23   opportunity to get them -- the signed versions filed.  But

24   Mr. Bock so as I understood Ms. Brook, defendants want all of

02:38    25   the exhibits -- all of the exhibits referenced in the

88

1   stipulation.  And Ms. Brook, why don't you summarize one more

2   time.  I want to make sure that I've got everything and make

3   sure that I've got Mr. Bock's agreement to it.  If there's a

4   disagreement to it, I want that flushed out.

02:38   5        MS. BROOK:  I have that in front of me now.  Paragraph

6   1 of the parties stipulation seeks to admit both Plaintiffs

7   Exhibits 1 through 75, as Mr. Bock indicated, and also

8   Defendants' Exhibits 501 through 506.  I would ask that both

9   sets of those exhibits be admitted.

02:38   10        The joint stipulation also contemplates not to oppose

11   the introduction of or reliance on any documents or declarations

12   attached to, referenced in or filed with any of the defendants'

13   briefing on the motions to dismiss or request for temporary

14   restraining order.  I believe Mr. Bock referenced just one of

02:39   15   those declarations.  I just seek to correct that it would be any

16   of the documents or declarations attached to or referenced in

17   those filings.

18        THE COURT:  Thank you.  Mr. Bock, that is correct, you

19   have no objection to that?

02:39   20        MR. BOCK:  Your Honor, the only thing we would like to

21   say is we're not conceding relevance as to these documents and

22   exhibits, but we don't otherwise have an objection.

23        THE COURT:  No, I get that.  I certainly understand

24   the defendants aren't conceding the relevance of a lot of the

02:39   25   things here either.  Fortunately, we have a bench trial, so I

89

1   can admit all of these things, as judge's love to say, for

2   whatever they're worth and they will be part of the record and

3   I'll rely on them to the extent they have evidentiary

4   significance and are relevant to the -- to the issues that I

02:39   5   address.  And to the extent they're not, I won't.  Is that

6   acceptable to everyone?  Ms. Brook?

7           MS. BROOK:  Yes, Your Honor.  Thank you.

8           MR. BOCK:  It's acceptable to the plaintiff, Your

9   Honor.

02:40   10          THE COURT:  All right.  Thank you.  At this point, the

11  factual record is complete subject to, you know, subject to --

12  There's apparently some question about whether one of these

13  latest affidavits or declarations is signed or not.  But once

14  it's signed, that will be the complete record upon which the

02:40   15  Court should base its decisions in this case.  Is that correct,

16  Mr. Bock?

17          MR. BOCK:  It is, Your Honor.

18          THE COURT:  And that's correct from the defense

19  perspective as well, Ms. Brook?

02:40   20          MS. BROOK:  That is, Your Honor.  If I just may make

21  one point of housekeeping.  I'm being told that the public line

22  is still mooted.

23          MR. BOCK:  Your Honor, I bring your attention to the

24  fact that the declaration of Claire Woodall-Vogg is not a part

02:40   25  of the stipulation, so just -- We'd also made that statement

1    that that's a part of our submission.  I just didn't want that

2    to be lost.

3            THE COURT:  It's accepted into evidence subject to the

4    conditions that are on everything else.  All right.  Let's hear

02:41    5    from Mr. Mandell as he's been lead off.

6                        DEFENSE ARGUMENT

7            MR. MANDELL:  Thank you, Your Honor.  Well, plaintiff

8    claims to enforce the directives of the Wisconsin Legislature.

9    What the Legislature has made most clear when it comes to

02:41    10    elections is that the will of the electors; that is, the voters

11    is what matters.  It's right there at the very top of the

12    Election Code.

13            In Wisconsin Statute § 5.01(1), "except as otherwise

14    provided, Chapters 5 to 12 shall be construed to give effect to

02:41    15    the will of the electors if that can be ascertained from the

16    proceedings notwithstanding informality or failure to fully

17    comply with some of their provisions."

18            In the midst of a pandemic, state and local officials

19    across Wisconsin of both parties and no party at all worked

02:42    20    diligently to hold a safe, fair election.  Plaintiff does not

21    dispute that the rules governing this election were in place and

22    known to all involved before election day.  He does not allege

23    that any election official did anything other than act in good

24    faith to fulfill their duties.  It is not disputed that

02:42    25    3.3 million voters cast their votes in reliance on those

1   established rules.

2           And while he now compares himself to the plaintiffs in

3   *Brown v. Board of Education* and *Loving v. Virginia* while asking

4   this Court to deem Wisconsin's election failed, there is no

02:42   5   conceivable basis for disenfranchising the 3.3 million voters

6   who cast their votes in good faith.

7           Plaintiff asks the Court to overturn the result of the

8   election, as determined by the people of Wisconsin, in an act of

9   judicial fiat, a result that, as this Court recognized this

02:43   10   morning, would likely be the most extraordinary relief ever

11   afforded by any court in this Nation's history.

12           As Justice Brian Hagedorn wrote for the majority of

13   the Wisconsin Supreme Court just last week in another case that

14   sought all of the votes in the November election to be set

02:43   15   aside, "something far more fundamental than the winner of

16   Wisconsin's electoral votes is implicated in this case.  At

17   stake in some measure is faith in our system of free and fair

18   elections, a feature central to the enduring strength of our

19   constitutional republic.  It can be easy to blithely move on to

02:43   20   the next case with a petition so obviously lacking, but this is

21   sobering.  The relief being sought by the petitioners is the

22   most dramatic invocation of judicial power I have ever seen.

23   Judicial acquiescence to such entreaties based on so flimsily a

24   foundation would do indelible damage to every future election.

02:44   25   Once the door is opened to judicial invalidation of Presidential

92

1  election results, it would be awfully hard to close that door

2  again.  This is a dangerous path we are being asked to tread.

3  The loss of public trust in our constitutional order resulting

4  from the exercise of this kind of judicial power would be

02:44   5  incalculable."

6          What President Trump seeks here is profoundly

7  anti-democratic and unconstitutional.  This Court should reject

8  it.  It also violates -- In addition to the other ways it's

9  unconstitutional, it violates the Eleventh Amendment.  Because

02:44  10  notwithstanding counsel's argument, it seeks retrospective

11  relief and goes well beyond a prospective injunction that would

12  be permissible.

13         Both on the face of the complaint which as we pointed

14  out in our motion to dismiss states no cause of action at all,

02:45  15  an argument by the way I would point out that was not responded

16  to in the reply brief and is therefore, under Seventh Circuit

17  precedent, waived and deemed admitted.

18         And on the stipulated record which in paragraphs 4 and

19  5 clearly admits the elements that are needed to establish

02:45  20  laches and others bars to plaintiff's claim.  This case should

21  be dismissed.  If it's not, the relief requested cannot and

22  should not be granted.

23         For the second time in 24 hours, plaintiff has in open

24  court completely reformulated his requested relief.  First and

02:45  25  to be clear first was only a week ago.  First, he wanted an

1    unconstitutional advisory declaration that Wisconsin's voting

2    laws weren't followed and a concomitant remand or today in a

3    distinction without much difference, a reversion to the

4    Legislature.  Realizing perhaps that that is entirely

02:46    5    problematic and unconstitutional, yesterday plaintiff's counsel

6    changed things up and sought an injunction against the Governor,

7    but that injunction would have concrete effect only following

8    unlawful and unlikely action by the Legislature.

9        I think that's part of what the Court might have meant

02:46    10   by terming it bizarre.  Today, plaintiff's counsel changed tact

11   again and asked for the first time for this Court to declare

12   Wisconsin's entire election void without notice or real proof

13   much less any legal precedent.

14       All of this is clearly improper, inappropriate and

02:46    15   beyond this Court's authority.  I'm going to begin, Your Honor,

16   because I think it is --  is most clear with laches.  A lot was

17   said by plaintiff's counsel before our break but it's important

18   to focus on what wasn't said.  What was not said but is made

19   clear in the stipulated facts is that President Trump never

02:47    20   challenged any of the guidelines he now complains of despite

21   having ample opportunity.  He didn't do it until he got an

22   election result that he didn't like.  And even then, it took

23   another four weeks.

24       Having lost the election, the President now comes to

02:47    25   this Court asking it to exercise jurisdiction it does not have

94

1        asking it to interpret state laws that are currently be

2        addressed in a state court proceeding, an exclusive state court

3        proceeding as we'll discuss in a minute.  To grant unheard of

4        relief that would deprive 3.3 million Wisconsinites of their

02:47  5        fundamental right to vote, that simply isn't right.

6                Plaintiff's evidence or argument at least centers on

7        three specific procedures within Wisconsin voting law.  All

8        three of these procedures are perfectly legal and reasonable for

9        the reasons articulated in defendant's briefs.  More

02:48  10       specifically, let me address each of them very briefly.

11               With respect to drop boxes.  Paragraphs 4 and 5 in the

12       parties stipulated facts make clear that the drop box issue was

13       well known before the election.  The guidance was issued on

14       August 19, 2020, so that's the latest possible time in which

02:48  15       President Trump was aware.  But this was not, as Mr. Bock

16       suggests, a new-fangled form of voting that was invented for the

17       November election.

18               Wisconsin used drop boxes in the April election.

19       Wisconsin used drop boxes in the August election, and then

02:48  20       Wisconsin used drop boxes in the November election.

21               If the President had a problem with that practice, he

22       should have made an effort to challenge it.  Some of the cases

23       that plaintiff's counsel cited were cases where the President

24       did indeed bring pretrial --  bring preelection challenges.  And

02:49  25       those because they seek prospective injunctive relief have been

1    treated very differently by the Court.

2            But that is not what happened here.  Here, we have a
3    delay of at least 105 days between the guidance that is now
4    complained of and the lawsuit that was filed.  They've had ample
02:49  5    opportunity to explain this delay.  They've offered very little
6    although there was a little smidgen at the end, and I'll talk
7    about that in a moment.  That alone is dispositive under
8    established principle of laches under recent decision by courts
9    around this country, including federal courts hearing other
02:49  10   claims about this election and under Seventh Circuit precedent
11   which makes quite clear that in election litigation
12   particularly, parties need to act with alacrity and the doctrine
13   of laches applies with particular force.  That will be *Fulani v.*
14   *Hogsett* case, Your Honor, 917 F.2d at 1031.

02:50  15           So let's look at -- Sorry before I move on from that,
16   let me also note that there is nothing in the plaintiff's
17   extensive presentation earlier that is actual evidence that the
18   votes cast at drop boxes helped Joe Biden as compared to Donald
19   Trump win the election.

02:50  20           They also complain about voting by those who self
21   designate as indefinitely confined as allowed by Wisconsin law.
22   Here too, paragraphs 4 and 5 in the parties stipulated facts
23   make clear that the guidance of which they now complain was
24   publicly known by March 29th of 2020 at the latest, 248 days
02:51  25   before plaintiff filed this lawsuit.

96

1   But let me add two more factors that I think make this

2   one particularly egregious, Your Honor.  One, is that the

3   Indefinitely Confined Statute has been on the books in Wisconsin

4   for 45 years.  This is not, as Mr. Bock suggested, a statute

02:51   5   that was created as an exception to the Voter ID Law.  Rather,

6   this is a long-standing principle of Wisconsin law that has

7   every time the Legislature amended it and expanded to make it

8   easier for people to use it, it reflects a legislative judgment

9   that people should be able to self certify, to be able to decide

02:51   10   for themselves whether they qualify to avail themselves of this

11   protection or not.  So that's one issue.

12   And when the Legislature adopted Wisconsin's Voter ID

13   Law almost ten years ago, they made another policy determination

14   not to change the Indefinitely Confined Statute.  It's not a way

02:52   15   to evade it or a hole in the statute.  It is a policy decision

16   of the State of Wisconsin that is separate from the Voter ID

17   Statute.

18   Secondly, this is actively being litigated in the

19   Wisconsin Supreme Court.  The Republican party of Wisconsin

02:52   20   brought a challenge based on some of the same Facebook posts

21   that plaintiff's counsel here is complaining about from late

22   March.  And that challenge was brought as an original action in

23   the Wisconsin Supreme Court.  And particularly importantly for

24   this Court in an order issued on March 31st, a temporary

02:52   25   injunction order, the Wisconsin Supreme Court unanimously with

97

1    one judge recused, but every justice on that court blessed that

2    guidance of March 29th from the Elections Commission and said it

3    accorded with the law.

4           Now, the case still goes on about exactly what the

02:53  5    interpretation of the statute is.  But that guidance has

6    received approval from the Wisconsin Supreme Court.  The Trump

7    Campaign did not seek to intervene in that case, did not seek

8    relief in that case.  That --  That too is laches.

9           And third, Your Honor, they talk about the idea of

02:53  10   corrections or completions of witness addresses on absentee

11   ballots.  Here too, paragraphs 4 and 5 in the stipulated facts

12   make clear.  That guidance was publicly known in October of

13   2016, before the last Presidential election, the one that the

14   plaintiff here was victorious in.  Plaintiff made no effort to

02:53  15   challenge that practice until now.

16          Yes, Mr. Bock showed you guidance from October of 2020

17   that mentioned this.  But the policy decision was made in

18   October 2016.  It was unanimously adopted by a bipartisan

19   Wisconsin Elections Commission, and this November was the 12th

02:54  20   election in which that guidance has been applied.

21          Now, I mentioned earlier that plaintiff's counsel

22   didn't really offer much of an excuse for those egregious delays

23   in bringing --  bringing this claim.  They did, as I said, offer

24   a smidgen of excuse, and the excuse that they offered was

02:54  25   essentially that they wanted to wait and see what was going to

1    happen.  They wanted to know if the President won the election

2    because if he did, there was no need to sue.

3              That is the worst form of laches.  That is exactly why

4    the Doctrine of Laches exists, to prevent parties from doing

02:54    5    exactly this, waiting to see if something bad happens and then

6    after it does trying to change the rules.

7              There are other reasons of course that this Court

8    should not grant the relief that the plaintiff's seek.  Let me

9    speak briefly.  I will cover them very briefly.  And if Your

02:55    10    Honor has questions or wants me to talk more about any of them,

11    I am happy to do.

12              First, is that the state court provides the exclusive

13    remedy, a remedy that the President, the plaintiff here, is

14    already pursuing in parallel with this case.  Now, I heard

02:55    15    plaintiff's counsel say it's a little bit different because

16    these are constitutional claims, and those are state law recount

17    claims.  And he said the purpose of the state recounts, if I

18    understood, was to make sure that the arithmetic was correct.

19              Well, we can have a discussion about what the purpose

02:55    20    of the state recount is.  But make no mistakes, those are not

21    the claims that the President is bringing in the state recount.

22    He's not complaining about arithmetic.  He is raising in the

23    state recounts exactly the same issues that he is trying to put

24    before this Court.  The only issue that is raised before this

02:56    25    Court that has not been raised in the recount is the grants from

1    the Center for Technology and Civic Life.  But those grants --

2    The legality of the CTCL grants has already been litigated in

3    this district, and the President's position lost.  We reference

4    that in our briefs.  Judge Griesbach made those decisions.

02:56  5         Given that exclusive state remedy, the plaintiff can't

6    have two bites at the apple.  They can't proceed in federal

7    court at the same time, and that leads, of course, right into

8    abstention.  This Court should abstain under well-established

9    doctrines of *Pullman* abstention.  There is substantial

02:56  10   uncertainty about the meaning of some of these state laws.  They

11   are not nearly as crystal clear as Mr. Roth will explain.  The

12   interpretations that the plaintiff makes are heavily contested.

13        The Indefinitely Confined Statute is still pending

14   before the Wisconsin Supreme Court.  These other questions will

02:57  15   be decided in that state law recount, which is really where they

16   should be decided.

17        And there's a reasonable probability that the state

18   court clarification of the state law will obviate the need for

19   any constitutional ruling in this Court.  That is the Seventh

02:57  20   Circuit standard for *Pullman* abstention under the Wisconsin

21   Right to Life case.

22        The Court should also abstain under the *Colorado River*

23   Doctrine.  We have parallel state and federal actions,

24   substantially the same parties contemporaneously litigating

02:57  25   substantially the same issues in another forum.  That's the

1    Seventh Circuit standard for parallelism here in the *Clark* case

2    at 376 F.3rd 686.  That is exactly what we have here.  Many of

3    the lawyers here today and most of the parties are involved in

4    both of these actions.  And as I said a moment ago, the state

02:58  5    recount case has almost the same claims, the same -- the same

6    state law issues that are raised.  So if you have a parallel

7    proceeding and circumstance warrant declining jurisdiction,

8    *Colorado River* applies.

9          The Seventh Circuit's identified six relevant

02:58  10   circumstances in the *Tyrer* case, most of which apply here.

11   Wisconsin state law provides the rule of decision in both cases.

12   The tight timeline nearly guarantees duplicative piecemeal

13   litigation.  The state recall proceedings were instituted first

14   when the President asked for a recount on November 18th, and

02:58  15   that there is little risk.  Plaintiff has pointed to no risk

16   that the state courts will not adequately protect his rights.

17         I mentioned the Eleventh Amendment earlier, Your

18   Honor.  The Eleventh Amendment absolutely applies here and bars

19   the kind of relief that is in the plaintiff's newly formulated

02:58  20   injunction request.  The plaintiff is asking for the relief

21   against state officials for alleged violations of state law.

22   That is flatly prohibited under *Pennhurst*.  There is an

23   exception, of course, under *Ex Parte Young*, but only for

24   prospective relief.

02:59  25         Here, the relief sought is retrospective.  It

1    fundamentally seeks to undue the election already held and the

2    certification already entered based on violations that allegedly

3    occurred before.  Judge Pepper's decision in the *Feehan* case

4    last night at page 36 explains this quite clearly.

02:59   5         Nor, Your Honor, does the plaintiff have standing.

6    There's no standing for the Electors Cause theory because

7    ultimately what's here is an advisory opinion.  Winning will not

8    redress the President's injury.  Even under today's

9    reformulated, audacious remedy request, the President still only

02:59   10   gets what he wants if the Legislature acts as he has requested

11   or as he wants, but there's no guarantee that that's going to

12   happen.

13         The Court can't instruct the Legislature what to do.

14   The Legislature has shown no inclination in fact every

03:00   15   inclination, including from members of the President's own

16   party, is that they're not going to do that.  The relief must be

17   tailored to a particular injury.  It is not.  There is no

18   standing here.

19         I would direct the Court --  standing cases are

03:00   20   legion.  But in particular, I direct the Court to the *Chafin*

21   case from the US Supreme Court in 2013.  Plaintiff must allege

22   an injury "likely to be addressed by a favorable judicial

23   decision" because "federal courts may not decide questions that

24   cannot affect the rights of litigants in the case before them."

03:00   25         Nor would there be prudential standing under the

102

1    Electors Clause theory advanced here.  Plaintiff's theory would

2    explode the concept of Article III standing so any violation of

3    any election law would suddenly be a constitutional issue under

4    the Electors Clause.  That simply can't be right.  The only

03:01    5    injury that can be remedied under federal law that couldn't

6    equally be remedied under state law is the usurpation of

7    legislative authority that injury is suffered uniquely by the

8    Legislature, which is not here.

9            And I would note it's not here even though two years

03:01   10    ago, the Legislature gave itself broad authority to intervene in

11    pretty much any judicial action involving the State of

12    Wisconsin, and it has used that extensively more than two dozen

13    times in the last two years.  The Legislature has intervened in

14    cases in state and federal court to speak for the State of

03:01   15    Wisconsin, but they are not here.

16            In the *Bognet* case in Pennsylvania, the Court

17    recognized this finding, a congressional candidate lacked

18    prudential standing because the Legislature should have brought

19    the claim under the Electors Clause.

03:01   20            The President also lacks standing under equal

21    protection.  Really, what the President's trying to do here

22    turns equal protection on its head because the Equal Protection

23    Clause protects Wisconsin voters whose rights might be violated

24    by the actions of state officials.

03:02   25            President Trump is not a Wisconsin voter.  He can't

103

1    argue he was treated differently than any other voter, and he

2    can't claim that the Constitution confers upon him a right that

3    would deprive 3.3 million voters of their rights.

4         Further his claimed injury is as a candidate, but he

03:02  5    was treated no differently than any other candidate in this

6    election.  All of the candidates had knowledge of and were

7    subject to the same rules in Wisconsin, so there is no equal

8    protection injury.  The vote dilution theory that plaintiff has

9    raised can't solve this problem.  The cases -- Just the cases

03:02  10   decided yesterday make that clear.

11        The *Boyer* case decided in Arizona says that vote

12   dilution is about different voters -- votes being weighed

13   differently.  And also says that allegations that election

14   officials misapplied state law do not implicate a concrete harm

03:03  15   that satisfies standing requirements under the Equal Protection

16   Clause.

17        Indeed, the Seventh Circuit in the *Shipley* case held

18   that, "even a deliberate violation of state election law by

19   state election officials does not transgress against the

03:03  20   Constitution when it was talking about these purposes."  It

21   follows that the good-faith election administration here cannot

22   conceivably be a constitutional violation.

23        And of course, the plaintiff's requested claim -- The

24   plaintiff's request relief is moot.  There's no live controversy

03:03  25   here again because the Court can't give President Trump the

1    relief that he seeks.

2         The -- I would refer this Court to the -- to the

3    Michigan decision issued on Monday, *King v. Whitmer*, where it

4    says, "this ship has already sailed" at page 13.

03:04    5         To the Eleventh Circuit decision issued last Saturday

6    in which Judge Pryor wrote, "we cannot turn back the clock and

7    create a world in which the 2020 election results are not

8    certified".  Or to the Pennsylvania Supreme Court case also

9    recently.  "There is no basis in law by which the courts may

03:04    10   grant the request to ignore the results of an election and

11   recommit the choice to substitute its preferred slate of

12   electors for the one that was chosen by majority of

13   Pennsylvania's voters."

14        On top of all of that, Your Honor, there's still no

03:04    15   basis -- There's still no claim or a basis for a claim.  While

16   this lawsuit should be dismissed on many different grounds, the

17   defendants haven't shied away from the merits.  Indeed, we

18   agreed to an expedited trial on stipulated facts, and we

19   explained in great detail why these claims should be dismissed

03:04    20   under Federal Rule of Civil Procedure 12(b)(6).  Argument that

21   as I mentioned earlier plaintiff ignored, and under governing

22   Seventh Circuit law thereby conceded.

23        And even if the Court does reach the merits, the

24   plaintiff still can't win.  The defendants submit, as indicated

03:05    25   by the Rule 52 motion I made at the outset of this hearing, that

105

1    the stipulations that comprise the entirety of the record here

2    do not amount to much of anything, certainly not enough to

3    justify the unprecedented, profoundly anti-democratic and

4    frankly absurd relief that the President is asking this Court to

03:05  5   grant.

6            If the Court has any questions regarding the -- that

7    we can answer regarding the plaintiff's presentation or the many

8    justiciability arguments that I ran through here and are raised

9    in defendants' brief or is inclined to entertain any questions

03:05  10  of plaintiff's argument, I'm more than happy to address those

11   concerns and questions.

12           Otherwise, I'd like to close by reminding the Court

13   who this case is really about.  Notably, it's a population that

14   counsel for plaintiff barely mentioned in their lengthy

03:06  15  presentation.  It's the voters.  This Court has not been

16   presented with a justiciable controversy.  And even if it has,

17   plaintiff has offered no evidence even remotely worthy of

18   stripping 3.3 million voters of their fundamental right to vote.

19           Absent any questions, Governor Evers is prepared to

03:06  20  rest on our papers and the argument here today after two very

21   brief notes, Your Honor.

22           First, Mr. Bock asked for a final judgment on the

23   merits.  We concur with that.  And while we're talking about

24   finality, I want to reserve the right of Governor Evers and any

03:06  25  other defendant to file a fee petition in this case.  Mr. Bock

1    says this is a 1983 action and such actions are subject to

2    motions for attorneys' fees.  Once this Court has disposed of

3    the matters addressed today, I imagine you may well see such

4    petitions.

03:06   5          Second, as I indicated prior to our break and again at

6    the outset of my remarks, I do want to turn things over to

7    counsel for the other defendants who may have specific issues to

8    address briefly.  And I believe first would be Assistant

9    Attorney General Colin Roth, attorney on behalf of the other

03:07   10   state defendants.  Thank you, Your Honor, unless you have any

11   other questions.

12          THE COURT:  No thank you.  Mr. Roth.

13          MR. ROTH:  Thank you, Your Honor.  Good afternoon.

14   Assistant Attorney General Colin Roth on behalf of Wisconsin

03:07   15   Elections Commission and Secretary of State La Follette.

16          I'd like to make one thing crystal clear at the

17   outset.  The Wisconsin Election Commission believes that

18   Wisconsin's Election Laws must be followed and, in fact, were

19   followed during the 2020 general election.

03:07   20          The election was secure.  The results were accurate,

21   and the Commission faithfully complied with Wisconsin law.

22   That's been confirmed by recounts of the vote in Wisconsin's two

23   largest counties.

24          Now, what's at issue here is plaintiff's disagreement

03:08   25   with certain longstanding absentee voting procedures.  Now, the

107

1    Commission believes that these disputes and plaintiff's

2    positions lack any merit as I'll explain.  All of them conform

3    to state election law.

4         I would like to reiterate a point made by co-counsel

03:08  5    Mr. Mandell that we believe these disputes simply have no place

6    in federal court.  These are disputes about state law that if

7    turned into federal disputes would involve the federal courts

8    with nearly any state election disputes across the country.  And

9    indeed this afternoon, as Mr. Mandell mentioned, a state court

03:08  10   will be addressing these precise issues, which is where the

11   disputes should be heard.

12        And before I turn to the merits of each of these three

13   state law issues, I want to make a brief higher-level

14   point about plaintiff's absurd theory that the Elections

03:08  15   Commission is somehow some rogue agency on a mission to help one

16   candidate win the Presidential election.

17        The Wisconsin Election Commission is a bipartisan

18   commission.  There are three Republicans and three Democrats

19   that control the Commission.  Any action they take and guidance

03:09  20   they issue is overseen by three Republicans and three Democrats.

21   Moreover, the Elections Commission is completely transparent.  I

22   advise a lot of agencies.  I'm not aware of a single one that

23   has had as many public meetings this year to discuss their work,

24   discuss their operations and their plans for the election.

03:09  25        All their guidance, their advice and their

1    communications to the public are posted on line for everyone to

2    see.  Nothing is hidden, and there's no partisan agenda in what

3    the Commission does.

4              With that, I'd like to turn to the three state law

03:09   5    issues that the plaintiffs raise here.  First, I will begin with

6    the indefinite confinement issue.  And again like with all of

7    these, this is not a partisan issue.  As Mr. Mandell noted, this

8    statute has been in effect for decades.  People all across

9    Wisconsin use this status.  It is not simply voters in Dane and

03:10   10   Milwaukee County, which is apparently what we heard from the

11   plaintiffs.

12             Everyone in Wisconsin everywhere, not everyone.  Many

13   people across the state use this status.  And one fact I really

14   need to emphasize is although the numbers of people who

03:10   15   registered for this status did increase from 2016 to 2020,

16   that's simply because the number of absentee voters increased

17   during this Presidential election.  The proportion of the people

18   who used this status remained around 10 percent and did not

19   change.

03:10   20             On the merits of this issue, I think it's critical to

21   take a look at what the Commission actually said.  We really

22   didn't hear much about that from the plaintiffs.  Now, what the

23   statute says is that Wisconsin voters can claim to be

24   "indefinitely confined because of age, physical illness, or

03:11   25   infirmity or disabled for an indefinite period."

109

1        Now, what did the Commission say about this?  They

2   emphasized that that status is "for each individual voter to

3   make based upon their current circumstance."  And they emphasize

4   I think as plaintiff would have us do that it shall "not be used

03:11   5   by electors simply as a means to avoid the photo ID

6   requirement."  That is exactly right.  That is completely

7   consistent with Wisconsin law.

8        And as for the COVID crisis, the Commission said

9   "during the current public health crisis, many voters of a

03:11  10   certain age or an at-risk population may meet that standard of

11   indefinitely confined until the crisis abates."  The Commission

12   never said that everyone in Wisconsin can use this status simply

13   because of COVID-19.  That is just absurd.  It said that

14   individual voters may elect the status if appropriate.  That is

03:12  15   completely consistent with Wisconsin law.

16        And as Mr. Mandell pointed, the Wisconsin Supreme

17   Court itself approved that guidance.  It's hard for me to

18   understand exactly what plaintiff's dispute with this is.  One

19   last point I need to make about this is many indefinitely

03:12  20   confined voters have, in fact, presented photo identification

21   within the last four years.  It's not as if all these voters are

22   submitting ballots without providing identification.  That is

23   simply not true.  The vast majority of voters who claim this

24   status have shown photo identification.  It is not as if this is

03:12  25   a tactic we use to avoid the photo ID requirements.

1       And with that unless Your Honor has any questions

2   about the indefinite confinement status, the last thing I would

3   note is the plaintiffs have not offered a single shred of

4   evidence about a single voter who actually does not meet the

03:13   5   standard for indefinite confinement.  All we have is a dispute

6   with certain guidance that the Supreme Court -- the Wisconsin

7   Supreme Court has approved.  There is no evidence in this case

8   whatsoever of a single voter who cast a ballot in the 2020

9   general election that did not qualify for indefinite confinement

03:13   10   status.  With that, I'll turn to the absentee drop boxes.

11       Again, this is neither a new or a partisan issue.

12   Drop boxes have been used before in Wisconsin.  And indeed as

13   plaintiff's acknowledge, they are used in every corner of the

14   state.  These are not limited to Madison and Milwaukee.  These

03:13   15   are used everywhere.  And I think it's precisely because of

16   that, that Justice Gorsuch in an opinion that the plaintiffs

17   repeatedly referenced during their presentation commended

18   Wisconsin's use of drop boxes during the COVID-19 crisis.  This

19   was in a case just two months ago challenging an extension of

03:14   20   the absentee ballot receipt deadline.  And what Justice Gorsuch

21   said is that, "returning an absentee ballot in Wisconsin is

22   easy.  Until election day, voters may, for example, hand deliver

23   their absentee ballots to the clerk's office or they may place

24   their absentee ballots in a secure absentee ballot drop box.

03:14   25   Some absentee ballot drop boxes are located outdoors and some

111

1    are indoors at a location like a municipal clerk's office."

2    That was Justice Gorsuch commending Wisconsin's use of drop

3    boxes.

4         I would also point to a letter by counsel for the

03:14  5    Wisconsin Legislature who called drop boxes lawful and commended

6    their use.  So again, it's quite difficult for me to understand

7    how the Legislature can -- state Legislature can call these drop

8    boxes lawful, but then somehow invalidate all votes deposited in

9    them.

03:15  10        Now, in terms of their legal argument, the plaintiffs

11   rely on a provision in Wisconsin law that says absentee ballots

12   "shall be mailed by the elector or delivered in person to the

13   municipal clerk issuing the ballot or ballots."

14        Now, clearly nothing in that plain text restricts

03:15  15   delivery to the clerk's office or any other particular location.

16   And I think the way we know that is that the Legislature and

17   other closely-related statutes have specified that when certain

18   election events need to take place at the office of the clerk,

19   that is what the statute says.

03:15  20        And I would point Your Honor to Wis. Stats.

21   6.86(1)(a)(2) and 6.87(3)(a).  Both of these statutes reference

22   the office of the clerk as a place that an event needs to

23   happen, whereas this provision on which plaintiff rely does not.

24        The other argument they make focuses on alternative

03:16  25   ballot cites.  And again, that mischaracterizes the provision

112

1    which is 6.85(5).  What that provision is designed to address is

2    in-person absentee voting where voters may go to the clerk's

3    office and both request, receive and then vote the absentee

4    ballot all in one go.  It does not apply to situations where an

03:16    5    absentee voter has requested a ballot by mail, voted it and then

6    simply goes to return it.

7         In terms of the --  So I think in both those respects,

8    neither statute prohibits the use of drop boxes as a place

9    simply where absentee voters can deposit a voted ballot.  We

03:17   10    heard, you know, a lot about the standards that apply to --  to

11    these drop boxes.  And what I can say is that in plaintiff's

12    exhibit, I believe it is at Exhibit 14, is uniform state-wide

13    guidance provided by the Commission to clerks statewide about

14    how to administer drop boxes in a safe and secure manner

03:17   15    advising them to keep track of the chain of custody of all the

16    votes and make sure that these are effective ways of --  of

17    voting and collecting ballots.

18         What I can say is the Commission does not, I think as

19    plaintiffs conceded, have the authority under Wisconsin law to

03:18   20    order municipalities to --  to administer these drop boxes in a

21    particular way.  With that said what it can do and what it did

22    do is provide standards and guidance for the localities to

23    follow when administering these drop boxes, and that's exactly

24    what they did, and it was completely consistent with Wisconsin

03:18   25    law.

113

1    Lastly, I'll turn to the final category that the

2    plaintiffs raise here, which is clerks completing certain

3    address information on absentee witness certification forms.

4    Again, as with these other two as Mr. Mandell pointed out, this

03:18   5    is not a new practice sprung upon the electorate for the 2020

6    election.

7    Again, I have to emphasize what Mr. Mandell said, this

8    was guidance unanimously approved by the Elections Commission in

9    2016 before the prior Presidential election.  Again, I think

03:19   10   this is just another indication that these are not acts of a

11   partisan body out to favor a particular candidate.  These have

12   been in place for a long time.

13   I would like to provide a little bit of context of

14   typically how this is used.  You know, I think of myself.  My

03:19   15   wife filled out an absentee ballot.  I had to witness it.  I

16   initially signed in the wrong place.  Somewhat embarrassingly

17   given my position, I had to cross it out and put it in the right

18   place.  And so I think what can typically happen is that the

19   witnesses, you know, make these mistakes.  They may leave off --

03:19   20   I won't call them mistakes.  They may leave off a city or a

21   state when they write down their address.

22   How this typically works is a clerk will look at the

23   absentee ballot, the outside of the envelope which is where

24   these certification forms are located.  And you'll see that one

03:20   25   person, the voter, has filled out their entire address, a street

1    number, city, state, zip code.  But the witness has --  has made

2    a mistake, like I've done, and perhaps left off the state.  And

3    what the clerk does will --  will note that the two people

4    obviously live in the same place, and they'll potentially fill

03:20    5    in the state or the zip code.

6        That's what's going on here.  This is not a situation

7    where the addresses are completely left off.  The witness form

8    and clerks are, you know, going on Google to --  to find the

9    address.  They use reliable information, either the voters who

03:20    10    obviously lives at the same address or a database like the Voter

11    Registration State Database.

12        And I do have to clear up I have think a misconception

13    that plaintiff made here, which is that somehow the witness is

14    certifying swearing to their address.  That is simply not what

03:21    15    the form says.  If you look at the form and you look at what the

16    witness is attesting to, the witness is attesting to the voter's

17    residence and the voter's identification.  Below -- And you can

18    read the form.  It says very specifically what the certification

19    entails, and the certification does not entail the witness'

03:21    20    address.  That is not part of what the witness is attesting to.

21    And I think the easiest way to see that is by contrasting to the

22    voter certification.

23        If you look at the voter certification, the voter

24    says, I certify that subject to the penalties for false

03:21    25    statements that I'm a resident of the ward of the municipality

115

1    and the county of the State of Wisconsin indicated hereon, et

2    cetera, et cetera.  So essentially the voter is expressly

3    saying, I live at this address and this street address.  And the

4    witness simply says that the voter was attesting to the truth.

03:22    5            And so what the purpose of the witness address is, you

6    know, it's not as if these clerks are altering a sworn statement

7    after the fact, which I think is the misimpression that

8    plaintiffs have created here.  The address form is -- is used

9    essentially if you need to find the witness to potentially put

03:22   10    them on the stand to see if the absentee voter who they were

11    witnessing, in fact, was who they said they were and lived where

12    they said they lived.  It's a tool to find the witness.  It's

13    not some, you know, some requirement or eligibility to be a

14    witness.  It's simply a tool to find them if needed.  And so

03:22   15    that's why it's not part of the sworn certification on these --

16    on these ballot forms.

17            And that's why I think address is --  is --  you know

18    you can be missing a state.  If the witness didn't list

19    Wisconsin, you can still find the witness if you need to --  to

03:23   20    probe their sworn testimony about the voter, and that's all that

21    needs to be done.

22            And I think the other statute in which they rely says,

23    well, if the certificate is missing, the address, the ballot may

24    not be counted.  All I say is just that the envelope needs to

03:23   25    list the witness' address, not who needs to fill it in.  Other

116

1    statutes specify who needs to fill in certain information, not

2    this one.  And similarly, other statutes specify what exactly

3    needs to go into an address if it needs to include every piece

4    of information including the municipality and state.  This one

03:23    5    does not do the same thing.

6        So with that, I think that's every piece of the

7    challenge.  If this Court has no questions, that's all I have.

8        THE COURT:  Thank you.  I don't have any questions on

9    those issues.

03:24    10                    DEFENSE ARGUMENT

11        MR. GREENBAUM:  Thank you, Your Honor.  I'm up next.

12    John Greenbaum representing the NAACP and individual clients.

13    As I said before along with my colleagues, the Lawyers'

14    Committee for Civil Rights Under Law and Laffey, Leitner &

03:24    15    Goode, I represent the Wisconsin State Conference of the NAACP,

16    Wendell Harris, Sr., Dorothy Harrell and Earnestine Moss.  And

17    my clients are the only voters that are parties to this case,

18    and I want to thank the Court for granting our motion to

19    intervene in this case.

03:24    20        And I wanted to mention that about the voters because

21    what is this case about?  It's an attempt to throw out

22    3.3 million votes that were cast in Wisconsin this year.  And

23    it's part of a series of cases that the Trump Administration and

24    its supporters have brought in state and federal court across

03:25    25    the country to seek to throw out the results in several states.

117

1        The NAACP and the Lawyers' Committee have partnered to

2   protect the rights of black voters in those cases.  That's

3   important because one of the things that we've seen is a

4   strategy to go after the black vote.  And we cited to in our

03:25   5   papers the argument made in the first of these federal cases

6   that that was argued in Pennsylvania by Mr. Giuliani, on behalf

7   of the President, where he talked about where they were going to

8   attack the vote.  And he specifically mentioned Philadelphia,

9   Pittsburgh, Detroit, Atlanta and Milwaukee, all cities with

03:26   10   substantial amounts of the black vote.

11        And you know, we have a bad history in this country of

12   suppressing the right of black voters, but it's not just a

13   history because these efforts are going on today.  And

14   unfortunately, these lawsuits are the latest unfortunate chapter

03:26   15   in terms of doing that.  And for that reason, the NAACP

16   anticipated this and has engaged in this proactive effort.

17        In speaking about Wisconsin specifically, if you look

18   at where this case is focused and where the state recount case

19   that is going on at the same time is focused.  Where is it

03:27   20   focused on?  Two places, Milwaukee County and Dane County, the

21   two counties in Wisconsin that have the most black people in

22   them with a special and particular focus on Milwaukee County

23   where roughly two thirds of the black population in Wisconsin

24   live.

03:27   25        Now, plaintiff's counsel in his argument two of the

118

1    cases he referenced, and he used them as this case as almost

2    being a successor to those two cases, and he talked about *Loving*

3    *v. Virginia* and *Brown v. Board of Elections*.  And when you think

4    about what those cases were about, *Brown v. Board* eliminates

03:27    5    being the (indiscernible) segregation of schools, the separation

6    of black students and white students.

7    *Loving v. Virginia*, eliminating the cegenation laws

8    across the country.  It's frankly patently offensive to compare

9    the effort that the plaintiff and his counsel are seeking in

03:28    10    this case and others to those cases because in part they are an

11    attack on the black vote.

12    Again 3.3 million votes cast in this election in

13    Wisconsin.  And one of the things --  And those 3.3 million

14    votes are what the plaintiff wants to throw out.  But yet not a

03:28    15    single allegation, let alone evidence that a single ineligible

16    voter voted in this election, not a single allegation let alone

17    evidence that a single voter engaged in voter fraud, but yet

18    plaintiff wants to throw all those votes out.

19    Now, the plaintiff also talked about his inability to

03:29    20    bring this case prior to the election this year because there's

21    a lot going on.  It's a 50-state campaign.  Well, I'll tell you

22    as a voting rights lawyer, there has been an unprecedented

23    number of cases that were filed before the election this year,

24    several hundred of them.  We were involved in a bunch and so was

03:29    25    the Trump Campaign, and we've been litigating against the Trump

119

1    Campaign all over the country.

2         So it's frankly no excuse to have if --  if President

3    Trump had a problem with any of these issues in Wisconsin law,

4    it's frankly no excuse that those issues were not raised prior

03:29   5    to the election as --  when if they would have had merit,

6    changes could have been made, and the voting rules would have

7    changed as opposed to having the voters vote and then trying to

8    get their votes thrown out after the election is over.

9         You know, as I said before and as you are well aware

03:30   10   of, there have been now a couple dozen cases that have been

11   brought across the country in both state and federal court

12   challenging the 2020 election.  And frankly up until now, this

13   is in my view the finest hour of the judiciary in both federal

14   and state court; that judges involving a variety of claims

03:30   15   across the country with judges that vary in terms of their views

16   ideologically have all followed the similar principles in all

17   these cases and; that is, voters decide elections, not courts

18   and not Legislatures.  And why?  Because as the Supreme Court

19   has recognized and has been commonly quoted, that voting is the

03:31   20   right that's preservative of all other rights.

21        Because if the right to vote is not protected and kept

22   sacrosanct, then democracy crumbles because then we have no

23   faith in the system.  We have no --  We as citizens have no

24   ability to have redress if it is somebody other than the voters

03:31   25   that are deciding elections.

120

1    And we hope and expect that this Court will render a

2    decision that is going to be consistent with what we've seen

3    elsewhere in the country and during this election cycle, and;

4    that is, to uphold the rights of the voters and to allow these

03:31    5    3.3 million votes to count.

6    So you know, we would submit that you grant the

7    defendants' motion to dismiss and you deny the plaintiff's

8    effort at relief.  Thank you, Your Honor.

9    MS. BROOK:  Your Honor, I do not believe that we have

03:32    10    any other planned presentations from the defendants.  Of course,

11    I ask anyone else if they have something to say to speak.

12    Great.

13    THE COURT:  Thank you for coordinating that.  I do

14    have --  I do have a few questions.  What I propose is we've

03:32    15    been going for another hour.  Why don't we take about

16    15 minutes.  We'll come back at 3:45, and I'll have some

17    questions for Mr. Mandell and also for Mr. Bock.  But give me --

18    I'll try to use this 15 minutes to get my thoughts organized

19    much like defendants used the lunch hour to get their

03:33    20    presentation organized.  I want to thank defendants for

21    coordinating on that and being succinct.  The Court very much

22    appreciates that.  We'll go into recess until 3:45.

23    (Brief recess taken.)

24    (Back on the record.)

03:55    25    THE CLERK:  The Court is now in session.

121

1          THE COURT:  Good afternoon everyone.  I have tried to

2     put pencil to paper, but I actually have a pen an try to limit

3     my questions.  Let me start first with Mr. Mandell.  I'd like to

4     ask you some questions about justiciability, abstention, the

03:55  5     Eleventh Amendment, *Pennhurst* -- *Pennhurst*, the case that I have

6     not read in a long time before this.

7          So plaintiff's complaint talks a lot about state law

8     of course.  But it also asserts a claim -- a request for

9     declaratory relief under Article II, Section 1 of the United

03:55  10    States Constitution, which is incredibly unique in the sense

11    that it refers to the actions of state legislators.  And at

12    least as I think Justice Rehnquist wrote in his concurrent

13    opinion in *Bush v. Gore* sort of federalizes state law.

14         So my question for you and so obviously, that's a very

03:56  15    different situation.  It's a very incredibly unique context, and

16    doesn't that take this case out of *Pennhurst* in the sense that

17    don't I have jurisdiction to determine whether --  so what the

18    Rehnquist concurrent says is there's -- if there's been a

19    significant departure from the legislative scheme that was

03:57  20    adopted under Article II, Section 1, that violation -- Article

21    II, Section 1, so the Court has to determine -- look at state

22    law and if there's been that significant departure from the

23    legislative scheme, it's violating the Constitution.  And don't

24    I have jurisdiction to analyze that?  And I'm not saying there

03:57  25    has been a significant departure here.

1        Plaintiffs allege that there has been.  Defendants

2    dispute that, but don't I have jurisdiction to make that

3    determination as a federal court?

4        MR. MANDELL:  I don't think you do, Your Honor, in the

03:57    5    first instance.  These are --  These are state law claims that

6    are dressed up in the garb of federal claims.  I think that, you

7    know, first of all, Chief Justice Rehnquist's concurrence was

8    exactly that.  It was a concurrence.  It's not binding law.

9        Second of all, to the extent there was binding law in

03:58    10    *Bush v. Gore*, it is quite clearly and expressly meant as a

11    ticket for one ride only and cautions courts not to rely on or

12    build upon it.  I understand that courts have, but it does say

13    this is not a stable foundation for future --  for future

14    jurisprudence.  And it came out of a state court, right?  So

03:58    15    that was --  the federal courts looking at short comings

16    allegedly in a state court adjudication.

17        Here what we have by contrast is the plaintiff

18    litigating in state court and without waiting to see how that

19    comes out or giving the state court a fair shake to use its

03:58    20    exclusive process under state law, running to this Court and

21    claiming that it's got federal claims that are really the exact

22    same issues that it's litigating in the state court.  That's

23    entirely improper.

24        THE COURT:  So what if the situation were this.  So

03:59    25    obviously, Wisconsin has passed -- Wisconsin legislature passed

123

1   Wis. Stat. § 8.25(1), which provides that the manner of

2   appointing Wisconsin's Presidential electors shall be by general

3   ballot at the general election, so that's the legislative

4   pronouncement consistent with Article II, Section 1.

03:59  5        And so what happens is Governor Evers and the

6   Elections Commission decide, well, we're not going to -- we're

7   not going to follow the election results.  We're going to

8   appoint Jeff Mandell, Colin Roth and a bunch of our friends to

9   be the electors.  And at that point, you know, maybe Joe Biden

03:59  10  comes in and says, you can't do that.  You're violating the

11  Constitution.  That is not the manner of choosing electors under

12  as determined by the state legislature.  You're violating

13  Article II of the Constitution.  Would he have standing to do

14  that?  And wouldn't I have jurisdiction to say, yes, what these

04:00  15  state officials are doing is they are violating state law, but

16  they're also violating the Constitution?

17       MR. MANDELL:  Well, Your Honor, if --  If what you're

18  hypothesizing is a situation in which the state canvass is not

19  --  is somewhat changed so it does not accord with the outcome

04:00  20  of the actual balloting, I think we would still be under the

21  recount statute because the recount statute is the exclusive way

22  to deal with issues in the voting or the canvassing.

23       That said, it's a radically different situation than

24  what we have here, and I don't think this Court's decision here

04:01  25  would necessarily have to deal with that kind of situation.  I

1    just --  I just think it's completely different.  It is an

2    apples and oranges comparison.

3           THE COURT:  So I mean my --  My issue is or my concern

4    is my question is that we do have a federal constitutional

04:01   5    provision that's been invoked and the federal constitutional

6    provision that does on some level depend on state law.  And so

7    it's one of these weird -- It's perhaps a unique situation in

8    all of federal jurisprudence or federal jurisdiction, and it

9    seems to me that as an Article III Court charged with

04:01  10    interpreting federal law, I have jurisdiction to resolve that

11    piece of it, at least to the extent there is as Chief Justice

12    Rehnquist put at the time, a significant departure from the

13    legislative scheme.  And it seems to me I have --  I have to

14    have jurisdiction at least to be able to entertain whether that

04:02  15    occurred.  And if that did not occur, that affects the relief

16    that I can order and may then cause me to --  to back off of the

17    --  of the state law issues.  But why don't --  I guess my view

18    is I have federal jurisdiction.  I have to have federal

19    jurisdiction to decide that over-arching issue.

04:02  20           MR. MANDELL:  Your Honor, even if --  Let's assume

21    arguendo that you do have the jurisdiction you're hypothesizing.

22    In the situation that -- that you're citing, there would be a

23    really clear departure from state law.  That's far less certain

24    here.  I mean, this is a much better candidate even if you had

04:03  25    that jurisdiction to abstain because there is to the extent that

125

1    you think there's any violation at all, there's grounds for

2    significant uncertainty about the state law.  And there are

3    proceedings happening right now in the state court.

4            So what I would say is we don't really think you have

04:03    5    that jurisdiction certainly not in this instance.  There might

6    be particularly extreme and egregious examples that we can come

7    up with where there would be federal jurisdiction because absent

8    that, we wouldn't have --  there wouldn't be any remedy at all,

9    but that's not --  none of that is what's happening here.  So

04:03    10    whether you want to think of it as jurisdictional question and

11    the *King* case out of Michigan dealt with this extensively.

12            And I know that we've given you so much to read, Your

13    Honor, but I do hope you'll have a chance to look at this

14    because it did talk about this jurisdictional, you know, puzzle

04:03    15    in trying to make sure because obviously no federal judge wants

16    to shirk a case where they do have jurisdiction.

17            But we would say, number one, you don't have

18    jurisdiction.  And number two, even if you do, there are a

19    number of other reasons that --  that you shouldn't exercise

04:04    20    that here, and you should defer to the state law proceedings,

21    state court proceedings.

22            THE COURT:  Thank you.  So --  Mr. Bock.

23            MR. BOCK:  Yes, Your Honor.

24            THE COURT:  So my --  My questions for you relate

04:04    25    primarily to Article II, Section 1.  In some ways, it follows up

126

1    on what I just asked Mr. Mandell.  So the Constitution provides

2    that each state shall appoint in such a manner as the

3    legislature there may direct a number of electors equal to the

4    whole number of senators and representatives to which the state

04:05  5    may be entitled in Congress.  So that's federal law.

6          And as Justice Kagan wrote this summer in the

7    *Chiafalo*, the faithless electors case, that language is the

8    result of an 11th hour compromise because some of the -- some of

9    the members of the convention thought that the state

04:05  10   legislatures should themselves pick the electors.  But

11   ultimately, it was decided that the state legislatures would

12   have just plenary power to choose how the electors for their

13   state would be chosen.

14         Given that, it seems to me in this case the Wisconsin

04:05  15   legislature has made a choice on the manner of appointing

16   Wisconsin's Presidential electors.  And that choice is reflected

17   in Wis. Stat. § 8.25(1) in the legislature has chosen that the

18   methodology should be not that the legislature -- not that the

19   members of the legislature pick the electors themselves.  They

04:06  20   haven't decided to go ene mene mane mo.  They decided to have a

21   popular election, which is essentially what every state in the

22   union does today.

23         But isn't the manner of appointing Wisconsin's

24   Presidential electors encompassed in Wis. Stat. 8.25(1) simply

04:06  25   having a general election and a general ballot for President and

127

1     Vice President.  Isn't that what manner means?

2          MR. BOCK:  It does initially, Your Honor.  It does

3     initially as long as the legislative direction related to that

4     election is fulfilled, and that's I think what all the cases

04:06   5     that have recently been decided under Article II, Section 1

6     suggest.  But once --  Once a state actor, state official

7     outside the legislature infringes upon the legislature's turf so

8     to speak, it's at that point it's no longer -- The election is

9     no longer conducted in the manner in which the Legislature shall

04:07   10     direct or the manner in which it was directed.

11          THE COURT:  Let me follow up on that.  Let me first

12     say this.  Isn't there a difference between a legislature

13     choosing the manner of appointing electors and then statutes and

14     rules that implement that choice?  And it seems to me that the

04:07   15     manner here is popular election.  The stuff that plaintiffs

16     seems to be complaining about is not the manner in which the

17     electors -- Presidential electors are chosen.  It's

18     implementation of that choice.  And it seems to me that's

19     different, and let me piggyback on some of the questions I have

04:08   20     for Mr. Mandell.

21          If you look at Chief Justice Rehnquist's comments in

22     *Bush v. Gore*, he talks about a significant departure from the

23     legislative scheme.  So I mean maybe we can talk about --  Maybe

24     we can talk about some of the electoral process.  But, you know,

04:08   25     Chief Justice Rehnquist said in order for it to implicate

128

1    Article II, it has to be a significant departure from the

2    legislative scheme.  And I have a hard time at this point seeing

3    how the things that plaintiff is pointing to aren't simply, you

4    know, implementation questions.  They are not a significant

04:08    5    departure from the legislative scheme.  Why is that wrong?

6         MR. BOCK:  Because, Your Honor, the -- For instance,

7    the drop boxes.  They were a pervasive way in which votes were

8    cast in this election all throughout the entire state.  And as

9    we've shown you just in these couple of counties, probably close

04:09    10    to 100,000 votes cast in that manner.

11         And so the Wisconsin Election Code is very clear.

12    There are only two ways of voting in casting a vote.  It's

13    either by mail or it's in person with the clerk.  You can either

14    deliver your ballot in person with the clerk, or you can cast it

04:09    15    by mail.  There's no other option.

16         So this implicates an entirely new process for voting

17    in the state.  And as we demonstrated, I mean it's not ready for

18    prime time.  There are not standards and of course, there aren't

19    standards and, of course, when the Wisconsin Elections

04:10    20    Commission asks about rules, they say there aren't rules because

21    this just came about this year.

22         Understand, you know, a statement was made, well,

23    there's some drop boxes earlier in the year but not on this

24    scale, not on this level.  All -- Virtually all of the drop

04:10    25    boxes in these counties as well as around the state were

129

1    implemented in just a few months in the lead up to the election.

2         The evidence before the Court is for instance that the

3    drop boxes in the City of Madison came into play in the middle

4    of October.  So --  So this is a massive, late-breaking change

04:11  5    in how the election was administered.  You know, another

6    significant departure related to this is the whole human drop

7    box idea, which again is massively --

8         THE COURT:  So you're saying it's significant, but

9    saying it's significant doesn't make it significant.

04:11  10         MR. BOCK:  I agree.

11         THE COURT:  These all seem to me to be, you know --  I

12    guess I should be careful because I understand these things are

13    being potentially litigated in state court by some of the same

14    parties.  And to me unless it is -- Again, if it is a

04:11  15    significant departure, maybe I have the opportunity to weigh in.

16    But if it's not, these issues I think in whether ballots should

17    be counted, that's all something for the state -- for the

18    parties to work out in state court consistent with the Wisconsin

19    Election Code and consistent with the Wisconsin Election

04:12  20    Statutes and the remedy provisions all of which were enacted by

21    the Wisconsin Legislature which would bring us --  make us again

22    consistent with Article II, Section 1.

23         MR. BOCK:  If I can respond to that, Your Honor.  I

24    understand what you're saying.  But there are drop box

04:12  25    procedures in the recount because this is --  This is a new

1    animal, number one.

2         But number two, the remedy that we're seeking here is

3    dramatically different than ones that acquire in a recount

4    proceeding where you're trying to count ballots.  And one of the

04:12  5    issues that our stipulation I think brings to light is the

6    stipulation says that --  that the -- many of the counties or at

7    least the Elections Commission does not have records for the

8    number of ballots that are voted through the drop box.  Because

9    --  Because of that, it would be quite difficult to --  to

04:13  10   address that issue through a recount.

11        So we think that because --  And in really in the way

12   that goes to each of the issues, and this is why there isn't

13   exclusive jurisdiction in the state court is that the drop box

14   issue, the witness signature issue at a minimum, those issues

04:13  15   are not capable of resolution by identifying numbers of ballots.

16        THE COURT:  Well, those are issues maybe --  Well, you

17   may have issues -- You may have problems raising those issues

18   now in state court, but I don't think I heard a very good

19   explanation today as to why the plaintiff didn't raise these

04:14  20   issue in advance of the election before when the guidance was

21   issued.  And again, this is guidance that's issued by the

22   Wisconsin Elections Commission which was created by the

23   Wisconsin Legislature authorized to provide guidance.

24        The guidance was issued and plaintiff fully on notice

04:14  25   of all that guidance some of it dating back years took no effort

131

1    to get it corrected.  I mean, there was one piece of guidance, I

2    guess the Dane County Clerk had a Facebook page that got

3    corrected, and the Wisconsin Supreme Court corrected it.  But

4    with respect to the other issues, there was no attempt prior to

04:14    5    the election.

6            Again, I think the Seventh Circuit law is pretty good

7    for the defendants on laches.  And the response that I heard

8    today was that the plaintiff, you know, had too much going on;

9    that he couldn't pay attention to what the --  what issues were

04:15    10    being raised in the State of Wisconsin.  That strikes me as

11    incredible.

12            MR. BOCK:  If I could just address maybe starting with

13    the guidance on the changes to the certificates.  There was

14    guidance earlier, but it didn't address the issue of not having

04:15    15    to contact even the voter.  The most recent guidance was October

16    19th, just two weeks before the election.  And that guidance was

17    you don't have to contact the voter and --  and it was I think

18    much more explicit than the prior guidance, and that's what we

19    sued upon was the October 19, 2020 guidance.

04:16    20            With respect to drop boxes.  There was --  It wasn't

21    possible to understand the impact of the -- the drop boxes

22    before this year.  And until --  And as I said, drop boxes were

23    being added up to several weeks before the election.  And we

24    have an exhibit that says exactly that with respect to the

04:16    25    Madison drop boxes, so these are --  These are last-minute

132

1    changes that could not have been addressed in October 19th

2    guidance.  And in August guidance related to the drop boxes, it

3    was just a suggestion.  Nobody could --  Nobody could predict

4    the magnitude at which this suggestion would be adopted across

04:17    5    the state to the extent that you have more than 500-drop boxes

6    with ballots being intermixed with utility bills and library

7    books and all in a manner that is not provided for by the

8    Legislature.

9         THE COURT:  All right.  I don't think I have any

04:17    10   further questions for the parties.  I think I --  I understand

11   your positions.  I think the federal jurisdiction issues here

12   are extremely interesting and challenging and unique, and I'm

13   glad I had a good federal jurisdiction teacher back at the

14   University of Minnesota Law School, Suzanna Sherry.  If this

04:18    15   gets tweeted out somewhere, thank you.  She's not there anymore.

16   She's a great professor.

17        I'll struggle with those, and I'll try to get a

18   decision drafted as promptly as we can.  I'm hoping to get it

19   out in the next day or two because I appreciate the timing.  And

04:18    20   I also appreciate that nobody on this call thinks that my word

21   is the last word on this, including me.

22        So I'll try to get this done as promptly as I can.

23   Thank you for working out the factual issues this morning.  The

24   Court very much appreciates that.  It makes my job a lot easier.

04:18    25   We will try to get a decision out as soon as we can.

133

1          Thank you all.  We're adjourned.

2          (Whereupon proceeding was concluded at 4:18 p.m.)

3                              *      *      *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I, JOHN T. SCHINDHELM, and I, SUSAN M. ARMBRUSTER,

4    Official Court Reporters for the United States District Court

5    for the Eastern District of Wisconsin, do hereby certify that

6    the foregoing pages are a true and accurate transcription of our

7    original machine shorthand notes taken in the aforementioned

8    matter, remotely via Zoom, to the best of our skill and ability.

9

10   Signed and Certified December 10, 2020.

11   /s/John T. Schindhelm

12   John T. Schindhelm

13

14   /s/Susan M. Armbruster

15   Susan M. Armbruster

16

17

18

19

20

21

22

23

24

25

**$250,000** - 27:19

**'This** - 52:5

**1** - 80:18; 87:20; 89:6; 122:9, 20-21; 124:4; 126:25; 128:5; 130:22

**10** - 76:4; 109:18

**10-page** - 10:2

**100,000** - 129:10

**1031** - 96:14

**1036** - 81:16

**105** - 96:3

**108,000** - 67:25

**11** - 53:21

**114** - 18:1

**11:19** - 15:25

**11th** - 127:8

**12** - 27:15; 76:9; 79:3; 91:14

**12(b)(1** - 17:23

**12(b)(6** - 17:23

**12(b)(6)** - 105:20

**12.60(1)(b)** - 47:25

**127** - 18:1

**1291** - 75:5

**12th** - 98:19

**13** - 76:9; 105:4

**14** - 28:7; 31:23; 32:2; 67:22; 113:12

**14th** - 77:18

**15** - 13:2; 14:7; 32:2-4, 15; 68:6; 77:5; 121:16, 18

**15th** - 27:16; 28:1

**16-year-old** - 66:10

**169,519** - 67:24

**17** - 57:3

**17,000** - 34:15

**17,271** - 68:7

**17th** - 78:4

**18** - 28:11, 19; 29:18; 32:24; 33:1, 3; 57:3; 69:11; 79:5, 12

**180,000** - 25:10; 40:24

**18th** - 101:14

**19** - 31:22; 68:15; 95:14; 132:19

**1978** - 71:23

**1983** - 54:8; 107:1

**19th** - 28:5; 44:21; 132:16; 133:1

**1:00** - 9:17

**1:34** - 85:10

**1:37** - 86:21

**2** - 9:17; 38:19; 59:4, 12; 60:8; 80:18

**20** - 29:18; 68:16

**20-CV-1785** - 6:4

**200** - 34:19

**2000** - 77:19

**2016** - 68:14; 98:13,

**18**; 109:15; 114:9

**2020** - 22:3; 27:16; 40:13; 61:6, 17; 73:10; 74:19; 95:14; 96:24; 98:16; 105:7; 107:19; 109:15; 111:8; 114:5; 120:12; 132:19

**21** - 68:16

**220** - 61:16

**23** - 29:19

**24** - 93:23

**240,000** - 40:22; 68:12

**247** - 71:22

**248** - 96:24

**250,000** - 25:10

**266** - 71:22

**26th** - 73:10

**28** - 75:4

**29th** - 40:14; 96:24; 98:2

**2:30** - 86:15, 19; 87:2

**2nd** - 62:1

**3** - 28:10; 32:4; 59:4, 12; 60:8; 64:15; 77:13

**3.3** - 91:25; 92:5; 95:4; 104:3; 106:18; 117:22; 119:12; 121:5

**30** - 27:4; 87:9

**30th** - 61:17; 77:12; 78:5

**31st** - 97:24

**32** - 23:9

**345** - 61:5

**35** - 44:20

**351** - 61:6

**36** - 44:9; 102:4

**376** - 101:2

**3:45** - 121:16, 22

**3rd** - 78:1; 84:14

**4** - 93:18; 95:11; 96:22; 98:11

**4.1** - 23:10

**435** - 71:22

**45** - 97:4

**48** - 28:23

**49** - 34:18; 35:2

**4:18** - 134:2

**5** - 32:15, 18; 61:16; 79:4; 91:14; 93:19; 95:11; 96:22; 98:11

**5.01(1** - 91:13

**50** - 54:24; 78:9, 11

**50-state** - 119:21

**500** - 28:11; 31:16; 69:11

**500-drop** - 133:5

**501** - 89:8

**506** - 89:8

**52** - 17:24; 105:25

**54** - 86:16

**5810556** - 61:16

**589** - 81:16

**6** - 77:7, 14

**6)** - 51:11

**6.3** - 27:21

**6.84(2** - 37:6

**6.84(2)** - 42:24

**6.85(5)** - 113:1

**6.855** - 36:16

**6.855(3)** - 36:10

**6.86(1)(a)(2** - 112:21

**6.86(2)(a** - 38:4

**6.87** - 50:1

**6.87(3** - 42:25

**6.87(3)(a** - 47:4

**6.87(3)(a)** - 112:21

**6.87(6** - 33:10; 37:7

**6.87(6d** - 42:21; 43:1

**6.87(6d)** - 42:12

**6.87(9** - 52:14

**6.87(9)** - 41:19; 42:10

**6.88(1)** - 51:20

**60** - 68:1; 69:13

**608** - 63:6

**639** - 63:8

**643** - 63:21

**65** - 35:1, 5

**65,000** - 68:2

**66,611** - 68:15

**665** - 63:7

**67** - 29:23; 30:1, 15, 24

**686** - 101:2

**6d** - 42:17

**6d)** - 42:12

**6th** - 77:3

**7** - 42:5, 25

**7.15(2m** - 36:13

**7.52** - 52:9

**70** - 68:1; 69:13

**72** - 29:8

**75** - 87:20; 89:7

**8** - 33:4, 9, 12; 78:2

**8.25(1** - 124:1; 127:17, 24

**80,000** - 68:3

**8:15** - 9:21

**8:30** - 9:22

**90** - 21:1, 4

**917** - 96:14

**963** - 63:7

**967** - 61:5

**977** - 63:6, 8

**9:15** - 6:2

**9:31** - 15:10

**9:32** - 15:25

**9:50** - 15:11, 24

**a.m** - 6:2; 9:17, 21-22; 15:25

**abates** - 39:2; 110:11

**ability** - 83:21; 120:24

**abridge** - 56:17

**abrogation** - 50:9

**absence** - 55:22

**absent** - 55:19; 106:19; 126:7

**absentee** - 21:23; 22:3, 25; 23:1, 5, 7, 23; 24:1, 5, 7; 25:5; 26:4; 27:22; 28:3, 6; 29:2, 21; 30:10; 33:8, 19, 22, 24-25; 34:12; 35:19, 22; 36:11, 15, 17, 22-23; 37:2, 4, 20; 38:1, 13; 39:11, 17; 40:10; 41:11; 46:5, 16, 20, 23; 47:5; 48:13, 19; 49:10, 16, 22; 50:5; 51:1, 5, 22, 25; 52:5, 8-9, 23; 58:18; 63:23; 67:24; 68:9, 12; 69:11; 98:10; 107:25; 109:16; 111:10, 20-21, 23-25; 112:11; 113:2, 5, 9; 114:3, 15, 23; 116:10

**absolute** - 38:21; 72:1, 14

**absolutely** - 42:16; 69:20; 101:18

**abstain** - 81:17; 82:3; 100:8, 22; 125:25

**abstention** - 80:3; 81:10; 82:5, 14; 100:8, 20; 122:4

**Abstention** - 81:17

**absurd** - 24:22; 44:1; 106:4; 108:14; 110:13

**abundant** - 69:9

**abundantly** - 36:19; 82:11

**abuse** - 23:6

**acceptable** - 90:6, 8

**acceptance** - 56:3

**accepted** - 9:25; 91:3

**accepts** - 17:20

**access** - 25:19; 29:3, 9, 14; 31:19

**accessed** - 30:23

**accessible** - 36:4

**accomplished** - 77:11

**accord** - 124:19

**accordance** - 64:23; 70:16, 22

**accorded** - 98:3

**according** - 36:9; 38:3; 71:2

**accuracy** - 79:18

**accurate** - 13:5; 60:22; 107:20

**accurately** - 59:20

**achieve** - 13:25; 18:7

**achieved** - 70:22

**acknowledge** - 111:13

**acknowledged** - 46:7

**acknowledgement** - 68:20

**acknowledges** - 42:6

**acquiescence** - 92:23

**acquire** - 131:3

**act** - 42:10; 49:20; 57:15, 18; 60:16; 91:23; 92:8; 96:12

**acting** - 80:15

**action** - 56:25; 57:22, 24; 58:3; 59:1, 17, 24; 62:7; 74:24; 76:24; 93:14; 94:8; 97:22; 103:11; 107:1; 108:19

**actionable** - 72:5, 18

**actions** - 42:16; 44:4; 50:12; 51:24; 58:4; 60:12; 65:14; 75:2; 78:11; 100:23; 101:4; 103:24; 107:1; 122:11

**active** - 67:14

**actively** - 97:18

**activities** - 34:23

**actor** - 128:6

**acts** - 102:10; 114:10

**actual** - 43:22; 72:6, 18; 96:17; 124:20

**ad** - 35:1, 4, 14

**add** - 17:14; 45:2; 97:1

**added** - 34:4; 64:12; 132:23

**adding** - 14:25; 23:13

**addition** - 28:9; 36:21; 93:8

**additional** - 10:7; 87:10

**additionally** - 32:12; 46:1; 68:23

**additions** - 88:16

**address** - 11:24; 41:13, 15; 42:9, 13, 18; 43:20; 44:12, 14,

23; 45:2, 4; 46:3;
53:15; 60:23; 61:14;
62:5; 72:12; 76:7;
82:15; 84:7; 90:5;
95:10; 106:10; 107:8;
113:1; 114:3, 21, 25;
115:9, 14, 20; 116:3,
5, 8, 17, 23, 25;
117:3; 131:10;
132:12, 14

**addressed** - 72:13;
95:2; 102:22; 107:3;
133:1

**addresses** - 98:10;
115:7

**addressing** - 57:5;
108:10

**adequately** - 36:18;
101:16

**adherence** - 59:10;
74:9

**adjourned** - 134:1

**adjudication** -
61:25; 123:16

**administer** -
113:14, 20

**administered** -
130:5

**administering** -
113:23

**Administration** -
117:23

**administration** -
104:21

**administrative** -
62:11; 63:1; 73:6

**administrator** -
42:3; 68:22

**administrators** -
23:16, 22, 25; 24:2, 5,
12, 18; 25:13, 24–25;
26:12; 64:9; 65:15;
73:3, 7; 79:20

**administrators'** -
66:3

**admission** - 87:23

**admissions** - 28:14

**admit** - 87:19; 89:6;
90:1

**admits** - 93:19

**admitted** - 89:9;
93:17

**admonition** - 83:25

**adopted** - 24:19;
58:18; 73:6; 97:12;
98:18; 122:20; 133:4

**adult** - 41:14

**advance** - 80:5;
131:20

**advanced** - 64:13;
103:1

**advantage** - 25:9;
34:2, 25; 35:13

**adverse** - 9:3

**adversely** - 56:13

**advice** - 19:25;
42:15; 108:25

**advise** - 108:22

**advising** - 113:15

**advisory** - 21:18;
94:1; 102:7

**affected** - 69:21;
72:20

**affects** - 125:15

**affidavit** - 17:4;
46:4, 7; 68:23

**affidavits** - 16:21;
17:6, 9; 41:23; 88:12,
19; 90:13

**affirm** - 49:19

**affirming** - 40:2

**afforded** - 92:11

**AFTERNOON** - 87:1

**afternoon** - 16:2;
87:4; 107:13; 108:9;
122:1

**age** - 38:6; 39:1;
109:24; 110:10

**agencies** - 108:22

**Agency** - 31:25

**agency** - 32:1;
108:15

**agenda** - 109:2

**agree** - 14:6, 15;
130:10

**agreed** - 10:12;
15:14; 16:19; 18:13;
78:3; 105:18

**agreed-upon** -
18:13

**ahead** - 13:10;
35:20

**alacrity** - 96:12

**alert** - 11:15

**allegation** - 119:15

**allegations** - 104:13

**allege** - 91:22;
102:21; 123:1

**alleged** - 58:12;
101:21

**allegedly** - 26:3;
53:22; 67:2; 102:2;
123:16

**allow** - 15:16;
43:22, 25; 46:9;
47:14; 74:16; 121:4

**allowed** - 96:21

**allowing** - 44:6;
50:11

**allows** - 37:25

**almost** - 12:18;
68:3; 75:20; 97:13;
101:5; 119:1

**alone** - 80:4; 96:7;
119:15

**alter** - 49:24; 51:13

**alteration** - 26:3;
41:10

**alterations** - 21:25;
46:6; 68:19

**altered** - 61:20; 69:1

**altering** - 116:6

**alternate** - 33:24;
35:19; 36:6, 11, 15;
37:16; 47:8; 52:1

**alternative** - 18:16;
112:24

**ambiguity** - 87:18

**amended** - 97:7

**Amendment** -
61:24; 80:3; 82:16;
83:1, 7; 84:2; 85:2;
93:9; 101:17; 122:5

**America** - 64:23;
81:15

**American** - 54:1

**Americans** - 74:2

**amici** - 65:6

**amounts** - 118:10

**ample** - 94:21; 96:4

**analogize** - 65:7

**analogy** - 65:5

**analysis** - 70:7, 19;
71:9

**analyze** - 122:24

**Anderson** - 54:8

**Andrew** - 6:22;
81:16

**animal** - 131:1

**announced** - 48:25

**announcement** -
46:10

**answer** - 12:16;
30:8, 17, 24; 31:9;
67:4; 85:18, 24–25;
87:12; 106:7

**answers** - 12:21,
24; 85:20

**anti** - 93:7; 106:3

**anti-democratic** -
93:7; 106:3

**anticipated** - 118:16

**appeal** - 66:22

**appealable** - 75:4

**Appeals** - 26:2; 63:6

**appear** - 7:13; 45:2

**appearance** - 8:12

**appearing** - 6:11,
25; 7:24; 8:5

**appellate** - 75:6

**apple** - 100:6

**apples** - 125:2

**applicable** - 20:2;
25:6; 29:9; 52:2;
65:21; 70:7

**application** - 63:25

**applied** - 25:15;

39:4; 66:19; 98:20

**applies** - 81:11;
82:6; 96:13; 101:8, 18

**apply** - 20:13; 29:3;
33:13; 36:19; 78:21;
81:12, 20, 25; 82:3,
14, 21; 83:1, 17; 84:1,
3; 101:10; 113:4, 10

**appoint** - 59:21;
61:2; 70:25; 71:1;
124:8; 127:2

**appointed** - 58:1;
59:7

**appointing** - 61:10;
62:8; 70:17; 80:23;
124:2; 127:15, 23;
128:13

**appointment** -
59:25; 60:6, 17

**apportionment** -
55:14

**appreciate** - 19:15;
133:19

**appreciates** -
121:22; 133:24

**approach** - 32:22;
46:16

**appropriated** -
27:24

**approval** - 98:6

**approved** - 21:21;
30:3; 110:17; 111:7;
114:8

**approximate** - 15:4

**approximations** -
15:3, 5

**April** - 95:18

**arching** - 125:19

**area** - 50:19; 54:1;
76:13

**areas** - 11:5; 71:21

**argue** - 19:8, 14;
77:23; 86:17; 104:1

**argued** - 18:22;
118:6

**arguendo** - 125:21

**argues** - 78:24; 79:9

**arguing** - 45:8;
79:13

**argument** - 19:10;
20:21, 25; 21:9; 27:7;
60:24; 75:10, 20-21,
25; 77:22; 78:8, 22;
93:10, 15; 95:6;
105:20; 106:10, 20;
112:10, 24; 118:5, 25

**ARGUMENT** - 21:6;
76:6; 91:6; 117:10

**arguments** - 17:22;
18:8, 17, 19, 21-22,
25; 19:3, 9, 16; 76:8,
11; 79:10; 82:15;
83:7; 87:5; 106:8

**arithmetic** - 99:18,
22

**Arizona** - 84:5;
104:11

**array** - 29:13

**arrive** - 33:12

**arrives** - 51:25

**Article** - 25:22;
26:16, 24; 53:17;
56:9; 58:22, 24;
59:18; 61:1, 3; 64:8;
67:7-10; 70:6, 9; 71:3,
13; 72:13; 74:23;
79:24; 80:6, 18;
83:20; 84:8; 103:2;
122:9, 20; 124:4, 13;
125:9; 126:25; 128:5;
129:1; 130:22

**articles** - 69:14

**articulated** - 82:24;
95:9

**ascertained** - 91:15

**ascertainment** -
76:21; 77:10

**aside** - 67:2; 92:15

**aspect** - 58:25

**aspects** - 46:16

**assert** - 58:15

**assertion** - 40:1;
67:3; 72:14

**assertions** - 72:2

**asserts** - 122:8

**assignment** - 24:8

**Assistant** - 107:8,
14

**assistant** - 6:15;
7:11

**assisting** - 6:10

**assume** - 73:18;
87:25; 125:20

**assuming** - 17:20;
45:16

**at-risk** - 39:1, 5;
110:10

**athletes** - 54:4

**athletic** - 65:5

**Atlanta** - 118:9

**attached** - 76:22;
87:19; 88:10; 89:12,
16

**attack** - 118:8;
119:11

**attempt** - 44:22;
66:2; 83:3; 117:21;
132:4

**attempted** - 9:10;
13:14; 45:22

**attempts** - 66:10

**attention** - 11:15;
47:21; 55:2; 66:3;
67:18; 90:23; 132:9

**attesting** - 115:16,
20; 116:4

**Attorney** - 107:9, 14
**attorney** - 107:9
**attorneys** - 82:20
**Attorneys** - 6:15;
7:12
**attorneys'** - 107:2
**audacious** - 102:9
**Audio** - 26:20
**audio** - 11:11; 35:4
**authoritative** - 22:5
**authority** - 11:15;
26:12, 14; 27:13;
34:5; 40:6; 49:10;
56:9; 57:18; 60:22;
61:4; 62:24; 70:10;
73:18; 80:7, 16, 18;
84:5; 94:15; 103:7,
10; 113:19
**authorize** - 34:6;
45:13
**authorized** - 23:9,
14; 31:17; 39:16;
41:21; 49:18; 51:11;
131:23
**authorizes** - 46:23
**automatically** -
59:25
**avail** - 97:10
**avoid** - 37:25;
38:14; 75:5; 110:5, 25
**awaiting** - 9:12
**aware** - 8:20; 10:14;
55:15; 56:24; 88:1;
95:15; 108:22; 120:9
**awfully** - 93:1
**BACH** - 7:19
**Bach** - 7:19
**bad** - 30:7; 33:17;
55:11; 99:5; 118:11
**balance** - 55:16
**balances** - 26:23;
70:12
**ball** - 65:7
**ballot** - 21:23, 25;
23:1, 5, 7, 23; 24:1, 5,
7; 27:22; 28:3, 6, 25;
29:21; 30:19; 31:4,
16; 32:6, 16; 33:19,
24; 34:14; 35:19;
36:6, 12, 15, 17, 25;
37:16; 38:1; 39:11;
40:7, 10; 41:11,
17-18; 42:13; 43:13,
15, 18, 20, 25; 44:5,
16; 45:24; 46:3, 5, 11,
17, 19, 23; 47:1, 5,
10-11; 48:9, 11, 13,
19, 23; 49:1, 5, 8, 10,
12, 16, 22; 50:5; 51:1,
3, 5, 7, 10, 14, 22, 25;
52:5, 10, 15; 53:13,
15; 56:3; 66:10;
69:11; 111:8, 20-21,

24-25; 112:13, 25;
113:4, 9; 114:15, 23;
116:16, 23; 124:3;
127:25; 129:14
**balloting** - 22:25;
34:12; 46:16; 124:20
**ballots** - 13:21;
15:4; 22:3; 26:4;
28:21; 29:2, 10, 15;
30:10, 20, 22; 31:2, 7,
20-21; 32:20; 33:3, 8,
11, 25; 34:5, 15, 17;
35:23; 36:22, 25;
37:2, 5, 9-10, 15;
39:18; 41:25; 42:22;
43:2; 46:6; 52:8, 12,
23; 53:1, 4; 58:18;
63:23; 67:6, 8, 24-25;
68:2, 7, 12; 69:2, 17,
21; 72:21; 79:17;
98:11; 110:22;
111:23; 112:11, 13;
113:17; 130:16;
131:4, 8, 15; 133:6
**banned** - 54:4
**barely** - 106:14
**bargain** - 66:24
**Barrett** - 7:14
**barrier** - 61:24
**bars** - 33:22; 93:20;
101:18
**Bartzen** - 8:1
**base** - 86:9; 90:15
**basing** - 38:18, 20
**basis** - 40:9; 92:5;
105:9, 15
**Baten** - 61:5
**Bay** - 7:17, 20
**Beach** - 63:4; 80:10,
13; 81:4
**bear** - 64:3
**became** - 24:14;
25:5
**bedrock** - 74:8
**began** - 33:20
**begin** - 20:19;
94:15; 109:5
**behalf** - 6:11, 16,
23; 7:13, 20; 8:5, 10,
14; 11:12; 21:8;
74:18; 107:9, 14;
118:6
**Behl** - 33:20
**belabor** - 11:19
**beliefs** - 39:5
**believes** - 19:4;
107:17; 108:1
**below** - 47:19;
115:17
**bench** - 89:25
**bend** - 55:8
**benefit** - 55:8
**benign** - 25:25

**beside** - 70:3
**best** - 12:7; 18:12;
63:19; 74:17
**better** - 125:24
**beyond** - 71:10;
72:11; 93:11; 94:15
**bickering** - 13:8
**Biden** - 35:5, 14;
96:18; 124:9
**big** - 16:12
**Bill** - 6:8
**bill** - 28:21
**bills** - 29:1; 133:6
**binding** - 123:8
**bipartisan** - 32:16,
19, 22; 98:18; 108:17
**bit** - 85:11; 99:15;
114:13
**bites** - 100:6
**bizarre** - 94:10
**black** - 118:2, 4, 10,
12, 21, 23; 119:6, 11
**blatant** - 66:21
**blessed** - 98:1
**blithely** - 92:19
**blocks** - 61:24
**blown** - 47:19
**board** - 52:9; 119:3
**Board** - 36:8; 62:3,
6; 63:4; 74:12; 80:14;
81:3, 5; 92:3
**Boardman** - 8:1
**BOCK** - 6:8; 9:10;
10:15; 13:4, 9, 11;
15:20; 16:11, 18;
17:10; 19:21; 20:19;
21:1, 4, 7; 22:12, 17,
23; 26:22; 27:2, 8, 11;
75:12, 15; 87:13, 16;
88:18; 89:20; 90:8,
17, 23; 126:23; 128:2;
129:6; 130:10, 23;
132:12
**Bock** - 6:8; 9:9;
10:10; 13:10; 15:19;
16:9; 19:20; 20:18;
26:21; 27:1, 3; 76:12;
78:8; 79:19; 82:10;
88:17, 22, 24; 89:7,
14, 18; 90:16; 95:15;
97:4; 98:16; 106:22,
25; 121:17; 126:22
**Bock's** - 78:13; 89:3
**bodies** - 73:7
**Bognet** - 103:16
**bold** - 44:13, 16
**book** - 28:20
**books** - 28:21; 97:3;
133:7
**Bostelmann** - 63:8,
16
**bottom** - 32:13;
42:12

**boundaries** - 26:25
**bounds** - 55:21
**Bowyer** - 84:5
**box** - 23:13; 28:8,
19, 25; 29:10; 30:2, 4,
16; 31:6, 11; 32:25;
33:4; 35:16; 37:3;
68:2, 4; 95:12;
111:24; 130:7, 24;
131:8, 13
**Box** - 29:1
**boxes** - 13:21;
21:23-25; 23:7, 10;
27:14, 23; 28:3, 7,
11-12, 17; 29:8, 13,
17, 22; 30:10, 14;
31:5, 7, 16, 23; 32:6,
20; 33:6, 8, 14, 19,
21; 34:6-8, 10, 14, 20;
36:10, 19, 21; 37:5;
68:6; 69:17; 95:11,
18-20; 96:18; 111:10,
12, 18, 25; 112:3, 5,
8; 113:8, 11, 14, 20,
23; 129:7, 23, 25;
130:3; 132:20-22, 25;
133:2, 5
**Boyer** - 104:11
**branches** - 63:20
**break** - 75:21, 23;
85:11, 16; 86:11, 15;
94:17; 107:5
**breaking** - 24:25;
130:4
**Brian** - 92:12
**brief** - 21:12; 59:19;
60:15; 63:3; 70:13;
75:22, 25; 76:3,
22-23; 78:23; 79:7, 9,
13; 80:7; 87:13;
93:16; 106:9, 21;
108:13
**Brief** - 121:23
**briefing** - 63:12;
88:10; 89:13
**briefly** - 11:14; 12:8;
16:8; 76:7; 86:2; 87:9;
95:10; 99:9; 107:8
**briefs** - 53:21; 76:9;
79:4; 84:16; 95:9;
100:4
**bring** - 67:18;
90:23; 95:24; 119:20;
130:21
**bringing** - 77:24;
98:23; 99:21
**brings** - 78:23;
131:5
**broad** - 103:10
**broken** - 74:2
**BROOK** - 7:5; 11:9;
12:2; 15:22; 17:15;
88:5; 89:5; 90:7, 20;

121:9
**brook** - 14:5, 7, 16;
15:1, 21; 17:13
**Brook** - 7:5; 11:12;
16:13; 88:5, 24; 89:1;
90:6, 19
**brought** - 84:8;
97:20, 22; 103:18;
117:24; 120:11
**Brown** - 74:12;
92:3; 119:3
**build** - 123:12
**Bullock** - 61:15, 19;
81:2
**bulwark** - 56:8
**bunch** - 119:24;
124:8
**burden** - 14:25;
78:11
**burdensome** -
78:19
**bureaucrats** -
35:11, 13
**Bush** - 61:8; 63:3;
77:3, 19; 80:10, 13,
20; 81:4; 83:24;
84:10; 122:13;
123:10; 128:22
**Campaign** - 98:7;
119:25; 120:1
**campaign** - 24:14;
35:6; 119:21
**candidate** - 6:12;
55:9; 58:2, 13, 24;
64:7; 78:15; 103:17;
104:4; 108:16;
114:11; 125:24
**candidates** - 55:1;
58:6, 22; 78:9, 11;
104:6
**cannot** - 13:6;
33:11; 37:17; 53:15;
63:14; 65:1, 13; 66:7;
67:1; 70:1; 71:5,
15-16; 93:21; 102:24;
104:21; 105:6
**canvass** - 78:4;
124:18
**canvassed** - 52:8;
78:3
**canvassers** - 52:10
**Canvassing** - 63:4;
80:11, 14; 81:5
**canvassing** - 46:5;
77:11; 124:22
**capabilities** - 17:2
**capable** - 131:15
**capacity** - 83:13
**care** - 13:7
**careful** - 130:12
**carefully** - 23:5
**Carey** - 71:22
**carrier** - 48:16,

20-21; 52:3, 18-19, 24; 53:4

**CARROLL** - 7:11

**Carroll** - 7:12

**carry** - 81:6

**Carson** - 26:1; 58:16, 19; 62:15

**cast** - 37:9; 43:2; 47:15; 52:7; 66:10; 67:6; 91:25; 92:6; 96:18; 111:8; 117:22; 119:12; 129:8, 10, 14

**casting** - 129:12

**catching** - 38:25

**category** - 114:1

**caucus** - 85:21

**caught** - 13:8

**caused** - 57:22; 58:4; 63:19; 67:20

**cautions** - 123:11

**cease** - 38:10

**cegenation** - 119:7

**Celebrezze** - 54:8

**cements** - 66:24

**Center** - 27:17; 100:1

**centers** - 95:6

**central** - 9:17; 92:18

**Central** - 9:21; 46:10; 69:2; 79:4

**centric** - 46:15

**certain** - 14:19; 30:11; 39:1; 71:18; 78:25; 107:25; 110:10; 111:6; 112:17; 114:2; 117:1; 125:23

**certainly** - 12:25; 17:12; 29:12; 69:19; 89:23; 106:2; 126:5

**certificate** - 41:10, 17; 42:13, 23; 46:2, 24; 47:17; 48:8; 51:6; 60:14, 18; 76:21; 77:10, 13-15, 17; 116:23

**certificates** - 21:25; 42:9; 43:8; 77:8, 19; 132:13

**certification** - 24:9; 41:12, 24; 43:14; 44:14; 45:10, 22; 47:13, 18-20, 23; 48:20; 49:2, 7, 12, 21, 25; 50:3; 51:3, 13, 15; 52:16; 74:25; 102:2; 114:3, 24; 115:18, 22-23; 116:15

**certifications** - 24:6; 41:25; 45:22; 50:18; 52:12; 68:19, 25; 69:1

**certified** - 37:12;

43:5

**certified"** - 105:8

**certify** - 39:12; 97:9; 115:24

**certifying** - 47:23; 115:14

**cetera** - 116:2

**Chafin** - 102:20

**chain** - 31:2, 4, 13-14; 113:15

**challenge** - 40:1; 41:25; 63:17; 71:13; 95:22; 97:20, 22; 98:15; 117:7

**challenged** - 57:22; 58:3; 94:20

**challenges** - 46:6, 9-10; 95:24

**challenging** - 84:19; 111:19; 120:12; 133:12

**chance** - 15:11; 17:21; 19:14; 86:9, 17; 126:13

**change** - 17:11; 41:3, 5; 52:12; 58:17, 19; 67:14; 97:14; 99:6; 109:19; 130:4

**changed** - 17:4; 39:3; 63:15; 73:5; 79:20; 82:13, 25; 94:6, 10; 120:7; 124:19

**changes** - 9:24; 12:12; 23:25; 32:8; 34:22; 57:11; 63:11; 73:20; 82:21; 120:6; 132:13; 133:1

**changing** - 26:4; 39:9

**chaos** - 50:8; 73:21

**chapter** - 118:14

**Chapters** - 91:14

**characterized** - 16:22

**charge** - 53:18; 65:20, 24; 66:21

**charged** - 125:9

**Charles** - 8:4

**chase** - 78:16

**check** - 39:25

**checks** - 26:23; 70:12

**Chevrolet** - 81:16

**Chiafalo** - 127:7

**Chief** - 26:17; 62:22; 123:7; 125:11; 128:21, 25

**chime** - 86:4

**choose** - 127:12

**choosing** - 59:5, 12; 124:11; 128:13

**chose** - 30:3; 73:3

**chosen** - 56:12, 17, 22; 57:18; 105:12; 127:13, 17; 128:17

**Christenson** - 6:24

**Christine** - 65:6

**Circuit** - 26:2; 58:8, 11, 13, 16; 60:24; 61:7; 62:15; 63:5, 8, 16; 93:16; 96:10; 100:20; 101:1; 104:17; 105:5, 22; 132:6

**Circuit's** - 101:9

**circumstance** - 101:7; 110:3

**circumstances** - 101:10

**circumvent** - 34:11

**CISA** - 32:1, 4, 9, 15

**citations** - 32:13

**cite** - 61:6

**cited** - 63:3; 80:6; 83:24; 95:23; 118:4

**cites** - 72:4; 112:25

**cities** - 27:17, 21, 24; 68:17; 118:9

**citing** - 125:22

**citizen** - 58:9

**citizens** - 83:10; 120:23

**city** - 33:14, 19; 34:19; 42:2; 68:21; 114:20; 115:1

**City** - 7:9, 11, 13, 17; 28:25; 29:4; 34:3; 35:4; 63:4; 67:23; 68:3, 5; 130:3

**Civic** - 27:17; 100:1

**Civil** - 8:14; 17:23; 105:20; 117:14

**claim** - 25:2; 34:14; 40:9; 64:17; 66:5; 67:7; 93:20; 98:23; 103:19; 104:2, 23; 105:15; 109:23; 110:23; 122:8

**claimant's** - 72:2

**claimed** - 34:5; 35:3; 104:4

**claiming** - 123:21

**claims** - 54:18; 63:10; 91:8; 96:10; 99:16, 21; 101:5; 105:19; 120:14; 123:5, 21

**Claire** - 7:14; 42:3; 45:5; 69:15; 87:21; 90:24

**clarification** - 17:17; 100:18

**clarify** - 17:14

**Clark** - 8:1; 101:1

**Clause** - 58:10, 20;

80:18; 103:1, 4, 19, 23; 104:16

**clean** - 10:2; 12:10, 12

**clear** - 14:8; 15:19, 21; 36:19; 37:14; 43:7, 11, 19; 46:1, 12, 15; 53:8, 16; 77:7; 79:1; 82:11; 91:9; 93:25; 94:16, 19; 95:12; 96:11, 23; 98:12; 100:11; 104:10; 107:16; 115:12; 125:23; 129:11

**clearly** - 48:2; 51:17; 93:19; 94:14; 102:4; 112:14; 123:10

**clerk** - 31:3, 12; 33:19, 25; 34:3, 18-19; 36:7, 16, 25; 37:16; 38:11; 41:18, 21; 42:2; 43:12, 23; 44:22; 45:9-12, 16-17, 20, 24; 46:23-25; 47:5; 48:18, 22; 50:24; 51:2, 5, 7, 18; 52:1, 4, 14, 18, 21; 112:13, 18, 22; 114:22; 115:3; 129:13

**CLERK** - 6:3, 13, 20; 7:4, 9, 16, 22; 8:3, 8, 19, 22; 22:21; 87:3; 121:25

**Clerk** - 6:23; 132:2

**clerk's** - 30:21; 34:1; 42:1; 43:16, 21; 45:3, 18, 21; 46:8; 47:8; 51:22; 69:3; 111:23; 112:1, 15; 113:2

**clerks** - 20:3; 25:1; 29:20; 30:11; 32:21, 25; 33:2; 39:15, 19; 42:16, 18; 45:13; 48:5, 10; 49:14; 50:17, 22; 51:12; 52:12; 53:3, 25; 78:18; 113:13; 114:2; 115:8; 116:6

**clients** - 86:6; 117:12, 17

**clock** - 12:21; 105:6

**close** - 12:4, 17; 32:17; 33:7; 55:15, 17; 93:1; 106:12; 129:9

**closely** - 112:17

**closely-related** - 112:17

**closing** - 18:17, 19, 22; 22:14; 78:8

**co** - 7:7; 75:8; 108:4

**co-counsel** - 7:7; 75:8; 108:4

**Code** - 21:13, 18, 23; 22:5; 23:12, 22; 26:4, 9; 28:4; 31:18; 32:14, 23; 33:22; 34:4, 11, 22; 35:17, 19; 37:20; 39:10, 23; 41:1; 42:17; 46:2, 13, 15; 47:2; 49:9; 50:16; 53:8; 57:13; 59:4; 73:4; 77:5; 91:12; 129:11; 130:19

**code** - 24:24; 33:11, 23; 34:11; 40:6, 18, 21; 41:20; 42:11; 46:18; 48:17; 50:1; 52:13, 17; 53:7, 14; 62:19; 81:6; 115:1, 5

**Coie** - 8:5

**Colin** - 6:16; 107:9, 14; 124:8

**colleague** - 17:16; 84:6

**colleagues** - 117:13

**collect** - 34:5, 14

**collected** - 69:17

**collecting** - 113:17

**collection** - 36:21

**collective** - 54:19

**college** - 54:22; 55:13; 56:14, 20, 23; 57:19

**Colorado** - 81:24; 82:3; 100:22; 101:8

**combines** - 66:1

**combining** - 30:9

**comings** - 123:15

**commencement** - 13:14

**commended** - 111:17; 112:5

**commending** - 112:2

**comments** - 128:21

**commission** - 108:18

**Commission** - 6:4, 17; 21:16; 23:9, 12, 14, 22; 24:18; 25:1, 13; 28:2, 5, 12; 29:5, 23-25; 30:1, 9, 17; 31:2, 9, 13, 17, 20, 22; 32:10, 12, 21; 33:15, 18; 34:6; 35:8; 37:22; 39:3, 9; 40:20; 42:7; 44:10, 20; 45:7; 46:22; 48:5; 51:24; 53:3, 25; 57:9; 60:15; 63:12; 65:14; 66:14; 67:16; 68:11; 73:2; 76:23; 82:18; 84:19; 98:2, 19; 107:15, 17,

21; 108:1, 15, 17, 19, 21; 109:3, 21; 110:1, 8, 11; 113:13, 18; 114:8; 124:6; 129:20; 131:7, 22

**Commission's** - 29:7, 21; 33:1; 40:16; 42:15; 44:8; 46:21; 49:14, 18; 50:6, 9; 53:16

**Commissioners** - 36:8

**Commissions** - 6:14

**Committe** - 63:7

**Committee** - 8:6, 14; 64:12; 73:11; 82:18; 117:14; 118:1

**common** - 21:16; 64:11

**commonly** - 120:19

**communications** - 16:4; 109:1

**compact** - 56:15

**compare** - 10:20; 32:2; 119:8

**compared** - 96:18

**compares** - 92:2

**comparing** - 12:12

**comparison** - 125:2

**compelled** - 25:25

**complain** - 96:20, 23

**complained** - 67:1; 96:4

**complaining** - 97:21; 99:22; 128:16

**complains** - 94:20

**complaint** - 28:15; 46:14; 59:17; 60:11; 70:13; 80:7; 82:24; 93:13; 122:7

**complete** - 17:7; 33:13; 41:12; 43:14; 85:12; 90:11, 14

**completed** - 10:5; 31:8; 41:16; 43:11, 24; 51:6

**completely** - 39:18; 52:11; 93:24; 108:21; 110:6, 15; 113:24; 115:7; 125:1

**completing** - 114:2

**completion** - 87:5

**completions** - 98:10

**compliance** - 66:6

**compliant** - 34:3

**complied** - 107:21

**comply** - 91:17

**components** - 57:21

**compounding** -

54:23

**comprise** - 106:1

**compromise** - 127:8

**compulsory** - 21:18

**concede** - 79:1

**conceded** - 78:25; 105:22; 113:19

**conceding** - 89:21, 24

**conceivable** - 92:5

**conceivably** - 104:22

**concept** - 103:2

**concern** - 125:3

**concerned** - 29:20; 57:7

**concerning** - 29:8, 16; 77:16

**concerns** - 21:24; 26:24; 85:3; 106:11

**conclude** - 54:21

**concluded** - 134:2

**conclusion** - 17:5

**conclusions** - 18:2

**concomitant** - 94:2

**concrete** - 94:7; 104:14

**concur** - 106:23

**concurrence** - 63:24; 123:7

**concurrent** - 122:12, 18

**concurring** - 80:21

**condition** - 70:25; 71:1

**conditions** - 38:8; 91:4

**conduct** - 22:6; 55:11; 57:9; 79:19

**conducted** - 55:20; 64:13, 23; 128:9

**conducting** - 80:8

**confer** - 12:8

**Conference** - 8:15; 117:15

**conference** - 11:19; 59:15; 82:19

**confers** - 104:2

**confidence** - 73:21

**confined** - 24:21; 25:2, 4; 37:20, 24; 38:3, 5, 18, 21; 39:2, 6, 12, 14, 21; 40:1, 12, 20, 23; 41:3; 54:23; 68:10, 13, 17; 96:21; 109:24; 110:11, 20

**Confined** - 97:3, 14; 100:13

**confinement** - 38:10, 12, 14, 24;

109:6; 111:2, 5, 9

**confirm** - 40:9

**confirmation** - 15:3

**confirmed** - 28:13, 15; 107:22

**confirming** - 30:13; 68:24

**confirms** - 30:25; 45:6

**conflict** - 39:6; 60:21

**conform** - 108:2

**confounding** - 54:25

**confusion** - 73:21

**Congress** - 61:11; 77:4; 127:5

**congressional** - 103:17

**consensual** - 9:7

**consequence** - 65:20

**consider** - 54:20

**consideration** - 82:2

**considered** - 48:4; 58:17; 70:6

**considering** - 32:6

**consistent** - 22:4; 110:7, 15; 113:24; 121:2; 124:4; 130:18, 22

**Constitution** - 25:23; 26:16; 53:17; 56:15, 18; 57:17; 59:18; 61:1, 22; 64:1; 67:7; 70:23; 71:14; 73:9, 13, 16; 74:7, 9, 24; 80:19, 24; 104:2, 20; 122:10, 23; 124:11, 13, 16; 127:1

**constitutional** - 55:21; 57:9, 15; 58:1, 10; 59:11, 22; 61:12; 62:9; 64:22; 65:16, 24-25; 66:3, 19; 69:24; 70:1, 7, 11; 71:12; 73:15; 81:9; 83:25; 84:9; 92:19; 93:3; 99:16; 100:19; 103:3; 104:22; 125:4

**constraining** - 19:17

**construction** - 24:22; 34:14

**construed** - 37:7; 42:23; 43:2; 53:14; 91:14

**consulting** - 85:18

**contact** - 132:15, 17

**contained** - 24:10

**containing** - 30:20; 46:6; 49:4

**contains** - 52:5

**contemplated** - 77:13

**contemplates** - 89:10

**contemporaneously** - 100:24

**contend** - 61:19; 69:24

**contest** - 25:2; 53:10; 65:6; 77:16, 20

**contested** - 100:12

**context** - 26:7; 54:10, 18; 62:17; 72:18; 114:13; 122:15

**continually** - 55:25

**continuation** - 36:3

**continues** - 37:8

**contrary** - 23:21; 36:22; 42:10; 45:23; 53:6; 75:2

**contrast** - 123:17

**contrasting** - 115:21

**contravention** - 37:9, 11; 43:2, 4; 61:21

**control** - 19:10; 43:15; 44:6; 46:19, 22-23; 50:10; 108:19

**controlling** - 44:4

**controversy** - 77:16, 20; 104:24; 106:16

**convenience** - 74:6

**convenient** - 74:17

**convention** - 127:9

**convinced** - 42:20

**cooperation** - 16:12

**coordinated** - 22:2

**coordinating** - 121:13, 21

**cope** - 63:19

**Corey** - 6:16

**corner** - 111:13

**corporation** - 27:18

**Corporation** - 7:1

**corrected** - 132:1, 3

**correcting** - 48:19

**correction** - 51:16

**corrections** - 51:18; 88:16; 98:10

**correctly** - 27:6

**costless** - 73:15

**counsel's** - 87:5; 93:10

**Count** - 46:10; 69:2

**count** - 24:15, 17; 48:9, 11; 49:1, 8; 65:12; 66:8, 11; 79:18; 121:5; 131:4

**counted** - 13:22;

33:11; 37:10, 18; 42:14, 22; 43:3; 44:16; 46:3; 49:5, 12; 53:15; 65:4; 66:7, 11; 77:4; 116:24; 130:17

**counters** - 46:5, 11

**Counties** - 23:23

**counties** - 25:14; 55:16; 107:23; 118:21; 129:9, 25; 131:6

**counting** - 33:12; 46:17; 63:23

**country** - 74:8; 96:9; 108:8; 117:25; 118:11; 119:8; 120:1, 11, 15; 121:3

**counts** - 43:25; 44:5

**county** - 38:11; 50:15; 78:3; 116:1

**County** - 6:20, 23-25; 7:23, 25; 80:11, 14; 81:5; 109:10; 118:20, 22; 132:2

**couple** - 6:9; 85:21; 120:10; 129:9

**courtroom** - 6:5

**courts** - 26:22; 55:10; 62:13, 22; 63:1, 14; 64:5; 72:7, 11; 79:24; 82:8; 83:9; 96:8; 101:16; 102:23; 105:9; 108:7; 120:17; 123:11, 15

**cover** - 65:8, 21; 99:9

**COVID** - 58:17; 63:18; 110:8

**COVID-19** - 26:3; 110:13; 111:18

**COVID-inspired** - 58:17

**create** - 34:25; 35:9; 56:2; 105:7

**created** - 35:3; 97:5; 116:8; 131:22

**creative** - 34:3

**crime** - 71:11

**criminal** - 71:7

**crisis** - 38:25; 39:2; 110:8, 11; 111:18

**criteria** - 38:21

**critical** - 109:20

**cross** - 114:17

**crumbles** - 120:22

**crystal** - 100:11; 107:16

**CTCL** - 100:2

**cure** - 41:16; 45:22

**current** - 110:3, 9

**CURTIS** - 8:4

**Curtis** - 8:4

**custody** - 31:2, 4, 13-14; 113:15
**Cybersecurity** - 31:25
**cycle** - 121:3
**damage** - 73:16; 92:24
**damages** - 71:21; 72:5, 10
**Dan** - 7:19
**Dane** - 7:22, 24; 23:23; 109:9; 118:20; 132:2
**danger** - 34:21, 23; 35:7
**dangerous** - 93:2
**data** - 13:16
**database** - 115:10
**Database** - 115:11
**date/time** - 31:11
**dating** - 131:25
**Daun** - 6:25
**Davida** - 7:5; 11:12; 16:12
**deadline** - 63:23; 79:5; 111:20
**deadlines** - 58:17
**deal** - 9:2; 124:22, 25
**dealing** - 75:17; 80:12; 81:21
**dealt** - 126:11
**decades** - 109:8
**December** - 77:18
**decide** - 15:15; 48:8; 53:25; 97:9; 102:23; 120:17; 124:6; 125:19
**decided** - 11:21; 48:11; 81:14; 84:6; 100:15; 104:10; 127:11, 20; 128:5
**deciding** - 11:17; 47:1; 63:19; 120:25
**decision** - 54:8, 19; 59:22; 61:6, 16; 63:21; 65:23; 71:8, 23; 74:4; 96:8; 97:15; 98:17; 101:11; 102:3, 23; 105:3, 5; 121:2; 124:24; 133:18, 25
**decisions** - 45:24; 48:25; 90:15; 100:4
**declaration** - 42:4; 45:6; 60:1, 12; 74:19; 84:24; 87:21; 90:24; 94:1
**declarations** - 89:11, 15-16; 90:13
**declaratory** - 8:25; 19:5; 74:22; 81:12; 84:23; 122:9
**declare** - 37:24;

57:15; 62:23; 76:14; 84:13; 94:11
**declared** - 41:2; 60:19; 71:20
**declaring** - 74:22
**declined** - 84:1
**declining** - 82:3; 101:7
**deem** - 92:4
**deemed** - 93:17
**defect** - 51:10
**defective** - 45:10; 51:3
**defects** - 65:25; 66:1
**defendant's** - 14:10; 67:14; 84:1; 88:9; 95:9
**defendants** - 6:21; 7:10, 13, 17-18, 20, 23, 25; 8:11; 9:13; 10:14; 11:20; 12:20; 14:18; 15:2, 6; 18:3; 21:12, 16; 27:17; 33:15; 40:11; 53:21; 58:4; 64:11, 13; 67:1, 16; 69:24; 74:16; 75:2, 23; 76:8, 12, 17; 77:22; 78:3; 80:2; 83:6, 15; 84:4; 87:6; 88:10, 24; 89:24; 105:17, 24; 107:7, 10; 121:10, 19-20; 123:1; 132:7
**Defendants'** - 89:8
**defendants'** - 18:20; 76:1; 86:4, 17; 89:12; 106:9; 121:7
**defense** - 9:18; 10:9; 11:4, 8; 19:13, 17; 78:20; 85:14; 87:10; 90:18
**defenses** - 14:10, 12; 80:2
**defer** - 82:8; 126:20
**defined** - 71:21
**definition** - 24:22
**deflect** - 66:3
**degree** - 72:14
**delay** - 75:5; 96:3, 5
**delays** - 98:22
**delegate** - 80:7
**delegated** - 26:14; 70:24; 71:1; 83:21
**delegitimized** - 70:20
**delegitimizes** - 71:4
**deliberate** - 104:18
**deliver** - 47:7; 111:22; 129:14
**delivered** - 33:9, 25; 36:24; 37:2; 112:12
**delivering** - 37:4

**delivery** - 35:22; 112:15
**demands** - 57:15
**democracy** - 120:22
**Democracy** - 34:8, 20; 35:2, 15; 62:3; 68:6, 8; 81:2
**Democrat** - 63:7; 64:11
**Democratic** - 8:6; 73:10; 82:17
**democratic** - 93:7; 106:3
**Democrats** - 108:18, 20
**demonstrate** - 31:16; 67:19
**demonstrated** - 129:17
**demonstrates** - 23:19; 27:13; 47:3
**demonstrating** - 34:21
**denial** - 72:4
**denied** - 57:25; 58:11
**deny** - 85:6; 121:7
**Department** - 6:14
**department** - 26:19
**departure** - 61:9; 80:22; 122:19, 22, 25; 125:12, 23; 128:22; 129:1, 5; 130:6, 15
**depicting** - 34:19
**depicts** - 28:23
**deposit** - 113:9
**deposited** - 112:8
**depositing** - 28:25
**depositories** - 31:20
**deposits** - 28:20
**deprive** - 95:4; 104:3
**deprived** - 65:2, 15
**depriving** - 66:15
**describe** - 50:25; 59:17
**described** - 35:18
**describes** - 59:20
**designate** - 35:22; 96:21
**designation** - 39:21; 40:23
**designed** - 113:1
**despite** - 32:21; 40:5; 46:1; 94:20
**destroys** - 50:7
**detail** - 31:5; 35:19; 43:10; 105:19
**detailed** - 45:17
**details** - 18:10
**determination** -

59:18; 60:14, 16; 75:2; 77:14; 97:13; 123:3
**determinations** - 73:7
**determinative** - 82:1
**determine** - 32:8; 45:18; 51:16; 55:20; 74:16; 80:8; 122:17, 21
**determined** - 70:21; 92:8; 124:12
**determining** - 44:4; 53:18
**Detroit** - 118:9
**develop** - 46:24
**devote** - 55:2
**difference** - 55:16; 69:22; 94:3; 128:12
**differently** - 50:18; 96:1; 104:1, 5, 13
**difficult** - 10:15; 55:7; 112:6; 131:9
**difficulties** - 63:19
**digest** - 16:9
**dilemma** - 67:4
**diligently** - 91:20
**dilution** - 104:8, 12
**direct** - 26:14; 39:6; 59:8; 80:17; 102:19; 127:3; 128:10
**directed** - 47:6; 75:25; 78:18; 79:22; 128:10
**direction** - 24:16; 67:9; 128:3
**directions** - 67:11, 17; 70:15
**directive** - 37:1; 39:19; 45:23; 49:14; 53:16
**directives** - 50:21; 73:5; 91:8
**directly** - 35:17; 36:22; 42:10; 47:10
**Director** - 6:24
**director** - 36:7
**directory** - 21:13; 53:24
**disabilities** - 36:5
**disability** - 38:23
**disabled** - 22:11; 38:6; 109:25
**disagree** - 13:15
**disagreement** - 11:5; 89:4; 107:24
**disallowed** - 30:6
**discharge** - 73:19
**disclose** - 47:14
**discovery** - 12:19; 29:7

**discretion** - 40:8; 45:14, 17-18; 51:12, 15
**discriminatory** - 71:8
**discuss** - 41:9; 95:3; 108:23
**discussed** - 60:14
**discussion** - 9:5; 11:13, 21; 27:12; 37:19; 99:19
**disease** - 38:25; 63:20
**disenfranchise** - 64:15; 66:18
**disenfranchised** - 66:15
**disenfranchisement** - 64:10; 65:20; 66:1, 5, 9, 12, 21
**disenfranchising** - 92:5
**disincentivize** - 55:11
**dismiss** - 11:21; 18:20; 19:16; 76:2; 79:3; 85:6; 89:13; 93:14; 121:7
**dismissal** - 17:22
**dismissed** - 93:21; 105:16, 19
**disposed** - 107:2
**dispositive** - 96:7
**dispute** - 14:11; 18:9; 64:6, 19; 91:21; 110:18; 111:5; 123:2
**disputed** - 14:13; 91:24
**disputes** - 108:1, 5-8, 11
**disqualified** - 65:10
**disregard** - 65:22
**dissenting** - 77:2
**distinct** - 58:15; 78:25
**distinction** - 94:3
**distinguish** - 69:3
**distributed** - 31:24
**District** - 61:17; 62:2; 81:15
**district** - 81:3; 100:3
**Dixon** - 7:19
**DNC** - 8:3
**docketed** - 16:6
**Doctrine** - 81:18, 24; 82:4; 99:4; 100:23
**doctrine** - 82:5, 21; 83:11; 96:12
**doctrines** - 80:3; 81:10, 12; 100:9
**documentation** - 39:14; 40:19

**Donald** - 21:8; 61:15; 81:1; 96:18

**donation** - 27:19

**donor** - 58:9

**door** - 33:18; 92:25; 93:1

**Dorothy** - 8:16; 117:16

**doubly** - 39:23

**doubt** - 56:24; 71:10; 74:5

**Doug** - 6:17

**dozen** - 103:12; 120:10

**draft** - 9:19, 22-23; 10:21

**drafted** - 133:18

**drafts** - 9:11

**dramatic** - 92:22

**dramatically** - 23:19; 25:14; 131:3

**draw** - 47:21

**dressed** - 123:6

**Drop** - 29:1

**drop** - 13:21; 21:23; 23:7, 10, 13; 27:14, 22; 28:3, 6, 8, 11-12, 17, 19, 25; 29:8, 10, 13, 17, 22; 30:2, 4, 10, 14, 16; 31:5, 10, 16, 23; 32:6, 17, 20, 25; 33:4, 6, 8, 13, 19, 21; 34:6-8, 10, 14, 20; 35:16; 36:10, 19, 21; 37:3, 5; 68:1, 4-5; 69:17; 95:11, 18-20; 96:18; 111:10, 12, 18, 24-25; 112:2, 5, 7; 113:8, 11, 14, 20, 23; 129:7, 23-24; 130:3, 6, 24; 131:8, 13; 132:20-22, 25; 133:2

**drop-off** - 32:17

**dropped** - 37:3

**Ducey** - 84:6

**due** - 33:13; 59:10; 71:25; 72:3, 5

**duplicative** - 101:12

**duties** - 73:18; 82:11; 91:24

**duty** - 26:18; 56:16

**dynamic** - 78:12

**Earnestine** - 8:16; 117:16

**easier** - 69:6; 97:8; 133:24

**easiest** - 115:21

**Eastern** - 81:14

**easy** - 50:6; 73:14; 92:19; 111:22

**economy** - 12:8

**edits** - 16:13

**effect** - 55:12, 18;

60:5; 91:14; 94:7; 109:8

**effective** - 55:19; 113:16

**effectively** - 25:6

**efficient** - 13:23; 20:14

**effort** - 13:25; 22:2; 86:8; 95:22; 98:14; 118:16; 119:9; 121:8; 131:25

**efforts** - 53:16; 67:14; 118:13

**egregious** - 97:2; 98:22; 126:6

**eight** - 10:2

**Eighth** - 26:2; 58:16; 62:15

**elect** - 110:14

**elected** - 36:15; 54:13; 62:25; 63:20

**electing** - 54:6; 61:10

**Election** - 21:13, 17, 22; 22:5; 23:12, 21-22; 26:3, 9; 28:4; 29:23; 31:1, 3, 18; 32:14, 23; 33:1, 22; 34:4, 11, 22; 35:8, 17-18; 36:8; 37:20; 39:3, 10, 23; 41:1; 42:17; 46:2, 12, 15, 21; 47:2; 49:9; 50:16; 53:8, 16; 57:8, 13; 60:15; 63:17; 73:4; 91:12; 107:17; 108:17; 129:11; 130:19

**election** - 21:17; 22:3, 7; 23:10, 17-18, 24; 24:1, 5, 12-13, 18; 25:10-12, 15, 17; 26:8; 27:21; 28:10; 29:14, 20, 24; 31:12; 32:22; 33:2, 4, 9, 16, 23; 34:13, 16; 35:8, 12; 37:13, 22; 38:13; 39:25; 40:4, 17, 24; 41:24; 42:1; 43:5, 22; 44:5, 23; 46:8; 48:4, 24; 52:7, 23; 53:6, 10, 19; 54:3, 10, 15, 24; 55:4, 6, 15, 17-20, 25; 56:12, 19; 57:9, 17; 58:2, 17; 59:5, 9; 60:1, 3, 5, 7, 13, 19-20; 62:11, 18-19; 64:4, 6, 9, 14, 22, 24; 65:2-4, 7, 14, 16, 19, 25; 66:3, 16, 20; 67:1, 12, 21; 68:7, 13, 15, 21; 69:21; 70:4, 6, 15-16, 20-22; 71:1;

72:22; 73:1, 3, 20; 74:20, 23; 75:1; 77:17, 25; 78:9, 15; 79:19, 21; 80:12; 81:6; 82:12; 83:21; 84:13; 91:20-23; 92:4, 8, 14, 24; 93:1; 94:12, 22, 24; 95:13, 17-20; 96:10, 19; 98:13, 20; 99:1; 102:1; 103:3; 104:6, 13, 18-19, 21; 105:7, 10; 107:19; 108:3, 8, 16, 24; 109:17; 111:9, 22; 112:18; 114:6, 9; 119:12, 16, 20, 23; 120:5, 8, 12; 121:3; 124:3, 7; 127:21, 25; 128:4, 8, 15; 129:8; 130:1, 5; 131:20; 132:5, 16, 23

**elections** - 42:3; 54:25; 55:23; 56:4, 11; 61:21; 78:10; 80:9; 83:22; 91:10; 92:18; 120:17, 25

**Elections** - 6:4, 14, 17, 24; 21:15; 23:9, 12; 24:25; 25:13; 28:2, 12; 29:5; 30:8, 17; 31:9, 22; 33:15, 18; 34:6; 37:22; 39:8; 42:7, 15; 44:7, 10, 19; 45:7; 51:24; 62:4, 6; 63:12; 65:14; 68:11; 73:2; 76:23; 81:3; 82:18; 98:2, 19; 107:15; 108:14, 21; 114:8; 119:3; 124:6; 129:19; 131:7, 22

**elector** - 24:11; 36:24; 38:5; 41:18; 46:20; 47:7, 12, 14; 48:25; 51:7, 10; 52:6; 58:23; 112:12

**elector's** - 47:6, 15

**electoral** - 25:23; 43:17; 54:22; 55:13; 56:13, 20, 23; 57:19; 73:22; 77:4; 92:16; 128:24

**electorate** - 114:5

**Electors** - 58:10, 20; 102:6; 103:1, 4, 19

**electors** - 26:10; 55:14; 56:12, 17, 22; 57:18; 58:1, 21; 59:5, 7, 12, 21; 60:6, 9, 17; 61:2, 10; 62:9, 20; 70:18, 25; 71:1; 74:25; 77:18; 80:23; 91:10, 15; 105:12;

110:5; 124:2, 9, 11; 127:3, 7, 10, 12, 16, 19, 24; 128:13, 17

**element** - 57:25; 67:7; 84:12; 85:3

**elements** - 53:9; 93:19

**Eleventh** - 58:8, 11, 13; 61:24; 80:3; 82:16; 83:1, 7; 84:2; 85:2; 93:9; 101:17; 105:5; 122:5

**eligibility** - 116:13

**eligible** - 38:23

**eliminates** - 119:4

**eliminating** - 119:7

**eloquently** - 73:25; 76:13

**elsewhere** - 121:3

**embarrassingly** - 114:16

**emergency** - 32:8

**emotion** - 65:23; 66:22

**emphasize** - 109:14; 110:3; 114:7

**emphasized** - 39:24; 63:2; 110:2

**emphatically** - 26:18; 43:7, 11; 51:23; 62:12

**employing** - 33:20

**emptied** - 31:11

**enable** - 22:19; 38:14

**enabled** - 22:21

**enacted** - 130:20

**enclose** - 52:2, 18

**encompassed** - 127:24

**encourage** - 15:1; 37:23

**encouraged** - 9:7; 55:12

**encroachment** - 70:11

**endeavor** - 19:10; 86:2

**endorse** - 49:11

**endorsed** - 52:4, 20

**enduring** - 92:18

**ene** - 127:20

**enforce** - 74:4; 91:8

**enforcement** - 84:21

**enforcing** - 40:18

**engaged** - 66:1; 78:9; 118:16; 119:17

**enjoin** - 60:12; 84:20

**enjoining** - 74:24; 75:1

**ensure** - 24:16; 36:18; 56:4; 86:8

**ensured** - 57:10

**entail** - 115:19

**entails** - 115:19

**enter** - 18:2; 49:15; 74:21; 88:7

**entered** - 16:15; 102:2

**entering** - 16:13

**entertain** - 106:9; 125:14

**entertained** - 46:11

**entire** - 25:6; 47:17; 71:11; 79:19; 94:12; 114:25; 129:8

**entirely** - 16:17; 66:16; 94:4; 123:23; 129:16

**entirety** - 106:1

**entitled** - 19:4, 7; 39:17; 40:10; 64:22, 24; 66:13; 127:5

**entreaties** - 92:23

**envelope** - 24:10; 41:14; 45:9, 12-13, 19; 47:17; 48:16, 19-21; 49:4, 10, 15, 22; 51:22; 52:3, 5, 19, 25; 114:23; 116:24

**envelopes** - 22:1; 24:7; 30:20; 53:4

**equal** - 103:20, 22; 104:7; 127:3

**Equal** - 103:22; 104:15

**equally** - 103:6

**equitable** - 83:13

**eradicated** - 42:17

**eroding** - 73:21

**erroneous** - 46:21

**error** - 70:7, 19; 71:4, 9

**escapes** - 84:14

**especially** - 26:13

**essential** - 53:12

**essentially** - 12:19; 18:17; 83:6; 98:25; 116:2, 9; 127:21

**establish** - 36:15; 39:13; 93:19

**established** - 67:10; 70:4, 14; 92:1; 96:8; 100:8

**establishing** - 47:9

**estimate** - 20:24

**estimated** - 68:1

**estimation** - 17:8

**evade** - 97:15

**evaluate** - 10:16; 54:20

**evening** - 9:15, 19

**event** - 59:9; 65:12; 68:6; 112:22

**events** - 34:21; 68:8; 112:18

**Evers** - 7:4; 17:24; 63:7; 74:24; 76:20; 78:23; 82:20; 87:8; 106:19, 24; 124:5

**Evers'** - 17:25

**everywhere** - 109:12; 111:15

**evidenced** - 83:1

**evident** - 29:14

**evidentiary** - 11:13, 25; 13:3; 17:25; 90:3

**Ex** - 83:11, 16; 84:2, 15; 101:23

**exact** - 19:14; 123:21

**exactly** - 15:13; 35:14; 98:4; 99:3, 5, 23; 101:2; 110:6, 18; 113:23; 117:2; 123:8; 132:24

**examinations** - 13:11

**example** - 35:1; 66:9; 111:22

**examples** - 29:16; 72:7; 126:6

**except** - 38:2; 91:13

**exception** - 24:20; 25:3; 37:20; 40:12; 41:6; 84:15; 97:5; 101:23

**exceptions** - 38:8; 83:10

**excerpt** - 30:1, 15; 44:9

**exclude** - 9:4

**exclusive** - 79:9; 95:2; 99:12; 100:5; 123:20; 124:21; 131:13

**excuse** - 98:22, 24; 120:2, 4

**executed** - 49:4; 88:13-15, 19

**executive** - 26:9; 36:7; 62:7, 19

**exercise** - 51:12; 55:10; 64:6; 93:4; 94:25; 126:19

**exercised** - 23:2

**existing** - 30:10; 32:7

**exists** - 54:15; 99:4

**expanded** - 97:7

**expansion** - 39:6

**expect** - 15:12; 18:21; 87:8; 121:1

**expedited** - 18:23; 105:18

**expeditious** - 13:12

**experience** - 38:7

**explain** - 23:8; 43:10; 96:5; 100:11; 108:2

**explained** - 46:14; 59:19; 83:19; 105:19

**explains** - 102:4

**explanation** - 131:19

**explicit** - 132:18

**explode** - 103:2

**exploded** - 40:13

**explodes** - 52:11

**express** - 22:4

**expression** - 22:24

**expressly** - 116:2; 123:10

**extension** - 111:19

**extensive** - 96:17

**extensively** - 103:12; 126:11

**extent** - 12:13, 22; 13:20; 14:10, 17; 15:2; 72:19; 90:3, 5; 123:9; 125:11, 25; 133:5

**extraordinarily** - 54:23

**extraordinary** - 92:10

**extrapolated** - 69:15

**extreme** - 126:6

**extremely** - 133:12

**F.2d** - 96:14

**F.3d** - 61:5; 63:6

**F.3rd** - 101:2

**F.Supp.2d** - 81:16

**face** - 63:18; 93:13

**Facebook** - 97:20; 132:2

**faced** - 79:3

**factor** - 54:25; 82:1

**factors** - 38:24; 81:25; 97:1

**facts** - 10:12; 12:11, 20; 14:11, 13, 15; 16:6; 18:7, 9; 19:3, 17; 20:1, 14; 73:25; 78:2; 94:19; 95:12; 96:22; 98:11; 105:18

**factual** - 18:13, 24; 90:11; 133:23

**failed** - 59:6, 10; 65:19; 78:24; 92:4

**fails** - 70:25

**failure** - 33:13; 41:5; 57:8; 66:8, 11; 91:16

**failures** - 67:20

**fairly** - 10:1; 13:12; 20:16; 75:25; 76:3;

87:9

**faith** - 73:16; 91:24; 92:6, 17; 104:21; 120:23

**faithfully** - 81:6; 107:21

**faithless** - 127:7

**fall** - 28:9

**fallacies** - 66:2

**fallacy** - 67:3

**false** - 47:25; 67:4; 115:24

**fangled** - 95:16

**far** - 10:13; 14:9; 78:20; 92:15; 125:23

**Faustian** - 66:24

**favor** - 18:3; 74:6; 114:11

**favorable** - 102:22

**feature** - 92:18

**Federal** - 17:23; 105:20

**federal** - 20:12; 23:14; 32:1; 53:9; 61:11, 13, 21, 24; 62:13; 64:2; 79:25; 80:23; 81:8, 13, 19, 21-22; 82:1, 8; 83:9, 20, 25; 84:9; 96:9; 100:6, 23; 102:23; 103:5, 14; 108:6; 117:24; 118:5; 120:11, 13; 123:3, 6, 15, 21; 125:4, 8, 10, 18; 126:7, 15; 127:5; 133:11, 13

**federalizes** - 122:13

**fee** - 106:25

**Feehan** - 84:6; 102:3

**fees** - 84:20; 107:2

**fence** - 76:16

**few** - 9:1; 22:17; 47:21; 48:17; 55:16; 121:14; 130:1

**fiat** - 92:9

**fidelity** - 74:18

**field** - 34:24; 35:10; 54:2; 56:5; 57:10; 65:9

**fifth** - 60:10

**fight** - 30:6

**filed** - 76:9, 23; 78:5, 23; 79:4; 84:4; 87:22; 88:13, 19-20, 23; 89:12; 96:4, 25; 119:23

**filing** - 57:2; 88:15

**filings** - 89:17

**fill** - 42:7, 18; 45:3, 14, 19; 115:4; 116:25; 117:1

**filled** - 41:25;

114:15, 25

**final** - 8:24; 9:6; 75:4; 78:4; 106:22; 114:1

**finality** - 106:24

**finally** - 9:22; 30:24; 32:24; 63:22; 82:15

**findings** - 18:2

**fine** - 30:10; 85:22

**finest** - 120:13

**FINKELMEYER** - 6:15

**Finkelmeyer** - 6:16

**firm** - 21:1

**fit** - 24:21; 46:15; 61:2

**fits** - 25:21

**five-city** - 33:14

**fix** - 51:14

**flatly** - 101:22

**flexible** - 63:18

**flimsily** - 92:23

**Florida** - 77:19

**flowing** - 74:25

**flushed** - 89:4

**focused** - 83:15; 86:14; 118:18

**focuses** - 112:24

**folks** - 9:7

**Follette** - 107:15

**follow** - 24:16; 35:7; 67:16, 20; 73:3; 113:23; 124:7; 128:11

**followed** - 46:13; 50:16, 21; 53:11; 54:2, 7; 64:20; 67:11; 74:15; 78:18; 81:4; 82:12; 83:24; 94:2; 107:18; 120:16

**following** - 59:18; 69:7; 94:7

**follows** - 104:21; 126:25

**force** - 96:13

**foreign** - 47:2

**forensic** - 49:16

**forgot** - 83:5

**form** - 33:14; 36:10; 39:11; 49:21, 25; 95:16; 99:3; 115:7, 15, 18; 116:8

**format** - 12:14

**forms** - 114:3, 24; 116:16

**formulated** - 101:19

**forth** - 16:4

**fortunately** - 89:25

**forum** - 100:25

**foundation** - 92:24; 123:13

**founded** - 26:24

**four** - 94:23; 110:21

**Fourth** - 60:24; 61:7

**framers** - 79:24

**frankly** - 14:2; 106:4; 119:8; 120:2, 4, 12

**fraud** - 23:6; 24:6, 20; 25:17; 67:2, 14-15; 69:21; 119:17

**frauds** - 67:8

**fraudulent** - 72:15

**fraudulently** - 67:6

**fraudulently-cast** - 67:6

**frenetic** - 28:8

**friendly** - 9:5

**friends** - 124:8

**front** - 44:8; 89:5

**froze** - 27:3

**frozen** - 26:21

**Fulani** - 96:13

**fulfill** - 91:24

**fulfilled** - 128:4

**full** - 44:13

**fully** - 17:21; 91:16; 131:24

**fund** - 27:21

**fundamental** - 25:19; 92:15; 95:5; 106:18

**fundamentally** - 102:1

**funded** - 27:18

**funding** - 27:22

**funds** - 23:14

**future** - 84:25; 92:24; 123:13

**Gahnz** - 7:19

**game** - 65:7, 9, 11

**garb** - 123:6

**General** - 6:16; 107:9, 14

**general** - 68:14; 107:19; 111:9; 124:2; 127:25

**generalized** - 58:12

**generally** - 19:25; 83:8

**George** - 6:23

**Ginsberg** - 77:2

**Giuliani** - 118:6

**glad** - 133:13

**glitch** - 26:20

**good-faith** - 104:21

**GOODE** - 8:9

**Goode** - 8:9; 117:15

**Google** - 115:8

**Gore** - 61:8; 63:4; 77:3; 80:10, 20; 81:4; 83:24; 122:13

**gore** - 123:10; 128:22

**Gorsuch** - 63:24;

73:10, 12, 23; 111:16, 20; 112:2

**governed** - 81:13, 19

**governing** - 35:20; 36:14; 91:21; 105:21

**government** - 32:1; 60:22; 63:21; 73:17

**governor** - 11:12; 17:19; 24:4; 60:14, 16; 77:8, 12

**Governor** - 7:4; 17:24; 61:19; 74:24; 76:20; 77:19; 78:23; 82:20; 87:8; 94:6; 106:19, 24; 124:5

**governor's** - 9:18

**governors** - 64:2

**grab** - 85:11

**grade** - 24:8

**gram** - 54:5

**grant** - 14:20; 26:14; 27:15, 20; 80:17; 85:6; 95:3; 99:8; 105:10; 106:5; 121:6

**granted** - 20:10; 27:23; 93:22

**granting** - 117:18

**grants** - 56:9; 99:25; 100:1

**great** - 74:11; 86:14; 105:19; 121:12; 133:16

**greater** - 74:10

**Green** - 7:17, 20

**GREENBAUM** - 8:13, 18; 117:11

**Greenbaum** - 8:13; 117:12

**Griesbach** - 100:4

**grievance** - 58:12

**grounds** - 105:16; 126:1

**guarantee** - 102:11

**guarantees** - 101:12

**guardrails** - 25:15; 56:3

**guess** - 9:1; 11:2; 16:1, 9; 19:5, 19; 85:14; 125:17; 130:12; 132:2

**guidance** - 25:1; 28:3, 6; 31:22; 32:10, 12, 21; 38:17, 19, 23; 39:8, 10; 40:13, 16; 42:6; 44:19; 45:3, 8; 46:21; 49:19; 50:7, 17; 78:12, 14, 16-17, 19; 95:13; 96:3, 23; 98:2, 5, 12, 16, 20; 108:19, 25; 110:17; 111:6; 113:13, 22;

114:8; 131:20, 23-25; 132:1, 13-16, 18-19; 133:2

**guide** - 45:18

**guided** - 28:17

**guidelines** - 94:20

**guilty** - 71:9

**gutting** - 25:6

**guys** - 14:7

**Hagedorn** - 92:12

**half** - 9:23; 69:17; 79:12

**Hall** - 28:25; 29:4

**hammer** - 12:5; 13:2

**hand** - 111:22

**handle** - 11:11; 50:18; 79:25

**handled** - 10:17; 58:8

**hands** - 40:4, 8

**Hanson** - 6:23

**happy** - 12:14; 87:12; 99:11; 106:10

**harm** - 104:14

**harmed** - 58:14

**harmless** - 70:7, 19; 71:9

**Harrell** - 8:16; 117:16

**Harris** - 8:15; 117:16

**hassle** - 15:9

**head** - 14:19; 103:22

**heads** - 20:20

**health** - 38:25; 110:9

**hearing** - 8:24; 13:14; 17:1; 18:23; 20:22; 62:21; 76:16; 79:16; 96:9; 105:25

**heavily** - 100:12

**held** - 57:17; 59:5; 60:24; 71:1; 77:25; 83:16; 102:1; 104:17

**help** - 18:25; 108:15

**helped** - 96:18

**helpful** - 20:3

**Henry** - 6:25

**hereon** - 116:1

**herring** - 66:4

**hidden** - 109:2

**high** - 56:4; 57:12

**higher** - 108:13

**higher-level** - 108:13

**highlight** - 35:21

**hijacked** - 25:24

**himself** - 92:2

**hinge** - 80:4

**history** - 20:11; 23:18; 25:17; 74:7;

92:11; 118:11, 13

**Hogsett** - 96:14

**hold** - 91:20

**holding** - 58:20

**holds** - 71:21

**hole** - 97:15

**homework** - 24:8

**Honor's** - 12:16

**hope** - 121:1; 126:13

**hopeful** - 17:10

**hoping** - 133:18

**hospitalized** - 38:3

**hostile** - 16:23

**hour** - 9:23; 86:11; 120:13; 121:15, 19; 127:8

**hours** - 30:5; 52:7; 75:20; 79:5; 86:7; 93:23

**housekeeping** - 90:21

**howls** - 74:6

**human** - 21:23; 33:21; 34:7, 10, 13, 20; 36:1; 68:5; 130:6

**humans** - 34:4

**hundred** - 119:24

**hundreds** - 69:16

**hypothesizing** - 124:18; 125:21

**I-don't-knows** - 13:1

**ID** - 22:1; 25:7; 37:25; 38:15; 39:24; 40:21, 25; 41:4, 7; 97:5, 12, 16; 110:5, 25

**idea** - 30:5, 7; 52:11; 67:13; 71:4, 18; 98:9; 130:7

**identification** - 24:19; 25:5; 38:2; 110:20, 22, 24; 115:17

**identified** - 66:23; 101:9

**identify** - 65:25

**identifying** - 131:15

**ideologically** - 120:16

**ignore** - 105:10

**ignored** - 105:21

**ignores** - 66:6

**II** - 25:22; 26:16, 24; 53:17; 56:9; 59:18; 61:1, 3; 64:8; 67:7-10; 70:6, 9; 71:3, 13; 72:13; 74:23; 80:6, 18; 83:20; 84:8; 122:9, 20-21; 124:4, 13; 126:25; 128:5; 129:1; 130:22

**III** - 58:22, 24; 77:5; 79:24; 103:2; 125:9

**illegal** - 23:7; 65:1, 3

**illness** - 38:6, 22; 109:24

**imagine** - 107:3

**immediately** - 17:12; 52:13

**immeshed** - 24:14

**immunity** - 80:3; 82:16; 83:8; 84:2

**impact** - 55:25; 56:13; 67:20; 132:21

**implement** - 128:14

**implementation** - 128:18; 129:4

**implemented** - 73:8; 130:1

**implicate** - 54:11; 104:14; 128:25

**implicated** - 92:16

**implicates** - 129:16

**importance** - 11:17; 21:10; 62:24; 64:19; 72:2; 86:5

**important** - 43:8; 48:1, 7; 51:21; 54:2, 11, 18; 55:6; 56:7; 71:19; 72:9; 79:25; 81:8; 83:10, 25; 84:9; 94:17; 118:3

**importantly** - 50:9; 97:23

**imposed** - 54:11

**improper** - 94:14; 123:23

**improperly** - 41:16; 51:6

**improvident** - 50:7

**in-office** - 34:12

**in-person** - 31:8; 33:22; 37:15; 68:8; 113:2

**inability** - 119:19

**inaccurate** - 66:17

**inappropriate** - 94:14

**Inc** - 61:15

**incalculable** - 93:5

**incentive** - 73:19

**incentives** - 55:7

**incentivize** - 55:23

**incentivized** - 24:25

**incite** - 65:22

**inclination** - 102:14

**inclined** - 14:20; 106:9

**include** - 39:4; 60:13; 83:3; 88:9; 117:3

**included** - 32:10;

37:12; 43:4

**includes** - 74:22

**including** - 27:22; 39:24; 41:12; 43:1; 58:10; 64:11; 96:9; 102:15; 117:4; 133:21

**inconsistent** - 60:12

**increase** - 109:15

**increased** - 109:16

**incredible** - 132:11

**incredibly** - 12:3; 122:10, 15

**indeed** - 50:2; 95:24; 104:17; 105:17; 108:9; 111:12

**indefinite** - 38:7, 10, 12, 14, 22, 24; 109:6, 25; 111:2, 5, 9

**indefinitely** - 24:21; 25:2, 4; 37:19, 24; 38:2, 5, 18, 21; 39:2, 6, 12, 14, 20; 40:1, 12, 20, 23; 41:3; 68:10, 12, 17; 96:21; 109:24; 110:11, 19

**Indefinitely** - 97:3, 14; 100:13

**indelible** - 92:24

**indicate** - 18:20; 41:15

**indicated** - 17:25; 23:8; 38:4; 78:8; 89:7; 105:24; 107:5; 116:1

**indicates** - 14:16; 31:24; 38:20; 45:3; 51:17; 69:11

**indication** - 33:7; 114:10

**indicator** - 24:10

**indiscernible** - 119:5

**individual** - 110:2, 14; 117:12

**individually** - 83:13

**individuals** - 17:3; 27:20; 31:19; 36:4

**individuals'** - 39:5

**indoors** - 112:1

**ineffectiveness** - 84:25

**ineligible** - 119:15

**infirmity** - 38:6, 22; 109:25

**influence** - 50:11

**influential** - 25:12

**informality** - 91:16

**information** - 9:12; 10:11; 14:2; 15:6; 32:25; 42:9; 44:15, 23-25; 45:4, 14; 47:22; 49:15; 53:6; 114:3; 115:9; 117:1, 4

**informational** - 31:24

**Infrastructure** - 31:25

**infringes** - 128:7

**initial** - 38:1; 79:3, 13

**initiated** - 56:25

**injected** - 24:12

**injecting** - 43:21; 44:3

**injunction** - 60:13, 18; 93:11; 94:6; 97:25; 101:20

**injunctive** - 8:25; 19:5; 74:22; 95:25

**injury** - 57:22; 58:3, 5, 14-15; 59:1; 72:6, 11, 15, 18, 20; 102:8, 17, 22; 103:5, 7; 104:4, 8

**insist** - 46:12

**inspectors** - 48:4, 8, 10, 14; 49:1, 8, 11; 50:8

**inspired** - 58:17

**instance** - 13:21; 26:1; 58:7; 67:22; 71:6, 22; 123:5; 126:5; 129:6; 130:2

**instances** - 29:18; 33:3; 35:13; 55:1

**instant** - 85:19

**instead** - 46:22; 53:5

**instituted** - 101:13

**instruct** - 102:13

**instructed** - 48:5; 69:3

**instructing** - 30:21

**instruction** - 39:23; 40:4

**instructions** - 32:24

**insufficient** - 49:7

**insufficiently** - 63:17

**integrity** - 53:12; 57:12

**intended** - 48:2; 50:24; 51:18; 70:10

**intends** - 62:5

**intentioned** - 26:6; 62:16

**interest** - 54:12

**interesting** - 27:25; 29:22; 32:2; 133:12

**intermixed** - 133:6

**interpret** - 95:1

**interpretation** - 98:5

**interpretations** - 100:12

**interpreted** - 42:25

**interpreting** - 125:10

**intervene** - 98:7; 103:10; 117:19

**intervened** - 63:8; 103:13

**intervenor** - 8:3, 8

**introduced** - 31:19; 33:14

**introduction** - 27:11; 89:11

**intrude** - 60:21

**intrusions** - 56:9

**invaded** - 58:20

**invalid** - 70:16

**invalidate** - 112:8

**invalidating** - 50:5

**invalidation** - 92:25

**invasions** - 62:25

**invented** - 95:16

**investigate** - 54:17, 20

**invitation** - 84:1

**inviting** - 73:21

**invocation** - 92:22

**invoked** - 125:5

**involve** - 53:3; 108:7

**involved** - 91:22; 101:3; 119:24

**involvement** - 50:23

**involves** - 66:6; 82:2

**involving** - 43:17; 45:23; 57:4; 63:22; 65:6; 103:11; 120:14

**irregardless** - 24:15

**issuance** - 60:18

**issued** - 25:1; 28:2, 6; 44:20; 76:20; 77:12, 15, 17, 19; 78:14; 95:13; 97:24; 105:3, 5; 131:21, 24

**issuing** - 36:25; 60:14; 112:13

**James** - 7:25

**January** - 77:3

**Jeb** - 77:19

**Jeff** - 17:18; 85:23; 124:8

**Jeffrey** - 7:7; 87:7

**Jim** - 6:9; 7:12, 14

**Joe** - 35:5, 14; 96:18; 124:9

**joined** - 57:2; 63:24

**joint** - 88:9; 89:10

**Jon** - 8:12

**JONES** - 6:22; 7:3

**Jones** - 6:22

**Joseph** - 8:9

**Judge** - 11:11, 16;

12:2; 62:21; 74:1; 84:7; 100:4; 105:6

**judge** - 98:1; 102:3; 126:15

**judge's** - 90:1

**judges** - 64:2; 120:14

**judgment** - 18:3; 75:4; 81:12; 97:8; 106:22

**judgments** - 40:6

**judicial** - 12:8; 26:18; 55:10, 19, 22; 56:7; 62:13; 64:6; 92:9, 22-23, 25; 93:4; 102:22; 103:11

**judiciary** - 20:12; 57:15; 74:3; 120:13

**Julietta** - 6:24

**jumping** - 79:10

**June** - 27:16; 28:1

**Junior** - 7:12

**jurats** - 49:17

**jurisdiction** - 57:5; 76:14; 94:25; 101:7; 122:17, 24; 123:2; 124:14; 125:8, 10, 14, 18-19, 21, 25; 126:5, 7, 16, 18; 131:13; 133:11, 13

**jurisdictional** - 126:10, 14

**jurisprudence** - 123:14; 125:8

**jury's** - 71:8

**justice** - 98:1

**Justice** - 6:14; 26:17; 61:8; 62:23; 63:23; 71:23; 73:9, 11, 23; 77:2; 80:20; 92:12; 111:16, 20; 112:2; 122:12; 123:7; 125:11; 127:6; 128:21, 25

**justiciability** - 11:17; 60:25; 106:8; 122:4

**justiciable** - 106:16

**justified** - 24:24; 63:10, 12

**justifies** - 45:7

**justify** - 106:3

**Kagan** - 127:6

**Kavanaugh** - 63:24

**keeping** - 53:4

**Kenosha** - 7:16, 20

**kept** - 31:12; 120:21

**Kevin** - 6:9; 75:24

**King** - 105:3; 126:11

**Knauer** - 6:9

**knowledge** - 44:25; 50:12; 104:6

**known** - 67:4;

91:22; 95:13; 96:24; 98:12

**knows** - 13:1

**KOONS** - 75:24; 76:4, 7

**Koons** - 6:9; 20:21; 60:23; 75:8, 24

**Koons'** - 75:10

**Koons's** - 75:19

**laboring** - 16:13

**Laches** - 99:4

**laches** - 93:20; 94:16; 96:8, 13; 98:8; 99:3; 132:7

**lack** - 10:4; 29:21; 33:13; 59:10; 108:2

**lacked** - 103:17

**lacking** - 92:20

**lacks** - 103:20

**Laffey** - 8:10; 117:14

**LaFollette** - 6:18

**laid** - 46:18; 81:25

**language** - 50:10; 127:7

**largest** - 27:16; 107:23

**last-minute** - 34:22; 57:11; 73:19; 83:3; 132:25

**lasting** - 41:1

**lastly** - 114:1

**latches** - 77:23; 78:20; 79:11

**late** - 26:1; 28:9; 76:17, 19, 25; 78:14, 24; 79:10, 14; 97:21; 130:4

**late-breaking** - 130:4

**latest** - 9:19; 12:12; 90:13; 95:14; 96:24; 118:14

**law** - 18:2; 20:2, 13; 21:17, 20; 22:1; 23:8, 15, 25; 24:3, 16, 19, 25; 25:7; 26:11, 19, 22; 35:7; 36:22; 37:25; 38:9; 39:16, 18; 40:3; 41:5, 11; 53:10; 57:14; 59:6; 62:10, 12, 23; 63:9, 14; 64:20, 23; 65:18, 21-22; 66:17; 67:15, 20; 71:6; 72:25; 73:16; 74:4, 8, 13-16, 19; 76:14; 79:25; 80:5, 12; 81:7, 13, 19, 21, 23; 82:2, 8; 83:18, 20; 95:7; 96:21; 97:6; 98:3; 99:16; 100:15, 18; 101:6, 11, 21; 103:3, 5-6; 104:14,

18; 105:9, 22; 107:21; 108:3, 6, 13; 109:4; 110:7, 15; 112:11; 113:19, 25; 120:3; 122:7, 13, 22; 123:5, 8-9, 20; 124:15; 125:6, 10, 17, 23; 126:2, 20; 127:5; 132:6

**Law** - 8:14; 63:17; 97:5, 13; 117:14; 133:14

**lawful** - 58:1; 69:7; 112:5, 8

**Laws** - 107:18

**laws** - 24:3; 26:13; 32:7; 53:9; 73:6, 8; 74:2; 94:2; 95:1; 100:10; 119:7

**lawsuit** - 57:6; 71:20; 76:25; 77:25; 78:6; 96:4, 25; 105:16

**lawsuits** - 118:14

**lawyer** - 119:22

**Lawyer's** - 8:13

**lawyers** - 10:25; 16:2; 19:8; 20:23; 101:3

**Lawyers'** - 117:13; 118:1

**laying** - 76:25

**lead** - 11:4; 91:5; 130:1

**leading** - 78:15; 87:6, 8

**leads** - 74:13; 100:7

**learn** - 44:11

**learned** - 48:9

**leave** - 87:17; 114:19

**leaves** - 18:5

**legal** - 18:25; 19:14; 24:15, 17; 34:14; 48:2; 60:5; 64:17; 65:19; 66:7; 94:13; 95:8; 112:10

**legality** - 100:2

**legion** - 102:20

**legislative** - 24:15; 27:13; 61:9; 62:8; 63:9; 79:20; 80:22; 97:8; 103:7; 122:19, 23; 124:3; 125:13; 128:3, 23; 129:2, 5

**legislators** - 122:11

**Legislature** - 21:21; 22:6, 24; 35:18; 43:7; 59:13; 73:11; 91:8; 94:4, 8; 97:7, 12; 102:10, 13-14; 103:8, 10, 13, 18; 112:5, 7, 16; 128:9; 130:21; 131:23; 133:8

legislature - 23:4; 24:4, 19; 26:13, 15; 35:11; 37:1; 49:22; 50:1, 24; 51:18; 53:13, 17-18; 56:4; 57:10; 58:21; 59:8, 24-25; 60:7, 21; 61:20; 62:25; 67:9, 11; 71:2; 73:6; 80:15; 123:25; 124:12; 127:3, 15, 17-19; 128:7, 12

legislature's - 45:23; 67:17; 70:15; 128:7

legislatures - 56:10; 61:1; 64:1; 70:10; 73:18; 80:8; 127:10

Legislatures - 120:18

legitimacy - 71:14

legitimately - 66:12

Leitner - 8:10; 117:14

length - 11:18

lengthy - 10:1, 20; 106:14

less - 24:1; 25:16; 34:25; 53:1; 73:19; 76:4; 77:25; 87:9; 94:13; 125:23

lesson - 74:11

level - 34:25; 35:10; 54:3; 56:5; 108:13; 125:6; 129:24

liberty - 74:10, 13

library - 28:20; 133:6

Life - 27:18; 100:1, 21

life - 54:1

light - 131:5

likely - 41:1; 49:23; 57:23; 59:1; 92:10; 102:22

likewise - 36:13; 58:16, 24; 72:13

limine - 9:4

limit - 20:7; 122:2

limited - 25:3; 111:14

limiting - 34:12

limits - 56:1

line - 9:24; 10:16-18, 20; 12:11; 13:6; 25:21; 35:6; 56:2; 90:21; 109:1

link - 27:6

list - 28:11, 19; 33:1; 116:18, 25

listen - 18:15

lists - 29:24

litigants - 54:16;

102:24

litigated - 97:18; 100:2; 130:13

litigating - 100:24; 119:25; 123:18, 22

litigation - 96:11; 101:13

litigators - 10:25

live - 104:24; 115:4; 116:3; 118:24

lived - 41:13; 116:11

lives - 115:10

local - 35:8; 37:22; 55:7, 25; 91:18

localities - 113:22

located - 34:1, 20; 35:24; 69:12; 111:25; 114:24

location - 30:22; 32:17; 33:12; 35:25; 41:13; 112:1, 15

locations - 29:13; 30:21

log - 31:6, 8, 11

logic - 66:17; 86:12

logical - 64:17; 66:2; 67:3

logs - 31:4

long-standing - 97:6

long-term - 41:7

longstanding - 73:20; 107:25

loser - 65:8

loses - 70:24

losing - 60:8

loss - 93:3

lost - 20:8, 12; 75:12; 91:2; 94:24; 100:3

loud - 48:14

love - 90:1

Loving - 74:12; 92:3; 119:2

loving - 119:7

lowered - 25:14

Ludwig - 11:11; 74:1

Luft - 63:6

lunch - 121:19

Madison - 7:22, 24; 8:1, 5; 26:17; 27:5; 33:19; 34:13, 18-19; 35:4; 55:18; 68:5, 18; 111:14; 130:3; 132:25

magnitude - 133:4

mailed - 36:24; 37:2; 44:11; 112:12

main - 14:23

major - 82:2

majority - 92:12;

105:12; 110:23

mandatory - 21:13; 22:5; 28:17; 33:10; 37:1, 7, 14; 42:23; 43:2; 52:2; 53:14, 24; 82:11

MANDELL - 17:18; 19:23; 85:23; 87:7; 91:7; 123:4; 124:17; 125:20

Mandell - 7:7; 11:3, 9-10; 17:16, 18; 19:22; 85:23; 87:7, 25; 91:5; 108:5, 9; 109:7; 110:16; 114:4, 7; 121:17; 122:3; 124:8; 127:1; 128:20

mane - 127:20

manipulated - 10:17

manned - 35:16

manner - 11:23; 30:12; 40:25; 48:14; 56:17; 58:2; 59:8, 12; 61:2, 20; 71:8; 80:8; 113:14; 124:1, 11; 127:2, 15, 23; 128:1, 9-10, 13, 15-16; 129:10; 133:7

Marbury - 26:17; 27:5

March - 40:13; 96:24; 97:22, 24; 98:2

Margaret - 6:25

Maribeth - 33:20

mark - 46:24

marked - 24:7

marking - 47:11

Marshall - 26:17; 62:23

Maryland - 84:20

massive - 130:4

massively - 130:7

material - 14:10, 13; 18:9; 67:20; 72:21

materiality - 69:10, 20

materials - 23:10; 31:12

matter - 29:5; 53:23; 65:18; 66:17; 76:20; 81:7; 87:14

matters - 9:2; 10:13; 91:11; 107:3

maximize - 22:2; 55:8

MAY - 7:24

Mayor - 7:13

mayors - 27:16

mayors' - 27:20, 25

McClain - 7:12

McMaster - 61:5

meaning - 82:7;

100:10

meaningless - 24:23

means - 30:19; 55:14; 65:12; 76:3; 110:5; 128:1

meant - 24:20; 94:9; 123:10

measure - 92:17

medals - 54:4

media - 13:17; 69:14

meet - 39:1; 70:5; 110:10; 111:4

meeting - 52:9; 54:21; 77:18

meetings - 108:23

members - 48:15; 61:11; 102:15; 127:9, 19

memo - 62:7

mene - 127:20

mention - 117:20

mentioned - 12:18; 21:22; 50:25; 68:20; 98:17, 21; 101:17; 105:21; 106:14; 108:9; 118:8

mere - 78:6

merely - 21:18; 65:21; 66:18; 78:19; 80:5; 81:7

merit - 108:2; 120:5

merits - 8:24; 72:1; 105:17, 23; 106:23; 108:12; 109:20

messaging - 85:19

method - 23:13; 70:17

methodology - 127:18

methods - 21:20; 23:24; 37:4; 56:2

Michael - 7:25

Michigan - 105:3; 126:11

mid - 82:13

Middle - 62:2

middle - 130:3

midst - 19:9; 91:18

midstream - 79:21

might - 83:1; 94:9; 103:23; 126:5

million - 23:10; 27:19, 21; 64:15; 69:18; 91:25; 92:5; 95:4; 104:3; 106:18; 117:22; 119:12; 121:5

Milwaukee - 6:20, 23-25; 7:9, 13; 8:10; 23:23; 41:24; 42:2; 45:5; 46:10; 50:19; 55:18; 67:23; 68:3,

17, 21; 85:10; 109:10; 111:14; 118:9, 20, 22

minimal - 15:17; 72:11

minimum - 29:11; 68:2; 131:14

Minnesota - 26:3; 58:18; 133:14

minor - 66:12

minor's - 66:11

minute - 23:8; 30:19; 34:22; 48:3; 57:11; 73:19; 83:3, 19; 95:3; 132:25

minutes - 13:2; 14:7; 21:2, 4; 48:17; 76:4; 85:21; 86:16; 87:9; 121:16, 18

misapplied - 104:14

mischaracterizes - 112:25

misconception - 115:12

misimpression - 116:7

misplaced - 78:7

miss - 27:7

missing - 42:9, 13, 23; 44:16, 22; 45:2, 4, 14; 46:2; 116:18, 23

mission - 108:15

mistake - 115:2

mistaken - 78:7

mistakes - 99:20; 114:19

mixed - 28:21; 30:20

mo - 127:20

modifications - 63:10

modified - 62:7

moment - 83:24; 96:7; 101:4

Monday - 105:3

monetary - 85:1

monitor - 32:19; 78:11

Montana - 61:18; 80:25; 83:23

Montana's - 61:20

month - 34:15; 54:20; 58:7; 62:14; 63:22; 77:25

months - 28:2; 54:17; 111:19; 130:1

moot - 76:20; 77:21; 104:24

mooted - 90:22

mootness - 76:19; 79:10

moreover - 88:11; 108:21

**morning** - 6:15, 19, 22; 7:2, 7-8, 15, 19, 21; 8:2, 4, 7, 9, 17-18, 23; 9:16, 20; 11:11; 12:23; 16:1; 92:10; 133:23

**Morrissey** - 7:6

**Moss** - 8:16; 117:16

**motion** - 9:4; 11:20; 14:21; 19:16; 79:3; 93:14; 105:25; 117:18; 121:7

**motion-to-dismiss** - 19:16

**motions** - 9:3; 18:20; 76:2; 85:6; 89:13; 107:2

**motivated** - 71:12

**motivations** - 25:25

**moving** - 78:22

**multiple** - 66:2

**multiples** - 69:22

**multiuse** - 28:24; 29:4, 13, 16; 30:14; 31:19

**municipal** - 21:11, 16; 36:7, 16, 25; 37:15; 47:5; 51:5; 52:1, 9; 112:1, 13

**municipalities** - 30:9, 16; 52:8; 55:24; 113:20

**municipality** - 30:22; 35:20; 36:14; 115:25; 117:4

**myth** - 64:13

**NAACP** - 8:8, 11, 15; 117:12, 15; 118:1, 15

**name** - 48:24; 52:4, 20

**narrow** - 24:20; 54:16

**nation** - 54:14, 19; 55:6, 19

**Nation's** - 92:11

**National** - 8:6; 63:7; 64:12; 73:11; 82:18

**national** - 21:10; 54:12

**nationwide** - 54:24

**near** - 34:1

**nearly** - 100:11; 101:12; 108:8

**necessarily** - 55:2; 124:25

**necessary** - 32:8; 67:6; 75:6

**necessity** - 72:25

**needed** - 51:15; 82:20; 93:19; 116:14

**neutral** - 24:13

**new** - 21:20, 22;

23:13; 33:14; 35:9; 56:2; 73:8; 95:16; 111:11; 114:5; 129:16; 130:25

**new-fangled** - 95:16

**newly** - 34:5; 101:19

**newly-found** - 34:5

**night** - 11:16; 76:9; 78:24; 79:4; 84:4, 7; 102:4

**Nissan** - 81:15

**nobody** - 85:18; 133:3, 20

**Nobody** - 133:3

**nominal** - 72:5

**non** - 66:5; 67:25; 79:20

**non-in-person** - 67:25

**non-legislative** - 79:20

**noncompliance** - 40:3

**none** - 22:3; 31:1; 126:9

**nonhuman** - 36:10

**nonpartisan** - 24:14

**noon** - 76:10

**North** - 81:15

**North Carolina** - 62:2, 5, 8; 80:25; 81:2; 83:23

**not-for-profit** - 27:18

**notably** - 106:13

**notaries** - 49:17

**notary** - 49:19

**note** - 11:14; 16:19; 63:11; 88:11; 96:16; 103:9; 111:3; 115:3

**noted** - 109:7

**notes** - 106:21

**nothing** - 30:18; 50:3; 82:23; 96:16; 109:2; 112:14

**notices** - 45:10

**notify** - 38:11

**notwithstanding** - 91:16; 93:10

**November** - 28:10; 77:12; 78:1, 4-5; 84:14; 92:14; 95:17, 20; 98:19; 101:14

**nowhere** - 28:4

**numbers** - 15:5; 109:14; 131:15

**oar** - 16:13

**oath** - 73:13

**objection** - 88:1; 89:19, 22

**objections** - 17:25;

68:25; 88:4, 6

**observed** - 72:3

**obviate** - 13:3; 16:16; 100:18

**obvious** - 33:12; 66:2, 9

**obviously** - 16:8; 19:13; 20:8; 30:13; 35:25; 36:10; 43:1; 58:23; 87:11; 88:22; 92:20; 115:4, 10; 122:14; 123:25; 126:15

**occur** - 57:16; 78:5; 125:15

**occurred** - 59:22; 84:13; 102:3; 125:15

**occurring** - 44:8

**occurs** - 49:11

**October** - 26:1; 44:21; 62:1; 73:10; 78:14; 98:12, 16, 18; 130:4; 132:15, 19; 133:1

**offensive** - 119:8

**offer** - 19:25; 98:22

**offered** - 96:5; 98:24; 106:17; 111:3

**office** - 34:1, 12; 36:17; 37:15; 42:1, 7; 43:16; 46:8; 47:8; 51:22; 52:1; 53:5; 69:3; 111:23; 112:1, 15, 18, 22; 113:3

**offices** - 30:21; 43:21; 45:3, 21

**officials** - 24:13; 29:14, 25; 33:2; 35:8; 37:23; 40:5, 17; 48:6; 54:13; 55:7, 25; 63:1; 64:3; 79:20; 81:6; 82:12; 83:12; 91:18; 101:21; 103:24; 104:14, 19; 124:15

**Okeson** - 63:6

**Olympic** - 54:4

**one's** - 66:7

**ones** - 73:14; 131:3

**open** - 31:5; 48:16; 49:4; 93:23

**opened** - 31:11; 52:6; 68:9; 92:25

**opening** - 33:18

**operate** - 36:16

**operations** - 108:24

**opinion** - 77:3; 80:21; 102:7; 111:16; 122:13

**opinions** - 84:7

**opportunity** - 60:7; 65:16; 66:16; 88:23; 94:21; 96:5; 130:15

**oppose** - 89:10

**opposed** - 10:25; 19:16; 120:7

**option** - 39:13; 43:13; 51:2, 8; 129:15

**options** - 48:18, 23; 52:14

**oral** - 15:16

**oranges** - 125:2

**Order** - 6:2

**order** - 10:21; 30:2; 67:16; 75:3; 84:19, 21, 25; 87:14; 89:14; 93:3; 97:24; 113:20; 125:16; 128:25

**organized** - 71:19; 72:3; 121:18, 20

**original** - 56:25; 57:4; 76:24; 82:24; 97:22

**originally** - 16:25; 83:5

**Oshkosh** - 28:25; 29:4

**otherwise** - 9:14; 10:12; 45:15; 47:6; 89:22; 91:13; 106:12

**ought** - 15:8; 76:14

**ourselves** - 15:9

**out-of-state** - 27:18

**outcome** - 77:16; 124:19

**outcomes** - 73:22

**outdoors** - 111:25

**outset** - 105:25; 107:6, 17

**outside** - 23:2; 31:5; 33:23; 46:25; 50:11; 114:23; 128:7

**outsized** - 55:18

**over-arching** - 125:19

**override** - 53:16

**overriding** - 72:24

**oversee** - 73:17

**overseen** - 108:20

**oversight** - 25:19

**overturn** - 92:7

**Owczarski** - 7:14

**own** - 8:12; 50:13; 73:17; 102:15

**p.m** - 33:4, 9, 12; 79:4; 86:21; 87:2; 134:2

**pace** - 28:8

**Palm** - 63:4; 80:10, 13; 81:4

**pandemic** - 26:7, 13; 40:16; 62:17; 63:10, 14-15; 91:18

**paper** - 122:2

**papers** - 106:20; 118:5

**paradoxically** - 55:5

**paragraphs** - 68:16; 93:18; 95:11; 96:22; 98:11

**parallel** - 81:18; 99:14; 100:23; 101:6

**parallelism** - 101:1

**parameters** - 14:15

**Park** - 34:9, 21; 35:2, 15; 68:6, 8

**parking** - 29:2

**Parte** - 83:11, 16; 84:2, 15; 101:23

**participants** - 65:1

**participate** - 66:16

**particular** - 35:25; 55:24; 86:5; 96:13; 102:17, 20; 112:15; 113:21; 114:11; 118:22

**particularity** - 88:2

**particularly** - 11:7; 41:22; 79:22; 96:12; 97:2, 23; 126:6

**parties** - 10:10, 12; 12:3, 8; 14:14; 15:11; 16:5, 19; 18:17; 19:1; 46:25; 55:14; 82:17; 83:2, 12; 88:8; 89:6; 91:19; 95:12; 96:12, 22; 99:4; 100:24; 101:3; 117:17; 130:14, 18; 133:10

**partisan** - 34:2, 25; 35:13; 109:2, 7; 111:11; 114:11

**partner** - 7:6

**partnered** - 118:1

**party** - 64:12; 75:5; 91:19; 97:19; 102:16

**party's** - 84:16

**pass** - 17:15

**passed** - 24:3; 32:20; 123:25

**past** - 13:13; 68:13; 84:24

**patently** - 119:8

**path** - 93:2

**patience** - 72:23

**Patrick** - 7:12

**payment** - 28:21; 30:4; 84:20

**payments** - 28:22; 30:5

**pen** - 122:2

**penalties** - 47:24; 115:24

**penalty** - 24:6; 85:1

**pencil** - 122:2

**pending** - 85:6; 100:13

**Pennhurst** - 83:16; 101:22; 122:5, 16

147

**Pennsylvania** - 103:16; 105:8; 118:6

**Pennsylvania's** - 105:13

**Pepper** - 84:7

**Pepper's** - 11:16; 102:3

perceived - 82:22

percent - 68:1; 69:13; 109:18

peremptory - 71:6, 13

perfectly - 95:8

perjury - 24:6

**Perkins** - 8:5; 22:19

permanent - 74:21

permissible - 93:12

permit - 49:24; 73:9

permits - 51:9

permitted - 37:5; 46:12; 49:17; 68:24

person - 12:4, 6; 31:8; 33:22; 36:24; 37:2, 15; 46:19; 49:9; 67:25; 68:8; 112:12; 113:2; 114:25; 129:13

personal - 44:24; 58:15

personally - 47:7

perspective - 12:7; 26:7; 62:17; 90:19

pertains - 26:10; 62:20

pervasive - 129:7

petition - 56:25; 92:20; 106:25

petitioners - 92:21

petitioning - 57:3

petitions - 107:4

**Philadelphia** - 118:8

photo - 22:1; 24:19; 25:5, 7; 28:23; 37:25; 38:1, 15; 39:24; 40:21, 25; 41:4, 7; 110:5, 20, 24

physical - 38:6, 21-22; 109:24

pick - 127:10, 19

picture - 28:24; 47:16

piece - 19:25; 32:9; 117:3, 6; 125:11; 132:1

piecemeal - 101:12

pieces - 43:9

piggyback - 128:19

pinpoint - 61:6

**Piphus** - 71:22; 72:17

**Pittsburgh** - 118:9

placed - 29:10;

---

52:24

places - 118:20

placing - 78:10

plain - 50:10; 73:4; 112:14

plainly - 60:4; 75:4

plaintiff - 6:6; 12:18; 15:3; 19:2, 4, 6; 20:23; 27:15; 57:21; 58:9; 86:18; 90:8; 91:7, 20; 92:7; 93:23; 96:25; 98:14; 99:13; 100:5, 12; 101:15, 20; 102:5, 21; 104:8; 105:21, 24; 106:14, 17; 110:4; 112:23; 115:13; 119:9, 14, 18-19; 123:17; 129:3; 131:19, 24; 132:8

plaintiff's - 8:25; 9:3, 5; 14:9; 16:2; 21:15; 28:13; 87:18; 93:20; 94:5, 10, 17; 95:6, 23; 96:16; 97:21; 98:21; 99:8, 15; 101:19; 103:1; 104:23; 106:7, 10; 107:24; 108:1, 14; 110:18; 111:13; 113:11; 118:25; 121:7; 122:7

**Plaintiff's** - 29:18; 87:20

planned - 35:3; 121:10

planning - 87:11

plans - 108:24

play - 22:14; 130:3

players - 55:23

playing - 34:24; 35:10; 54:2; 56:5; 57:10

plenary - 127:12

pointed - 28:15; 79:19; 93:13; 101:15; 110:16; 114:4

pointing - 129:3

points - 60:23; 78:25; 79:2, 6

policies - 73:5

policy - 22:24; 26:7; 42:18; 62:17; 97:13, 15; 98:17

political - 20:7; 58:13

politicization - 34:23

politics - 55:24

poll - 43:23

polling - 23:3; 48:24; 52:7

polls - 32:17; 33:7,

---

9; 52:7

popular - 127:21; 128:15

population - 106:13; 110:10; 118:23

populations - 39:1

populous - 25:14

portion - 75:19

position - 86:17; 100:3; 114:17

positions - 18:18; 19:15; 75:23; 108:2; 133:11

possible - 44:23; 77:8; 95:14; 132:21

possibly - 43:8; 69:17

posted - 32:10, 25; 33:1; 44:11; 109:1

posts - 97:20

potential - 23:6; 50:8; 54:18

potentially - 31:18; 34:25; 115:4; 116:9; 130:13

**Powell** - 71:24

power - 59:21, 25; 61:2; 70:24; 73:17; 79:23; 92:22; 93:4; 127:12

**PowerPoint** - 22:8; 36:2

powers - 26:23

practicable - 34:1

practice - 68:21; 73:4; 95:21; 98:15; 114:5

prayer - 84:23

precedence - 74:11

precedent - 93:17; 94:13; 96:10

preceding - 52:13

precise - 108:10

precisely - 32:17; 54:7; 111:15

predict - 133:3

preelection - 95:24

prefer - 12:13

preferred - 55:8; 105:11

prefers - 11:23

prehearing - 9:6

prejudice - 17:22

preliminary - 9:1

preparations - 27:21

prepared - 9:15; 13:13, 24; 106:19

prescribed - 49:21, 25; 59:6

present - 18:17;

---

75:23; 81:18

presentation - 13:3; 78:13; 86:10; 96:17; 106:7, 15; 111:17; 121:20

presentations - 121:10

presented - 31:15; 106:16; 110:20

presently - 38:7

presents - 61:11; 62:12; 80:23

preservative - 120:20

preserving - 62:24

**President** - 6:11; 21:8; 35:5; 57:25; 60:4, 10; 61:15; 64:7; 72:16, 19; 74:15, 18; 77:24; 81:2; 93:6; 94:19, 24; 95:15, 21, 23; 99:1, 13, 21; 101:14; 102:9; 103:20, 25; 104:25; 106:4; 118:7; 120:2; 127:25; 128:1

president - 30:3; 53:10; 54:3, 6, 12; 55:1; 56:14; 60:3, 6; 66:18; 67:2, 13; 70:1; 78:5, 7; 85:7

**President's** - 31:15; 100:3; 102:8, 15; 103:21

**Presidential** - 92:25; 98:13; 108:16; 109:17; 114:9; 124:2; 127:16, 24; 128:17

presidential - 23:11; 25:11; 26:8, 10; 40:24; 54:10, 15; 55:20, 23-24; 56:10; 58:21, 23; 61:10; 62:9, 18, 20; 64:21; 65:18; 68:14; 69:22; 74:20, 23, 25; 78:9; 80:9, 13, 23; 83:22

press - 13:20; 15:7

pretrial - 8:24; 9:6; 11:19; 82:19; 95:24

pretty - 10:20; 14:8; 103:11; 132:6

prevail - 26:22

prevent - 23:5; 24:20; 50:3; 60:8; 64:8; 79:15; 99:4

prevented - 40:17

preventing - 25:23

previous - 40:24

primarily - 19:6; 27:19; 76:1; 79:25; 80:4; 126:25

primary - 64:3

---

principally - 63:20

principle - 46:21; 72:24; 96:8; 97:6

principles - 26:24; 120:16

private - 83:10, 12

privilege - 23:1, 4

proactive - 118:16

probability - 100:17

probe - 116:20

problem - 50:14; 66:23; 95:21; 104:9; 120:3

problematic - 94:5

problems - 52:16; 73:20; 131:17

procedural - 71:25; 72:3, 5

**Procedure** - 17:23; 105:20

procedure - 35:19; 47:3

procedures - 32:22; 37:9, 11; 38:13; 43:3; 48:15; 95:7; 107:25; 130:25

proceed - 9:1; 11:22; 13:13, 24; 19:20; 21:5; 100:6

proceeding - 18:23; 20:10; 42:4; 81:18, 21-22; 82:1; 95:2; 101:7; 131:4; 134:2

produce - 71:5, 16

productive - 14:20

professor - 133:16

profit - 27:18

profound - 55:22

profoundly - 93:6; 106:3

programs - 10:23

prohibit - 39:15

prohibited - 35:17; 54:5; 101:22

prohibits - 30:18; 113:8

prompt - 55:19

promptly - 20:15; 85:13; 133:18, 22

pronouncement - 124:4

proof - 39:13, 22; 67:6, 10; 71:20; 72:6, 18-19; 94:12

proper - 26:25

properly - 49:3

proportion - 109:17

propose - 18:15; 19:2; 85:10; 121:14

prosecuting - 54:21

prosecutor - 71:7

prospective -

83:14; 93:11; 95:25; 101:24

**protect** - 53:12; 70:10; 101:16; 118:2

**protected** - 56:21; 120:21

**protecting** - 52:22; 57:12

**protection** - 97:11; 103:21; 104:8

**Protection** - 103:22; 104:15

**protects** - 103:23

**protest** - 74:6

**prove** - 67:14-16; 69:20; 70:1

**proved** - 67:2

**provides** - 36:14; 40:22; 41:2; 42:11; 47:12; 59:4; 64:1; 79:8; 99:12; 101:11; 124:1; 127:1

**providing** - 14:2; 36:22; 37:6; 46:4, 15; 67:4; 110:22

**province** - 26:8, 12, 18; 58:21; 60:21; 62:18

**provision** - 33:10; 36:3; 37:8; 38:9, 16; 42:22; 46:12; 48:17; 49:6; 51:20; 112:11, 23, 25; 113:1; 125:5

**provisions** - 22:13; 34:11; 37:10, 12; 40:21, 25; 46:14; 48:12; 53:8, 24; 58:10; 67:19; 91:17; 130:20

**prudential** - 102:25; 103:18

**Pryor** - 105:6

**publicly** - 96:24; 98:12

**pull** - 56:3

**Pullman** - 82:6, 14; 100:9, 20

**purchase** - 23:10

**purpose** - 24:9; 59:5; 99:17, 19; 116:5

**purposes** - 15:8; 36:17; 104:20

**pursuant** - 17:23; 26:14; 59:11

**pursuing** - 99:14

**pushed** - 23:23, 25

**puts** - 46:23; 53:18

**puzzle** - 126:14

**qualify** - 97:10; 111:9

**quash** - 9:3; 14:21; 15:15

**questioning** - 12:24

**queue** - 22:9

**quickly** - 20:4; 51:4

**quintessentially** - 61:23

**quite** - 96:11; 102:4; 112:6; 123:10; 131:9

**quote** - 32:18; 33:5; 36:6; 47:24; 60:24; 61:8; 63:18; 70:2; 80:14; 84:15, 17, 22

**quoted** - 13:17; 120:19

**quoting** - 27:5; 80:13

**racially** - 71:7, 12

**racially-motivated** - 71:12

**Racine** - 7:17, 20

**radically** - 124:23

**radio** - 35:1

**Raffensperger** - 58:8

**raise** - 68:24; 87:14; 109:5; 114:2; 131:19

**raised** - 14:12; 21:24; 46:5; 57:6; 69:10; 76:1, 8, 18; 77:22; 79:2; 80:2; 81:11; 82:5, 16-17; 83:2; 88:1; 99:24; 101:6; 104:9; 106:8; 120:4; 132:10

**raising** - 55:7; 99:22; 131:17

**ramifications** - 40:2; 41:7; 55:21

**ran** - 23:17; 86:7; 106:8

**rather** - 24:16; 38:17, 20; 49:19; 65:23; 66:22; 97:5

**re** - 26:9

**re-write** - 26:9

**reach** - 10:22; 15:7; 105:23

**reached** - 16:5, 14

**reaching** - 12:4, 17

**ready** - 129:17

**real** - 75:20; 79:15; 94:12

**realistic** - 56:8

**realize** - 17:2; 85:17

**realizing** - 94:4

**realm** - 10:24

**reason** - 14:23; 17:12; 49:13, 17, 21; 50:21, 23; 65:23; 66:25; 79:15; 82:13; 118:15

**reasonable** - 40:18; 95:8; 100:17

**reasons** - 56:6; 76:11; 85:5; 95:9;

99:7; 126:19

**receipt** - 26:4; 51:1; 87:23; 111:20

**receives** - 51:5; 52:18

**recent** - 25:17, 21; 62:6; 96:8; 132:15

**recently** - 73:10; 105:9; 128:5

**recess** - 86:19; 121:22

**Recess** - 15:25; 86:21

**recipe** - 50:8

**reciprocal** - 68:14

**recites** - 68:6

**reckless** - 65:22

**recognize** - 62:22

**recognized** - 77:2; 84:2, 10; 92:9; 103:17; 120:19

**recognizes** - 83:8, 12

**recognizing** - 81:5

**recommend** - 31:10

**recommendation** - 32:9, 19

**recommended** - 32:4, 15

**recommit** - 105:11

**recording** - 31:10; 48:13

**records** - 74:7; 131:7

**recount** - 79:8, 16; 99:16, 20-21, 25; 100:15; 101:5, 14; 118:18; 124:21; 130:25; 131:3, 10

**recounting** - 79:17

**recounts** - 79:22; 99:17, 23; 107:22

**recused** - 98:1

**red** - 9:24; 10:16-18; 12:11; 13:6; 46:7; 66:4; 69:3, 6

**redress** - 55:3; 64:8; 102:8; 120:24

**redressed** - 57:23; 59:1

**refer** - 105:2

**reference** - 49:22; 100:3; 112:21

**referenced** - 10:11; 88:25; 89:12, 14, 16; 111:17; 119:1

**referencing** - 33:5

**referred** - 33:20; 66:4

**refers** - 122:11

**reflect** - 88:21

**reflected** - 28:11;

68:15; 69:13; 127:16

**reflects** - 28:20; 32:24; 40:12; 97:8

**reformulated** - 93:24; 102:9

**refusals** - 57:11

**refused** - 46:9

**regard** - 10:21

**regarding** - 13:5, 17; 22:6; 28:3; 29:9; 45:8; 77:23; 82:16; 84:20; 106:6

**register** - 38:2

**registered** - 109:15

**Registration** - 115:11

**registration** - 44:25

**regrettable** - 65:5

**regrettably** - 65:13

**regularly** - 58:6

**regulate** - 55:7

**regulated** - 23:5

**Rehnquist** - 61:8; 80:20; 122:12, 18; 125:12; 128:25

**Rehnquist's** - 123:7; 128:21

**reiterate** - 108:4

**reiterated** - 11:16

**reject** - 93:7

**rejected** - 49:13

**relate** - 126:24

**relating** - 55:3

**relation** - 35:14

**relatively** - 75:22

**relevance** - 89:21, 24

**relevant** - 90:4; 101:9

**reliable** - 23:18; 24:10; 25:16; 44:24; 71:16; 115:9

**reliance** - 89:11; 91:25

**relied** - 71:5, 15

**relief** - 8:25; 19:5; 20:9; 60:4, 11; 74:22; 82:22; 83:13; 84:12, 23; 85:4, 6; 92:10, 21; 93:11, 21, 24; 95:4, 25; 98:8; 99:8; 101:19, 24-25; 102:16; 104:24; 105:1; 106:4; 121:8; 122:9; 125:15

**rely** - 90:3; 112:11, 23; 116:22; 123:11

**remained** - 109:18

**remaining** - 15:14; 80:2

**remand** - 59:16; 94:2

**remarkable** - 20:10

**remarks** - 107:6

**remediable** - 69:25

**remedied** - 103:5

**remedies** - 80:6

**remedy** - 41:16; 59:3; 60:2; 79:9; 99:13; 100:5; 102:9; 126:8; 130:20; 131:2

**reminded** - 73:10

**reminding** - 106:12

**remotely** - 106:17

**remove** - 38:11

**render** - 60:6; 121:1

**rendered** - 24:22

**rendering** - 67:12

**renew** - 11:20

**repeatedly** - 63:12; 73:3; 74:9; 111:17

**replied** - 76:9; 79:2

**reply** - 59:19; 70:13; 76:22; 78:23; 80:7; 83:3; 93:16

**reported** - 10:6

**represent** - 54:13; 117:15

**representation** - 13:5

**representatives** - 127:4

**representing** - 117:12

**republic** - 92:19

**Republic** - 55:21; 74:4

**Republican** - 97:19

**Republicans** - 108:18, 20

**request** - 8:25; 18:1; 27:23; 29:7; 38:1; 39:11, 21-22; 40:9, 19; 46:17; 60:11; 75:3; 89:13; 101:20; 102:9; 104:24; 105:10; 113:3; 122:8

**requested** - 20:9; 27:20; 60:10; 82:23; 84:12; 85:4, 7; 93:21, 24; 102:10; 104:23; 113:5

**requesting** - 59:11

**requests** - 12:19; 28:13; 68:12

**require** - 39:13, 22; 66:19

**required** - 31:1; 32:23; 33:9; 36:11; 44:15; 45:11; 52:25; 57:16; 67:13; 71:3; 72:11

**requirement** - 38:15; 39:18, 24; 41:7; 58:14; 69:20;

110:6; 116:13

**requirements** - 22:4; 23:21; 29:11; 32:7; 37:25; 53:10; 63:9; 104:15; 110:25

**requires** - 26:11; 33:24; 38:1; 41:12; 74:19

**reread** - 10:3

**rerun** - 70:17

**research** - 54:20

**reserve** - 86:3; 106:24

**residence** - 47:6; 115:17

**resident** - 115:25

**residents** - 30:4

**resolution** - 9:8, 11; 65:25; 131:15

**resolve** - 10:7; 12:9; 18:13; 20:14; 44:22; 125:10

**resolved** - 20:4, 15; 77:20

**resolving** - 64:19; 82:9

**respect** - 26:11; 57:14; 68:5; 74:14; 95:11; 132:4, 20, 24

**respectfully** - 13:15; 75:3

**respective** - 81:7

**respects** - 64:18; 113:7

**respond** - 78:25; 79:5; 86:17; 130:23

**responded** - 79:6; 93:15

**response** - 8:21; 9:19; 12:24; 29:7, 25; 41:20; 63:13; 132:7

**responses** - 28:13

**responsibilities** - 62:22

**responsibility** - 59:16; 64:3

**rest** - 18:5; 106:20

**restating** - 17:25

**restore** - 74:3

**restrain** - 83:18

**restraining** - 89:14

**restricting** - 40:18

**restrictions** - 54:11

**restricts** - 112:14

**result** - 33:18; 43:5; 46:20; 55:5; 71:5, 17; 92:7, 9; 94:22; 127:8

**resulting** - 67:14; 93:3

**results** - 37:12; 54:6; 60:5; 70:21; 93:1; 105:7, 10; 107:20; 117:25; 124:7

**resume** - 86:16

**retain** - 52:15

**retrieved** - 30:11

**retrospective** - 84:12; 85:3; 93:10; 101:25

**return** - 30:9; 31:7; 45:9, 11-12, 19; 51:3, 7, 10; 52:15; 74:8; 113:6

**returned** - 33:4; 53:22; 68:1, 3

**returning** - 41:18; 111:21

**reverse** - 9:24; 10:18

**reversed** - 58:19

**reversion** - 94:3

**revert** - 59:17

**reverts** - 59:12, 25

**reviewing** - 69:1

**rewrite** - 23:12; 62:11, 19

**rewriting** - 24:2

**Reynolds** - 6:23

**rhetoric** - 66:25

**ride** - 123:11

**Rights** - 8:14; 117:14

**rights** - 57:14; 64:7; 71:18, 20; 72:8, 13; 77:24; 78:7; 101:16; 102:24; 103:23; 104:3; 118:2; 119:22; 120:20; 121:4

**rile** - 66:22

**risk** - 38:24; 39:1, 5; 73:20; 101:15; 110:10

**River** - 81:24; 82:3; 100:22; 101:8

**robust** - 25:18

**rogue** - 25:24; 65:14; 108:15

**role** - 43:18; 48:10

**room** - 6:9; 8:1; 12:5; 52:6; 87:18

**Rosenbaum** - 7:6

**ROTH** - 107:13

**Roth** - 6:16; 107:9, 14; 124:8

**roth** - 100:11; 107:12

**roughly** - 118:23

**rule** - 21:20; 26:11, 22; 57:14, 16; 64:18, 20; 65:22; 72:25; 74:3, 5, 8, 13-15, 19; 83:11; 101:11

**Rule** - 17:24; 105:20, 25

**rules** - 22:6; 25:15; 35:9; 50:15; 53:18;

54:2; 55:3, 8, 22; 56:1, 10; 57:10; 64:4, 9; 70:16; 71:2; 73:15, 20; 79:21; 80:12; 83:22; 91:21; 92:1; 99:6; 104:7; 120:6; 128:14; 129:20

**Rules** - 17:23

**ruling** - 11:16; 20:11; 60:20; 100:19

**run** - 70:15

**running** - 43:16; 123:20

**sacrosanct** - 120:22

**sad** - 65:17

**safe** - 91:20; 113:14

**safeguard** - 31:2

**safeguards** - 23:2

**sailed** - 105:4

**sample** - 54:6

**sandwich** - 85:12

**sat** - 77:24; 78:7

**satisfies** - 104:15

**satisfy** - 58:14; 70:25

**Saturday** - 105:5

**save** - 15:9

**saw** - 69:1; 78:13

**scale** - 129:24

**scheme** - 61:10; 62:8; 80:23; 122:19, 23; 125:13; 128:23; 129:2, 5

**scope** - 54:24

**screen** - 22:10, 12, 19; 27:4; 32:5; 36:24; 38:4, 16; 41:19; 75:12; 84:17

**sealed** - 48:21; 52:3, 20, 24

**second** - 27:3; 40:4; 66:5; 75:13; 77:13; 88:13; 93:23; 107:5; 123:9

**secondly** - 86:8; 97:18

**seconds** - 27:4

**secretary** - 58:18, 20

**Secretary** - 6:17; 107:15

**secretary's** - 58:19

**Section** - 33:10; 36:16; 37:6; 41:19; 47:25; 50:1; 52:9; 59:4, 12; 60:8; 75:5; 77:5, 7, 14; 80:18; 122:9, 20-21; 124:4; 126:25; 128:5; 130:22

**section** - 42:11; 44:14; 52:13, 17

**Sections** - 36:13

**secure** - 23:17, 24;

24:1; 25:16; 53:2; 107:20; 111:24; 113:14

**securely** - 52:3, 20, 24

**securing** - 53:5

**security** - 29:11; 52:22

**Security** - 31:25

**seeing** - 129:2

**seek** - 89:15; 95:25; 98:7; 99:8; 117:25

**seeking** - 55:3; 59:3; 66:18; 75:5; 80:5; 119:9; 131:2

**seeks** - 65:21; 66:19, 22; 84:24; 89:6; 93:6, 10; 102:1; 105:1

**seem** - 96:20; 97:9

**segregation** - 119:5

**selection** - 26:10; 62:20

**self** - 96:20; 97:9

**senators** - 127:4

**send** - 12:10; 43:13; 48:18; 51:13; 56:16, 22

**sense** - 12:7, 25; 15:18; 19:19; 72:1; 83:20; 84:12; 86:12; 122:10, 16

**sensible** - 19:20

**sent** - 9:11; 10:17; 12:12; 13:6; 27:15

**separate** - 54:25; 97:16

**separation** - 26:23; 119:5

**September** - 33:19; 61:17

**sequitur** - 66:5

**series** - 117:23

**serve** - 24:9

**session** - 6:3; 87:3, 5; 121:25

**SESSION** - 87:1

**set** - 18:24; 35:11; 56:4; 67:2; 70:16; 71:2; 79:24; 83:21; 92:14

**sets** - 80:12; 89:9

**setting** - 64:3

**settled** - 61:3

**Seventh** - 63:5, 8, 16; 93:16; 96:10; 100:19; 101:1, 9; 104:17; 105:22; 132:6

**several** - 9:11; 28:10; 31:6; 33:6; 56:16; 117:25; 119:24; 132:23

**shake** - 123:19

**shall** - 36:4, 6, 16, 18; 37:7; 47:5, 7, 12, 14; 49:4, 8, 11; 52:2; 91:14; 110:4; 112:12; 124:2; 127:2; 128:9

**share** - 22:10, 20; 30:16; 84:17

**sharing** - 22:12

**shepherd** - 41:5

**Sherry** - 133:14

**shied** - 105:17

**ship** - 74:3; 105:4

**Shipley** - 104:17

**shirk** - 126:16

**short** - 25:12; 123:15

**shorter** - 86:6

**shoulder** - 43:24

**showed** - 52:12; 82:10; 98:16

**showing** - 72:10

**shown** - 72:20; 73:2; 74:9; 102:14; 110:24; 129:9

**shows** - 44:9; 49:6

**shred** - 111:3

**side** - 11:4

**sides** - 19:19; 20:1; 76:16

**sidestep** - 73:15

**sign** - 29:1; 41:14; 44:13; 49:17, 24; 50:3

**signature** - 38:15; 44:12; 131:14

**signed** - 16:21, 25; 17:6; 24:4; 49:20; 88:22; 90:13; 114:16

**significance** - 48:2; 53:20; 77:2; 90:4

**significant** - 61:9; 80:22; 122:19, 22, 25; 125:12; 126:2; 128:22; 129:1, 4; 130:6, 8-9, 15

**significantly** - 45:5; 87:9

**signing** - 17:4

**similar** - 58:7; 120:16

**similarly** - 62:1; 117:2

**Simon** - 26:2; 58:16

**simply** - 24:24; 78:21; 83:3; 95:5; 103:4; 108:5; 109:9, 16; 110:5, 12, 23; 113:6, 9; 115:14; 116:4, 14; 127:24; 129:3

**single** - 46:19; 108:22; 111:3, 8; 119:15

**site** - 35:22; 36:4, 6,

15-16, 18; 37:16; 47:8; 52:1

**sites** - 28:20; 33:24; 34:19; 35:19, 22; 36:12; 69:12

**sitting** - 55:1

**situation** - 40:16; 45:8; 73:23, 25; 78:12; 115:6; 122:15; 123:24; 124:18, 23, 25; 125:7, 22

**situations** - 54:17; 113:4

**six** - 101:9

**skimmed** - 16:8

**slate** - 56:16; 105:11

**slide** - 44:9, 18; 47:11, 16

**slides** - 22:8, 13

**slot** - 29:4

**slots** - 28:21, 24; 29:16

**smidgen** - 96:6; 98:24

**so-called** - 29:21; 34:20

**sobering** - 92:21

**society** - 25:20; 71:19; 72:3

**software** - 10:23

**sole** - 41:16; 51:2

**solely** - 80:15; 83:18

**solutions** - 66:23

**solve** - 104:9

**somewhat** - 114:16; 124:19

**somewhere** - 133:15

**soon** - 52:23; 133:25

**sophisticated** - 20:6

**sort** - 19:3; 20:5; 25:18; 122:13

**sorts** - 34:23

**sought** - 60:2; 83:18; 84:20; 92:14, 21; 94:6; 101:25

**sources** - 42:8

**sovereign** - 82:16

**SPEAKER** - 22:10

**speaking** - 46:25; 73:23; 118:17

**speaks** - 67:9

**specified** - 37:10; 112:17

**specify** - 75:4; 117:1

**spend** - 11:6

**spends** - 79:13

**spent** - 79:12

**sphere** - 50:11

**split** - 20:21

**spoken** - 73:24

**sprung** - 114:5

**squarely** - 25:21; 26:24

**Sr** - 8:15; 117:16

**St** - 7:12

**stable** - 123:13

**staffed** - 35:3; 36:4, 7, 11, 18

**Stafford** - 7:5

**staged** - 38:22

**stake** - 92:17

**stand** - 9:9; 116:10

**standard** - 39:2; 100:20; 101:1; 110:10; 111:5

**standards** - 24:15; 28:17; 29:2, 9, 12, 21; 30:13, 25; 33:13; 34:24; 45:18; 50:14, 20; 56:3; 57:12; 59:11; 66:7, 19; 70:5; 113:10, 22; 129:18

**standing** - 57:20; 58:6, 11, 22-25; 97:6; 102:5, 18-19, 25; 103:2, 18, 20; 104:15; 124:13

**standpoint** - 11:8; 21:11

**stands** - 69:23

**start** - 6:6; 19:2; 122:3

**started** - 16:3; 87:13, 17

**starting** - 132:12

**Stat** - 124:1; 127:17, 24

**state's** - 23:18; 25:23; 26:9; 61:9; 62:19

**state-imposed** - 54:11

**state-wide** - 113:12

**statement** - 22:5; 46:1; 69:14; 90:25; 116:6; 129:22

**statements** - 13:20; 23:19; 47:25; 115:25

**states** - 45:9; 55:14; 56:13, 16; 57:3, 7, 15; 61:3; 78:10, 12; 81:7; 83:8, 21; 93:14; 117:25

**States** - 6:12; 21:8; 25:22; 53:11; 54:3, 7, 9, 13; 57:1, 4; 61:21; 63:2; 71:23; 80:19; 122:10

**statewide** - 29:9;

45:18; 60:3, 5; 113:13

**stating** - 58:11; 63:18

**statistical** - 10:11; 13:16

**statistics** - 9:13; 13:17; 14:16, 19; 15:4; 40:11; 68:16

**Stats** - 112:20

**status** - 11:7; 38:12, 18, 21, 24; 39:5, 12, 21; 40:1, 20; 41:3; 59:15; 68:13; 109:9, 13, 15, 18; 110:2, 12, 14, 24; 111:2, 10

**Statute** - 33:10; 36:10, 13; 37:6; 38:3; 47:25; 91:13; 97:3, 14, 17; 100:13

**statute** - 24:23; 36:6, 23; 39:3, 7, 9; 44:6; 45:8, 16; 51:25; 52:13; 97:4, 15; 98:5; 109:8, 23; 112:19; 113:8; 116:22; 124:21

**Statutes** - 130:20

**statutes** - 39:13; 42:20; 43:9, 19; 50:25; 82:10; 112:17, 21; 117:1; 128:13

**statutory** - 22:13; 38:16; 49:23; 50:10

**stay** - 9:15; 63:25

**step** - 56:2

**Steve** - 7:6

**stick** - 20:1

**stipulated** - 10:12; 12:11, 20; 16:6; 18:7; 21:14; 22:18; 31:15; 40:11; 67:23; 68:11; 78:2; 88:8; 93:18; 94:19; 95:12; 96:22; 98:11; 105:18

**stipulation** - 9:12; 10:5; 12:4; 13:15; 14:1; 16:7, 14, 20, 25; 17:7, 20; 25:8; 34:16; 40:22; 67:19, 22; 69:15; 87:17, 19; 88:3, 9, 19; 89:1, 6, 10; 90:25; 131:5

**stipulations** - 106:1

**stop** - 39:9

**strategy** - 118:4

**stream** - 82:13

**streamline** - 86:10

**street** - 114:25; 116:3

**strength** - 92:18

**strike** - 71:14

**strikes** - 71:6; 132:10

**stripped** - 54:4

**stripping** - 106:18

**strong** - 41:22; 69:19

**struck** - 26:2

**structural** - 70:12; 71:4

**structure** - 35:25; 72:8

**structures** - 33:25

**struggle** - 133:17

**struggling** - 20:4

**stuff** - 128:15

**subject** - 47:24; 88:3, 15; 90:11; 91:3; 104:7; 107:1; 115:24

**submission** - 91:1

**submit** - 41:4; 61:13; 74:18; 78:20; 105:24; 121:6

**submitted** - 17:9; 21:14; 27:15; 28:1, 16, 23; 35:4; 39:21; 41:23; 42:4; 87:21

**submitting** - 110:22

**subpoenas** - 9:3; 15:16

**subscribe** - 47:13

**subsequent** - 59:7

**substance** - 54:5

**substantial** - 82:7; 100:9; 118:10

**substantially** - 100:24

**substantiate** - 40:19

**substantive** - 12:17; 72:2

**substantively** - 79:2

**substitute** - 105:11

**substituting** - 24:3

**successful** - 19:11

**successor** - 119:2

**succinct** - 121:21

**succumbing** - 73:14

**suddenly** - 103:3

**sue** - 83:12; 99:2

**sued** - 58:9; 83:9; 132:19

**suffered** - 57:22; 58:3; 72:15; 103:7

**suffice** - 15:8

**sufficiently** - 71:18

**suggest** - 12:5; 78:6, 15; 82:20; 128:6

**suggested** - 60:20; 97:4

**suggestion** - 84:11; 133:3

**suggestions** - 18:16

**suggests** - 95:16

**summarize** - 89:1

**summarizing** - 19:3

**summer** - 28:9; 127:6

**supervise** - 41:6

**supplemental** - 11:15; 84:5

**supported** - 67:15

**supporters** - 117:24

**supposed** - 46:18; 51:1, 21

**suppressing** - 118:12

**Supreme** - 54:9; 57:1, 4; 63:2; 71:23; 72:17; 74:11; 76:24; 80:11; 83:17; 84:22; 92:13; 97:19, 23, 25; 98:6; 100:14; 102:21; 105:8; 110:16; 111:6; 120:18; 132:3

**susceptible** - 25:16

**Suzanna** - 133:14

**swearing** - 115:14

**sworn** - 24:13; 116:6, 15, 20

**system** - 70:11; 71:15; 72:8, 10; 92:17; 120:23

**table** - 18:21

**tact** - 94:10

**tactfully** - 39:19

**tactic** - 110:25

**tag** - 35:6

**tailored** - 102:17

**taint** - 56:13

**tainted** - 56:12

**talks** - 122:7; 128:22

**tampering** - 64:8

**task** - 63:20

**tax** - 29:1

**teacher** - 133:13

**teams** - 32:16, 19

**Tech** - 27:17

**technical** - 53:23

**Technology** - 100:1

**technology** - 17:2; 75:17

**template** - 31:10, 13

**temporary** - 31:7; 89:13; 97:24

**temptation** - 73:14

**ten** - 97:13

**term** - 28:3; 34:10; 41:7; 59:16, 20

**termed** - 34:8

**terming** - 94:10

**terminology** - 66:24

**test** - 56:1

**tested** - 73:13

**testify** - 12:24

**Texas** - 56:25

**text** - 21:22; 112:14

**theater** - 20:7

**theme** - 64:11

**themselves** - 37:23; 43:17, 21; 44:3; 46:20; 53:4; 97:10; 127:10, 19

**theory** - 14:9, 11; 63:13; 80:5; 102:6; 103:1; 104:8; 108:14

**thereby** - 24:12; 40:1, 20; 50:4; 57:18; 105:22

**thereto** - 87:20

**they've** - 13:16, 20; 41:13; 76:17; 82:5; 96:4

**thinks** - 19:7; 133:20

**third** - 58:25; 66:21; 98:9

**thirds** - 118:23

**thoughts** - 121:18

**thousands** - 31:19; 69:16

**throughout** - 23:15; 30:25; 31:17; 40:5; 41:22; 42:16; 45:4; 50:17; 51:23; 53:1; 69:12; 129:8

**throw** - 12:5; 117:21, 25; 119:14, 18

**thrown** - 120:8

**ticket** - 123:11

**tickets** - 29:2

**tie** - 22:1

**tied** - 40:4, 8, 15

**tight** - 101:12

**timeframe** - 54:23

**timeline** - 101:12

**timely** - 30:11

**timing** - 27:25; 133:19

**tipping** - 55:15

**title** - 52:4, 20

**Title** - 77:5

**today** - 15:9, 17; 16:17; 17:10; 18:12; 21:9; 94:2, 10; 101:3; 106:20; 107:3; 118:13; 127:22; 131:19; 132:8

**today's** - 18:5; 102:8

**Todd** - 65:6

**together** - 14:14; 46:15; 88:20

**Tom** - 7:13

**Tony** - 7:4

**tool** - 116:12, 14

**top** - 14:19; 34:5; 47:18, 22; 91:11; 105:14

**topic** - 64:10

**total** - 86:6

**touch** - 86:9

**toward** - 32:22; 46:16

**towards** - 55:2

**track** - 53:6; 113:15

**tracking** - 43:17

**traded** - 66:25

**traditional** - 23:2

**transgress** - 104:19

**transmitted** - 37:17

**transparency** - 25:19

**transparent** - 108:21

**transportation** - 17:3

**tread** - 93:2

**treasury** - 85:2

**treat** - 48:6

**treated** - 43:9; 96:1; 104:1, 5

**tried** - 122:1

**trivieth** - 54:5

**trouble** - 11:10

**truly** - 29:17

**Trump** - 6:4; 21:8; 57:25; 60:4, 10; 61:15; 72:16; 74:15, 18; 77:24; 81:1; 93:6; 94:19; 95:15; 96:19; 98:6; 103:25; 104:25; 117:23; 119:25; 120:3

**Trump's** - 64:7; 72:19

**trust** - 93:3

**truth** - 116:4

**Tuesday** - 76:9; 79:4

**Tully** - 63:6

**turf** - 128:7

**turns** - 103:22

**tweet** - 34:18

**tweeted** - 133:15

**two-week** - 34:12

**type** - 19:16; 70:8

**typically** - 114:14, 18, 22

**Tyrer** - 101:10

**Tyrone** - 7:12

**U.S** - 26:16; 59:4; 61:17; 62:1; 71:22; 77:5; 83:17

**U.S.C** - 59:12; 60:8; 75:5; 77:13

**ultimate** - 77:1

**ultimately** - 28:16; 47:1; 102:7; 127:11

**unable** - 10:6; 55:2

**unanimously** - 97:25; 98:18; 114:8

**unartful** - 59:16

**unauthorized** - 34:4, 21

**unbalanced** - 57:11

**uncertainty** - 82:7; 100:10; 126:2

**unconstitutional** - 56:19, 22; 58:4; 60:1, 3; 64:15, 24; 65:4; 67:12; 70:5, 20-21; 74:20; 75:1; 84:14; 93:7, 9; 94:1, 5

**unconstitutionally** - 62:7

**underlined** - 51:9

**undermine** - 39:10; 49:14

**undermined** - 24:9; 39:19, 23; 40:21, 25

**undermining** - 22:1

**underscored** - 37:6

**understood** - 13:9; 39:20; 88:24; 99:18

**undertaken** - 70:18

**undisputed** - 14:15

**undivided** - 55:2

**undue** - 102:1

**unelected** - 24:2

**unforeseen** - 17:12

**unfortunate** - 118:14

**unfortunately** - 10:4; 118:14

**unheard** - 95:3

**UNIDENTIFIED** - 22:10

**uniform** - 29:8; 30:25; 113:12

**uniformly** - 63:14

**unilaterally** - 45:14

**union** - 127:22

**unique** - 120:10, 15; 125:7; 133:12

**uniquely** - 54:11; 103:7

**United** - 6:12; 21:8; 25:22; 53:11; 54:3, 7, 9, 13; 57:1, 4; 61:21; 63:2; 71:23; 80:19; 122:9

**University** - 133:14

**unknown** - 33:8

**unlawful** - 50:22; 94:8

**unlawfully** - 37:24

**unless** - 47:6; 107:10; 111:1; 130:14

**unlikely** - 94:8

**unmanned** - 28:6;

35:16; 36:20; 37:3, 5

**unnecessary** - 67:15

**unopened** - 52:3

**unprecedented** - 106:3; 119:22

**unregulated** - 34:22

**unreviewable** - 61:4

**untethered** - 65:20

**untimeliness** - 77:23

**untrue** - 23:20

**unusual** - 71:6

**upheld** - 57:9; 63:9, 16

**uphold** - 26:23; 39:16; 57:12; 73:13; 74:7; 121:4

**upholding** - 25:22; 72:25

**US** - 102:21

**usual** - 73:15

**usurpation** - 27:13; 103:6

**utility** - 28:21; 30:4; 133:6

**vacate** - 63:25

**vague** - 50:16

**valid** - 24:11; 66:16; 71:5

**validity** - 50:12; 77:4

**validly** - 66:8

**value** - 49:16; 74:8

**variety** - 42:8; 56:5; 120:14

**various** - 12:20; 58:9; 76:2

**vary** - 12:15

**vast** - 110:23

**venture** - 85:24

**verify** - 39:20

**Verizon** - 84:16, 18

**Verizon's** - 84:23

**version** - 12:10, 12; 88:13

**versions** - 88:23

**vest** - 61:3

**via** - 12:19; 68:1, 4

**vice** - 54:12

**Vice** - 128:1

**victorious** - 98:14

**videotape** - 71:11

**view** - 10:16; 13:6; 21:16; 120:13; 125:17

**views** - 120:15

**village** - 30:3

**vindicate** - 64:7

**violated** - 46:22; 53:17; 59:19; 67:8; 103:23

**violates** - 93:8

**violating** - 122:23; 124:10, 12, 15

**violation** - 23:14; 31:18; 57:17; 59:22; 67:10; 71:12, 19; 103:2; 104:18, 22; 122:20; 126:1

**violations** - 53:20, 23; 55:3; 57:16; 58:9; 66:4; 69:24; 70:1; 83:17, 20; 101:21; 102:2

**Virginia** - 74:13; 92:3; 119:3, 7

**Virtually** - 129:24

**virtue** - 80:17

**vis** - 59:24

**vis-a-vis** - 59:24

**vitality** - 25:22

**Vogg** - 7:14; 42:3; 46:9; 69:15; 87:21; 90:24

**Vogg's** - 45:6

**void** - 57:17; 59:10; 60:1, 4, 6, 13, 19-20; 70:6, 22; 71:9; 74:23; 75:1; 94:12

**vote** - 24:10, 14, 17; 31:21; 39:17; 43:20, 25; 45:24; 47:1, 15; 49:5; 56:14, 22; 64:22, 24; 65:2, 16; 66:7, 10, 13; 95:5; 104:8, 11; 106:18; 107:22; 113:3; 118:4, 8, 10; 119:11; 120:7, 21; 129:12

**voted** - 43:15; 64:21; 113:5, 9; 119:16; 131:8

**Voter** - 97:5, 12, 16; 115:10

**voter** - 24:21; 28:24; 37:25; 38:10, 14, 23; 39:20; 40:9; 41:2; 43:14; 44:25; 45:1, 9, 12-13, 19, 22, 25; 46:15, 22; 47:9, 18; 48:19; 49:3; 50:10; 51:4, 14; 52:15; 103:25; 104:1; 110:2; 111:4, 8; 113:5; 114:25; 115:22; 116:2, 4, 10, 20; 119:16; 132:15, 17

**voter's** - 25:2; 50:11; 115:16

**voters** - 24:21; 25:4; 30:21; 32:25; 37:21, 23; 39:1, 12, 14, 17, 20, 25; 41:12; 44:8, 10-11; 45:21; 54:14; 64:16; 65:15; 66:15,

152

18; 68:17; 91:10, 25; 92:5; 103:23; 104:3, 12; 105:13; 106:15, 18; 109:9, 16, 23; 110:9, 14, 20-21, 23; 111:22; 113:2, 9; 115:9; 117:17, 20; 118:2, 12; 120:7, 17, 24; 121:4

**votes** - 52:6; 65:4; 72:15; 77:4, 11; 91:25; 92:6, 14, 16; 96:18; 104:12; 112:8; 113:16; 117:22; 119:12, 14, 18; 120:8; 121:5; 129:7, 10

**voting** - 21:20; 23:1, 4, 13, 24; 24:13; 25:5; 31:8; 33:14, 23; 38:13; 41:11; 43:18, 22; 46:19; 48:12; 56:2; 57:11, 13; 66:6; 68:9; 94:1; 95:7, 16; 96:20; 107:25; 113:2, 17; 119:22; 120:6, 19; 124:22; 129:12, 16

**vs** - 6:4; 26:1, 17; 27:5; 54:8; 58:7; 61:5, 15; 62:3; 63:3, 6-7; 71:22; 73:11; 74:12; 81:2, 15; 84:6

**wait** - 98:25

**waiting** - 99:5; 123:18

**waived** - 93:17

**walk** - 43:23; 47:2

**wants** - 11:4; 85:18; 99:10; 102:10; 119:14, 18; 126:15

**ward** - 115:25

**warrant** - 101:7

**waste** - 13:25

**wasting** - 11:6

**water** - 29:1

**ways** - 37:14, 17; 93:8; 113:16; 126:25; 129:12

**website** - 32:11

**WEC** - 38:17

**weeks** - 28:10; 33:23; 49:18; 94:23; 132:16, 23

**weigh** - 10:14; 130:15

**weighed** - 104:12

**weird** - 125:7

**well-established** - 100:8

**well-intentioned** - 26:6

**well-settled** - 61:3

**Wendell** - 8:15; 117:16

**Westlaw** - 61:16

**white** - 119:6

**Whitman** - 65:6

**Whitmer** - 105:3

**whole** - 13:1; 14:25; 16:8; 127:4; 130:6

**wholly** - 23:2

**wide** - 29:12; 113:12

**widened** - 24:20

**wife** - 114:15

**Wilton/Brillhart** - 81:11, 17, 20

**win** - 30:6; 96:19; 105:24; 108:16

**window** - 54:16

**winner** - 55:13; 65:8; 92:15

**winner-take-all** - 55:13

**winning** - 70:2; 102:7

**Wis** - 112:20; 124:1; 127:17, 24

**Wisconsin** - 6:4, 13-14, 17; 8:5, 10, 15; 21:12, 15, 17, 21-22; 22:4, 6-7, 24; 23:7, 9, 12, 17, 21-22, 25; 24:25; 25:13; 28:2, 4, 9-10, 12, 19; 29:5; 30:8, 17; 31:9, 18, 22; 32:13, 21, 23; 33:10, 15, 18, 22; 34:6; 35:17; 36:9, 13, 22; 37:6, 20, 22, 25; 38:3, 13; 39:8; 41:1, 8, 11; 42:6, 15, 17; 43:6; 44:7, 10, 19; 45:7; 47:25; 51:23; 56:21; 57:1, 5, 8; 59:10, 13; 60:15; 63:11, 16; 64:9, 14, 16; 65:14, 19; 68:11; 69:23; 72:25; 73:2, 4, 11, 24; 74:1, 20, 23; 76:23; 78:4; 79:8; 80:17; 81:15; 82:18; 91:8, 13, 19; 92:8, 13; 95:7, 18-20; 96:21; 97:3, 6, 16, 19, 23, 25; 98:6, 19; 100:14, 20; 101:11; 103:12, 15, 23, 25; 104:7; 107:14, 17, 21; 108:17; 109:9, 12, 23; 110:7, 12, 15-16; 111:6, 12, 21; 112:5, 11; 113:19, 24; 116:1, 19; 117:15, 22; 118:17, 21, 23; 119:13; 120:3; 123:25; 127:14; 129:11, 19; 130:18,

21; 131:22; 132:3, 10

**Wisconsin's** - 22:1; 25:6, 12, 14, 17; 27:16; 39:24; 63:23; 92:4, 16; 94:1, 12; 97:12; 107:18, 22; 111:18; 112:2; 124:2; 127:16, 23

**Wisconsinites** - 64:21; 95:4

**wisdom** - 24:3

**wish** - 55:25

**withdrawal** - 32:20

**withdrawing** - 50:4

**witness'** - 115:19; 116:25

**witnessed** - 41:14

**witnessing** - 49:16; 116:11

**Witzel** - 33:20

**Witzel-Behl** - 33:20

**won** - 99:1

**Wood** - 58:7

**Wood's** - 58:11

**Woodall** - 7:14; 42:3; 45:6; 46:9; 69:15; 87:21; 90:24

**Woodall-Vogg** - 7:14; 42:3; 46:9; 69:15; 87:21; 90:24

**Woodall-Vogg's** - 45:6

**word** - 9:17; 133:20

**workers** - 41:24; 42:1; 45:21; 46:8; 53:6

**works** - 114:22

**world** - 105:7

**worse** - 40:17

**worst** - 99:3

**worth** - 90:2

**worthy** - 106:17

**write** - 26:9; 49:10; 56:10; 114:21

**writing** - 12:23; 40:2; 71:24

**wrongful** - 49:19

**wrote** - 26:17; 61:18; 63:24; 92:12; 105:6; 122:12; 127:6

**yesterday** - 9:6, 11; 11:19; 14:8; 29:23; 76:10, 22; 82:19, 25; 94:5; 104:10

**Young** - 83:11, 16; 84:2, 15; 101:23

**zip** - 115:1, 5

**Zoom** - 6:5; 14:24; 15:17; 27:4

**§** - 91:13; 124:1; 127:17

153