**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

---

DONALD J. TRUMP, Candidate for President of the
United States of America,

        Plaintiff,

    v.

THE WISCONSIN ELECTIONS COMMISSION, and its
members, ANN S. JACOBS, MARK L. THOMSEN,
MARGE BOSTELMANN, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official capacities,
SCOTT MCDONELL in his official capacity as the Dane
County Clerk, GEORGE L. CHRISTENSON in his
official capacity as the Milwaukee County Clerk,
JULIETTA HENRY in her official capacity as the
Milwaukee Election Director, CLAIRE WOODALL-
VOGG in her official capacity as the Executive Director
of the Milwaukee Election Commission, MAYOR TOM
BARRETT, JIM OWCZARSKI, MAYOR SATYA
RHODES-CONWAY, MARIBETH WITZEL-BEHL,
MAYOR CORY MASON, TARA COOLIDGE, MAYOR
JOHN ANTARAMIAN, MATT KRAUTER, MAYOR
ERIC GENRICH, KRIS TESKE, in their official
capacities; DOUGLAS J. LA FOLLETTE, Wisconsin
Secretary of State, in his official capacity, and TONY
EVERS, Governor of Wisconsin, in his official capacity.

        Defendants.

Case No.: 20CV1785

---

**DEFENDANT GOVERNOR TONY EVERS'S**
**NOTICE OF SUPPLEMENTAL AUTHORITY**

---

      Further to the Notice of Supplemental Authority filed earlier today (Dkt. 131), Defendant

Governor Evers submits the following:

    (1) Reserve Judge Simanek's order affirming the presidential recount results, attached as
        Exhibit A;

    (2) pages 1-30 of the Joint Proposed Findings of Fact and Conclusions of Law, which are
        incorporated by reference in the order, attached as Exhibit B; and

(3) a transcript of today's hearing at which Reserve Judge Simanek issued an oral ruling on the matter, attached as Exhibit C.

In particular, Governor Evers calls the Court's attention to pages 26-30 of the Joint Proposed Findings of Fact and Conclusions of Law, expressly adopted by the state court as part of its ruling, which address several issues of statutory interpretation also before this Court, and to page 68 of the hearing transcript where Reserve Judge Simanek begins his oral ruling.

Dated: December 11, 2020

Respectfully submitted,

/s/ Jeffrey A. Mandell
Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Madison, WI 53701-1784
Telephone: 608-256-0226
Email: jmandell@staffordlaw.com
Email: rsnyder@staffordlaw.com
Email: rmanthe@staffordlaw.com

Justin A. Nelson
Stephen E. Morrissey
Stephen Shackelford Jr.
Davida Brook
SUSMAN GODFREY L.L.P.
1000 Louisiana St., Suite 5100
Houston, TX 77002
(713) 651-9366
jnelson@susmangodfrey.com
smorrissey@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com

Paul Smith
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
psmith@campaignlegalcenter.org

*Attorneys for Defendant, Governor Tony Evers*

2

# EXHIBIT A

**FILED**
**12-11-2020**
**John Barrett**
**Clerk of Circuit Court**
**2020CV007092**

**DATE SIGNED: December 11, 2020**

<u>Electronically signed by Judge Stephen A. Simanek</u>
Circuit Court Judge

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY

DONALD J. TRUMP, MICHAEL R. PENCE, et al.

        Plaintiffs/Appellants,        Milwaukee County Case No.:  2020CV7092

v.        Dane County Case No.:  2020CV2514

JOSEPH R. BIDEN, KAMALA D. HARRIS, et al.

        Defendants/Appellees,

## FINAL ORDER

        The matter having come before the Court, Reserve Judge Stephen A. Simanek, on December 11, 2020 on Plaintiffs' Motion for Judgment on their appeal under Wis. Stat. § 9.01(6) from the final recount determinations of the Dane County Board of Canvassers and Milwaukee County Elections Commission, the Court having considered the submissions by all parties, and having heard oral argument from all parties;

        IT IS HEREBY ORDERED:

        For the reasons set forth on the record, which are incorporated herein by reference, incorporating pages 1-30 of the Joint Proposed Findings of Fact and Conclusions of Law by Joseph R. Biden, Kamala D. Harris, the Dane County Defendants and the Milwaukee County Defendants

(Doc. 89) as the Court's findings of fact and conclusions of law, and pursuant to Wis. Stat. § 9.01(8)(a), the determinations of the Dane County Board of Canvassers and Milwaukee County Elections Commission under review are **AFFIRMED.**

Costs will be taxed in favor of Respondents pursuant to Wis. Stat. § 9.01(7)(b).

**THIS IS A FINAL ORDER FOR PURPOSES OF APPEAL.**

# EXHIBIT B

**FILED**
**12-09-2020**
**John Barrett**
**Clerk of Circuit Court**
**2020CV007092**

## STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY

| | |
|---|---|
| DONALD J. TRUMP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, *et al.* <br><br> Defendants. | Milwaukee County Case No. 20-CV-7092 <br> Dane County Case No. 20-CV-2514 <br><br> Consolidated |

### JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BY JOSEPH R. BIDEN, KAMALA D. HARRIS, THE DANE COUNTY DEFENDANTS AND MILWAUKEE COUNTY DEFENDANTS

Defendants, Joseph R. Biden, Kamala D. Harris, Milwaukee County Clerk George L. Christensen, Milwaukee County Elections Commission (named herein as the Milwaukee County Board of Canvassers), Dane County Clerk Scott McDonnell, and Dane County Board of Canvassers, by their undersigned counsel, submit these Joint Proposed Findings of Fact and Conclusions of Law for the Court's consideration.

### PROPOSED FINDINGS OF FACT

**A.    Procedural History and Background**

1.    The 2020 Presidential election was conducted on November 3, 2020.

2.    On November 17, 2020, the initial Wisconsin county canvasses of the election results were completed. The canvass results showed Joseph R. Biden and Kamala D. Harris won the State of Wisconsin by 20,427 votes.

3.    On November 18, 2020, Plaintiffs filed a Recount Petition with the Wisconsin Elections Commission ("WEC") (Doc. 36).[1] Despite alleging that "mistakes and fraud were

---

[1] "Doc." refers to the e-filing document number associated with electronic filings in this consolidated case.

committed throughout the state of Wisconsin," the petition sought recounts in just two of Wisconsin's 72 counties—Milwaukee and Dane Counties.

4.      Plaintiff's Recount Petition (Doc. 36) alleged, on information and belief, that the following errors occurred in the two counties:

   a.  Municipal clerks improperly completed missing information on absentee ballot envelopes related to witness addresses (Recount Petition, ¶ 4);

   b.  In-person absentee voters did not submit written applications for an absentee ballot (Recount Petition, ¶ 5); and

   c.  Voters who were not indefinitely confined claimed "indefinitely confined" status for the purposes of obtaining an absentee ballot without having to show photo identification (Recount Petition, ¶ 6).

5.      While not raised in the Petition, Plaintiffs at the Dane County recount took issue with the City of Madison's Democracy in the Park program, during which election officials collected properly sealed and witnessed absentee ballots.

6.      The recount process lasted from November 20, 2020 to November 29, 2020.

7.      During the recount and on this appeal, the Trump Campaign seeks to disenfranchise no fewer than 221,323 voters in the two counties. Trump Proposed Findings (Doc. 62), ¶¶ 93-96. If the Trump Campaign's grounds for attempting to disqualify these ballots were applied throughout the state, more than 700,000 ballots cast by Wisconsin voters would potentially be affected. (Def. App. 8-9).[2]

8.      In both Dane and Milwaukee counties, the Trump Campaign challenged and sought to disqualify votes in the following categories, with the following result:

---

[2] "Def. App." refers to the Defendants' Joint Appendix filed herewith.

a.  Ballots cast which had an absentee envelope where a witness address, or a portion of a witness address, had been completed by a clerk (e.g., where the ballot envelope was initially submitted with a witness address that was missing the state).

   i.  The Milwaukee County Board of Canvassers moved to accept ballots from envelopes with witness addresses that had been completed by clerks consistent with specific guidance by the WEC, which the Board viewed as consistent with Wis. Stat. § 6.87(6d). (Milwaukee 11/20/20 126:23-128:17) (Doc. 37, pp. 126-128). The WEC guidance provides: "The WEC has determined that clerks **must** take corrective actions in an attempt to remedy a witness address error." (emphasis in original) (Def. App. 50).

   ii.  The Dane County Board of Canvassers also declined to "exclude envelopes that had a witness address added by the clerk." (Dane 11/20/20 65:1-15) (Doc. 49, p. 17).

b.  All ballots cast by electors designating themselves as "indefinitely confined" after March 25, 2020.

   i.  The Milwaukee County Board of Canvassers found that "a designation of an indefinitely confined status is for each individual voter to make based upon their current circumstances" and that "no evidence of any voter in Milwaukee County [was] offered that has abused this process and voted through this status…not even an allegation that there was a single voter who abused this process to vote without providing proof of their ID, but eliminating proof that anyone did so. So there's no allegation…no proof…no evidence." (Milwaukee 11/21/20 145:2-146:2) (Doc. 39, pp. 14-

- 3 -

15). The Board voted to overrule any challenge to a voter with the status of "indefinitely confined." (*Id*. 146:9-147:19) (Doc. 39, pp. 15-16).

    ii. The Dane County Board of Canvassers also rejected the Trump Campaign's challenge that would have required invalidating the ballots of all electors in Dane County who declared indefinitely confined status. The Board specifically declined to separate or "draw down"[3] the ballots cast by electors who declared indefinitely confined status. (Dane 11/20/20 65:18-66:9) (Doc. 49, pp. 17-18).

c. In Milwaukee County, all ballots cast through absentee in-person voting that, according to Plaintiffs, were obtained without a "written application."

    i. The Milwaukee County Board of Canvassers determined that there are multiple forms of application for an absentee ballot that can be made by absentee in-person voters and that the absentee ballot envelope provided to absentee in-person voters – which has the word "application" stated on it and must be completed by the voter – is an application for an absentee ballot. The Milwaukee Board thus rejected the Trump Campaign's challenge to ballots cast by in-person absentee voters. (Milwaukee 11/21/20 183:15-187:10) (Doc. 39, pp. 52-56).

d. In Dane County, every absentee ballot on the basis that the Trump Campaign was not allowed to review the written absentee ballot applications during the recount

---

[3]    When an absentee ballot envelope is rejected during a recount, the statutory remedy is to "randomly draw one absentee ballot" from the entire pool of absentee ballots and set it aside from the count. Wis. Stat. § 9.01(1)(b)(4)b. The process is random because ballots are not marked to correspond to individual voters, consistent with Wisconsin's right to privacy in voting. *See* Wis. Const. Art. III, Section 3. Thus, the remedy sought by the Trump Campaign would randomly disenfranchise hundreds of thousands of voters in the two targeted counties.

- 4 -

process, and also to all absentee in-person absentee ballots that, according to Plaintiffs, were obtained without a "written application."

> i. The Dane County Board of Canvassers voted not to exclude or draw down any absentee ballots on the basis that they "do not have an attached or identifiable application." (Dane 11/20/20 38:1-40:25) (Doc. 49, p. 11). The Dane County Board of Canvassers concluded that review of absentee ballot applications is not a part of the statutory recount process under Wis. Stat. § 9.01(1)(b) and therefore the applications were not relevant to the recount.

9.      In addition to the challenges listed above, in Dane County only, the Trump Campaign sought to disqualify "all ballots received in the Democracy in the Park process" that elections officials conducted in Madison on September 26, 2020 and October 3, 2020. (Dane 11/24/20 52:7-11) (Doc. 51, p. 194). This challenge was a blanket challenge to 17,271 ballots. The Dane County Board of Canvassers denied the challenge, ruling that the Democracy in the Park events were the equivalent of a human drop box and valid under the statute. (Dane 11/24/20 53:13-25, 72:21-73:16) (Doc. 51, pp. 194, 199).

10.     In Dane County, the Trump Campaign challenged nearly all of the absentee ballots in the Town of Westport (2,233 out of a total of 2,308) because the clerks failed to initial the absentee envelope reflecting that the voter submitted or showed a photo identification. The Dane County Board of Canvassers denied the challenge based on the testimony of the Town Clerk that "we check all photo ID" and "no ballots leave our office unless it has been checked." (Dane 11/23/20 50:14-51:5, 52:16-21) (Doc. 51, p. 161).

11.    In Milwaukee County, the Board of Canvassers instructed tabulators to take the following steps as part of the recounts to accommodate Plaintiffs' standing challenges to categories of ballots:

    a.  Set aside any absentee envelope that "has a different color on the address versus the actual witness signature;"

    b.  Set aside any absentee envelope containing an "indefinite confinement" designation; and

    c.  Set aside any envelope that is the subject of a specific challenge other than the two challenges listed above. (Milwaukee 11/20/20 66:20-67:7; 11/21/20 42:2-18) (Doc. 37, pp. 66-67; Doc. 38, p. 61).

12.    The Milwaukee County Elections Commission certified the results of its recount on November 27, 2020. (Doc. 42, pp. 162-63).

13.    The Dane County Board of Canvassers certified the results of its recount on November 29, 2020. (Doc. 51, p. 320).

14.    On November 30, 2020, Ann Jacobs, the chairperson of the WEC, certified the results of the 2020 Wisconsin Presidential Election, after the results of the Milwaukee County and Dane County recounts, pursuant to Wis. Stat. § 7.70(3)(a). The certified results showed Joseph R. Biden and Kamala D. Harris received 1,630,866 votes, and Donald J. Trump and Michael R. Pence received 1,610,184 votes. The final margin of victory was 20,682 votes.

15.    On December 1, 2020, Plaintiffs filed a Petition for Original Action with the Wisconsin Supreme Court seeking to exclude several categories of ballots from the presidential election results in Wisconsin.

16.    On December 2, 2020, President Trump sued the WEC, its members, the mayors of Wisconsin's five largest cities, multiple clerks, the Governor, and the Secretary of State in federal court, seeking a declaration that "the constitutional violations of the Defendants likely tainted more than 50,000 ballots" and that the court "remand[ ] the case to the Wisconsin legislature." *Trump v. Wisconsin Elections Commission*, E.D. Wis. Case No. 2:20-cv-01785.

17.    On December 3, 2020, the Wisconsin Supreme Court denied Plaintiffs' Petition for Leave to Commence an Original Action.

18.    On December 3, 2020, hours after the Wisconsin Supreme Court denied the petition for leave to commence an original action and pursuant to Wis. Stat. § 9.01(6), Plaintiffs filed separate Notices of Appeal from the Recounts in Dane County and Milwaukee County.  (Doc. 7, 9).

19.    On December 3, 2020, Chief Justice Patience D. Roggensack consolidated the two appeals, *Trump v. Biden*, Milwaukee County Case No. 2020-cv-7072, and *Trump v. Biden*, Dane County Case No. 2020-cv-2514, and assigned the consolidated appeal to Reserve Judge Stephen A. Simanek. (Doc. 9).

### B. Challenged Procedures

#### a. Absentee Ballot Applications

20.    A municipal clerk may not issue an absentee ballot without receiving "a written application therefor from a qualified voter of the municipality." Wis. Stat. § 6.86(1)(ar). The statute defines "written application…for an official ballot" to include a variety of "methods," including "[b]y mail," "[i]n person at the office of the municipal clerk," on request forms, and "[b]y electronic mail or facsimile transmission."  Wis. Stat. § 6.86(1)(a).

21.    For many years, the WEC has applied this broad definition to allow online ballot requests in multiple ways, including:

    a.   through the MyVote website, which generates an email and prompts a clerk to mail an envelope and ballot (Milwaukee 11/20/20 50:3-11) (Doc. 37, p. 50);

    b.   by regular mail or e-mail (Milwaukee 11/20/20 49:2-4, 50:3-7, 76:6-25) (Doc. 37, pp. 49-50, 76);

    c.   if done in-person, through completion of an official WEC multi-step form, EL-122, titled "Official Absentee Ballot Application/Certification," which provides both an application and a certification. (Milwaukee 11/20/20 51:2-8) (Doc. 37, p. 51).

22.    The WEC and its predecessor agency, the Government Accountability Board ("GAB"), have used Form EL-122 since May 2010. (Affidavit of Kevin J. Kennedy, ¶ 14) (Def. App. 106-107). Since that time, Form EL-122 has been accepted as a lawful application for an absentee ballot. *Id*.

23.    Form EL-122 and its predecessor, Form GAB-122, originated from "inefficiencies experienced with in-person absentee voting" in the November 2008 presidential election. (Affidavit of Kevin J. Kennedy, ¶ 6, Exh. A) (Def. App. 104-105, 108-150).

24.    On December 17, 2009, the GAB unanimously voted to eliminate the requirement for a separate written application for in-person absentee voters, and instead to incorporate the application into the in-person process. (Affidavit of Kevin J. Kennedy, ¶ 10) (Def. App. 105-106).

25.    The GAB thereafter amended the official absentee ballot envelope, Form GAB-122, to also act as the written application for those voters who voted absentee in-person during the "early voting" period. (Affidavit of Kevin J. Kennedy, ¶ 11) (Def. App. 106).

26.    The new Form GAB-122, entitled "Official Absentee Ballot Application/Certification," was distributed to all Wisconsin municipal clerks on May 10, 2010,

and has been in use continually throughout Wisconsin since that time. (Affidavit of Kevin J. Kennedy, ¶ 11, Exhs. B-C) (Def. App. 151-154).

27.     Consistent with statewide practice, municipalities and voters in Dane County and Milwaukee County use Form EL-122 for in-person absentee voting. The total number of in-person absentee votes cast in the state in the November 2020 Election using Form EL-122 was 651,422. WEC Absentee Ballot Report 11/3/20 General Election (Def. App. 8-9).

28.     Plaintiffs' counsel James Troupis voted early in-person using Form EL-122. (Affidavit of Devin Remiker, Exhibit A) (Def. App. 169).

29.     In Milwaukee County, when a voter requests an absentee ballot in person, the voter identifies himself or herself to the clerk, who then enters the request for the ballot into the WisVote system directly. (Milwaukee 11/20/20 46:7-21) (Doc. 37, p. 46). This generates "a record of application." (Milwaukee 11/20/20 85:14-17) (Doc. 37, p. 85). The system then generates a label for that envelope. The voter then shows the labeled envelope to an official to receive a ballot. The voter completes the ballot and signs a certification on the envelope, which a clerk witnesses. The vote is not cast until the day of the election. (Milwaukee 11/20/20 46:7-21) (Doc. 37, p. 46); (Dane Biden Exhs. 2-16; Milwaukee Biden Exhs. 798-809) (Def. App. 10-41) (affidavits of absentee in-person voters describing multi-step process).

30.     The absentee in person process in Dane follows the same or similar procedures, whereby the application portion of the envelope is completed and shown to an official before the voter receives a ballot. (Def. App. 10-20)

31.     The Dane County Board of Canvassers determined that 61,193 electors cast absentee ballots in person in Dane County using Form EL-122. (Dane 11/22/20 58:7-10). Each in-

person absentee voter completed an EL-122, which the Board concluded is legally sufficient to satisfy Wis. Stats. § 6.86(1)(ar). *Id*.

32.    The Milwaukee County Board of Canvassers determined that the total number of voters who voted absentee in person in Milwaukee County using Form EL-122 was 108,947. (Milwaukee 11/21/20 184:14-19) (Doc. 39, p. 53).

33.    At no time prior to the election on November 3, 2020 did the Trump Campaign assert that the use of Form EL 122 by voters and election officials in Wisconsin was in any way improper or inconsistent with Wisconsin law. The first time the Trump Campaign made that claim was in its recount petitions filed with Dane and Milwaukee counties on November 18, 2020, after election results showed that President Trump had lost the election in Wisconsin by more than 20,000 votes.

34.    The Trump Campaign did not make any allegation that a single vote was cast in either county by an ineligible voter who applied via Form EL-122.  There are no facts to support such an allegation.

35.    The Trump Campaign did not make any allegation that any fraud occurred relating to the use of Form EL-122 in either county. There are no facts to support such an allegation.

### b. Witness Addresses

36.    An absentee voter must complete their ballot and sign a "Certification of Voter" on the absentee ballot envelope in the presence of a witness.  Wis. Stat. § 6.87(4)(b). The witness must then sign a "Certification of Witness" on the envelope, which must include the witness's address.  Wis. Stat. § 6.87.

37.    The witness-address requirement is "mandatory," *id.* § 6.84(2), and "[i]f a certificate is missing the address of a witness, the ballot may not be counted," *id.* § 6.87(6d).

- 10 -

38.     Since October 2016, the WEC has instructed municipal clerks that, while they may never add missing signatures, they "*must* take corrective action" to add missing *witness addresses* if they are "reasonably able to discern" that information by contacting the witnesses or looking up the addresses through reliable sources. 10/18/16 WEC Memo to Clerks "Missing or Insufficient Witness Address on Absentee Certificate Envelopes." (Def. App. 50-51).

39.     Since then, the WEC has repeated these instructions in multiple guidance documents, including in the WEC Election Administration Manual (Sept. 2020), at 98 (clerks "may add a missing witness address using whatever means are available," and "should initial next to the added witness address") and an October 19, 2020 guidance memo.[4]

40.     As a result, the WEC's guidance on the witness address issue has governed in *eleven* statewide races since then, including the 2016 presidential election and recount. Moreover, local election officials and voters throughout the State have relied on it, and it has never been challenged through Chapter 227 judicial review or otherwise. 11/10/20 WEC Release "Correcting Misinformation About Wisconsin's Election," No. 6 (Def. App. 55-56).

41.     In November 2016, Candidate Donald Trump won a recount in which thousands of ballots were completed based upon the same WEC guidance on witness addresses used in the November 2020 election. (Milwaukee 11/20/20 117:15-25) (Doc. 37, p. 117).  Neither Candidate Trump nor anyone else raised any objections to the use of that guidance in 2016. *Id*.

42.     At no time prior to the election on November 3, 2020 did the Trump Campaign assert that the practice of election workers filling in missing, verifiable witness addresses was in any way improper or inconsistent with Wisconsin law. The first time the Trump Campaign made that claim was in its recount petitions filed with Dane and Milwaukee counties on November 18,

---

[4]  Available at https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Spoiling%20Ballot%20Memo%2010.2020.pdf

2020, after election results showed that President Trump had lost the election in Wisconsin by more than 20,000 votes.

43.     As the petition for recount admits, WEC guidance on completing addresses applies *statewide*, not just in Dane and Milwaukee counties. (Recount Petition, p. 1) (Doc. 36); (Dane County Transcript, 11/29/20 11:25) (Doc. 51, p. 320).

44.     The witness address issue is not limited to situations in which absentee ballots are entirely missing address information for a witness.  Instead, for the most part, clerks corrected partial addresses, such as by completing the city, zip code, or state. (Milwaukee 11/20/20 116:2-7; 11/21/20 271:3-6, 277:13-14) (Doc. 37, p. 116; Doc. 39, pp. 140, 146).  As a result, the Trump Campaign objected to ballots that were witnessed, signed by a witness, and contained a witness' street address, but had the city, state, or zip code filled in by a clerk. (*Id.*; *see also* Milwaukee 11/20/20 125:2-5) (Doc. 37, p. 125).

45.     In completing witness addresses, the City of Milwaukee "do[es]n't make guesses" if there are multiple persons with the name of a witness. In that situation, clerks do not fill in any missing witness address information. Instead, they contact the voter or mail the ballot back to the voter in an attempt to have the voter contact the witness and provide the missing information. (Milwaukee 11/20/20 117:1-7).

46.     It is "very common" that an envelope will have a street address but that the address will not be "fill[ed] out completely." (Milwaukee 11/20/20 117:8-11) (Doc. 37, p. 117).

47.     There is no evidence establishing beyond a reasonable doubt that adding missing witness address information to any particular voter's envelope was improper or in violation of Wisconsin law and thus no evidence establishing beyond a reasonable doubt that any absentee

ballots associated with envelopes containing added witness address information are improper or in violation of Wisconsin law.

### c. "Indefinitely Confined" Voters

48.     Voters who self-certify that they are "indefinitely confined because of age, physical illness or infirmity or…disabled for an indefinite period" are not required to submit photocopies of their photo IDs with their absentee ballot applications. Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)(2).

49.     Voters who certify they are indefinitely confined and who do not provide proof of identification must submit with their ballot "a statement signed by the same individual who witnesses voting of the ballot which contains the name and address of the elector and verifies that the name and address are correct."  Wis. Stat. § 6.87(4)(b)2.

50.     In contrast, if a voter is not indefinitely confined and has not previously submitted voter identification, they must submit such identification. *See* Wis. Stat. § 6.87(1).

51.     After the COVID-19 pandemic hit Wisconsin in March 2020 and the State issued a "Safer-at-Home Order" on March 24, 2020, the Dane County Clerk stated in a Facebook post that pursuant to the Safer-At-Home Order all Dane County voters could meet the definition of "indefinitely confined" for purposes of voting absentee in the April 7 spring election. Wis. Sup. Ct. Order, p. 2, *Jefferson v. Dane Cty.*, No 2020AP557-OA (Mar. 31, 2020) (Def. App. 65).

52.     The WEC was also considering the indefinite confinement issue in the context of COVID-19 and the Safer-At-Home Order prior to the April 7 election. On March 29, 2020, the WEC issued a guidance memorandum to all clerks, stating in relevant part:

> 1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstance. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

- 13 -

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

March 29, 2020 WEC Guidance for Indefinitely Confined Voters (Def. App. 61).

53.     The WEC's guidance goes on to explain:

We understand the concern over the use of indefinitely confined status and do not condone abuse of that option as it is an invaluable accommodation for many voters in Wisconsin. ***During the current public health crisis, many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates.*** We have told clerks if they do not believe a voter understood the declaration they made when requesting an absentee ballot, they can contact the voter for confirmation of their status. They should do so using appropriate discretion as voters are still entitled to privacy concerning their medical and disability status. Any request for confirmation of indefinitely confined status should not be accusatory in nature.

March 29, 2020 WEC Guidance for Indefinitely Confined Voters (Def. App. 62).

54.     Consistent with Wisconsin's decades-long legislative policy of taking voters at their word concerning indefinite confinement, the WEC's guidance emphasizes the importance of avoiding any "proof" requirements: "Statutes do not establish the option to require proof or documentation from indefinitely confined voters.  Clerks may tactfully verify with voters that the voter understood the indefinitely confined status designation when they submitted their request, but they may not request or require proof." (Def. App. 62).

55.     In a March 31, 2020 order, the Wisconsin Supreme Court granted the Republican Party of Wisconsin's motion for a temporary restraining order, directing the Dane County Clerk to "refrain from posting advice as the County Clerk for Dane County inconsistent with the above quote from the WEC guidance." *Jefferson v. Dane Cty.*, No 2020AP557-OA (Mar. 31, 2020) (Def. App. 64-66).

- 14 -

56.     The Wisconsin Supreme Court's Order stated: "We conclude that the WEC's guidance quoted above provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time." *Id*. at p. 2 (Def. App. 65).

57.     Voters claiming "indefinite confinement" status increased significantly in 2020, during the COVID-19 pandemic, as compared to voters claiming that status in 2016 when there was no pandemic.   The increases in voters designating themselves as indefinitely confined occurred statewide, not only in Dane and Milwaukee counties. *See* Dane County Board Exh. 2 (Def. App. 214-215).

58.     Neither the WEC nor the Wisconsin Supreme Court provided further guidance about the criteria for voters to claim indefinitely confined status before the November 3, 2020 election, meaning the guidance in place for the election was the WEC guidance approved by the Wisconsin Supreme Court. (Def. App. 65). The Wisconsin Supreme Court heard oral argument in *Jefferson* on September 29, 2020, and has not issued a decision, which means the WEC guidance quoted above remains in place.

59.     At no time prior to the election on November 3, 2020 did the Trump Campaign assert that the WEC guidance relating to indefinitely confined status was in any way improper or inconsistent with Wisconsin law. The first time the Trump Campaign made that claim was in its recount petitions filed with Dane and Milwaukee counties on November 18, 2020, after election results showed that President Trump had lost the election in Wisconsin by more than 20,000 votes.

60.     Statewide, voters who indicated that they were indefinitely confined received a form letter from a municipal clerk stating: "Identifying as an indefinitely confined voter is an individual choice based on your current situation and it does not require you to be permanently confined." The letter then gave the voter an option to (1) continue to claim indefinite confinement

- 15 -

status, (2) to opt out of the parameters of indefinitely confinement but still continue to receive absentee ballots for the remainder of 2020, or (3) cancel the voter's request to be designated as indefinitely confined. (Dane County Board of Canvassers Exh. 3) (Def. App. 200) (Dane 11/29/20 7:3-6).

61.    The Milwaukee County Board of Canvassers did not determine how many voters cast ballots while indefinitely confined that had not previously submitted an ID within the past year.

62.    The Dane County Board of Canvassers did not determine how many voters cast ballots while indefinitely confined that had not previously submitted an ID within the past year.

63.    No facts were presented to the Milwaukee County Board of Canvassers that any voter in the county cast a ballot as indefinitely confined that did not qualify as indefinitely confined. Specifically, "no evidence of any voter in Milwaukee County [was] offered that has abused this process and voted through this status…not even an allegation that there was a single voter who abused this process to vote without providing proof of their ID, but eliminating proof that anyone did so. So there's no allegation…no proof…no evidence." (Milwaukee 11/21/20 145:2-146:2) (Doc. 39, pp. 14-15).

64.    No facts were presented to the Milwaukee County Board of Canvassers that any voter relied upon any statement made by County Clerk George Christensen to determine their eligibility as indefinitely confined. (Milwaukee 11/21/2020 136:8-16; 145:18–146:8) (Doc. 39, pp. 5, 14-15).

65.    The Trump Campaign presented the Dane County Board with a list of "eight or nine Facebook posts" allegedly by persons whose names were also names of persons who had voted absentee as "indefinitely confined." (Dane 11/28/20 14:19-25) (Doc. 51, p. 288).

- 16 -

66.    The Trump Campaign did not challenge the ballots of these voters or seek a factual determination as to their indefinitely confined status. The Trump Campaign also did not provide evidence concerning whether the election clerk already had each voter's photo ID on file. Accordingly, no finding was alleged, requested, or made that any voter had improperly invoked indefinitely confined status.

67.    There is no evidence establishing beyond a reasonable doubt that any voter cast a vote as indefinitely confined who did not qualify as indefinitely confined.

**d.    "Democracy in the Park"**

68.    On two Saturdays before the November 3, 2020 general election (September 26, 2020 and October 3, 2020), the City of Madison held "Democracy in the Park" events in 206 Madison parks. The events were designed to create a safe way for voters to personally deliver absentee ballots to the City of Madison Clerk during the pandemic. (Affidavit of Maribeth Witzel-Behl, ¶¶ 4-6) (Def. App. 209).

69.    No absentee ballots were distributed, and no absentee ballot applications were accepted or distributed at Democracy in the Park. (Affidavit of Michael Haas, ¶ 4) (Def. App. 202).

70.    At the events, sworn city election inspectors collected sealed and properly witnessed absentee ballots that the voters had previously received.  (Haas Aff., ¶ 4) (Def. App. 202).

71.    At the events, city election inspectors served as witnesses for absentee electors only if the elector brought an unsealed, blank ballot with them.  (Haas Aff., ¶ 4) (Def. App. 202).

72.    The Madison City Attorney emphasized in a letter to counsel for the Legislature that:

> The procedures that the City Clerk has established to secure ballots [at the Democracy in the Park events] are equivalent to the procedures used to secure all absentee ballots. … Sworn election

- 17 -

> officials will retrieve ballots that have already been issued and will
> ensure that ballots are properly witnessed and are secured and sealed
> in absentee ballot envelopes and ballot containers with tamper-
> evident seals, to be tabulated on Election Day.  The election officials
> will maintain a chain of custody log that is open to public inspection.
> No new ballots will be issued in the parks.

(Def. App. 204-205).

73.     Neither the Madison City Attorney nor any other City official received any response to the letter to the counsel for the Legislature "and no further legal concerns regarding the Democracy in the Park program were communicated to [him]."  (Haas Aff., ¶ 6) (Def. App. 203).

74.     The City Clerk for the City of Madison designed the Democracy in the Park event "to comply with all applicable election laws." (Witzel-Behl Aff., ¶ 4) (Def. App. 209). There is no evidence that the Democracy in the Park events violated any Wisconsin election laws or resulted in any improper votes being cast.

75.     In creating the program, the City Clerk for the City of Madison "sought to accommodate the unprecedented demand for absentee ballots, address concerns about the capacity of the U.S. Postal Service to deliver ballots by Election Day, and provide City of Madison voters with a secure and convenient means of returning their completed ballots and obtain a witness if necessary." (Witzel-Behl Aff., ¶ 4) (Def. App. 209).

76.     Voters relied on the City of Madison's determination that the Democracy in the Park events complied with Wisconsin laws, and they cast their votes at the events based on that reliance. *See, e.g.*, Affidavit of Michael Martin Walsh ("I dropped off my ballot based on the assurance from the City of Madison that doing so was legal and proper") (Biden Exh. 253) (Def. Aff. 93).

- 18 -

77.    The City of Madison invited both major political parties to observe the entire process at the Democracy in the Park events. (Haas Aff., Exh. B) (Def. App. 204).

78.    According to the City Clerk of the City of Madison, a total of 17,271 absentee ballots were collected during the Democracy in the Parks events. (Witzel-Behl Aff., ¶ 7) (Def. App. 210).

79.    The Democracy in the Park events did not function as in-person absentee voting sites.  Voters could not obtain and vote ballots there; they could only return absentee ballots they had previously received in the mail.  At the events, city election inspectors "collected completed, sealed, and properly witnessed absentee ballots." (Witzel-Behl Aff., ¶ 6) (Def. App. 209).

80.    The 206 staffed locations were not "alternate absentee ballot sites" regulated under Wis. Stat. § 6.855.  Instead, they were ballot return locations governed under Wis. Stat. § 6.87(4)(b)1 ("The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots.").

81.    The WEC has interpreted Wis. Stat. § 6.87(4)(b)1 to allow the use of secured ballot drop boxes in a variety of locations and circumstances.  These include book slots at public libraries, mail slots used for payment of taxes and other government fees, "staffed temporary drive-through drop offs," and "unstaffed 24-hour ballot drop boxes." August 19, 2020 WEC Guidance re Absentee Ballot Drop Box Information. (Def. App. 71-72).

82.    The drop-offs that were used in the Democracy in the Park events were functionally identical in all respects to the "staffed" and "unstaffed" drop boxes endorsed by the WEC and Wisconsin legislature. Thus, deposit of a sealed ballot envelope in one of the drop boxes staffed by duly designated agents of the clerk constituted "deliver[y] in person, to the municipal clerk" within the meaning of Wis. Stat. § 6.87(4)(b)1.

83.    No allegations were made, and the Dane County Board of Canvassers did not find, that a single vote cast at Democracy in the Park was cast by an ineligible voter.

## PROPOSED CONCLUSIONS OF LAW

1.    Voting is a fundamental right:

> The right of a qualified elector to cast a ballot for the election of a public officer, which shall be free and equal, is one of the most important of the rights guaranteed to him by the constitution. If citizens are deprived of that right, which lies at the very basis of our Democracy, we will soon cease to be a Democracy. For that reason no right is more jealously guarded and protected by the departments of government under our constitutions, federal and state, than is the right of suffrage.

*State ex rel. Frederick v. Zimmerman*, 254 Wis. 600, 613, 37 N.W.2d 473, 480 (1949).

**A.    Standard of Review on Wis. Stat. § 9.01 Appeal**

2.    Unless the court finds grounds for setting aside or modifying the determination of the Board of Canvassers, it must affirm the Board's determination. Wis. Stat. § 9.01(8)(c).

3.    The court must separately treat disputed issues of procedure, interpretations of law, and findings of fact. Wis. Stat. § 9.01(8)(b).

4.    The court will set aside or modify the determination of the Board of Canvassers only if it finds that the Board of Canvassers has erroneously interpreted a provision of law and a correct interpretation compels a particular action. Wis. Stat. § 9.01(8)(c).

5.    If the determination depends on any fact found by the Board, the court may not substitute its judgment for that of the Board as to the weight of the evidence on any disputed finding of fact. The court shall set aside the determination if it finds that the determination depends on any finding of fact that is not supported by substantial evidence. Wis. Stat. § 9.01(8)(c).

6.    The Court will review questions of law *de novo*. *Clifford v. Sch. Dist. of Colby*, 143 Wis. 2d 581, 585, 421 N.W.2d 852, 853 (Ct. App. 1988).

7.    But, when a party tries to change the results of an election by disqualifying the votes of certain voters, the challenger must "demonstrate beyond a reasonable doubt that the person does not qualify as an elector or is not properly registered." *Logerquist v. Board of Canvassers for Town of Nasewaupee*, 150 Wis. 2d 907, 917, 442 N.W.2d 551, 555-56 (Ct. App. 1988).

8.    Wisconsin courts have established a general rule that, in order to successfully challenge an election in a subsequent judicial appeal, the challenger must show that the outcome of the election would have been changed absent the challenged irregularity. *See Carlson v. Oconto County Board of Canvassers*, 2001 WI App 20, ¶ 10, 240 Wis. 2d 438, 444-45, 623 N.W.2d 195 ("Under the outcome test, to successfully challenge an election, the challenger must show the probability of an altered outcome, in the absence of the challenged irregularity…our supreme court has approved the outcome test for most election irregularities.").

9.    Wisconsin courts have historically protected the right to vote and declined to disenfranchise voters for clerical errors by election officials where the voter acted in good faith. *See e.g. Ollmann v. Kowalewski*, 238 Wis. 574, 578, 300 N.W. 183, 186 (1941) ("The voter would not knowingly be doing wrong. And not to count his vote for no fault of his own would deprive him of his constitutional right to vote. ... A statute purporting so to operate would be void, rather than the ballots."); *Sommerfeld v. Bd. of Canvassers of City of St. Francis*, 269 Wis. 299, 304, 69 N.W.2d 235, 238 (1955) (rejecting "purely technical" "complaint as to the delivery of the ballots"); *Lanser v. Koconis*, 62 Wis. 2d 86, 93, 214 N.W.2d 425, 428 (1974) ("[W]e are not inclined to disenfranchise these voters who acted in conformance with the statutory requirements. There is absolutely no evidence from which it could be inferred that the method of delivery by the municipal clerk in any way affected their vote."); *Matter of Hayden*, 105 Wis. 2d 468, 478, 313 N.W.2d 869,

- 21 -

873–74 (Ct. App. 1981) (construing mandatory language about delivery of ballots as directory because "[o]nly when the municipal clerk appears to have solicited voters, or when there is any evidence of fraud, will voters who acted in good faith be disenfranchised."); *Roth v. La Farge Sch. Dist. Bd. of Canvassers*, 2001 WI App 221, ¶ 27, 247 Wis.2d 708, 726, 634 N.W.2d 882, 889 ("A statute which merely provides that certain things shall be done in a given manner and time without declaring that conformity to such provisions is essential to the validity of the election should be construed as directory.") (quoting *Matter of Hayden*, 105 Wis. 2d at 483).

10.    While the provisions in Wis. Stat. §§ 6.86, 6.87 (3)-(7) and 9.01 (1) (b) 2. and 4 shall be construed as mandatory, the reason is "to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses." Wis. Stat. § 6.84 (1)-(2).

11.    But where fraud or impropriety is not alleged, outside of §§ 6.86, 6.87 (3)-(7) and 9.01 (1) (b) 2. and 4, the will of the voter controls. *See, e.g.*, *Lanser v. Koconis*, 62 Wis. 2d 86, 93-94, 214 N.W.2d 425, 429 (1974) (holding that technical noncompliance with a statutory provision for delivery of absentee ballots and signature requirement did not render the ballots invalid and that voters were entitled to have their votes counted).

12.    Except as otherwise provided, the Wisconsin Election Code shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to comply fully with some of its provisions. Wis. Stats. § 5.01 (1). In this context, the Wisconsin Supreme Court has "quite consistently" held mandatory language to in fact be permissive. *Id*. This is particularly true for absentee ballots. *Sommerfeld v. Bd. of Canvassers of City of St. Francis*, 269 Wis. 299, 302, 69 N.W.2d 235, 237 (1955) ("The

- 22 -

number of absentee ballots is increasing rather than decreasing. Where possible our statute should be interpreted to enable these people to vote."). *See also Ollman v. Kowalewski*, 238 Wis. 574, 578, 300 N.W. 183, 185 (1941) (where a clerk erroneously placed his initials on ballots when initials from two clerks were required: "The voter would not knowingly be doing wrong. And not to count his vote for no fault of his own would deprive him of his constitutional right to vote. Any statute that purported to authorize refusal to count ballots cast under the instant circumstance would be unconstitutional. A statute purporting so to operate would be void, rather than the ballots.").

**B.      Plaintiffs' Legal Challenges to WEC Statewide Guidance are Not Within the Scope of a Recount Under Wis. Stat. § 9.01.**

13.      Post-election challenges under Wis. Stat. § 9.01 are limited in scope. This court may not wade into alleged statewide procedural irregularities underlying the election process itself. *Clapp v. Joint School Dist. No. 1*, 21 Wis. 2d 473, 478, 124 N.W.2d 678, 681-82 (1963) ("The statute does not contemplate a judicial determination by the board of canvassers of the legality of the entire election but of certain challenged ballots. ... True, there is an appeal from the board of canvassers to the circuit court but the scope of that appeal is no greater than the duties of the board of canvassers and does not reach a question of the illegality of the election as a whole.").

14.      WEC is an agency of the executive branch. *See State ex rel. Zignego v. Wisconsin Elections Commission*, 2020 WI App 17, ¶ 38, 391 Wis. 2d 441, 463, 941 N.W.2d 284.

15.      Among other duties, WEC administers all of Wisconsin's election laws.  Wis. Stat. § 5.05(1).

16.      Each one of the categories of absentee ballots challenged by Plaintiffs was accepted by the municipal clerks in reliance on published guidance documents issued by the WEC.  The categories and associated WEC guidance documents include:

- 23 -

a. <u>In-Person Absentee Voting Using EL-122 as the Written Application</u>: WEC Form EL-122 has been in use since May 2010. WEC's Form EL-122 (in use since 2010) and Election Administration Manual, p. 91 (Sept. 2020) provide that the absentee certificate envelope itself constitutes an in-person absentee voter's written absentee ballot application.

b. <u>Correcting Missing Witness Address Information</u>: The WEC's October 18, 2020 Memo to Clerks re: "Missing or Insufficient Witness Address on Absentee Certificate Envelopes" states that municipal clerks "must take corrective action" to add missing witness address information if they are "'reasonably able to discern'" that information. (Def. App. 50). The WEC Election Administration Manual states at p. 99 that: "Clerks may add a missing witness address using whatever means are available."

c. <u>Indefinitely Confined Voters</u>: The WEC's March 29, 2020 guidance (approved by the Wisconsin Supreme Court on March 31, 2020) stated that to claim "indefinitely confined" status, a voter need not suffer from a "permanent or total inability to travel outside of the residence"; that the decision "is for each individual voter to make based upon their current circumstance"; and that "many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the [pandemic] crisis abates."

d. <u>Democracy in the Park</u>: The WEC's "Absentee Ballot Drop Box Information" guidance dated August 19, 2020 expressly recommended "outdoor" "staffed" ballot drop boxes like those used in Madison's Democracy in the Park events.

17.     Plaintiffs only avenue to challenge a procedure contained in a WEC guidance document is pursuant to Wis. Stat. § 227.40. Wis. Stat. § 227.40(1) provides that "the exclusive means of judicial review of the validity of a[n] [agency's] rule or guidance document" shall be in the form of "an action for declaratory judgment . . . brought in the circuit court for the county where the party asserting the invalidity of the rule or guidance document resides . . ." These exclusive review provisions "are not permissive, but rather are mandatory." *Richards v. Young*, 150 Wis. 2d 549, 555, 441 N.W.2d 742 (1989); *see State v. Town of Linn*, 205 Wis. 2d 426, 449, 556 N.W.2d 394 (Ct. App. 1996).

18.     The WEC documents attacked as "illegal" by the Plaintiffs are "guidance" documents under Chapter 227. *See* Wis. Stat. § 227.01(3m) (defining "guidance document" to include "any formal or official document or communication issued by an agency, including a manual, handbook, directive, or informational bulletin, that does any of the following: (1) Explains the agency's implementation of a statute or rule enforced or administered by the agency, . . . [or] (2) Provides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency, if that guidance or advice is likely to apply to a class of persons similarly situated.").

19.     The Court therefore has no jurisdiction under Wis. Stat. § 9.01 to reject broad categories of ballots based upon Plaintiffs' contention that the WEC's statewide guidance was inconsistent with the statutes the agency is statutorily required to administer.

### C. Plaintiffs' Challenges to Voters Relying on the WEC's Guidance Fail on the Merits.

#### 1. Absentee Ballot Applications

20.     Wis. Stat. § 6.86(1)(ar) states: "Except as authorized in s. 6.875(6), the municipal clerk shall not issue an absentee ballot unless the clerk receives a written application therefor from a qualified elector of the municipality."

21.     No election statute requires any absentee application to take any particular form or structure.

22.     WEC Form EL-122 is entitled "Official Absentee Ballot Application/Certification." When completed by a voter during the in-person absentee voting period, Form EL-122 operates as the voter's "written application" for an absentee ballot. *See* WEC Election Administration Manual (Sept. 2020), pp. 90-91 ("The applicant does not need to fill out a separate written request if they only wish to vote absentee for the current election. The absentee certificate envelope doubles as an absentee request and certification when completed in person in the clerk's office.").

23.     WEC's use of Form EL-122 as the written application for in-person absentee voters is consistent with WEC's "responsibility for the administration of chs. 5 to 10 and 12 and other laws relating to elections." Wis. Stat. § 5.05(1).

24.     Plaintiff's position that Form EL-122 does not constitute a "separate written application" for an absentee ballot has no basis in Wisconsin's election laws. Form EL-122 is a separate document from the absentee ballot itself.

25.     There is no statutory or other basis upon which to overturn either Board's finding that the Trump Campaign's objections to the use of Form EL-122 should be overruled.

- 26 -

## 2.    Adding Missing Witness Address Information

26.    WEC guidance in place for more than four years permits—and in some instances even requires—the practice of curing missing witness addresses based on reliable information.

27.    The WEC's guidance to clerks to cure missing witness address information is not unlawful. On the contrary, the WEC's guidance is grounded in a reasonable interpretation of the Election Code. While Wis. Stat. § 6.87(9) states that a clerk "may" return an absentee ballot with an improperly completed certificate, the statute does not preclude a clerk from remedying a witness address deficiency herself. In addition, the statute is not mandatory.  *See* Wis. Stat. § 6.84(2).

28.    The law does not direct who may add or correct a witness's address on an envelope.

29.    Plaintiffs' generalization that even corrected envelopes, where clerks filled in only the municipality, the state or the zip code in red ink, are "missing" an address is inconsistent with the plain language of Wis. Stat. § 6.87(6d), which states: "if a certificate is missing **the address** of a witness, the ballot may not be counted." (emphasis added). Wisconsin Statutes, court forms, and tax forms all treat one's "address" as distinct from the city, state or zip code. *See e.g.* Wis. Stats. § 801.095(1) (form of summons listing "Address, city, state, zip code"); *Acuity Mut. Ins. Co. v. Olivas*, 2007 WI 12, ¶ 158, 298 Wis. 2d 640, 697, 726 N.W.2d 258, 287 (describing Form 1099 which asks for "Payer's name, street address, city, state, ZIP code, and telephone no."). And the absentee ballot envelope in question itself treats address, city, state, and zip code as distinct and in separate boxes for the voter's information in the top half the application. (Def. App 7). So too, does Form EL-121, which Plaintiffs endorse. (P. App. 24). To read into the statute that "missing the address" means missing a city, state, or zip code defies principles of statutory construction, internal consistency, and common sense. *State v. Kozel*, 2017 WI 3, ¶ 39, 373 Wis. 2d 1, 21-22, 889 N.W.2d 423, 433 (Court would not "require a specific type or degree of direction where the statute at issue does not so specify. We will not read into the statute a limitation the plain language

- 27 -

does not evidence.") (internal quotation omitted). Doing so ignores Wis. Stat. § 5.01, which requires giving effect to the will of the elector, which requirement is not overridden—even if § 6.87(6d) is mandatory—where an address but not a zip code or state appears and that zip code or state is readily ascertainable. See Wis. Stat. § 5.01 (1).

30.    That an absentee envelope's witness address was completed by a clerk is not a statutory basis for objecting to or invalidating a vote during a recount. Wis. Stat. § 9.01(1)(b)2 ("An absentee ballot envelope is defective only if it is not witnessed or if it is not signed by the voter or if the certificate accompanying an absentee ballot that the voter received by facsimile transmission or electronic mail is missing.").

31.    No allegation has been made and the court cannot find that any corrected witness address involved any fraud, impropriety or abuse by a municipal clerk, or allowed ineligible votes to be cast.

32.    Therefore, the Milwaukee Elections Commission and the Dane County Board of Canvassers properly rejected the Plaintiffs' challenges to ballots where a clerk added missing witness address information.

### 3.    "Indefinitely Confined" Voters

33.    The substantive provision allowing absentee voting for "indefinitely confined" electors has been in place for more than forty years, and the relevant text of Wis. Stat. § 6.82(2)(a) has been unchanged since 1985.  See Wis. Stat. § 6.86(2) (1985); 1985 Wisconsin Act 304.

34.    On March 29, 2020, the WEC issued guidance on applying the "indefinitely confined" exemption during the pandemic.

35.    On March 31, 2020, in considering a challenge to informal guidance provided on social media by certain county election officials, the Wisconsin Supreme Court held that the WEC's March 29, 2020 guidance "provide[d] the clarification on the purpose and proper use of

- 28 -

the indefinitely confined status that is required at this time." *Jefferson v. Dane Cnty.*, No. 2020AP557-OA, at 2 (Mar. 31, 2020). The WEC's guidance has remained unchanged since then and was effective for the 2020 general election.

36.     During the recount proceedings, Plaintiffs submitted two pieces of evidence regarding indefinitely confined voters: (a) a spreadsheet with nineteen (19) names of voters and links to Facebook posts by each identified voter; and (b) a November 25, 2020 affidavit of Kyle Hudson attaching seven (7) purported "social media posts" by voters registered as "indefinitely confined" that show the individuals outside of their homes. None of the posts related to Milwaukee County electors.

37.     Plaintiffs' evidence lacks proper foundation regarding the identity of the individual voters, whether they are the same persons with the social media accounts, the particular circumstances of the individuals at the time they registered as indefinitely confined and at the time of the election, and the posts are hearsay. *See* Wis. Stat. § 906.02 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); § 908.01(3) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'").

38.     The court cannot draw any conclusions based upon this tenuous and inadmissible evidence and cannot extrapolate from the evidence a conclusion that over 28,000 Dane and Milwaukee County residents fraudulently identified themselves as indefinitely confined.

39.     Ballots from voters who claimed indefinite confinement status in reliance of WEC rules and the Wisconsin Supreme Court's order are therefore lawful.

- 29 -

40.     The Milwaukee Elections Commission and Dane County Board of Canvassers properly denied Plaintiffs' challenges to indefinitely confined voters.

### 4.     "Democracy in the Park"

41.     Wis. Stat. § 6.87(4)(b)1 states that an absentee ballot envelope "shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots."  The statute does not restrict the manner in which a voter can return an absentee ballot to a municipal clerk.

42.     The Democracy in the Park events conducted by the City of Madison were for the express purpose of allowing voters to deliver absentee ballots in person to the municipal clerk.

43.     The affidavits of Maribeth Witzel-Behl and Michael Haas establish that the Democracy in the Park events were properly staffed by employees of the City of Madison Clerk, and that proper procedures were used to ensure the security of the ballots so delivered. (Def. App. 201-210).

44.      The Democracy in the Park events were not "early voting" as Plaintiffs allege, because no absentee ballots were requested or issued at the events. *See* Wis. Stat. § 6.86(1)(b); Dane 11/24/20 53:14-19 (Doc. 51, p. 194). *See also* Haas Aff., ¶ 4 (Def. App. 202).

45.     Plaintiffs do not allege and submitted no evidence that any ballot delivered to the City of Madison during the Democracy in the Park events was tampered with or cast by an ineligible voter.

46.     The court therefore finds no statutory basis to disqualify more than 17,000 ballots personally delivered to the City of Madison Clerk at the Democracy in the Park events.

# EXHIBIT C

STATE OF WISCONSIN      CIRCUIT COURT  MILWAUKEE COUNTY
-------------------------------------------------------

DONALD J. TRUMP, et al.,

              Plaintiffs,

    -vs-                         Case No. 20CV007092

JOSEPH R. BIDEN, et al.,

              Defendants.
-------------------------------------------------------
          MOTION HEARING AND DECISION
-------------------------------------------------------

December 11, 2020           Hon. Stephen A. Simanek
                        Presiding


               APPEARANCES

James Troupis and George Burnett, Attorney at Law,
appeared on behalf of the Plaintiff/Petitioners, Donald
Trump and Vice President Michael Pence.

John Devaney, Attorney at Law, appeared on behalf of
President Elect Joseph Biden and Vice President Elect
Kamala Harris.

Matt O'Neill, Attorney at Law, appeared on behalf of
President Elect Joseph Biden and Vice President Elect
Kamala Harris.

Andrew Jones, Attorney at Law, appeared on behalf of the
Milwaukee County Clerk, George Christenson, and the
Milwaukee County Elections Commission.

David Gault, Dane County Corporation Counsel, appeared on
behalf of the Dane County Clerk and the Dane County Board
of Canvassers.

Steven Kilpatrick, Assistant Attorney General with the
Wisconsin Department of Justice, appeared on behalf of the
Wisconsin Elections Commission and its chairperson, Ann
Jacobs.


     Kristin Menzia, RMR, CRR, Official Court Reporter

```
 1                   P R O C E E D I N G S

 2                   THE COURT:  Calling Case 2020CV-

 3       007092.  Donald J. Trump, et al., versus Joseph

 4       R. Biden, et al.  This matter's set for a

 5       hearing.  Counsel, your appearances, please.

 6                   ATTORNEY TROUPIS:  This is James

 7       Troupis on behalf of the Plaintiff/Petitioners,

 8       Donald Trump and Vice President Pence.

 9                   ATTORNEY DEVANEY:  Good morning, Your

10       Honor.  John Devaney on behalf of President Elect

11       Biden and Vice President Elect Harris.

12                   ATTORNEY O'NEILL:  Good morning, Your

13       Honor.  Matt O'Neill, also on behalf of President

14       Elect Biden and Vice President Elect Harris.

15                   ATTORNEY JONES:  Good morning, Your

16       Honor.  Andrew Jones of Hansen Reynolds on behalf

17       of the Milwaukee County Clerk, George

18       Christenson, and the Milwaukee County Elections

19       Commission.

20                   ATTORNEY GAULT:  Good morning, Your

21       Honor.  David Gault, Dane County Corporation

22       Counsel, on behalf of the Dane County Clerk and

23       the Dane County Board of Canvassers.

24                   ATTORNEY KILPATRICK:  Good morning,

25       Your Honor.  My name is Steven Kilpatrick,
```

```
 1    Assistant Attorney General with the Wisconsin

 2    Department of Justice, representing the Wisconsin

 3    Elections Commission and its chairperson, Ann

 4    Jacobs.

 5              THE COURT:  Mr. Burnett I think is

 6    last.  Have we heard from him?

 7              THE CLERK:  We have not.

 8    Mr. Burnett, can you please state your

 9    appearance?

10              ATTORNEY BURNETT:  George Burnett on

11    behalf of the Plaintiffs.

12              THE COURT:  I think that's everyone.

13    Okay.  Everyone has made their appearances.  This

14    matter is the continuation of a hearing pursuant

15    to the statute with regard to the recounts in

16    Dane County and Milwaukee County.

17              The paperwork has been filed.

18    There's been a complaint filed.  Answers have

19    been filed.  Issue is joined.  Before we begin on

20    oral argument, which is what we have left to do

21    on this summary-type proceeding, there are a

22    couple of housekeeping matters that have to be

23    taken care of.

24              I was advised by the Clerk that a

25    number of parties wish to file amicus briefs, and
```

```
 1    there was at least one request to participate by

 2    Zoom in this proceeding.  I will elicit any

 3    comment by counsel, but I think we have a full

 4    house already.

 5              I think the issues can be properly

 6    addressed by everyone who is presently here, and

 7    I don't see any need to muddy the waters by

 8    allowing people to intervene or file amicus

 9    documents.

10              Anyone have any objection to me just

11    outright ruling that we will not allow anyone

12    else either as an amicus or participant in the

13    Zoom hearing?  Hearing none, I will simply order

14    that those requests are hereby denied.

15              We also, since yesterday, have had a

16    motion filed with regard to excluding affidavits

17    of Meagan Wolfe and Kim Wayte.  There's been a

18    motion filed and there's been a response filed to

19    that motion.

20              Does the moving party wish to be

21    heard on that motion, motion to strike, because

22    it's outside the record?

23              ATTORNEY BURNETT:  Yes, Your Honor.

24    Very briefly.  This is George Burnett.  I think

25    in response, we would make three, possibly four
```

1    points.

2            The first is that, as the court has

3    pointed out, this is an abbreviated summary

4    procedure.  The Court's essentially sitting as an

5    appellate court, reviewing the decisions made by

6    the Milwaukee and Dane County Board of

7    Canvassers.  The statute at play here, 9.01

8    subpart eight, indicates that unless a very good

9    reason exists for taking additional facts, the

10   Court is to be confined to the facts made in the

11   record below.

12           To that point, the Wisconsin

13   Elections Commission responds indicating that it

14   was not a party to the proceedings below and

15   therefore it should have an opportunity to

16   present additional facts as well.  I would point

17   out that neither the Board of Canvassers were

18   technical parties.  They were not litigants to

19   those proceedings below, although they are also

20   parties here.  The board --  The Commission

21   received the petition and was involved in the

22   recount from the start.

23           Certainly the information that is

24   being offered now was available to the Biden

25   campaign and could have been introduced in the

```
 1    recount proceedings.

 2              And further, if you read 9.01 subpart

 3    eight in context and add in subpart six, it seems

 4    clear that what the statute is referring to when

 5    it talks about parties is parties to the recount

 6    proceeding.  The alternative is to allow the

 7    Commissioner and the Boards to supplement the

 8    record, which makes it near impossible for the

 9    Court to review what the Board of Canvassers did

10    below.

11              The last point I would make addresses

12    the Wolfe affidavit in particular.  That

13    affidavit, especially paragraphs eight through

14    10, constitutes largely a summary, conclusions

15    drawn from data.  The data would have been

16    available for the recount proceedings and the

17    data itself is not offered, supplied or

18    available.  So there is no way to measure or test

19    the conclusions that Miss Wolfe draws from that

20    data.

21              And indeed, she talks about the

22    conclusions as being rough conclusions.  She uses

23    the word "roughly" a number of times.  In a

24    courtroom proceeding, that kind of testimony

25    would unlikely to be admitted.
```

```
 1                    So unless the Court has any

 2         questions, our point is that 9.01 subpart eight

 3         does not authorize the admission of additional

 4         evidence like this.

 5                    THE COURT:  There was a --

 6                    THE REPORTER:  I'm sorry, Judge?

 7                    THE COURT:  There was a response

 8         filed?  No one wants to respond?

 9                    ATTORNEY BURNETT:  I think

10         Mr. Kilpatrick has authored something, Your

11         Honor.

12                    ATTORNEY KILPATRICK:  Yes, Your

13         Honor.  Thank you very much.  I couldn't hear you

14         at first.  Just a quick response.

15                    That the Commission certainly was not

16         a party before the Board of Canvassers.  Wasn't a

17         participant either.  And so it did not have the

18         opportunity to enter into the record any

19         evidence.  Whether the other co-defendants here

20         had such opportunity is irrelevant to the

21         Commission's inability to enter into evidence

22         before the Commission --  I'm sorry.  Before the

23         Board.

24                    We were not a participant clearly,

25         the Commission or Commissioner Jacobs.
```

7

```
 1      Commissioner Jacobs and the Commission determined
 2      the election so was not participating before the
 3      Board of Commissioners -- the canvassers.
 4               Also with regard to the data in
 5      Ms. Wolfe's affidavit, that is public data.  I
 6      believe that there were other parties who had
 7      requested data regarding indefinite confined
 8      voters that could have been obtained publicly by
 9      the Plaintiffs.  And so there's really nothing
10      controversial about that data.
11               With regard to Miss Wayte's
12      affidavit, again, that goes to, as Ms. Wolfe's
13      testimony and statements, goes to the
14      Commission's defenses.  The Commission, again,
15      because it wasn't a participant before the Board,
16      had no opportunity to raise defenses.  And this
17      evidence is crucial to some of the defenses such
18      as laches and equal protection that the
19      Commission makes and raises in its brief.
20               So I believe it would be prejudicial
21      to the Commission in defending this lawsuit if
22      these affidavits and attachments were stricken.
23               THE COURT:  Any response,
24      Mr. Burnett?
25               ATTORNEY BURNETT:  Just very briefly,
```

8

1    Your Honor.  The Commission's role in this entire
2    proceeding is a bit unusual.  As Mr. Kilpatrick
3    correctly points out, the Commission did not play
4    an active role as a litigant in the proceedings
5    before the Board of Canvassers, nor should it
6    have.  Because the Commission obstensible is
7    supposed to be a neutral governmental agency.  It
8    should not be favoring one candidate or the
9    other.

10          That role doesn't change by virtue of
11    the fact that the statutes require the Commission
12    to be served with a notice of appeal and with a
13    complaint in this case.  If you look at the
14    complaint, the only allegations pertinent to
15    the -- certified right these election results.

16          Depending on this Court's decision,
17    it may be compelled to do something vis-a-vis
18    that certification, but its role should remain a
19    neutral governmental agency that neither -- that
20    favors neither candidate.

21          THE COURT:  As was indicated, this is
22    a summary proceeding.  It's essentially an appeal
23    being heard in a circuit court.  The statute
24    makes clear that the Court is limited to the
25    record that was made at the time of the recount.

```
 1            The affidavits proposed here were not

 2    made part of that record.  I will, therefore,

 3    grant the motion of the Petitioner/Appellant to

 4    strike those affidavits.  We will limit ourselves

 5    to what was available, what was made available at

 6    the time of the recount.  So the motion is

 7    granted.

 8            I believe that takes care of all the

 9    housekeeping matters that we have.  It's the

10    Court's intention to allow counsel to present

11    oral argument.  I should note that I've reviewed

12    all of the pleadings, the briefs.  The briefs

13    have had extensive appendices attached to them,

14    hundreds of pages.  I reviewed hundreds of pages

15    of transcripts from the recounts and the exhibits

16    that were attached as well.  So I expect counsel

17    can relatively briefly present their oral

18    arguments.

19            As you well understand, time is of

20    the essence here.  In less than 100 hours, the

21    electors meet to vote, next Monday, the 14th.

22    And it's this Court's intention to wrap this

23    thing up this morning.

24            So Mr. Troupis, I think you're lead

25    counsel for the Petitioner/Appellants, go ahead.
```

```
 1    I'm not setting a hard time limit, but I expect
 2    people to be concise.
 3              ATTORNEY TROUPIS:  Yes.  Having sat
 4    in your role, Your Honor, I understand very well.
 5    First of all, I want to thank you.  This was a
 6    task you were given by the Chief Justice, and
 7    it's an enormous task.  And I think I speak on
 8    behalf of everyone in saying thank you to you.
 9              I candidly also want to thank
10    opposing counsel and I want to do that
11    publicly.  They're courteous, their civility,
12    their pleasantness is a part of being a part of
13    the Wisconsin Bar.  And whatever else goes on
14    elsewhere in the country, here the lawyers have
15    acted with extraordinary civility and courtesy.
16    And I want to thank them for their effort both
17    during the recount and during these proceedings.
18              As Your Honor mentioned just a moment
19    ago, I will limit my remarks to three items not
20    otherwise addressed in the papers.  First, I want
21    to address the laches extensions that have
22    occurred here.  Second, I want to address
23    W.E.C.'s role, which I think has been
24    misunderstood in these proceedings.  And third, I
25    want to address a statute that had not previously
```

```
 1    been raised.  Section Wisconsin 227.40 which is a
 2    declaratory judgment statute.
 3              So let me start with the laches
 4    question.  It's important to remember that the
 5    role of this court is that of reviewing court.
 6    It's stuck with the evidence.  Your Honor just
 7    mentioned exactly that.  There's no speculation
 8    now.  There's no guessing at what people know.
 9    There's no guessing at what the record has.
10              Now, why is that important?  It's
11    important here because the opposing parties now
12    rely on an intensely factual question, laches.
13    Laches requires an enormous amount of proof about
14    what the parties knew, when the parties knew it,
15    what other parties relied upon.
16              None of that evidence is in the
17    record.  There's nothing in this record that was
18    introduced with regard to what Donald Trump or
19    Mike Pence knew about Wisconsin election laws or
20    knew about the claims that were now being made.
21              It's sort of a situation where
22    defendants or oppositions just saying, well, they
23    must have known.  That's not enough.  That can
24    never be enough.  We have a record.  Everything
25    in our petition, everything before the Court was
```

1  in front of the canvassing boards.  The parties
2  apparently knew they were gonna raise this
3  objection.  They could have put evidence in.
4           But you will look, for example, at
5  Biden findings of fact 47 to 51, which are the
6  ones dealing with laches.  And you will note
7  there is not a single substantive reference to
8  the record.  Not one.
9           Now, why is that?  Because they don't
10 have any facts that support the proposition that
11 President Trump and Vice President Pence had
12 knowledge that relied on that knowledge to the
13 detriment of another party.  For that matter,
14 there's no evidence that the Biden campaign or
15 the canvassing boards or the clerks or anyone
16 relied on the fact that Donald Trump had not
17 raised these matters.  And that's the second
18 prong.
19           So they neither satisfy the first
20 prong, which is a factual prong about our
21 knowledge, about the knowledge of the Plaintiff,
22 that he sat upon, with the intent of causing
23 harm, nor is there any evidence that other
24 parties even relied upon that.  On the contrary,
25 there's evidence they relied on other things but

1    not Donald Trump's failure to raise this.

2              What's also fascinating is whether or

3    not the Biden campaign knew about these same

4    problems in statutes.  The same issues that might

5    ultimately arise in these proceedings.  My guess

6    is with all of their legal counsel and all the

7    brains on the other side of this proceeding, they

8    did know about them.  They knew full well and

9    they in fact took advantage of these things

10   throughout the campaign.  But even that's not

11   necessary and it's not in the record.

12             The point I make is that laches is

13   intensely factual.  There is no facts supporting

14   the propositions that they have asserted here,

15   and there's no reliance.  If this is important,

16   really important in an election case of this

17   type, because if you could rely on an assumption,

18   which is apparently what they're doing, there's

19   an assumption that a candidate and a candidate's

20   committee are aware of every possible legal

21   concern that might arise in a recount, we would

22   be required, if that's the law, then we would be

23   required, the Trump campaign, would be required

24   to sue 72 counties, 595 municipalities, because

25   all of them administer the laws in their

1  jurisdictions.  And we would be required to
2  examine every one of their processes and
3  procedures in advance or be stuck with the idea
4  that we couldn't raise those irregularities
5  afterwards.  That cannot be the law.

6            Moreover, the implication here of
7  allowing a defense like this without any evidence
8  whatsoever, where does it stop?  What if one is
9  running for circuit court judge and they think
10 they're going to win but they don't?  They lose
11 by 10 votes.  Turns out 25 envelopes were
12 altered.  Well, does the circuit court judge, is
13 he required to raise those?  Obviously know about
14 them?  Well, maybe not.  Maybe not a circuit
15 court judge because that's an office we have many
16 of.

17            But what about Governor?  Well, the
18 Governor has lots of resources.  So in a
19 Governor's race, we would assume other things.
20 No facts needed, just assume it.  Well, what
21 about assembly?  What about people running for
22 assembly?  That's kind of significant.

23            The point I'm making, as a matter of
24 policy, the law requires there be facts to
25 support a laches claim.  There are no facts in

1      this case.  None were introduced and none are
 2      even being offered.
 3              We go to the second point that I
 4      mentioned I'd like to go to, which is a
 5      misunderstanding.  I'll call it a misunder-
 6      standing.  It might be a misdirection.  But
 7      either way, the question of W.E.C.'s role here,
 8      that's the Wisconsin Election Commission, I think
 9      there's -- the briefs of the opposition
10      misunderstand or misdirect at it because we're
11      not asserting -- the Trump campaign is not
12      asserting that W.E.C. violated a statute.  They
13      didn't.  They're not --  They just pointed out
14      they're not a party.  The municipal clerks and
15      the people who voted were the subjects of this
16      recount.  Not W.E.C.
17              Let me walk through how the claim is
18      made.  We looked at detailed records during the
19      recount, which were made available to us, of
20      absentee voting in Dane and Milwaukee County.  We
21      were provided digital records from both counties
22      early in the recount process, which we were then
23      able to analyze and determine the exact name of
24      the in-person voters.
25              This is not a claim in any way, shape

1    or form that the election as a whole in this
2    instance, for example, that these cases they cite
3    where they go, well, you can't challenge an
4    underlying referendum.  That's not what we're
5    doing.  We're challenging individual ballots cast
6    by individuals, named in the record, every single
7    one of them identified.  We took that from a
8    digital record of in-person voting.

9              Nobody disagrees on those lists now.
10   There's been no contrary evidence.  Both Boards
11   agreed, for example, when we talked about the
12   failure to have applications exact to that list.
13   Having gotten the list, we then asked the
14   question of each Board, can we look at the
15   applications?  Because applications had been
16   delivered.  Big boxes of them from the municipal
17   clerks, which is where the applications are kept.
18   You have to have an application for absentee
19   voting in Wisconsin.
20             Both Boards said no, you can't have
21   those.  We said why?  And they said, because for
22   our purposes, our clerks in Dane and Milwaukee
23   County universally chose not to have a separate
24   application.  And the Boards will find as a
25   matter of law and conclude that the EL-122, which

1    is the ballot certification envelope, not the

2    application, it's the ballot certification

3    envelope, we're gonna consider that an

4    application.  And in fact, it has application on

5    it.  And that was the conclusion of each Board.

6              So now we had the two elements of our

7    claim.  Number one, the names of individuals who

8    voted in person; and number two, we had that

9    there was no separate application.

10             Now, one can disagree, and that's the

11   subject of this litigation, on whether

12   applications are required, whether or not --

13   whether or not the ballot certification is an

14   application.  Actually there is no disagreement

15   that an application is required.  Everybody

16   agrees on that.

17             But the point here is, that was our

18   claim.  We were done.  That --  At that moment in

19   time when we knew the names of the people, when

20   we knew that there was no separate application,

21   our claim was completed.  That's the claim.

22   That's what we're making.

23             Now, what's W.E.C. role in that?

24   Well, it turns out that after our claim list

25   perfected, the Defendants argued that there isn't

1    a separate application because we're taking
2    W.E.C.'s advice.  So the claim is not that their
3    advice was wrong.  It's a defense.  Rather it's
4    the clerk's.

5           It's the --  The only question posed
6    is could the clerks rely on that advice as a
7    defense.  We're not --  Whether the advice was
8    right or wrong is irrelevant to our claim.  The
9    defense is we get a sort of get-out-of-jail-free
10   card because we relied on W.E.C.'s advice.  No
11   matter what the statute said, we relied on
12   W.E.C.'s advice.

13          Now, I think that's patently
14   incorrect.  Clearly W.E.C.'s advice cannot and
15   does not supplant the law.  It cannot.  If it's
16   wrong advice, it's wrong advice.  But I'm not the
17   only one who says that.  W.E.C. itself says don't
18   rely on our advice.  You need to have separate
19   counsel.

20          In the W.E.C.'s recount manual, it
21   says, and I quote, Petitioner's candidates and
22   filing officers should seek legal counsel when
23   they're involved in a recount.  There's a
24   memorandum also cited in our briefs that says
25   ultimately the decision of the Board of

1    Canvassers is what is challenged in court, not

2    the advice of the Commission's staff.

3              That's the point.  You can't rely on

4    their advice because you have to follow the

5    statute, whether it's right or wrong.  But again,

6    our Supreme Court has dealt directly, directly on

7    this question.  In the last term in a now

8    relatively famous case here in Wisconsin, the

9    *SEIU* case, which we again cite, but it's

10   important to remember the words of the *SEIU* case,

11   which the Defendants don't even allude to.

12             Here's what they say about advice

13   from the Wisconsin Election Commission or any

14   other administrative agency providing advice or

15   guidance.  This is what they say.  They, the

16   guidance, are not law.  They do not have the

17   force or effect of law, and they provide no

18   authority for implementing or enforcing standards

19   or conditions.  They simply explain statutes and

20   rules or they, quote, provide guidance or advice,

21   end quote, about how the Executive Branch is,

22   quote, likely to apply a statute or rule.

23             They impose no obligations, set no

24   standards, and bind no one.  They are

25   communications about the law.  They are not the

1      law itself.  They communicate intended

2      applications of the law.  They are not the actual

3      execution of the law.  Functionally, and as a

4      matter of law, they are entirely inert.  That is

5      to say, they represent nothing more than the

6      knowledge and intentions of their authors, *SEIU*

7      *Local versus Vos*, 220 Wisconsin 67 at paragraph

8      102.

9              I read all that language because it's

10     as if all of that was forgotten in this case.

11     It's as if the primary defense, we're supposed to

12     bring actions against these regulations.  But

13     why?  The regulations have no meaning.  They have

14     no force of law.  If we'd have brought that case,

15     we'd have been kicked out in two seconds under

16     ripeness doctrines.  And the reason is because

17     the W.E.C.'s guidance is not at issue, unless

18     somehow the Defendants come up with some law that

19     we're unaware of that if the advice is contrary

20     to the statute, that's okay.  You can follow

21     either the statute of the legislature or the

22     advice of unelected bureaucrats at W.E.C.

23             When I state the proposition, I think

24     it states the conclusion.  You can't do it.

25     There's no case that's ever said that.  It

```
1    doesn't exist.  So either laches doesn't apply
2    and W.E.C.'s guidance is no defense at all.
3              Moreover, as we indicated in the
4    record, other places including Oconomowoc, right
5    outside Milwaukee, did this correctly under the
6    statutes.  They required the application before
7    they provided the ballot envelope, and of course
8    all the other arguments.
9              But my point here is simply, there
10   are jurisdictions -- this record indicates there
11   are only two jurisdictions in this record that
12   violated these statutes, Dane and Milwaukee.  I'm
13   not saying others didn't.  I'm just saying that's
14   what the record says.  And the record also says
15   that other places complied with the statute.
16   That's the point of the litigation from our
17   perspective.  That's the claim.
18             Now, the third problem that I wanted
19   to address that wasn't addressed in the briefs,
20   which is the statute 227.40.  It's an interesting
21   statute in that it's a declaratory relief
22   statute.  But again, because we allege nothing
23   with regard to the W.E.C.'s regulations or
24   guidance, there's nothing to declare.  There's
25   nothing to approach as a declaration.
```

1      We weren't required to bring
2   anything.  Because, after all, as I just said,
3   under the *SEIU* case, those guidance are
4   meaningless.  They're not law.  Moreover, some
5   jurisdictions followed the statute, some didn't.
6   We could not know of a claim until in fact the
7   election happened.  It's the ballots.  It's the
8   actions that count.  Not a formal declaration
9   around the state.
10      And again, consider that there are
11  500 plus municipalities.  Some did it
12  differently.  Some got it wrong.  Dane and
13  Milwaukee got it wrong.  We can't be obligated to
14  seek a declaration against behavior that hasn't
15  happened, under guidelines that are not binding,
16  that we know are not followed in certain areas.
17      Finally, they seem to forget
18  completely we're stuck with Wisconsin 9.01.
19  Recall we were ordered by the State Supreme Court
20  after our original action to bring our claims in
21  the exclusive jurisdiction here before Your
22  Honor.  That's what we did.
23      Under 9.01(11), it provides that all
24  actions of all irregularities are merged into
25  this action, and this is our exclusive and only

1    way to address these.  That was a conscious

2    decision by the legislature to merge election law

3    into a single place during the recount.

4    Otherwise, of course, we'd have a plethora of

5    litigation before, during or after elections.

6    There's no point in it.

7              You want to have a situation where it

8    actually makes a difference.  Where you don't

9    have to speculate that those 10 envelopes in

10   Waupaca might make a difference so you better sue

11   the Waupaca county clerk.  You don't have to make

12   that kind of decision under our statute.  It's

13   precisely written so that you aren't questioning

14   things that we don't need to question.

15             We didn't know the outcome of this

16   election last year.  No one knew the outcome of

17   the election.  No one knew that it would be this

18   close.  I'm sure that the Biden campaign thought

19   they'd win by a lot.  I'm sure that Donald Trump

20   always believes and is right thinks he's gonna

21   win by a lot.  That's good.  That's what

22   candidates do.

23             227.40 cannot usurp 9.01's obligation

24   of a candidate or a right of a candidate.

25   Because if it did, we would have nothing but

```
1    endless litigation over election laws.  As I
2    said, we don't have to here, because as I said,
3    everybody -- the administration for, the reasons
4    I just said.
5              But even 227 acknowledges this.
6    227.40(3) explicitly provides that in any
7    judicial proceeding other than number one and
8    two, some they refer to, in which the invalidity
9    of a rule or guidance document is material, so if
10   it were material here, I don't think it is, but
11   if it were material to that cause of action, the
12   assertion of the invalidity shall be set forth in
13   a pleading of the party maintaining the
14   invalidity during that later proceeding.
15   Exactly.
16             So if we were required to do it, we
17   could do it in these proceedings, I guess.  And
18   the Court could seek and enter a declaratory
19   judgment.  We're not barred from raising a
20   response that W.E.C. in fact gave wrong advice if
21   it's relevant.  I don't think it's relevant.  I
22   don't think it matters.  I don't think it's
23   any -- it's an affirmative defense.  The statutes
24   say what the statutes say.
25             I think they got it exactly
```

```
1    backwards.  The idea that W.E.C. supercedes the
2    law or that W.E.C.'s advice is an absolute
3    defense is unsupportable.  There's no support in
4    the law for that proposition of which I'm aware.
5    It is advice.  It is not law.  We are not
6    involved --  We would not be involved in endless
7    litigation guessing at what people are gonna do
8    or not do in a proceeding.
9              Your Honor, I'm glad to answer any
10   other questions either now or in the future, but
11   I appreciate that we have briefed extensively
12   many of those other issues and I addressed the
13   three I thought with some certainty I should
14   address based upon the brief.
15             THE COURT:  Thank you, Mr. Troupis.
16   Mr. Burnett, did you wish to argue on behalf of
17   Petitioners/Appellants also?
18             ATTORNEY BURNETT:  No, I do not, Your
19   Honor.
20             THE COURT:  Then with respect to the
21   Respondents, I don't know if you have among
22   yourself decided in what sequence you will argue,
23   but whatever way you want to go is fine with the
24   Court.
25             ATTORNEY DEVANEY:  Your Honor, thank
```

1    you.  We have spoken among us, and I will speak
2    first on behalf of President Elect Biden and Vice
3    President Elect Harris.  And I think it's hoped
4    among my colleagues that I'll address most of the
5    points.  I know my colleagues are available for
6    supplementing me or answering any questions.  So
7    if that's acceptable to Your Honor, that's how
8    we'll proceed.
9            THE COURT:  It certainly is.  Go
10   ahead.
11           ATTORNEY DEVANEY:  Your Honor, really
12   the elephant in the room here that Mr. Troupis
13   did not address and we need to be very clear
14   about is what are Plaintiffs' asking you to do
15   here.  They're asking you to throw out the votes
16   of more than 220,000 Wisconsin citizens who voted
17   in full compliance with the laws that were in
18   effect at the time of the election.
19           They are asking you to do this
20   without evidence that a single voter, not even
21   one, voted improperly or engaged in anything
22   remotely approaching voter fraud.  And even
23   worse, Your Honor, they're asking you to throw
24   out the votes of only those who live in two of
25   Wisconsin's 72 counties.  They have very

27

```
 1      cynically targeted the two most urban, non-white,

 2      and democratic counties, even though voters in

 3      the other 70 counties voted using the exact same

 4      procedures the Plaintiffs' claim are unlawful.

 5              Counsel for Petitioner here said

 6      there's no evidence of that.  That's not true.

 7      We have an affidavit from Mr. Kennedy in the

 8      record that demonstrates that these procedures

 9      were used statewide.  And, Your Honor, that's not

10      surprising because clerks do rely on W.E.C.

11      guidance and the guidance provided for exactly

12      the procedures that were followed in Dane and

13      Milwaukee and around the state.

14              The people of Wisconsin have spoken,

15      Your Honor.  Vice -- President Elect Biden and

16      Vice President Elect Harris won by more than

17      20,000 votes.  President Trump sought a recount.

18      That recount was performed diligently by

19      Milwaukee and Dane canvassers over a course of a

20      week to nine or 10 days.  And the outcome of that

21      was the margin of victory actually increased.

22              Your Honor, Justice Hagedorn just a

23      few days ago stated that in response to precisely

24      this type of relief, this very request for relief

25      as a matter of fact, that the loss of public
```

```
 1      trust in our constitutional order resulting from
 2      the exercise of this kind of judicial power would
 3      be incalculable.
 4              Indeed, Your Honor, the election code
 5      of Wisconsin 5.01, the first provision in it says
 6      that the election code must be construed to give
 7      effect to the will of the voters.  You are being
 8      asked to do exactly the opposite.  And that, of
 9      course, is entirely inconsistent with Wisconsin
10      law and with the Wisconsin and Federal
11      Constitutions.
12              It is not surprising, Your Honor,
13      given this extraordinary request for relief that
14      no court in the history of our country has ever
15      come close to granting that there are many
16      reasons why the relief should be denied.
17              And of course, Your Honor, you're
18      well aware of the Court's limited scope of review
19      in this circumstance.  It's not the Court's role
20      to substitute its judgment for the Canvassing
21      Boards with respect to issues of fact, nor is it
22      the Court's role to second guess questions of law
23      that were appropriately decided or consistently
24      decided with statute and guidance by the
25      Canvassing Boards.
```

1  Importantly, Your Honor, the Supreme

2  Court long ago of Wisconsin spoke to a limited

3  aspect of review by this court.  And the Court

4  said in a *Clapp v. Joint School District* board

5  case that the Court's role here is no greater

6  than the duties of the Board of Canvassers and

7  does not reach a question illegality of the

8  election as a whole.

9  In fact, what the Court's role is and

10  what the Boards of Canvassers' role was was to

11  review ballots on an individual basis and ballot

12  envelopes and to decide whether some should be

13  included -- or whether some should be excluded

14  for irregularities or not.  And that is the

15  limited role the canvassing board and Your Honor,

16  this Court's limited role as well in this

17  proceeding, giving deference to the canvassers.

18  Your Honor, I am mindful that you've

19  read our briefs and I will not delve too deeply

20  into our various arguments, but I do want to

21  highlight some of the very important points.

22  I'll begin with the laches, equitable

23  estoppel, and unclean hands argument that we have

24  made.  And it's very clear, Your Honor, that

25  President Trump has been on notice of the

1    provisions that he is challenging in this
2    proceeding.
3              In 2016, President Trump ran for
4    President in Wisconsin.  These very provisions
5    that are being challenged now were in effect at
6    that time.  He went through a recount.  These
7    very provisions were at issue in that recount.
8    This is in the record the fact that President
9    Trump ran in 2016.  That there was a recount in
10   2016.  To suggest that President Trump does not
11   have notice of this guidance from the W.E.C. is
12   just ignoring the record, ignoring reality.
13             Of course President Trump had notice
14   of the fact that, for example, the absentee
15   in-person ballot application has been in use for
16   more than a decade.  It was in use when he ran in
17   2016.  Likewise, the witness address information
18   guidance from the W.E.C. and the command that
19   clerks should fill in pieces of missing witness
20   addresses has been in effect for more than four
21   years and was in effect when President Trump ran
22   for the presidency in 2016.
23             Similar, the indefinitely confined
24   guidance from the Wisconsin Election Commission
25   has been in effect for something like more than

```
 1      40 years, Your Honor.  And the particular

 2      guidance at issue here has been in effect since

 3      last March, and there was a Wisconsin Supreme

 4      Court decision that interpreted and affirmed that

 5      language.

 6               And likewise, the Democracy in the

 7      Park initiative that President Trump challenges

 8      was noticed more than a month and a half before

 9      the election.  And so to argue that there wasn't

10      notice and that President Trump couldn't have

11      known to have challenged these provisions before

12      the election just simply defies reality and

13      common sense and the facts in the record.

14               Your Honor, whether call laches,

15      equitable estoppel, or some other equitable

16      notion, the case law in Wisconsin and around the

17      country establishes that any relief, much less

18      the drastic relief that President Trump seeks

19      here, cannot be granted where a party has slept

20      on its rights in the way that has occurred here.

21               It's established by the case law

22      cited in our brief, this principle applies with

23      particular force in the context of elections

24      where challenges are brought after the election

25      and the challenges would disenfranchise voters.
```

```
 1      Plaintiffs' delay here could not be more
 2      prejudicial to the 220,000-plus voters affected
 3      by this request for relief.  The prejudice is
 4      outright disenfranchisement and a denial of their
 5      right to vote.
 6              So, Your Honor, the equitable
 7      estoppel, laches argument applies powerfully here
 8      under Wisconsin law and law from other
 9      jurisdictions around the country.
10              Second, Your Honor, is the issue of
11      voter reliance, which provides another basis for
12      rejecting this challenge.  As we discussed in our
13      briefs, that is, all the Defendants, Wisconsin
14      like states throughout the country, protect
15      voters who rely on the law as it exists at the
16      time that they voted.
17              Consistent with the sacred right of
18      the constitutional right to vote, Wisconsin
19      courts have long made it clear that any error in
20      the administration of an election and, by the
21      way, Your Honor, there were no errors here, but
22      even if there had been, such an error should not
23      result in the exclusion of any votes where voters
24      relied on the law and the actions of election
25      officials.
```

1    Here, Plaintiffs' entire claim rests

2    on the assertion that voters should not have

3    relied on the guidance of the W.E.C. and the way

4    in which election officials administered the

5    election.  There is not a single allegation and

6    no evidence that any voter did anything improper.

7    Your Honor, in this circumstance,

8    discarding a single vote, much less 220,000,

9    would violate Wisconsin law and the strong policy

10   reflected in 5.01 that says we must respect and

11   honor the will and intent of the voters.  I'll

12   elaborate upon a little further -- in a little

13   more detail in a few minutes.  It also would

14   violate the constitutional rights of these

15   voters, the 1st and 14th Amendment, due process

16   rights, and the right to vote.

17   Third, Your Honor, this is the third

18   reason why this challenge must be rejected, is

19   9.01, which counsel for President Trump has

20   discussed.  Plaintiffs' broad challenges to the

21   W.E.C. guidance and the request to discard broad

22   categories of ballots are simply a misuse of

23   9.01.

24   Once again, the *Clapp* case I cited

25   earlier decided decades ago, the Wisconsin

```
 1        Supreme Court made it clear that administrative

 2        irregularities underlying election process or

 3        alleged administration irregularities are not a

 4        proper subject for a 9.01 recount proceeding.

 5        The Court's been clear about that since the early

 6        1960s, Your Honor.

 7                 These recount procedures in 9.01

 8        establish that ballots will be viewed on an

 9        individual basis.  If any individual ballot is

10        excluded because it is improperly cast, the

11        remedy is a random draw-down where one ballot is

12        then removed from the total collection of

13        ballots.

14                 And as the Wisconsin Department of

15        Justice very capably explains in its brief, there

16        is no anchoring in evidence that ties the

17        challenges here to broad categories of ballots to

18        the individual ballots that are the exclusive

19        focus of a recount under 9.01.  And for this

20        additional reason, the relief Plaintiff is

21        seeking is entirely improper in the context of

22        this recount proceeding.

23                 And the truth of the matter, Your

24        Honor, is notwithstanding counsel's contention to

25        the contrary, President Trump is actually
```

1     seeking -- is actually asking you to rule on what
 2     is in effect a collateral challenge to the W.E.C.
 3     guidance and election practice.  As we describe
 4     in our brief, challenges to W.E.C. guidance, and
 5     any agency guidance, are governed by Wisconsin
 6     Statute 227.41, which provides the exclusive
 7     means of judicial review of the validity of
 8     guidance issued by a state agency.
 9             And specifically, that provision
10     provides that it is the exclusive means of
11     judicial review of an agency's guidance document,
12     and that such review shall be through an action
13     for declaratory judgment brought in the circuit
14     court.  The Supreme Court has held that this
15     exclusive review provision is not permissive but
16     rather than -- but is mandatory.  And for that
17     we -- I refer you to the cases as cited on page
18     21 of our brief.
19             Moreover, the only permissible relief
20     when challenging agency guidance, such as
21     President Trump is doing here, is prospective in
22     response to a ruling on a declaratory judgment.
23     Not retrospective in a way that would
24     disenfranchise hundreds of thousands of voters,
25     as being requested here.

```
 1                Your Honor, next, the reason for
 2      another -- the additional reasons for rejecting
 3      these challenges are on the merits.  And I know
 4      Your Honor is familiar with the facts relating to
 5      the four broad challenges.  I won't delve too
 6      deeply into them, but there are a few points that
 7      I think must be made to make sure that the
 8      Court's fully aware of the weakness of the
 9      challenges.  The first relates to --  And also
10      the evidence in the record to support the
11      Canvassing Board's determination.
12                And the first one is, of course, the
13      absentee in-person application and the challenge
14      to hundreds of thousands of votes on that basis
15      or more than a hundred thousand I believe the
16      number is.  As Defendants describe in our briefs,
17      every in-person early voter applied for an
18      absentee ballot by completing form EL-122
19      entitled official absentee ballot application.
20      That is the name of it.  It says application on
21      it.  And it requires voters to complete
22      information that other voters complete when
23      submitting a separate application for an absentee
24      ballot, such as through the mail.
25                Now, that application on EL-122 must
```

1    be completed before a voter receives a ballot.
 2    And the record evidence shows exactly how that
 3    process works.  And as I mentioned before, Your
 4    Honor, this process has been in place for more
 5    than a decade.  It was implemented after the 2008
 6    presidential election, as demonstrated by the
 7    record in this case, to increase -- to address
 8    inefficiencies that were experienced with
 9    in-person absentee voting in the November 2008
10    presidential election.

11             And the way it works, Your Honor,
12    is -- and this is in the record in the evidence
13    as cited in our brief, a voter must show -- shows
14    up in a clerk's office.  He or she shows an ID,
15    requests a ballot in person.  The request for a
16    ballot is entered to the Wis-Vote System.  That
17    system generates a record of application and a
18    label for an envelope.

19             The voter shows the label -- the
20    label envelope to the official, the clerk before
21    receiving a ballot.  And then the voter signs the
22    certification on the envelope that the clerk
23    witnesses.  So you have to go -- you have to
24    apply for the application -- for the ballot, you
25    do so in the presence of the clerk, you receive

1    it, and then you complete it.  So there is an
2    application.  And to suggest otherwise is just
3    ignoring the reality of the situation and 11
4    years of practice with precisely this procedure.

5              No one has ever before objected to
6    these practices or to the use of form EL-122.
7    And one of the great ironies here, Your Honor, is
8    that this form was used in 2016.  And it was used
9    to help President Trump himself get elected.
10   Plaintiffs offer no excuse for not challenging
11   this longstanding practice before now.

12             And Your Honor, the last point I'll
13   make on this particular issue is there is no
14   evidence that any person, not a single person who
15   used this process of early in-person voting voted
16   improperly or was not qualified to vote.  And
17   again, going back to 50.01, respecting the will
18   of the voter, honoring the will of the voter,
19   every voter who used this method was lawful.  And
20   his or her vote should be honored in the way it
21   was cast.

22             Second, Your Honor, the provision of
23   witness address information.  An absentee voter
24   must complete her ballot and sign a certification
25   of voter on the absentee ballot envelope in the

```
 1      presence of a witness.  And the witness must then

 2      sign a certification of witness on the envelope,

 3      which must include the witness's address.

 4                  Now, since 2016, October 2016, the

 5      W.E.C. has instructed clerks that they must take

 6      corrective action to fill in any missing witness

 7      address information if they are reasonably able

 8      to discern that information.  That guidance was

 9      approved by the Wisconsin Department of Justice

10      under the leadership of Wisconsin Republican

11      Attorney General Brad Schimel, it was unanimously

12      approved by the W.E.C.'s Commissioners, and, as I

13      said, has been followed for four years-plus since

14      then, including in 11 statewide elections.  It

15      has never been challenged until now.

16                  And President Trump won the 2016

17      election and a recount using precisely this

18      practice.  And to suggest, therefore, that he

19      didn't know about it and couldn't have challenged

20      it before this November is just in complete

21      defiance of those facts.

22                  In the evidence established, the Dane

23      and Milwaukee election officials completed this

24      information reliably by contacting voters, by

25      relying on public sources to obtain witness
```

1    address information when it was missing.  There's
2    not a single piece of evidence, Your Honor, that
3    any address added or any address information
4    added was wrong.
5              And moreover, adding the address
6    information is consistent with the purpose of the
7    witness's requirement, which is to verify the
8    identity of voters -- of witnesses.  It
9    facilitates contacting a witness, which is the
10   purpose of the witness requirement.  So you
11   can -- an official can contact a witness to
12   verify that a voter was who he or she said that
13   she was.
14             And, Your Honor, I just have a few
15   more minutes and then I will wrap up.  The
16   indefinitely confined issue.  As I said earlier,
17   it's been in place for more than 40 years and it
18   was modified in March because of the pandemic.
19   And the W.E.C. guidance issued on March 29th says
20   that the indefinitely confined exception during
21   the pandemic will be as follows.  And it sets
22   forth the ability of a voter to designate him or
23   herself as indefinitely confined because of age,
24   physical illness or infirmity or being disabled.
25   It does not require permanent or total inability

1    to travel outside one's residence.

2              And the guidance goes on to explain

3    that during the current public health crisis,

4    many voters of a certain age or at-risk

5    populations may meet the standard of indefinitely

6    confined until the crisis abates.  That makes

7    sense.  During this pandemic, there's much more

8    risk for voters.  The W.E.C. recognized that.

9    The Supreme Court of Wisconsin considered this

10   language.  That case is still pending before the

11   Court but it left that language in place and no

12   one challenged it until now.

13             Now, in their brief, President Trump

14   claims that there is a sort of suspicious spike

15   in the number of people who claimed indefinitely

16   confined status and that something is amiss

17   because of that.  But the truth of the matter,

18   Your Honor, is the record shows the percentage of

19   people who claim that status is consistent,

20   entirely consistent with past elections.

21             The reason the numbers have increased

22   is because, one, we're facing a once-in-a-century

23   pandemic.  And two, the number of people who

24   voted, the raw number of people who voted

25   absentee increased.  So it's not surprising at

```
 1       all that the number of people who claimed

 2       indefinitely confined status also increased.  And

 3       again, there's not a single piece of evidence in

 4       this record that a single voter improperly

 5       claimed indefinitely confined status.

 6                    In sum on that issue, Your Honor, the

 7       guidance is consistent with the statute.  There's

 8       no evidence of impropriety and Plaintiffs

 9       improperly challenged the guidance and

10       implementation of it after the election.

11                    And the final on-the-merits point

12       with these four issues, Your Honor, is Democracy

13       in the Park.  And just as with the other three

14       rulings from the Boards rejecting the Trump

15       campaign challenges, the Board's ruling on this

16       issue is fully supported by substantial evidence

17       in the record.

18                    That evidence establishes that the

19       Madison clerk designed the event of Democracy in

20       the Park to comply with all applicable election

21       laws.  The event was for the purpose of

22       accommodating unprecedented demand for absentee

23       ballots, to address the very real concerns about

24       the postal service's ability to deliver ballots

25       in a timely way, and to provide Madison voters
```

1    with a secure and convenient means of returning
2    their completed ballots.
3              A careful chain of custody of the
4    ballots was established, as is demonstrated by
5    the evidentiary record in this case.  And again,
6    there is no evidence that any ballots delivered
7    at these events, the two days that they were
8    held, not a single one was improper or any way
9    unlawful.
10             The evidence also shows, Your Honor,
11   that both major political parties were invited to
12   the event.  And that after the lawyer for the
13   City of Madison explained to the legislature's
14   counsel the lawfulness of this event, no one
15   objected to it.  It was permitted to go forward.
16   And of course, there was no pre-election
17   challenge to it.
18             The evidence also shows, Your Honor,
19   going back to my point earlier about voter
20   reliance, that voters relied on the lawfulness of
21   this program as represented by Madison --
22   accurately represented by Madison city
23   officials.  We have affidavits in the record from
24   voters saying that they cast their votes at these
25   events in reliance upon representations that the

1     events were appropriate and lawful, and that
2     reliance must be respected and protected.
3              Your Honor, the claim of the -- of
4     President Trump is that the Democracy in the Park
5     events constituted early in-person voting under
6     Wisconsin Statute Section 6.855.  But that
7     statute does not apply at all to this situation.
8     The only thing voters could do, Democracy in the
9     Park, is return sealed, completed ballots.  They
10    could not obtain or apply for ballots at that
11    event and, therefore, 6.855 does not apply.
12             This was not early in-person voting.
13    Instead, these events were governed by
14    6.87(4)(b)1, which is the provision that allows
15    for ballot return locations.  The Commission, the
16    Election Commission, has interpreted this
17    provision to allow the use of secure ballot drop
18    boxes in a variety of circumstances and
19    locations.  This was one of those circumstances.
20    These were staffed drop boxes in parks, and they
21    were functionally identical to the staffed and
22    unstaffed drop boxes that have been used for many
23    years in Wisconsin.
24             Your Honor, last point on this is the
25    statute provides that for delivery of these

1    ballots, delivery in-person to the municipal

2    clerk, is permissible under 6.87(4)(b)1 and

3    that's exactly what happened here.  These ballots

4    were delivered to agents of the clerk in the

5    parks, entirely consistent with the expressed

6    language of the statute.

7              And the Boards, therefore, properly

8    concluded the ballots cast in these events were

9    lawful.  And once again, there's not evidence

10   that a single person who delivered their ballots

11   at these events voted improperly or unlawfully.

12             Your Honor, my final two points, and

13   I'll be very brief on these, goes to the

14   constitutional violations that would result from

15   granting the relief that Plaintiff, President

16   Trump, seeks here.  And I'll focus first on due

17   process and second on equal protection.

18             The procedural substantive due

19   process issues here cry out for attention.

20   What's being asked here is to change the rules

21   after the game has been played.  And fundamental

22   due process prohibits that.  Voters were not on

23   notice that the rules would be changed in this

24   way, of course.  And it goes to the heart of due

25   process that you cannot do that after the fact

1    and disenfranchise hundreds of thousands of
2    voters.
3            I just refer you to our brief on due
4    process, without getting into case law, but Your
5    Honor I'm sure is very well aware, well-versed to
6    due process law.  But this would be one of the
7    ultimate violations of both procedural and
8    substantive due process to have the changes after
9    the election that President Trump is seeking.
10           And then finally, Your Honor, is
11   equal protection.  I made the point earlier that
12   the relief being sought here is targeted at two
13   out of 72 counties.  In the other 70 counties as
14   I -- as the record demonstrates, voters voted in
15   the same way.  They relied upon indefinitely
16   confined.  They relied upon W.E.C. guidance, the
17   clerks did, with respect to adding witness
18   information.
19           Voters throughout the state used the
20   form for in-person absentee voting just as the
21   voters in Dane and Milwaukee did.  And under the
22   equal protection clause, Your Honor, it would be
23   an egregious violation to discount just the votes
24   of voters in Dane and Milwaukee as being
25   requested here.

```
 1              In *Bush v. Gore,* the Supreme Court
 2      said that the fundamental nature of the right to
 3      vote means equal weight afforded to each vote and
 4      the dignity, equal dignity owed to each other.
 5      Here, if the relief Plaintiffs seek were granted,
 6      220,000 Wisconsin citizens would have no weight
 7      afforded to their vote and certainly would not be
 8      afforded the equal dignity that voters in 70
 9      other counties are receiving.
10              Your Honor, for all those reasons,
11      Plaintiffs' or President Trump's challenges and
12      requests for relief should be denied.  We
13      respectfully ask that the Court do so.
14              THE COURT:  Thank you, Mr. Devaney.
15      Have you consulted and agreed on who goes next?
16      Mr. Kilpatrick's raising your hand.  Let me just
17      check with the reporter.  You're okay on the
18      time?
19              THE REPORTER:  Yes.
20              THE COURT:  Mr. Kilpatrick, go ahead.
21              ATTORNEY KILPATRICK:  Thank you, Your
22      Honor.  I will be brief.  I just wanted to say
23      that the Election Commission does not take sides
24      in the election.  The side of the Election
25      Commission in this appeal is to defend its
```

1    decisions.  And I ask that the Court, if it would
 2    take judicial notice of those Election Commission
 3    memos that were attached to Administrator Wolfe's
 4    affidavit.  Those are public documents and they
 5    can be taken judicially noticed of.  They're all
 6    on the website.
 7              That also goes to the laches argument
 8    in that it is clear that the Plaintiffs had
 9    knowledge and notice of the Commission's
10    guidance.  These were all publicly-available
11    guidance.  They were distributed throughout the
12    state to all the clerks.  All the candidates and
13    political parties had knowledge of those for
14    years.
15              For example, the guidance regarding
16    the application, it actually was created, the
17    EL-122, approved unanimously by the Government
18    Accountability Board, the predecessor agency of
19    the Elections Commission, in 2009.  The
20    application began use in May of 2010 and has been
21    used ever since.  And so any challenge could have
22    been brought literally years before.
23              With regard to the indefinitely
24    confined aspect, again, the Plaintiffs were on
25    notice of that.  As this Court is aware and the

1  briefs make clear, there was a pre-election suit
2  brought by a political party before the Wisconsin
3  Supreme Court in March about a local official's
4  statement.  So it is unpersuasive that the
5  Plaintiffs argue that they could not have brought
6  any suit prior to the recount.  It's clear in
7  Wisconsin that that did happen months before this
8  November election.
9             And I also would like to note with
10  regard to the indefinitely confined issue is that
11  the Wisconsin Supreme Court approved in a
12  preliminary relief order the guidance that the
13  Commission issued and had no problem with that
14  back in March.
15             That's all I have to say.  I think
16  Mr. Devaney did a fine job providing a defense
17  altogether with the Defendants.  Thank you.
18             THE COURT:  Who wishes to proceed
19  next?  Mr. Jones?
20             ATTORNEY JONES:  Yes, Your Honor.
21  I'm not sure if I was supposed to go next, but
22  not seeing Mr. Gault raise his hand, I will go
23  next.
24             And like other counsel on this side
25  of the table, I am mindful of the voluminous

```
1    submissions that are in front of Your Honor and
2    Your Honor's statements at the beginning of
3    argument, so I too will keep it succinct, or at
4    least try to.  I know lawyers say they will and
5    often don't, but I will do my best.
6              There's really just a few points I
7    want to make.  Picking up on some of the things
8    that have been said in argument, and particular
9    by Mr. Troupis, and then just to highlight a
10   couple of other points on the various defenses
11   that have been raised.
12             With respect to the laches issue, I
13   would point Your Honor back to just the elements
14   of that defense in Wisconsin, those elements
15   being three.  Unreasonable delay in bringing a
16   claim; two, a lack of knowledge by the party
17   who's asserting that defense that the other party
18   would assert the claim; and prejudice.
19             And the argument that I think I hear
20   coming from opposing counsel really goes to the
21   unreasonable delay element.  And I think the
22   facts here, the record that was in front of these
23   two Boards, are very clear on the issue of
24   unreasonable delay.
25             And I think what opposing counsel is
```

```
 1      trying to do now is characterize these claims or
 2      these challenges that are being brought via the
 3      recount really is being about particular voters.
 4      And of course, now at this point in the
 5      proceedings, President Trump is aware of how many
 6      voters fit into a particular category or
 7      categories as a result of the recount that
 8      occurred.
 9              But this is not a challenge to
10      particular voters or particular ballots.  And I
11      think that's obvious for a number of reasons, not
12      the least of which being the way that the recount
13      petition itself was framed.  The petition was
14      framed in terms of alleged statewide errors in
15      the administration of the election.
16              I would point Your Honor to
17      paragraphs 4-B, 5-B, 6-C and 6-E of the recount
18      petition.  Those paragraphs all allege statewide
19      misadministration of the election.  The Trump
20      campaign knew going into the election that those
21      alleged problems in the administration of the
22      election were out there.  It's not about
23      individual voters or individual ballots.  And the
24      facts relating to those alleged, and I underscore
25      alleged, errors in administration are obviously
```

```
 1    all facts, matters of public record for reasons
 2    that the briefs explain, that Mr. Devaney and
 3    Mr. Kilpatrick have already emphasized for Your
 4    Honor.  It's very clear on the record that there
 5    was unreasonable delay here.
 6                 Another point that I'd like to
 7    emphasize for Your Honor that I think is implicit
 8    in what the other defense counsel have already
 9    said, but that is that part of this strong public
10    policy in Wisconsin that favors the counting of
11    all votes, which is expressed in section 5.01(1)
12    of the Wisconsin statutes and cases such as the
13    Zimmerman case from the Wisconsin Supreme Court
14    in 1949 cited by the parties, but part of that
15    strong public policy or part of the way that
16    policy has been enforced by the Courts is this
17    idea that we don't throw out votes in Wisconsin
18    when the error at issue is official error or
19    error by election officials, rather than error or
20    misconduct or perhaps even fraud by individual
21    voters.
22                 And I won't go through all those
23    cases, but I would simply reemphasize that point
24    and point Your Honor to the cases that we cited
25    in our brief at pages 11 and 12.  That's a line
```

```
 1        of cases that goes back over 100 years.  And I
 2        don't think there really can be any argument that
 3        what the Petitioners here are contending is that
 4        there was error by the election officials.
 5               There is no allegation, there
 6        certainly isn't any proof of voter error or voter
 7        fraud.  And I think on the strength of that line
 8        of cases, the Court really is not in a position
 9        where it can throw out votes for the reasons that
10        are being asserted here.
11               I have only two brief points I want
12        to make in terms of the merits of the claims with
13        respect to Wisconsin election law.  One relating
14        to the in-person absentee ballots specific to
15        Milwaukee County, and the other about the
16        indefinitely confined absentee voter issue.
17               The first being that the Board in
18        Milwaukee certainly reached the conclusion that
19        the almost 109,000 ballots that the Petitioners
20        are challenging, those all being in-person
21        absentee ballots, were supported by a written
22        application in that each and every single one of
23        those absentee voters filled out this combined
24        application certification form, the EL-122.  So
25        without question, there was a written application
```

1    in that form.

2               The Board also addressed, however,

3    the fact that the way it works in Milwaukee

4    County for all of those 19 municipalities is that

5    when someone walks into the clerk's office to

6    vote in-person absentee, the clerk, checking

7    their ID, inputs the fact that the voter is

8    requesting a ballot, an absentee ballot, into the

9    my -- the My Vote system, if I've got the name

10   right.

11              So in that moment when the voter is

12   present, asking for a ballot, the clerk is

13   essentially doing online what hundreds of

14   thousands of other Wisconsin voters did in

15   requesting absentee ballots through the online

16   system.  There is then a written record of that

17   transaction, so to speak, that's created just

18   like there is a record of every other voter who

19   applied for an absentee ballot online in that

20   way.

21              The Petitioners are not challenging

22   those hundreds of thousands of voters who went

23   online and asked for an absentee ballot in that

24   way, and there is absolutely no reason to treat

25   any of the 109,000 Milwaukee County voters who

```
 1     went in and asked for a ballot in person but
 2     through that process essentially also applied
 3     online, there's no reason to treat them any
 4     differently and to throw out those 109,000
 5     ballots.
 6              The last point I'd like to make, Your
 7     Honor, again, on indefinitely confined, certainly
 8     the arguments made in the briefs go to the fact
 9     that the guidance that was at issue, issued by
10     the W.E.C. in March, was essentially 100 percent
11     correct under the law.  And the Wisconsin Supreme
12     Court said so.
13              But I think an even more fundamental
14     point for Your Honor to consider is the fact that
15     it's really nothing but supposition or
16     speculation that the Petitioners are relying on
17     to suggest that any or, as they argue, all of
18     those voters in Milwaukee County, almost 20,000,
19     were not entitled to claim indefinite confinement
20     status.
21              And the argument is, well, the
22     numbers went up, therefore, some or all of them
23     must have been invalid or inappropriately
24     claiming that status.  But the fact of the matter
25     is, the burden of proof was on the Petitioners at
```

```
 1      the recount to present evidence that any of those
 2      voters inappropriately claimed that status.
 3      There was no such proof.  Not any proof of a
 4      single Milwaukee County voter who should not or
 5      could not or was not entitled to claim that
 6      status.  Certainly not proof beyond a reasonable
 7      doubt as the law requires with respect to any
 8      individual voter.  They had the burden of proof,
 9      they failed to meet it, there is absolutely no
10      basis to throw out any of those ballots.
11              I'm going to rely on the arguments in
12      the briefs as to the curing of witness address
13      information on the absentee ballot envelopes.
14              I think that to wrap up or to close,
15      certainly it's understood that the legislature
16      intended that absentee voting in this state be
17      closely watched, regulated.  That's clear in
18      Section 6.84 of the statutes.
19              But it's also clear that this appeal
20      does not truly serve that legislative purpose.
21      That purpose is not served by over-technical,
22      formalistic reading of the statutory requirements
23      for absentee ballots.  And I think it's clear,
24      based on the submissions, that that is what is
25      being advocated by the Petitioners.
```

```
 1              That purpose, that legislative
 2    purpose, is not served by speculation about
 3    wrongdoing on the part of voters.  And that's
 4    absolutely what is being advocated with respect
 5    to the indefinitely confined voters, if not the
 6    other categories as well.  And that purpose in
 7    6.84, that legislative purpose, does not require
 8    Your Honor to abandon the strong, longstanding
 9    public policy of the state to give effect and
10    meaning to the right to vote and to honor the
11    will of the electorate.
12              And I think being faithful to that
13    public policy purpose, while still respecting the
14    intent of the legislature regarding absentee
15    voting, requires Your Honor, requires this Court,
16    to uphold the determinations of the Milwaukee and
17    Dane County Boards and to dismiss this appeal.
18    Thank you.
19              THE COURT:  Yes.  Mr. Gault.
20              ATTORNEY GAULT:  Thank you, Your
21    Honor.  I'm gonna try to be really, really brief.
22    My primary concern in this case was two issues
23    that were somewhat centered to Dane County and
24    that was the indefinitely confined issue and
25    Democracy in the Park.  I think those issues have
```

```
 1    been fully addressed by the briefs as well as
 2    argument by Mr. Devaney and don't need anymore
 3    attention here.
 4              I do briefly just want to touch on
 5    one issue raised by Mr. Troupis this morning, and
 6    that is the role of the Board of Canvassers in
 7    reviewing absentee ballot application.  And I
 8    wrote down a couple quotes here by Mr. Troupis.
 9    One was that the Board of Canvassers had an
10    obligation to follow the statute; and number two,
11    that the statutes say what they say.  And I agree
12    wholeheartedly with that.
13              I also agree that the Board of
14    Canvassers was required to seek their own
15    independent legal counsel and not file -- not
16    just follow the Election Commission's guidance on
17    that.  And I can tell you, with respect to Dane
18    County, they did because I was the one who gave
19    them the independent legal counsel.
20              And what I would tell you, Your
21    Honor, is that Wisconsin Statute Section
22    9.01(1)(b) sets forth a very specific procedure
23    for the Board of Canvassers to follow in
24    conducting the recount.  It lists step by step
25    what the Board of Canvassers are to do.  It says
```

```
1    the recount shall proceed for each board and

2    municipality as follows, and then those steps are

3    listed.

4              As to absentee ballots, the Board of

5    Canvassers has an obligation to examine the

6    absentee ballot envelopes.  And then there is

7    very specific guidance on when an absentee ballot

8    is defective.  There is no mention of a review of

9    the absentee ballot applications as part of the

10   recount process.  It simply is not something that

11   the legislature told the Board of Canvassers they

12   were supposed to do as part of the recount

13   process.

14             And that was the advice that was

15   given to the Dane County Board of Canvassers in

16   conducting their canvass.  I suspect they got the

17   same guidance in Milwaukee County.  And I just

18   wanted to correct that, because there was an

19   issue raised that somehow the Board of Canvassers

20   didn't follow the statute by not reviewing those

21   applications, and that's simply not the case.

22             Other than that, I believe all the

23   issues have been fully briefed and those were

24   covered, and we would rest on the briefs

25   submitted and the other arguments of counsel.
```

1   Thank you, Your Honor.

2                THE COURT:  Anyone else from the

3   Respondents?  If not, then Mr. Troupis, any

4   rebuttal?

5                ATTORNEY TROUPIS:  Yes.  On a couple

6   of items that I think are just misstated.  Let me

7   begin with the idea that there's somehow proof in

8   this record that the clerks elsewhere in the

9   state did things exactly like Dane and Milwaukee

10  County.  And for that, they cite the only piece

11  of evidence apparently they have now, the Kennedy

12  affidavit.  I'm looking at the Kennedy affidavit.

13  Kevin says nothing, nothing, about what goes on

14  elsewhere in the state.  Not a word.  He is

15  talking about the processes they went through in

16  issuing various memoranda.

17               Mr. Devaney is simply wrong.  There

18  is no evidence except the evidence we introduced

19  that in fact other counties and clerks understood

20  these rules and they followed them and they

21  didn't in Dane and Milwaukee County.

22               Second, they completely mislead this

23  court when they say look to the will of the voter

24  in deciding this case.  No.  It is of course true

25  we want the will of the voter, but that's not the

```
 1    issue.  Every case they cited, every one, 100
 2    percent that they cited on that did not deal with
 3    absentee voting or they dealt with absentee
 4    voting before 1984.
 5              Clapp, Zimmerman, are all cases
 6    before the legislature stepped in in 1984 and
 7    passed explicitly, explicitly, why absentee
 8    voting ought to be regulated much more carefully.
 9    We --  And it's important to remember the words.
10    The words are the legislature finds, this is
11    their finding, that voting by absentee ballot is
12    a privilege exercised wholly outside the
13    traditional safeguards of the poling place.  The
14    legislature finds that the privilege of voting by
15    absentee ballot must be carefully regulated to
16    prevent potential for fraud or abuse, to prevent
17    overzealous solicitation of absentee electors who
18    may prefer not to participate, to prevent undue
19    influence.
20              Why is that important?  Because then
21    they go on and say these provisions in 6.842 must
22    be construed as mandatory and ballots cast in
23    contravention, I'm reading from the statute of
24    these procedures specified, may not be counted
25    and may not be included in certified results.
```

```
 1              So all that is wonderful, wonderful

 2      to think about about the voters and the way that

 3      they're talking about maybe elsewhere in the

 4      country.  But in Wisconsin, we understood the

 5      very problem this court and we all face which is

 6      the difficulty, mere impossibility, of examining

 7      every single person who votes and determining

 8      after the fact whether they are eligible voters,

 9      whether they in fact were entitled to vote,

10      whether they in fact cast that ballot.

11              All of those things are well

12      regulated on the day of election.  But in

13      advance, none of that happens.  And that's the

14      reason why the statute is explicit and requires

15      that you must comply with these things.

16              Take for example the application

17      requirement, which is made light of here.  Well,

18      just do it at the same time.  But isn't it

19      precisely to avoid undue influence, to avoid

20      marching people into the clerk's office at the

21      last minute to vote, that you require an

22      application prior to getting the absentee votes?

23      That's a perfectly rational and, in fact,

24      mandatory provision of the statute.  It's

25      explicit.  It's not --  It's not implicit.
```

Folks, you -- Folks who like to argue this tend
to forget the difference between those two types
of votes, and all the federal courts have
accepted that there is a difference and there are
different rules that apply. And they are
mandatory in Wisconsin.

Last item, draw-down. And it is. It
feels harsh. It's what the legislature said has
to be done because there's no other way to deal
with individual ballots. We've complied
specifically with the statute by doing that.

Now, W.E.C. makes a fascinating
argument in this regard. They seem to argue that
on the one hand -- Well, with regard to draw-
down and due process, on the one hand, we had to
comply with the statute and we could elect for
two counties. But on the other hand, W.E.C. now
believes the statute's unconstitutional. Well,
that's an odd position for a state agency that's
supposed to be administering a statute to say,
but so it goes.

But remember, the Biden campaign had
the absolute option, and I expect W.E.C. did as
well, to count the rest of the state. They
wanted seven million dollars for us to have a

1    recount of the rest of the state.  Three million
2    to do these two counties.  We selected those two
3    counties, and the statute explicitly says they
4    could select any other ones they wanted.  They
5    chose not to.
6              The draw-down process is explicit in
7    the statute.  The question was raised and it only
8    apply when there's certain types of ballots.
9    Well, of course that's not true.  If you look at
10   9.01 and its a lengthy citation, but it
11   eventually is sub (e), it provides that you must
12   equalize the ballots and the poling -- the roles.
13             When you do that, we call that a
14   draw-down.  You can call it whatever you'd like.
15   But you have to -- you have to equalize those.
16   That's the system that we have in Wisconsin.
17   It's the only system.  To suggest we haven't done
18   it, which was another comment we heard, well,
19   that's -- that's just untrue.  I have not been in
20   a recount nor has anybody here who participates
21   in them has not had draw-downs of any
22   significance.  You have draw-downs throughout the
23   process.  It's the way we do it.  And *Lee versus*
24   *Paulson* stands as a case under the absentee
25   voting statute where that is the only, only

1  remedy that you can have of -- under absentee

2  voting for it to be equalized much.  So the

3  reality is that's what the statutes provide.

4  That's apparently the only option that we have.

5                  There is an assumption here

6  underlying the defendant's argument, and that is

7  that you can change the statute at will.  That

8  W.E.C. has a good idea so why not just do it.

9  That's not the way the law works.  The statutes

10  must be complied with.  Absentee voting is

11  subject to enormous fraud.  That's why this state

12  made the choices it did, and that's why the

13  complaint must be granted and the notice of

14  appeal allowed and reverse the Boards of

15  Canvassers.  Your Honor, I thank you very much

16  again.

17                  THE COURT:  Mr. Kilpatrick, you wish

18  to respond to Mr. Troupis?

19                  ATTORNEY KILPATRICK:  Yes.  Thank

20  you, Your Honor.  I just have to respond to one

21  thing that was just said, and maybe it was a

22  mistake or I misunderstood.  But the Commission

23  has never in this litigation asserted that the

24  recount statute is unconstitutional.  I just want

25  to make that clear.

66

1          I think what maybe was considered by

2     Mr. Troupis is, yes, our brief in the argument

3     has said that there are equal protection possible

4     violations if this court were to issue a remedy

5     in which ballots were thrown out in two counties

6     but not thrown out in other counties because of

7     Commission guidance.  So that is the only type of

8     constitutional argument that we made.  We

9     certainly didn't say that the recount statute was

10    unconstitutional.  Maybe that was in some other

11    brief or not.  But, no, the Commission has never

12    said the recount statute was unconstitutional.

13         But I also want to ask the Court to

14    reconsider its denial of our -- or reconsider,

15    yes, our position that the affidavits shouldn't

16    be stricken, or at least with regard to Miss

17    Wayte.  Mr. Troupis just said that there is

18    nothing in the record about what other clerks did

19    across the state.  That's exactly what Miss

20    Wayte's affidavit says and that's what we tried

21    to get into this record, and that was denied.

22         So on one hand, Plaintiffs say

23    there's nothing in the record and on the other

24    hand say and it shouldn't get in what other

25    clerks do.  So I do ask respectfully that the

```
 1     Court reconsider its earlier decision striking at
 2     least the affidavit of Kim Wayte.

 3              THE COURT:  Okay.  That appears to be
 4     it.  As I indicated earlier, the Court intended
 5     to rule from the bench when all the material that
 6     is appropriately provided to the Court has been
 7     provided and considered.  I am now prepared to
 8     rule from the bench.

 9              Clearly the election laws in
10     Wisconsin starting with Section 501, entitled
11     scope, say except as otherwise provided, Chapters
12     5 through 12 shall be construed to give effect to
13     the will of the electors, if that can be
14     ascertained from the proceedings, notwithstanding
15     informality or failure to fully comply with some
16     of their provisions.  So the bottom line here is
17     that the Court should do everything to ensure
18     that the will of the voters prevail.

19              There was a hotly-contested election
20     in Wisconsin and across the nation.  In
21     Wisconsin, it resulted in a Biden/Harris ticket
22     receiving more votes than the Trump/Pence ticket.
23     As a result, the Petitioners here, the Trump/
24     Pence ticket, asked for a partial recount, a
25     recount in two of the 72 counties.  It was not a
```

1     request to recount all of the votes in the State

2     of Wisconsin. That recount occurred making minor

3     changes to the totals but not changing the

4     outcome as originally reported.

5            Section -- Section 9.01 deals with

6     appeals to that recount, and that's what we're

7     here for today. I won't go through the

8     procedural aspects. We addressed that at the

9     time of the scheduling order. But the case is

10    properly venued in this court, the Court has

11    jurisdiction to make a determination on the

12    appeal of the recount.

13           The right to vote at a poling place

14    on election day is guaranteed in the

15    Constitution. Early absentee voting is a

16    privilege created by the legislature. Because

17    early absentee voting is done outside the

18    controlled environment of a poling place and

19    therefore subject to potential fraud or abuse,

20    the legislature can impose limitations,

21    restrictions and regulations on how it is

22    exercised.

23           Wisconsin has enacted early absentee

24    voting with restrictions and limitations. In

25    dispute today is whether those restrictions were

1     properly applied and enforced when recounting the
2     votes from Dane County and Milwaukee County in
3     the November 3rd, 2020, election.

4              The Wisconsin Elections Commission
5     adopts rules and guidelines in accordance with
6     the statutes, as did its predecessor, the
7     Government Accountability Board.  Those rules and
8     guidelines must conform to the underlying early
9     absentee voting statutes.  Petitioners/Appellants
10    allege and argue that erroneous interpretations
11    of the law were used by the canvassers during the
12    recounts.  Respondents argue that the rules and
13    guidelines correctly interpret the underlying
14    election law.  That's the dispute we have before
15    us.

16             901.08 sets forth the scope of the
17    review.  I have to review only the recount in the
18    two counties that were recounted.  In those two
19    counties, approximately 220,000 ballots were
20    challenged by the Petitioners/Appellants.  Those
21    ballots were counted by the canvassers over the
22    challenges and objections of the Petitioner/
23    Appellants.

24             The job of this Court is only to
25    determine issues relating to that particular

```
 1    recount.  In doing so, 9.01(8)(b) says the Court
 2    shall separately treat disputed issues of
 3    procedure, interpretations of law and findings of
 4    fact.  The Court shall set aside or modify the
 5    determination of the Board of Canvassers or the
 6    Commission chairperson or the chairperson's
 7    designee if it finds that the Board of Canvassers
 8    or the chairperson or chairperson's designee has
 9    erroneously interpreted a provision of law and
10    that a correct interpretation compels a
11    particular action.
12            Sub (8)(a) says, unless the Court
13    finds a ground for setting aside or modifying the
14    determination of the Board of Canvassers or the
15    Commission chairperson, or chairperson's designee
16    it shall affirm the determination.
17            So really the job of this court is
18    quite limited.  I'm not here to make
19    determinations on broad constitutional issues
20    with regard to any potential remedies that have
21    been requested or may be provided for.
22            With regard to what our issues in
23    dispute here, really these are not procedural
24    issues with regard to the recall itself, unlike
25    where problems may have occurred in other states.
```

```
 1        The COVID protocols were provided here.  It made

 2        it difficult for the count to proceed, for it to

 3        be observed.  But there's no real dispute here

 4        the observers were able to properly challenge

 5        ballots they thought should not have been

 6        counted.  The parties reached agreement early on

 7        for a standing objection to broad ranges of

 8        ballots in the four categories that are in

 9        dispute here.

10                I believe the recount was transparent

11        and open.  I believe it may have even been

12        live-streamed.  There is no dispute in that

13        regard.  And I wish to thank those involved in

14        the recounts in Dane and mad -- Dane and

15        Milwaukee County, the canvassers, the observers,

16        the clerks, the attorneys, everyone involved

17        because it went rather smoothly and

18        transparently.

19                There again is no real dispute with

20        regard to factual issues.  Allegations of fact

21        were made in the complaint on this appeal.  The

22        answers essentially did not deny those

23        allegations.  The real dispute here is whether or

24        not there were erroneous interpretations of law

25        used in the recount in making the determination
```

```
 1    whether a ballot should be counted or not
 2    counted.
 3              As I indicated earlier, I've reviewed
 4    all the pleadings, briefs.  I've reviewed the
 5    record, the transcripts, the exhibits.  And now I
 6    have had the benefit of oral argument.
 7              Taking all that into account, because
 8    the Court is satisfied the rules and guidelines
 9    applied in each of the disputed areas are
10    reasonable and a correct interpretation of the
11    underlying early absentee voting laws, the
12    certification of the results of the 2020
13    Wisconsin Presidential Election, after the Dane
14    County and Milwaukee County recounts, is
15    affirmed.
16              The certified results show Joseph
17    Biden and Kamala Harris received 1,630,866 votes,
18    and Donald Trump and Michael Pence received
19    1,610,184 votes.  A difference or margin of
20    victory of 20,682 votes in favor of Biden and
21    Harris.
22              The determination of the Court is
23    that the Petitioner/Appellant here have not
24    demonstrated that an erroneous interpretation of
25    Wisconsin early voting laws happened here.  And
```

73

```
 1      in the complaint, there really is no allegation

 2      here of widespread fraud.  That's not the issue.

 3      There is no credible evidence of any misconduct

 4      or wide-scale fraud.

 5              At issue here simply is whether or

 6      not the recount occurred in compliance with the

 7      Wisconsin election laws.  This Court adopts pages

 8      one through 30 of the proposed findings of facts

 9      and conclusions of law of Joseph Biden, Kamala

10      Harris, the Dane County Defendants, and Milwaukee

11      County Defendants, and incorporates them into

12      this judgment of affirmance.

13              I have excluded from that everything

14      after page 30 because those are arguments

15      relating to laches, equitable estoppel and equal

16      protection.  It's not the role of this Court to

17      determine the constitutionality of proposed

18      remedies.  The Court is simply charged with the

19      obligation of determining whether or not the

20      recount properly applied a correct interpretation

21      of Wisconsin's early voting laws.

22              So I'm not gonna sit here and read

23      the 30 pages of findings of fact and conclusions

24      of law because time truly is of the essence here,

25      as I indicated earlier.  I think this is the last
```

1    litigation going on.  Wisconsin's the only state
2    that apparently missed the safe-harbor rules.
3    And because my determination, this Court's
4    determination can be appealed further and the
5    Electoral College is scheduled to vote in less
6    than 100 hours, I think it's important to wrap
7    this up as quickly as possible.
8              But I just wanted to make some
9    summary comments with regard to where the basic
10   disputes arose.  The first was approximately
11   5,500 dollars -- 5,500 ballots that had defective
12   or missing witness addresses.  6.87(6d) was
13   interpreted -- (6d) provides that a clerk may
14   return a ballot to a voter under those
15   circumstances.  It's not mandatory, but the clerk
16   can do so.  In 20 --  It's not an exclusive
17   remedy.
18             In 2015, the Wisconsin Elections
19   Commission set down guidance for clerks to use to
20   have -- to look at various sources to remedy or
21   cure an incomplete or missing witness address.
22   We're not dealing with signatures of voters or
23   signatures of witnesses.  Simply an address of a
24   witness which was required so that if there were
25   issues of validity, the witness could be

```
1     contacted.

2              The statute is silent with regard to

3     what the Commission can do in curing a defect in

4     a ballot.  It certainly does not prohibit the

5     clerks from doing so.  Adding, the requisite

6     information by the clerk has been in effect since

7     before the 2016 election.  The election which

8     Trump prevailed in Wisconsin, I believe, after a

9     recount.  It's longstanding, I believe it's not

10    prohibited by law, and it is therefore a

11    reasonable interpretation to make sure, as the

12    Court indicated earlier, that the will of the

13    electors, the voters, are brought to fruition.

14             The second broad category where there

15    is an issue involves approximately 170,000

16    ballots in the two counties is the claim by the

17    Petitioners/Appellants that there was no written

18    application for a ballot.  We're dealing with

19    6.86(1)(ar) of the statutes.  More than 10 years

20    ago, the administrative agency in charge of

21    election law developed form EL-122.  It's

22    entitled official absentee ballot application

23    slash certification.  It has been in use

24    continuously in elections since that time.  It

25    came into effect after the 2008 election with
```

1    regard to early absentee voting in order to
2    streamline the process.
3          Many methods for obtaining a ballot
4    are authorized under the law.  There can be an
5    online application, the website My Vote, it can
6    be regular mail application, e-mail application,
7    or in-person application.  Whenever in-person
8    application is used, form EL-122 is used.  And as
9    was indicated, on its face it is designated
10   official absentee ballot application
11   certification.
12          The only thing that happened after
13   the 2008 election and the adoption of EL-122 is
14   that two steps were combined into one on the
15   form.  It's been in continuous use since then as
16   I believe it is a correct, allowable
17   interpretation and application of 6.86(1)(ar).
18          The third area in dispute is the
19   indefinitely confined issue under 6.87 two and
20   four.  It affects approximately 28,000 votes.
21   This statute's been in effect for more than 30
22   years.  It allows voters to self-identify as
23   qualifying as indefinitely confined.  There is no
24   proof needed.  You don't need a doctor's excuse.
25   An issue arose here in the spring when the Dane

1    County clerk apparently made Facebook postings

2    implying that because of the safer at home orders

3    in effect, anyone could use this particular

4    section in order to early vote.

5                The problem is that this section does

6    not require the voter ID requirements that are

7    applicable in other sections.  The Republican

8    party immediately sued for injunctive relief.

9    The case was *Jefferson versus Dane County*, 2020

10   Appellate, I believe, 557.

11               As a consequence of that litigation,

12   the Commission established guidance indicating

13   that it is the individual choice of the elector

14   to utilize that section.  That it should not be

15   used to avoid voter ID requirements.  And the

16   language in that guidance essentially was

17   approved by the Wisconsin Supreme Court.

18               I recognize that litigation is

19   ongoing, but to infer that people utilized and

20   voted under that section to evade the voter ID

21   requirements, it is no basis for not counting

22   those votes.  It's far more likely because of the

23   ongoing pandemic that people were very concerned,

24   especially those who have compromised systems, to

25   go out in public, to not want to stand in line

```
 1    for potentially hours at a poling place in order
 2    to cast a ballot.  I certainly could not strike
 3    those ballots based on an inference which is not
 4    really supported in law.  Or in --  Excuse me.
 5    Supported in fact.
 6              The last category in dispute
 7    amounting to approximately 17,000 votes are the
 8    Democracy in the Park provisions.  Petitioners/
 9    Appellants argue that 6.855 applies and that this
10    was an inappropriate or improper interpretation
11    of law creating a clerk's office for voting.  I
12    believe the correct application is 6.87(4)(b)1,
13    the governing provisions relating to drop boxes
14    or the ability to deposit a vote with the clerk.
15              Those drop box provisions, again,
16    have been in use and were used around the state.
17    The distinction here being a potential voter
18    could not obtain a ballot at any such location.
19    It's not an extension of the clerk's office for
20    voting.  It is simply an extension to allow a
21    voter to deliver a completed ballot in a
22    socially-distanced way.  It certainly is an
23    appropriate and correct interpretation of law to
24    allow that to happen.
25              Because the Court has determined that
```

```
 1      there has been no reliance on an erroneous
 2      interpretation of Wisconsin's early voting
 3      absentee laws, I indicated I'd enter judgment in
 4      favor of the Respondents.  The Court will issue
 5      an order confirming the results as I've
 6      indicated, the certification that I've indicated
 7      earlier.
 8              I will assess costs as required by
 9      law.  I'm not familiar with the process here with
10      respect to who drafts the order.  I will sign
11      either a paper copy of the order affirming the
12      determination or I will e-sign one.  That has to
13      be done, I believe, immediately because, as I
14      have indicated earlier, sub (9) of 9.01 says that
15      within 30 days after the entry of the order of
16      the circuit court, a party aggrieved by the order
17      may appeal to the Court of Appeals.
18              I want to sign an order and have it
19      in effect yet this morning.  So can we agree on
20      who does that?  I have to ask the clerk whether
21      normally the successful party drafts it.  Who
22      wants to take the lead?  Mr. Devaney?
23              ATTORNEY DEVANEY:  Your Honor, unless
24      others on the defense side would like to do it,
25      we'd be happy to do it.
```

```
 1              ATTORNEY TROUPIS:  We just wanted --
 2      I'm speaking from the Trump campaign, obviously a
 3      one sentence order is what's appropriate.  I
 4      mean, I don't --
 5              THE COURT:  Yeah.  Yeah.  Just
 6      saying, hey, the earlier determination is
 7      affirmed.
 8              ATTORNEY TROUPIS:  And that's really
 9      all it needs to say with the magic language for
10      appeal, because obviously the Supreme Court is
11      expecting to hear from us shortly.
12              ATTORNEY O'NEILL:  Your Honor, the
13      ordinary practice in Milwaukee is that the
14      successful party drafts the order.  I agree with
15      Mr. Troupis in this case.  It's best a simple
16      order that says for the reasons stated on the
17      record, the determinations of the Board of
18      Canvassers as confirmed.  This is an appealable
19      form in order of right.  You can draft that.  I
20      will send it to Mr. Troupis and Mr. Burnett for
21      their approval and we --
22              THE COURT:  I will expect it within
23      five minutes, Mr. O'Neill.  And then I will sign
24      it electronically.  We've got to keep this ball
25      rolling.
```

```
 1              ATTORNEY TROUPIS:  Appreciate it very
 2      much, Your Honor.  And thank you again for the
 3      speed with which you've handled this.  And again,
 4      I appreciate, Matt, and all of defense counsel's
 5      assistance and courtesies throughout.
 6              ATTORNEY KILPATRICK:  Your Honor?
 7              THE COURT:  Yes.
 8              ATTORNEY KILPATRICK:  Your Honor,
 9      just housekeeping, just want to make sure we dot
10      our I's and cross our T's.  In the order will
11      there be a reference to the granting of the
12      motion to strike?  And I think I made an oral
13      request for reconsideration.  I did like the
14      Court to address that also so that everything is
15      ready for this appeal.
16              THE COURT:  Well, the record will
17      show that.  Mr. O'Neill, just draft a simple one
18      or two sentence order as you indicated, file it
19      electronically, I'll sign it electronically, and
20      the clock will start running for any potential
21      appeal.
22              ATTORNEY TROUPIS:  Thank you.
23              ATTORNEY O'NEILL:  Your Honor, the
24      only thing I suspect everyone will want an
25      immediate transcript, as immediate as immediate
```

can be.  I'm sorry, madam clerk court reporter,
but there's a little bit of pressure in all of
that.

                THE COURT:  You have to deal, I
believe, with Kristin.  You know how she can be
reached.  Okay, folks.  The Court would then
stand adjourned.

                    - - - - - -

                (Proceedings concluded.)

```
 1   STATE OF WISCONSIN    )
                           )   SS:
 2   MILWAUKEE COUNTY      )

 3

 4

 5

 6            I, KRISTIN MENZIA, RMR, CRR, an

 7   official court reporter in and for the Circuit Court

 8   of Milwaukee County, do hereby certify that the

 9   foregoing is a true and correct transcript of all the

10   proceedings had and testimony taken in the above-

11   entitled matter as the same are contained in my

12   original machine shorthand notes on the said trial or

13   proceeding.

14            Dated at Milwaukee, Wisconsin, this

15   11th day of December, 2020.

16

17

18

19

20
                           Kristin Menzia, RMR, CRR
21                         Official Reporter

22                         ELECTRONICALLY SIGNED

23

24

25
```