UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

DONALD J. TRUMP,

                    Plaintiff,

     v.

                                         Case No. 20-cv-1785-BHL

The WISCONSIN ELECTIONS COMMISSION, ET AL.,

                    Defendants.

_____

## DECISION AND ORDER
_____

      This is an *extraordinary* case.   Plaintiff Donald J. Trump is the current president of the United States, having narrowly won the state of Wisconsin's electoral votes four years ago, through a legislatively mandated popular vote, with a margin of just over 22,700 votes.   In this lawsuit, he seeks to set aside the results of the November 3, 2020 popular vote in Wisconsin, an election in which the recently certified results show he was defeated by a similarly narrow margin of just over 20,600 votes.   Hoping to secure federal court help in undoing his defeat, plaintiff asserts that the defendants, a group of some 20 Wisconsin officials, violated his rights under the "Electors Clause" in Article II, Section 1 of the Constitution.[1]   Plaintiff seizes upon three pieces of election guidance promulgated by the Wisconsin Elections Commission (WEC)—a creation of the Wisconsin Legislature that is specifically authorized to issue guidance on the state election statutes—and argues that the guidance, along with election officials' conduct in reliance on that guidance, deviated so significantly from the requirements of Wisconsin's election statutes that the election was itself a "failure."

      Plaintiff's requests for relief are even more *extraordinary*.   He seeks declarations that defendants violated his Constitutional rights and that the violations "likely" tainted more than

_____

[1] Plaintiff's complaint also refers to the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.   At the December 9, 2020 final pre-hearing conference, plaintiff disclaimed reliance on any First Amendment or Due Process claims.   While counsel purported to reserve the Equal Protection claim, the complaint offers no clue of a coherent Equal Protection theory and plaintiff offered neither evidence nor argument to support such a claim at trial.   It is therefore abandoned.   *See Puffer v. Allstate Ins. Co*., 675 F.3d 709, 718 (7th Cir. 2012) (undeveloped arguments and arguments unsupported by pertinent authority are waived).

50,000 ballots. Based on this declaratory relief, his complaint seeks a "remand" of the case to the Wisconsin Legislature to consider and remedy the alleged violations. Plaintiff's ask has since continued to evolve. In his briefing, he says he wants "injunctive relief" requiring the Governor "to issue a certificate of determination consistent with, and only consistent with, the appointment of electors by the Wisconsin legislature." In argument, counsel made plain that plaintiff wants the Court to declare the election a failure, with the results discarded, and the door thus opened for the Wisconsin Legislature to appoint Presidential Electors in some fashion other than by following the certified voting results.

Defendants want plaintiff's claims thrown out, arguing his complaint fails to state a claim and raising several knotty issues of federal jurisdiction. With the Electoral College meeting just days away, the Court declined to address the issues in piecemeal fashion and instead provided plaintiff with an expedited hearing on the merits of his claims. On the morning of the hearing, the parties reached agreement on a stipulated set of facts and then presented arguments to the Court. Given the significance of the case, the Court promised, and has endeavored, to provide a prompt decision. Having reviewed the caselaw and plaintiff's allegations, the Court concludes it has jurisdiction to resolve plaintiff's claims, at least to the extent they rest on federal law, specifically the Electors Clause. And, on the merits of plaintiff's claims, the Court now further concludes that plaintiff has not proved that defendants violated his rights under the Electors Clause. To the contrary, the record shows Wisconsin's Presidential Electors are being determined in the very manner directed by the Legislature, as required by Article II, Section 1 of the Constitution. Plaintiff's complaint is therefore dismissed with prejudice.[2]

## PROCEDURAL BACKGROUND
## AND FINDINGS OF FACT

### 1. THE PARTIES

Plaintiff Donald J. Trump is the current, properly elected, President of the United States. In 2016, after a statewide recount, plaintiff won Wisconsin's Presidential Electors by 22,748 votes. *Certificate of Ascertainment for President, Vice President and Presidential Electors General Election – November 8, 2016*, seal affixed by Governor Scott Walker, National Archives,

---

[2] This decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52.

https://www.archives.gov/electoral-college/2016. Plaintiff went on to win the 2016 Electoral College with 304 electoral votes. 2016 Electoral College Results, National Archives, https://www.archives.gov/electoral-college/2016. He was a candidate for reelection to a second term as President in the November 3, 2020 election.

Defendant Wisconsin Elections Commission is a creation of the Wisconsin Legislature. *See* 2015 Wis. Act 118 §4, Wis. Stat. §5.05. It is a bi-partisan, six-person commission that has "responsibility for the administration" of the state election laws in Chapters 5 to 10 and 12 of the Wisconsin Statutes.[3] Wis. Stat. §15.61. Any action by the commission requires the affirmative vote of at least two-thirds of its members. Wis. Stat. §5.05(1e). Defendants Ann S. Jacobs, Mark L. Thomsen, Marge Bostelmann, Dean Knudson, and Robert F. Spindell, Jr. are five of the six members of the commission.[4]

Defendant Scott McDonnell is sued in his official capacity as the Dane County Clerk. As the county clerk, McDonnell has a host of election-related responsibilities, including providing ballots and elections supplies to the municipalities, preparing ballots, educating voters, and training election officials. *See* Wis. Stat. §7.10. Additionally, McDonnell serves on the county board of canvassers, which is responsible for examining election returns and certifying the results to the WEC. Wis. Stat. §7.60.

Defendants Maribeth Witzel-Behl, Tara Coolidge, Matt Krauter, and Kris Teske are sued in their official capacities as the City Clerks of Madison, Racine, Kenosha, and Green Bay. As city clerks, they supervise both voter registration and elections. Wis. Stat. §7.15. They provide training for voters and election officials and equip the polling places. *Id.* Additionally, they are part of each respective city's board of canvassers. Wis. Stat. §7.53.

Because of their substantial populations, Milwaukee County and the City of Milwaukee have additional "election boards." Milwaukee County has a county board of election commissioners and the City of Milwaukee has a municipal board of election commissioners. Wis. Stat. §7.20(1). These boards have the same powers and duties assigned to the municipal and county clerks in other parts of the state. Wis. Stat. §7.21. Defendant George L. Christiansen is sued in his official capacity as the Milwaukee County Clerk. As the county clerk,

---

[3] Chapter 11 of the Wisconsin Statutes contains the state's campaign finance laws, which are outside of the WEC's authority.

[4] For reasons not explained, plaintiff did not name Commissioner Julie M. Glancey as a defendant.

he serves as the executive director of the county board of election commissioners, *id.*, but he is not on the county board of canvassers. *See* Wis. Stat. §7.60. Jim Owczarski is sued in his official capacity as the Milwaukee City Clerk. Like Defendant Christiansen, Owczarski maintains some election-related responsibilities, but he is not on the city's board of canvassers. Wis. Stat. §7.53.

Julietta Henry is sued in her official capacity as Milwaukee County Elections Director. The record in unclear on Henry's duties as Elections Director. Claire Woodall-Vogg is sued in her official capacity as the Executive Director of the City of Milwaukee Election Commission. She has the same powers and duties assigned to city clerks throughout the rest of the state. *See* Wis. Stat. §7.21.

Defendants Tom Barrett, Satya Rhodes-Conway, Cory Mason, John Antaramian, and Eric Genrich are sued in their official capacities as the Mayors of Milwaukee, Madison, Racine, Kenosha, and Green Bay. Plaintiff contends that these five mayors unlawfully promoted the expansion of mail-in voting in their cities by adopting practices that were banned by the Wisconsin Legislature. Under Wisconsin's election statutes, mayors play no formal role in presidential elections.

Defendants Tony Evers and Douglas La Follette are sued in their official capacities as the Governor and Secretary of State of Wisconsin. As governor, in accordance with Wis. Stat. §7.70, Defendant Evers signed the certificate of ascertainment prepared by the WEC, affixed the state seal, and forwarded the certificate to the U.S. administrator of general services. Wis. Stat. §7.70(5)(b). Defendant La Follette also signed the certificate of ascertainment.

## 2. WISCONSIN'S MANNER OF CHOOSING PRESIDENTIAL ELECTORS

Article II, Section 1, Clause 2 of the United States Constitution (the "Electors Clause") states, "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors…" U.S. CONST. art. II, §1, cl. 2. Pursuant to this federal Constitutional command, the Wisconsin Legislature has directed that Wisconsin choose its Presidential Electors through a general election. *See* Wis. Stat. §8.25. Specifically, the Wisconsin Legislature has directed:

> (1) Presidential electors. By general ballot at the general election for choosing the president and vice president of the United States there shall be elected as many electors of president and vice president as this state is entitled to elect senators and representatives in congress. A vote for the president and vice president nominations of any party is a vote for the electors of the nominees.

Wis. Stat. §8.25(1). The statutes define "general election" as "the election held in even-numbered years on the Tuesday after the first Monday in November to elect United States … presidential electors." Wis. Stat. §5.02(5).

The Wisconsin Legislature has also established laws detailing the particulars of election administration; these details are set forth in Chapters 5 to 12 of the Wisconsin Statutes. For the last five years, responsibility for the administration of Wisconsin elections has rested with the WEC. The Wisconsin Legislature created the WEC in 2015 specifically to "have the responsibility for the administration of … laws relating to elections and election campaigns." 2015 Wis. Act 118 §4; Wis. Stat. §5.05. To carry out these duties, the legislature has delegated significant authority to the WEC. The Wisconsin Legislature directed the WEC to appoint an administrator to "serve as the chief election officer" of the state. Wis. Stat. §5.05(3d), (3g). The Wisconsin Legislature has authorized the WEC to conduct investigations, issue subpoenas, and sue for injunctive relief. Wis. Stat. §5.05(b), (d). The legislature also directed the WEC to receive reports of "possible voting fraud and voting rights violations," Wis. Stat. §5.05(13), and to "investigate violations of laws administered by the commission and … prosecute alleged civil violations of those laws." Wis. Stat. §5.05(2m)(a).

The Wisconsin Legislature has also assigned powers and duties under the state election laws to municipal and county clerks, municipal and county boards of canvassers, and in Milwaukee, the municipal and county boards of election commissioners. Wis. Stat. §§7.10, 7.15, 7.21. The Wisconsin Legislature has directed that these officials, along with the WEC, administer elections in Wisconsin. *See* Wis. Stat. chs. 5 to 10 and 12. When the polls close after an election, these officials make sure that "all ballots cast at an election … be counted for the person … for whom … they were intended." Wis. Stat. §7.50(2). Once all the votes have been counted, the WEC chairperson "shall publicly canvass the returns and make his or her certifications and determinations on or before … the first day of December following a general election." Wis. Stat. §7.70(3)(a). For the determination of Presidential Electors, the Wisconsin Legislature has directed the WEC to "prepare a certificate showing the determination of the results of the canvass and the names of the persons elected." Wis. Stat. §7.70(5)(b). The legislature has further directed that "the governor shall sign [the certificate], affix the great seal of the state, and transmit the certificate by registered mail to the U.S. administrator of general services." *Id.* At noon on

the first Monday after the second Wednesday in December, the Presidential Electors meet to vote for the presidential candidate from the political party which nominated them.   Wis. Stat. §7.75.

In addition to logistically administering the election, the Wisconsin Legislature has directed the WEC to issue advisory opinions, Wis. Stat. §5.05(6a), and "[p]romulgate rules … applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns."   Wis. Stat. §5.05(1)(f).   The WEC is to "conduct or prescribe requirements for educational programs to inform electors about voting procedures, voting rights, and voting technology."   Wis. Stat. §5.05(12).

Finally, the Wisconsin Legislature has provided detailed recount procedures.   Wis. Stat. §9.01.   After requesting a recount, "any candidate … may appeal to circuit court."   Wis. Stat. §9.01(6).   The legislature has also directed that "[Wis. Stat. §9.01] constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process."   Wis. Stat. §9.01(11).

### 3. WEC'S GUIDANCE IN ADVANCE OF THE 2020 PRESIDENTIAL ELECTION IN WISCONSIN

Consistent with its statutory mandate, since the start of the year, the WEC has published more than 175 messages to County and Municipal elections officials in anticipation of the November 2020 general election.   *See Recent Clerk Communications*, Wisconsin Elections Commission, https://elections.wi.gov/clerks/recent-communications.   In addition to notifying elections officials of training opportunities, relevant court decisions, and upcoming deadlines, these messages provided detailed guidance on how to prepare for the election and count the resulting votes.   *See id.*   As stipulated by the parties, the WEC issued specific guidance on three specific issues flagged by plaintiff:   missing or incorrect absentee ballot witness certificate addresses, voters claiming indefinitely confined status, and absentee ballot drop boxes. (Stipulation of Proposed Facts and Exhibits, ECF No. 127 ¶11.)

WEC's guidance on at least one of these issues dates back even further.   More than four years ago, on October 18, 2016, the WEC issued written guidance to city and county elections boards providing guidance on the topic of witness addresses provided in connection with absentee

balloting.   (Stipulation, ECF No. 127 ¶4.)[5]   This guidance explained to elections officials how to handle missing or incorrect witness addresses on absentee certificate envelopes.   (Pl. Ex. 73, ECF No. 117-72.)   The memo highlighted Wis. Stat. §6.87, which states "[i]f a certificate is missing the address of a witness, the ballot may not be counted."   (*Id.*)   Since the statute does not provide any additional details, the WEC defined "address" as a "street number, street name and name of municipality."   (*Id.*)   The memo then provided guidance for situations where a voter may have left off the certificate one or more components of the witness address.   In the memorandum, the WEC states "clerks **must** take corrective actions in an attempt to remedy a witness address error."   (*Id.*)   The guidance allowed clerks to contact the voter to notify them of the address requirement; however, the clerk only had to contact the voter if the clerk could not "remedy the address insufficiency from extrinsic sources."   (*Id.*)   The WEC stated "clerks shall do all that they can reasonably do to obtain any missing part of the witness address."   (*Id.*)   The purpose of the guidance was to "assist voters in completing the absentee certificate sufficiently so their votes may be counted."   (*Id.*)   This has been the unchallenged guidance on the issue for more than four years.

In September 2020, as directed in Wis. Stat. §7.08(3), the WEC updated the Wisconsin Election Administration Manual.   The updated manual states "[c]lerks may add a missing witness address using whatever means are available."   *Wis. Election Admin. Manual*, 99 (September 2020).   Finally, on October 19, 2020, the WEC issued "Spoiling Absentee Ballot Guidance," reaffirming the previous guidance, and stating "the clerk should attempt to resolve any missing witness address information prior to Election Day if possible, and this can be done through reliable information (personal knowledge, voter registration information, through a phone call with the voter or witness). The witness does not need to appear to add a missing address."   (Pl. Ex. 35, ECF No. 117-35.)

On March 29, 2020, in the early stages of the COVID-19 pandemic, the WEC issued "Guidance for Indefinitely Confined Electors COVID-19" to election officials across the state. (Pl. Ex. 2, ECF No. 117-2.)   Through the published guidance, the WEC stated that "many voters

---

[5]  The parties' stipulation describes this as an October 19, 2016 memorandum.   (Stipulation of Proposed Facts and Exhibits, ECF No. 127 ¶4.)   The memo itself is dated October 18, 2016, however.   (ECF No. 117-72.)   The Court will use the date on the actual document.

of a certain age or in at-risk populations" may meet the standard of indefinitely confined due to the ongoing pandemic. (*Id.*) The Guidance also stated:

> 1. Designation of indefinitely confined status is for each individual voter to make based upon their current circumstances. It does not require permanent or total inability to travel outside of the residence. The designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

> 2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness or infirmity, or disability.

(*Id.*) The WEC issued this guidance after the Dane County Clerk issued a statement advising that the pandemic itself was sufficient to establish indefinite confinement for all voters. (*See* Stipulation, ECF No. 127 ¶23.) The statement was challenged in court, and the Wisconsin Supreme Court granted a temporary injunction against the Dane County Clerk. *See Jefferson v. Dane County*, 2020AP557-OA (March 31, 2020). In concluding that the Dane County guidance was incorrect, the Wisconsin Supreme Court expressly confirmed that the WEC guidance quoted above provided "the clarification on the purpose and proper use of the indefinitely confined status that is required at this time." *Id.*

On August 19, 2020, the WEC sent all Wisconsin election officials additional guidance that, among other things, discussed absentee ballot drop boxes. (Pl. Ex. 13, ECF No. 117-13.) Wisconsin law provides that absentee ballots "shall be mailed by the elector, or delivered in person, to the municipal clerk." Wis. Stat §6.87(4)(b). The WEC memorandum provided advice on how voters could return their ballots to the municipal clerk, including "information and guidance on drop box options for secure absentee ballot return for voters." (Pl. Ex. 13, ECF No. 117-13.) Citing to a resource developed by the U.S. Cybersecurity and Infrastructure Security Agency (CISA), the guidance states the "drop boxes can be staffed or unstaffed, temporary or permanent." (*Id.*) The memorandum stated that the "drop boxes … allow voters to deliver their ballots in person" and will allow voters "who wait until the last minute to return their ballot." (*Id.*) The memorandum lists potential types of drop boxes, along with security requirements, chain of custody, and location suggestions for the drop boxes. (*Id.*)

As stipulated by the parties, election officials in Milwaukee County, the City of Milwaukee, Dane County, and the City of Madison relied on the above WEC guidance when

handling absentee ballots with missing or incorrect witness address, using absentee ballot drop boxes, and handling voters that had claimed indefinitely confined status. (Stipulation, ECF No. 127 ¶11.) Because they relied on the guidance, election workers added missing information to the witness address on at least some absentee ballots, more than five hundred drop boxes were used throughout the state, and approximately 240,000 "indefinitely confined" voters requested absentee ballots. (*Id.* ¶¶ 17, 18, 28.)

### 4. THE 2020 PRESIDENTIAL ELECTION IN WISCONSIN

On November 3, 2020, nearly 3.3 million Wisconsin voters cast their ballots in the general election for the President and Vice President of the United States. (Stipulation, ECF No. 127 ¶7.) At 8:00 p.m., all polls in Wisconsin closed. Wis. Stat. §6.78. The respective boards of canvassers began to publicly canvass all the votes received at the polling place. Wis. Stat. §7.51.

Voting officials in Milwaukee dealt with an unprecedented number of absentee ballots during this election. (Pl. Ex. 62, ECF No. 117-61.) In Milwaukee and Dane Counties, and likely other locations, election officials processed the absentee ballots in accordance with guidance published by the WEC. (Stipulation, ECF No. 127 ¶11.) The WEC received the last county canvass on November 17, 2020. (*Id.* ¶8.) On November 18, 2020, the deadline for requesting a recount, plaintiff sought a recount under Wis. Stat. §9.01 of only Dane and Milwaukee Counties.[6] (*Id.* ¶9.) The Milwaukee County recount was completed on November 27, 2020 and the Dane County recount was completed on November 29, 2020. (Id. ¶10.) Once the recount was complete, the WEC prepared the Certificate of Ascertainment for the Governor's signature. *See* Wis. Stat. §7.70(5)(b). On November 30, 2020, Governor Evers signed the certificate and affixed the state seal. (Def. Ex. 501, ECF No. 119-1.)

On December 1, 2020, the day after Wisconsin certified its election results, Donald Trump, Michael Pence, and the Trump campaign filed a petition in the Wisconsin Supreme Court against Governor Tony Evers, the Wisconsin Elections Commission, and other state election officials.

---

[6] After receiving a recount petition and $3 million payment from the Trump campaign, the six-member, bipartisan commission conducted a meeting on November 18, 2020, at which the commission unanimously approved the recount order. The WEC ordered a partial recount of the presidential election results in Dane and Milwaukee Counties on November 19, 2020. The recount order required Dane and Milwaukee Counties' boards of canvassers to convene by 9 a.m. Saturday, November 21, and complete their work by noon on Tuesday, December 1. Wis. Elections Comm'n Order for Recount, Recount EL 20-01, https://elections.wi.gov/node/7250.

*Trump v. Evers*, No. 2020AP001971 (Wis. S. Ct.). The issues presented by the plaintiffs included whether absentee ballots should be excluded due to various alleged deviations from legislated election procedures. As a remedy, they asked the Court to decertify the state's election results and exclude 221,000 votes in Milwaukee and Dane Counties from the count. On December 3, 2020, the Wisconsin Supreme Court denied the petition for leave to commence an original action in the state Supreme Court, but noted that, as an aggrieved candidate, plaintiff could refile at the circuit court level.

That same day, plaintiff filed his complaint in this Court. Additionally on that day, plaintiff, along with Michael R. Pence, and Donald J. Trump for President, Inc. filed complaints in Dane and Milwaukee County Circuit Courts against Joseph R. Biden, Kamala D. Harris, and several Wisconsin election officials, some of whom are defendants in this case. *Trump v. Biden*, No. 2020CV007092 (Milw. Co. Cir. Ct.), No. 2020CV002514 (Dane Co. Cir. Ct.). Chief Justice Roggensack of the Wisconsin Supreme Court combined the cases and appointed Racine County Reserve Judge Stephen A. Simanek to hear it. The suits are substantially similar and both allege irregularities in the way absentee ballots were administered. In the Milwaukee County case, the plaintiffs allege the ballots were issued without the elector having first submitted a written application; there were incomplete and altered certification envelopes; and there was a massive surge in indefinitely confined absentee ballot voters. The Dane County case included the same claims, plus one involving an allegation that absentee ballots were improperly completed or delivered to City of Madison employees at a public event, "Democracy in the Park." The plaintiffs asked the state court to set aside the county board of canvassers' legal determinations that certain absentee ballots should be counted due to deviations in state elections laws.[7]

## LEGAL CONCLUSIONS AND ANALYSIS

Plaintiff claims that defendants violated his rights under the Electors Clause by "deviating from the law, substituting their 'wisdom' for the laws passed by the State Legislature and signed by the Governor." (Pl. Br., ECF No. 109.) In the complaint, plaintiff contends three specific pieces of guidance issued by the WEC, and followed by the named defendants, contradict

---

[7] On December 11, Judge Simanek affirmed the recount and ruled against plaintiff in the state court proceeding. *Trump v. Biden*, No. 2020CV007092, Doc. 101 (Milw. Co. Cir. Ct. Dec. 11, 2020). Plaintiff has since filed an appeal in the Wisconsin Supreme Court.

Wisconsin's election statutes, and that the WEC lacked the authority to issue any guidance in contravention of Wisconsin law. (Compl., ECF No. 1.) Invoking the Court's federal question jurisdiction under 28 U.S.C. §1331, plaintiff asserts claims for the violation of his federal Constitutional rights under 42 U.S.C. §1983. (*Id.*) Among other remedies, he seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201, and asks this Court to declare the Wisconsin general election void under the U.S. Constitution. (*Id.*)

## I. This Court Has Limited Jurisdiction to Resolve Plaintiff's Electors Clause Challenge.

Before addressing the merits of plaintiff's claims, this Court has the obligation of confirming that it has jurisdiction even to consider them. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (federal district courts "possess only that power authorized by Constitution and statute"). Defendants offer a host of arguments related to the justiciability of plaintiff's claims. They insist that plaintiff lacks standing to assert his claims, that his claims are barred by the Eleventh Amendment, and that they are moot. (Defs. Brs., ECF No. 70, 81, 87, 95, 98, 100, 101, and 120.) Finally, they contend that even if this Court could resolve plaintiff's claims, it should abstain from doing so. (Defs. Brs., ECF No. 70, 81, 87, 95, 101, and 120.) Despite the tricky questions of federal jurisdiction implicated by plaintiff's claims and requests for relief, the Court concludes plaintiff's claims are justiciable, at least in part. Given the importance of the issues at stake and the need for a prompt resolution, the Court will not abstain from ruling on whether defendants violated plaintiff's federal rights under the Electors Clause.

### A. Plaintiff Has Standing to Seek an Adjudication of the Alleged Violation of His Rights under the Electors Clause.

Defendants insist that plaintiff lacks standing to assert claims and obtain declaratory relief based on the Electors Clause. (Defs. Brs., ECF No. 70, 81, 87, 95, 98, 100, 101, and 120.) That plaintiff seeks primarily declaratory relief does not remove his obligation to establish standing. The Declaratory Judgment Act permits the Court to "declare the rights and other legal relations of any interested party," but only when there is "a case of actual controversy within its jurisdiction." 28 U.S.C. §2201(a). "A 'controversy' in this sense must be one that is appropriate for judicial determination," *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937), and

"the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

To establish standing, plaintiff bears the burden of proving that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016). An injury in fact is one in which plaintiff claims to have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

Plaintiff asserts that he suffered an injury in fact when he "was denied the Constitutional right to have electors appointed in a lawful manner in an election in which he was a candidate." (Pl. Br., ECF No. 109.) The Court agrees. The Eighth Circuit and the Eleventh Circuit have concluded that losing candidates likely have standing to bring a claim under the Electors Clause, because such a candidate has suffered a "personal, distinct injury." *Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866, at *4 (11th Cir. Dec. 5, 2020); *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) ("An inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."). That is the situation here: plaintiff, a candidate for election, claims he was harmed by defendants' alleged failure to comply with Wisconsin law. Assuming he could prove his claims, he has suffered an injury. Plaintiff, as a candidate for election, has a concrete, particularized interest in the actual results of the general election. *Carson*, 978 F.3d at 1057; *see Carney v. Adams*, ___ S. Ct. ___, 2020 WL 7250101 (Dec. 10, 2020) (holding plaintiff had not proved injury in fact sufficient to establish standing where plaintiff was merely potential candidate and had not yet applied for judicial position). Plaintiff has therefore established injury in fact.

Based on the allegations in his complaint, plaintiff also meets the other requirements for standing. He contends that defendants' failure to comply with Wisconsin law has resulted in a failed election, one in which he was one of the two major-party candidates for President. (Compl., ECF No. 1.) As administrators of the election, defendants implemented the Wisconsin election statutes and WEC's guidance. His harms are therefore traceable to defendants. And as redress, he seeks a declaration that defendants violated the Electors Clause by failing to follow the

directions of the Wisconsin Legislature during the 2020 Presidential Election. [8] (*Id.*) Redressability is established because "plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.5 (1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). Thus, his alleged injury is fairly traceable to the challenged conduct of the defendants and would be redressed by a favorable judicial decision.

Defendants' arguments against standing are largely premised on their challenges to the merits of plaintiff's claims. For example, defendants complain that "[p]laintiff offers no proof whatsoever of how many votes were affected in the three categories of alleged state election law violations he identifies." (Def. Br., ECF No. 98.) But that argument puts the cart before the horse. A court must determine standing based on the allegations in the complaint, not based on its final resolution of the veracity of those allegations. *Spokeo*, 136 S. Ct. at 1547 ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly ... allege facts demonstrating' each element."). If plaintiff were to succeed in proving that defendants violated the Electors Clause, causing Wisconsin's Presidential Electors to be appointed in a manner inconsistent with the Wisconsin Legislature's directives, and depriving plaintiff of his opportunity to win those Presidential Electors, he should have the ability (and the standing) to enforce the Constitution's plain terms in federal court.

### B. The Eleventh Amendment and *Pennhurst* Do Not Apply to Plaintiff's Unique Article II Claims.

Defendants next argue that plaintiff's claims are barred by the Eleventh Amendment and the Supreme Court's decision in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). (Defs. Brs., ECF No. 75, 81, 98, 101, and 120.) They contend that plaintiff is complaining that defendants failed to comply with state law such that the Eleventh Amendment bars this Court from entertaining such claims. (*Id.*)

---

[8] The complaint alleges the exclusive remedy for a failed election resides in the Wisconsin Legislature. (Compl., ECF No. 1.) That allegation brought strongly into question whether this Court could redress Plaintiff's injury, a point raised by the Court at the initial hearing with the parties. Plaintiff has since explained that he seeks a declaration that the Wisconsin general election was a failed election under 3 U.S.C. §2, a declaration he argues is a predicate to allowing the Wisconsin Legislature to take action to determine the manner in which the state should appoint its Presidential Electors now that the originally chosen method has "failed." (Transcript, ECF No. 130.) While this explanation is tenuous, it sufficiently ties the relief requested to a potential remedy to establish standing.

The Eleventh Amendment provides that: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Defendants are correct that, as a general matter, the Eleventh Amendment bars litigation in federal courts against a state.[9] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 336 (7th Cir. 2000) ("[The Eleventh] Amendment bars federal jurisdiction over suits brought against a state … [and] extends to state agencies as well."). But the Supreme Court has long held that suits against state agents, rather than against the state itself, based on those agents' violations of federal law, can be maintained in federal court without running afoul of the Eleventh Amendment. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). A federal court thus may adjudicate and order relief against state officers based on allegations of ongoing unconstitutional conduct. *Id.*; *MCI Telecommunications Corp.*, 222 F.3d at 345.

In *Pennhurst*, the Supreme Court clarified that the rule in *Ex parte Young* does not extend to claims based merely on alleged violations of state law. 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). Thus, under the Eleventh Amendment and state sovereign immunity, a federal court "cannot enjoin a state officer from violating state law." *Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999).

The *Pennhurst* exception to *Ex parte Young* does not apply here, because plaintiff's claims are based on federal law—the Electors Clause of Article II, Section 1 of the U.S. Constitution. *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680, at *75 (W.D. Pa. Oct. 10, 2020) (holding that claims under the Electors Clause are not barred by the Eleventh Amendment); *cf. Dean Foods Co.*, 187 F.3d at 614 ("the question at the heart of this jurisdictional matter is what is the source of the regulations' potential invalidity"). While plaintiff also cites provisions of Wisconsin's election statutes, he does so in an attempt to show that defendants violated not merely those statutes, but rather the Electors Clause itself. In this

---

[9] The Eleventh Amendment precludes a federal suit against state agencies, and this likely includes the Wisconsin Elections Commission. *See* Wis. Stat. §5.05; *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 336 (7th Cir. 2000); *Feehan v. Wisconsin Elections Commission*, No. 20-cv-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020). The WEC has not made this argument. Even if it had, plaintiff's claims against the individual commission members would survive.

unique context, alleged violations of state laws implicate and may violate federal law. *See Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) ("[I]n the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, §1, cl. 2, of the United States Constitution."). This is the opposite of what the Eleventh Amendment forbids; here, a truly federal cause of action is being articulated. Because plaintiff's claims and request for relief are premised on a federal Constitutional violation, not merely a violation of state law, *Pennhurst* does not apply, and the Eleventh Amendment does not bar plaintiff's claims.

### C. Plaintiff's Claims Are Not Moot.

Defendants also contend plaintiff's claims are moot. (Defs. Brs., ECF No. 70, 75, 95, 120.) They insist that because plaintiff waited until after Wisconsin certified the election results to file suit, his suit is too late. (*Id.*) They further maintain that plaintiff's claims are moot because Governor Evers has already signed a "Certificate of Ascertainment For President, Vice President, and Presidential Electors General Election - November 3, 2020" (2020 Electoral College Results, National Archives, https://www.archives.gov/electoral-college/2020) on November 30, 2020, an act they contend makes this action irrelevant. (*Id.*)

The final determination of the next President and Vice President of the United States has not been made, however, and the issuance of a Certificate of Ascertainment is not necessarily dispositive on a state's electoral votes. *See Bush v. Gore*, 531 U.S. 98, 144 (2000) (Ginsburg J., dissenting) (noting none of the various Florida elector deadlines "has ultimate significance in light of Congress' detailed provisions for determining, on 'the sixth day of January,' the validity of electoral votes").

Under the federal statute governing the counting of electoral votes, a state governor may issue a certificate of ascertainment based on the canvassing and then a subsequent certificate of "determination" upon the conclusion of all election challenges. 3 U.S.C. §6. The certificate of "determination" notifies the U.S. Congress of the state decision when Congress convenes on January 6 to count the electoral votes. Indeed, the WEC acknowledged that plaintiff's claims are not moot in a filing with the Wisconsin Supreme Court. (Response of Respondents Wisconsin Elections Commission and Commissioner Ann Jacobs, *Trump v. Evers*, No. 20AP1971-OA, filed

Dec. 1, 2020, ECF No. 109-1.)    At this time, it is also unclear whether the litigation commenced in state court, *Trump v. Biden*, No. 2020CV007092 (Milw. Co. Cir. Ct.), No. 2020CV002514 (Dane Co. Cir. Ct.), is coming to a final resolution sufficient to resolve plaintiff's challenges. Given plaintiff's pending appeal and the limited time available should that appeal succeed on the state law issues, this Court will proceed to decide the merits of the federal law claims.    The Court concludes this case is not yet moot.

### D.  This Court Is Not Required to Abstain from Deciding Plaintiff's Challenge under the Electors Clause.

Defendants also contend that even if this Court could adjudicate plaintiff's claims, it should abstain from doing so.    (Defs. Brs., ECF No. 70, 81, 87, 95, 101, and 120.)    They focus on three different abstention doctrines: (1) *Wilton/Brillhart* abstention; (2) *Pullman* abstention; and (3) *Colorado River* abstention.    (*Id.*)    After reviewing the law under all three forms of abstention, this Court will decline defendants' invitation to abstain.

Defendants first invoke the *Wilton/Brillhart* abstention doctrine, derived from *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995), and *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942).    Under the *Wilton/Brillhart* abstention doctrine, "district courts possess significant discretion to dismiss or stay claims seeking declaratory relief, even though they have subject matter jurisdiction over such claims."    *R.R. St. & Co. v. Vulcan Materials Co.*, 569 F.3d 711, 713 (7th Cir. 2009).    While labelled with Supreme Court case names, this form of abstention arises from the plain terms of the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, itself.    Section 2201 expressly provides that district courts "*may* declare the rights and other legal relations of any interested party seeking such declaration."    28 U.S.C. § 2201(a) (emphasis added).    The statute thus gives district courts the discretion not to declare the rights of litigants.    The Seventh Circuit has confirmed that a district court properly exercises discretion to abstain where, for example, "declaratory relief is sought and parallel state proceedings are ongoing."    *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 (7th Cir. 2010).

Defendants also invoke *Pullman* abstention.    *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501-02 (1941).    The *Pullman* doctrine "applies when 'the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law.'"    *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664

F.3d 139, 150 (7th Cir. 2011) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996)). *Pullman* abstention is appropriate if there is (1) "a substantial uncertainty as to the meaning of the state law" and (2) "a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Id.* (internal quotation marks omitted).

Finally, defendants ask the Court to avoid deciding this case under *Colorado River* abstention. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 818 (1976). Under *Colorado River* abstention principles, a federal court should abstain in favor of a parallel state court lawsuit if (1) "the concurrent state and federal actions are actually parallel" and (2) "the necessary exceptional circumstances exist to support a stay or dismissal." *DePuy Synthes Sales, Inc. v. OrthoLA, Inc.*, 953 F.3d 469, 477 (7th Cir. 2020) (internal quotation marks omitted).

The Court declines to abstain under any of these doctrines. The federal Constitutional issues raised in plaintiff's complaint are obviously of tremendous public significance. For the first time in the nation's history, a candidate that has lost an election for president based on the popular vote is trying to use federal law to challenge the results of a statewide popular election. While there is parallel litigation pending in the state court, that litigation does not address the federal constitutional issue that is the center of plaintiff's case. Given the importance of the federal issue and the limited timeline available, it would be inappropriate to wait for the conclusion of the state court case. In these circumstances, the Court will exercise its discretion to declare plaintiff's rights under the Electors Clause and will decline to utilize *Pullman* or *Colorado River* abstention principles to defer to the state court proceedings.

## II. Plaintiff's Claims Fail on Their Merits—Wisconsin's Appointment of Presidential Electors for the 2020 Presidential Election Was Conducted in the Manner Directed by the Wisconsin Legislature.

To succeed on his claims for relief under 42 U.S.C. §1983, plaintiff must prove that defendants acted under the color of state law and deprived him of a right secured by the Constitution or laws of the United States. *Wilson v. Warren Cnty., Ill.*, 830 F.3d 464, 468 (7th Cir. 2016) (citations omitted). Plaintiff alleges that the defendants violated his rights under the Electors Clause in Article II, Section 1. (Compl., ECF No. 1.) There is no dispute that defendants' actions as alleged in the complaint were undertaken under the color of Wisconsin law.

Defendants strongly and uniformly dispute, however, that their conduct violated any Constitutional provision.  (Defs. Brs., ECF No. 70, 81, 87, 95, 98, 100, 101, and 120.)

### A. The Wisconsin Legislature Has Directed the Appointment of Presidential Electors to Be by Popular Vote.

The Electors Clause directs state legislatures to appoint presidential electors in a manner of their choosing.  U.S. CONST. art. II, § 1, cl. 2.  As the Supreme Court explained just this past summer, the Electors Clause was the result of "an eleventh-hour compromise" at the 1787 Constitutional convention.  *Chiafalo v. Washington*, __ U.S. __, 140 S. Ct. 2316, 2320 (2020). Apparently fatigued and ready to return to their homes, the delegates decided on language that would give state legislatures the responsibility of choosing the "Manner" in which presidential electors would be appointed.  *Id.*  And the Supreme Court has confirmed that state legislators have "the broadest power of determination" over who becomes a Presidential Elector.  *Id.* at 2324 (quoting *McPherson v. Blacker*, 146 U.S. 1, 27 (1892)).

Today, the manner of appointment among the states is largely uniform.  *See Chiafalo*, 140 S. Ct. at 2321.  All states use an appointment process tied to the popular vote, with political parties fielding presidential candidates having the responsibility to nominate slates of Presidential Electors.  *Id.* at 2321-22.  But that manner of appointing Presidential Electors is not required by the Constitution.  As Chief Justice Fuller explained in 1892:

> The constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object.

*McPherson*, 146 U.S. at 27.  Historically, presidential electors have been appointed directly by state legislatures, by general ticket, by districts, and by majority popular vote.  *Id.* at 27-32 (summarizing the methods by which presidential electors were appointed by state legislatures during the first four presidential elections).  But by 1832, "all States but one had introduced popular presidential elections."  *Chiafalo*, 140 S. Ct. at 2321.

The Wisconsin Legislature's decision to appoint the state's presidential electors by popular vote is embodied in Wis. Stat. §8.25(1).  This statute provides:

> Presidential electors. By general ballot at the general election for choosing the
> president and vice president of the United States there shall be elected as many
> electors of president and vice president as this state is entitled to elect senators
> and representatives in congress. A vote for the president and vice president
> nominations of any party is a vote for the electors of the nominees.

Wis. Stat. §8.25(1). The statutes define "general election" as "the election held in even-numbered years on the Tuesday after the first Monday in November to elect United States … presidential electors." Wis. Stat. §5.02(5).

Plaintiff contends defendants have violated the Electors Clause by failing to appoint the state's presidential electors in the "Manner" directed by the Wisconsin Legislature. (Compl., ECF No. 1.) By this, plaintiff means that he has raised issues with the WEC's guidance on three issues related to the administration of the election. This argument confuses and conflates the "Manner" of appointing presidential electors—popular election—with underlying rules of election administration. As used in the Electors Clause, the word "Manner" refers to the "[f]orm" or "method" of selection of the Presidential Electors. *Chiafalo*, 140 S. Ct. at 2330 (Thomas, J., concurring) (citations omitted). It "requires state legislatures merely to set the approach for selecting Presidential electors." *Id.* Put another way, it refers simply to "the mode of appointing electors—consistent with the plain meaning of the term." *Id.*; *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("It has been said that the word 'appoint' is not the most appropriate word to describe the result of a popular election. Perhaps not; but it is sufficiently comprehensive to cover that mode…").

The approach, form, method, or mode the Wisconsin Legislature has set for appointing Presidential electors is by "general ballot at the general election." Wis. Stat. §8.25(1). There is no dispute that this is precisely how Wisconsin election officials, including all the defendants, determined the appointment of Wisconsin's Presidential Electors in the latest election. They used "general ballot[s] at the general election for choosing the president and vice president of the United States" and treated a "vote for the president and vice president nominations of any party is a vote for the electors of the nominees." Absent proof that defendants failed to follow this "Manner" of determining the state's Presidential Electors, plaintiff has not and cannot show a violation of the Electors Clause.

Plaintiff's complaints about the WEC's guidance on indefinitely confined voters, the use of absentee ballot drop boxes, and corrections to witness addresses accompanying absentee ballots

are not challenges to the "Manner" of Wisconsin's appointment of Presidential Electors; they are disagreements over election administration. Indeed, the existence of these (or other) disagreements in the implementation of a large election is hardly surprising, especially one conducted statewide and involving more than 3.2 million votes. But issues of mere administration of a general election do not mean there has not been a "general ballot" at a "general election." Plaintiff's conflation of these potential nonconformities with Constitutional violations is contrary to the plain meaning of the Electors Clause. If plaintiff's reading of "Manner" was correct, any disappointed loser in a Presidential election, able to hire a team of clever lawyers, could flag claimed deviations from the election rules and cast doubt on the election results. This would risk turning every Presidential election into a federal court lawsuit over the Electors Clause. Such an expansive reading of "Manner" is thus contrary both to the plain meaning of the Constitutional text and common sense.

**B. Even If "Manner" Includes Aspects of Election Administration, Defendants Administered Wisconsin's 2020 Presidential Election as Directed by the Wisconsin Legislature.**

Plaintiff's claims would fail even if the Court were to read the word "Manner" in Article II, Section 1, Clause 2 to encompass more than just the "mode" of appointment. Including material aspects of defendants' election administration in "Manner" does not give plaintiff a win for at least two reasons. First, the record shows defendants acted consistently with, and as expressly authorized by, the Wisconsin Legislature. Second, their guidance was not a significant or material departure from legislative direction.

Plaintiff's "Manner" challenges all stem from the WEC's having issued guidance concerning indefinitely confined voters, the use of absentee ballot drop boxes, and corrections to witness addresses on absentee ballots. (Compl., ECF No. 1.) Plaintiff expresses strong disagreement with the WEC's interpretations of Wisconsin's election statutes, accusing the WEC of "deviat[ing] from the law" and "substitut[ing] their 'wisdom' for the laws passed by the State Legislature and signed by the Governor." (Pl. Br., ECF No. 109.) While plaintiff's statutory construction arguments are not frivolous, when they are cleared of their rhetoric, they consist of little more than ordinary disputes over statutory construction.

These issues are ones the Wisconsin Legislature has expressly entrusted to the WEC.

Wis. Stat. §5.05(2w) ("The elections commission has the responsibility for the administration of chs. 5 to 10 and 12."). When the legislature created the WEC, it authorized the commission to issue guidance to help election officials statewide interpret the Wisconsin election statutes and new binding court decisions. Wis. Stat. §5.05(5t). The WEC is also expressly authorized to issue advisory opinions, Wis. Stat. §5.05(6a), and to "[p]romulgate rules … applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections or election campaigns." Wis. Stat. §5.05(1)(f). The Wisconsin Legislature also directed that the WEC would have "responsibility for the administration of … laws relating to elections and election campaigns." Wis. Stat. §5.05(1). In sum, far from defying the will of the Wisconsin Legislature in issuing the challenged guidance, the WEC was in fact acting pursuant to the legislature's express directives.

If "Manner" in the Electors Clause is read to includes legislative enactments concerning election administration, the term necessarily also encompasses the Wisconsin Legislature's statutory choice to empower the WEC to perform the very roles that plaintiff now condemns. Thus, the guidance that plaintiff claims constitutes an unconstitutional deviation from the Wisconsin Legislature's direction, is, to the contrary, the direct consequence of legislature's express command. And, defendants have acted consistent with the "Manner" of election administration prescribed by the legislature.

Plaintiff points to language in Chief Justice Rehnquist's concurring opinion in *Bush v. Gore*, stating that "[a] significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring). But the record does not show any *significant* departure from the legislative scheme during Wisconsin's 2020 Presidential election. At best, plaintiff has raised disputed issues of statutory construction on three aspects of election administration.[10] While plaintiff's disputes are not frivolous, the Court finds these issues do not remotely rise to the level of a material or significant departure from Wisconsin Legislature's plan for choosing Presidential Electors.

---

[10] Even these three statutory construction issues were raised only after-the-fact. If these issues were as significant as plaintiff claims, he has only himself to blame for not raising them *before* the election. Plaintiff's delay likely implicates the equitable doctrine of laches. The Court does not need to reach that issue, however, and therefore makes no findings or holdings on laches.

Because plaintiff has failed to show a clear departure from the Wisconsin Legislature's directives, his complaint must be dismissed. As Chief Justice Rehnquist stated, "in a Presidential election the clearly expressed intent of the legislature must prevail." *Bush v. Gore*, 531 U.S. 98, 120 (2000) (Rehnquist, C.J., concurring). That is what occurred here. There has been no violation of the Constitution.

## CONCLUSION

Plaintiff's Electors Clause claims fail as a matter of law and fact. The record establishes that Wisconsin's selection of its 2020 Presidential Electors was conducted in the very manner established by the Wisconsin Legislature, "[b]y general ballot at the general election." Wis. Stat. §8.25(1). Plaintiff's complaints about defendants' administration of the election go to the implementation of the Wisconsin Legislature's chosen manner of appointing Presidential Electors, not to the manner itself. Moreover, even if "Manner" were stretched to include plaintiff's implementation objections, plaintiff has not shown a significant departure from the Wisconsin Legislature's chosen election scheme.

This is an *extraordinary* case. A sitting president who did not prevail in his bid for reelection has asked for federal court help in setting aside the popular vote based on disputed issues of election administration, issues he plainly could have raised before the vote occurred. This Court has allowed plaintiff the chance to make his case and he has lost on the merits. In his reply brief, plaintiff "asks that the Rule of Law be followed." (Pl. Br., ECF No. 109.) It has been.

**IT IS HEREBY ORDERED:**

1. Plaintiff's complaint, ECF No. 1, is DISMISSED WITH PREJUDICE.

2. Plaintiff's motion for preliminary injunction, ECF No. 6, is DENIED as moot.

3. Defendants' motions to dismiss, ECF No. 69, 71, 78, 84, 86, 96, 97, and 99, are GRANTED.

4. Defendant Governor Evers' oral motion for judgment under Fed. R. Civ. P. 52 is GRANTED.

Dated at Milwaukee, Wisconsin on December 12, 2020.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge