# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

DONALD J. TRUMP, Candidate for President of the
United States of America,

      Plaintiff,

  v.

THE WISCONSIN ELECTIONS COMMISSION, and its
members, ANN S. JACOBS, MARK L. THOMSEN,
MARGE BOSTELMANN, DEAN KNUDSON,
ROBERT F. SPINDELL, JR., in their official capacities,
SCOTT MCDONELL in his official capacity as the Dane
County Clerk, GEORGE L. CHRISTENSON in his
official capacity as the Milwaukee County Clerk,
JULIETTA HENRY in her official capacity as the
Milwaukee Election Director, CLAIRE WOODALL-
VOGG in her official capacity as the Executive Director
of the Milwaukee Election Commission, MAYOR TOM
BARRETT, JIM OWCZARSKI, MAYOR SATYA
RHODES-CONWAY, MARIBETH WITZEL-BEHL,
MAYOR CORY MASON, TARA COOLIDGE, MAYOR
JOHN ANTARAMIAN, MATT KRAUTER, MAYOR
ERIC GENRICH, KRIS TESKE, in their official
capacities; DOUGLAS J. LA FOLLETTE, Wisconsin
Secretary of State, in his official capacity, and TONY
EVERS, Governor of Wisconsin, in his official capacity.

      Defendants.

Case No. 20CV1785

---

## DEFENDANT GOVERNOR EVERS'S BRIEF IN SUPPORT OF HIS PETITION FOR ATTORNEYS' FEES AND SANCTIONS

## INTRODUCTION

The Court itself described this as "an *extraordinary* case" in which Plaintiff requested "even more *extraordinary*" relief. (Dkt. 134 at 1) While the exact mechanism for this relief was a moving target, the through-line was Plaintiff's consistent demand for a judicial order "to set aside the results of the November 3, 2020 popular vote in Wisconsin," disregarding the collective judgment of the nearly 3.3 million Wisconsinites who voted. (*Id.*) This demand was as meritless as it was unprecedented. As Wisconsin Supreme Court Justice Brian Hagedorn noted in another case, "[s]uch a move would appear to be unprecedented in American history." *Wis. Voters All. v. Wis. Elections Comm'n*, No. 2020AP1930-OA (Wis. Dec. 4, 2020) (Hagedorn, J., concurring in denial of petition for original action).[1]

Courts at every level rebuffed Plaintiff's outrageous request. This Court determined that Plaintiff's lawsuit lacked legal merit. (Dkt. 134 at 2) The Seventh Circuit affirmed, under the doctrine of laches and on the merits. *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 925-26 (7th Cir. 2020). This Court had already expressed concern about how dilatory Plaintiff's filing had been. (Dkt. 134 at 21, n.10) The Supreme Court denied review. No. 20-883, 2021 WL 850635 (U.S. Mar. 8, 2021).

Plaintiff and his lawyers advanced a lawsuit that, from its inception, was frivolous, dilatory, and without merit. Plaintiff's 70-page complaint did not clearly identify any cognizable cause of action, did not enumerate the essential elements of any legal claim much less attempt to meet those elements, and initially sought relief that amounted to an improper and unconstitutional advisory opinion. When Governor Evers and other Defendants identified those defects, Plaintiff did not file an amended complaint or even defend the shortcomings of his pleading; instead, he repeatedly

---

[1] A copy of the decision is available at Dkt. 95-18.

announced different formulations of the relief he was seeking, all of which suffered from significant constitutional and logical flaws. Plaintiff's vexatious and unreasonable litigation approach—both procedurally and in terms of legal theory—multiplied the work required by Governor Evers's counsel.

Notwithstanding the blatant shortcomings of Plaintiff's case, the stakes of this litigation and the accelerated timeline (exacerbated by Plaintiff's dilatory filing of this lawsuit) necessitated Governor Evers' counsel litigating this case aggressively and thoroughly, at Wisconsin taxpayer expense. The stakes could not have been higher: failure by Governor Evers and other Defendants to thoroughly and zealously oppose Plaintiff's requested relief could have led to the disenfranchisement of nearly 3.3 million Wisconsin voters.

Plaintiff and his lawyers should be held jointly responsible for filing and prosecuting this meritless and vexatious lawsuit. There is no reason for Wisconsin taxpayers to bear the cost of this attempt to hijack the democratic process. Governor Tony Evers respectfully requests an order requiring Plaintiff and his attorneys to pay, at minimum, the attorneys' fees and costs incurred in defending Wisconsin's November 2020 presidential election results against this baseless, belated, and cynical assault. The Court should also impose a punitive sanction. This relief is warranted under 28 U.S.C. § 1927 and the Court's inherent judicial authority.

**STATEMENT OF THE CASE AND PROCEDURAL HISTORY**

On Tuesday, December 1, 2020, Donald J. Trump ("Trump") filed a petition for leave to commence an original action in the Wisconsin Supreme Court challenging the presidential election results. *Trump v. Evers*, No. No. 2020AP1971-OA, Pet. for Original Action (Wis. Dec. 1, 2020) (Dkt. 95-17). The very next day, notwithstanding that state law governs the election process,

2

Trump filed this suit asking the federal court to grant relief from the election results. (Dkt. 1)[2] Importantly, this lawsuit was filed on Wednesday, December 2, 2020—twenty-nine days after the November 3, 2020 general Presidential election, fourteen days after Trump petitioned for a recount in Milwaukee and Dane Counties, two days after the chairperson of the Wisconsin Elections Commission ("WEC") certified that Joseph R. Biden and Kamala D. Harris had received the highest number of votes following that recount, two days after Governor Evers had signed the certificate of ascertainment naming Wisconsin's presidential electors, and while Trump's petition for leave to commence an original action remained pending before the Wisconsin Supreme Court.[3]

On December 3, the Wisconsin Supreme Court denied Trump's petition for leave to commence an original action, and Trump filed, in the circuit courts for Dane and Milwaukee Counties, lawsuits challenging the results of the recounts conducted in those counties. (Dkt. 95-19 (*Trump v. Biden*, No. 2020CV7092, Order for Consolidation and for Appointment of Judicial Officer (Milwaukee Cty. Cir. Ct. Dec. 3, 2020), No. 2020CV2514 (Dane Cty. Cir. Ct. Dec. 3, 2020)) In those suits, he alleged, among other things, that ballots should not be counted because voters illegally claimed indefinitely confined status, that municipal officials improperly added witness information on absentee ballot certifications, and that ballots collected at "Democracy in the Park" events in Madison were illegal. *Trump v. Biden*, 2020 WI 91, ¶2, 394 Wis. 2d 629, 951 N.W.2d 568.

---

[2] Around the same time, Trump allies filed a bevy of lawsuits in Wisconsin state and federal challenging the Wisconsin presidential election results. *See Wis. Voters All. v. Wis. Elections Comm'n*, No. 2020AP1930-OA, (Wis. Dec. 4, 2020); *Mueller v. Jacobs*, No. 2020AP1958-OA (Wis. Dec. 2, 2020); *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-1771(E.D. Wis. Dec. 1, 2020); Dkt. 1. Notably, two prior suits, both in the Eastern District of Wisconsin, raised claims articulated here. *See Wis. Voters All. v. City of Racine,* No. 20-C-1487, 2020 WL 6129510, at *1-2 (E.D. Wis. Oct. 14, 2020)*, injunction pending appeal denied*, 2020 WL 6591209 (E.D. Wis. Oct. 21, 2020); *Langenhorst v. Pecore*, No. 1:20-cv-1701 (E.D. Wis. 2020) (voluntarily dismissed Nov. 16, 2020).

[3] Pursuant to E.D. Wis. Civil L. R. 7(j)(2), all unpublished cases, orders, and dispositions cited are filed in conjunction with this brief.

Despite the Wisconsin Supreme Court holding on December 3, 2020 that a state-court action under Wis. Stat. § 9.01 provided Trump's "exclusive judicial remedy," Trump and his lawyers continued to prosecute this action. *Trump v. Evers*, No. 2020AP1971-OA (Wis. Dec. 3, 2020) (Hagedorn, J., concurring) (internal footnote omitted). His federal claims mirrored his state claims in that he sought to invalidate: (1) ballots submitted by those who claimed indefinitely confined status; (2) ballots where election officials filled in witness address information; and (3) Democracy in the Park ballots. (Dkt. 1, ¶¶83-108, 235-258) Trump also challenged the legality of Center for Tech and Civic Life grants made to municipalities, despite Judge Griesbach having already twice denied relief on the same theory pressed here. (*Compare* Dkt. 1, ¶¶168-234 *with* Dkt. 95-8 (*Wis. Voters All. v. City of Racine*, No. 20-C-1487, 2020 WL 6129510, at *1-2 (E.D. Wis. Oct. 14, 2020), *injunction pending appeal denied*, 2020 WL 6591209 (E.D. Wis. Oct. 21, 2020))

Strikingly, the challenged practices were all in place months prior to the November presidential election. Before the 2016 presidential election, an election in which Trump was on the ballot, the WEC issued guidance on how local election administrators should handle absentee-ballot envelopes with incomplete witness-address information. In March of 2020, approximately eight months—and two statewide elections—prior to the presidential election, the WEC issued guidance regarding absentee voters claiming "indefinitely confined" status. The WEC similarly issued drop-box guidance in August of 2020. That same month the City of Madison publicly advertised its Democracy in the Park events, which occurred in September and October. (Dkt. 127 at 31) Despite significant advance notice of these practices, Trump chose not to challenge any of them until after he lost Wisconsin's presidential election.

This Court ruled in Defendants' favor on December 12, 2020. *First*, the Court found that Wisconsin's electors were chosen in the "manner" prescribed by the Legislature: by the results of the statewide election. (Dkt. 134 at 17-20) It followed that Trump had no valid Electors Clause claim under Art. II, § 1, cl. 2 of the U.S. Constitution. (*See id.*) *Second*, the Court held that none of the WEC guidance Trump complained about deviated meaningfully from Wisconsin law. (*Id.* at 20-22) *Third*, the Court determined that despite referencing the First Amendment, as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment, Trump's failure to pursue those claims meant that he had abandoned those claims. (*Id.* at 1, n.1) The Court also strongly suggested that laches barred Trump's suit because he could, and should, have brought it earlier. (*Id.* at 21, n.10)

Simultaneously, Trump advanced his state-court case. The circuit court ruled against him, and then, after bypassing the court of appeals, the Wisconsin Supreme Court ordered simultaneous briefing and heard oral argument. Two days after this Court ruled, the Wisconsin Supreme Court held that Trump's argument about indefinitely confined voters failed because he could not show a single voter had improperly claimed that status. *Trump v. Biden*, 2020 WI 91, ¶8. The Court then ruled that Trump's remaining claims were barred by laches. *Id.*, ¶10.

In the meantime, Trump had appealed this Court's decision and sought expedited review in the Seventh Circuit. Trump's appellate briefs ignored his loss in the Wisconsin Supreme Court, continuing to argue—contrary to a definitive holding from the court of last resort on questions of state law—that indefinitely confined voters should have been barred from participating in Wisconsin's November 2020 election and pretending that his other legal theories had not been rejected as untimely. On December 24, 2020, the Seventh Circuit affirmed this Court's decision. In its ruling, the court declared "[o]n the merits, the district court was right to enter judgment for

the defendants. We reach this conclusion in no small part because of the President's delay in bringing the challenges to Wisconsin law that provide the foundation for the alleged constitutional violation." 983 F.3d at 925. The court of appeals noted that "the errors that [Trump] alleges occurred in the Commission's exercise of its authority are in the main matters of state law. They belong, then, in the state courts, where [he] had an opportunity to raise his concerns." *Id.* at 927. On February 22, the Supreme Court of the United States declined to review the Wisconsin Supreme Court's decision. *Trump v. Biden*, No. 20-882, 2021 WL 666465 (U.S. Feb. 22, 2021). Two weeks later, that court declined to review this case. *Trump v. WI Elections Comm'n*, No. 20-883, 2021 WL 850635 (U.S. Mar. 8, 2021).

## GOVERNING LAW

Governor Evers requests that the Court sanction Trump and his attorneys under 28 U.S.C. § 1927 and the inherent authority of a federal court.[4] Imposing fees, under section 1927 or the Court's inherent authority, is a discretionary decision. *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1183 (7th Cir. 1992).

### A. 28 U.S.C. § 1927 Expressly Authorizes Assessment of Fees for Vexatious Litigation.

Congress has expressly authorized courts to tax attorneys' fees against opposing counsel under 28 U.S.C. § 1927. That section provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the

---

[4] Had there been sufficient time, Governor Evers would likely have also pursued sanctions under Federal Rule of Civil Procedure 11. However, the Rule 11's safe-harbor provision requires the party moving for sanctions to first notify the opposing party and allow 21 days for withdrawal or correction before filing a motion for sanctions. Here, Plaintiff filed his complaint on the evening of December 2 and demanded resolution of the case and all appellate review by December 11. Ultimately, the Court issued an order dismissing the case on December 12. There was not time to comply with Rule 11's safe-harbor requirement. But their demand for an expeditious process cannot insulate Plaintiff and his attorneys from appropriate consequences for their egregious conduct.

excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

*Id.* The purpose of this statutory provision is to limit abuse of judicial process and deter frivolous litigation, because the best way to control "unjustified tactics in litigation is to ensure that those who create costs also bear them." *In re TCI Ltd.*, 769 F.2d 441, 446 (7th Cir. 1985).

Litigation conduct meets the vexatious standard if it is conducted in bad faith, measured either subjectively or objectively. *Kotsilieris*, 966 F.2d at 1184. There are several ways to show bad faith, including intentional ill will, malice, reckless conduct, and indifference to the law. *See, e.g.*, *Ordower v. Feldman*, 826 F.2d 1569, 1574 (7th Cir. 1987); *In re TCI Ltd.*, 769 F.2d at 445. "Sanctions against counsel under 28 U.S.C. § 1927 are appropriate when 'counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders.'" *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013) (quoting *Kotsilieris*, 966 F.2d at 1184-85). Among other improper tactics that have warranted sanctions under section 1927 are: deliberately ignoring potentially dispositive authority (*Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 753 (7th Cir. 1988)), advancing claims barred by statute (*id.* at 752-753), failing to respond to a motion for summary judgment (*Claiborne v. Wisdom*, 414 F.3d 715, 722 (7th Cir. 2005)), persisting with litigation of claims after it was clear they lacked any basis (*Walter v. Fiorenzo*, 840 F.2d 427, 435 (7th Cir. 1988)), serving defendants in a piecemeal fashion (*Ordower*, 826 F.2d at 1575), and manipulating legal procedures to disrupt the timing of litigation (*In re Matter of Lisse*, 921 F.3d 629, 642 (7th Cir. 2019)).

## B. The Court Has Inherent Authority to Sanction Trump and His Lawyers

Independent of section 1927, courts have broad authority to sanction a party or attorney who litigates in bad faith. "[D]istrict courts possess certain inherent powers, not conferred by rule

7

or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 953 (7th Cir. 2020) (internal quotation marks and citations omitted). Sanctionable abuses can include "harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim" *Mach v. Will Cty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009). Additionally, courts may consider the totality of the conduct when determining if sanctions are appropriate. *Fuery v. City of Chicago*, 900 F.3d 450, 454 (7th Cir. 2018).

This inherent authority reaches bad-faith conduct, "not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15 (1973). For example, in one case the Seventh Circuit found bad faith and imposed fees based on "(1) the obvious meritlessness of the … claim; (2) the failure to provide any factual or legal support for the sundry constitutional claims; (3) counsel's omission of a key sentence from a quotation; and (4) the failure to respond to defendant's motion for fees and costs." *McCandless v. Great Atl. & Pac. Tea Co.*, 697 F.2d 198, 201 (7th Cir. 1983). Additionally, allowing "litigation to continue after discovery had erased any doubt that his arguments had even a chance of success" has been held to constitute bad faith. *Mach*, 580 F.3d at 501.

Imposing sanctions under inherent authority has two primary purposes: to punish and deter attorneys from litigating frivolous lawsuits. *See Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1396 (7th Cir. 1983). "As with fee awards entered against a party guilty of bad faith litigation, an award against counsel serves only incidentally to compensate the prevailing party for fees that should never have been incurred." *Id.*

8

*Methode Elecs., Inc. v. Adam Techns., Inc.*, 371 F.3d 923 (7th Cir. 2004), further illustrates the breadth of the Court's inherent judicial authority. There, the plaintiff filed suit in the Northern District of Illinois, claiming a press release established venue, even though the defendant had no apparent connection to Illinois. *Id.* at 924. When discovery confirmed the venue allegation was false, the defendant moved for sanctions. *Id.* After briefing and a hearing, the court imposed $45,000 in attorney fees and an additional $10,000 fine. *Id.* at 925-26. The Seventh Circuit upheld the attorney fee award and the fine, holding that both were within the district court's broad inherent authority to impose fines and fees. *Id.* at 928. Further demonstrating the wide discretion available to the Court is that bad-faith conduct has even warranted overturning a jury award. *Fuery*, 900 F.3d at 468.

## ARGUMENT

From this case's inception through the staggeringly expedited subsequent proceedings, there is no doubt that Trump and his attorneys brought and litigated this lawsuit in bad faith. Unconscionably, they did so for the purpose of sowing doubt about the legitimacy of the 2020 presidential election, with a goal of disenfranchising nearly 3.3 million Wisconsin voters in order to secure the presidency contrary to majority will. This Court has both statutory and inherent authority to make the State whole for attorneys' fees necessitated by this frivolous suit and to issue sanctions, for which Trump and his attorneys should be jointly and severally liable, to dissuade future candidates and attorneys from engaging in such reckless abuses of the judicial system.

## I. TRUMP AND HIS ATTORNEYS ENGAGED IN VEXATIOUS AND BAD-FAITH LITIGATION.

Trump and his attorneys engaged in unreasonable and vexatious conduct by bringing and conducting this meritless, dilatory lawsuit despite knowing that state law, interpreted by state courts, governs the election process, and then rushing adjudication in a haphazard, procedurally

9

inept way that exacerbated Governor Evers's burdens and increased the expenses imposed upon the state treasury. Accordingly, Plaintiff and his counsel should reimburse the attorneys' fees Governor Evers incurred in defending this suit. The most egregious examples of the conduct warranting sanctions are described below.

### A. Trump Engaged in an Extensive—and Unjustifiable—Delay in Filing the Claims Adjudicated Here.

Trump's claims regarding alleged violations of state election law disputed guidance and practices from WEC that were adopted and in place well before the 2020 presidential election. WEC guidance relating to missing witness addresses was in place before the 2016 presidential election. The indefinitely confined voter guidance was issued in March of 2020, prior to Wisconsin's presidential primary. Though Trump was on the ballot during both of those elections, he did not challenge that guidance at any time until well after he lost. WEC's drop-box guidance was issued in August of 2020, over two months prior the fall election. Similarly, the Madison Democracy in the Park events were held in September and October of 2020. These events were widely advertised prior to taking place. Yet Trump took no action at the time.

Trump waited until after he lost the election—and then for nearly another four weeks—to file this lawsuit. This delay was manifestly unwarranted and unreasonable. As this Court and the Court of Appeals both recognized (as did the Wisconsin Supreme Court), Trump's significant delay in bringing his claims doomed his efforts.

### B. Trump Used the Federal Court in an Effort to Evade the Preclusive Effect of State Court Rulings on the Same Claims.

Trump and his lawyers' decision to file this action while his petition for leave to commence an original action was pending before the Wisconsin Supreme Court, served to multiply proceedings. In addition, their decision to continue to prosecute this action after the Wisconsin Supreme Court denied his petition for leave and while his two state court actions were pending,

served to multiply proceedings. The Court can infer from the undisputed facts that this decision was made for the improper purpose of attempting an end run around the Wisconsin Supreme Court's December 3, 2020 holding that an action originating in the state circuit court under Wis. Stat. § 9.01 was the "exclusive judicial remedy" applicable to Trump's election challenge.

Trump's state and federal claims were nearly identical. The legal theory in both cases was identical: the election was invalid because the WEC's guidance was inconsistent with state law. Trump improperly used the federal court to take an unreasonable additional bite at the apple in the (completely predictable) event the state courts ruled against him. He should have included all of his claims in his state court case rather than improperly using the federal system to seek a second chance. As the Seventh Circuit observed:

> [W]e are not the ultimate authority on Wisconsin law. That responsibility rests with the State's Supreme Court. Put another way, the errors that the President alleges occurred in the Commission's exercise of its authority are in the main matters of state law. They belong, then, in the state courts, where the President had an opportunity to raise his concerns.

*Trump*, 983 F.3d at 927. In other words, Trump's federal suit was wholly unnecessary because he was already pursuing the same cause of action in state court, which was the exclusive jurisdiction for his claims. His federal suit was baseless. At minimum, he should have voluntarily dismissed this suit once the Wisconsin Supreme Court held that a state-court challenge to the recount process was the exclusive means to contest election results. The decision to continue this action after the Wisconsin Supreme Court's "exclusive remedy" ruling was objectively unreasonable.

### C. Trump Ignored the Fact that Courts Across the Country Had Already Upheld the Validity of the CTCL Grants Trump Challenged.

When he filed this action, Trump was aware that his theories and arguments challenging the validity of grants by the Center for Tech and Civic Life ("CTCL") had been rejected by all eight courts—including one in this district—to consider them. Judge Griesbach found that nothing

11

in Wisconsin law prohibits municipalities from accepting nonpartisan private funds to facilitate voting access. *Wis. Voters All. v. City of Racine*, No. 20-C-1487, 2020 WL 6129510, at *2 (E.D. Wis. Oct. 14, 2020). Judge Griesbach confirmed—as did the seven other courts that heard similar cases around the country—that no federal law, including the Elections Clause, prohibits CTCL grants. *Id*.[5] Trump had no additional legal basis to challenge these grants when he filed his complaint here.

### D. Trump's Complaint Was Facially Deficient and Failed to Properly Allege Any Claims.

Fundamentally, any federal-court complaint must contain three elements: (1) a short and plain statement of the grounds for the court's jurisdiction; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought. Fed. R. Civ. P. 8(a). To satisfy the second element, a plaintiff must allege a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not include detailed factual allegations, but a plaintiff must "provide the grounds of his entitlement to relief" which "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Id*. at 545 (internal quotation marks and citations omitted).

Trump's complaint fell well short of this standard. Trump and his attorneys merely paraded a hodge-podge of objections to mail-in voting and the alleged deficiencies of Wisconsin election officials during the 2020 election in more than 300 paragraphs over 70 pages. They never identified

---

[5] *Accord Ga. Voter All. v. Fulton Cty.*, No. 1:20-CV-4198-LMM, 2020 WL 6589655, at *5 (N.D. Ga. Oct. 28, 2020); *S.C. Voter's All. v. Charleston Cty.*, No. 2:20-CV-03710, Dkt. 5 (D.S.C. Oct. 26, 2020); *Pa. Voters All. v. Centre Cty.*, No. 4:20-CV-01761, 2020 WL 6158309, at *7 (M.D. Pa. Oct. 21, 2020); *Tex. Voters All. v. Dallas Cty.*, No. 4:20-CV-00775, 2020 WL 6146248, at *21 (E.D. Tex. Oct. 20, 2020); *Iowa Voter All. v. Black Hawk Cty.*, No. C20-2078-LTS, 2020 WL 6151559, at *5 (N.D. Iowa Oct. 20, 2020); *Election Integrity Fund v. City of Lansing*, No. 1:20-CV-950, 2020 WL 6605987, at *3 (W.D. Mich. Oct. 19, 2020); *Minn. Voters All. v. City of Minneapolis*, No. CV 20-2049 (MJD/TNL), 2020 WL 6119937, at *9 (D. Minn. Oct. 16, 2020). (Copies of these unpublished decisions are on file with the Court at Dkt. 95-9-15)

any cause of action that could plausibly support the requested relief—*i.e.*, casting aside the votes of nearly 3.3 million Wisconsinites who exercised their fundamental right to vote in the presidential election—or provided a legal basis for a court's authority to issue the requested relief.

Although the Court did not address this argument, the Complaint's blatant deficiencies evidence the vexatious conduct of Trump's attorneys. These shortcomings were more than just a formality; they increased the time and effort defendants had to devote even to determine what, if anything, Trump's suit was alleging so that they could then formulate appropriate arguments in response. The meandering, prolix complaint further illustrates the vexatious conduct of Trump and his attorneys.

### E. Trump's Attorneys Failed to Adhere to Fundamental Procedural Rules in Initiating this Case.

Trump and his attorneys failed to follow even the most basic rules under the Federal Rules of Civil Procedure and this Court's local rules. Specifically, Trump and his lawyers:

- failed to provide this Court with notice, as required by Eastern District of Wisconsin, Civil L. R. 3(b), of the pendency of a related case, *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771, (E.D. Wis. Dec. 1, 2020)(Dkt. 1), assigned to Chief Judge Pepper. By not disclosing the related case, Trump's attorneys undermined the goal of the local rule to preserve judicial resources in the manner in which cases are assigned. Having the related actions assigned to the same judge would have promoted judicial economy and mitigated the burden on defendants' counsel in litigating both cases.

- Trump's attorneys did not comply with Federal Rule of Civil Procedure 4, which requires service of process on every defendant. This was not a case of piece-meal service—itself recognized by the Seventh Circuit as a basis for imposing fees under section 1927, *Ordower*, 826 F.2d at 1575—but the total absence of mandatory service.

Trump and his lawyers acted recklessly and showed indifference to this Court's local rules and the Federal Rules of Civil Procedures.

### F. Trump and His Attorneys Raised and Abandoned Arguments Haphazardly.

In litigating this suit, Trump and his lawyers never cohered on any cognizable legal theory or made any effort to marshal evidence that would demonstrate Trump should prevail. Barely a

week passed between Trump filing this case and it going to trial; in that short time, Trump's team repeatedly reformulated the relief he was seeking. None of the various formulations asked for a remedy that this Court could constitutionally or practically provide.

For example, Trump's complaint referenced the First Amendment, as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment. But Trump never had developed theories or arguments under these authorities, and he ultimately abandoned any reliance on these provisions. On the eve of trial, Trump's attorneys conceded that they had no argument under the First Amendment or the Due Process Clause. (Dkt. 134 at 1, n.1) They insisted that they would forge ahead under the Equal Protection Clause, but, as this Court concluded, "the complaint offers no clue of a coherent Equal Protection theory and plaintiff offered neither evidence nor argument to support such a claim at trial." (*Id.*) Even though Trump and his attorneys essentially conceded those arguments had no merit, Governor Evers still had to research and respond to those arguments in the few days they had to respond to Trump's complaint. (Dkt. 95 at 16-18) That effort was entirely wasted, due to the haphazard approach Trump's attorneys took. Asserting theories without having researched them in advance and ensured they had legal merit is an improper and vexatious approach to litigation.

### G. Trump Requested Three Types of Unprecedented Relief Without Any Legal Basis.

Trump and his lawyers' quick-change approach to constitutional arguments was outdone only by their ever-shifting approach to the ultimate relief they sought. This Court aptly described the case as "*extraordinary*" and "Plaintiff's requests for relief [as] even more *extraordinary*." (Dkt. 134 at 1 (emphases in original)) Trump and his attorneys asked for three different forms of relief in a matter of seven days. They originally requested that the Court remand "this case to the Wisconsin Legislature" and allow the Legislature to determine the appropriate remedy. (Dkt. 1 at

72) Acknowledging that our constitutional structure does not permit a federal court to "remand" an election to the Wisconsin Legislature, Trump's attorneys backpedaled, claiming the term "remand" was "unartful." (Dkt. 130 at 59) Trump's attorneys then asked the Court to "issue injunctive relief ordering Governor Evers to issue a certificate of determination consistent with, and only consistent with, the appointment of electors by the Wisconsin legislature." (Dkt. 109 at 41) They changed tack again at oral argument, asking the Court to declare the election unconstitutional, void the appointment of Wisconsin's Democratic presidential electors, and "revert" the case to the Legislature to appoint electors. (Dkt. 130 at 59-60) They further requested an injunction against Governor Evers to issue a certificate of determination. (*Id.* at 60)

Trump's shifting requests for relief required Defendants continually to adjust their arguments and perform research to respond to his new requests. The fact that their final request for relief came *at trial* further illustrated bad-faith litigation tactics. Had this been a serious case, the relief that Trump sought should have been clearly defined from the beginning, rather than his attorneys moving the goal posts every time Defendants pointed out that their latest request was unconstitutional. None of these requests has any basis in constitutional, statutory, or other legal authority. In essence, Trump asked this Court to disenfranchise 3.3 million Wisconsinites who voted in a valid election, without providing any legal basis for this shocking request. Making such requests without any legal support constitutes vexatious conduct.

### H. Trump's Attorneys Failed to Respond to Governor Evers' Substantive Arguments.

Trump's attorneys largely ignored Governor Evers' brief supporting his motion to dismiss. Governor Evers' brief included substantive arguments that directly impacted the success of Trump's claims. Specifically, they did not address any of the following arguments, each of which was potentially dispositive of the case:

- Trump failed to state a claim in compliance with Fed. R. Civ. P. (8)(a)(2);

- The exclusive state remedy of Wis. Stat. § 9.01(11) barred Trump's claims; and

- Trump requested this Court issue an unconstitutional advisory opinion.

Governor Evers decided to file a reply brief in support of his motion to dismiss largely because Trump did not address these arguments and therefore conceded them. Addressing this failure by Trump's attorneys required further research and briefing, all completed within nine hours after Trump's attorneys filed their (incomplete) brief in opposition to Governor Evers's motion to dismiss. (*See* Dkt. 109; Dkt. 84) At trial, Trump's attorneys still did not address the merits of Governor Evers's arguments, insisting that their failure to address key issues in the motion to dismiss "didn't concede anything." (Dkt. 130 at 78-79)

## I. Trump Never Made Any Effort to Present Evidence that Supported His Case.

This case was doomed from the start because the foundation on which Trump's attorneys constructed the lawsuit was unsound. In the most generous possible reading, Trump's suit complained that Wisconsin violated the Electors Clause by failing to allow the Legislature to determine the manner for appointing the state's presidential electors. But this is utter nonsense. For more than 170 years—literally, for as long as Wisconsin has been a state—Wisconsin law has expressly provided that the state's presidential electors would be appointed by the results of the statewide presidential election. Wis. Stat. § 8.25. Trump did not—and indeed could not—dispute that Wisconsin held a general election in November 2020, that the certified results showed he lost that election, and that Wisconsin's presidential electors were appointed in accord with the certified results. The "manner" of the election was never in question. Trump's allegations pertained only to the administration of the general election, which could not form the basis for an Article II claim. Therefore, his claims were completely unfounded and vexatious.

Moreover, even if his complaints about the election administration were timely and properly brought in this Court (they were not), he made no effort to provide evidence in support of those complaints. Notably absent from Trump's lawsuit was any fact showing that even one Wisconsin voter improperly submitted a ballot. Consider:

- Trump's attorneys asserted that every Wisconsinite who requested an absentee ballot under the longstanding provision for indefinitely confined voters should have been disenfranchised. But, instead of providing actual evidence, they simply asserted that ballots for all such voters should have been discarded.

- They similarly provided no evidence regarding the number of absentee ballots that had envelopes with incomplete witness addresses. Again, they merely asserted that the practice alone warranted voiding an entire election rather than proving that any individual ballot was improperly counted.

- Further, Trump's challenges to drop boxes included no evidence of how many ballots were returned to drop boxes, much less how many were allegedly improper in some way. Trump instead insisted that drop boxes were somehow inherently suspect and therefore invalid, even though counsel for Republican leaders in the Wisconsin Legislature expressly praised drop boxes as a vital tool. (*See* Dkt. 95 at 15) Trump's lawyers never challenged any individual ballot returned to a drop box.

Trump's lawyers litigated a case built upon a flawed foundation and for which they could not, and indeed did not even try to, support with actual evidence. Such conduct is vexatious.

### J. Trump's Attorneys Pressed Ahead with Their Appeal, Ignoring both Relevant Factual Developments and Dispositive Precedent.

Prior to Trump's appeal of this Court's decision, the Wisconsin Supreme Court affirmed the rejection of his parallel claims in the state-court recount suit. *Trump v. Biden*, 2020 WI 91. The Wisconsin Supreme Court—the ultimate authority on questions of what Wisconsin state law, including Wisconsin election law, means—reiterated that the WEC's guidance interpreting the longstanding statutory provision on indefinitely confined voters was not flawed. *Id.*, ¶¶7-8. It then ruled that all of his other election claims were barred by laches. *Id.*, ¶¶9-31. Wisconsin's Supreme Court reiterated that WEC's indefinitely confined voter guidance was correct in a separate

decision, issued the same day as *Trump. Jefferson v. Dane Cty.,* 2020 WI 90, ¶¶23-27, 394 Wis. 2d 602, 951 N.W.2d 556.

The Wisconsin Supreme Court's decisions were wholly dispositive of Trump's appeal in this matter. Yet, in his appeal to the Seventh Circuit, Trump's lawyers did not even acknowledge the Wisconsin Supreme Court's majority opinion in *Trump*. He cited from the dissents (which have no legal effect), but failed even to note the majority holding, much less its preclusive effect on the Seventh Circuit's consideration of his appeal., (Dkt. 41 at 13, 25, 43)

Hours after the Wisconsin Supreme Court issued its decision, Wisconsin's presidential electors met and cast their votes for Biden and Harris. The electors promptly transmitted the results to Congress.[6] Those developments mooted Trump's appeal. Yet, Trump's lawyers forged ahead that same day with filing their appeal. (Dkt. 136) Not only that, but they obtained an expedited schedule for litigating the appeal before the Seventh Circuit and, after the Seventh Circuit affirmed the failure of Trump's case, they sought additional review in the U.S. Supreme Court. Indeed, even after the inauguration, Trump's lawyers filed supplemental briefs in the Supreme Court seeking to extend this litigation, in which at that point no relief was even conceivable, much less available. *See Trump v. Wis. Elections Comm'n*, No. 20-883, Suppl. Br. of Pet'r Pursuant to Supreme Court Rule 15.8.

This litigation never should have occurred, because the state-court proceedings were the exclusive process for challenging the administration of Wisconsin's election after that election was over. Once the Wisconsin Supreme Court ruled, and once Wisconsin's presidential electors had

---

[6] Wisconsin's Certificate of Votes Cast for President is available at https://www.archives.gov/files/electoral-college/2020/vote-wisconsin.pdf (last visited Mar. 30, 2021).

cast their votes, Trump's appeal was rendered not only improper but also meaningless. Yet Trump and his attorneys persisted, heedless of the costs imposed by their pointless litigation strategy.

## II. TRUMP AND HIS ATTORNEYS' CONDUCT WARRANTS IMPOSITION OF ATTORNEY FEES.

Here, Trump and his attorneys engaged in unreasonable, bad-faith, and vexatious litigation from the moment they filed the complaint. Governor Evers had no choice but to respond to their baseless arguments and assault on the democratic process, because Trump and his attorneys pushed the case ahead so fast they precluded routine procedural motions that would otherwise have disposed of this case. The conduct of this litigation was unreasonably vexatious by several measures. Individually, those establish that Trump and his attorneys were reckless, indifferent to the law, or extremely negligent in prosecuting this suit. Cumulatively, they leave no doubt that their prosecution of this case is sanctionable.

### A. Trump's Attorneys Should Bear Governor Evers's Fees under 28 U.S.C. § 1927.

The totality of actions taken by Trump's attorneys easily satisfy the unreasonable and vexatious standard. The totality of actions qualifies as objective and subjective bad faith. *See Kotsilieris*, 966 F.2d at 1185 (attorney fees can be awarded by finding of objective or subjective bad faith). They recklessly filed and pursued baseless claims challenging the validity of the election nearly one month after it took place without providing any legal basis for their extraordinary request or any evidence of improper voting, and abandoning three of their theories prior to trial. *Fred A. Smith Lumber Co.*, 845 F.2d at 753 (sanctions warranted for bringing meritless claims); *Claiborne*, 414 F.3d at 722 (pursuing claims without a factual basis supported decision to impose fees). Trump and his attorneys abused the judicial process by duplicating groundless claims and changing their requested relief three times. *In re Matter of Lisse*, 921 F.3d 629 (abuses to and manipulation of the judicial process supported sanctions). Throughout the

litigation they showed a complete indifference to the law by ignoring binding precedent that barred their claims. *Grochocinski*, 719 F.3d at 799 (sanctions appropriate for reckless pursuit of frivolous claims and showing indifference to law); *Fred A. Smith Lumber Co.*, 845 F.2d at 753 (sanctions appropriate for ignoring dispositive authority). They continued to litigate, appealing to the Seventh Circuit and Supreme Court, even after it was clear their claims were moot, barred by Wisconsin's *Trump* decision, and without any likelihood of success. *Walter*, 840 F.2d at 435 (sanctions appropriate for continuing to litigate meritless claims). Trump's attorneys failed to respond to substantive arguments raised by Governor Evers. *Claiborne*, 414 F.3d at 722 (failure to respond to motion for summary judgment supported fee award). It is also clear in the record that not all defendants were properly served or asked to waive service. *Ordower*, 826 F.2d at 1575 (piecemeal service as basis for attorney fees). The totality of all of these actions was reckless, in bad faith, and warrants imposition of fees under 28 U.S.C. § 1927.

**B. Trump and His Attorneys Should Bear Governor Evers's Attorneys' Fees and Additional Sanction under this Court's Inherent Authority.**

Separate and apart from section 1927, this Court should exercise its inherent authority to sanction Trump and his attorneys. As explained above, Trump and his attorneys brought this lawsuit in bad faith. These grounds warrant imposition of fees, and additional punitive sanctions, against Trump individually and his attorneys pursuant to the Court's inherent authority.

The standard for imposition of fees pursuant to the Court's inherent authority is similar to that of section 1927, as both require a finding of bad faith. Fees against both Trump and his attorneys are appropriate because both initiated and pursued this litigation in bad faith. This lawsuit was unprecedented and meritless: it had no legal support from the outset, and several of the constitutional theories advanced were undeveloped, groundless, and/or precluded by prior decisions. *McCandless*, 697 F.2d at 201 (sanctions appropriate for advancing meritless claim and

failing to provide factual or legal support for constitutional claims). Indeed, some theories initially advanced here were so meritless that Trump and his counsel abandoned them immediately before or at trial. *Id.* (failure to provide support for constitutional claims warranted sanctions). The fact that Trump and his attorneys ignored dispositive arguments from Governor Evers is also grounds for sanctions. *Id.* (failure to respond to motion for fees and costs contributed to sanctions). Additionally, after December 14, it was clear Trump had no possibility of success in this litigation. The Wisconsin Supreme Court had definitively dismissed his challenge to the recount results, the Electoral College had met, and Wisconsin's presidential electors cast the state's votes for Biden. Yet Trump pressed on in the Seventh Circuit, where he did not even cite the authority that precluded his claims. That conduct is sanctionable. *Mach*, 580 F.3d at 501 (continuing to litigate after it is apparent claims are meritless warranted sanctions).

Fees against Trump himself are especially appropriate given that the primary purpose of his post-election litigation seemed to be not vindicating legal rights but fueling his campaign fundraising. Following his election loss, Trump raised approximately $250 million in campaign contributions.[7] This underscores that Trump did not pursue this case, or any other post-election litigation, in good faith; instead he used the courts—as well as the defendants, all of whom were government actors—as tools to assist him in raising funds to aid future political endeavors. Misusing the judicial system as a fundraising tool certainly qualifies as bad faith, and warrants sanctions.

*Methode* and *Fuery* establish that this Court has vast discretion when it comes to fashion a proper sanction. *Methode* teaches that a punitive monetary sanction above and beyond full

---

[7] Jemima McEvoy, *Trump Raised $250 Million Since Election To Challenge Outcome—Here's Where Most Of The Money Will Actually Go*, Forbes, Jan. 31, 2021, https://www.forbes.com/sites/jemimamcevoy/2021/01/31/trump-raised-250-million-since-election-to-challenge-outcome-heres-where-most-of-the-money-will-actually-go/?sh=63227b778824 (last visited Mar. 30, 2021).

21

attorneys' fees is acceptable. *Fuery* teaches that, whether the party or its counsel is responsible for the conduct, the appropriate sanction may be levied against the party; if it were not so, the *Fuery* court would not have affirmed the sanction of vacating a jury award to the plaintiff of $260,000 based on the lawyer's misconduct. *Fuery* also makes clear that the Court may ultimately act based on the litigation whole of the conduct, which might exceed the sum of its parts. Here, even if the Court may be inclined to overlook any single act of Trump and his attorneys, their conduct on the whole, throughout this short, intense litigation, justifies sanctions. From the moment they filed this lawsuit until the Supreme Court denied review, Trump and his attorneys litigated in bad faith. Their conduct imposed substantial litigation expenses on Wisconsin taxpayers, and, even though their case was unsuccessful, it blazed a dangerous path suggesting that losing election candidates can run to court and complain about the rules after the election. The Court should fashion a remedy that adequately makes the State whole and also helps deter this type of conduct in the future.

### C. Imposing Sanctions Would Discourage Similar Abuse in the Future of the Litigation Process as a Way to Attack Unfavorable Election Results.

The audacity of this lawsuit—an attack on the bedrock principle that ballots decide elections, brought without any legal or factual basis, more than four weeks after the election— merits the imposition of both a fee award and a punitive sanction. This is true not only because Wisconsin taxpayers deserve to be made whole, but also because deterrence demands making an example of Trump and his attorneys to discourage future frivolous litigation. Absent a clear deterrent message here, Wisconsin—known for perennial, razor-thin election results—will likely see similar cases following future elections. If there is not a penalty for bringing litigation like this, losing candidates, their allies, and attorneys will have nothing to lose by challenging results following elections, and they could even perceive that they have incentives to do so. Simply put,

a message must be sent that this type of behavior cannot be tolerated in the judicial system, and that attorneys should avoid these types of frivolous attempts to disenfranchise voters in the future.

Other courts have reached this conclusion and have imposed sanctions for baseless post-election litigation. An Arizona state court awarded attorneys' fees to the Secretary of State because the Arizona Republican Party filed a groundless lawsuit challenging the outcome of that state's 2020 presidential election.[8] And Judge James Boasberg, on the federal court for the District of D.C., referred a lawyer to a disciplinary panel for bringing a meritless suit as a forum for political grandstanding.[9] That suit, like this one, challenged the results of Wisconsin's 2020 presidential election and sought to relitigate, in yet another forum, many of the same claims already deemed meritless in Wisconsin state and federal courts. Fee petitions in other post-election challenges are pending in Michigan and Georgia.[10] Awarding sanctions here would not make this Court an outlier. To the contrary, doing so would put this Court on record advancing the deterrent function that the Seventh Circuit recognized as a purpose of imposing sanctions. *See, e.g.*, *Textor*, 711 F.2d at 1396; *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009); *Dotson v. Bravo*, 321 F.3d 663, 668 (7th Cir. 2003).

## III. THE AMOUNT OF GOVERNOR EVERS'S FEE REQUEST IS REASONABLE.

Because this lawsuit was filed and prosecuted in bad faith, an award of all fees and expenses incurred in defending this lawsuit is appropriate. *Goodyear Tire & Rubber Co. v. Haeger*,

---

[8] A copy of the order is available at https://www.democracydocket.com/wp-content/uploads/sites/45/2020/11/m9485207.pdf (last visited Mar. 30, 2021).

[9] Josh Gerstein, *Lawyer Who Brought Election Suit Referred for Possible Discipline*, Politico, Feb. 19, 2021, https://www.politico.com/news/2021/02/19/lawyer-election-suit-discipline-470369 (last visited Mar. 30, 2021).

[10] Alison Durkee, *Georgia Counties Ask Trump For Nearly $17,000 In Legal Fees As GOP Election Lawyers Face Consequences*, Forbes, Feb. 24, 2021, https://www.forbes.com/sites/alisondurkee/2021/02/24/georgia-counties-ask-trump-for-nearly-17000-in-legal-fees-as-gop-election-lawyers-face-consequences/?sh=1005545957c8 (last visited Mar. 30, 2021).

137 S. Ct. 1178, 1188 (2017) ("If a plaintiff initiates a case in complete bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may" award the entire amount of legal expenses incurred). In this case, the abuses of the judicial system began with the dilatory filing of this suit and continued through its conclusion, all for an extraordinarily improper purpose of disenfranchising nearly 3.3 million Wisconsinites who turned out to vote in the 2020 presidential election.

Governor Evers's request for $145,174.90 in attorney fees and costs is reasonable. It reflects the time expended by his lead counsel team, necessitated by the extraordinarily expedited timeline Trump and his lawyers demanded, the complexity of the issues involved, and the high stakes of the litigation. The hours expended and the hourly rates ascribed are reasonable for this type of case. Calculation of fees begins with the lodestar calculation, which is "the product of the hours reasonably expended on the case multiplied by a reasonable hourly rate." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014). Governor Evers's legal team on this case was led by a team of three lawyers at Stafford Rosenbaum LLP. While a number of other lawyers provided pro bono counsel to Governor Evers before this Court—including several partners at Susman Godfrey LLP and Paul Smith at the Campaign Legal Center—the Stafford team led the Governor's representation in all post-election litigation. Fees for that team should be taxed against Trump and his lawyers.

The number of hours the Stafford Rosenbaum LLP team devoted to litigating this matter was reasonable. Trump waited until four full weeks after the election to file his lawsuit, and then demanded an expedited schedule to resolve the case in the minimal time available between his belated filing and the meeting of the Electoral College. The Court accommodated Trump, allowing defendants four calendar days (including a Saturday and Sunday) to file briefs opposing Trump's

motion for injunctive relief. (Dkt. 45) Simultaneously with that briefing schedule, Governor Evers drafted and briefed a motion to dismiss on numerous jurisdictional, standing, and merits grounds. (Dkt. 95) After Trump submitted his response/reply brief, Governor Evers submitted a reply brief—researched, written, and filed within nine hours—highlighting the dispositive holes in Trump's arguments against the motion to dismiss. (Dkt. 120)

The hours worked in researching and drafting briefs, as well as preparing for and participating in a conference with the Court, and the merits hearing were all reasonable under the circumstances. (Mandell Decl., ¶28; Leitner Decl., ¶16; Olson Decl., ¶¶26-29; O'Neill Decl., ¶13; Packard Decl., ¶¶17-18; Rosenzweig Decl. ¶13) A team of attorneys had to work together to respond to Plaintiff's claims and also raise a panoply of arguments for dismissal. (Mandell Decl., ¶¶7-9) Governor Evers's legal team worked in concert, sometimes in shifts around the clock, to research, draft, and refine multiple briefs simultaneously. (*Id.*) That work was necessary to dispatch this frivolous lawsuit and protect Wisconsin's election results. (*Id.*, ¶¶7-10) Governor Evers's counsel also served an informal coordinating role among the counsel for all twenty-three Defendants Trump chose to sue. (*Id.*, ¶6)

The variety and complexity of issues addressed by Governor Evers's briefs also contributed to the hours consumed. (*Id.*, ¶¶7-9) Trump's untimely request for unprecedented injunctive relief required delving into a panoply of constitutional bars to Trump's suit, such as standing for claims under the Constitution's distinct Election Clause and Electors Clause, as well as the Eleventh Amendment's preclusive effect. Governor Evers also presented arguments asserting laches, mootness, exclusive state remedies, abstention, and failure to state a claim. (Dkt. 95 and 120) Each of these arguments required research, analysis, and development into a clear, cogent, concise brief. (Mandell Decl., ¶¶7-9) The complexity of these issues required a significant time investment from

Governor Evers's attorneys. (*Id.*, ¶¶7-9, 28) Additionally, there were nearly two dozen named defendants in this case. Counsel for Governor Evers took a lead role in coordinating among the attorneys representing the defendants, both at the district court level and court of appeals; this was especially true in the Seventh Circuit appeal, where the Court provided only 48 hours for briefing and required that all of the named defendants coordinate to file one collective brief. (*Id.*, ¶6) Thus, the total hours number of hours worked was reasonable. (*Id.*, ¶29)

The rates requested by Governor Evers are also reasonable. (*Id.*, ¶30) "A reasonable hourly rate is based on the local market rate for the attorney's services." *Montanez*, 755 F.3d at 553. That market rate can be determined by reference to "rates charged by similarly experienced attorneys in the community." *Id*. Submitted with this motion is a declaration by Jeffrey A. Mandell, lead special counsel for Governor Evers in post-election matters, outlining his qualifications and those of others who represented Governor Evers in this matter. (Mandell Decl., ¶¶14-19) Mandell routinely handles complex and constitutional litigation matters. (*Id.*, ¶18) The rates he and other members of the Stafford team assert here are consistent with the local market for rates in these kinds of cases, as evidenced by the declarations provided with this brief from several other Wisconsin attorneys who handle matters of this complexity and importance. (Leitner Decl., ¶17; Olson Decl., ¶¶22-24; O'Neill Decl., ¶14; Packard Decl., ¶16; Rosenzweig Decl., ¶15) They are also consistent with rates paid over the past several years by the Wisconsin Legislature to private outside counsel in litigation matters involving governance issues. (Mandell Decl., ¶30)

Bearing in mind that one purpose of sanctions is deterrence, *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005), Governor Evers suggests that the fees sought here should be supplemented with a monetary sanction against Trump and his attorneys. In the *Methode Electronics, Inc.* case, the court imposed a fine payable to the court. 371 F.3d at 925-26. Governor

Evers believes a fine payable to the Court—or alternatively to a charity focused on protecting voting rights in Wisconsin—would also be appropriate.

## IV.    GOVERNOR EVERS'S FEE REQUEST IS TIMELY.

In *Overnite Transportation Co. v. Chicago Industrial Tire Co.*, 697 F.2d 789, 793 (7th Cir. 1983), the Seventh Circuit held that "a party must bring a motion for fees and costs either before an appeal is perfected or during the pendency of the appeal on the merits." But both the extraordinary circumstances surrounding this case and *Overnite*'s outlier status—it is in tension (at minimum) with Supreme Court precedent and no other Circuit has adopted the Seventh Circuit's reasoning—militate against its application here.

*First*, if ever there were a case to distinguish on its facts, it is this one. The extremely expedited nature of this case made it practically impossible for Governor Evers or any other Defendant to seek fees before Trump's appeals concluded. Trump filed his complaint in the evening of December 2, 2020; this Court issued its order on the morning of December 12, 2020; and the Seventh Circuit affirmed mid-afternoon on December 24, 2020. The truncated briefing, merits hearing, and appeal schedule Trump demanded, first in this Court and then in the Seventh Circuit, precluded the Defendants from filing a motion for fees prior to the appellate decision.[11] *Overnite* is inapposite to a situation like this one, where the Plaintiff's own actions and demands led to such an expedited schedule. Applying *Overnite* here would allow attorneys to engage in unreasonably vexatious conduct, but escape culpability by losing quickly.

---

[11] The circumstances here go beyond the short time that the appeal was pending before the Seventh Circuit. The one week in which the appeal was pending immediately preceded the Christmas holiday, and it fell in the middle of the calendar month, so that counsel's typical billing practices did not even calculate fees until more than a week after the appeal had already concluded. (Mandell Decl., ¶25) Moreover, this was only one of a number of redundant cases filed to overturn the results of Wisconsin's election, so defendants' counsel did not have the luxury of focusing exclusively on this case to prioritize a fee motion during the pendency of the appeal.

*Second*, subsequent case law reveals *Overnite* is an outlier decision abrogated by subsequent Supreme Court case law. The Supreme Court rejected *Overnite*'s logic, holding that fee motions under 42 U.S.C. § 1988 did not need to comply with time limits established by Fed. R. Civ. P. 59(e) because doing so was not "necessary or desirable to promote finality, judicial economy, or fairness." *White v. New Hamp. Dep't of Empl. Sec.*, 455 U.S. 445, 452 (1982). Rather, the *White* Court explained, attorney fees are "uniquely separable from the cause of action to be proved at trial." *Id.* Similarly, the Supreme Court has held that district courts retain jurisdiction to impose Rule 11 sanctions even after dismissal of the case because sanctions are collateral to the merits, even if the court lacks subject matter jurisdiction. *See Willy v. Coastal Corp.*, 503 U.S. 131, 138-39 (1992); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396-97 (1990).

Other Circuits have recognized the same, refusing to adopt *Overnite*'s approach to section 1927 motions. The Fourth Circuit opined that "[e]ven where, as here, the defendants characterize the plaintiffs' claims as entirely baseless, the appropriateness of the characterization is unsettled as long as there is a pending appeal.... There is some reason to think that such uncertainty should be clarified before counsel and the district judge should be called upon to consider the appropriateness of a fee award and assess the amount." *Hicks v. S. Md. Health Sys. Agency*, 805 F.2d 1165, 1167 (4th Cir. 1986). The *Hicks* Court went on: "The Supreme Court seems to have held in *White* that the district court has jurisdiction to consider and grant a motion for the allowance of fees, though made several months after the conclusion of all appellate proceedings." *Id.*

The Third Circuit subsequently compared the Seventh Circuit's rationale in *Overnite* with the Fourth Circuit's in *Hicks*, ultimately "agree[ing] with the Court of Appeals for the Fourth Circuit that a Rule 11 motion is 'uniquely separable' and collateral from the decision on the merits" and could be filed even after an appeal was completed. *Mary Ann Pensiero, Inc. v. Lingle*, 847

F.2d 90, 98 (3d Cir. 1988)(quoting *White*, 455 U.S. at 452); *accord In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101-03 (3rd Cir. 2008). The Second, Sixth, and Tenth Circuits have similarly rejected *Overnite*'s reasoning. *See Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1223 (10th Cir. 2006); *Schlaifer Nance & Co. v. Esate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999); *In re Ruben*, 825 F.2d 977, 982 (6th Cir. 1987). By contrast, no Circuit appears to have adopted *Overnite*'s approach.[12]

Given that the *Overnite* decision is inconsistent with Supreme Court precedent and that, even on its own terms, it should not apply in the circumstances of this case, there is no doubt that Governor Evers's fee request should be considered timely and granted on its merits.

## V.     THIS COURT SHOULD HOLD TRUMP AND HIS ATTORNEYS JOINTLY AND SEVERALLY LIABLE FOR ALL FEES AND SANCTIONS ASSESSED.

If the Court imposes fees against Trump and his attorneys, it should make all of those against whom they are assessed jointly and severally liable. All fees awarded under 28 U.S.C. § 1927 should be joint and several against all counsel who entered appearances on behalf of Trump in this case. All fees and any sanctions levied under the Court's inherent authority should be joint and several against Trump and his attorneys. The Seventh Circuit held that parties and multiple counsel can be made jointly and severally liable for attorney fees. *See Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 710 (7th Cir. 2014). Since Trump and his attorneys all played a role in bringing, prosecuting, and perpetuating this bad-faith litigation, the Court should find them all jointly and severally liable for any resulting fees and sanctions.

---

[12] The *Overnite* rationale has also been rejected by other courts. *See, e.g., In re Veg Liquidation, Inc.*, No. 5:13-BK-73597, 2015 WL 13776226, at *4 (Bankr. W.D. Ark. Sept. 15, 2015); *Kellar v. Van Holtum*, 605 N.W.2d 696, 700 (Minn. 2000), *as amended on denial of reh'g* (Feb. 29, 2000), *superseded in part by rule on other grounds, as stated in In re Com'r of Public Safety*, 735 N.W.2d 706, 710 (Minn. 2007).

## CONCLUSION

This case was extraordinary, as the Court itself repeatedly noted. In this instance, that is neither an exaggeration nor a compliment. From its inception, through its haphazard prosecution, and until its ignominious conclusion, this case was wholly meritless. Trump and his attorneys were either reckless or extremely negligent at every step of this litigation. Their actions imposed upon Wisconsin's taxpayers the expense of defending the state's election results and the decision made by the nearly 3.3 million Wisconsinites who turned out to vote. The Court should make Wisconsin's taxpayers whole. It should also impose and additional sanction against Trump and his attorneys, on a joint and several basis.

Respectfully submitted this 31st day of March, 2021.

/s/ Jeffrey A. Mandell
Jeffrey A. Mandell
Rachel E. Snyder
Richard A. Manthe
STAFFORD ROSENBAUM LLP
222 W. Washington Ave., Suite 900
Madison, WI 53701-1784
Telephone: 608-256-0226
Email: jmandell@staffordlaw.com
Email: rsnyder@staffordlaw.com
Email: rmanthe@staffordlaw.com

*Attorneys for Defendant,*
*Governor Tony Evers*