**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| Donald J. Trump, Candidate for President of the United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br>The Wisconsin Elections Commission, and its members, Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Dean Knudson, Robert F. Spindell, Jr., in their official capacities, Scott McDonell in his official capacity as the Dane County Clerk, George L. Christenson in his official capacity as the Milwaukee County Clerk, Julietta Henry in her official capacity as the Milwaukee Election Director, Claire Woodall-Vogg in her official capacity as the Executive Director of the Milwaukee Election Commission, Mayor Tom Barrett, Jim Owczarski, Mayor Satya Rhodes-Conway, Maribeth Witzel-Behl, Mayor Cory Mason, Tara Coolidge, Mayor John Antaramian, Matt Krauter, Mayor Eric Genrich, Kris Teske, in their official Capacities; Douglas J. La Follette, Wisconsin Secretary of State, in his official capacity, and Tony Evers, Governor of Wisconsin, in his Official capacity.<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:20-cv-01785-BHL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO MULTIPLE DEFENDANTS' MOTIONS FOR ATTORNEYS' FEES

## PLEADINGS RESPONDED TO

Plaintiff Donald J. Trump, by counsel, responds to: (1) Governor Tony Evers' motion and brief supporting his petition for attorneys' fees and sanctions (Dkt. Nos. 144 and 145) (filed March 31, 2021); (2) the motion and brief in support filed on behalf of Cory Mason, Tara Coolidge, John Antaramian, Matt Krauter, Eric Genrich, and Kris Teske (the "Green Bay, Kenosha and Racine Defendants" or the "City Defendants") (Dkt Nos. 152 and 153) (filed April 2, 2021); and (3) the motion and memorandum of law filed by George L. Christenson and Julietta Henry (the "Milwaukee County Defendants") (Dkt Nos. 155 and 156) (filed April 8, 2021) (collectively, the "Motions").*

*As the City Defendants and Milwaukee County Defendants incorporated and rely upon extensive portions of Governor Evers' brief, and to streamline and simplify the pleadings before the Court, on July 2, 2021, Plaintiff was granted leave to file a single, consolidated response memorandum totaling not more than fifty-six (56) pages. Governor Evers, the City Defendants and the Milwaukee County Defendants are referred to herein as "Co-Defendants." To remove any doubt, references herein to "Governor Evers" and/or to "Co-Defendants" in relation to any argument is intended to apply equally to each such argument raised on behalf of any Co-Defendant. Plaintiff does not intend to limit his response through use of the term "Governor Evers" rather than "Co-Defendants." Rather, this usage simply recognizes that Governor Evers filed his motion first and the other Defendants largely incorporated it verbatim by reference as their own arguments.

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT ............................................................................. 1

   A.   The Motions Are Untimely ...................................................................... 1

   B.   The Motions Ignore the Rulings of this Court and the Seventh Circuit .................. 2

   C.   President Trump's Claims Were Colorable as this Court and the Seventh Circuit Recognized ......................................................... 4

   D.   The Motions Do Not Demonstrate Bad Faith by the Former President or His Legal Counsel .......................................................... 5

II.     FACTUAL AND PROCEDURAL BACKGROUND .......................................... 9

   A.   The Challenged Practices ...................................................................... 10

      1.   Municipal clerks' completion of missing information on absentee ballot envelopes related to the witness's address ............................. 10

      2.   Circumvention of the Legislature's photo ID requirements regarding the "indefinitely confined" exception for absentee ballot requests ................. 13

      3.   Unmanned ballot drop box repositories ............................................ 15

      4.   The City of Madison's use of volunteers to collect absentee ballots ........ 17

   B.   This Action .......................................................................................... 18

   C.   Seventh Circuit Appeal ......................................................................... 21

   D.   Supreme Court Proceedings .................................................................. 22

III.    ARGUMENT ............................................................................................... 25

   A.   Under Settled Seventh Circuit Law the Motions for Fees Are Untimely and this Court Lacks Jurisdiction to Consider Them ................. 25

      1.   Overnite is recognized as settled law in this Circuit ......................... 26

      2.   Overnite has not been abrogated by the U.S. Supreme Court ............... 29

      3.   Overnite is fully consistent with federal precedents which disfavor piecemeal appeals and promote the prompt presentation of fee petitions ............... 32

   B.   This Court's Ruling that Plaintiff's Claims Were "Not Frivolous," and the Seventh Circuit's Ruling that Plaintiff's Claims Were Justiciable Are Both Correct and Bar Co-Defendants' Motions .................. 34

   C.   Plaintiff's Filings Were in Good Faith and the Co-Defendants Have Failed to Articulate Any Sufficient Basis for Their Claims of Bad Faith ............... 36

   D.   Each of the Claims Made by Governor Evers and His Co-Defendants Is Meritless ............................................................................ 41

      1.   State law claims ........................................................................... 41

|     |     |     |
| --- | --- | --- |
| *2.* | *Delay or Laches* ................................................................. | 42 |
| *3.* | *Alleged Preclusive Effect of State Court Rulings* ................ | 46 |
| *4.* | *Center for Technology and Civic Life (CTCL) Grants* ........... | 48 |
| *5.* | *Sufficiency of Complaint* .................................................... | 49 |
| *6.* | *Adherence to Procedural Rules* ........................................... | 49 |
| *7.* | *Abandoned Arguments* ........................................................ | 50 |
| *8.* | *Remedy Sought* ................................................................... | 53 |
| *9.* | *Response to Arguments* ....................................................... | 53 |
| *10.* | *Presenting Evidence* .......................................................... | 55 |
| *11.* | *Treatment of Precedent* ..................................................... | 55 |
| **IV.** | **CONCLUSION** ............................................................................ | 56 |

iii

# TABLE OF AUTHORITIES

## Cases

*Alyeska Pipeline Service Co. v. Wilderness Society,*
 421 U.S. 240 (1975) ................................................................................................ 1

*Arizona Free Enterprise Club's Freedom Club Pac v. Bennett,*
 564 U.S. 721 (2011) .............................................................................................. 51

*Asher v. Harrington,*
 461 F.2d 890 (7th Cir. 1972) ................................................................................ 26

*Avocet Sports Tech. Inc. v. Polar Electro Inc.,*
 2013 WL 4067823 (N.D. Cal. Aug. 1, 2013) ...................................................... 46

*Bush v. Gore,*
 531 U.S. 98, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000)................................20, 42

*Carson v. Simon,*
 978 F.3d 1051 (8th Cir. 2020) .............................................................................. 42

*Church of Scientology v. United States,*
 506 U.S. 9, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)......................................21, 23

*Claiborne v. Wisdom,*
 414 F.3d 715 (7th Cir. 2005).............................................................................. 6, 7

*Cooter & Gell v. Hartmarx Corp.,*
 496 U.S. 384 (1990).........................................................................................31, 32

*Democratic Nat'l Comm. v. Bostelmann,*
 451 F. Supp. 3d 952 (W.D. Wis. 2020)................................................................ 11

*Democratic Nat'l Comm. v. Bostelmann,*
 977 F.3d 639 (7th Cir. 2020).................................................................................43

*Democratic Nat'l Comm. v. Bostelmann,*
 No. 20-1538, 2020 WL 3619499 (7th Cir. Apr. 3, 2020) ................................... 11

*Dep't of Empl. Sec.,*
 455 U.S. 445 (1982)........................................................................................29, 30, 33

Case 2:20-cv-01785-BHL   Filed 07/12/21   Page 5 of 67   Document 164

*Dreiling v. Peugeot Motors of Am., Inc.,*
768 F.2d 1159 (10th Cir. 1985) ..................................................... 37

*Duane Smelser Roofing Co. v. Armm Consultants, Inc.,*
609 F. Supp. 823 (E.D. Mich. 1985) ............................................. 32

*Equal Emp. Opportunity Comm'n v. CVS Pharmacy, Inc.,*
907 F.3d 968 (7th Cir. 2018) ......................................................... 40

*F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.,*
417 U.S. 116 (1974) ........................................................................ 37

*Feury v. City of Chicago,*
900 F.3d 450 (7th Cir. 2018) ........................................................... 7

*Franzen v. Deere & Co.,*
409 N.W.2d 672 (Iowa 1987) ......................................................... 33

*Fred A Smith Lumber Co. v. Edidin,*
845 F.2d 750 (7th Cir. 1988) ........................................................... 7

*Grochocinski v. Mayer Brown Rowe & Maw LLP,*
452 B.R. 676 (N.D. Ill. 2011) ......................................................... 38

*Hamer v. Lake Cty.,*
819 F.2d 1362 (7th Cir. 1987) ..................................................... 5, 40

*In re TCI Ltd.,*
769 F.2d 441 (7th Cir. 1985) ....................................................... 1, 36

In re. Cent. Ice Cream Co.,
1986 WL 13635 (N.D. Ill. Nov. 21, 1986) ..................................... 28

*Jefferson v. Dane Cty.,*
951 N.W.2d 556 (Wis. 2020) ..................................................... 13, 14

*Kafantaris v. Signore,*
2012 WL 3880056 (N.D. Ill. Sept. 5, 2012) .................................. 28

*Kaplan v. Zenner,*
956 F.2d 149 (7th Cir. 1992) ......................................................... 28

*Kiefel v. Las Vegas Hacienda, Inc.,*
404 F.2d 1163 (7th Cir.1968) ......................................................... 36

*Kotsilieris v. Chalmers,*
966 F.2d 1181 (7th Cir. 1992) ......................................................... 6

v

*Kovilic Constr. Co. v. Missbrenner,*
106 F.3d 768 (7th Cir.1997) ................................................................. 39

*Leffler v. Meer,*
936 F.2d 981 (7th Cir. 1991) ................................................................ 40

*Lightspeed Media Corp. v. Smith,*
761 F.3d 699 (7th Cir. 2014) ................................................................ 27

*Loctite Corp. v. Fel-Pro, Inc.,*
667 F.2d 577 (7th Cir. 1981) ................................................................ 27

*Mach v. Will Cty. Sheriff,*
580 F.3d 495 (7th Cir. 2009) ................................................... 4, 7, 39, 52

*Mary Ann Pensiero v. Lingle,*
847 F.2d 90 (3d Cir. 1988) ................................................................... 33

*Matter of Lisse,*
921 F.3d 629 (7th Cir. 2019) .................................................................. 7

*Matter of Palmisano,*
70 F.3d 483 (7th Cir. 1995) .................................................................... 8

*McCandless v. Great Atl. & Pac. Tea Co.,*
697 F.2d 198 (7th Cir. 1983) ............................................................... 6, 7

*McHugh v. Hillerich & Bradsby Co.,*
2010 WL 11639808 (N.D. Cal. Sept. 2, 2010) ...................................... 45

*McPherson v. Blacker,*
146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892) ........................................ 42

*Methode Elecs., Inc. v. Adam Techns. Inc.,*
371 F.3d 923 (7th Cir. 2004) ............................................................... 7, 39

*Miller v. Bittner,*
985 F.2d 935 (8th Cir.1993) ................................................................... 8

*Moore v. W. Sur. Co.,*
140 F.R.D. 340 (N.D. Miss. 1991) ....................................................... 37

*Morganroth & Morganroth v. DeLorean,*
213 F.3d 1301 (10th Cir. 2000) ............................................................ 37

*Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.,*
194 F.R.D. 633 (N.D. Ill. 2000) ..................................... 28, 30, 31, 32

Case 2:20-cv-01785-BHL   Filed 07/12/21   Page 7 of 67   Document 164

*Novelty Textile Mills, Inc. v. Stern,*
  136 F.R.D. 63 (S.D.N.Y. 1991) ......................................................... 37

*Obin v. Dist. No. 9 of Int'l Ass'n of Machinists & Aerospace Workers,*
  651 F.2d 574 (8th Cir. 1981) ................................................... 30, 33, 34

*Oliveri v. Thompson,*
  803 F.2d 1265 (2d Cir. 1986) ........................................................ 37

*Orlett v. Cincinnati Microwave, Inc.,*
  954 F.2d 414 (6th Cir. 1992) ........................................................ 37

*Overnite Transp. Co. v. Chicago Indus. Tire Co.,*
  697 F.2d 789 (7th Cir. 1983) .................................................. passim

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ......................................................................... 43

*Reiser v. Residential Funding Corp.,*
  380 F.3d 1027 (7th Cir. 2004) ....................................................... 32

*Republican Party of Pennsylvania v. Degraffenreid,*
  141 S. Ct. 732 (2021) ........................................................ 23, 24, 25

*Roadway Exp., Inc. v. Piper,*
  447 U.S. 752 (1980) ............................................................... 38, 40

*Royce v. Michael R. Needle, P.C.,*
  950 F.3d 939 (7th Cir. 2020) (awarding sanctions where judge granted ........................... 7

*S. Grounds & Mortars, Inc. v. 3M Co.,*
  No. 07-61388-CIV, 2009 WL 10669036 (S.D. Fla. Mar. 20, 2009) ..................................... 45

*Schmude v. Sheahan,*
  420 F.3d 645 (7th Cir. 2005) ........................................................ 38

*Serv. Emps. Int'l Union, Loc. 1 v. Vos,*
  946 N.W.2d 35 (Wis. 2020) ........................................................... 11

*Sherman Treaters Ltd. v. Ahlbrandt,*
  115 F.R.D. 519 (D.D.C.1987) ........................................................ 37

*Smith v. CB Com. Real Est. Grp., Inc.,*
  947 F. Supp. 1282 (S.D. Ind. 1996) ................................................. 29

*Soules v. Kauaians for Nukolii Campaign Comm.,*
  849 F.2d 1176 (9th Cir. 1988) .................................................. 44, 45

*Suslick v. Rothschild Sec. Corp.*,
741 F.2d 1000 (7th Cir. 1984) ................................................................ 4, 6, 7, 44

*Terket v. Lund*,
623 F.2d 29 (7th Cir. 1980) ................................................................................. 26

*Textor v. Bd. of Regents of N. Illinois Univ.*,
711 F.2d 1387 (7th Cir. 1983) ............................................................................... 6

*Tice v. Am. Airlines, Inc.*,
373 F.3d 851 (7th Cir. 2004) ............................................................................... 35

*Trump v. Biden*,
951 N.W.2d 568 (Wis. 2020) ...................................................................... passim

*Trump v. Wisconsin Elections Comm'n*,
506 F.Supp.3d 620 (E.D. Wis. Dec. 12, 2020) .......................................... passim

*Trump v. Wisconsin Elections Comm'n*,
983 F.3d 919 (7th Cir. 2020) ..................................................................... passim

*Tucker v. Williams*,
682 F.3d 654 (7th Cir. 2012) ......................................................................... 38, 41

*Tully v. Okeson*,
977 F.3d 608 (7th Cir. 2020) ............................................................................... 43

*Vandeventer v. Wabash Nat. Corp.*,
893 F. Supp. 827 (N.D. Ind. 1995) ................................................................ 28, 29

*Waller v. Int'l Harvester Co.*,
574 F. Supp. 166 (N.D. Ill. 1983) ....................................................................... 44

*Walter v. Fiorenco*,
840 F.2d 427 (7th Cir. 1988) ................................................................................. 7

*Wilford v. Cty. of Rush*,
2003 WL 77003 (S.D. Ind. Jan. 7, 2003) ............................................................. 8

*Willy v. Coastal Corp.*,
503 U.S. 131 (1992) ............................................................................................. 31

*XCO Int'l Inc. v. Pac. Sci. Co.*,
2003 WL 2006595 (N.D. Ill. Apr. 29, 2003) ....................................................... 28

*Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*,
313 F.3d 385 (7th Cir. 2002) ..................................................................... 8, 38, 39

## Statutes

28 U.S.C. § 1927 ....................................................................................passim

28 U.S.C. § 1988 ....................................................................................29, 40

3 U.S.C. § 15 ..........................................................................................21, 22

Wis. Stat. § 5.05(1)(f) ............................................................................. 16

Wis. Stat. § 6.855(1) and (3) ................................................................. 16

Wis. Stat. § 9.01 ...................................................................................46, 47, 54

## Rules

Fed. R. Civ. P. 8(a)(2) ...........................................................................53, 54

Fed. R. Civ. Pro. 16(f) ........................................................................... 28

Fed. R. Civ. Pro. 4 ................................................................................. 50

Fed. R. Civ. Pro. 59(e) ..........................................................................29, 30

Rule 11, Fed. R. Civ. P ..........................................................................37, 38, 39, 40

## Other Authorities

U.S. Const., Art. II, Sec. 1, Cl. 2 .......................................................... 10

U.S. Const., Art. III................................................................................ 31

L.R. 3...................................................................................................... 50

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.)........... 35

## I.  SUMMARY OF ARGUMENT

"The American Rule is that each party bears his own legal fees unless the other side acts in bad faith." *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985), (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975)). Governor Evers and his Co-Defendants have not articulated a basis for departing from the American Rule. Far from it, the untimely and unwarranted relief they seek is unprecedented.

### A. The Motions Are Untimely

On December 12, 2020, this court ruled against former President Trump on his claim that Article II, §1, cl. 2 (the "Electors Clause") was violated. On December 24, 2020, the Seventh Circuit rejected President Trump's appeal. Yet, Governor Evers waited until March 31, 2021, and his Co-Defendants until April 2 and April 8, to file motions for attorneys' fees (97 days, 99 days and 107 days respectively, after the Seventh Circuit's dismissal). This delay is extraordinary, and under settled Seventh Circuit law bars the relief requested.

But knowing his claims were unequivocally time barred, on March 31, 2021, Governor Evers filed a motion and brief laden with inflammatory adjectives common to a campaign press release— such as "outrageous,"[1] "baseless,"[2] "cynical,"[3] "attempt to hijack the democratic process,"[4] and "egregious conduct,"[5]—to impugn the motives of President Trump and his legal counsel. Governor Evers' filings were expressly intended to be

---

[1] Defendant Governor Evers' Brief in Support of His Petition for Attorneys' Fees and Sanctions, Dkt. 145 (filed Mar. 31, 2021) ("Evers' Brief") at 1.
[2] *Id.* at 2.
[3] *Id.*
[4] *Id.*
[5] *Id.* at 6.

"punitive,"[6] and his attention-grabbing invective was foreseeably quoted directly in numerous press stories[7] although such terms had not been used in the underlying opinions of this court or the Seventh Circuit.

It is manifestly ironic that Governor Evers and his Co-Defendants filed untimely motions for attorneys' fees in which they ask this court to ignore binding Seventh Circuit precedent in *Overnite Transp. Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789 (7th Cir. 1983), while accusing President Trump of having made "frivolous" legal claims. Indeed, it is Governor Evers who has offered no sound rationale for why the *Overnite* decision should not be followed. He simply asks this court to depart from, and not apply, settled law.[8]

## B. The Motions Ignore the Rulings of this Court and the Seventh Circuit

On top of providing no sound basis for ignoring controlling Seventh Circuit authority, Governor Evers and his Co-Defendants do not even attempt to address this court's ruling that the claims raised by President Trump and his attorneys were "not frivolous." *Trump v. Wisconsin Elections Comm'n,* 506 F.Supp.3d 620, 638, 639 (E.D. Wis.

---

[6] Dkt. 145 at 2 ("The Court should . . . impose a punitive sanction."); 8 ("punish and deter attorneys"); ("punitive sanctions [sought], against Trump individually and his attorneys pursuant to the Court's inherent authority"); 21 ("a punitive monetary sanction"); 22 ("a punitive sanction . . . because deterrence demands making an example of Trump and his attorneys").

[7] *See, e.g.*, "Wisconsin seeks $145,000 in fees for Trump's 'bad faith' election lawsuit," Reuters (April 1, 2021), *available at*: https://www.reuters.com/article/idUSKBN2BO6M8; "Wisconsin Seeks $145,000 in Fees for Trump's 'Bad Faith' Election Lawsuit," U.S. News & World Report (April 1, 2021), *available at*: https://www.usnews.com/news/us/articles/2021-04-01/wisconsin-seeks-145-000-in-fees-for-trumps-bad-faith-election-lawsuit; "Wisconsin seeks legal fees, citing Indy firm's 'egregious conduct' in Trump election suit," The Indiana Lawyer (April 1, 2021), *available at*: https://www.theindianalawyer.com/articles/wisconsin-seeks-legal-fees-citing-indy-firms-egregious-conduct-in-trump-election-suit.

[8] Governor Evers' only attempt to justify his delay is to claim the case moved too quickly for him to file a fee motion. This explanation is inconsistent with *Overnite*'s mandate that his motion be filed before the Court of Appeals ruled. It also fails to address that Governor Evers was aware from the outset that Plaintiff was seeking expedited relief. Governor Evers was not caught off guard. He knew this case would proceed quickly. He also does not attempt to explain why he delayed filing his motion during the three months President Trump's petition for certiorari was pending. Governor Evers cannot claim the pace of the case precluded filing for fees during this period as he waived his opportunity to file a brief in opposition to President Trump's petition for certiorari, and did not take an active role in the Supreme Court proceedings.

2

Dec. 12, 2020), *aff'd*, 983 F.3d 919 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1516, 209 L. Ed. 2d 253 (2021). None of the Motions even mention this aspect of the court's ruling, despite repeatedly using the term "frivolous" to describe President Trump's lawsuit.

Governor Evers and his Co-Defendants likewise ignore the Seventh Circuit's ruling that President Trump's claims were justiciable. The linchpin of Governor Evers' legal argument is that President Trump allegedly sought an unconstitutional remedy.[9] However, Governor Evers has already lost this point. On the threshold issue of justiciability, the Seventh Circuit ruled:

> Were we to grant the President the relief he requests and declare the election results void, the alleged injury—the unlawful appointment of electors—would be redressed. . . . A favorable ruling would provide the opportunity for the appointment of a new slate of electors. From there, it would be for the Wisconsin Legislature to decide the next steps in advance of Congress's count of the Electoral College's votes on January 6, 2021.

*Trump v. Wisconsin Elections Comm'n*, 983 F.3d 919, 924–25 (7th Cir. 2020), *cert. denied,* 141 S. Ct. 1516, 209 L. Ed. 2d 253 (2021).

Without even acknowledging these clear rulings, Governor Evers argues President Trump's claims were frivolous and his case not justiciable. Governor Evers provides no argument to counter these key prior rulings; even worse, Governor Evers and his Co-Defendants simply ignored them. Failure to acknowledge and address relevant prior

---

[9] Evers' Brief at 14 ("None of the various formulations asked for a remedy that this Court could constitutionally or practically provide."); Evers' Brief at 15 (Alleging that President Trump lacked "any basis in constitutional, statutory, or other legal authority" for the relief he requested.); Evers' Brief at 16 ("Trump requested this Court issue an unconstitutional advisory opinion."). Co-Defendants made the same erroneous claims. Dkt. 153 at 11 ("bad faith . . . is evidenced by the scope of the relief sought"); Dkt. 156 at 4 ("fees are warranted here because the extraordinary relief that Trump sought . . . was objectively unreasonable").

3

rulings violated the Co-Defendants' duty of candor to the tribunal.[10] For this reason as well the Motions should be denied.

### C. President Trump's Claims Were Colorable as this Court and the Seventh Circuit Recognized

Governor Evers cannot carry his high burden of establishing that President Trump's claims, when they were brought, lacked even a colorable basis in law. In *Suslick v. Rothschild Sec. Corp.*, 741 F.2d 1000, 1002 (7th Cir. 1984), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir. 1990), the Seventh Circuit noted that a claim "must lack even a colorable basis in law to justify an award of fees." *Id*. at 1006. There, "complex questions raised by the statute of limitations" that involved "complicated interaction between state and federal law" "demonstrated the colorability of the plaintiffs' complaint." *Id*. at 1006. Therefore, the court was "unwilling to conclude that the actions of the [plaintiff's] attorney was sufficient to amount to bad faith." *Id*. Similarly, in *Mach v. Will Cty. Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009), the Seventh Circuit said that pursuing claims "even [when] facing great odds against their success [will] not warrant sanctions."

Furthermore, as the Seventh Circuit observed, *in this case*, in a passage which Governor Evers also ignored, "[d]efining the precise contours of the Electors Clause is a difficult endeavor" and "case law interpreting or applying the Clause is sparse." *Trump*, 983 F.3d at 926. It was entirely proper for President Trump and his counsel to turn to the

---

[10] *See, e.g.*, *Texas Alliance for Retired Americans v. Hughs*, No. 20-40643, (5th Cir., March 11, 2021) (unpublished order) (in election case against Texas Secretary of State, counsel's inexplicable failure to disclose court's earlier denial of a similar motion violated duty of candor to tribunal and justified award of attorneys' fees); *upheld on reconsideration* (June 30, 2021) (unpublished order) (per curiam) ("at the very least . . . counsel recklessly disregarded their duty to the court by failing to demonstrate candor in their motion to supplement and in their merits brief") at 6. Both orders submitted as supplemental authority.

federal courts to remedy colorable constitutional claims whether they be characterized as novel or not. *Overnite*, 697 F.2d at 794-95. To hold otherwise "would have a profound chilling effect upon litigants and would further interfere with the presentation of meritorious legal questions to th[e] court[s]." *Id.*

Of course, the role of federal courts in our constitutional structure is precisely to consider challenging issues of constitutional law. *Id. see also Hamer v. Lake Cty.*, 819 F.2d 1362, 1367 (7th Cir. 1987) ("It is often through vigorous advocacy that changes and developments in the law occur and new precedent is created. Innovative, even persistent advocacy in the face of great adversity must not be unreasonably penalized with hindsight. Subsequent failure is not the test."). And, after this case was filed, many of President Trump's claims were recognized to be grounded in viable legal principles by, among others, this court, the Seventh Circuit, three Justices of the Wisconsin Supreme Court, the Attorney Generals of at least eighteen (18) states, and three Justices of the U.S. Supreme Court. Governor Evers therefore cannot prevail in his contention that President Trump's claims were beyond the pale of legitimate constitutional argument, as this court and the Seventh Circuit, in line with the text of the Electors Clause, have held otherwise.

### D. The Motions Do Not Demonstrate Bad Faith by the Former President or His Legal Counsel

Even had Governor Evers' motion been timely filed, and even had he not ignored key rulings in this case which contradict his claims, to prevail Governor Evers must demonstrate "bad faith" by President Trump's counsel and he plainly has not done that. President Trump's claims in this case were, at a minimum, colorable as confirmed by the prior rulings of this court and the Seventh Circuit *in this case*. However, even had Plaintiff's claims been without legal merit Governor Evers and the Co-Defendants are still

5

required to show more to establish bad faith. *See, e.g., Textor v. Bd. of Regents of N. Illinois Univ.*, 711 F.2d 1387, 1395 (7th Cir. 1983) ("there is no basis for assuming that counsel acted in bad faith from the fact that the suit was unsuccessful"); *McCandless v. Great Atl. & Pac. Tea Co.*, 697 F.2d 198, 201 (7th Cir. 1983) ("a finding of *meritlessness will not support a finding of bad faith in and of itself*, that an attorney filed such a suit is evidence that should be considered along with any other facts") (emphasis added).

Proof of bad faith must either involve proof of subjective bad faith, *i.e.*, proof of malice or intentionally wrongful conduct, or proof of objective bad faith "and *extremely negligent conduct, like reckless and indifferent conduct, satisfies this standard.*" *Claiborne v. Wisdom*, 414 F.3d 715, 721 (7th Cir. 2005) (quoting *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1185 (7th Cir. 1992) (emphasis added).

Governor Evers cannot point to any evidence of "extremely negligent conduct" by President Trump's counsel. [11] Rather, he merely disagrees with Plaintiff's legal analysis. This is insufficient for sanctions. In fact, the Governor has not pointed to a single erroneous case citation in Plaintiff's filings, nor to any misstatement of fact made by counsel; he does not contend that a single statement made by Plaintiff's counsel lacked decorum or was intentionally false, misleading, or untrue; nor did President Trump's counsel fail to respond to any motion made by Defendants. The Governor has clearly not established the sort of misconduct on which fees were granted in the cases he has cited to

---

[11] **Contrary to law**, Evers and the Co-Defendants seek fees *directly against President Trump*, <u>but</u> § 1927 does *not* authorize an award against a client. *They fail to advise the court* the Seventh Circuit has held "[s]ection 1927 will support an award of fees *only against . . . counsel.*" *Suslick*, 741 F.2d at 1006 (emphasis added).

this court, most of which involved contemptuous behavior, failure to follow court orders, intentionally deceptive or disruptive behavior, or misrepresentations to the court.[12]

Governor Evers repeatedly calls President Trump's lawsuit "dilatory,"[13] but this is not a talisman. Although the Seventh Circuit relied upon laches as a second ground supporting its ruling, dismissal based on untimeliness of the suit will not typically result in a finding that the lawsuit was brought in bad faith. For instance, in *Suslick*, the Seventh Circuit reversed an award of attorneys' fees under § 1927 against the plaintiff even though the plaintiff filed the case after the statute of limitations had expired. *Suslick*, 741 F.2d at 1002. Here no period of limitations was involved, and application of

---

[12] *E.g.*, *McCandless*, 697 F.2d at 201(misrepresentation of legal authority; failure to provide factual and legal support for claims; failure to respond to motion for fees); *Fred A Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752–54 (7th Cir. 1988) (counsel failed to withdraw claims after notification that claims were meritless, even amending clearly time-barred claims to delete references to untimeliness after motion to dismiss was filed, and correspondence demonstrated that counsel continued to pursue claims that were objectively unreasonable); *Mach*, 580 F.3d at 501 (counsel pursued case even after discovery revealed there was no good faith factual basis for claims); *Methode Elecs., Inc. v. Adam Techns*. Inc., 371 F.3d 923, 928 (7th Cir. 2004) (district court "found not only that Methode's venue allegations were false, but that Methode's conduct in advancing them was intentionally deceptive . . . [and] was an effort to deceive the court"); *Claiborne*, 414 F.3d at 722  (three of four major claims presented by attorney lacked any factual basis; attorney engaged in "evasive and dilatory tactics" such as filing an incomplete disclosure of witnesses, failing to respond to defendants' interrogatories and production requests, and failing to respond to defendants' motion for summary judgment); *Walter v. Fiorenco*, 840 F.2d 427, 435–36 (7th Cir. 1988) (counsel needlessly waited until after summary judgment was entered to produce affidavit which resulted in summary judgment order being vacated; court found that after three prior defendants had been dismissed in the case over a three year period "it should have been obvious to counsel that if plaintiffs' claims against three individual defendants had already failed because no relationship existed between those defendants and REL, claims against a fourth defendant would likely also fail" yet plaintiffs' counsel did not dismiss that defendant voluntarily); *Feury v. City of Chicago*, 900 F.3d 450, 463–69 (7th Cir. 2018) (court found repeated misrepresentations to the court, intentional violation of court orders and other unethical conduct, including speaking to a reporter during the trial about facts not in evidence); *In re. Matter of Lisse*, 921 F.3d 629, 641-42 (7th Cir. 2019) ("blatant" "stall tactics," including improperly using the bankruptcy court to permit a debtor to avoid home foreclosure for 8 years; "Using . . . automatic stay . . .  as a litigation ploy to drag out foreclosure proceedings in another jurisdiction" and "filing numerous, last-minute motions for lengthy stays or deadline extensions" and then dismissing the appeal when no further extensions were granted); *Royce v. Michael R. Needle, P.C.,* 950 F.3d 939, 958–59 (7th Cir. 2020) (awarding sanctions where judge granted attorney's request to appear telephonically and attorney took the call in a public place with too much ambient noise, preventing him from participating in the hearing, requiring it be rescheduled; attorney disregarded court order not to alter substance of amended pleading, and attorney engaged in delay tactics, missed deadlines, and failed to respond to court orders).

[13] Evers' Brief at 1, 2, 9, 24.

the equitable doctrine of laches was, at worst, a topic on which reasonable lawyers might disagree, as this court's decision *not* to reach the equitable doctrine of laches supports. *Trump*, 506 F.Supp.3d at 639, n. 10 ("Plaintiff's delay likely implicates the equitable doctrine of laches. The Court does not need to reach that issue, however, and therefore makes no findings or holdings on laches.").

Finally, Governor Evers has offered no admissible proof of subjective bad faith or *scienter* supporting his false claim that President Trump's "attorneys brought and litigated this lawsuit in bad faith." Evers' Brief at 9. Instead, Governor Evers has improperly:

(1) accused Plaintiff's lawyers of "[u]nconscionabl[e]"[14] motives to undermine democracy and "secure the presidency contrary to majority will"[15] without a shred of record evidence supporting this accusation,[16] and

(2) raised inadmissible conjecture and speculation about matters outside the record, such as political contributions received by President Trump.[17]

In contrast, numerous *facts in the record confirm the objective and subjective good faith of President Trump's counsel* and negate any basis for fees, including: the Seventh Circuit's finding that President Trump's claims were justiciable and the remedy he sought

---

[14] Evers' Brief at 9.

[15] *Id.*

[16] Such personal attacks without a good faith factual basis serve only to bring the legal profession into disrepute. *See Matter of Palmisano*, 70 F.3d 483, 487 (7th Cir. 1995) ("Courts . . . may require attorneys to speak with greater care and civility than is the norm in political campaigns."), *cert. denied* 517 U.S. 1223 (1996); *Wilford v. Cty. of Rush*, No. IP02-0985-C-T/K, 2003 WL 77003, at *7 (S.D. Ind. Jan. 7, 2003) ("The parties, the profession, and the public all lose when the attorneys fail to treat each other with common courtesy.") (quoting *Miller v. Bittner*, 985 F.2d 935, 941 (8th Cir.1993)).

[17] Governor Evers urges the court to award fees against President Trump based upon speculation and conjecture about the President's motives arising from inadmissible hearsay in a single press article which was not part of the record in this case. *See* Evers' Brief at p. 21 (speculating about campaign contributions), p. 21, n. 7 (press article). This claim, unsupported by record evidence, cannot be considered, nor is it relevant. *See also Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2002) (inherent authority to award attorneys' fees may only be used "to punish misconduct . . . occurring in the litigation itself, not in the events giving rise to the litigation"), *cert. denied* 540 U.S. 1068 (2003).

8

was legally viable, this court's determination that Plaintiff's claims were not frivolous, the rapidity with which this case was prosecuted, counsel's responsiveness to this court's orders, and the fact the trial proceeded on a stipulated record, which required good faith negotiations with Co-Defendants' counsel and a stipulation signed off on by all counsel.

For these and other reasons, as explained herein, it is Governor Evers who has ignored settled precedent and established law by seeking sanctions which are contrary to law. The Motions should be promptly dismissed.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Donald J. Trump was a candidate for President of the United States in the presidential election held in Wisconsin on November 3, 2020. He had previously been a candidate for the presidential election held on November 8, 2016.

In 2016, candidate Trump won Wisconsin's electoral votes after winning the election by 22,748 votes, a margin of 0.77%.  Wisconsin was the tipping point in the 2016 election, the closest state that both candidates needed to win to emerge with a victory in the election.

Between the 2016 and 2020 presidential elections, the use of absentee ballots in Wisconsin exploded, substantially due to procedures and practices implemented outside the Wisconsin Code including: (1) municipal clerks unilaterally completing missing information on absentee ballot envelopes related to the witness' address; (2) circumvention of the Legislature's photo ID requirements by encouraging widespread misuse of Wisconsin's "indefinitely confined" exception for absentee ballot requests; (3) installation of 500 unmanned ballot drop box repositories; and (4) the City of Madison's use of volunteers at 200 sites around the city where volunteers collected absentee ballots.

The certified results of the November 3, 2020, presidential election show President Trump was defeated by 20,600 votes, a difference of 0.624% of the votes counted.

This action challenged those procedures and practices implemented by non-legislative officials in conflict with the State Election Code adopted by the legislature, as they resulted in an election conducted by executive branch officials that was not "in such Manner as the Legislature thereof may direct." U.S. Const., Art. II, Sec. 1, Cl. 2 (the "Electors Clause"). Then-President Trump sought: (1) a declaratory judgment that the election was not conducted in a lawful manner and therefore electoral votes cast on December 14 based on the flawed election were not valid, and (2) injunctive relief ordering Governor Evers to issue a certificate of determination consistent with, and only consistent with, the appointment of electors by the Wisconsin legislature.

## A. The Challenged Practices

### 1. Municipal clerks' completion of missing information on absentee ballot envelopes related to the witness's address

The Wisconsin Elections Commission (WEC) provided shifting guidance regarding missing absentee ballot information throughout 2020. A challenge to the guidance before the election was made difficult because WEC's advice can be changed, enhanced, revoked or ignored at any time as evidenced by the limitless number of advisories, letters, opinions, and booklets which it generates. WEC can, and does, change its advice.[18] Further, WEC manuals and memos "are not law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions."

---

[18] WEC, Recount Manual November 2020, at pp. 7-8, n. 5, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2020-11/Recount%20Manual%20Final%20%2811-2020%29%20highlight.pdf; *see also* Recount Manual August 2018, *available at* https://elections.wi.gov/sites/elections.wi.gov/files/2019-02/Recount%20Manual%20Final%20%288-2018%29.pdf.

*Serv. Emps. Int'l Union, Loc. 1 v. Vos*, 946 N.W.2d 35, 67 (Wis. 2020). Because of shifting guidance, it is difficult to ascertain what rules will be followed until the election occurs.

In late March 2020, amidst fears of a global pandemic in the weeks leading to Wisconsin's April 7th presidential primary, the Democratic National Committee and Democratic Party of Wisconsin sued for emergency injunctive relief to enjoin enforcement of the witness requirement for absentee voting. *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 958 (W.D. Wis. 2020). On April 2, 2020, the district court enjoined WEC from enforcing the statutory requirement that an absentee ballot must be witnessed, if the voter provided a written statement that despite reasonable efforts he or she could not safely obtain a witness certification. *Id.* at 983. The next day, the Seventh Circuit stayed the injunction, "concern[ed] with the overbreadth of the district court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combatting voter fraud." *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538, 2020 WL 3619499, at *2 (7th Cir. Apr. 3, 2020).

On April 5, 2020, WEC issued *new* guidance, given the Circuit Court's decision. (*See* ECF 117-72, pp. 33–34.) This new guidance appeared to retreat from the October 2016 guidance about the clerk's role in filling in missing witness information.

On September 18, 2020, once the spotlight on absentee witnesses had passed, WEC published an *updated* comprehensive, 250-page *Election Administration Manual for Wisconsin Municipal Clerks*. (ECF 117-72 p. 23.) Buried on page 99 of the Manual, WEC advised that "Clerks may add a missing witness address using whatever means are available. Clerks should initial next to the added witness address." (ECF 117-72, p. 139 (for extract of page); ECF 80-2 p. 101¶ 8.b.). However, under the immediately following

heading, *Correcting Defective Absentee Certificate Envelopes*, the Manual specified

conflicting step-by-step guidance for "curing" defective certificate envelopes. (ECF 117-72,

p. 139 (for extract of page); ECF 80-2 pp. 101–02, emphases added.)

On October 19, 2020, just two weeks before the election, WEC again issued *further*

*guidance* entitled, *Spoiling Absentee Ballot Guidance*. (ECF 117-35, p. 1.) On page 3,

under the heading, *Absentee Voter Errors or Ballot Damage After the Spoiling Deadline*,

WEC stated:

> On Election Day, if a voter needs to correct information on the absentee
> certificate envelope, they and/or their original witness, depending on what
> the error is, must appear at the polling place or central count. This would be
> due to missing voter information, missing voter signature, or missing witness
> signature. ***The witness can appear without the voter to add their***
> ***signature or address***. Please note that ***the clerk should attempt to***
> ***resolve any missing witness address information*** prior to Election Day if
> possible, and this can be done through reliable information (personal
> knowledge, voter registration information, through a phone call with the
> voter or witness). ***The witness does not need to appear to add a missing***
> ***address.***

(ECF 117-35, p. 3 (emphases added.))

In the November 2020 Wisconsin election, election workers added information to

the witness address on the envelopes of an unspecified number of absentee ballots, and

these absentee ballots were counted as valid votes. (ECF 127, p. 5 ¶ 17.) At the Milwaukee

Central Count on election day, Defendant Woodall-Vogg announced that ballot counters

who happened on a ballot without a witness address could go to a computer, look the

address up and insert it on the ballot. (ECF 128-1, pp. 1-2 ¶ 11.) In this action, Defendants

claimed they used WEC's written guidance to guide their handling of the absentee ballot

witness addresses, but they did not specify which written guidance they followed. (ECF

127, p. 4 ¶ 11.)

### 2. *Circumvention of the Legislature's photo ID requirements regarding the "indefinitely confined" exception for absentee ballot requests*

This action further challenged the expanded definition of "indefinitely confined" to expand eligibility for absentee ballots. On March 24, 2020, WEC posted guidance in one of its FAQ documents relating to the COVID-19 pandemic, which included these statements:

> The statutory definition of 'age, illness, infirmity or disability' does not require any voter to meet a threshold for qualification and indefinitely confined status need not be permanent.. . . During the current public health crisis, many voters of a certain age or in at-risk populations may meet that standard of indefinitely confined until the crisis abates.

(ECF 117-2 pp. 1–2.)

The next day, March 25, 2020, the Dane County Clerk McDonell emailed an announcement to all Dane County Municipal clerks and posted on his official Facebook page that "based on the Governors Stay at Home order I am declaring all Dane County voters may indicate as needed that they are indefinitely confined due to illness.. . . I urge all voters who request a ballot and have trouble presenting valid ID to indicate that they are indefinitely confined." (ECF 127, p. 6 ¶ 23.) That same day, the Milwaukee County Clerk issued a similar statement. (ECF 127, p. 7 ¶ 25.)

On March 27, 2020, Mark Jefferson and the Republican Party of Wisconsin filed an original action with the Wisconsin Supreme Court seeking a declaration that the Dane County Clerk's statement was erroneous and a preliminary injunction directing him to remove his posts and issue a corrective statement. *Jefferson v. Dane Cty.*, 951 N.W.2d 556, 560 (Wis. 2020).

On March 29, 2020, WEC issued further guidance stating:

> 1.  Designation of indefinitely confined status is for each individual voter to make based upon their current circumstance. It does not require permanent or total inability to travel outside of the residence. The

designation is appropriate for electors who are indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period.

2. Indefinitely confined status shall not be used by electors simply as a means to avoid the photo ID requirement without regard to whether they are indefinitely confined because of age, physical illness, infirmity or disability.

(ECF 117-2 p. 1.)

On March 31, 2020, the Wisconsin Supreme Court granted the request for a temporary injunction, holding that McDonell's public advice urged voters to violate Wisconsin election law and ordered any future postings to conform to the above two paragraphs from WEC's statement. *Jefferson*, 951 N.W.2d at 560. The Court confined its holding to the two specific paragraphs quoted in its order and did not adjudicate the remaining content of the WEC guidance, which WEC did not retract but rather re-published in its March 29 guidance. (ECF 117-2 p. 2). The Wisconsin Supreme Court then granted the petition for original action and assumed jurisdiction the following day. *Jefferson*, 951 N.W.2d at 560.

The Wisconsin Supreme Court's final adjudication, however, remained pending until after the election, when it rendered its final decision on December 14, 2020. *Id.* Meanwhile, in response to the Wisconsin Supreme Court's temporary injunction, the Milwaukee County Clerk removed his Facebook posting. (ECF 127, p. 7 ¶ 26.)[19] As of the November 3, 2020 election, 11,374 voters in the City of Madison claimed to be indefinitely confined. (ECF 127, p. 6 ¶ 21.) Similarly, 29,391 voters in the City of Milwaukee claimed to be indefinitely confined. (ECF 127, p. 6 ¶ 22.)

---

[19] It is not clear whether the Dane County Clerk removed his Facebook post or merely posted the WEC's updated guidance. (ECF 73-5.)

14

As of November 10, 2020, approximately 240,000 Wisconsin voters requested absentee ballots claiming to be "indefinitely confined." (ECF 127, p. 5 ¶ 18.)[20] By comparison, 66,611 Wisconsin voters cast absentee ballots in the 2016 general presidential election claiming to be indefinitely confined. (ECF 127, pp. 5-6 ¶ 19.)

### 3. *Unmanned ballot drop box repositories*

In June 2020, the Mayors of Wisconsin's five largest cities—Madison, Milwaukee, Racine, Kenosha and Green Bay—announced a collaboratively developed plan for the upcoming November election that would "Encourage and Increase Absentee Voting (By Mail and Early, In-Person)." (ECF 117-12, p. 4.) The Mayors and their staff decided that voters "need to have confidence that they are returning their completed absentee ballots into secure containers that are not at risk of tampering." (ECF 117-12, p. 10.) They requested outside "resources to purchase additional secure drop-boxes and place them at key locations throughout their cities, including libraries, community centers, and other well-known places. . . ." (ECF 117-12, p. 10.)

On July 6, 2020, the Mayors announced they had secured $6.3 million in funding from the Center for Tech and Civic Life (CTCL) for their plan. (ECF 117-28.) Although the Mayors secured funding for their plan, the WEC had not yet issued any guidance for drop boxes, which "are not found anywhere in the absentee voting statutes."[21]

On August 19, 2020, WEC issued guidance on absentee ballot drop boxes. (ECF 117-13, p. 1.) Although WEC's guidance largely followed a nationwide resource developed by

---

[20] As of the trial date, the number of ballots that were actually cast and counted on that basis were unknown and efforts were still being undertaken to reconcile the numbers. (ECF 127, p. 5 ¶ 18.)
[21] *Trump v. Biden*, 951 N.W.2d 568, 591 ¶ 101 (Wis. 2020) (Roggensack, C.J., Ziegler & Rebecca Grassl Bradley, JJ., dissenting) *cert. denied,* 141 S. Ct. 1387, 209 L. Ed. 2d 128 (2021).

the U.S. Cybersecurity and Infrastructure Security Agency (CISA), WEC's guidance omitted a key warning from CISA:

> If you are considering the use of ballot drop boxes, *you should review your existing laws and requirements and determine whether emergency changes may be necessary*. A full list of state practices can be found at the National Conference of State Legislators (NCSL) website listed in the Additional Resources section.

(ECF 117-15 p. 3, emphasis added.) Notably, WEC's guidance on drop boxes did not cite a single Wisconsin statute and made no attempt to identify any statutory authority for its guidance. (*See* ECF 117-13, p. 1.) WEC also did not attempt to "[p]romulgate rules under ch. 227 applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections" relating to dropboxes. Wis. Stat. § 5.05(1)(f). Although the Wisconsin Election Code prescribes rules for establishing alternate absentee ballot sites at which voters "may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors," that site "shall be staffed by the municipal clerk or the executive director of the board of election commissioners" or their employees. Wis. Stat. § 6.855(1) and (3). However, WEC's guidance directly contradicted these rules, instead stating that drop boxes can be *unstaffed*. (ECF 117-13, p. 1.)

Sometime near the week of September 10, 2020, the City of Milwaukee installed 15 new dropboxes around the city. (ECF 117-58.) But later, just a week before the election, Milwaukee replaced its 15 dropboxes with "sturdier, longer-lasting" dropboxes that had "important security features." (ECF 117-25, p. 2; ECF 127, p. 8 ¶ 29.) This last-minute replacement calls into question the strength and security of the earlier dropboxes. Meanwhile, just weeks before the election, the City of Madison added 14 dropboxes around the city. (ECF 117-26, p. 1; ECF 127, p. 8 ¶ 30.) None of the absentee drop boxes in Dane

and Milwaukee Counties were staffed. (ECF 127, p. 8 ¶ 27.) One box in Madison was placed in a large public park not adjacent to any building. (ECF 127, p. 8 ¶ 30.)

Over 500 absentee ballot drop boxes were used across Wisconsin, including in Madison, Milwaukee, Green Bay, Kenosha, and Racine, in the November 2020 presidential election. (ECF 127, p. 8 ¶ 28.) Drop boxes were deployed in a variety of contexts, and WEC's "guidance" lacked any semblance of uniform standards. For example, the City of Oshkosh implemented a "drop box" with a sign that it was "for tax bills, water bills, parking tickets, and absentee ballots." (ECF 117-48.)

While WEC does not maintain statewide records concerning the number of ballots collected from dropboxes, the City of Madison collected at least 9,346 and the City of Milwaukee collected approximately 65,000–75,000 absentee ballots from dropboxes for the November 2020 election. (ECF 127, pp. 4-5 ¶¶ 12–14.)

### 4. *The City of Madison's use of volunteers to collect absentee ballots*

Madison officials developed "Democracy in the Park" events held on two consecutive Saturdays in late September and early October. (ECF 127, p. 8 ¶ 31.) They stationed poll workers at over 200 Madison parks to register voters, accept absentee ballots, and serve as a witness for people who had not yet filled out an absentee ballot. (ECF 117-54; B109.) The poll workers were described as "human drop boxes." (ECF 127, p. 5 ¶ 16.) Ballot materials and voted absentee ballots were exchanged between poll workers and couriers using a "code phrase." (ECF 117-52 pp. 3, 21.) The events were publicized and pushed by the Biden campaign. (ECF 117-64.) WEC issued no written guidance about the event, and Madison officials used no WEC written guidance in connection with the events which collected 17,271 absentee ballots. (ECF 127, pp. 4-5 ¶¶ 11 & 15.) Concerns over the

legality of the events caused some voters to file preemptive lawsuits asking a judge to declare their absentee ballots had been legally collected. (ECF 117-54 p. 2.)

### B. This Action

On November 17, 2020, the last county in Wisconsin submitted its canvass of votes to the WEC. (ECF 127, p. 4 ¶ 8.) On November 18, 2020, President Trump requested a recount in Dane and Milwaukee Counties. (ECF 127, p. 4 ¶ 9.) The final state canvass was completed on November 30, 2020. (ECF 127, p. 4 ¶ 8.) Two days later, President Trump filed the instant action, along with a request for an expedited final trial on the merits. (ECF 1 and 6.)

On December 10, 2020, this court held the final trial on the merits via remote proceedings. (ECF 116, 130.) At the outset, at the urging of this court, the parties reached a stipulated set of facts and all exhibits (ECF 130, pp. 14:4-15:24; B025-B039; ECF 73, 80, 82, 117, and 119, and), and the District Court heard closing arguments. (ECF 130, pp. 16:4–17:12 (discussion of stipulations[22]), ECF 127 (filed stipulations), ECF 128-1 and ECF 128-2 (stipulated affidavits).)

Accordingly, the Parties agreed on the relevant facts. The dispute related to the constitutional effect of the facts.

Defendants claimed this action was an effort to "disenfranchise" Wisconsin voters. As explained in closing argument before the District Court, this charge is not well grounded in law or logic, constituting an appeal to emotion, a strawman, a *non sequitur*, and an effort to deflect blame from the conduct of the WEC. *See* Dkt. 130 Trans. at 64:10–66:25.

---

[22] The remainder of the hearing transcript comprises closing argument.

Former President Trump was not alone in this belief. Three of seven Wisconsin Supreme Court justices dissented in the companion state court case, rejecting the hyperbole that the legal actions constituted disenfranchisement. *Trump*, 951 N.W.2d at 598 (Ziegler, J. dissenting (joined by Roggensack, C.J., and Bradley, J.)) ("When the law is not followed, the counting of illegal ballots effectively disenfranchises voters. . . . It disenfranchises those that followed the law in favor of those who acted in contravention of it. This is not the rule of law; it is the rule of judicial activism through inaction."), *see also* 951 N.W. 2d at 601 ¶ 145 (Bradley, J. dissenting (joined by Roggensack, C.J., and Ziegler, J.)) ("'disenfranchise' means to deny a voter the right to vote . . . it is not 'disenfranchisement' to uphold the law . . . the judiciary has the constitutional responsibility to say whether a ballot was cast in accordance with the law prescribed by the people's representatives").

It is an unreasonable burden for any court to expect a candidate to parse through guidance that may be issued shortly before an election, and which may change, for evidence of conflicting guidance *within the document*, particularly when as Justice Ziegler highlighted, the candidate must parse not only the state agency's (dynamic and non-binding) guidance, but also that of "the 1,850 municipal clerks who administer the election at the local level." *Trump*, 951 N.W. 2d at 597 ¶ 133 (Ziegler, J. dissenting (joined by Roggensack, C.J., and Bradley, J.)).

Defendants claimed that President Trump should have sued before the election to protest WEC guidance. But in contrast to Defendants' arguments, consider again that three of the seven Wisconsin Supreme Court justices disagreed: Rather than avoiding needless litigation, requiring pre-election suits, given the ever-changing guidance, will

"spawn[]...preventative lawsuits to address any possible infraction of our election laws."
*Trump*, 951 N.W.2d at 597 ¶ 133 (Ziegler, J. dissenting (joined by Roggensack, C.J., and Bradley, J.).

Further, as Justice Ziegler observed, requiring pre-election suits to contest each process requires that "a candidate will have to monitor all election-related guidance, actions, and decisions of not only the Wisconsin Elections Commission, but of the 1,850 municipal clerks who administer the election at the local level." *Id*.

Defendants contended that the state court, and the state court only, was the proper venue for this action. However, given that laws enacted by the Legislature and applicable to a Presidential election are adopted via authority conferred by the Constitution, those laws are subject to interpretation by federal courts. As Chief Justice Rehnquist observed, by virtue of the Electors Clause "*the text of the election law itself*, and not just its interpretation by the courts of the States, takes on independent significance." *Bush v. Gore*, 531 U.S. 98, 113, 121 S. Ct. 525, 534, 148 L. Ed. 2d 388 (2000).

On December 12, 2020, the District Court issued a *Decision and Order* granting the Motions to Dismiss and denying Plaintiff's motion for preliminary injunction (ECF 134, p. 1) and entered Judgment against Plaintiff. (ECF 135.) In its *Decision and Order*, this court explicitly determined that "plaintiff's statutory construction arguments are not frivolous" *Trump*, 506 F.Supp.3d at 638, and, as well, that Plaintiff's concern that Wisconsin had departed from the legislative scheme for appointing Presidential electors was "not frivolous." *Id*. at 639.

20

## C. Seventh Circuit Appeal

On appeal the Seventh Circuit found that Plaintiff had established standing to bring his claims, confirming that, "[o]n the injury prong of standing, the President has alleged 'concrete and particularized' harm stemming from the allegedly unlawful manner by which Wisconsin appointed its electors." *Trump*, 983 F.3d at 924. As to the final prong of standing, "that the alleged injury 'likely' would be redressed by a favorable decision" the Court of Appeals found "a closer question." *Id*. Nevertheless, the Seventh Circuit determined that Plaintiff did meet this threshold, ruling:

> [T]he President's complaint can be read as more modestly requesting a declaration that the defendants' actions violated the Electors Clause and that those violations tainted enough ballots to "void" the election. Were we to grant the President the relief he requests and declare the election results void, the alleged injury—the unlawful appointment of electors—would be redressed. True, our declaration would not result in a new slate of electors. But the fact that a judicial order cannot provide the full extent or exact type of relief a plaintiff might desire does not render the entire case nonjusticiable. *See Church of Scientology v. United States*, 506 U.S. 9, 12–13, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). A favorable ruling would provide the opportunity for the appointment of a new slate of electors. From there, it would be for the Wisconsin Legislature to decide the next steps in advance of Congress's count of the Electoral College's votes on January 6, 2021. See 3 U.S.C. § 15. All of this is enough to demonstrate Article III standing.

*Id* at 924–25.

Moving to the merits of President Trump's claims, the Seventh Circuit "conclude[d] that the President's complaint presents a federal question, despite its anchoring in alleged violations of state law," observing that federal courts "can decide whether [state officials'] interpretation of state law violated a provision of the federal Constitution, here the Electors Clause." *Id*. at 925. Thus, the Seventh Circuit confirmed that President Trump's view was correct that he could seek a remedy in federal court

under the Electors Clause based on Wisconsin officials' erroneous interpretation and application of State Election Code provisions in a Presidential election.

While the District Court had read the Electors Clause "as addressing only the manner of appointing electors and thus nothing about the law that governs the administration of an election (polling place operations, voting procedures, vote tallying, and the like)," *id*. at 926, the Seventh Circuit preferred a broader reading, the reading urged by President Trump in the District Court and in the Seventh Circuit, that construes "the term 'Manner' in the Electors Clause as also encompassing acts necessarily antecedent and subsidiary to the method for appointing electors—in short, Wisconsin's conduct of its general election." *Id*.

Ultimately, the Seventh Circuit did not find that the departures from the Election Code in the conduct of the election were sufficient to establish an Electors Clause violation and buttressed its ruling by concluding that President Trump had an opportunity before the election to press his challenges and his post-election claims were barred by laches, *id*. at 925–26, a ground which the District Court expressly did not apply. *See Trump*, 506 F.Supp.3d at 629, n. 10. However, the Seventh Circuit's affirmance clearly did not in any way suggest that President Trump's claims were frivolous or in bad faith.

### D. Supreme Court Proceedings

This case was one of a number before the U.S. Supreme Court in late 2020 in which the gravamen was a contention that the Electors Clause forbade non-legislative state actors from altering the way elections for President were conducted. In one case the Attorney General of Texas, joined by seventeen (17) states filing an amicus brief supporting Texas' motion, sought to file an original action addressing Electors Clause

22

issues in the presidential election arising from multiple states, including Wisconsin.[23] The allegations in Texas' motion tracked many of the concerns raised by the former President's counsel in this case, including concerns over the late addition of over 500 unmanned ballot drop boxes, the handling of indefinitely confined voters, and the last minute guidance of the WEC that permitted election officials to alter absentee voter certificates.[24] The Texas filing specifically cited President Trump's complaint in this lawsuit, indicating the legal arguments made by President Trump's counsel in this case were viewed as meritorious by the chief legal officers of some eighteen or more states.[25]

In another filing before the U.S. Supreme Court, President Trump, through different counsel, raised Electors Clause challenges in Pennsylvania. Ultimately, three U.S. Supreme Court Justices dissented from denial of certiorari in that case. *See Republican Party of Pennsylvania v. Degraffenreid*, 141 S. Ct. 732, 732–40, 209 L. Ed. 2d 164 (2021) (Alito, J., Gorsuch, J., and Thomas, J., dissenting from denial of certiorari)

There, Justice Thomas wrote: "The Constitution gives to each state legislature authority to determine the 'Manner' of federal elections. Art. I, §4, cl. 1; Art. II, §1, cl. 2. Yet both before and after the 2020 election, nonlegislative officials in various States took it upon themselves to set the rules instead." *Republican Party of Pennsylvania*, 141 S. Ct. at 732 (Thomas, J., dissenting). Justice Thomas said, that as a result, the Supreme Court had "received an unusually high number of petitions and emergency applications contesting those changes." *Id.* At the time of Justice Thomas's dissent from denial of

---

[23] *See* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/22o155.html (Supreme Court Docket for *Texas v. Pennsylvania*, et. al., No. 220155).
[24] *See* https://www.supremecourt.gov/DocketPDF/22/22O155/162953/20201207234611533_TX-v-State-Motion-2020-12-07%20FINAL.pdf (*Texas v. Pennsylvania*, motion for leave to file a bill of complaint); *see especially* pp. 29-37 setting forth Electors Clause concerns in relation to the Wisconsin election).
[25] *Id*. at 31, n. 10.

certiorari, this case, *Trump v. Wisconsin Elections Commission*, was one of those petitions pending before the U.S. Supreme Court to which Justice Thomas referred.

Justice Thomas explained his concern that, "[c]hanging the rules in the middle of the game is bad enough. Such rule changes by officials who may lack authority to do so is even worse. When those changes alter election results, they can severely damage the electoral system on which our self governance so heavily depends." *Id.* at 735. He observed, such last-minute changes "sow confusion and ultimately dampen confidence in the integrity and fairness of elections." *Id.* at 734.

Speaking to the Supreme Court's role in these matters, Justice Thomas was of the view that, "[i]f state officials have the authority they have claimed, we need to make it clear. If not, we need to put an end to this practice now before the consequences become catastrophic." *Id.* at 735. Three Justices dissented from denial of certiorari in the Pennsylvania case, agreeing the case presented "an important and recurring constitutional question" that deserved consideration by the Supreme Court. *Republican Party of Pennsylvania*, 141 S. Ct. at 738 (Alito, J., dissenting; joined by Gorsuch, J.).

President Trump filed his petition for certiorari in this case on December 30, 2020.[26] In response, Governor Evers and his Co-Defendants all elected to waive their right to file any opposition to President Trump's petition for certiorari[27] and no brief was filed

---

[26] *See* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-883.html (U.S. S.Ct. Docket in *Trump v. Wisconsin Elections Commission, et al.*, No. 20-883).

[27] *See* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-883.html (Waivers were filed by: WEC on Jan. 15, the Madison County Defendants on Jan. 19, Governor Evers on Jan. 20, and the City Defendants and Milwaukee County Defendants on Jan. 22 and Jan. 25, respectively.)

opposing President Trump's petition for certiorari.[28] On March 8, 2021, the Supreme Court denied the petition.[29]

## III.   ARGUMENT

### A. Under Settled Seventh Circuit Law the Motions for Fees Are Untimely and this Court Lacks Jurisdiction to Consider Them

Governor Evers does not explain why he waited until March 31, 2021, nearly four months after the District Court's dismissal of this case and over three weeks after President Trump's petition for certiorari was denied by the U.S. Supreme Court, to move for attorneys' fees. Under clearly established Seventh Circuit law, Governor Evers' delay, and his Co-Defendants even longer delay, are fatal to their claims and jurisdictionally bar consideration of their fee petitions.

A motion for attorneys' fees filed in the district court is untimely if, as here, the motion is filed after the conclusion of an appeal. *Overnite*, 697 F.2d at 792 (finding that district court abused its discretion by awarding fees under 28 U.S.C. § 1927 after appeal had concluded). One reason is that after the appeal "no case or controversy any longer exist[s] between the litigants," therefore, the courts lack jurisdiction to consider an attorneys' fees motion filed after an appeal. *Id*. Another is the Seventh Circuit's goal of avoiding piecemeal appeals.

Governor Evers admits that under controlling Seventh Circuit precedent, this court lacks jurisdiction to consider his fee petition but nonetheless urges this court not apply Seventh Circuit law. Evers' Brief at 27–29. Governor Evers' arguments lack a sound legal basis and should be rejected.

---

[28] *See https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-883.html*
[29] *Id*.

### 1.  *Overnite* is recognized as settled law in this Circuit

In *Overnite* the Seventh Circuit held that a district court lacked jurisdiction to consider a fee petition under 28 U.S.C. § 1927 filed two months after the appellate court issued its opinion. *Overnite*, 697 F.2d at 794. Subject to limited exceptions, once an appeal is taken from a district court, jurisdiction vests in the "court of appeals [and] further proceedings in the district court cannot then take place without leave of the court of appeals." *Id.* at 792 (quoting *Asher v. Harrington*, 461 F.2d 890, 895 (7th Cir. 1972)). Jurisdiction can be retained by the district court only if it expressly reserves or retains such jurisdiction, jurisdiction is reserved by statute, or the court "entertain[s] motions collateral to the judgment or motions which would aid in resolution of the appeal." *Id.* Even so, the district court can retain jurisdiction only over motions "filed with the district court while the appeal on the merits is pending." If the court of appeals dismisses the case, then "no case or controversy any longer exist[s] between the litigants" and the district court lacks jurisdiction over any subsequently filed motion. *Id.*

The Seventh Circuit's holding in *Overnite* is consistent with prior circuit precedent pursuing a policy of preventing piecemeal appeals. Three years earlier, the Seventh Circuit held that a district court had jurisdiction to consider fee petitions while the case was on appeal. *Terket v. Lund*, 623 F.2d 29 (7th Cir. 1980). The court reasoned that holding otherwise would "result in piecemeal appeals" and cause "delay and wasted effort." *Id.* at 34. Therefore, the *Terket* court ruled "district courts in this circuit should proceed with attorneys' fees motions, even after an appeal is filed, as expeditiously as possible" so that "[a]ny party dissatisfied with the court's ruling may then file an appeal and apply to this court for consolidation with the pending appeal of the merits." *Id.* A subsequent case

26

interpreted *Terket* as "contemplat[ing] and approv[ing] the situation . . . where an appeal is filed after both the substantive judgment and the award of attorneys' fees and consolidated for review." *Loctite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 584 (7th Cir. 1981).

Interpreting *Loctite* and *Terket* together, the *Overnite* Court concluded that their rules "reveal that a motion for attorney's fees and costs under section 1927 is so inexorably bound to the underlying merits of the case that a party must bring a motion for fees and costs either before an appeal is perfected or during the pendency of the appeal on the merits." 697 F.2d at 793.

Governor Evers repeatedly claims *Overnite* is an "outlier." Evers' Brief at 27, 28. He is wrong. The Governor cites no Seventh Circuit decision indicating *Overnite* is no longer good law. None exist. Indeed, in *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 707 (7th Cir. 2014), the court expressly confirmed *Overnite*'s rule that "motions under section 1927 must not be unreasonably delayed." Although *Lightspeed* concluded the district court did have jurisdiction over the fee petition, it did so by distinguishing *Overnite*, noting that in *Overnite* after the Seventh Circuit issued its ruling on appeal, "the district court was without jurisdiction to rule on the motion for costs and attorneys' fees," *id.*, but that in *Lightspeed*, plaintiffs voluntarily dismissed their case and no appeal was taken. *Id.* Therefore, the district court had discretion to consider a fee petition filed fourteen days after a voluntary dismissal and subsequent petitions filed while the parties were fighting over the first petition. *Id.* at 708.

Governor Evers also ignores that district courts within the Seventh Circuit have followed *Overnite* in evaluating the timeliness of fee petitions. For instance, the Northern District of Illinois cited *Overnite* in support of its decision that a fee petition filed over six

weeks after the sanctionable conduct became apparent and two and a half months after the district court had dismissed the case was untimely. *In re Cent. Ice Cream Co.*, No. 85 C 10073, 1986 WL 13635, at *7 (N.D. Ill. Nov. 21, 1986). More recently, in 2012, another district court followed *Overnite*, and concluded a bankruptcy court lacked jurisdiction to impose sanctions. *Kafantaris v. Signore*, No. 09 B 13534, 2012 WL 3880056, at *1 (N.D. Ill. Sept. 5, 2012). In *Kafantaris*, the defendant moved for sanctions under Fed.R.Civ.Pro. 16(f) two days before the bankruptcy court granted a summary judgment motion. *Id*. Plaintiff appealed the summary judgment decision to the district court. *Id*. Meanwhile, the parties filed briefs related to the sanctions motion in the bankruptcy court. *Id*. The district court affirmed the summary judgment decision several months later, but the bankruptcy court had not yet ruled on the sanctions motion. *Id*. Subsequently, the bankruptcy court denied the sanctions motion. *Id*. at *2. However, the defendant filed a new sanctions motion two weeks later, which the bankruptcy court granted. *Id*. The plaintiff appealed the sanctions to the district court, which applied *Overnite* and concluded that the bankruptcy court lacked jurisdiction over the new sanctions motion, stating that *Overnite* "plainly forbids filing for sanctions after judgment has been rendered in the appellate court on the merits." *Id*. at *4. Therefore, the bankruptcy court was "without power" to entertain a "motion for sanctions post-appeal." *Id*.[30]

---

[30] Some district courts in the Seventh Circuit have cross-applied Rule 11 timeliness standards to § 1927 sanctions motions. The Seventh Circuit has held that a Rule 11 motion should be brought "as soon as practicable after discovery of a Rule 11 violation." *Kaplan v. Zenner*, 956 F.2d 149, 151 (7th Cir. 1992). Concluding that this timeliness standard should apply with equal force to § 1927 motions, several district courts have denied such motions. *See, e.g., Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.*, 194 F.R.D. 633, 636 (N.D. Ill. 2000) (denying as untimely motion for § 1927 sanctions filed nine months after judgment order); *XCO Int'l Inc. v. Pac. Sci. Co.*, No. 01 C 6851, 2003 WL 2006595, at *5 (N.D. Ill. Apr. 29, 2003), *aff'd on other grounds*, 369 F.3d 998 (7th Cir. 2004) (denying as untimely motion for § 1927 sanctions filed eight months after movant believed that claims were frivolous). *But see Vandeventer v. Wabash Nat. Corp.*, 893 F.

## 2. *Overnite* has not been abrogated by the U.S. Supreme Court

Without any Seventh Circuit cases weakening *Overnite's* precedential value and despite Seventh Circuit and district court decisions confirming its vitality, Governor Evers contends *Overnite* has been silently "abrogated"[31] by the U.S. Supreme Court. Here too, Governor Evers' argument lacks merit. Indeed, Governor Evers fails to acknowledge that one of the Supreme Court opinions he relies upon was issued *before Overnite*. Additionally, Governor Evers reads the Supreme Court opinions he cites far too broadly.

The primary case Governor Evers relies on, *White v. New Hamp. Dep't of Empl. Sec.*, 455 U.S. 445 (1982), did not deal with a district court's jurisdiction to consider a motion for sanctions. Instead, the motion at issue was a request for prevailing party attorneys' fees under 28 U.S.C. § 1988 and the question presented was whether a request for fees under § 1988 was a "motion to alter or amend a judgment" that had to be filed within ten days of judgment per Fed. R. Civ. Pro. 59(e). The Court noted that Rule 59(e) had a specific purpose, to "make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment." *Id.* at 450 (quoting Notes of Advisory Committee on 1946 Amendment to Rules). Therefore, Rule 59(e) was "never intended to apply" to § 1988 motions because they raised "legal issues collateral to the main cause of action." *Id.* at 451. The Court also noted that such a motion could not even be considered until a party had "prevailed." *Id.*

---

Supp. 827, 846 (N.D. Ind. 1995) (holding that Rule 11 timeliness standard does not apply to motions for § 1927 sanctions); *Smith v. CB Com. Real Est. Grp., Inc.*, 947 F. Supp. 1282, 1285 (S.D. Ind. 1996) (following *Vandeventer* and declining to apply Rule 11 timeliness standard to motion to dismiss § 1927 sanctions). If a Rule 11 timeliness standard were applied to the Motions they would fail that standard as well. The fees petitions were plainly not brought as soon as practicable after discovery of the basis on which the petitions were ultimately filed.

[31] Evers' Brief at 28.

While declining to apply Rule 59(e) to § 1988 motions, *White* affirmed the authority of individual jurisdictions to set their own rules governing the timeliness of post judgment attorney fee motions. In fact, the Court acknowledged that because "different jurisdictions have established different procedures for the filing of fee applications, there may be valid local reasons for establishing different time limits." *Id*. at 454 n. 16. The Court cited with approval an Eighth Circuit opinion that recommended that district courts adopt a "uniform rule requiring the filing of a claim for attorney's fees within twenty-one days after entry of judgment." *Id*. (quoting *Obin v. Dist. No. 9 of Int'l Ass'n of Machinists & Aerospace Workers*, 651 F.2d 574, 583 (8th Cir. 1981)).

*White* contradicts neither *Overnite*'s holding nor its logic. *Overnite* dealt with a separate question, *i.e.*, when does a district court have jurisdiction to adjudicate a § 1927 motion? *Overnite* noted that prior Seventh Circuit cases had rejected applying Rule 59(e) to fee motions, and instead used the *Terket* rule to govern timeliness. *Overnite*, 697 F.2d at 793 n. 3. Further, the limited nature of the holding in *White* has been recognized by other courts. For example, in *Northlake Mktg. & Supply, Inc. v. Glaverbel, S.A.*, 194 F.R.D. 633 (N.D. Ill. 2000), the district court distinguished *White* when denying an untimely post-appeal motion under Rule 11 and § 1927. Like Governor Evers, the party seeking fees cited *White* in support of the timeliness of their motion. However, the *Northlake* court disagreed, noting *White* "did not address the general timeliness of the movant's request." *Id*. at 636. Instead, the court concluded *White's* endorsement of district courts "promptly hearing and deciding claims to attorneys' fees" so "appeals from fee awards" could be combined with an appeal from a final judgment cut against the decision to wait until

disposition of the appeal to file a fee motion. *Id*. Thus, the *Northlake* court's reading of *White* refutes Governor Evers' attempt to rely on it.

Neither did the other Supreme Court cases cited by Governor Evers implicitly overrule *Overnite. Willy v. Coastal Corp.*, 503 U.S. 131 (1992), addressed whether Article III of the Constitution permits Rule 11 sanctions to be assessed even if it is ultimately determined the court lacks subject matter jurisdiction. The Court held "Rule 11 is designed to punish a party who has already violated the court's rules" and the "interest in having rules of procedure obeyed . . . does not disappear upon subsequent determination that the court was without subject-matter jurisdiction." *Id*. at 139. Thus, the Court concluded there was "no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules" and to allow "courts to impose Rule 11 sanctions in the event of their failure to do so." *Id*. Notably, timeliness of the Rule 11 motion was not at issue. Therefore, *Willy* did not address the issue in *Overnite* or the present case where the question is how long *after* a final judgment a district court has jurisdiction to entertain a sanctions motion.

The final Supreme Court case cited by Governor Evers, *Cooter & Gell v. Hartmarx Corp.* 496 U.S. 384 (1990), is likewise distinguishable. In *Cooter & Gell* the Court analyzed whether a district court retained jurisdiction over a Rule 11 motion filed before the case was voluntarily dismissed. The plaintiff argued that as soon as the case was dismissed, the district court was stripped of jurisdiction to consider the Rule 11 motion. *Id*. at 394. The *Cooter & Gell* Court concluded instead that voluntary dismissal "did not divest the District Court of jurisdiction to consider respondents' Rule 11 motion." *Id*. at 398.

31

Like *Willy*, the *Cooter & Gell* Court did not address the timeliness of a fee petition filed *after* final judgment. In *Northlake* cited above, the plaintiff also relied on *Cooter & Gell* in support of its argument that its post judgment Rule 11 and § 1927 motions were timely. However, the *Northlake* court distinguished *Cooter & Gell*, noting that in *Cooter & Gell* the Rule 11 motion was filed *before* final judgment. 194 F.R.D. at 635. The *Northlake* Court concluded that "[n]othing in *White*, [or] *Cooter & Gell* . . . counsels that this Court should not follow the Seventh Circuit standard for timeliness." *Id.* at 636. Thus, it is plain that district courts in this Circuit are required to follow *Overnite*. Nothing in the *White*, *Willy*, or *Cooter & Gell* decisions suggests otherwise.

### 3. *Overnite* is fully consistent with federal precedents which disfavor piecemeal appeals and promote the prompt presentation of fee petitions

Governor Evers also tries to paint *Overnite* as a discredited decision not followed by other circuits. This court is not at liberty to decide which circuit to follow. Rather, it must "follow the decisions of [the Seventh Circuit] whether or not they agree." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

Although some circuits have adopted different timeliness standards than the Seventh Circuit, Governor Evers' effort to portray *Overnite* as an outlier falls flat. Other courts have followed *Overnite*'s guidance and rejected post appeal fee motions as untimely. For example, in *Duane Smelser Roofing Co. v. Armm Consultants, Inc.*, 609 F. Supp. 823, 824 (E.D. Mich. 1985), the court applied *Overnite* to reject a fee petition filed two months after the court of appeals affirmed final judgment. The court noted the "prudential reason for permitting District Court jurisdiction" post-appeal "is absent" because "[a] decision by the District Court comes too late to permit consolidation of appeals[.]" *Id.* And the Iowa

Supreme Court followed *Overnite*, concluding a trial court did not have jurisdiction to consider a fee petition filed after the Supreme Court had affirmed a prior summary judgment ruling. *Franzen v. Deere & Co.*, 409 N.W.2d 672, 675–76 (Iowa 1987).

Further, *Overnite's* goal of avoiding piecemeal appeals has been consistently affirmed by the U.S. Supreme Court and federal circuit courts. In *White*, the Court acknowledged that "district courts can avoid piecemeal appeals by promptly hearing and deciding claims to attorney fees." 455 U.S. at 454. The Third Circuit, a court Governor Evers claims rejected *Overnite*, actually affirmed *Overnite's* policy goals by adopting a strict timeliness standard for Rule 11 motions. In *Mary Ann Pensiero v. Lingle*, 847 F.2d 90, 100 (3d Cir. 1988), the court held that a district court had jurisdiction to award Rule 11 attorneys' fees after appellate affirmance on the merits, but adopted a new rule requiring all subsequent Rule 11 motions be filed "before the entry of final judgment." The court noted that "resolution of the [Rule 11] issue before the inevitable delay of the appellate process will be more efficient because of current familiarity with the matter." *Id.* at 99. The court went on to state that "concurrent consideration of challenges to the merits and the imposition of sanctions avoids the invariable demand on two separate appellate panels to acquaint themselves with the underlying facts and the parties' respective legal positions." *Id.*

The Eighth Circuit has likewise expressed a "real concern over fragmentation of appeals." *Obin v. Dist. No. 9 of Int'l Ass'n of Machinists & Aerospace Workers*, 651 F.2d 574, 583 (8th Cir. 1981), and instructed that "disputes regarding the allowance of attorney's fees to a prevailing party, should ordinarily be considered and decided by this court in either a single or consolidated appellate proceeding." *Id.* To ensure that a single

33

appeal was taken from a case, the court urged trial courts to "delay[] entry of judgment on the merits pending determination of attorney's fee claims and thereafter enter[] a single final judgment determining all issues." *Id.* In cases where an attorney fee motion was filed subsequent to final judgment, the court recommended that district courts adopt a local rule requiring an attorneys' fee claim be filed within twenty-one days after entry of judgment. *Id.* By following those procedures courts would "avoid piecemeal consideration of issues arising out of a single lawsuit." *Id.*

In adopting a rule requiring any fee motion be filed during pendency of the appeal, the *Overnite* court expressly valued conserving judicial resources by limiting piecemeal appeals, a policy recognized as legitimate by the Supreme Court and multiple other courts. Other circuits, such as the Fourth Circuit may have crafted different rules upholding different policies. However, this court must uphold the rules laid out by the Seventh Circuit. Governor Evers has advanced no authority that permits disregarding clearly established, long followed, and well-reasoned Seventh Circuit precedent.

## B. This Court's Ruling that Plaintiff's Claims Were "Not Frivolous," and the Seventh Circuit's Ruling that Plaintiff's Claims Were Justiciable Are Both Correct and Bar Co-Defendants' Motions

Even if Governor Evers' and his Co-Defendants' Motions were considered on the merits, the Motions should be denied as they fail to meet the applicable legal standards.

Governor Evers' concedes he must demonstrate that Plaintiff's lawsuit was "frivolous,"[32] invoking the term "frivolous" in mantra-like fashion to describe Plaintiff's case. Yet, *Governor Evers never mentions this Court's rulings expressly finding that*

---

[32] Evers' Brief at 1, 7, 8, 9, 20, 22, 24, 25; City Defendants' Brief (Dkt. 153) at 16; Milwaukee County Defendants' Brief (Dkt. 156) at 7.

*Plaintiff's claims were not frivolous*. Instead, Governor Evers simply ignores this court's previous determination which forecloses Governor Evers' request for attorneys' fees.[33]

Equally applicable to Governor Evers' motion for fees is the Seventh Circuit's criticism of litigants in *Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004), that they "seem not to have heard of the doctrine of the law of the case, under which a ruling made in an earlier phase of a litigation controls the later phases unless a good reason is shown to depart from it." While the Co-Defendants may reply that this court's rulings were *dicta* and unnecessary to its decision, it is well accepted that "[i]f there is no new ground that demands extended reconsideration, earlier dicta may support rapid disposition when the same issues must be encountered head-on." Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.).

The Co-Defendants have not even *raised* this court's prior rulings or the Seventh Circuit's justiciability and remedy rulings, let alone attempted to dispute them. Therefore, the law of this case is that Plaintiff's claims are not frivolous. Governor Evers cannot recharacterize as "frivolous" legal positions this court has already ruled were not unless Governor Evers demonstrates a good reason to depart from that prior ruling. Given that Governor Evers has entirely ignored the prior rulings, he has not done so. Accordingly, the Motions should be denied.

---

[33] It was disingenuous and inconsistent with the Co-Defendants' duty of candor to the tribunal to entirely ignore the District Court's repeated prior rulings that Plaintiff's claims were not frivolous. *See, e.g., Texas Alliance for Retired Americans v. Hughs*, No. 20-40643, *supra* at 4, n.10.

### C. Plaintiff's Filings Were in Good Faith and the Co-Defendants Have Failed to Articulate Any Sufficient Basis for Their Claims of Bad Faith

Governor Evers' claim for fees is further without merit because his brief is devoid of any particularized explanation of how conduct of former President Trump's attorneys allegedly satisfies the bad faith standard necessary to support an award of fees.

It is the law in the Seventh Circuit that the power to assess costs against an attorney under 28 U.S.C. § 1927 "is a power which the courts should exercise only in instances of a serious and studied disregard for the orderly process of justice." *Kiefel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir.1968), *cert. denied*, 395 U.S. 908, 89 S.Ct. 1750, 23 L.Ed.2d 221 (1969) (emphasis supplied); *accord Overnite*, 697 F.2d at 795. As the Court said in *Overnite*, "[l]itigants and their attorneys must be free to pursue . . . remedies except in truly unmeritorious and frivolous cases" and this holds particularly true for filing a case of "first impression" and even if based upon a "legally incorrect" theory. *Overnite*, 697 F.2d at 794-95.

Therefore, "the good faith filing of a claim supported by an arguable legal theory will not be viewed as 'vexatious.'" *Overnite*, 697 F.2d at 795. An award of attorneys' fees cannot be supported under 28 U.S.C. § 1927 where "the attorneys . . . had a reasonable belief based upon a logical (albeit incorrect) interpretation of the law, and prosecuted the lawsuit in an orderly and timely fashion[.]" *Id*. To hold otherwise "would have a profound chilling effect upon litigants and would further interfere with the presentation of meritorious legal questions to th[e] court[s]." *Id*.

The 28 U.S.C. § 1927 requirement of "vexatiousness" is interpreted in the Seventh Circuit and throughout the federal system as incorporating a "bad faith standard." *In re TCI Ltd.*, 769 F.2d at 447 ("Congress believed when it added fees to the list of sanctions

under § 1927 that the enforcement of the traditional bad faith standard would prevent making counsel timorous."); *see Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 419 (6th Cir. 1992) ("A district court may find a violation under Rule 11 and still not find a basis for violation of § 1927."); *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986) ("Imposition of a sanction under § 1927 requires a 'clear showing of bad faith'."); *Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985) ("The power to assess costs against an attorney under § 1927, however, is a power that must be strictly construed and utilized only in instances evidencing a 'serious and standard disregard for the orderly process of justice.'"); *Moore v. W. Sur. Co.*, 140 F.R.D. 340, 349 (N.D. Miss. 1991) (28 U.S.C. § 1927 "differs from Rule 11 by requiring bad faith or vexatiousness in the filing of an unsupported claim."), *aff'd*, 977 F.2d 578 (5th Cir. 1992); *Novelty Textile Mills, Inc. v. Stern*, 136 F.R.D. 63, 72–73 (S.D.N.Y. 1991) ("Unlike Rule 11, Fed. R. Civ. P., which imposes an objective standard, . . . § 1927 requires a 'clear showing of bad faith.'"); *Sherman Treaters Ltd. v. Ahlbrandt*, 115 F.R.D. 519, 524–25 (D.D.C.1987) (an award of attorneys' fees under 28 U.S.C. § 1927 "must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation").

Similarly, an award of attorneys' fees based on the inherent power of the court to supervise and control its proceedings is in derogation of the American Rule, requiring a showing that the losing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129 (1974). Furthermore, "the clear majority view in federal courts is that the inherent power to award fees is limited to bad faith conduct *in the litigation*." *Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1318 (10th Cir. 2000) (emphasis added); *see*

37

*Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012) ("Sanctions imposed pursuant to the district court's inherent power are appropriate where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith."); *see also Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R. 676, 682 (N.D. Ill. 2011), *aff'd*, 719 F.3d 785 (7th Cir. 2013) ("Mere negligence. . . is not enough; the imposition of sanctions under a federal court's inherent authority requires fraudulent or dilatory conduct, or a showing of bad faith.").

The Seventh Circuit will review *de novo* whether a district court has properly invoked inherent power to grant attorneys' fees as a sanction, *Schmude v. Sheahan*, 420 F.3d 645, 650 (7th Cir. 2005), and has interpreted this remedy extraordinarily restrictively. *Tucker*, 682 F.3d at 662 ("a district court must exercise restraint and caution in exercising its inherent power") (finding district court abused its discretion). The Seventh Circuit's approach follows the Supreme Court's recognition that, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).

For example, in *Zapata*, 313 F.3d at 390–91, the Seventh Circuit pointed out that:

> The inherent authority of federal courts to punish misconduct before them is not a grant of authority to do good, rectify shortcomings of the common law (as by using an award of attorneys' fees to make up for an absence that the judge may deem regrettable of punitive damages for certain breaches of contract), or undermine the American rule on the award of attorneys' fees to the prevailing party in the absence of statute.

The *Zapata* court noted that the inherent authority to award attorneys' fees "is a residual authority, to be exercised sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation . . . and (2) not adequately dealt with by other rules, most pertinently. . . Rules 11 and 37 of the Federal Rules of Civil

38

Procedure[.]" *Zapata*, 313 F.3d at 391. The Seventh Circuit further noted that Federal Rules 11 and 37 "place limits on the award of sanctions under them (for example by the provision of safe harbors in Rule 11)" and that "those limitations are equally limitations on inherent authority, which may not be used to amend the rules. . . . For federal rules of procedure have the force of statutes." *Id*. The Seventh Circuit's holding in *Zapata* was that an award of attorneys' fees should not be premised upon the court's inherent authority where the party seeking fees has not satisfied the rule-based preconditions for obtaining fees under Fed. R. Civ. P. 11.

More recent case law in the Seventh Circuit confirms that district courts retain discretion to award fees based on their inherent authority even absent the applying party complying with Rule 11, however, district courts should be "cautious" when doing so. *Mach* 580 F.3d at 502 ("A district court should be cautious when exercising . . . inherent authority, [to award fees outside the confines of Rule 11] but it retains that authority nonetheless"); *Methode Elecs., Inc.* 371 F.3d at 927 ("there is a 'need to be cautious when resorting to inherent powers to justify an action, particularly when the matter is governed by other procedural rules'") (quoting *Kovilic Constr. Co. v. Missbrenner*, 106 F.3d 768, 772–73 (7th Cir.1997)).

Governor Evers concedes that he has not met the Rule 11 preconditions.[34] His failure to do so is another factor weighing against sanctions. While he argues that he did

---

[34] Governor Evers admits that he cannot seek fees under Rule 11 because he failed to notify the opposing party and allow 21 days for withdrawal or correction. Evers' Brief at 6, n. 4. Evers contends he lacked the time to comply with Rule 11 as the case was dismissed by the trial court on December 12, ten days after the complaint was filed. However, Evers is seeking attorneys' fees covering the Seventh Circuit appeal dismissed on December 24, 2020. Thus, contrary to his claims, Governor Evers could have sought relief under Rule 11 but simply failed to undertake the predicate steps necessary to seek relief under Rule 11.

not have time to comply with Rule 11, he did not even attempt to comply or file a motion during the entire period from December 2, 2020, until March 31, 2021.

Besides the requests based upon 28 U.S.C. § 1927 and the inherent authority of the court to award attorneys' fees, the City Defendants alone have also moved the court for an award of fees under 28 U.S.C. § 1988. This difference does not significantly change the analysis. Under section 1988, "[i]n order to collect attorney's fees, a prevailing defendant must demonstrate that the plaintiff brought her action in subjective bad faith, or that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Leffler v. Meer*, 936 F.2d 981, 986 (7th Cir. 1991) (internal quotation marks omitted). "[I]t takes much more than a loss on the merits to warrant a fee award." *Equal Emp. Opportunity Comm'n v. CVS Pharmacy, Inc.*, 907 F.3d 968, 976 (7th Cir. 2018). "[A]n award of fees is only permitted when litigation proceeds in the face of controlling and unambiguous precedent. All reasonable doubts regarding the merits of the claim are resolved in favor of the plaintiff." *Hamer*, 819 F.2d at 1368. Therefore, at a minimum, the City Defendants had to meet the same high standard applicable to attorneys' fees motions under 28 U.S.C. § 1927 and the inherent authority of the court. For all the reasons discussed in this brief they have not done so.[35]

Governor Evers attacks many of the decisions made by President Trump's legal counsel in this relatively short case. However, Monday morning quarterbacking and frustration with the other side's approach has never sustained an award of attorneys' fees

---

[35] The City Defendants rely on § 1988 to request attorneys' fees be "imposed jointly and severally against [President Trump's] attorneys." Dkt. 153 at 17. **This claim is contrary to law** for the further reason that "[s]ection 1988 only authorizes the imposition of fees against parties to the litigation, *not their attorneys*." *Hamer*, 819 F.2d at 1370 (emphasis added); *accord Roadway*, 447 U.S. at 761. *Yet, the City Defendants failed to inform the Court of a clear legal standard contrary to their position on this point as well.*

in the Seventh Circuit. *See*, *e.g.*, *Tucker*, 682 F.3d at 662 ("The district court's and Tucker's frustration may be understandable but by upholding this sanction—without a finding of bad faith—we would be imposing a level of foresight and efficiency that is simply unattainable in litigation. Efficiency, unfortunately, has never been an earmark of litigation. Lawyering must be in good faith; it need not be omniscient."), *reh. and reh. en banc denied* (Jul. 17, 2012).

Governor Evers concedes, as he must, that under either 28 U.S.C. § 1927 or the court's inherent authority there must be "a finding of bad faith." Evers' Brief at 20. His brief even describes various types of conduct that has in other cases been found to meet the bad faith standard. *See supra* at 8, n. 12. Yet, he neglects to offer any coherent argument based on an analysis of past precedent that any specific conduct of, or positions taken by, Plaintiff's legal counsel were in bad faith. For these reasons as well, the Motions must be denied.

### D. Each of the Claims Made by Governor Evers and His Co-Defendants Is Meritless

#### 1. *State law claims*

##### a. Governor Evers' contention

*"Trump and his attorneys engaged in unreasonable and vexatious conduct by bringing and conducting this meritless, dilatory lawsuit despite knowing that state law, interpreted by state courts, governs the election process[.]"[36]*

##### b. President Trump's Response

Governor Evers' foundational contention that state law, interpreted by state courts, is controlling is inaccurate. As the Seventh Circuit held, "the President has alleged an

---

[36] Evers' Brief at 9.

injury traceable to the actions of the defendants and capable of being redressed by a favorable judicial ruling." *Trump*, 983 F.3d at 924. The Seventh Circuit "conclude[d] that the President's complaint presents a federal question, despite its anchoring in alleged violations of state law." *Id*. at 925. Thus, state courts were indisputably *not* the exclusive forum for the President's complaint. Rather, the Seventh Circuit ruled that federal courts "can decide whether [state officials'] interpretation of state law violated a provision of the federal Constitution, here the Electors Clause." *Id*. Thus, the Electors Clause can be enforced in federal court to ensure that the requirement of state legislative control of the selection of presidential electors takes place.

The applicability of the Electors Clause to this case, and the President's statutory construction arguments,[37] are precisely the points on which the District Court said "plaintiff's disputes are not frivolous," *Trump*, 506 F.Supp.3d at 629. Also, the scope of the Electors Clause and the relief available under it is precisely the point that Justices Alito, Gorsuch and Thomas said needed to be reviewed by the Supreme Court post-election. Thus, that the Electors Clause sets a standard that can be enforced in federal court is well-grounded in the Electors Clause, the prior precedents of the U.S. Supreme Court, *see*, *e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892); *Bush v. Gore*, 531 U.S. 98, 113, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (Rehnquist, C.J., concurring), and in the Eighth Circuit's decision in *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), all of which provide a sound legal basis for this lawsuit, which Governor Evers' brief simply ignores and does not even attempt to confront.

### 2. *Delay or Laches*

---

[37] *Trump*, 506 F.Supp.3d at 628.

### a. Governor Evers' contention

*"Trump Engaged in an Extensive—and Unjustifiable—Delay in Filing the Claims Adjudicated Here."*[38]

### b. President Trump's Response

The Seventh Circuit did not agree President Trump's lawsuit was timely. However, the former President's position that under this Circuit's application of *Purcell v. Gonzalez*, 549 U.S. 1 (2006), he was foreclosed from bringing a lawsuit from September 17, 2020, the day absentee balloting began in Wisconsin, through election day was certainly reasonable. *See, e.g., Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 641 (7th Cir. 2020) (district court's September 21, 2020, order stayed on October 8, 2020); *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020) ("Given that voting is already underway in Indiana, we have crossed *Purcell*'s warning threshold and are wary of turning the State in a new direction at this late stage."). Dual application of what might be termed "*Purcell* abstention" (abstaining from considering suits after absentee balloting starts) and the doctrine of laches (to bar suits post-election) creates a lacuna, which insulates a substantial amount of election conduct (in this case more than a 6-week period) from judicial review. President Trump challenged numerous practices that occurred within the *Purcell* window, *i.e.*, after September 16, (*e.g.*, changes to WEC guidance on handling absentee ballots, issued on September 18 and October 19; installation of hundreds of illegal drop boxes; the collection of over 17,000 ballots through illegal "human drop boxes," in late September and early October, and misconduct in handling ballots on election day). It was therefore reasonable for President Trump's counsel to contend that the equitable and discretionary doctrine of

---

[38] Evers' Brief at 9.

laches should not be applied to claims arising on or after September 17. Further, laches rarely is applied without assessing the practicality of bringing an earlier suit. It was not unreasonable for President Trump to conclude, as did three Justices of the Wisconsin Supreme Court, that laches should not bar claims of a presidential candidate who could not possibly monitor all changes taking place in Wisconsin's 1,850 election jurisdictions and throughout the entire U.S. and bring suit before the election.[39]

In any case, a dismissal based on untimeliness does not automatically mean the lawsuit was brought in bad faith. *See Suslick*, 741 F.2d at 1002. In *Waller v. Int'l Harvester Co.*, 574 F. Supp. 166 (N.D. Ill. 1983), a district court denied a motion for attorney fees filed under § 1927 against a plaintiff who had failed to file his complaint within the limitations period and not exhausted available administrative remedies. Even though plaintiff's case was dismissed, the district court concluded his claims were not "frivolous" and therefore his attorney had not "multiplied" the proceedings. *Id*. at 170 n. 4.

A case involving an election lawsuit dismissed due to laches is *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176 (9th Cir. 1988), where, after a special election was conducted, a citizens group filed an election challenge in the Hawaii Supreme Court. *Id*. at 1178. After the state supreme court dismissed the case, the citizens filed a complaint in federal district court under § 1983, arguing that the conduct of the election violated equal protection and due process, and seeking an order invalidating the election results. *Id*. at 1179. The judge granted summary judgment in favor of defendants, in part based on laches, and awarded defendants sanctions under 28 U.S.C. § 1927 and the court's inherent authority. *Id*.

---

[39] *Trump*, 951 N.W. at 597 ¶133 (Ziegler, J. dissenting (joined by Roggensack, C.J., and Bradley, J.)).

44

On appeal, the 9th Circuit affirmed the judge's rulings on the merits but reversed the sanctions award because the judge failed to find that the attorney's conduct was in "bad faith." *Id.* at 1186. Instead, the judge simply concluded that "it might agree that plaintiffs have not been shown to have acted in subjective bad faith." *Id.* The Ninth Circuit held it would not "treat this conditional observation as a finding of bad faith." *Id.*

In numerous other cases courts have declined to award attorneys' fees because a claim was dismissed based on laches. For instance, in *S. Grounds & Mortars, Inc. v. 3M Co.*, No. 07-61388-CIV, 2009 WL 10669036, at *3 (S.D. Fla. Mar. 20, 2009), *report and recommendation adopted,* No. 07-61388-CIV, 2009 WL 10668162 (S.D. Fla. June 4, 2009), a district judge granted summary judgment because laches barred plaintiff's claims. However, the court declined to award attorneys' fees under Rule 11 or § 1927 because "the record demonstrates that [the plaintiff's] counsel was familiar with the facts of this case and undertook a sufficient legal investigation in order to provide plausible causes of action at the time the lawsuit was filed." *Id.* at *6. The district court noted that the "absence of controlling Eleventh Circuit authority on several key issues in this case provided SGM with an opportunity to advance" novel legal theories regarding intellectual property law. *Id.*

In *McHugh v. Hillerich & Bradsby Co.*, No. C-07-03677 JSW (JCS), 2010 WL 11639808, at *7 (N.D. Cal. Sept. 2, 2010), *report and recommendation adopted,* No. C 07-03677 JSW, 2010 WL 11639815 (N.D. Cal. Nov. 8, 2010), the court declined to award attorney fees under § 1927 after dismissing a plaintiff's complaint. One argument made in support of the motion for fees was that plaintiff had pursued his claims in the face of a "strong laches defense." *Id.* at *17. However, the court did not "find the evidence

supporting the laches defense to be sufficient to show bad faith." *Id*. In addition, the court found that arguments advanced in opposition to laches were not "obviously frivolous or baseless." *Id*. Similarly, in *Avocet Sports Tech. Inc. v. Polar Electro Inc.*, No. C-12-02234 EDL, 2013 WL 4067823, at *4 (N.D. Cal. Aug. 1, 2013), a district court denied a motion for fees holding that, although the case was dismissed based on laches, the plaintiff had not acted in bad faith as there was no clear and convincing evidence that he "subjectively knew that his case was baseless."

Likewise, attorneys' fees are not awardable in this case based on the timing of President Trump's lawsuit.

### 3. Alleged Preclusive Effect of State Court Rulings

#### a. Governor Evers' contentions

*"The Court can infer from the undisputed facts that this decision was made for the improper purpose of attempting an end run around the Wisconsin Supreme Court's December 3, 2020 holding that an action originating in the state circuit court under Wis. Stat. § 9.01 was the "exclusive judicial remedy" applicable to Trump's election challenge."[40]*

*"At minimum, he should have voluntarily dismissed this suit once the Wisconsin Supreme Court held that a state-court challenge to the recount process was the exclusive means to contest election results. The decision to continue this action after the Wisconsin Supreme Court's "exclusive remedy" ruling was objectively unreasonable."[41]*

#### b. President Trump's Response

In fact, there was no December 3, 2020, "holding" of the Wisconsin Supreme Court such as Governor Evers claims, and there could have been no "end run" around a ruling which never occurred. Rather, the December 3 order was merely a 3-paragraph

---

[40] Evers' Brief at 10.
[41] *Id*. at 11.

46

interlocutory order denying a petition for leave to commence an original action and denying a pending motion to intervene as moot.[42] Governor Evers' effort to elevate a short interlocutory order to a "holding" to be given preclusive effect is a case study in how not to construe a court order, ignoring basic fundamentals regarding the proper construction of judicial rulings.

The only reference to Wis. Stat. § 9.01 in the December 3 interlocutory order is an observation in the concurring opinion of Justice Hagedorn about what the parties "seem to agree."[43] As such, Justice Hagedorn's observation does not even rise to the level of *dicta*. Characterizing an observation in a concurring opinion as a "holding" of the Wisconsin Supreme Court is improper as any first-year law student should understand.

Furthermore, Justice Hagedorn's observation that "[a]ll parties seem to agree that Wis. Stat. § 9.01 . . . constitutes the 'exclusive judicial remedy' applicable to this claim"[44] is plainly limited by the context of the "claim" then being handled by the court which was an appeal of the findings of a board of recount commissioners. In context, Justice Hagedorn is not attempting to opine on whether recount proceedings preclude all other remedies related to the conduct of the election – that was not the issue before the Wisconsin Supreme Court. Rather, Justice Hagedorn was merely explaining why he joined the court's decision that an appeal of the board of recount commissioners should be initiated in the circuit court and not through an original action in the Wisconsin Supreme Court. The short interlocutory order on December 3 was not an "'exclusive remedy' ruling" of the

---

[42] *See* Dkt. No. 73-2 at 1–2 (Dec. 3 order). Although Governor Evers did not provide the full text of the order to the court in connections with the Motions, it was previously filed in the case.
[43] *Id.* at 2 (Hagedorn, J., concurring).
[44] *Id.*

Wisconsin Supreme Court as Governor Evers misconstrues it. Governor Evers' blatant disregard of basic rules of construction demonstrates his sanctions motion is not grounded in good faith legal analysis and calls into question his motives for filing the motion.

Finally, as this court stated at the December 10 hearing: "the federal jurisdiction issues here are extremely interesting and challenging and unique." Dkt. 130, Tr. 133, lines 11–14. And, as explained above, Governor Evers is simply wrong on his claim that the exclusive forum for Plaintiff's Electors Clause claim was in state court. Both this court and the Seventh Circuit rejected Governor Evers' jurisdictional challenges and found that the federal courts had jurisdiction over former President Trump's Electors Clause claims.[45]

### 4. *Center for Technology and Civic Life (CTCL) Grants*

#### a. **Governor Evers' contentions**

*"Trump Ignored the Fact that Courts Across the Country Had Already Upheld the Validity of the CTCL Grants Trump Challenged."[46]*

#### b. **President Trump's Response**

Governor Evers' claim that "Trump had no . . . legal basis to challenge these [CTCL] grants when he filed his complaint here"[47] is yet another red herring, illustrating again the insufficient factual and legal basis of Governor Evers' motion. Tellingly, in this section of his brief, Governor Evers fails to cite to any aspect of President Trump's prior pleadings when leveling the false charge that President Trump challenged the *validity* of CTCL grants made in Wisconsin. In fact, President Trump neither asked for such funds to be returned nor claimed election results were invalid based on the CTCL grants. Rather,

---

[45] Additionally, Governor Evers raised a *res judicata* argument before the 7th Circuit and it was not a basis upon which the 7th Circuit ruled in his favor.
[46] Evers' Brief at 11.
[47] *Id*. at 12; *see also Id*. at 11 (alleging Trump was "challenging the validity of the [CTCL] grants").

President Trump challenged the legality of election law changes themselves, *e.g.*, the adoption of drop boxes the statewide proliferation of which was made possible by a large influx of CTCL grants.

The President's complaint describes CTCL funding to demonstrate that behind-the-scenes plans for drop boxes were made in Democrat controlled cities long before any public endorsement of drop boxes was given by the WEC and to demonstrate that the plan of the mayors of Milwaukee, Madison, Green Bay, Racine, and Kenosha for drop boxes was a privately funded partisan effort. However, it mischaracterizes President Trump's complaint to contend this lawsuit challenged the *validity* of CTCL funding.[48] Clearly, neither this court nor the Seventh Circuit understood the validity of the grants to have been challenged, as neither opinion even mentions the CTCL, let alone the grants.

### 5. *Sufficiency of Complaint*

#### a. **Governor Evers' contentions**

*"Trump's Complaint Was Facially Deficient and Failed to Properly Allege Any Claims."*[49]

#### b. **President Trump's Response**

Governor Evers' contention that President Trump "never identified any cause of action that could plausibly support the requested relief"[50] is refuted by the decisions of this court and the Seventh Circuit as discussed above.

### 6. *Adherence to Procedural Rules*

#### a. **Governor Evers' contentions**

---

[48] The City Defendants engaged in the same mischaracterization. *See* Dkt. 153 at 9, 12–13.
[49] Evers' Brief at 12.
[50] Evers' Brief at 13.

*"Trump's Attorneys Failed to Adhere to Fundamental Procedural Rules in Initiating this Case."[51]*

### b. President Trump's Response

Governor Evers makes two claims: (1) that Plaintiff failed to provide the court notice of an allegedly related case; and (2) that Plaintiff did not comply with Fed. R. Civ. Pro. 4 requiring service of process on every defendant. Regarding the first contention, no notice had to be filed. Plaintiff's counsel was not aware of the *Feehan* case in which President Trump was *not a party* and which was *filed by different counsel* only the day before this case. Nor was *Feehan* a related case. Civil L.R. 3(b) provides related cases are those involving substantially the same transactions and events and parties. The two cases had different plaintiffs, many defendants did not overlap, and they involved vastly different claims about what happened in the election. In any event, Governor Evers brought the *Feehan* case to the attention of both this court and Chief Judge Pepper who declined to consolidate it with this case.[52] On the second issue, Governor Evers fails to identify which defendant was allegedly not served. Moreover, the court's record discloses that every defendant was served.[53]

### 7. *Abandoned Arguments*

### a. Governor Evers' contentions

*"Trump and His Attorneys Raised and Abandoned Arguments Haphazardly."[54]*

### b. President Trump's Response

---

[51] *Id*.

[52] *See Feehan v. WEC*, Case No. 20-cv-1771-pp, Dkt. 19 in *Feehan* (Order of Judge Pepper denying motion to reassign case); *see also* Dkt. 8 (Civil L.R. 3(b) Notice of Related Case and Request for [Re-]Assignment).

[53] *See* Dkt. 124 (12/10/2020) ("Summons Returned Executed by Donald J Trump. All Defendants."); Dkt. 125 & 126.

[54] Evers' Brief at 13.

Governor Evers contends Plaintiff and his lawyers never "made any effort to marshal evidence that would demonstrate Trump should prevail."[55] This is untrue. First, as this court noted in its first pretrial conference, the facts upon which Plaintiff's complaint was based were largely public actions which were part of the public record and undisputed. Thus, from the first pretrial both the court and the Defendants were aware of the anticipated evidentiary basis of Plaintiff's claims. In fact, there was ultimately no dispute regarding the facts underlying Plaintiff's claims. Plaintiff marshaled the facts he relied upon in the most efficient means possible by proposing and working through a stipulation agreed to by Defendants' counsel that eliminated the need to call witnesses or introduce documents at the final hearing.

Governor Evers complains that the complaint refers to the First and Fourteenth Amendments, that Plaintiff's counsel affirmed in a pre-hearing conference that Plaintiff would not be pursuing a First Amendment claim at the hearing, and that the court dismissed Plaintiff's Fourteenth Amendment equal protection claim. However, these circumstances do not raise an inference of bad faith.

Regarding reference to the First Amendment, numerous cases have noted that the First Amendment prohibits the enforcement of ambiguous or onerous criteria that would deprive a candidate of her First Amendment right to run for public office. *See, e.g.*, *Arizona Free Enterprise Club's Freedom Club Pac v. Bennett*, 564 U.S. 721, 735–40 (2011). Therefore, in Plaintiff's view, the First Amendment is implicated by a requirement that a candidate engage in pre-election litigation to preserve every possible post-election remedy. However, this was a "defensive" (in response to laches), rather than an "offensive" position

---

[55] *Id.*

and the First Amendment therefore did not need to be cited in the complaint and Plaintiff's counsel should not have recited that his action arose in part under the First Amendment. Therefore, at the pretrial conference, when asked, counsel provided verbal notice to the court and parties that a First Amendment *claim* was not a *cause of action* Plaintiff was pursuing. This notice confirms that citing the First Amendment in the complaint, though an error, was not in bad faith. *See, e.g.*, *Mach*, 580 F.3d at 501–02 ("abandoning . . . claims generally indicates the absence of bad faith [it] benefits the parties, the court, and, ultimately, the efficient administration of justice").

As to the equal protection claim, had the parties not achieved a stipulation of facts after the commencement of the hearing Plaintiff's counsel would have explored in more detail with the subpoenaed witnesses, including Claire Woodall-Vogg, Maribeth Witzel-Behal and Meagan Wolfe, the inconsistent treatment and handling of ballots and the lack of clear and uniform standards regarding ballot drop boxes. However, given the District Court's clear preference for a stipulated record, there was not the same opportunity to develop evidence in support of this theory at the hearing. Thus, the Defendants may have achieved a strategic advantage in their defense of this claim by avoiding examination of their witnesses through the stipulation which also reduced the length of the hearing. This last-minute development, precipitated by Plaintiff's good faith effort to shorten the evidentiary process at the hearing, cannot legitimately be relied upon as a basis for implying bad faith. Furthermore, Plaintiff respectfully disagrees that no evidence was presented to the court supporting an equal protection claim. Plaintiff submits there was substantial evidence that ballots were handled inconsistently with the uniform standards

set forth in the Election Code and that ballot drop boxes were implemented without any uniform, reliable security standards to protect the integrity of ballots.

### 8. *Remedy Sought*

#### a. Governor Evers' contentions

*"Trump Requested Three Types of Unprecedented Relief Without Any Legal Basis."[56]*

#### b. President Trump's Response

The viability of President Trump's claim for relief was confirmed by the Seventh Circuit.

### 9. *Response to Arguments*

#### a. Governor Evers' contentions

*"Trump's Attorneys Failed to Respond to Governor Evers' Substantive Arguments."[57]*

#### b. President Trump's Response

Governor Evers alleges that Plaintiff failed to respond to three specific arguments raised by Governor Evers. First, Governor Evers alleges that the former President did not respond to the Governor's claim that President Trump "failed to state a claim in compliance with Fed. R. Civ. P. 8(a)(2)." Evers' Brief at 16. This is inaccurate. Plaintiff's reply brief certainly provided an explanation of the Electors Clause claim articulated in Plaintiff's complaint.[58] Further, Governor Evers is flatly wrong on the merits of his contention that President Trump failed to state a claim as both this court and the Seventh

---

[56] Evers' Brief at 14.
[57] Evers' Brief at 15.
[58] Dkt. 109.

53

Circuit have found that the complaint did state a justiciable claim and sought relief which could have been granted.[59] Therefore, invocation of Fed. R. Civ. P. 8(a)(2) is without merit.

Second, Governor Evers alleges that President Trump did not respond to his argument that "[t]he exclusive remedy of Wis. Stat. § 9.01(11) barred Trump's claims." Evers' Brief at 16. This contention should be rejected for three reasons: (1) it is factually inaccurate, (2) it is legally erroneous, and (3) it is insufficient to raise an inference of bad faith. The argument that Wisconsin election law provides the "exclusive remedy," allegedly precluding former President Trump's Electors Clause claim was directly addressed in Plaintiff's counsel's oral presentation at the hearing. Dkt. 130, Tr. 79, lines 7 – 80, line 9; Tr. 131, lines 2–15. Additionally, Plaintiff addressed the contention through briefing in the District Court on abstention issues and in the Seventh Circuit on abstention and *res judicata* issues. Governor Evers had a full and fair opportunity to argue his position that state law provided the exclusive remedy to President Trump and took advantage of it. Dkt. 130, Tr. 99, line 12 – 13, line 8; Tr. 123, lines 17–23; Tr. 124, lines 20–22; Tr. 125, line 20 – 126, line 21. However, he did not prevail on the issue before this court or the Seventh Circuit.

[59] The Governor's Motion to Dismiss Brief contended the complaint "contains . . . nothing that could be read as setting forth a count or cause of action under any body of law." Dkt. 95 at 5. The Governor argued, "the notion that the Plaintiff could obtain the relief he seeks . . . [is] contrary to the rule of law." *Id*. To the contrary, the Seventh Circuit said, "[a] favorable ruling would provide the opportunity for the appointment of a new slate of electors." *Trump*, 983 F.3d at 924–25. The Governor asserted that President Trump's claims could only be "brought in state, not federal court" and his relief could not be granted "render[ing] the instant case non-justiciable." Dkt. 95 at 5. The Seventh Circuit said, "[w]e also conclude that the President's complaint presents a federal question . . . we can decide whether [Wisconsin official's] interpretation of state law violated a provision of the federal Constitution, here the Electors Clause." *Trump*, 983 F.3d at 925. In the Governor's Reply in support of his motion to dismiss he protested that the complaint "contravenes . . . basic fundamentals of federalism." Dkt. 120 at 3. The Seventh Circuit, however, said, "we can decide whether [state officials'] interpretation of state law violated a provision of the federal Constitution, here the Electors Clause. This distinction alleviates any federalism concerns that might otherwise preclude our consideration of the President's claims." *Trump*, 983 F.3d at 925.

Third, Governor Evers contends President Trump did not respond to his assertion "Trump requested this Court issue an unconstitutional advisory opinion." Evers' Brief at 16. However, this is merely a restatement of Governor Evers' erroneous contention that President Trump did not adequately state a claim for relief which was flatly rejected by the Seventh Circuit as discussed above.

### 10. Presenting Evidence

#### a. Governor Evers' contentions

"Trump Never Made Any Effort to Present Evidence that Supported His Case."[60]

#### b. President Trump's Response

Governor Evers alleges that purportedly "[t]his case was doomed from the start" because "Trump's allegations pertained only to the administration of the general election, which could not form the basis for an Article II claim" and "[t]he 'manner' of the election was never in question." Evers' Brief at 16. This is Monday morning quarterbacking of the worst sort, however, as Governor Evers never made the "administration" versus "manner" distinction in his own briefs.[61] Moreover, as the filings in the U.S. Supreme Court by at least 18 Attorney Generals and the dissenting opinions of three U.S. Supreme Court Justices indicate, it is reasonable for President Trump to disagree.

### 11. Treatment of Precedent

#### a. Governor Evers' contentions

"Trump's Attorneys Pressed Ahead with Their Appeal, Ignoring both Relevant Factual Precedent and Dispositive Precedent."[62]

#### b. President Trump's Response

---

[60] Evers' Brief at 16.
[61] *See* Dkt. 94, 95, 120.
[62] Evers' Brief at 16.

Again, Governor Evers recycles an argument he presented to the Seventh Circuit but did not prevail on. He argued to the Seventh Circuit that the December 14, 2020, decision of the Wisconsin Supreme Court in *Trump v. Biden*, 951 N.W.2d 568 (Wis. 2020), was *res judicata* as to President Trump's federal claims, but the Seventh Circuit did not reach the issue as a ground of the panel's decision.

## IV.   CONCLUSION

Governor Evers' motion for sanctions is deeply flawed. Repeatedly, the Governor simply made things up—for instance, his false claims that President Trump failed to abide by a legal ruling which does not exist[63] and that President Trump raised legal challenges he did not.[64] Just as egregiously, Governor Evers entirely failed to address how the reasoning and analysis of this court that President Trump's claims were "not frivolous" and of the Seventh Circuit that the claims were justiciable apply to his motion.

Perhaps Governor Evers believes he scored political points by making unsupported claims which predictably received significant media attention. It does not take a public relations genius to understand this response will receive far less attention and therefore cannot repair the damage inflicted by the Governor's initial false assertions.

The same hit and run tactics frequently used in political debate should not find a home in sanctions motions filed after an election case. A point-by-point rebuttal of Governor Evers' claims demonstrates there is no basis for sanctions. Governor Evers' motion should never have been filed. It should be promptly and firmly rejected.

---

[63] *See* discussion above at pp. 49-51 (re. Dec. 3, 2020, interlocutory order of Wisconsin Supreme Court).
[64] *See* discussion above at pp. 51-52 (re. CTCL grants).

56

Respectfully Submitted,


KROGER, GARDIS & REGAS, LLP


/s/ William Bock, III
William Bock III, Indiana Attorney No. 14777-49
James A. Knauer, Indiana Attorney No. 5436-49
Kevin D. Koons, Indiana Attorney No. 27915-49

ATTORNEYS FOR PLAINTIFF DONALD J. TRUMP

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000


## CERTIFICATE OF SERVICE

A copy of the foregoing document was served upon all parties' counsel of record via this Court's CM/ECF service on this 12th day of July, 2021.


/s/ William Bock, III


57